## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

-------------------------------------------------------

IN RE:  URETHANE                 MDL 1616
ANTITRUST LITIGATION     Civil No. 04-md-01616-JWL

This document relates to:

POLYESTER POLYOLS

-------------------------------------------------------

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Steven A. Kanner
William H. London
Douglas A. Millen
Michael E. Moskovitz
MUCH SHELIST FREED DENENBERG
  AMENT & RUBENSTEIN, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL  60606-1615
Tel:   (312) 521-2000
Fax:   (312) 521-2100

W. Joseph Bruckner
Heidi M. Silton
Darla Jo Boggs
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
Tel:   (612) 339-6900
Fax:   (612) 339-0981

Susan G. Kupfer
Sylvie K. Kern
Kevin F. Ruf
GLANCY BINKOW & GOLDBERG, L.L.P.
445 Market Street
Suite 1810
San Francisco, CA  94105
Tel:   (415) 972-8160
Fax:   (415) 972-8166

Roy M. Bell
Jason S. Hartley
ROSS DIXON & BELL, L.L.P.
550 West B Street
Suite 400
San Diego, CA  92101-3599
Tel:   (619) 235-4040
Fax:   (619) 231-8796

## PLAINTIFFS' CO-LEAD COUNSEL

Norman E. Siegel
George A. Hanson
STUEVE SIEGEL HANSON WOODY LLP
330 W. 47th Street, Suite 250
Kansas City, MO  64112
Tel:   (816) 714-7100
Fax:   (816) 714-7101

## PLAINTIFFS' LIAISON COUNSEL

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

I. INTRODUCTION ......................................................................................................... 1

II. FACTUAL BACKGROUND ........................................................................................ 4

III. ARGUMENT ................................................................................................................ 5

    A.  Horizontal Price-Fixing Cases Are Routinely Certified As Class Actions................ 5

    B.  Standard for Class Certification .............................................................................. 7

        (1)  The Requirements of Rule 23(a) Are Satisfied ............................................. 8

            a)  Fed. R. Civ. P. 23(a)(1):  The Class Is So Numerous
               That Joinder of All Members is Impracticable .................................... 8

            b)  Fed. R. Civ. P. 23(a)(2):  There Are Questions of Law
               and Fact Common To All Class Members......................................... 9

            c)  Fed. R. Civ. P. 23(a)(3):  The Claims of the Representative
               Parties Are Typical of the Claims of the Class .................................. 10

            d)  Fed. R. Civ. P. 23(a)(4):  The Representative Plaintiffs
               Will Fairly and Adequately Protect the Interests of the
               Plaintiff Class................................................................................... 13

        (2)  The Class Satisfies The Requirements of Rule 23(b)(3) ............................. 14

            a)  Questions of Law and Fact Common to the Class
               Predominate Over Any Questions Affecting Individual
               Class Members ................................................................................ 14

               i)  The Existence and Scope of the Conspiracy ........................... 15

               ii)  Common Impact ................................................................... 17

                iii)  Computation of Damages .................................................... 19

                iv)  Fraudulent Concealment ...................................................... 21

b) A Class Action Is Superior to Other Available
Methods for the Fair and Efficient Adjudication
of the Controversy ......................................................................... 22

(3) The Class Satisfies the Requirement of Rule 23(b)(2).................................23

C. The Court Should Appoint Co-Lead Counsel To Be
Class Counsel Pursuant to Rule 23(g) ....................................................................24

IV. CONCLUSION..............................................................................................................27

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Adamson v. Bowen,*
    855 F.2d 668 (10th Cir. 1988) ................................................................... 7, 11

*Albertson's Inc. v. Amalgamated Sugar Co.,*
    62 F.R.D. 43 (D. Utah 1973), *rev'd in part on other grounds,*
    503 F.2d 459 (10th Cir. 1979) ...................................................................... 8

*Albertson's Inc. v. Amalgamated Sugar Co.,*
    503 F.2d 459 (10th Cir. 1979) ................................................................... 13

*In re Alcoholic Beverages Litig.,*
    95 F.R.D. 321 (E.D.N.Y 1982) ............................................................. 10, 12

*In re Aluminum Phosphide Antitrust Litig.,*
    160 F.R.D. 609 (D. Kan. 1995)................................................................... 19

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) .................................................................................... 14

*In re Auction Houses Antitrust Litig.,*
    193 F.R.D. 162 (S.D.N.Y. 2000) .......................................................... 12, 18

*In re Automotive Refinishing Paint Antitrust Litig.,*
    MDL Docket No. 1426, slip op. (E.D. Pa. Oct. 9, 2002) .................................. 5

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) ................................................................... 4, 7

*Bogosian v. Gulf Oil Corp.,*
    561 F.2d 434 (3d Cir. 1977) ...................................................................... 20

*In re Carbon Black Antitrust Litig.,*
    No. 03-10191-DPW, 2005 WL 102966 (D. Mass. Jan. 18, 2005)..................... 5

*In re Carbon Dioxide Antitrust Litig.,*
    149 F.R.D. 229 (M.D. Fla. 1993)............................................................... 10

*In re Catfish Antitrust Litig.,*
    826 F. Supp. 1019 (N.D. Miss. 1993) ............................................. 18, 20, 21

*In re Citric Acid Antitrust Litig.,*
    1996 U.S. Dist. LEXIS 16409 (N.D. Cal. Oct. 2, 1996) .................................. 6

*Coleman v. Cannon Oil Co.,*
    141 F.R.D. 516 (M.D. Ala. 1992) .................................................................................5

*In re Commercial Tissue Products Antitrust Litig.,*
    183 F.R.D. 589 (N.D. Fla. 1998) .................................................................................5

*In re Commercial Explosives Antitrust Litig.,*
    No. 2:96MD 1093S, slip op. (D. Utah Apr. 22, 1997) ...................................................5

*In re Corrugated Container Antitrust Litig.,*
    80 F.R.D. 244 (S.D. Tex. 1978) ..................................................................................3

*Cumberland Farms, Inc. v. Browning-Ferris Industrial, Inc.,*
    120 F.R.D. 642 (E.D. Pa. 1988).......................................................................... 10, 12

*Dietrich v. Bauer,*
    192 F.R.D. 119 (S.D.N.Y. 2000) ............................................................................. 14

*In re Disposable Contact Lens Antitrust Litig.,*
    170 F.R.D. 524 (M.D. Fla. 1996).............................................................................. 10

*In re Domestic Air Transportation Antitrust Litig.,*
    137 F.R.D. 677 (N.D. Ga. 1991).............................................................................. 12

*Dura-Bilt Corp. v. Chase Manhattan Corp.,*
    89 F.R.D. 87 (S.D.N.Y. 1981) ................................................................................. 12

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974) ..................................................................................................7

*Emig v. American Tobacco Co.,*
    184 F.R.D. 379 (D. Kan. 1998).............................................................................. 4, 7

*Esplin v. Hirschi,*
    402 F.2d 94 (10th Cir. 1968) ............................................................................... 7, 24

*Fears v. Wilhelmina Model Agency, Inc.,*
    2003 WL 21659373 (S.D.N.Y. July 15, 2003) ........................................................... 12

*In re Fine Paper Antitrust Litig.,*
    82 F.R.D. 143 (E.D. Pa. 1979)........................................................................... 16, 21

*In re Flat Glass Antitrust Litig.,*
    191 F.R.D. 472 (W.D. Pa. 1999)................................................................5, 8, 10, 11, 12,
                                   14, 16, 18, 21

*Gold Strike Stamp Co., v. Christensen,*
　436 F.2d 791 (10th Cir. 1970) ...................................................................... 19

*Hawaii v. Standard Oil Co.,*
　405 U.S. 251 (1972) ............................................................................... 5, 6

*Heartland Communications, Inc. v. Sprint Corp.,*
　161 F.R.D. 111 (D. Kan. 1995)............................................................... 8, 11

*In re Industrial Diamonds Antitrust Litig.,*
　167 F.R.D. 374 (S.D.N.Y. 1996) ............................................................. 3, 8

*J.B. ex rel. Hart v. Valdez,*
　186 F.3d 1280 (10th Cir. 1999)........................................................ 9, 10, 11

*J. Truett Payne Co. v. Chrysler Motors Corp.,*
　451 U.S. 557 (1981) ........................................................................... 19, 20

*Jerry Enterprises of Gloucester, Inc. v. Allied Beverage Group, LLC,*
　178 F.R.D. 437 (D.N.J. 1998)...................................................................... 16

*Law v. National Collegiate Athletic Ass'n,*
　5 F. Supp. 2d 921 (D. Kan. 1998) ........................................................ 18, 20

