## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

IN RE: URETHANE ANTITRUST
LITIGATION                                             No.  04-MD-1616-JWL

This Order Relates to the
Polyester Polyol Cases
_____

## MEMORANDUM AND ORDER

In this multidistrict litigation proceeding plaintiffs allege that defendants engaged in

a price-fixing conspiracy with respect to polyester polyols and related polyurethane systems

in violation of federal antitrust laws.  This matter is presently before the court on Plaintiffs'

Motion for Class Certification and Appointment of Class Counsel (doc. #171).  The court

held a class certification hearing on July 24, 2006.  Having fully considered the record, the

court is now prepared to rule.  For the reasons explained below, the court will grant the

motion in part and deny it in part.  The court will certify a Rule 23(b)(3) class with the

revised proposed class definition as clarified at the class certification hearing.  The court will

not, however, certify the class under Rule 23(b)(2).

## BACKGROUND

In the Consolidated Class Action Complaint (doc. #39) plaintiffs Skypark

Manufacturing LLC (Skypark), Maine Industrial Tires Limited (Maine Tire), and Urethane

Products Industries, Inc. (UPI)[1] allege defendants engaged in a horizontal price-fixing

conspiracy with respect to polyester polyols and related polyurethane systems, a per se violation of § 1 of the Sherman Act, 15 U.S.C. § 1.  Generally speaking, polyurethanes are formed by reacting a polyol with an isocyanate.  Thus, polyols are a primary component of polyurethanes.  Polyols are blended (as part of a "system") with catalysts, surfactants, and blowing agents, and mixed in the correct proportion with isocyanates (methylene dyphenyldiisocyanate (MDI) and toluene diisocyanate (TDI)) to yield polyurethane products. The term "polyester polyols"[2] describes a variety of chemical compounds that can be used as a component in manufacturing products based on polyurethane polymers.  The products at issue in this lawsuit are aliphatic polyester polyols, which are made primarily from adipic acid, and related chemical systems.  They are used to manufacture a variety of foam-based products such as packaging, automobile air filters, sound-deadening materials, and furniture as well as non-foam products such as certain coatings and adhesives.

The defendants in this lawsuit collectively are the primary aliphatic polyester polyol manufacturers.  The defendants include Uniroyal Chemical Company, Inc. and Chemtura Corporation f/k/a Crompton Corporation (collectively, Chemtura) as well as Bayer AG and related entities Bayer Corporation, Bayer MaterialScience (f/k/a Bayer Polymers LLC),

---

[1] The plaintiffs also originally included Industrial Rubber Products, L.L.C. and Kryptane Systems, LLC, but they both subsequently withdrew from being named plaintiffs in this case.

[2] Polyols are typically either ether-based or ester-based.  Hence, the term poly*ester* polyols for this set of consolidated cases and the term poly*ether* polyols for the other set of consolidated cases in this MDL proceeding.

Rhein Chemie Rheinau GmbH, and Rhein Chemie Corporation (collectively, Bayer). At the time plaintiffs originally filed their class certification motion, they sought class certification with respect to their claims against Chemtura and Bayer. Since the time when this motion was filed, however, plaintiffs and Bayer[3] entered into a settlement agreement. The court issued an order preliminary approving the Bayer settlement, certifying a settlement class, and authorizing dissemination of class notice. Consequently, the current motion now applies only to class certification and appointment of class counsel with respect to plaintiffs' claims against Chemtura.

Chemtura vigorously opposes class certification, primarily on the grounds that plaintiffs have failed to show that antitrust injury and damages are susceptible to common proof on a class-wide basis, hence predominance and superiority are lacking. Chemtura contends that the relevant products encompass numerous differently formulated chemical compounds known generally as "polyester polyols," as well as a myriad of differently formulated polyester-based prepolymers ("prepolymers") and two-component, polyester-based polyurethane systems ("polyurethane systems" or "systems"). Chemtura contends that, in reality, these various categories and formulations of compounds have little in common with each other in their manufacture, marketing, pricing, or practical application. According

---

[3] Specifically, the parties to the settlement agreement are Bayer AG, Bayer Corporation, Bayer MaterialScience AG, and Bayer MaterialScience LLC (f/k/a Bayer Polymers LLC). The court also has stayed class proceedings as to defendants Rhein Chemie Corporation and Rhein Chemie Rheinau GmbH because, under the terms of the settlement, plaintiffs' claims against them are to be released.

to Chemtura, contrary to plaintiffs' expert report which states that antitrust impact and damages are susceptible to class-wide proof, the empirical and testimonial evidence reflects that actual transaction prices were established through highly individualized negotiations that often took no account of price lists or price announcements.  In sum, Chemtura argues that the diversity of circumstances surrounding each putative class member's purchase of the precise product purchased by that class member undercuts the simple economic assumptions upon which plaintiff's expert report is based, which ignore the marketplace realities.

