## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

-------------------------------------------------------
                                          :      MDL 1616

IN RE:  URETHANE             :      Civil No. 04-md-01616-JWL

ANTITRUST LITIGATION     :

                                            :

This document relates to:       :      **FIRST AMENDED CONSOLIDATED**

                                          :      **CLASS ACTION COMPLAINT**

Polyester Polyols            :

                                          :
-------------------------------------------------------

Plaintiffs, individually and on behalf of a class of all those similarly situated, bring this action for injunctive relief, costs of suit and treble damages under the antitrust laws of the United States.  Plaintiffs allege:

### NATURE OF THE CASE

1.     Plaintiffs allege a conspiracy among Defendants and certain unnamed co-conspirators to fix, raise, maintain and/or stabilize prices for Urethanes and Urethane Chemicals (as defined in this Complaint) sold in the United States, and/or to allocate markets and customers for the sale of Urethanes and Urethane Chemicals in the United States.

2.     This action is brought on behalf of all individuals and entities which purchased Urethanes and Urethane Chemicals in the United States directly from Defendants, their predecessors or subsidiaries or affiliates from at least as early as January 1, 1998 through the present (the "Class Period").  At all relevant times, Defendants and their co-conspirators were involved in the manufacture, distribution, or sale of Urethanes and Urethane Chemicals.  During the Class Period, Defendants and their co-conspirators agreed, combined, and conspired with each other to fix, raise, maintain and/or stabilize the price of Urethanes and Urethane Chemicals or to allocate markets and/or customers in the United States.  As a result of Defendants' unlawful

conduct, Plaintiffs and the Class (as defined in this Complaint) paid prices for Urethanes and Urethane Chemicals that were artificially inflated, and have suffered injury to their business and property.

## JURISDICTION AND VENUE

3.      This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, from Defendants for damages sustained by Plaintiffs for violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

4.      This Court has jurisdiction under 28 U.S.C. §§1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

5.      Venue is proper in this District under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d), because during the relevant period one or more of the Defendants resided, transacted business, was found, or had agents in this District.

## DEFINITIONS

6.      "Urethanes and Urethane Chemicals," as the terms are used in this Complaint, mean aliphatic polyester polyols, aliphatic polyester polymers and prepolymers, and aliphatic polyester-based polyurethane systems in the United States.  Polyurethane systems include a polyol, an isocyanate, and other substances or materials which, when mixed together, react to form a polyurethane or polyisocyanurate polymer.

7.      Polyester polyols are macroglycols that are combined with isocyanates (including TDI, MDI, and other isocyanates) to produce and manufacture polyurethane.  Polyester polyols are used to manufacture foam and non-foam polyurethane products, including flexible foam,

rigid foam, cast elastomers, thermoplastic polyurethane elastomers (TPEs), reaction-injection molding elastomers (RIM), other polyurethane elastomers, surface coatings, adhesives and sealants, polyurethane fibers, and other polyurethane products.   Although sometimes sold separately, polyols and isocyanates are often sold together as the major  components of the products listed above.

8.      The "Class Period" or "relevant period" means the period from January 1, 1998 to the date of the filing of this Complaint.

9.      "Person" means any individual, partnership, corporation, association, or other business or legal entity.

## **PLAINTIFFS**

10.      Plaintiff Skypark Manufacturing LLC, f/k/a Burtin Urethane Corporation ("Skypark"), is a California limited liability company with its principal place of business in Santa Ana, California.   During the Class Period, Skypark purchased Urethanes and Urethane Chemicals in the United States directly from one or more of the Defendants, and by reason of the antitrust violations alleged herein, was injured in its business and property.

11.      Plaintiff Maine Industrial Tires Limited is an Indiana corporation with its principal place of business in Gorham, Maine.   During the Class Period, Maine Industrial and its affiliates purchased Urethanes and Urethane Chemicals in the United States directly from one or more of the Defendants and, by reason of the antitrust violations alleged herein, was injured in its business and property.

12.      Plaintiff Urethane Products Industries, Inc. ("UPI") is an Ohio corporation with its principal place of business in Stow, Ohio.   During the Class Period, UPI purchased Urethanes

and Urethane Chemicals in the United States directly from one or more of the Defendants and, by reason of the antitrust violations alleged herein, was injured in its business and property.