*Law v. National Collegiate Athletic Ass'n,*
　167 F.R.D. 178 (D. Kan. 1996)......................................................... 5, 8, 10

*Lawlor v. National Screen Serv. Corp.,*
　349 U.S. 322 (1955) ..................................................................................... 6

*In re Linerboard Antitrust Litig.,*
　203 F.R.D. 197 (E.D. Pa. 2001)........................................................... 15, 17

*In re Linerboard Antitrust Litig.,*
　305 F.3d 145 (3d Cir. 2002), *cert. denied sub nom.*
　*Gaylord Container Corp. v. Garret Paper, Inc.,*
　538 U.S. 997 (2003) ..........................................................5, 18, 21, 22

*In re Lorazepam & Clorazepate Antitrust Litig.,*
　202 F.R.D. 12 (D.D.C. 2001), *review denied,*
　289 F.3d 98 (D.C. Cir. 2002)............................................................... 5, 11

*Lumco Indus., Inc. v. Jeld-Wen, Inc.,*
　171 F.R.D. 168 (E.D. Pa. 1997)................................................................... 17

*In re Magnetic Audiotape Antitrust Litig.*,
  2001 WL 619305 (S.D.N.Y. Jan. 6, 2001) ......................................................................... 11

*In re Mercedes-Benz Antitrust Litig.*,
  213 F.R.D. 180 (D.N.J. 2003) .......................................................................................... 11

*In re Microcrystalline Cellulose Antitrust Litig.*,
  218 F.R.D. 79 (E.D. Pa. 2003) ........................................................................................ 18

*In re Monosodium Glutamate Antitrust Litig.*,
  205 F.R.D. 229 (D. Minn. 2001) ................................................................................ 5, 10

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y 1996) ..............................................................5, 11, 13, 14
  15, 16, 20, 21, 23, 24

*Olenhouse v. Commodity Credit Corp.*,
  136 F.R.D. 672 (D. Kan. 1991).......................................................................7, 10, 11, 13

*In re Plastic Cutlery Antitrust Litig.*,
  No. Civ.A. 96-CV-728,
  1998 WL 135703 (E.D. Pa. Mar. 20, 1998) .................................................................... 5

*In re Playmobil Antitrust Litig.*,
  35 F. Supp. 2d 231 (E.D.N.Y. 1998).............................................................5, 8, 9, 10, 12

*In re Polypropylene Carpet Antitrust Litig.*,
  996 F. Supp. 18 (N.D. Ga. 1997) ............................................................................... 5, 17

*In re Polypropylene Carpet Antitrust Litig.*,
  178 F.R.D. 603 (N.D. Ga. 1997) ...................................................................................... 3

*In re Potash Antitrust Litig.*,
  159 F.R.D. 682 (D. Minn. 1995)................................................................................... 7, 15

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ......................................................................................................... 6

*Rex v. Owens ex rel. State of Okl.*,
  585 F.2d 432 (10th Cir. 1978) ......................................................................................... 8

*Robinson v. Gillespie*,
  219 F.R.D. 179 (D. Kan. 2003).......................................................................................... 7

*Rossi v. Standard Roofing, Inc.*,
    156 F.3d 452 (3d Cir. 1998) ........................................................... 17

*In re Rubber Chemicals Antitrust Litig.*,
    ___ F.R.D. __,
    2005 WL 2649292 (N. D. Cal. Oct. 6, 2005) ..................................... 6, 7, 8, 10, 11, 15, 20

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
    314 F.3d 1180, 1187-88 (10th Cir. 2002)....................................... 13

*Sprague v. General Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998) ........................................................ 11

*State of Ala. v. Blue Bird Body Co.*,
    573 F.2d 309 (5th Cir. 1978) ........................................................ 17

*Stewart v. Abraham*,
    275 F.3d 220 (3d Cir. 2001) ........................................................... 8

*In re Sugar Indus. Antitrust Litig.*,
    73 F.R.D. 322 (E.D. Pa. 1976)...................................................... 23

*In re Sumitomo Copper Litig.*,
    182 F.R.D. 85 (S.D.N.Y. 1998) .................................................... 12

*Transamerican Refining Corp. v. Dravo Corp.*,
    130 F.R.D. 70 (S.D. Tex. 1990)....................................................... 3

*In re Universal Service Fund Serv. Fund Tel. Billing Practices Litig.*,
    219 F.R.D. 661 (D. Kan. 2004)............................................. 5, 8, 10, 13, 14, 15,
                                                                                    17, 19, 20, 21, 23, 24

*In re Visa Check/MasterMoney*,
    280 F.3d 124 (2d Cir. 2001), *cert. denied*,
    536 U.S. 917 (2002) ................................................................. 20, 24

*In re Visa Check/Master Money Antitrust Litig.*,
    192 F.R.D. 68 (E.D. N.Y. 2000), *aff'd*,
    280 F.3d 124 (2d Cir. 2001), *cert denied*,
    536 U.S. 915 (2002) .................................................................... 24

*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251 (D.D.C. 2002)......................................................... 5

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ........................................................... 5

*Wetzel v. Liberty Mutual Insurance Co.,*
    508 F.2d 239 (3d Cir. 1975) ................................................................................. 13

*In re Wirebound Boxes Antitrust Litig.,*
    128 F.R.D. 268 (D. Minn. 1989) ...................................................................... 10, 18

*In re Workers' Compensation,*
    130 F.R.D. 99, 110 (D.Minn.1990) ........................................................................ 7

*Woodward v. Online Information Services,*
    191 F.R.D. 502 (E.D.N.C. 2000) ............................................................................ 9

*Zapata v. IBP, Inc.,*
    167 F.R.D. 147 (D. Kan. 1996) ................................................................. 8, 10, 14

**FEDERAL STATUTES**

15 U.S.C. § 1 .................................................................................................................. 1

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 23 ........................................................................................................... 7

Fed. R. Civ. P. 23(a) ..................................................................... 1, 2, 4, 5, 7, 8, 14

Fed. R. Civ. P. 23(a)(1) ........................................................................................... 8, 9

Fed. R. Civ. P. 23(a)(2) ........................................................................................ 9, 10

Fed. R. Civ. P. 23(a)(3) ................................................................... 10, 11, 12, 14

Fed. R. Civ. P. 23(a)(4) ........................................................................................ 13, 14

Fed. R. Civ. P. 23(b) ............................................................................................... 7, 14

Fed. R. Civ. P. 23(b)(2) ............................................................... 1, 2, 4, 5, 23, 24

Fed. R. Civ. P. 23(b)(3) ............................................ 1, 2, 4, 5, 6, 14, 22, 23, 24

Fed. R. Civ. P. 23(g) ................................................................... 4, 24, 25, 27

Fed. R. Civ. P. 23(g)(1)(C) ......................................................................................... 24

Fed. R. Civ. P. 23(g)(1)(C)(i) ..................................................................................... 25

Fed. R. Civ. P. 23(g)(1)(C)(ii) .................................................................................... 25

**OTHER**

4 H. Newberg & A. Conte, *Newberg on Class Actions*
§ 18:05 (3d ed. 1992) ................................................................................................ 10

6 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*
§ 18:9 (4th ed. 2002) ................................................................................................ 12

6 Alba Conte & Herbert Newberg, *Newberg on Class Actions*
§ 18:28 (4th ed. 2002) ................................................................................................ 15

Macy & Miller, *The Plaintiff's Attorney Role in Class Action*
*and Derivative Litigation*, 58 U. Chi. L. Rev. 1 (1991) ............................................. 26

## I.    INTRODUCTION

Plaintiffs bring this straightforward price-fixing class action on behalf of themselves and a class of all entities who directly purchased Urethanes and Urethane Chemicals in the United States from Defendants or their related entities.[1]  Plaintiffs define Urethanes and Urethane Chemicals to mean polyester polyols and related polyurethane systems.  Complaint ¶ 6.[2] Plaintiffs allege that Defendants – Bayer Corporation and Crompton Corporation, and their respective subsidiaries and affiliates - conspired to fix, raise, maintain and/or stabilize prices, and to allocate markets and customers for Urethanes and Urethane Chemicals in the United States in violation of Section One of the Sherman Act, 15 U.S.C. § 1.  *E.g., id.* ¶ 2.

Plaintiffs request that the Court certify the following class under Fed R. Civ. P. 23(a), (b)(2) and (b)(3):

> All persons[3] (excluding governmental entities and excluding Defendants and their present and former parents, predecessors, subsidiaries and affiliates) that purchased Urethanes and Urethane Chemicals in the United States from any of the Defendants, or any present or former parent, subsidiary or affiliate thereof, at any time during the period from January 1, 1998 to the present.