## LEGAL STANDARD FOR CLASS CERTIFICATION

The standards for certifying a class action are set forth in Fed. R. Civ. P. 23.  This rule requires all four prerequisites of Rule 23(a) and at least one of the three requirements of Rule 23(b) to be satisfied.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1262 (10th Cir. 2004).  The decision whether to certify a class is committed to the broad discretion of the trial court.  *Rector v. City & County of Denver*, 348 F.3d 935, 949 (10th Cir. 2003); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1287 (10th Cir. 1999).  The court must perform a rigorous analysis of whether the proposed class satisfies the requirements of Rule 23.  *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982); *Hart*, 186 F.3d at 1287-88; *see also Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988) (party seeking to certify a class is under a strict burden of proof to show that all of the requirements are met).  The court should accept the allegations in the complaint as true, although it "need not blindly rely on conclusory allegations which parrot Rule 23

4

requirements [and] may . . . consider the legal and factual issues presented by plaintiff's complaints." *J.B.*, 186 F.3d at 1290 n.7 (quotation omitted; brackets in original). The court is to remain focused on the requirements of Rule 23 rather than looking at the merits underlying the class claim. *Shook v. El Paso County*, 386 F.3d 963, 971 (10th Cir. 2004); *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988); *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982).

## DISCUSSION

For the reasons explained below, the court finds as a threshold matter that plaintiffs' proposed class definition as revised at the class certification hearing defines the class with sufficiently objective and ascertainable criteria. The court further finds that the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—are satisfied with respect to the proposed class and its representatives. The requirements of Rule 23(b)(3) also are satisfied because the court concludes that common questions of law and fact will likely predominate this case and a class action is the best method for adjudicating this controversy; the court rejects Chemtura's arguments to the contrary. The court will not, however, certify the class pursuant to Rule 23(b)(2) because it appears that plaintiffs' suggestion that Chemtura is continuing to act on grounds generally applicable to the class (in light of the federal price-fixing investigation and its implications for Bayer and Chemtura) is dubious and, consequently, the appropriate final relief relates

exclusively or predominantly to money damages, not injunctive relief. Finally, the court will appoint co-lead counsel and liaison counsel in this set of consolidated cases as class counsel.

## I.   Definition of the Class and the Class Claims, Issues, or Defenses

The court must begin its analysis with the proposed class definition. The Manual for Complex Litigation explains the importance of defining the class in terms of sufficiently definite and readily ascertainable criteria: "Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action. The definition must be precise, objective, and presently ascertainable." Manual for Complex Litigation § 21.222, at 270 (4th ed. 2005).

In plaintiffs' motion for class certification, they initially sought certification of the following class:

> All persons (excluding governmental entities and excluding Defendants and their present and former parents, predecessors, subsidiaries and affiliates) that purchased Urethanes and Urethane Chemicals in the United States from any of the Defendants, or any present or former parent, subsidiary or affiliate thereof, at any time during the period from January 1, 1998 to the present.

Plaintiffs further proposed to define the term "Urethanes and Urethane Chemicals" as "polyester polyols and related polyurethane systems," just as it is defined in their complaint. Chemtura objects to this proposed product definition, contending essentially that it is not sufficiently definite in terms of the scope of the relevant product market. The court agrees: defining the market in terms of "related" systems seems too indefinite because it does not appear to be susceptible to objective application.

6

In plaintiffs' reply, they explain that their proposed definition includes the products discussed by defendants in their brief—that is, it includes direct purchasers of polyester polyols, polyester polymers and prepolymers, and polyester-based polyurethane systems. At the class certification hearing, upon inquiry by the court, plaintiffs confirmed this would be an appropriate class definition. At the hearing the court also asked plaintiffs' counsel whether the class definition should be further confined to aliphatic polyester polyols, which would be consistent with the scope of the declarations of plaintiffs' expert, Dr. Robert Tollison, in support of class certification. The opinions offered by Dr. Tollison are confined to the aliphatic polyester polyol market; he expressly excludes the aromatic polyester polyol market from his opinions. Plaintiffs' counsel agreed that it would be appropriate to confine the relevant class definition to the aliphatic polyester polyol market. Thus, the proposed class definition now at issue is as follows:

> All direct purchasers (excluding governmental entities and excluding Defendants and their present and former parents, predecessors, subsidiaries and affiliates) of aliphatic polyester polyols, aliphatic polyester polymers and prepolymers, and aliphatic polyester-based polyurethane systems in the United States from any of the Defendants, or any present or former parent, subsidiary or affiliate thereof, at any time during the period from January 1, 1998 to the present.[4]

---

[4] After the class certification hearing, plaintiffs submitted a revised proposed order for the court to grant their motion for class certification. In that proposed order, they proposed yet a different class definition including "products . . . containing polyester polyols, including without limitation polyester prepolymers; thermoplastic urethanes; elastomers; and polyurethane systems (defined as any polyurethane product whose principal inputs are an isocyanate and a polyester polyol)." The court declines to adopt this class definition because it contains new verbiage that is arguably critical but was not proposed until such a late date (*after* plaintiffs submitted their reply brief and *after* the class certification hearing) that

This revised proposed class definition defines the class in terms of precise, objective, and presently ascertainable criteria.  With this revision, the court rejects Chemtura's argument that the proposed class definition is not sufficiently definite.