## **DEFENDANTS**

13.     Defendant Uniroyal Chemical Company, Inc. is a Delaware corporation with its principal place of business in Akron, Ohio, and is a wholly-owned subsidiary of Defendant Crompton Corporation.  Uniroyal Chemical manufactured, marketed and/or sold Urethanes and Urethane Chemicals in the United States during the Class Period, directly and through its predecessors, affiliates, parents and/or subsidiaries.

14.     Defendant Chemtura Corporation, formerly known as Crompton Corporation ("Crompton"), is a Delaware corporation with its principal place of business in Middlebury, Connecticut, and manufacturing facilities in Perth Amboy, New Jersey.  Chemtura Corporation was formed by the merger of Crompton and Great Lakes Chemical in July 2005.  Crompton was formed in September 1999 by the merger of Crompton & Knowles Corp. and Witco Corp. Crompton manufactured, marketed and/or sold Urethanes and Urethane Chemicals in the United States during the Class Period, directly and through its predecessors, affiliates and/or subsidiaries, including its wholly-owned subsidiary, Defendant Uniroyal Chemical.  By virtue of the mergers and acquisitions described in this Complaint, Defendant Crompton acquired all liabilities of its predecessors, including Witco, for the conduct alleged in this Complaint. Moreover, at all relevant times, Defendant Uniroyal was owned entirely by and/or took direction in the conduct of its business from Defendant Crompton, and Defendant Crompton otherwise so dominated and controlled the Urethanes and Urethane Chemicals business of Defendant Uniroyal Chemical so as to make Defendant Crompton liable for the conduct of Defendant Uniroyal as alleged in this Complaint.

4

15.     Defendant Bayer AG is a German corporation with its principal place of business at Werk Leverkusen, 51368 Leverkusen, Germany.  Bayer AG manufactured, marketed and/or sold Urethanes and Urethane Chemicals in the United States during the Class Period, directly and through its predecessors, affiliates and/or subsidiaries, including Defendants Bayer Corporation and Bayer MaterialScience.  At all relevant times, Defendants Bayer Corporation and Bayer MaterialScience were owned entirely by and/or took direction in the conduct of their respective businesses from Defendant Bayer AG, and Bayer AG otherwise so dominated and controlled the Urethanes and Urethane Chemicals businesses of Defendants Bayer Corporation and Bayer MaterialScience so as to make Defendant Bayer AG liable for the conduct of Defendants Bayer Corporation and Bayer MaterialScience as alleged in this Complaint.

16.     Defendant Bayer Corporation is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania, and is a wholly-owned subsidiary of Defendant Bayer AG.  Bayer Corporation manufactured, marketed and/or sold Urethanes and Urethane Chemicals in the United States during the Class Period, directly and through its predecessors, affiliates, parents and/or subsidiaries.

17.     Defendant Bayer MaterialScience (f/k/a Bayer Polymers LLC) is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania and is a wholly-owned subsidiary of Defendant Bayer AG.  Bayer MaterialScience manufactured, marketed and/or sold Urethanes and Urethane Chemicals in the United States during the Class Period, directly and through its predecessors, affiliates, parents and/or subsidiaries.

18.     Defendant Rhein Chemie Rheinau GmbH ("Rhein GmbH") is a German corporation with its principal place of business in Mannheim, Germany.  Rhein GmbH is a subsidiary of Defendant Bayer AG and manufactured, marketed and/or sold Urethanes and

Urethane Chemicals in the United States during the Class Period, directly and through its predecessors, affiliates, parents and/or subsidiaries, including its subsidiary, Defendant Rhein Chemie Corporation.  At all relevant times, Defendant Defendant Rhein Chemie Corporation was owned entirely by and/or took direction in the conduct of its business from Defendant Rhein GmbH, and Defendant Rhein GmbH otherwise so dominated and controlled the Urethanes and Urethane Chemicals business of Defendant Rhein Chemie Corporation so as to make Defendant Rhein GmbH liable for the conduct of Defendant Rhein Chemie Corporation as alleged in this Complaint.

19.     Defendant Rhein Chemie Corporation ("Rhein Chemie") is a New Jersey corporation with its principal place of business in Chardon, Ohio.  Rhein Chemie is a wholly-owned subsidiary of Defendant Rhein GmbH.  Rhein Chemie manufactured, marketed and/or sold Urethanes and Urethane Chemicals in the United States during the Class Period, directly and through its predecessors, affiliates, parents and/or subsidiaries.

## DEFENDANTS' AGENTS AND CO-CONSPIRATORS

20.     Wherever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

21.     The acts alleged in this Complaint to have been done by the Defendants were authorized, ordered and condoned by their parent companies and authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

22.     Various other persons, firms and corporations, not named as defendants in this Complaint, have participated as co-conspirators and performed acts and made statements in furtherance of the conspiracy alleged herein.

## CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> All direct purchasers (excluding governmental entities and excluding Defendants and their present and former parents, predecessors, subsidiaries and affiliates) of aliphatic polyester polyols, aliphatic polyester polymers and prepolymers, and aliphatic polyester-based polyurethane systems in the United States from any of the Defendants or any present or former parent, subsidiary or affiliate thereof, at any time during the period from January 1, 1998 to the present.

24.     Because such information is in the exclusive control of Defendants and/or their co-conspirators, Plaintiffs do not know the exact number of Class members.  Due to the nature of the trade and commerce involved, Plaintiffs believe that there are hundreds of Class members and that they are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all class members is impracticable.

25.     Plaintiffs are members of the Class, Plaintiffs' claims are typical of the claims of the Class members, and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are direct purchasers of Urethanes and Urethane Chemicals from one or more of the Defendants, and their interests are coincident with and not antagonistic to those of the other members of the Class.  In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

26.     There are questions of law or fact common to the Class, including but not limited to:

7

a.      Whether Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain or stabilize prices of Urethanes and Urethane Chemicals sold in the United States;

b.      Whether Defendants and their co-conspirators engaged in a combination and conspiracy to allocate their major customers, accounts or territories;

c.      Whether the conduct of Defendants and their co-conspirators caused injury to the business and property of Plaintiffs and the other members of the Class;

d.      The identity of the participants in Defendants' conspiracy as alleged in this Complaint;

e.      The duration of Defendants' conspiracy and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

f.      Whether Defendants' conspiracy violated Section 1 of the Sherman Act;

g.      The effect of Defendants' conspiracy on the prices of Urethanes and Urethane Chemicals sold in the United States during the Class Period;

h.      The appropriate measure of damages sustained by Plaintiffs and other members of the Class; and

i.      Whether Plaintiffs and the other members of the Class are entitled to injunctive relief.

27.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

28.      Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

29.     The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

30.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records of the names and addresses of the Class should exist in the files of Defendants.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

31.     The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate commerce.

32.     During the relevant period, Defendants and their co-conspirators sold and distributed Urethanes and Urethane Chemicals throughout the United States.

33.     Defendants and their co-conspirators, and each of them, have used instrumentalities of interstate commerce to manufacture, sell, distribute and market Urethanes and Urethane Chemicals.

34.     Defendants and their co-conspirators manufactured, sold and shipped substantial quantities of Urethanes and Urethane Chemicals in a continuous and uninterrupted flow of

interstate commerce to customers located in states other than the states in which Defendants produced Urethanes and Urethane Chemicals.

## THE URETHANES AND URETHANE CHEMICALS MARKET

35.     The urethane chemicals industry includes polyester polyols, polyether polyols, monomeric and polymeric isocyanates, polyurethane dispersions, microcellular systems, silicone surfactants, amine and/or metallic catalysts, biocides, flame retardants, fillers and pigments.

36.     Polyurethane is a subclass of urethane and, as its name suggests, is composed of many single urethanes.   Polyurethanes are a versatile family of polymers and are often substitutes for soft rubber polymers.   Polyurethanes generally belong to a class of block copolymers and can be processed into thermoplastic elastomers, cast elastomers, thermoset foams, RIM and dispersions.

37.     Polyurethanes are among the most versatile polymers available to product designers and manufacturers, as they can vary from solid polymers to rigid or flexible foams. They can be molded into complex shapes over a wide range of hardness and a wide range of temperature resistance.   They can appear in blocks or granules, which are in turn cut or further processed into finished goods.

38.     Polyurethanes serve as engineering materials for a broad range of products in almost every major industry.   Polyurethanes are used in the manufacture of many rubber and plastic products, including but not limited to high pressure rollers, conveyor belts, seals, gaskets, low temperature flexible aerospace materials, abrasion resistant materials for rubber equipment, tires, wheels, engineering parts, bearings, sprockets, mining parts, pump linings, radiation resistance for high-voltage and nuclear applications, molded goods, shoe soles, bumpers, mechanical goods, o-rings, dust covers, mounts and bearings for the automotive industry,

automotive finishes, foam mattresses, oil and gas applications, wood floor coatings and paint coatings, and graphic arts supplies.