---

[1] The proposed representatives of the Plaintiff Class are Skypark Manufacturing LLC; Maine Industrial Tires Limited; Urethane Products Industries, Inc.; Industrial Rubber Products, LLC; and Kryptane Systems, LLC.  All Plaintiffs assert all claims against all Defendants. Consolidated Class Action Complaint, November 19, 2004 ("Complaint") ¶ ¶ 11-15.  The Defendants are Bayer AG, Bayer Corporation, Bayer MaterialScience, Crompton Corporation, Rhein Chemie Corporation, Rhein Chemie Rheinau GmbH, and Uniroyal Chemical Company, Inc. *Id.* ¶¶ 16-22.

[2] Polyester polyols are macroglycols which when combined with isocyanates produce polyurethane polymers.  Polyols are sold separately or as part of a polyurethane system. Complaint ¶¶ 6-8.

[3] "Persons" include individuals, partnerships, corporations, associations, or any other business or legal entity.  Complaint ¶ 10.

Plaintiffs allege that Defendants' conspiracy forced Plaintiffs and members of the Class to pay artificially inflated, non-competitive prices for Urethanes and Urethane Chemicals they purchased during the Class Period, and that as a result they suffered antitrust injury. *Id.* ¶¶ 62-63. Defendants and their co-conspirators also fraudulently concealed their conspiracy. *Id.* ¶ 60.

As discussed in detail below, this action is ideally suited for class certification, and readily satisfies the requirements of Fed. R. Civ. P. 23(a), (b)(2), and (b)(3). With hundreds or thousands of class members dispersed across the United States, their joinder is impracticable. There are questions common to the proposed Class, as the Complaint alleges a price-fixing conspiracy among Defendants that serves as the basis of all Class members' claims. One common issue alone, *i.e.,* whether Defendants violated the Sherman Act by conspiring to fix the price of Urethanes and Urethane Chemicals, predominates over any individual issues. In fact, there are no individual issues in this case that would warrant diverging from the federal courts' accepted practice of granting class certification in horizontal price-fixing cases. The representative Plaintiffs' claims are typical of the claims of all class members, since Plaintiffs are direct purchasers of Urethanes and Urethane Chemicals from Defendants, and their interests coincide with the other putative class members. Plaintiffs and their counsel will fairly and adequately represent the interest of the Class, as shown by their willingness to serve as class representatives and the qualifications of their counsel. Finally, a class action is superior to all other available methods for the fair and efficient adjudication of this matter.

This case does not pose any issues of market complexity raised by defendants in other price-fixing cases.  As Plaintiffs' expert Dr. Robert Tollison[4] concluded, for the purposes of this motion the market for the Urethanes and Urethane Chemicals is relatively uncomplicated.  For example, the market is highly concentrated with relatively high barriers to entry, both of which facilitate price coordination among manufacturers and sellers.[5]  Tollison Rep. ¶ ¶ 25-31.  Defendants' conspiracy involved a relatively small number of products — polyester polyols and their related polyurethane systems.[6]  These are fungible, commodity products, for which price competition should be the principal means by which producers differentiate their products.  *Id.* ¶ ¶ 32-36.  Thus, this case — involving price-fixing of a limited number of fungible, commodity products by a small number of defendants with substantial market control — presents no reason to deviate from the long line of cases certifying horizontal price-fixing cases as class actions.

---

[4]  Dr. Tollison's report ("Tollison Rep.") is submitted with this Memorandum as Exhibit A.

Dr. Tollison is a widely recognized and highly experienced economist with over thirty years of experience in economic policy research and applied economics.  He has served as an economist on the President's Council of Economic Advisers, and as the Director of the Bureau of Economics at the Federal Trade Commission.  Tollison Rep. ¶ 3.  In addition to having published numerous articles and books dealing with antitrust and industrial organization topics and a broad variety of other economic issues, Dr. Tollison has taught antitrust and industrial organization economics at the undergraduate and graduate levels for over 30 years.  *Id.* ¶ 4.  Dr. Tollison has been qualified as an expert witness in economics in state and federal courts.  *Id.* ¶ 5.  His experience in antitrust litigation includes competitive analyses of commercial practices and estimation of antitrust damages in several industries, including professional and intercollegiate sports, petroleum marketing, health care, commercial explosives, prescription drugs, commercial tissue, pulpwood timber, carbon fiber, and carbonated beverages.  *Id.* ¶ 5.

[5]*Compare Transamerican Ref. Corp. v. Dravo Corp.,* 130 F.R.D. 70, 72 (S.D. Tex. 1990); and *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 245 (S.D. Tex. 1978), in which classes were certified notwithstanding scores of manufacturers in the market.

[6]*Compare In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 620 (N.D. Ga. 1997) (over 500 different products); and *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996) ("thousands of industrial diamond products"), in which classes were certified notwithstanding hundreds or thousands of products at issue.

Accordingly, this Court should certify the proposed class pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3). The Court also should appoint Co-Lead Counsel as Class Counsel pursuant to Rule 23(g), consistent with the Court's Practice and Procedure Order No. 2.

## II. FACTUAL BACKGROUND[7]

Plaintiffs allege that Defendants conspired to fix, raise, maintain and/or stabilize prices of Urethanes and Urethane Chemicals, and to allocate markets and customers to maintain a non-competitive market. Complaint ¶¶ 54-55. This conspiracy caused the prices of Urethanes and Urethane Chemicals to be fixed, raised, maintained, and/or stabilized. *Id.* ¶¶ 62-63.[8]

Two principal Defendants – Bayer Corporation and Crompton Corporation, competitors in the urethanes industry -- have admitted that they conspired to fix prices of certain Urethanes and Urethane Chemicals. Defendant Crompton Corporation has been granted conditional amnesty from criminal prosecution by antitrust authorities in the U.S., Canada and the European Union with respect to "Urethanes and Urethane Chemicals." Complaint ¶ 51.[9] Defendant Bayer Corporation pleaded guilty to criminal charges and paid a $33 million criminal fine for conspiring to fix prices of aliphatic polyester polyols.[10]

---

[7] Specific facts are discussed in context in the Argument Section below. This Section contains a brief summary of the factual allegations in Plaintiffs' Complaint.

[8] The Court should accept these allegations as true for purposes of this motion. *See, e.g., Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975); *Emig v. American Tobacco Co.,* 184 F.R.D. 379, 385 (D. Kan. 1998) ("[T]he court must accept as true the allegations of the complaint when deciding whether to certify [the case as a class action].").

[9] The U.S. Justice Department grants conditional amnesty only if an organization admits guilt and agrees to aid in implicating its co-conspirators. Complaint ¶ 52. Crompton's receipt of amnesty coincided with its guilty plea and payment of a $50 million criminal fine for fixing prices of rubber chemicals. Press Release, Department of Justice, Crompton Corporation Agrees to Plead Guilty for Participating in Rubber Chemicals Cartel (March 15, 2004). Ex. B.

[10] *United States v. Bayer Corp.*, No. Cr 04-0318 (N.D. Cal. May 24, 2005) at 7 (Reporter's Transcript of Proceedings) (Mr. Lykos, appearing on behalf of Bayer Corporation, stated without reservation that there were "discussions about pricing" including "agreements put

# III. ARGUMENT

## A. Horizontal Price-Fixing Cases Are Routinely Certified As Class Actions.

Like the plethora of price-fixing cases in which classes have been certified, this case

satisfies the requirements of Rule 23(a), (b)(2) and (b)(3). By their nature, horizontal price-

fixing cases are paradigms for class action treatment because the central issues that each plaintiff

and class member must prove are identical, *i.e.,* that a price-fixing conspiracy existed and that

the conspiracy was effectuated to plaintiffs' detriment. Accordingly, courts have consistently

granted class certification in horizontal price-fixing cases such as this.[11]

Price-fixing cases are well suited for class treatment because "a class-action lawsuit is the

most fair and efficient means of enforcing the law where antitrust violations have been

continuous, widespread, and detrimental to as yet unidentified consumers." *Coleman v. Cannon*

*Oil Co.*, 141 F.R.D 516, 520 (M.D. Ala. 1992). The Supreme Court noted that class actions also

---

into place in connection with the maintenance of pricing of those products into the polyester polyols marketplace" under knowingly illegal circumstances.) Ex. C.