"Rule 23(c)(1)(B) also requires district courts to include in class certification orders a clear and complete summary of those claims, issues, or defenses subject to class treatment." *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 184 (3d Cir. 2006) (noting current practice often falls short of that standard).  Here, plaintiff's motion did not originally discuss this issue.  At the class certification hearing, however, plaintiffs' counsel agreed that the claims subject to class treatment include: (1) the antitrust claim, and (2) the fraudulent concealment theory for purposes of tolling the statute of limitations.  This includes the issues broadly alleged in plaintiffs' complaint such as whether defendants and their co-conspirators engaged in an unlawful continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for polyester polyols and related polyurethane systems; as well as whether they engaged in anti-competitive activities, the purpose and effect of which was to artificially raise, fix, maintain, or stabilize

---

defendants have not had an opportunity to be heard concerning this proposed class definition. *See Green v. New Mexico*, 420 F.3d 1189, 1196-97 (10th Cir. 2005) ("Generally, the nonmoving party should be given an opportunity to respond to new material raised for the first time in the movant's reply."); *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003) (argument raised for the first time in reply brief is waived) (citing *Coleman v. B-G Maint. Mgmt.*, 108 F.3d 1199, 1205 (10th Cir. 1997) (issues not raised in the opening brief are deemed abandoned or waived)).  If the parties believe plaintiffs' latest proposed class definition more accurately defines the class, they are of course welcome to file a motion to reconsider.

prices for those products.  It also includes the defenses raised in the Chemtura defendants'

answers (docs. #49 & #50) such as lack of standing, failure to state a claim upon which relief

can be granted, applicable statutes of limitation, and defenses such as those based on equity

and due process.

Accordingly, as the court discusses the propriety of class certification, it is doing so

with an eye toward the class definition and the class claims, issues, and/or defenses set forth

above.  With these threshold issues resolved, then, the court will proceed to evaluate the

propriety of class certification.

## II.    Class Certification

In determining whether class certification is appropriate, the court must first find that

the proposed class meets the four prerequisites of numerosity, commonality, typicality, and

adequacy of representation set forth in Fed. R. Civ. P. 23(a).  *In re Integra Realty Res., Inc.*,

354 F.3d 1246, 1262 & n.3 (10th Cir. 2004).  If so, the court must then find that the

plaintiffs' claim is maintainable as a class action under one (or more) of the three categories

of suits described in Rule 23(b).  *Id.*  In this case, plaintiffs contend that the four prerequisites

of Rule 23(a) are satisfied and that the claims can be maintained under both Rule 23(b)(2)

and/or Rule 23(b)(3).

### A.    Four Prerequisites Set Forth in Rule 23(a)

#### 1.    Numerosity

Rule 23(a)(1) allows certification of a class only if the proposed class is so numerous

that joinder of all class members would be impracticable.  In order to satisfy this numerosity

requirement, plaintiffs "must present some evidence or otherwise establish by reasonable estimate the number of class members who may be involved." *Rex v. Owens*, 585 F.2d 432, 436 (10th Cir. 1978). This is a fact-specific inquiry, as there is no set formula for determining if the class is so numerous that it should be certified. *Trevizo v. Adams*, — F.3d —, 2006 WL 2065084, at *5 (10th Cir. July 26, 2006) (publication forthcoming). Here, plaintiffs state that the limited transactional data produced so far shows more than 120 Chemtura customers and more than 250 Bayer customers who would be members of the class. Given this transactional data as well as the nature of the industry and the commerce involved, plaintiffs believe the class consists of hundreds, if not thousands, of geographically dispersed businesses. Based on this estimate, the court finds plaintiffs have satisfied the numerosity requirement because joinder of all class members would be impracticable. Indeed, Chemtura does not dispute that the proposed class satisfies the numerosity requirement.

### B.    Commonality

Rule 23(a)(2) requires the presence of questions of law or fact common to the class. This requirement is satisfied where members of a putative class "possess the same interest and suffer the same injury." *Gen. Tele. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982). Commonality is not necessary on every issue raised in the case. *Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir. 1999). A finding of commonality "requires only a single issue common to the class." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1288 (10th Cir. 1999). Here, the court is satisfied that the individual claims of the putative class members share

common issues of law and fact.  These include, for example, whether defendants and their co-conspirators conspired to fix, raise, maintain or stabilize prices of the relevant products; whether they conspired to allocate their major customers, accounts, or territories; whether their conduct caused injury to the plaintiff class members; and the appropriate measure of damages.  With respect to these issues, all of the putative class members possess the same interest and allegedly suffered the same injury.  Accordingly, this element is satisfied.  *See, e.g.*, *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005) (noting that courts have consistently held that the nature of an antitrust conspiracy action compels a finding of commonality); *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 686 (S.D. Fla. 2004) ("Specifically in the antitrust context, courts . . . have consistently held that allegations of price-fixing . . . and conspiracy by their very nature involve common questions of law or fact."); *see also* 7A Charles Alan Wright et al., Federal Practice & Procedure § 1763, at 204 & n.11 (2d ed. 1986 & Supp. 2005) (observing that "[t]he claimed existence of a conspiracy to fix prices . . . in violation of the antitrust laws has been found to present common questions"; citing an abundance of case law on this issue).