39.    Polyurethanes made from polyester polyols are used in the manufacture of a wide array of foam and nonfoam polyurethane products, including prepolymers, flexible foam, rigid foam, cast elastomers, thermoplastic urethanes and TPEs, reaction-injection molding elastomers or "RIM", other polyurethane elastomers, surface coatings, adhesives and sealants, polyurethane fibers, polyurethane systems and other polyurethane products.

40.    The largest market for polyester polyols is in flexible specialty foam products. Applications for such specialty foam products include textile laminates, packaging, automobile components, sound-deadening materials, and furniture.  The major non-foam use of polyester polyols is surface coatings, including coatings for aircraft, railroad cars, bridges, plastic parts, automotive OEM finishes and refinishes, fabric and paper.  Other markets for polyester polyols include thermoplastic polyurethane elastomers (TPEs), which are solid products that are used mainly in extrusion and injection molding.  Applications for TPEs include automotive parts, hydraulic seals, sport and recreational items, and miscellaneous industrial parts.   Other applications for polyester polyols include cast elastomers, especially those requiring high solvent resistance; urethane adhesives and sealants; and polyurethane fibers used in the production of hosiery, intimate apparel, athletic wear and sportswear, elastic trims, and other miscellaneous applications.

41.    Polyester polyols and the other components which make up related polyurethane systems are commodity products that are fungible among grades.

42.    The industry for Urethanes and Urethane Chemicals in the United States and worldwide is concentrated, thus facilitating coordination of prices.

11

43.     During the Class Period, Defendants accounted for production of a significant share of Urethanes and Urethane Chemicals produced in the United States.  Defendant Crompton is "one of the largest publicly traded specialty chemicals companies in the United States. . .and a top marketer and producer of urethane polymers."     See http://www.chemtura.com/chem/about/default.htm.     The Polyurethanes Business Unit of Defendant Bayer MaterialScience holds a "pole position worldwide" and contributes 42% to the Company's total sales.  See www.bayermaterialscience.com.

## THE URETHANE CARTEL AND  INVESTIGATIONS

44.     During the Class Period, Defendants' price changes were inconsistent with changes in key input costs and thus inconsistent with the price changes one would expect to observe in a competitive market.

45.     During the Class Period, Defendants regularly and repeatedly increased prices for Urethanes and Urethane Chemicals, in a coordinated manner --- close in time and in like amounts. For example, on a number of occasions, beginning as least as early as January 1, 1998, Defendants Crompton and Bayer both announced identical price increases on each company's competing polyester polyol product on the very same day.

46.     The Defendants colluded, conspired and/or agreed to artificially manipulate the prices of polyester polyols - both individually and in the sale of polyurethane products that contain these chemicals.  Defendants engaged in anticompetitive behavior to increase the prices of polyester polyols in order to also increase the prices of urethane products.

47.     Defendants intended to manipulate the urethane and urethane chemical market through agreements between and among them concerning, *inter alia*, price setting, manufacture for hire of competitors' products, allocation of customers and allocation of markets.  For

example, during the class period, Defendants Crompton and Bayer entered into a tolling agreement (i.e., an agreement to manufacture for hire) in which the parties agreed that one party would manufacture urethane chemicals for the other, with one supplying the raw materials at no cost along with containers labeled with its name but utilizing the other's facilities to manufacture the chemicals for a small manufacturing fee.   The tolling agreements enabled Defendants to utilize their excess manufacturing capacity while providing an opportunity for so-called competitors to work together in manufacturing and pricing their products.   Defendants recognized that an "alliance" would restrict capacity and prevent competitors from "fighting for market share."   These tolling agreements between and among Defendants were part of Defendants' overall conspiracy, and were one method by which Defendants carried out their conspiracy.

48.   Beginning at least as early as January 1, 1998, Defendants communicated, conspired and agreed to increase prices of urethane and urethane chemicals in a coordinated fashion.  Defendants, in fact, kept their agreement.  Defendants uniformly, at or about the same times, and in the same amounts, increased the prices of polyester polyols.   In fact, Bayer reviewed first with Crompton announced price increases for polyester polyols and other products.

49.   During the Class Period, Crompton's predecessor company, Witco, made and sold in the United States polyester polyols and polyurethane products whose principal inputs were polyester polyols and isocyanates.  Witco manufactured polyester polyols under the brand name Fomrez.  Crompton, after its acquisition of Uniroyal Chemical Company, also manufactured and continues to manufacture polyester polyol prepolymers under the brand names Adiprene and Vibrathane.