[11] *See In re Universal Service Fund Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 666 (D. Kan. 2004); *Law v. Nat'l Collegiate Athletic Ass'n*, 167 F.R.D. 178, 181 (D. Kan. 1996) (finding that price-fixing cases are particularly appropriate for class action treatment). *See also, e.g., Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527, 534 (3d Cir. 2004); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 151-52, 164 (3d Cir. 2002), *cert. denied sub nom. Gaylord Container Corp. v. Garrett Paper, Inc.*, 538 U.S. 977 (2003); *In re Carbon Black Antitrust Litig.*, No. 03-10191-DPW, 2005 WL 102966, at *9 (D. Mass. Jan. 18, 2005); *In re Vitamins Antitrust Litig.*, 209 F.R.D 251, 258 (D.D.C. 2002); *In re Automotive Refinishing Paint Antitrust Litig.*, MDL Docket No. 1426, slip op. at 102 (E.D. Pa. Oct. 9, 2002) (Ex. D); *In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 235 (D. Minn. 2001); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 21 (D.D.C. 2001), *review denied,* 289 F.3d 98 (D.C. Cir. 2002); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 476 (W.D. Pa. 1999); *In re Commercial Tissue Products Antitrust Litig.*, 183 F.R.D. 589, 595 (N.D. Fla. 1998); *In re Plastic Cutlery Antitrust Litig.*, No. Civ.A. 96-CV-728, 1998 WL 135703 at *2 (E.D. Pa. Mar. 20, 1998); *In re Playmobil Antitrust Litig.*, 35 F. Supp.2d 231, 238-40 (E.D.N.Y. 1998); *In re Polypropylene Carpet Antitrust Litig.*, 996 F.Supp. 18, 22 (N.D. Ga. 1997); *In re Commercial Explosives Antitrust Litig.*, No. 2:96MD 1093S, slip op. at 1 (D. Utah Apr. 22, 1997) (Ex. E); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 504 (S.D.N.Y 1996).

play a significant role in the important process of enforcing the federal antitrust laws through private claims. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 334 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 328-29 (1955).

Only two months ago, in a similar case, *In re Rubber Chemicals Antitrust Litigation,* ___ F. R. D. __, 2005 WL 2649292 (N. D. Cal. Oct. 6, 2005), Judge Martin S. Jenkins certified a class of direct purchasers of Rubber Chemicals. Similar to this case, plaintiffs in *Rubber Chemicals* alleged that defendants - including Bayer AG, Bayer Corporation, Rhein Chemie Corporation, Crompton Corporation, and Uniroyal Chemical Company, all Defendants in this case - had conspired to fix and raise prices for Rubber Chemicals. Also similar to this case, in which Bayer Corporation pleaded guilty to criminal charges that it fixed the prices of certain polyester polyols, in *Rubber Chemicals* Bayer AG pleaded guilty to fixing prices of certain rubber chemicals. *Id.* at *1-2.

In *Rubber Chemicals*, only the Bayer defendants opposed class certification; plaintiffs had settled with or were in the process of settling with the remaining defendants. *Id.* at *1. As defendants often do in price-fixing cases, defendants opposed class certification principally based on the time-worn argument that plaintiffs could not demonstrate common proof of classwide impact or damages, and thus could not show that common issues would predominate over individual issues. *Id.* at *5, 7. The court rejected this argument, and noted that "the great weight of authority suggests that the dominant issues in cases like this are whether the charged conspiracy existed and whether price-fixing occurred." *Id.* at *5 (citing *Citric Acid,* 1996 U.S. Dist. LEXIS 16409, at *21). The court concluded that plaintiffs' proposed economic analysis satisfied the predominance requirement of Rule 23 (b)(3). *Id.* at *7. The court also rejected defendants' argument that calculation of damages prevented class certification, and noted:

"Antitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate. Plaintiffs do not need to supply a precise damage formula at the certification stage of an antitrust action. Instead, assessing whether to certify a class, the court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all." *Potash,* 159 F.R.D. at 697 (citation omitted). "Moreover, the fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis." *Id; see also In re Workers' Compensation,* 130 F.R.D. 99, 110 (D.Minn.1990) ("individual questions of damages are often a problem encountered in an antitrust action and are rarely a barrier to certification.").

*Id.* at *7. Similar arguments by Defendants here should be seen as similarly unpersuasive.

## B. <u>Standard for Class Certification.</u>

On a motion for class certification, the sole issue is whether plaintiffs' claim satisfies Fed. R. Civ. P. 23. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177 (1974). If the court finds that Plaintiffs satisfy the four requirements of Rule 23(a) -- numerosity, commonality, typicality, and adequacy -- the court must "examine whether the action falls within one of the three categories of suits set forth in Rule 23(b)." *Adamson v. Bowen,* 855 F.2d 668, 675 (10th Cir. 1988).[12] If the appropriateness of class certification is uncertain, the court "should err in favor of the maintenance of a class action." *Robinson v. Gillespie,* 219 F.R.D. 179, 183 (D. Kan. 2003) (citing *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir. 1968)); *Olenhouse v. Commodity Credit Corp.,* 136 F.R.D. 672, 679 (D. Kan. 1991).

---

[12] In doing so, the court may not inquire into the merits of the case. *Eisen,* 417 U.S. at 177-78; *Adamson,* 855 F.2d at 676. Rather, the court should accept the allegations in the complaint as true. *See, e.g., Blackie v. Barrack,* 524 F.2d at 901; *Emig v. American Tobacco Co.,* 184 F.R.D. at 385.

**(1) The Requirements of Rule 23(a) Are Satisfied.**

        **a)  Fed. R. Civ. P. 23(a)(1): The Class Is So Numerous That Joinder of All Members Is Impracticable.**

There is no set formula for determining the requisite level of numerosity.  *Rex v. Owens ex rel. State of Okl.*, 585 F.2d 432, 436 (10th Cir. 1978).  In fact, "[t]he party seeking class certification need not show the exact size of the class."  *Law v. Nat'l Collegiate Athletic Ass'n*, 167 F.R.D. at 181 (citing *Albertson's Inc. v. Amalgamated Sugar Co.*, 62 F.R.D. 43, 52 (D. Utah 1973), *rev'd in part on other grounds,* 503 F.2d 459 (10th Cir. 1979).  *See also In re Rubber Chemicals Antitrust Litigation*, 2005 WL 2649292 at *6; *In re Universal Service Fund*, 219 F.R.D. at 666; *Heartland Communications, Inc. v. Sprint Corp.*, 161 F.R.D. 111, 115 (D. Kan. 1995).  Precise quantification is unnecessary, and the Court may make common sense assumptions.  *See Playmobil*, 35 F.Supp.2d at 239.  The class "is sufficiently numerous if joinder of all class members is 'impracticable.'"  *Heartland Communications,* 161 F.R.D. at 115; *see also In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 379 (S.D.N.Y. 1996).

Generally, if the number of class members exceeds 40, Rule 23(a)(1) is satisfied.  *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).  Both the number of proposed class members and their decentralized locations weigh heavily in favor of class certification, as their joinder would be impracticable.  "Impracticable does not mean impossible, *i.e.*, a plaintiff need not show that joinder cannot be accomplished . . . . Instead, showing a strong litigational hardship or inconvenience may be sufficient . . . . [T]he significant geographic distribution among the class members makes joinder impracticable."  *In re Flat Glass*, 191 F.R.D. at 477-78 (internal citations omitted); *see also Zapata v. IBP, Inc.*, 167 F.R.D. 147, 157 (D. Kan. 1996).

To date, Defendants have produced only limited transactional data, but those data alone show more than 120 Crompton customers and more than 250 Bayer customers.  At present,

Defendants themselves have exclusive control of their own customer lists, which will indicate more precisely the total number of Class members.  However, based upon the nature of the industry and the commerce involved, and the transactional data received so far, Plaintiffs believe the class consists of hundreds, if not thousands, of geographically dispersed businesses that purchased Urethanes and Urethane Chemicals from the Defendants.  Accordingly, this proposed class meets the numerosity requirement of Rule 23(a)(1).

### b) Fed. R. Civ. P. 23(a)(2):  There Are Questions of Law and Fact Common To All Class Members.

In the Tenth Circuit and elsewhere, "one issue of common fact or law is sufficient for commonality purposes." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1298 (10th Cir. 1999). Plaintiffs need not show that their claims are identical; "some factual variation among class members' specific grievances will not prevent certification of claims on behalf of a class of plaintiffs." *Playmobil*, 35 F.Supp.2d at 240; *see also Hart*, 186 F.3d at 1298.  "Factual differences among the class members' cases do not violate the rule, so long as a common legal theory is shared." *Woodward v. Online Information Servs.*, 191 F.R.D. 502, 505 (E.D.N.C. 2000).