### 3.     *Typicality*

Rule 23(a)(3) requires the named plaintiffs to show that the claims or defenses of the representative parties are typical of those of the class members they seek to represent.  *Rector v. City & County of Denver*, 348 F.3d 935, 949 (10th Cir. 2003).  In this case, Chemtura argues that none of the named plaintiffs purchased polyester polyols on a stand-alone basis and therefore their claims are not typical of other class members who did purchase polyester

polyols.  Chemtura's argument is essentially twofold.  First, Chemtura points out that Maine Tire and UPI did not purchase polyester polyols on a stand-alone basis.  Instead, Maine Tire and UPI purchased polyester prepolymers; UPI also purchased polyurethane systems.  Second, Chemtura contends that Skypark has not presented any evidence that it purchased polyester polyols or related polyurethane systems, and that although Skypark's assignor purchased polyester polyols on a stand-alone basis, Skypark does not have standing to assert a claim because Skypark is an assignee.  The court finds these arguments to be without merit for two reasons.

First, it is well established that "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory."  *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988); *see also Anderson v. City of Albuquerque*, 690 F.2d 796, 800 (10th Cir. 1982) (noting it is well established that the claims of all the class need not be identical to those of the named plaintiffs).  Here, plaintiffs' claims are typical of the claims of the other putative class members because they are all based on the same legal or remedial theory, which is that they suffered damages by virtue of the fact that they all purchased polyester polyols and related chemical systems at prices that were allegedly artificially inflated because of the price-fixing conspiracy among Bayer, Chemtura, and their co-conspirators.  "[T]here is substantial legal authority holding in favor of a finding of typicality in price fixing conspiracy cases, even where differences exist between plaintiffs and absent class members with respect to pricing, products, and/or methods of purchasing products."

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, Case No. 02-1486, 2006 WL 1530166, at *5 (N.D. Cal. June 5, 2006) (collecting case law).  This is because, in conspiracy cases, the plaintiffs' claims are typical of those of the class because the claims all depend on proof of the antitrust violation by the defendants, not on the plaintiffs' individual positions.  *Id.*; *see also* 6 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 18.9, at 30 (4th ed. 2002) (noting the typicality requirement can be met "even though there were many products sold at varied prices" because typicality refers to the nature of the claim, "not to the specific facts from which it arose").  Accordingly, the court is satisfied that the named plaintiffs' claims are typical of the claims of the other putative class members.

As to Chemtura's related argument that Skypark does not have standing to assert claims because it has not produced any evidence showing that it purchased the relevant chemicals during the class period, the court simply notes that Rule 17(a) of the Federal Rules of Civil Procedure provides that "every action shall be prosecuted in the name of the real party in interest."  The real party in interest is the one who, under applicable substantive law, has the legal right to bring the suit.  *FDIC v. Geldermann, Inc.*, 975 F.2d 695, 698 (10th Cir. 1992).  In this case, Skypark contends it is the real party in interest as the assignee of claims originally held by Burtin Urethane Corporation and Burtin Urethane LLC.  Skypark's president is Jorge Burtin.  Mr. Burtin was formerly the president and owner of the two Burtin entities.  In 2001, these companies sold most of their assets to BASF, including the Burtin company name.  But, the Burtin family retained the companies' claims and liabilities, and created Skypark as a holding company to hold those claims and liabilities.  Thus, Skypark

13

is the assignee of Burtin's "right, title and interest" in claims arising out of Burtin's purchases of urethane and urethane chemicals, "specifically including antitrust claims against the vendors of urethane and urethane chemicals." Thus, Skypark is asserting its claims as the real party in interest as the assignee of Burtin. As such, it is immaterial that Skypark has not produced any evidence showing that it (as opposed to Burtin) purchased the relevant chemicals during the class period.[5]

Related to this argument is Chemtura's argument based on its view of the evidence concerning Burtin's chemical purchases: Chemtura contends that plaintiffs have failed to produce "invoices, receipts, shipping papers or otherwise plausible evidence" to establish that Burtin purchased polyester polyols and/or related polyurethane systems during the class period. The court finds this argument, which essentially is that plaintiffs have not produced "good enough" evidence, to be without merit at this procedural juncture. Although the court may not blindly rely on conclusory allegations in the complaint, the court generally should accept the allegations in the complaint as true. Here, plaintiffs' complaint specifically alleges that Skypark f/k/a Burtin purchased these chemicals from one or more of the defendants through the class period. (Consol. Class Action Compl. (doc. #39) ¶ 11, at 5.) Additionally,

---

[5] The court is not ruling here that Skypark necessarily is the real party in interest. That determination is a factual issue that must be resolved based on the evidence concerning Burtin's assignment of its rights to Skypark. Chemtura has not challenged the validity of the purported assignment at this procedural juncture, and the court therefore confines its analysis accordingly. The court is simply rejecting Chemtura's argument that plaintiffs' failure to present evidence that Skypark itself (as opposed to Burtin) purchased the relevant chemicals precludes class certification.