50.     Bayer, including its predecessor company, Ruco, manufactured and marketed a fully integrated product line.  It manufactured polyester polyols and other urethane products that included as its principal inputs a polyester polyol and an isocyanate during the class period.

51.     As part of their overall conspiracy, Defendants who manufactured and sold urethane and urethane chemicals in both the United States and Europe agreed to allocate certain geographic markets so that certain Defendants would concentrate their marketing activities in North America while others would do so in Europe.

52.     Investigations are being carried out by U.S., Canadian and European Union competition authorities into possible price-fixing and/or market and customer allocation schemes in the urethane industry.  A criminal investigation into possible antitrust violations in the urethane industry is currently pending before a grand jury convened by the United States Department of Justice in the Northern District of California.

53.     On March 15, 2004, Defendant Crompton Corporation issued a press release in which it announced that it had entered into a plea agreement with the U.S. Department of Justice in connection with a criminal antitrust investigation into price fixing of rubber chemicals. Under the agreement, Crompton agreed to plead guilty and pay a fine of $50 million.

54.     In addition, Crompton stated:  "The company announced that it is cooperating with competition authorities in the U.S., Canada and the European Union that have opened an investigation into possible collusive behavior by manufacturers of urethanes and urethane chemicals. Crompton is cooperating fully with authorities and has received assurances of conditional amnesty in the U.S., Canada and the European Union regarding fines and criminal prosecution with respect to urethanes and urethane chemicals. Amnesty is conditioned upon

several factors, including the company's continued cooperation with the authorities. Crompton's urethanes and urethane chemicals business had sales of $286 million in 2003."

55.     According to Justice Department guidelines, such conditional amnesty could have been procured only by Crompton's full confession of wrongdoing.  In fact, acceptance into the criminal amnesty program requires an admission of guilt, and testimony and other evidence as to the complicity of others in the price-fixing conspiracy.  One of the requirements of the amnesty program is that the confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials.  Crompton is also a defendant in lawsuits alleging that it engaged in anticompetitive practices regarding rubber chemicals, heat stabilizers, nitrile rubber (NBR) and ethylene propylene diene monomer (EPDM) synthetic rubber.

56.     In September 2004 Defendant Bayer Corp. agreed to plead guilty and to pay a $33 million criminal fine for participating in a criminal conspiracy to fix prices of a urethane chemical, aliphatic polyester polyols made from adipic acid, between 1998 and 2002.  Bayer Corp. has agreed to assist the government in its ongoing investigation.

57.     Defendant Bayer Corp. entered its guilty plea on May 24, 2005, and paid a criminal fine of $33 million.  At the hearing, in allocution, Bayer's representative admitted to allegations which "include meetings with representatives of competitors at which time discussions about pricing, about products in the polyester polyols marketplace were engaged in and [there were] agreements put into place in connection with the maintenance of pricing of those products into the polyester polyols marketplace."  Bayer's sentence did not include restitution to victims of the conspiracy; counsel for Bayer cited to this class action proceeding in MDL 1616 as the reason why restitution need not be ordered in the criminal proceeding, since a civil action for damages was pending. At the hearing, the Government moved for the fine of $33

million, which it stated represented a downward departure from the Department of Justice sentencing guidelines.  Those guidelines for criminal fines provide for an amount equal to twice the gross pecuniary gain derived from the crime or twice the gross pecuniary loss caused to the victims; it was stated that the range for Bayer under the guidelines was $46,800,000 to $93,600,000.

58.     According to the U.S. government, July 1995 was the beginning of the price fixing conspiracy in the rubber chemicals price-fixing case, in which both defendants Crompton and Bayer pleaded guilty and paid criminal fines.  See Criminal Complaint filed March 15, 2005, *U.S.A. v. Crompton Corp., Case No. CR 04-0074 SI (N.D.CA.).*

## VIOLATIONS ALLEGED

59.     Beginning at least as early as January 1, 1998 and continuing thereafter until the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Urethanes and Urethane Chemicals in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

60.     In formulating and effectuating their combination and conspiracy, Defendants and their co-conspirators engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain or stabilize the prices of Urethanes and Urethane Chemicals or to allocate markets and customers for the sale of Urethanes and Urethane Chemicals in the United States.  These activities included the following:

a.     Participating in meetings and conversations to discuss, raise and maintain the prices of Urethanes and Urethane Chemicals and to discuss the applicable customers or markets for such products;

b.    Agreeing during those meetings and conversations to charge prices at certain levels or otherwise increase or maintain prices of Urethanes and Urethane Chemicals sold in the United States and elsewhere;

c.    Participating in meetings and conversations to implement and adhere to the agreements they reached;

d.    Issuing price announcements and price quotations and charged prices consistent with the agreements reached; and

e.    Allocating markets and customers for the sale of urethane consistent with the agreements reached.