Here, several common issues of fact and law exist, including:

(1) whether Defendants and their co-conspirators conspired to fix, raise, maintain or stabilize prices of Urethanes and Urethane Chemicals sold in the United States;

(2) whether Defendants and their co-conspirators conspired to allocate their major customers, accounts or territories;

(3) whether the conduct of Defendants and their co-conspirators caused injury to the business and property of Plaintiffs and other members of the class; and

(4) the appropriate measure of damages sustained by the Plaintiffs and whether Plaintiffs are entitled to injunctive relief.

Such questions, which are common to all horizontal price-fixing cases, led this Court to recognize that "[a]ntitrust price fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy." *Law v. Nat'l Collegiate Athletic Ass'n*, 167 F.R.D. at 182 (citing *Cumberland Farms, Inc., v. Browning-Ferris Indus., Inc.*, 120 F.R.D. 642 (E.D. Pa. 1988)). [13]

Commonality also exists when, as alleged here, defendants conspired to allocate markets or customers. *See, e.g.*, *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996) (alleged conspiracy to eliminate channels of distribution); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268 (D. Minn. 1989) (alleged conspiracy to fix prices and allocate customers). Therefore, this proposed class satisfies Rule 23(a)(2).

### c) Fed. R. Civ. P. 23(a)(3): The Claims of the Representative Parties Are Typical of the Claims of the Class.

Rule 23(a)(3) requires that "the claims . . . of the representative parties are typical of the claims . . . of the class." "Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Zapata*, 167 F.R.D. at 160 (citations omitted). A claim is typical when plaintiffs "possess the same interest and suffer the same injury as the [proposed] class members." *Olenhouse*, 136 F.R.D. at 680 (citations omitted). Typicality does not require that class members' claims be identical to plaintiffs' claims. *Hart*,

---

[13] *See also In re Rubber Chemicals*, 2005 WL 2649292 at *3; *In re Universal Service Fund*, 219 F.R.D. at 666; *In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 232 (D. Minn. 2001); *In re Flat Glass*, 191 F.R.D. at 478 ("'[A]llegations concerning the existence, scope and efficacy of an alleged conspiracy present questions adequately common to class members to satisfy the commonality requirement." (quoting 4 H. Newberg & A. Conte, *Newberg on Class Actions* § 18:05, at 18-15 (3d ed. 1992)); *Playmobil*, 35 F.Supp.2d at 240; *In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229, 232 (M.D. Fla. 1993); *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 324 (E.D.N.Y 1982).

186 F.3d at 1299. "[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Adamson*, 855 F.2d at 676. In antitrust cases, typicality can be shown "'by plaintiffs and all class members alleging the same antitrust violations by defendants.'" *In re Rubber Chemicals*, 2005 WL 2649292 at *4 (citations omitted).[14]

Accordingly, the court "should determine whether the claims of the representative [plaintiffs] are significantly antagonistic to those of the [proposed] class members." *Olenhouse*, 136 F.R.D. at 680; *see also Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) ("Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct . . . .") (citations omitted); *Heartland Communications*, 161 F.R.D. at 116 (typicality requires the court to "look to whether the claims of the representative plaintiffs are 'significantly antagonistic' to the claims of the proposed class" rather than mandating that the claims be identical).

Due to the commonality and non-antagonistic nature of the plaintiffs' claims compared with those of the class, antitrust price fixing cases are generally found to meet Rule 23(a)(3)'s typicality requirement. "Since the representative parties need prove a conspiracy, its effectuation, and damages therefrom - precisely what the absentees must prove to recover - the representative claims can hardly be considered atypical." *In re Flat Glass*, 191 F.R.D at 480 (citations omitted). Furthermore, "claims in antitrust price-fixing cases generally satisfy Rule

---

[14] *See also In re Mercedes-Benz Antitrust Litigation*, 213 F.R.D. 180, 185 (D.N.J. 2003); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. at 27; *Flat Glass*, 191 F.R.D. at 480; *NASDAQ*, 169 F.R.D. at 510; *In re Magnetic Audiotape Antitrust Litig.*, 2001 WL 619305, at *2 (S.D.N.Y. Jan. 6, 2001).

23(a)(3)'s typicality requirement, even if members purchase different quantities and pay different prices." *Playmobil*, 35 F. Supp. 2d at 241.[15]  In price fixing cases:

> The overarching scheme is the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid.  Furthermore, the various products purchased and the different amount of damage sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong.

*In re Flat Glass*, 191 F.R.D. at 480.

Here, the Plaintiffs' claims are typical of the claims of the putative class.  The claims of the class representatives and the remainder of the putative class are based on the same legal theories and the same course of events and conduct of Defendants.  The representative Plaintiffs and each putative Class member purchased Urethanes and Urethane Chemicals directly from Defendants and have thereby been subjected to overcharges.  Class representatives must prove the same major elements as absent members, including the existence, scope, and efficacy of the conspiracy.  Additionally, the interests of the class representatives are not antagonistic to those of the absent class members.  Thus, the proposed class meets the requirement of Rule 23(a)(3).

---

[15] *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct"); *see In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 164-65 (S.D.N.Y. 2000).  Factual differences as to damages, terms of sale, purchasing patterns or manner of payment will not defeat certification if plaintiffs allege that the same unlawful course of conduct affected all class members.  *Fears v. Wilhelmina Model Agency, Inc.*, 2003 WL 21659373, at *5 (S.D.N.Y. July 15, 2003); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998); 6 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 18:9, at 30-31 (4th ed. 2002) (footnote omitted) ("typicality requirement can be met even though there were many products sold at varied prices and [under varied] conditions"); *see also In re Domestic Air Transportation Antitrust Litig.*, 137 F.R.D. 677, 698-99 (N.D. Ga. 1991); *Cumberland Farms, Inc. v. Browning-Ferris Indus., Inc.*, 120 F.R.D. 642, 647 (E.D. Pa. 1988); *In re Alcoholic Beverage Antitrust Litig.*, 95 F.R.D. 321, 324-25 (E.D.N.Y. 1982).

### d) Fed. R. Civ. P. 23(a)(4):  The Representative Plaintiffs Will Fairly and Adequately Protect the Interests of the Plaintiff Class.

"Resolution of two questions determines legal adequacy:  (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *In re Universal Service Fund*, 219 F.R.D. at 668 (quoting *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002)).  Here Plaintiffs meet both elements of the test.

Courts have consistently rejected defendants' efforts to argue "the possibility of hypothetical conflicts or antagonisms among class members."  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 513.  To defeat class certification the conflict must be "apparent, imminent, and on an issue at the very heart of the suit."  *Id.* at 514 (citations omitted).[16]

Plaintiffs in this action have no interests that are antagonistic to or conflict with other class members.  To the contrary, Plaintiffs and putative class members each purchased Urethanes and Urethane Chemicals from Defendants, and therefore share a mutual interest in proving Defendants' conspiracy, recovering damages, and obtaining injunctive relief.

Adequacy of representation also depends upon the qualifications and experience of plaintiffs' counsel.  *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975).  Plaintiffs are represented by competent counsel who are experienced in complex antitrust price-fixing class action litigation such as this case.  Plaintiffs' counsel are experienced and focused litigators who have been and will continue to vigorously pursue the litigation in the best interest of the proposed class of plaintiffs.  "In the absence of proof to the contrary, courts presume that class

---

[16] A conflict of interest exists when representative plaintiffs have interests antagonistic to the class.  *Olenhouse*, 136 F.R.D. at 680; *see also Albertson's*, 503 F.2d at 463 ("It is axiomatic that a plaintiff cannot maintain a class action when his interests are antagonistic to . . . the interests of the persons he would seek to represent.") (citations omitted).

counsel is competent and sufficiently experienced to vigorously prosecute the action on behalf of the class." *Zapata*, 167 F.R.D. at 161.  In this case, the extensive experience of class counsel in litigating large and complex antitrust cases, coupled with their willingness to represent the proposed class, meets the adequacy of representation standard of Rule 23(a)(4).

### (2)  The Class Satisfies the Requirements of Rule 23(b)(3).

Once Rule 23(a) is satisfied, the court "must also find that the requirements of one of the subsections of Rule 23(b) are satisfied." *In re Universal Service Fund*, 219 F.R.D. at 673.

To certify a class under Rule 23(b)(3), the court must find: (1) common questions predominate over questions affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quotations omitted).  The "predominance" and "superiority" provisions are intended to promote "economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated." *Id.* (quotations omitted).  As demonstrated below, the proposed class meets the requirements of Rule 23(b)(3).

### a)  Questions of Law and Fact Common to the Class Predominate Over Any Questions Affecting Individual Class Members.

Antitrust cases such as this typically meet the predominance requirement because "where many significant questions are common to the class, predominance is satisfied." *In re Flat Glass*, 191 F.R.D. at 484.  Accordingly, "the predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 517.