14

Mr. Burtin, who was the individual responsible for purchasing urethane chemicals for Burtin, testified in his deposition that he believed the corporation purchased two or three truckloads of polyester polyols at a rate of approximately one truckload a year beginning in the early to mid-90s. Additionally, a search of Skypark's accounting records reflected at least two purchases of polyester polyols from Ruco, one of Bayer's predecessors, in 1999. The allegations in plaintiff's complaint as buttressed by other evidence in the record, then, indicates that Burtin purchased polyester polyols during the class period. The court should not endeavor to resolve the merits of the case at the class certification stage.[6] As such, the court cannot find that Skypark's claims fail to satisfy the typicality requirement so as to defeat class certification.

### 4.   Adequacy of Representation

Rule 23(a)(4) requires that the named plaintiff(s) must fairly and adequately protect the interests of class members. To satisfy this prerequisite, the plaintiffs must show that their interests are aligned with those of the persons they seek to represent and that they will vigorously prosecute the class through qualified counsel. *Rutter & Wilbanks Corp. v. Shell*

---

[6] At oral argument, counsel for Chemtura argued that Burtin made these purchases from Ruco before Ruco was purchased by Bayer, and therefore "[t]hose are not conspiracy purchases." (Class Cert. Hrg. Tr. at 61:17.) But the court believes that the implications of this assertion involve issues of fact that must be resolved on the merits, not at the class certification stage. At this procedural juncture, the court is holding only that it is satisfied that Skypark has made an adequate showing that its claims are typical of those of the putative class members in the sense that its predecessor purchased urethane chemicals that were within the scope of the alleged price-fixing conspiracy. Chemtura may of course raise this argument again at a more appropriate procedural juncture in which the court is at liberty to examine the merits of Skypark's claims.

15

*Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002). In this case, the court is satisfied that the named plaintiffs and class counsel will fairly and adequately protect the interests of class members, as they have vigorously prosecuted this case thus far and the record does not reveal any potentially problematic conflicts of interest.

## B.    Certification Under Rule 23(b)(3)

To certify a class under Rule 23(b)(3), the court must find that: (1) common questions predominate over questions affecting only individual members; and (2) class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Chemtura's primary argument in opposition to class certification is that plaintiffs have failed to show that common questions predominate over individual questions and that a class action is superior to individual actions. Chemtura contends that plaintiffs have not shown they can demonstrate antitrust impact or damages using common proof on a class-wide basis. Chemtura also contends that, for similar reasons, common issues will not predominate concerning plaintiff's allegation that the applicable statute of limitations should be tolled because Bayer and Chemtura fraudulently concealed the alleged price-fixing conspiracy.

### 1.    Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. "The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir.

16

2005).  If the proposed class members will need to present evidence that varies from member to member in order to make out a prima facie case, then it is an individual question.  *Id.*  If, on the other hand, the same evidence will suffice for each member to make out a prima facie case, then it is a common question.  *Id.*  To establish an antitrust violation, a plaintiff must prove (1) a violation of the antitrust laws, (2) that plaintiffs suffered some resulting injury from the violation (also called impact), and (3) the measure of damages.  *See Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006); *Blades*, 400 F.3d at 566; *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 302 & n.12 (5th Cir. 2003).  Thus, the court must examine whether plaintiffs have demonstrated that these three elements may be proven by common proof on a class-wide basis.

### a.      Violation of the Antitrust Laws

Clearly, the issue of whether Chemtura violated the antitrust laws will be a common one among all of the class members.  The central allegation in plaintiffs' complaint is that Bayer and Chemtura engaged in a price-fixing conspiracy with respect to polyester polyols and related polyurethane systems.  Thus, plaintiffs can present common proof on the issue of whether the defendants engaged in this combination or conspiracy.  This issue will necessarily focus on the conduct of Bayer and Chemtura, not on the individual conduct of class members.  *See, e.g.*, *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (affirming district court's determination that common proof could be used to prove antitrust violations); *see also* 7AA Charles Alan Wright et al., Federal Practice & Procedure § 1781, at 228 (3d ed. 2005) (noting that "whether a conspiracy exists is a

common question"); 6 Alba Conte & Herbert Newberg, Newberg on Class Actions § 18.28, at 102 (4th ed. 2002) ("As a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions.").  Chemtura does not dispute this point.