61.    The allegations in this Complaint are likely to have further evidentiary support after a reasonable opportunity for discovery.

## FRAUDULENT CONCEALMENT

62.    Throughout the relevant period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs.

63.    Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged in this Complaint until shortly before this litigation was commenced. Nor could Plaintiffs have discovered the violations earlier than that time because Defendants and their co-conspirators conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, attempted to confine information concerning the combination and conspiracy to high-level officials, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

64.     Only after March 15, 2004, when Crompton issued a press release announcing that competition authorities in the U.S., Canada and the European Union had given Crompton conditional amnesty in connection with an investigation into allegations of collusive behavior in the urethanes market, did Plaintiffs have any reason to suspect the existence of the conspiracy alleged in this Complaint. Prior to this time, Defendants fraudulently attributed price increases to, for example, an increase in the cost of raw materials and/or a lack of supply or capacity to meet demand for urethane and urethane chemicals. Plaintiffs could not have discovered the unlawful conduct at an earlier date through the exercise of reasonable diligence because of Defendants' and their co-conspirators' active and purposeful concealment of their unlawful activities.

65.     Defendants and their co-conspirators engaged in an illegal price-fixing conspiracy with respect to Urethanes and Urethane Chemicals which they affirmatively concealed in at least the following respects:

a.      By meeting secretly to discuss prices, customers and markets for Urethanes and Urethane Chemicals sold in the U.S. and elsewhere;

b.      By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; and

c.      By giving false and pretextual reasons for the pricing of Urethanes and Urethane Chemicals sold by them during the Class Period and by describing such pricing falsely as being the result of non-collusive factors, rather than collusion.

66.     As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, Plaintiffs assert the tolling of any applicable statute of limitations.

## EFFECTS

67.     Defendants' unlawful combination and conspiracy has had the following effects, among others:

a.     Price competition in the sale of Urethanes and Urethane Chemicals has been restrained, suppressed or eliminated;

b.     Prices charged by Defendants and their co-conspirators were maintained at artificially high and non-competitive levels; and

c.     Plaintiffs paid more for Urethanes and Urethane Chemicals than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing.

68.     During the Class Period, Plaintiffs and members of the Class paid more for Urethanes and Urethane Chemicals than they would have paid absent Defendants' conspiracy. As a direct and proximate result, Plaintiffs and members of the Class were injured and damaged in their business and property in an amount yet to be determined.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request:

a.     That the Court determine that this action may be maintained as a class action under Rule 23 (a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and that Plaintiffs are adequate representatives of the Class;

b.     That the Court adjudge and decree that Defendants' combination and conspiracy, and Defendants' acts done in furtherance thereof as alleged in this Complaint, were a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

c.     That judgment be entered against Defendants, jointly and severally;

d.      That judgment so entered be trebled in accordance with antitrust laws;

e.      That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing or maintaining the combination and conspiracy alleged in this Complaint, or from engaging in any other combination and conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

f.      That the Court award Plaintiffs their attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law;

g.      That the Court award Plaintiffs such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demands a trial by jury of all of the claims asserted in this Complaint so triable.

Date:  May 21, 2007                              Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

/s Norman E. Siegel
Norman E. Siegel
George A. Hanson
330 W. 47th Street, Suite 250
Kansas City, MO  64112
Tel:        (816) 714-7100
Fax:        (816) 714-7101

**PLAINTIFFS' LIAISON COUNSEL**

W. Joseph Bruckner
Heidi M. Silton
Darla Jo Boggs
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Suite 2200
100 Washington Avenue South
Minneapolis, MN  55401
Tel:     (612) 339-6900
Fax:     (612) 339-0981

Steven A. Kanner
William H. London
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN
LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Tel: (224) 632-4500

Susan G. Kupfer
Sylvie K. Kern
GLANCY BINKOW & GOLDBERG LLP
455 Market Street
Suite 1810
San Francisco, CA  94105
Tel:     (415) 972-8160
Fax:     (415) 972-8166

Roy M. Bell
Timothy P. Irving
Jason S. Hartley
ROSS, DIXON & BELL, LLP
550 West B Street, Suite 400
San Diego, CA  92101-3599
Tel:     (619) 235-4040
Fax:     (619) 231-8796