"In determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class." *Dietrich v. Bauer*, 192 F.R.D. 119, 127 (S.D.N.Y. 2000).  Thus, where, as here, two principal

Defendants have admitted their guilt in conspiring to unlawfully fix prices and allocate a market, common issues necessarily will predominate over any individual claims.

For Plaintiffs to prevail on their claims, they must prove three elements: (1) that Defendants violated the antitrust laws; (2) the fact of damage, or "impact," of the unlawful activity; and (3) the amount of damages. *See In re Universal Service Fund*, 219 F.R.D. at 673; *In re Linerboard*, 203 F.R.D. 197, 214 (E.D. Pa. 2001). In Plaintiffs' proof of each one of these elements, issues common to the proposed class will predominate over any individual issues.

### i) The Existence and Scope of the Conspiracy.

Horizontal price-fixing cases typically meet the predominance standard because "as a general rule in antitrust price-fixing cases, questions common to members of the class will predominate over questions affecting only individual members." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995). "Courts repeatedly have held that the existence of a conspiracy is the *predominant* issue in price fixing cases, warranting certification of the class even where significant individual issues are present." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 518. "[T]he great weight of authority suggests that the dominant issues in cases like this are whether the charged conspiracy existed and whether the price-fixing occurred." *In Re Rubber Chemicals*, 2005 WL 2649292, at *5 (citation omitted).[17]

In proving a price-fixing claim, particularly the existence and scope of the conspiracy, "plaintiffs can present common proof on the issue of whether defendants violated the antitrust laws by engaging in this combination or conspiracy." *In re Universal Service Fund*, 219 F.R.D. at 673. The focus is on defendants' illegal conduct, not on the conduct of class members. *Id.*;

---

[17] *See also* 6 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 18:28, at 102 (4th ed. 2002) ("As a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions.").

*see also In re Flat Glass*, 191 F.R.D at 484 (generalized proof sufficient to show conspiracy because defendants' conduct is the focus).  Where, as here, a "single conspiracy is alleged, the relevant proof of this will not vary among class members, and clearly presents a common question fundamental to all class members." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 518.  Accordingly, "the existence, scope, duration, effect, and ultimately, the legality, of the alleged conspiracy would appear, at this point, to be the overwhelming centerpiece of this litigation." *Jerry Enters. of Gloucester, Inc. v. Allied Beverage Group, LLC*, 178 F.R.D. 437, 442 (D.N.J. 1998).

The existence of a conspiracy is the predominant question, regardless of any differences among product marketing, pricing, or mode and manner of distribution.  *In re Fine Paper Antitrust Litig.*, 82 F.R.D. 143, 151-52 (E.D. Pa. 1979) (differences in prices and marketing are not fatal to predominance because the conspiracy is the "overriding predominant question").  One court elucidated this conclusion, stating:

> Contentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected.  Courts have found the conspiracy issue the overriding predominant question.  Further, where a [Sherman Act] § 1 conspiracy is alleged, as here, it is appropriate to look beyond surface distinctions between the products because identical products, uniform prices and unitary distribution patterns are not indispensable for class certification in this context.  More importantly, any difference in the manner in which the conspiracy was manifested throughout the marketing and distribution of the various products does not change the common question, namely, whether defendants acted in concert to decrease competition among themselves.

*In re Flat Glass*, 191 F.R.D. at 484-85 (internal citations omitted).

Plaintiffs in this action will prove Defendants' conspiracy to fix prices and allocate customers using common, class-wide proof.  Proof of the conspiracy's existence will be based on generalized proof of Defendants' conduct, and the legal issues involved will be identical for all

Class members.  If each individual class member were to bring a separate action, each would be required to prove the same conspiracy.  Proof of the conspiracy therefore involves issues of law and fact common to all Class members which predominate over any individual issues.

### ii) Common Impact.

To prove "impact" or "fact of damage," a "plaintiff must generally show that he or she paid supracompetitive prices as a result of the antitrust conspiracy." *In re Universal Service Fund*, 219 F.R.D at 673-74 (citing *State of Ala. v. Blue Bird Body Co.,* 573 F.2d 309, 327 (5th Cir. 1978)).  Plaintiff need not show with precision the amount of damages, "just that the antitrust violation caused the antitrust injury suffered by the plaintiff." *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 483 (3d Cir. 1998).  "[At] the class certification stage, 'the court need not concern itself with whether Plaintiffs can prove their allegations regarding common impact; the Court need only assure itself that Plaintiffs' attempt to prove their allegations will predominantly involve common issues of fact and law." *In re Linerboard*, 203 F.R.D. at 220 (*quoting Lumco Indus., Inc. v. Jeld-Wen, Inc.*, 171 F.R.D. 168, 174 (E.D. Pa. 1997)).  "[T]he Court does not inquire *whether* Plaintiffs can prove the existence of a [pricing structure], but *how* Plaintiffs will prove the existence of a [pricing structure]." *In re Polypropylene Carpet Antitrust Litig.*, 996 F.Supp. 18, 23 (N.D. Ga. 1997) (emphasis and brackets included in original) (citations omitted).

In fact, "plaintiffs' burden in proving fact of injury may be discharged by reasonable inferences from circumstantial evidence.  Any evidence which is logically probative of a loss attributable to the violation will advance the plaintiffs' case.  As a practical matter, in a class action context, proof of an effective conspiracy to fix prices will include facts which tend to

establish—perhaps circumstantially—that each class member was injured." *Law v. Nat'l*

*Collegiate Athletic Ass'n*, 5 F.Supp.2d 921, 927 (D. Kan. 1998) (citations omitted).

Where a horizontal price-fixing conspiracy exists, an economic analysis of the industry at

issue can demonstrate classwide impact. *In re Linerboard*, 305 F.3d at 153 ("industry

characteristics" showed that "all class members would be impacted"); *In re Flat Glass*, 191

F.R.D. at 486 ("If the price structure in the industry is such" that a conspiracy affected "free

market prices…it would be clear that all members of the class suffered some damage . . . ."); *In*

*re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 90 (E.D. Pa. 2003) ("economic

theory predicts that the artificial absence of competition leads to less competitive prices").

Some courts presume a class-wide impact in cases alleging a price-fixing conspiracy.[18]

Under the presumption of impact theory, "[p]rice fixing conspiracies, at least to the extent they

succeed in fixing prices, almost invariably injure everyone who purchases the relevant goods or

services." *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 166 (S.D.N.Y. 2000).[19]

Plaintiffs here do not rely on a presumption to show class-wide impact. Plaintiffs' expert

economist, Dr. Tollison, examined the market for polyester polyols and related polyurethane

systems, and the structure of pricing in that market. He concluded, based on his experience and

his analysis of industry characteristics and pricing structure, that the conspiracy Plaintiffs allege

in their Complaint would have had a common impact on the proposed Class, and that well-

---

[18] *In re Linerboard*, 305 F.3d at 151-53 (economic principles supported district court's use of "presumption of impact" theory); *In re Flat Glass*, 191 F.R.D. at 485-66; *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1041 (N.D. Miss. 1993) ("[i]n an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price").

[19] *See also In re Catfish*, 826 F. Supp. at 1041 (in price-fixing cases, "there is a presumption that all purchasers will be impacted/injured by having to pay the higher price") and *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. at 272 (common proof possible where prices are individually negotiated).

accepted economic and statistical methods can be applied to this industry not only to confirm

classwide impact but to compute damages for the Class as well.  Tollison Rep. ¶ 56.  Dr.

Tollison found support for his conclusion in the following characteristics of the industry, *inter*

*alia*:

> • There is high concentration among polyester polyol
> manufacturers;
>
> • There are high barriers to entry into the polyester polyol industry;
>
> • Polyester polyol products are fungible and substitutable for each
> other across polyester polyol products; and
>
> • Defendants' pricing structure makes it easy for firms to
> implement across-the-board price increases, and to raise prices in a
> coordinated fashion.

Tollison Rep. ¶ ¶ 25-56.

As Dr. Tollison concluded, if Plaintiffs prove the conspiracy they allege, that conspiracy

would have had a common impact on all members of the proposed Class.  *Id.* ¶ 56.