> ### b.    Fact of Injury from the Antitrust Violation, or "Impact"

The far more pivotal issue is whether common issues will predominate resolution of the issue of whether each of the putative plaintiff class members suffered antitrust injury, or "impact."  In support of plaintiff's motion for class certification, plaintiffs submitted an expert declaration of an economist, Dr. Robert D. Tollison.  In Dr. Tollison's declaration, he relies on an economic analysis of the polyurethane industry.  He opines that there is high concentration among polyester polyol manufacturers, that high barriers to entry exist such as proprietary process patents and the level of capital investment required for plants of minimally efficient scale, that the products are fungible commodity products, that the industry social structure is such that it lends itself to opportunities for direct contacts with counterparts at competitors, and that defendants' pricing structure makes it easy for them to implement across-the-board pricing and to raise prices in a coordinated fashion.  Based on these considerations, he opines that "if the plaintiffs prove the conspiracy that they allege in the Complaint as described above, that conspiracy would have had a common impact on the class."  (Dr. Tollison's Report ¶ 48, at 20.)  And, furthermore, that "it will be possible to analyze the impact of the alleged conspiracy on the polyurethane industry on a classwide basis."  (*Id.* ¶ 56, at 25.)  Plaintiffs contend this expert declaration is sufficient to establish that the issue of antitrust impact is susceptible to common proof on a class-wide basis,

relying on (among other cases) *In re Linerboard Antitrust Litigation*, 305 F.3d 145, 153 (3d Cir. 2002) (district court did not err in determining that plaintiffs demonstrated they could establish injury on a class-wide basis where the plaintiffs' expert declarations were based on industry characteristics).

In response, Chemtura submitted an expert declaration from its own economist, Dr. Barry C. Harris. Dr. Harris opines that Dr. Tollison did not set forth a methodology that would show class-wide impact by common proof because the economic assumptions upon which Dr. Tollison's opinion rests are incorrect as applied to the relevant product market. Dr. Harris further states that he performed an empirical economic analysis based on defendants' actual transaction data and that, in reality, prices are established on a customer-by-customer basis and a product-by-product basis; consequently, separate product-specific and customer-specific inquires of actual transaction prices would be necessary to show impact. He explains that an examination of the data reflects that the changes in actual prices of polyester polyols and polyurethane systems were not related to changes in the list prices, and that pricing patterns varied significantly among purchasers of the same products. Additionally, he explains that documents from Chemtura provide evidence that prices are regularly negotiated with customers on an individualized basis with those negotiations taking into consideration different factors such as volume discounts, discounts to help specific customers be more competitive with their own pricing, payment terms, competitive pressure to lower prices, and products being sold in different competitive markets. Chemtura contends that because list prices did not correlate with transaction prices in any consistent

way, and because many customers never received list prices or used them as a starting point for negotiations, an analysis of list price cannot supply proof of impact. Chemtura points out that Dr. Tollison did not consider the customer-specific contracting practices or how they could be squared with his assumption of common proof. Ultimately, Chemtura contends that the circumstances of this case are similar to those rejected by the court in *Sample v. Monsanto Co.*, 218 F.R.D. 644 (E.D. Mo. 2003) (holding plaintiffs failed to demonstrate that antitrust impact could be measured on a class-wide basis with common proof where the plaintiffs presumed "class-wide impact without any consideration of whether the markets . . . actually operated in such a manner").

Plaintiffs then submitted a supplemental declaration from Dr. Tollison in which he responded to the opinions and assertions made by Dr. Harris in his report. In Dr. Tollison's supplemental report, he adheres to the opinion stated in his initial report that "common impact derives from the structure of the industry, the behavior of the defendants in the industry, and the behavior of pricing within the industry." (Tollison Supp. Report ¶ 2, at 2.) He opines that common impact derives, among other things, from the structure of pricing: price lists are important because conspiratorial behavior elevates list prices and list prices serve as a reference or benchmark for pricing or pricing negotiations; therefore, the collusive, artificially inflated list prices influence all or nearly all customers' transaction prices at some point during the class period. He states that Dr. Harris's analyses of transaction and list prices were based on flawed and unreliable methodologies which resulted in Dr. Harris using incorrect and misleading customer transaction prices in his analyses. Moreover, in Dr.

Tollison's supplemental report he provided an illustrative multiple regression model utilizing 1999-2004 Chemtura transaction data to show that such a multi-dimensional econometric analysis of the data is much more reliable than the one-dimensional, subjective charts of subjectively selected data such as those generated by Dr. Harris.  He explains that his relatively simple model, which is based on very preliminary data, explains almost 90% of the variability Dr. Harris attributed to "individual customer analysis," and thus demonstrates that Dr. Harris is wrong.

As the record stood immediately after Chemtura filed its memorandum in opposition to plaintiff's motion for class certification (which included Dr. Harris's expert report), the court would have had a much more difficult task evaluating whether common questions will predominate the determination of antitrust impact.  But, now that Dr. Tollison has buttressed his initial report with his far more comprehensive, detailed, and thorough supplemental report, his opinions satisfy the court that the issue of antitrust injury in this case is susceptible to common proof on a class-wide basis notwithstanding arguable product-specific and customer-specific pricing disparities.  Dr. Tollison's thirty-page supplemental report was prepared after he had reviewed Dr. Harris's declaration and related materials, numerous deposition transcripts, and databases provided by Bayer and Chemtura.  Appendix A to his supplemental report contains a persuasive, thirteen-page, detailed discussion with sixty-seven in-depth footnotes discussing the errors in Dr. Harris's metholodogy.  Appendix B consists of more than twenty pages of charts, ten of which demonstrate the relationship between quantity and price along with comparisons to the industry median price or quantity, and ten