**PLAINTIFFS' CO-LEAD COUNSEL**

Arthur N. Bailey
ARTHUR N. BAILEY & ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, NY 147601
T: (716) 664-2967
F: (716) 716-2983

Anthony J. Bolognese
Joshua H. Grabar
BOLOGNESE & ASSOCIATES
One Penn Center
1617 JFK Blvd., Suite 650
Philadelphia, PA 19103
Tel:     (215) 814-6750
Fax:     (215) 814-6764

Michael D. Hausfeld
COHEN MILSTEIN HAUSFELD & TOLL
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C.  20005
Tel:     (202) 408-4600
Fax:     (202) 408-4699

Linda P. Nussbaum
COHEN MILSTEIN HAUSFELD & TOLL,
P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022
Tel:     (212) 838-7797
Fax:     (212) 838-7745

Roger M. Schrimp
Clinton P. Walker
DAMRELL NELSON SCHRIMP PALLIOS
PACHE
1601 "I" Street, Fifth Floor
Modesto, CA 95354
Tel:     (209) 526-3500

Isaac L. Diel
DIEL & SEELMAN, P.C.
4121 W. 83rd Street, Suite 254
Prairie Village, KS  66208
Tel:     (913) 383-8711
Fax:     (913) 383-8712

Fax:     (209) 526-3534

Ronald D. Foreman
FOREMAN & BRASSO
930 Montgomery Street, Suite 600
San Francisco, CA  94133
Tel:     (415) 433-3475
Fax:     (415) 781-8030

Michael P. Lehmann
Thomas Patrick Dove
Julio Ramos
FURTH LEHMANN & GRANT LLP
225 Bush Street, 15th Floor
San Francisco, CA  94104
Tel:     (415) 433-2070
Fax:     (415) 982-2076

Paul F. Bennett
Steven O. Sidener
Joseph M. Barton
GOLD BENNETT CERA & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA  94105-2835
Tel:     (415) 777-2230
Fax:     (415) 777-5189

Marc H. Edelson
EDELSON & ASSOCIATES
45 West Court Street
Doylestown, PA  18901
Tel:     (215) 230-8043
Fax:     (215) 230-8735

Robert N. Kaplan
Richard J. Kilsheimer
Jason A. Zweig
Matthew P. McCahill
KAPLAN FOX & KILSHEIMER
805 Third Avenue, 22nd Floor
New York, NY 10022

Lionel Z. Glancy
Michael M. Goldberg
Peter A. Binkow
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA  90067
Tel:     (310) 201-9150
Fax:     (310) 201-9160

James Belford Brown
HERUM CRABTREE BROWN
2291 West March Lane, Suite B100
Stockton, CA  95207
Tel:     (209) 472-7700
Fax:     (209) 472-7986

Dennis J. Stewart
Blake M. Harper
HULETT, HARPER, STEWART, LLP
550 West C Street, Suite 1600
San Diego, CA  92101
Tel:     (619) 338-1133
Fax:     (619) 338-1139

Joseph C. Kohn
Douglas A Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107-3389
Tel:     (215) 238-1700
Fax:     (215) 238-1968

Joseph M. Patane
LAW OFFICE OF JOSEPH M. PATANE
2280 Union Street
San Francisco, CA  94123
Tel:     (415) 563-7200
Fax:     (415) 346-0679

Howard J. Sedran
LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel:     (215) 592-1500
Fax:     (215) 592-4663

Tel:    (212) 687-1980
Fax:    (212) 687-7714

Jeffrey A. Brodkin
LAW OFFICES OF JEFFREY BRODKIN
1845 Walnut Street, 22nd Floor
Philadelphia, PA  19103
Tel:    (215) 567-1234

Francis O. Scarpulla
Craig C. Corbitt
ZELLE, HOFMANN, VOELBEL, MASON &
GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Tel:    (415) 693-0700
Fax:    (415) 693-0770

Joseph R. Saveri
Michele C. Jackson
Eric B. Fastiff
LIEFF, CABRASER, HEIMANN
   & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Tel:    (415) 956-1000
Fax:    (415) 956-1008

Allyn Z. Lite
Joseph J. DePalma
Michael E. Patunas
LITE DEPALMA GREENBERG
   & RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, NJ  07102-5003
Tel:    (973) 623-3000
Fax:    (973) 623-0858

Angela K. Drake
LOWTHER JOHNSON, LLC
901 E. St.  Louis Street, 20th
Springfield, MO  65806
Tel:    (417) 866-7777
Fax:    (417) 866-1742

Ann D. White
Michael J. Kane
MAGER, WHITE & GOLDSTEIN, LLP
One Pitcairn Place, Suite 2400
165 Township Line Rd.
Jenkintown, PA  19046
Tel:    (215) 481-0273
Fax:    (215) 481-0271

Stephen Lowey
Peter D. St. Phillip, Jr.
LOWEY DANNENBERG BEMPORAD
   & SELINGER, P.C.
The Gateway
One North Lexington Avenue
White Plains, NY  10601
Tel:    (914) 997-0500
Fax:    (914) 997-0035

John P. McCarthy
217 Bay Avenue
Somers Point, NJ  08224

Steven J. Greenfogel

James V. DeMera, III
MULLEN, SULLIVAN & NEWTON
1111 West Tokay Street
Lodi, CA  95241-0560
Tel:    (209) 334-5144
Fax:    (209) 333-1034

Mark Rheinhardt
Garrett D. Blanchfield
RHEINHARDT WENDORF
   & BLANCHFIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN  55101
Tel:    (651) 287-2100

Joel C. Meredith
MEREDITH COHEN GREENFOGEL
  & SKIRNICK, P.C.
Architects Building, 22nd Floor
117 South 17th Street
Philadelphia, PA  19103
Tel:    (215) 564-5182
Fax:    (215) 569-0958

William J. Pinilis
PINILIS HALPERN LLP
237 South Street
Morristown, NJ  07960
Tel:    (973) 656-0222
Fax:    (973) 401-1114

Robert E. Davy, Jr.
ROBERT E. DAVY JR. & ASSOCIATES
100 N. LaSalle Street
Suite 1400
Chicago, IL  60602
Tel:    (312) 214-1142
Fax:    (312) 346-5843

Merril Hirsh
ROSS, DIXON & BELL, LLP
2001 K Street, N.W.
Washington, D.C.  20006
Tel:    (202) 662-2000
Fax:    (202) 662-2190

Guido Saveri
R. Alexander Saveri
Geoffrey C. Rushing
Cadio Zirpoli
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA  94111
Tel:    (415) 217-6810
Fax:    (415) 217-6813

Philip A. Steinberg
124 Rockland Avenue
Bala Cynwyd, PA  19004
Tel:    (610) 664-0972

Fax:    (651) 287-2103

Michael G. Nast
Dianne M. Nast
RODA & NAST, P.C.
801 Estelle Drive
Lancaster, PA 17601
Tel:    (717) 892-3000
Fax:    (717) 892-1200

Andrew B. Sacks
John K. Weston
SACKS, WESTON, SMOLINSKY,
  ALBERT & LUBER
510 Walnut Street, Suite 400
Philadelphia, PA  19106
Tel:    (215) 925-8200
Fax:    (215) 925-0508

Eugene A. Spector
Jay S. Cohen
SPECTOR, ROSEMAN
  & KODROFF, PC.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Tel:    (215) 496-0300
Fax:    (215) 496-6611

Ira N. Richards
TRUJILLO RODRIGUEZ
& RICHARDS, LLC
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA 19103
Tel:    (215) 731-9004
Fax:    (215) 731-9044

Lisa J. Rodriguez
TRUJILLO RODRIGUEZ
& RICHARDS, LLC
8 Kings Highway West
Haddonfield, NJ 08033
Tel:    (856) 795-9002

24

Daniel R. Karon
SCARLATO, KARON & GOLDMAN
55 Public Square
Suite 1500
Cleveland, OH  44113-1998
Tel:     (216) 622-1851
Fax:     (216) 622-1852

Mary Jane Edelstein Fait
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
656 W. Randolph Street
Suite 500W
Chicago, IL  60661
Tel:     (312) 466-9200
Fax:     (312) 466-9292

Fax:     (856) 795-9887

Mario N. Alioto
TRUMP ALIOTO TRUMP
  & PRESCOTT LLP
2280 Union Street
San Francisco, CA  94123
Tel:     (415) 563-7200
Fax:     (415) 346-0679

David H. Weinstein
Steven A. Asher
Mindee J. Reuben
WEINSTEIN, KITCHENOFF & ASHER,
LTD.
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
Tel:     (215) 545-7200
Fax:     (215) 545-6535

Fred Taylor Isquith
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY  10016
Tel:     (212) 545-4600
Fax:     (212) 545-4653

**COUNSEL FOR PLAINTIFFS**