### iii) Computation of Damages.

Where conspiracy and impact are common issues, as in this case, "the fact that there may

have to be individual examinations on the issue of damages has never been held . . . a bar to class

actions."  *Gold Strike Stamp Co., v. Christensen*, 436 F.2d 791, 798 (10th Cir. 1970); *see In re*

*Universal Service Fund*, 219 F.R.D. at 676-77 ("even if damages had to be determined on an

individualized basis," that would not preclude class certification); *In re Aluminum Phosphide*

*Antitrust Lit.*, 160 F.R.D. 609, 615 (D. Kan. 1995) ("that individual proof as to the amount of

damages may be necessary does not preclude class certification").[20]

---

[20] As to proof of damages, it should be noted that:

> Once an antitrust violation has been established . . . the burden of proving
> damages is "to some extent lightened."  *J. Truett Payne Co. v. Chrysler Motors*
> *Corp.*, 451 U.S. 557, 568 (1981).  [The court's] willingness to accept a degree of

At the class certification stage, issues regarding the possibility of individual amounts of damages do not preclude class certification. *In re Universal Service Fund*, 219 F.R.D. at 676 ("Even if damages had to be determined on an individualized basis, however, that would not preclude class certification."); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977) ("[C]alculation of damages on an individual basis should not preclude class determination."); *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1043-44 (N.D. Miss. 1993). In fact, "[i]f individual damage questions were a barrier to class certification, there would be little if any place for the class action device in the adjudication of antitrust claims." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 524 (citations omitted); *In re Visa Check/MasterMoney*, 280 F.3d 124, 139-40 (2d Cir. 2001), *cert. denied*, 536 U.S. 917 (2002).

Plaintiffs' expert, Dr. Tollison, has presented a "potentially feasible method for proving damages on a class-wide basis." S*ee In re Universal Service Fund*, 219 F.R.D. at 676. Specifically, Dr. Tollison has concluded that there are widely-accepted and feasible methods which may be useful in this case for estimating damages on a classwide basis, including the "before and after" approach, margin and profitability analysis, and benchmarking from other industries. These methods would result in the determination of a percentage overcharge attributable to Defendants' conspiracy. Once the percentage overcharge is determined, it is

---

uncertainty in fixing the amount of damages rests in part on the difficulty of ascertaining business damages, in that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." [*Id.* at 566]. [The court's] willingness also rests on the principle that "it does not come with very good grace" for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted. *Id.*

*Law v. NCAA*, 5 F. Supp. 2d 921, 929 (D.Kan. 1998). *See also In re Rubber Chemicals*, 2005 WL 2649292, at *7 ("court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to [no]…method at all," and fact that damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis) (citations omitted).

applied to the dollar volume of Class members' purchases from Defendants during the Class

Period. As Dr. Tollison notes, these are well accepted and feasible methods to determine the

damages suffered by Class members. Tollison Rep., ¶ ¶ 49-56.[21]

### iv)  Fraudulent Concealment

Defendants' fraudulent concealment of their conspiracy is another predominating issue

common to the Class.  On a motion for class certification, "it generally has been recognized that

the question of concealment by the antitrust defendant is a common question, subject to being

uniformly resolved on behalf of all members of the class." *In re Flat Glass*, 191 F.R.D. at 487;

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 519; *In re Fine Paper*, 82 F.R.D. at

154-55.  Accordingly, whether Defendants successfully concealed their conspiracy is a common

issue that predominates over individual questions.  *In re Linerboard*, 305 F.3d at 160-63; *In re*

*Flat Glass*, 191 F.R.D. at 488; *In re Catfish*, 826 F.Supp. at 1046.

While recognizing that the issue of fraudulent concealment contains both common and

individual questions, the Third Circuit in *Linerboard* affirmed the district court's conclusion that

fraudulent concealment was an issue in which common questions predominated, concluding:

> Notwithstanding the individual determinations that will undoubtedly arise
> at trial, common issues of concealment predominate here because "the
> inquiry necessarily focuses on *defendants'* conduct, that is what
> *defendants* did rather than what plaintiffs did." *In re Flat Glass*, 191
> F.R.D. at 488 (emphasis added).  Key questions will not revolve around
> whether Appellees knew that the prices paid were higher than they should
> have been or whether Appellees knew of the alleged conspiracy among
> Appellants.  Instead, the critical inquiry will be whether "defendants
> successfully concealed the existence of the alleged conspiracy, which

---

[21] *See In re Universal Service Fund*, 219 F.R.D. at 676 (accepting "yardstick" method as
reasonable to prove damages); *see also In re Linerboard*, 305 F.3d at 154-55 (finding persuasive
an expert's opinion that "multiple regression analysis" or "yardstick" approach would provide
ability to measure damages); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 522
(accepting several methodologies, including "before and after" and "yardstick" approaches).

proof will be common among the class members in each class." *Id.* It is the fact of *concealment* that is the polestar in an analysis of fraudulent concealment. It is the camouflage that demands attention, the cover up, the acts of obscuring or masking. These allegations of proof are all common to the defendants, not the plaintiffs. It is not the conspiracy of the defendant that is relevant on the issue of tolling the statute of limitations, it is the act of concealing the conspiracy.

*In re Linerboard*, 305 F.3d at 163.

Here, Plaintiffs' fraudulent concealment claims pose common questions which predominate over individual questions. Plaintiffs allege a conspiracy among Defendants which they went to great lengths to keep secret. Complaint ¶¶ 58-60. Plaintiffs had no reason to suspect Defendants were conspiring to fix prices until Crompton's March 15, 2004 press release, in which it divulged for the first time the investigations by authorities from the United States, Canada and European Union into anticompetitive practices in the Urethane and Urethane Chemicals industry. *Id.* Defendants not only concealed their conspiracy, but affirmatively perpetuated the conspiracy by providing false and pre-textual reasons for the industry-wide price increases. *Id.* ¶ 60. As a result, notwithstanding Plaintiffs' due diligence they were unable to discover the conspiracy because of Defendants' affirmative steps to conceal it. *Id.* ¶ 59.

Therefore, the issue of fraudulent concealment in this case presents common questions which predominate over any individual questions.

### b) A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy.

In this case, as in many others, a class action is superior to all other methods of adjudication. [22] In fact, for most Class members it is the *only* way to pursue their claims, and for all Class members it is the most manageable and fair way. As this Court noted:

---

[22] Rule 23(b)(3) sets forth four factors that a court should consider in deciding whether a class action is superior: (A) the interest of members of the class in individually controlling the

> Here, the obvious alternative to a class action would be for plaintiffs to
> bring individual suits against defendants.  This would be grossly
> inefficient, costly, and time consuming because the parties, witnesses, and
> courts would be forced to endure unnecessarily duplicative litigation . . . .
> It can reasonably be anticipated that many of the individual claims will
> involve relatively insubstantial amounts of money such that a class action
> is perhaps the only feasible way for plaintiffs to pursue those claims.
> Thus, the court is persuaded that a class action is by far the most superior
> method for resolving the claims at issue in this lawsuit.

*In re Universal Service Fund*, 219 F.R.D. at 679.  Failure to certify a class in this case likely

would mean that all but the very largest claims would be abandoned.  *See In re NASDAQ*

*Market-Makers Antitrust Litig.*, 169 F.R.D. at 527.  This cannot be a fair result, particularly

where two principal Defendants have admitted participating in a price-fixing conspiracy.

Resolution of this case as a class action will make it decidedly more manageable as all

claims may be determined in one action.  Even if manageability issues arise, they should not be a

primary reason to refuse certification.  "Manageability problems are significant only if they

create a situation that is less fair and efficient than other available techniques.  [Therefore],

[c]ourts are generally loath to deny class certification based on speculative problems with case

management . . . ." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 528 (*quoting*

*In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 358 (E.D. Pa. 1976)).

Therefore, the proposed class satisfies the superiority requirement of Rule 23(b)(3).

### (3)  The Class Satisfies the Requirement of Rule 23(b)(2).

Under Rule 23(b)(2), class certification is appropriate where "the party opposing the class

has acted or refused to act on grounds generally applicable to the class, thereby making

appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a

---

prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning
the controversy already commenced by or against members of the class; (C) the desirability or
undesirability of concentrating the litigation of the claims in the particular forum; and (D) the
difficulties likely to be encountered in the management of a class action.

whole." Plaintiffs have alleged that Defendants have acted on grounds generally applicable to the class, and that final injunctive relief is warranted with respect to the Class as a whole. Complaint ¶ 31. Injunctive relief is a significant element of the relief Plaintiffs seek. "Certification is appropriate under Rule 23(b)(2) where declaratory or injunctive relief is an important aspect of the overall relief sought." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 516 (citations omitted). *See also In re Universal Service Fund*, 219 F.R.D. at 681 (certifying class under Rule 23(b)(2), court found that injunctive relief would not necessarily be the "predominant form of relief"); *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 88-89 (E.D.N.Y. 2000) (certifying a class action under Rule 23(b)(3) and Rule 23(b)(2) because plaintiffs sought "highly significant injunctive relief"), *aff'd*, 280 F.3d 124 (2d Cir. 2001), *cert. denied*, 536 U.S. 917 (2002)). Plaintiffs should be given the benefit of the doubt as any error by the court should be "in favor and not against the maintenance of the class action." *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968)).