of which evidence a correlation between customers' price increases at the time of list price increases. Finally, Appendix C contains his illustrative regression model. Ultimately, it is not the court's task at this procedural juncture to resolve on the merits the issue of whether plaintiffs have in fact established that they suffered injury as a result of the alleged conspiracy by weighing the conflicting expert reports or engaging in statistical dueling of the experts. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 135. Rather, at this procedural juncture the court must remain focused on "whether plaintiff's expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive." *Id.*; *see also In re Linerboard*, 305 F.3d at 152 ("Plaintiffs need only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class."); *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, Case No. 02-6030, 2006 WL 891362, at *10 (D.N.J. Apr. 4, 2006) (emphasis added) ("The operative question here is not whether the plaintiffs can establish class-wide impact, but whether class-wide impact may be proven by evidence common to all class members."); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, Case No. 02-1486, 2006 WL 1530166, at *9 (N.D. Cal. June 5, 2006) ("Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis."). Here, the court is persuaded that plaintiffs have met their burden of showing that the issue of whether each of the plaintiffs suffered some resulting injury from

the alleged price-fixing conspiracy may be proven by common proof on a class-wide basis.

Accordingly, common issues will likely predominate this inquiry.[7]

### c.      Proof of Damages

The court is also satisfied that plaintiffs have suggested a potentially feasible method

for proving damages on a class-wide basis.  Dr. Tollison opined in his initial report that

several widely accepted and feasible methods may be used to estimate damages on a class-

wide basis, including the "before and after" approach, multiple regression analysis, and

comparison of prices to cost indices.  In his supplemental report, he reaffirmed that damages

can be determined on a class-wide basis using formulaic methodologies customarily used in

these types of cases.  He further noted that "there appear to be ample transactional pricing

and other data from Chemtura and Bayer with which, after further discovery, to apply any

of several damage methodologies typically used in antitrust class action matters (in-period

versus out-of-period pricing, for example)."  (Tollison Supp. Report ¶ 2, at 2.)  Dr. Tollison

also states that nothing Dr. Harris said in his opinion changed Dr. Tollison's opinion that a

common formulaic model of damages can be specified and estimated in this case.  Thus,

damages are also likely susceptible to class-wide proof, as well.  Even if individualized

issues (rather than common issues) were to predominate the damage inquiry, the more

appropriate course of action would be to bifurcate a damages phase and/or decertify the class

as to individualized damages determinations.  In other words, even if individualized issues

---

[7] Of course, as this litigation progresses Chemtura is free to continue to challenge the persuasiveness of Dr. Tollison's opinions in light of Dr. Harris's opinions to the contrary.

predominate the issue of damages, the court believes that common questions nonetheless predominate in this case because common questions will govern the more difficult, threshold liability issues of proving an antitrust violation and impact.

### d.     Fraudulent Concealment

Finally, plaintiffs allege that the four-year statute of limitations for antitrust claims should be tolled based on the doctrine of fraudulent concealment, which tolls the limitation period when a plaintiff's cause of action has been obscured by the defendant's conduct.  The fraudulent concealment tolling doctrine is "read into every federal statute of limitation." *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946).  To toll the statute of limitations based on fraudulent concealment, plaintiffs must show: (1) the use of fraudulent means by the defendants; (2) successful concealment from plaintiffs; and (3) that plaintiffs did not know or by the exercise of due diligence could not have known that they might have a cause of action.  *Ballen v. Prudential Bache Sec., Inc.*, 23 F.3d 335, 337 (10th Cir. 1994).  Of course, "certain determinations involving the fraudulent concealment defense to the statute of limitations will require individualized proof, which might vary among the" class member plaintiffs.  *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002).  But the common issue of concealment will predominate because the key inquiry will focus on the defendants' conduct—that is, what the defendants did—rather than on the plaintiffs' conduct. *See id.* (noting the fact of concealment is the "polestar" in a fraudulent concealment analysis).  Consequently, the court believes that common issues will predominate the fraudulent concealment determination.  As with the possibility of individualized damage

24

issues, the court believes the more appropriate course of action with respect to any individualized fraudulent concealment issues would be to adjudicate them at a later phase of the litigation. *See id.* ("Many courts faced with similar circumstances have certified class status with the expectation that individual questions concerning fraudulent concealment can be resolved at a later damages phase."); *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268-70 (D.D.C. 2002) (holding common issues would predominate determination of fraudulent concealment for purposes of tolling the statute of limitation).

### e.    Conclusion Regarding Predominance

In sum, the court is satisfied that the key issues plaintiffs will need to prove are susceptible to common proof on a class-wide basis. These common questions will include the two issues necessary to establish liability—antitrust injury and impact—as well as Chemtura's alleged fraudulent concealment of the alleged price-fixing conspiracy. Damages might be provable on a class-wide basis, although the possibility certainly exists that individualized damage determinations will need to be made. Likewise, other issues relating to plaintiffs' fraudulent concealment allegations may require individualized proof. Overall, however, the court is satisfied that common issues will predominate over questions affecting only individual class members.