Therefore, class certification under Rule 23 (b)(2) is appropriate.

## C. The Court Should Appoint Co-Lead Counsel To Be Class Counsel Pursuant to Rule 23(g).

Plaintiffs request that this Court appoint Co-Lead Counsel -- Lockridge Grindal Nauen P.L.L.P; Much Shelist Freed Denenberg Ament & Rubenstein, P.C.; Ross, Dixon & Bell, L.L.P.; and Glancy Binkow & Goldberg, L.L.P. -- as Class Counsel under Fed. R. Civ. P. 23(g).

Rule 23(g)(1)(C) provides that a court must consider, when appointing class counsel:

- The work counsel has done in identifying or investigating potential claims in the action;

- Counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action;

- Counsel's knowledge of the applicable law; and

- The resources counsel will commit to represent the class.

Fed. R. Civ. P. 23(g)(1)(C)(i).  In addition, a court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the class."  Fed. R. Civ. P. 23(g)(1)(C)(ii).

Co-Lead Class Counsel have substantial and extensive experience in complex antitrust class action litigation, and meet all the qualifications for class counsel in Rule 23(g)(1)(C).  In Practice and Procedure Order No. 2, this Court appointed these firms to serve as Co-Lead Counsel for Plaintiffs.  The Court should continue this appointment for the following reasons.

First, Co-Lead Counsel have invested substantial resources in identifying, investigating, and pursuing claims of the potential class both before and after their appointment as Co-Lead Counsel.  Since their appointment, Co-Lead Counsel have devoted significant time and energy pursuing timely and successful litigation of Plaintiffs' claims, and will continue to do so as Class Counsel.  Co-Lead Counsel have collected, reviewed and produced documents to Defendants, propounded discovery requests to Defendants, analyzed and reviewed hundreds of thousands of documents from Defendants, engaged in third party discovery, fully briefed motions to compel, negotiated proposed protective orders, taken corporate depositions of Defendants, and engaged and worked together with economic and industry experts.

Second, Co-Lead Counsel are proven leaders in antitrust litigation, bringing vast experience and expertise to the service of the proposed Class.  As summarized below, and provided in more detail in the attached firm resumes at Exhibits F-I, the proposed firms are well qualified to be appointed Class Counsel:

Lockridge Grindal Nauen P.L.L.P:  Since 1978, Lockridge Grindal Nauen, a 30-attorney firm with offices in Minneapolis and Washington, D.C., has developed a diverse global and national practice in antitrust class actions and other complex civil litigation, including securities

and investment fraud, product liability, and mass tort cases. Time and again, the firm's antitrust group has proven its expertise through appointment to prominent leadership positions in which they have obtained more than $2 billion in settlements and verdicts, as detailed in the firm's resume attached as Exhibit F.

Much Shelist Freed Denenberg Ament & Rubinstein, P.C.: Much Shelist is one of the nation's leading class action firms. *See* Macey & Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation*, 58 U. Chi. L. Rev. 1 (1991). The firm has nearly 30 years of experience in successfully prosecuting major complex antitrust, securities, fraud, and consumer fraud class actions. Under the firm's leadership, class members have obtained judgments and settlements well in excess of $4 billion. Federal and state courts have recognized their expertise and experience as evidenced by the appointment of Much Shelist attorneys to leadership roles in a multitude of complex class actions, as detailed in the firm's resume attached as Exhibit G.

Ross, Dixon & Bell, L.L.P.: Ross, Dixon & Bell comprises over 100 attorneys who have represented both plaintiffs and defendants in a multitude of major antitrust cases. The firm has demonstrated its expertise in litigating Sherman Act cases by aiding in the recovery of several hundred million dollars for class members. The firm's antitrust team's success in litigating antitrust actions has resulted in them being chosen to draft the Section 2 chapter of the ABA's comprehensive Antitrust and Telecommunications Practice Guide. As described in detail in the firm's resume attached as Exhibit H, Ross, Dixon & Bell has the vast experience and knowledge in the field of antitrust law.

Glancy Binkow & Goldberg, L.L.P.: Glancy Binkow & Goldberg is a preeminent national leader in prosecuting antitrust, securities fraud, and complex commercial litigation. In its 15 years of litigation, the firm has recovered over $1 billion for plaintiffs wronged by

corporate fraud and malfeasance. As set forth in detail in attached Exhibit I, Glancy Binkow & Goldberg has served as Lead Counsel or as a member of Plaintiffs' Counsel Executive Committees in an exceptional number of cases and are currently serving in leadership positions in dozens of actions through the United States. The firm's history of successful litigation and its current involvement in major cases is detailed in the firm's resume attached as Exhibit I.

Third, as provided in the firm descriptions above, all four Co-Lead Counsel possess extensive knowledge of the applicable law. These firms, each of which have decades of antitrust price-fixing litigation experience, remain in the forefront of complex class action antitrust litigation by continually representing plaintiffs in complex antitrust cases.

Fourth, all four Co-Lead Counsel have the financial and professional resources necessary to prosecute the class claims. These firms' collective base of 225 attorneys, coupled with their proven track records of withstanding the financial rigors of representing class action plaintiffs in lengthy litigation, demonstrate their superior capabilities for service as Class Counsel.

Accordingly, Plaintiffs ask that Co-Lead Counsel be named Class Counsel under Rule 23(g).

## IV. <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request that the Court certify this case as a class action on behalf of all direct purchasers of Urethanes and Urethane Chemicals, and appoint Co-Lead Counsel as Class Counsel.

Dated:  December 2, 2005   STUEVE SIEGEL HANSON WOODY LLP


       s/Norman E. Siegel
       Norman E. Siegel
       George A. Hanson
       330 W. 47th Street, Suite 250
       Kansas City, MO  64112
       Tel: (816) 714-7100
       Fax: (816) 714-7101

       *Plaintiffs' Liaison Counsel*

| | |
|---|---|
| Steven A. Kanner | W. Joseph Bruckner |
| William H. London | Heidi M. Silton |
| Douglas A. Millen | Darla Jo Boggs |
| Michael E. Moskovitz | LOCKRIDGE GRINDAL NAUEN P.L.L.P. |
| MUCH SHELIST FREED DENENBERG | 100 Washington Avenue South |
|   AMENT & RUBENSTEIN, P.C. | Suite 2200 |
| 191 N. Wacker Drive, Suite 1800 | Minneapolis, MN  55401 |
| Chicago, IL 60606 | Tel: (612) 339-6900 |
| Tel: (312) 521-2000 | Fax: (612) 339-0981 |
| Fax: (312) 521-2100 | |
| | |
| Susan G. Kupfer | Roy M. Bell |
| Sylvie K. Kern | Jason S. Hartley |
| Kevin F. Ruf | ROSS DIXON & BELL, L.L.P. |
| GLANCY BINKOW & GOLDBERG, L.L.P. | 550 West B Street |
| 445 Market Street | Suite 400 |
| Suite 1810 | San Diego, CA  92101-3599 |
| San Francisco, CA  94105 | Tel: (619) 235-4040 |
| Tel: (415) 972-8160 | Fax: (619) 231-8796 |
| Fax: (415) 972-8166 | |

      *Plaintiffs' Co-Lead Counsel*

| | |
|---|---|
| Joseph R. Saveri | Dennis Stewart |
| Michele C. Jackson | Stephanie Dieringer |
| Eric B. Fastiff | HULETT HARPER & STEWART |
| Jennifer Gross | 550 West C Street |
| LIEFF, CABRASER, HEIMANN | Suite 1600 |
|   & BERNSTEIN, LLP | San Diego, CA 92101 |
| 275 Battery Street, 30th Floor | Tel:  (619) 338-1133 |
| San Francisco, CA  94111-3339 | Fax:  (619) 338-1139 |
| Tel: (415) 956-1000 | |
| Fax: (415) 956-1008 | |

      *Plaintiffs' Counsel on Brief*

## CERTIFICATE OF SERVICE

Plaintiffs' Liaison Counsel hereby certifies the following document were electronically filed with the Clerk of Court through ECF, and that ECF notification was sent to at least one attorney from each law firm that represents one or more of the defendants, and was mailed, via U.S. Mail, postage prepaid, this 2nd day of December, 2005 upon at least one attorney at each law firm that represents one or more of the plaintiffs that is not registered for ECF notification.

s/Norman E. Siegel
*Plaintiffs' Liaison Counsel*