### 2.    *Superiority*

Because these common issues will predominate, the court believes class resolution is superior to other available methods for the fair and efficient adjudication of this lawsuit. The requirement that a class action be the superior method of resolving the claims insures that

there is no other available method of handling the litigation which has greater practical advantages. Fed. R. Civ. P. 23 advisory committee notes to the 1966 amendments. Here, the obvious alternative to a class action would be for plaintiffs to bring individual suits against defendants. This would be grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation. The hundreds, and perhaps thousands, of class members are dispersed across the country, each with relatively similar claims. Certainly, the most feasible way for these plaintiffs to pursue their claims is by way of a class action. Even though a second (perhaps cumbersome and tedious) phase may be required to determine individualized issues relating to damages or fraudulent concealment, the parties will at least benefit from the initial phase, which presumably will result in a determination of liability or non-liability, thus perhaps altogether obviating the need for a second phase. Thus, the court is persuaded that a class action is by far the best method for resolving the claims at issue in this lawsuit. Accordingly, the court finds that certification of this class under Rule 23(b)(3) is warranted.

## F.     Certification Under Rule 23(b)(2)[8]

Plaintiffs also ask the court to certify the class under Rule 23(b)(2). Rule 23(b)(2) allows certification where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief

---

[8] The court recognizes that it could certify a 23(b)(2) class with respect to particular issues. *See* Fed. R. Civ. P. 23(c)(4)(A). Plaintiffs, however, have made no such request, opting instead to seek wholesale certification under 23(b)(2), which the court rejects for the reasons stated.

26

or corresponding declaratory relief with respect to the class as a whole." In this case, two

related considerations bear on the court's determination that certification under Rule 23(b)(2)

is not appropriate. First, the nature of this case does not lend itself particularly well to a

determination that Chemtura is continuing to act on grounds generally applicable to the class

such that final injunctive or declaratory relief with respect to the class as a whole would be

appropriate. Chemtura has already been involved in criminal proceedings with respect to

some of the alleged price-fixing behavior at issue in these civil proceedings. It has been

given conditional amnesty and paid millions of dollars in fines. Under these circumstances

involving a high degree of scrutiny of its alleged price-fixing behavior, it seems highly

unlikely that Chemtura is continuing to act on grounds generally applicable to the class such

that injunctive relief will be necessary to ensure Chemtura's continuing compliance with

antitrust regulations.

A second and related consideration is that certification under Rule 23(b)(2) is

inappropriate in "'cases in which the appropriate final relief relates exclusively or

predominantly to money damages.'" *Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir.

2004) (quoting the advisory committee notes to Rule 23); *see also Boughton v. Cotter Corp.*,

65 F.3d 823, 827 (10th Cir. 1995) (finding the district court did not abuse its discretion where

it declined to certify the class under Rule 23(b)(2) because the relief sought was primarily

money damages). In this case, it is clear to the court that the primary relief sought is money

damages. The court seriously doubts plaintiffs would be pursuing the claims at issue in this

lawsuit were it not for the monetary aspect of the case. In fact, given the dubious nature of

plaintiffs' claim for injunctive relief (as discussed above), the monetary aspect of this case dwarfs any purported aspect involving injunctive relief.  Accordingly, the court declines to certify the class under Rule 23(b)(2).

## III.    Appointment of Counsel

An order certifying a class must also appoint class counsel that will adequately represent the interests of the class. Fed. R. Civ. P. 23(c)(1)(B), (g)(1).  The court must consider the work counsel has done in identifying or investigating potential claims in the actions, counsel's experience in handling class actions and other complex litigation and claims of the type asserted in the present action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(C). For the reasons stated on the record at the initial conference in these consolidated cases on October 15, 2004, the court is satisfied that the firms of Ross, Dixon & Bell, L.L.P.; Glancy Binkow & Goldberg LLP; Lockridge Grindal Nauen, P.L.L.P.; and Much Shelist Freed Denenberg Ament & Rubenstein, P.C. satisfy these criteria and will adequately represent the interests of the class as lead counsel.  Stueve Siegel Hanson Woody LLP shall continue to serve as liaison counsel.

## IV.    Notice

Rule 23(c)(2)(B) provides that "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  The court believes that the overwhelming majority of, if not all, class members can likely be identified

through reasonable efforts.  To that end, defendants are directed to provide to plaintiffs the names, addresses, and telephone numbers of all customers who are potential members of the class on or before **September 14, 2006**.  Also on or before **September 14, 2006**, plaintiffs shall prepare and submit to the court for approval an order regarding notice that complies with the requirements of Fed. R. Civ. P. 23(c).

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion for Class Certification and Appointment of Class Counsel (doc. #171) is granted in part and denied in part as set forth above.

**IT IS SO ORDERED** this 16th day of August, 2006.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge