IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| IN RE: URETHANE ANTITRUST LITIGATION ) ) ) ) | MDL No. 1616 |
|  ) | Civil No. 04-MD-1616-JWL |
| THIS DOCUMENT RELATES TO: POLYESTER POLYOL CASES ) ) ) ) | Chief Judge Lungstrum |

### DECLARATION OF WILLIAM D. COSTON IN SUPPORT OF WM. T. BURNETT'S MOTION FOR RECOVERY OF ATTORNEYS' FEES AND OPPOSITION TO SETTLEMENT AGREEMENT PROVISION ON <u>CLASS COUNSEL ATTORNEYS' FEES</u>

William D. Coston, pursuant to 28 U.S.C. § 1746(2), declares as follows:

1. I am the lead attorney for Class Member Wm. T. Burnett & Co. ("Burnett"). I offer this declaration in support of Burnett's opposition to the settlement agreement provision allowing class counsel to seek attorneys' fees of up to 30% of the proceeds for the settlements with Bayer and Chemtura and in support of Burnett's separate motion for recovery of fees. Burnett's opposition to class counsel's fee provision is based on several concerns:

   (a) Each of the settling defendants had already admitted liability;

   (b) The amount received from settling defendant Chemtura, as a percentage of sales, was not extraordinary; and

   (c) Burnett, the largest member of the class, and its counsel were forced to expend significant resources to analyze data produced in discovery and to improve the settlement plan of allocation, over plaintiffs counsels' resistance. These reasons are described more fully below.

- 1 -

**Defendants' Guilt**

2. On May 24, 2005, Bayer pled guilty to charges of participating in a criminal conspiracy to fix prices of Aliphatic polyester polyols made with adypic acid between 1998 and 2002, and paid a criminal fine of $33 million. 6/13/06 Notice of Class Action Settlement with Bayer (Docket No. 380-1). As the Second Amended Complaint ("SAC") in this case notes, Bayer "admitted to allegations which include meetings with representatives of competitors at which time discussions about pricing, about products in the polyester polyols marketplace were engaged and [there were] agreements put into place in connection with the maintenance of pricing of those products into the polyester polyols marketplace" (Docket No. 564 at ¶ 57). Not surprisingly, Bayer reached a settlement in this civil class action suit within 18 months of the filing of the amended complaint. Much of the intervening time was spent on class certification issues. *See* Docket No. 291 (4/6/06 Order preliminarily approving settlement with Bayer and certifying a settlement class with Bayer).

3. With respect to Defendant Chemtura, in November 2003, Chemtura voluntarily entered into an agreement with the U.S. Department of Justice granting Chemtura conditional amnesty concerning the sales of polyester polyols in the United States. As noted by Class Counsel in the SAC, conditional amnesty such as that obtained by Chemtura may only be procured by a "full confession of wrongdoing," including "an admission of guilt, and testimony and other evidence as to the complicity of others in the price-fixing conspiracy." SAC, ¶ 55, Docket No. 564. *See also* Chemtura amnesty filing, Docket No. 598, June 2007.

**Settlement Recovery as a Percentage of Sales**

4.  According to the Notice of Settlement with Bayer, the $18 million settlement amount with Bayer represents 8.5% of Bayer's sales of the polyester polyol products during the class period.  6/13/06 Notice of Class Action Settlement with Bayer, Docket No. 380-1.

5.  According to the Motion for Preliminary Approval of the Chemtura settlement, the $15 million settlement represents approximately 4.2% of Chemtura's sales of polyester polyols, and 2.9% of all sales of Chemtura's polyester polyol products, during the class period.  8/2/07 Motion for Preliminary Settlement Approval, Docket 622 at 11.

**Lack of Cooperation with Burnett**

6.  Burnett believes that it is the largest member of the class of purchasers from Chemtura.  This status has been confirmed by Plaintiffs' class counsel on several occasions.

7.  In or about July 2006, Burnett received notice of a class action settlement with Bayer and of a fairness hearing.  Burnett had not directly purchased polyester polyol products from Bayer.  The notice indicated that if Burnett wished to participate in the settlement, it would need to file a claim form at a later date.

8.  In or about February 2007, Burnett received a notice that this Court had certified the lawsuit as a class action, with Bayer and Chemtura as the principal defendants.  Because Burnett was a significant customer of Chemtura, Burnett decided to inquire into the role it might play in the litigation.

9.  On March 13, 2007, I called Joseph Buckner, one of the lead counsel for Plaintiffs, to introduce myself and to express the willingness and interest of Burnett to participate actively in the litigation.  Mr. Bruckner encouraged Burnett not to opt-out and promised to work closely with Burnett and its counsel.

10. By email dated March 14, 2007, I informed Mr. Bruckner and co-counsel Steve Kanner of the following:

> Joe and Steve: Thank you for your time yesterday. As we discussed, our client Wm. T. Burnett ("Burnett") appears to be the single largest purchaser of bulk polyester from Chemtura (Crompton) and, as a result, has a vital interest in the class action against Chemtura. Burnett's possible recovery in a separate suit could be in the tens of millions of dollars. Our present inclination is not to opt-out of the class at this time. Our decision is based on your thoughtful and much-appreciated commitment to work closely with Burnett in providing us with access to key evidence, and allowing us to understand and work with the experts, and in consulting with us on a regular and frequent basis to shape the case and receive our input on settlement considerations and damages issues. We have not decided yet to enter an appearance, although it is likely we'll do so, particularly if that would permit us to obtain rights under the Protective Order.
>
> Thank you for attempting to obtain defense counsel's consent to Burnett's counsel to review the Expert Opinions and data compilations, including those submitted in connection with class certification and those offered for other purposes in the litigation. Could you also send the Protective Order, as entered, at your earliest convenience?
>
> Thank you. We look forward to working with you and your colleagues.

11. In response that same day, Mr. Bruckner replied:

> Thank you very much for your email and for your decision. We welcome W.T. Burnett's interest and involvement in this case, and are committed to working closely with you on this case going forward.
>
> As you asked, we have attached a copy of the Court's Protective Order. We will let you know as soon as we learn from defense counsel whether they will agree to have you having access to confidential materials, and therefore whether we will need to take other action to enable you to have access to this material. Once you have these materials, it would make sense for us to meet in person at your convenience and review and discuss the case in more depth.
>
> We look forward to working with you as well, and will be back in touch soon.

12. Over the next three months, Burnett's counsel endeavored to obtain access to discovery and expert opinions, with little success.

- 4 -

13. On June 6, 2007, I entered my appearance on behalf of Burnett and, on June 8, notified both class counsel and defense counsel that I would abide by the terms of the Protective Order and wished to obtain access to the expert reports in the case submitted in connection with the class certification proceedings.

14. The request went unanswered and, on June 15, I again contacted plaintiffs' counsel, Mr. Bruckner, stating: "We are miffed that we cannot seem to get anyone's attention. As the largest member of the class, Burnett wants to understand the case and to help bring it to a successful conclusion."

15. That same day, Mr. Bruckner emailed back offering apologies and stating, "We certainly do value Burnett's participation."

16. With my client, I spoke on the phone with Mr. Bruckner and Mr. Kanner on June 18 in order to expedite my access to expert and other materials. Mr. Bruckner promised to expedite materials. Chemtura's counsel, on June 21, expressly consented to that disclosure.

17. On June 25, I received from Chemtura's counsel a courtesy copy of its amnesty filing with this Court. Docket No. 598. On or about June 26, I received a CD-ROM of selected expert confidential materials submitted to this Court in connection with the class certification proceedings. Up to this time, Burnett had not been notified that any settlement with Chemtura was imminent or, indeed, that any discussions were under way. Rather, our efforts to participate in the case by helping to shape the experts' reports and to explain the data were met with apparent enthusiasm.

18. To our surprise, on June 27, 2007, we received by email from this Court the clerk's notice of electronic filing of a joint motion to stay the case pending documentation and approval of settlement between the plaintiff class and Chemtura. Docket No. 603. After

receiving the electronic notice, I received a phone call from representatives of plaintiffs' class counsel informing me of a proposed settlement.

19. On June 29, I phoned Mr. Bruckner to express Burnett's concern that, despite assurances to the contrary, Burnett had not been included in settlement discussions. Mr. Bruckner returned my call stating that he was concerned that Burnett was not pleased and that he would try to "clear this up."

20. On July 3, this Court stayed further activity in the case pending submission of appropriate settlement documents. Docket No. 609.

21. On July 12, 2007, Mr. Bruckner and Mr. Kanner came to my office in Washington, D.C. to meet with me and representatives of Burnett to explain the theory of liability in the case and, without disclosing confidential information to Burnett, a justification for settling the case. On behalf of Burnett, we expressed some concern that some theories of liability, notably customer allocation, did not seem to have been explored sufficiently by class counsel, despite the fact that the underlying guilty plea suggested, and the consolidated class action complaint explicitly stated, that there may have been a customer allocation in addition to a price fixing scheme.

22. On July 19, I spoke with the experts selected by plaintiffs' counsel. They had not prepared a written damages report, but discussed generally the underlying theory of liability and the quantification of damages.

23. On July 31, I spoke at length with Messrs. Bruckner and Kanner indicating that Burnett was considering whether it would opt out of the settlement or seek to amend the proposed agreement, notably with respect to the plan of allocation.

24. On August 14, 2007, Burnett filed a motion with this Court to defer the opt-out decision until after the fairness hearing, Docket 625. Among other issues, we criticized the plan of allocation, as it allowed claimants to average their two highest years of purchases and use that as a surrogate for each of the nine years of the class period.

25. In response to our motion and, in particular, to the criticisms of the plan of allocation, on August 16, 2007, Mr. Bruckner emailed me a letter. Mr. Bruckner sought to identify what improvements we hoped to see in the plan of allocation. He correctly noted that Burnett had objected to the use of a two-year proxy in lieu of actual data in the proposed plan of allocation. Mr. Bruckner stated:

> We understand Burnett's objection to be that under a two-year proxy period, a class member would choose its two years of highest purchases and thus a relatively consistent purchaser such as Burnett might be disadvantaged compared to a class member whose purchases spiked in certain years. As we explained, we carefully considered that possibility. We anticipate that every class member, including Burnett, will act in its own best interest and select its two best years. Accordingly, we concluded that any such theoretical advantage would be *de minimus* or eliminated, especially when most class members purchases are compared to purchases as large as Burnett's.

Mr. Bruckner went on to justify the use of a two-year snapshot, invoking the alleged absence of data:

> Moreover, neither Bayer nor Chemtura maintain sales records for the entire class period, and accordingly we cannot pre-fill each class member's claims forms. The class period in this case begins January 1, 1998 – nearly 10 years ago. Since it is unlikely every class member – or even a majority of class members – has maintained purchase records for all years of the class period. It would unfairly penalize many or most class members to require purchase information and documentation for the entire class period. Therefore, a proxy period (often used in such circumstances), together with the claims administrator's right to audit claims and other safeguards, is the most equitable method to ensure that every class member has an opportunity to maximize its return.

26.     The next day I wrote back to Mr. Bruckner asking, among other things, that class counsel provide me with any evidence supporting the belief that the two-year snapshot proxy would produce only "de minimus" errors. I also asked for the sales records in order to determine whether the assertion that adequate data was not available was correct.

27.     On August 24, I received permission from defendant to review all of the data produced to class counsel during discovery. On August 27, class counsel sent that data to my firm for analysis.

28.     Over the course of the next two weeks, members of my firm diligently worked with the data to determine whether or not it would serve as an efficient and accurate basis for determining a plan of allocation.

29.     On September 10, Burnett filed a reply brief in this Court on the then-pending motion to deter the opt-out decision. In that brief, we noted:

> If, as Burnett believes, the plan of distribution would reward spot purchasers, and under-compensate class members who were regular and sustained purchasers, that would be a rational basis for a class member to opt out of the settlement and pursue a separate claim for treble damages.

30.     On October 10, this Court issued a notice of a hearing, including argument on Burnett's then pending motion to defer the opt out. The Court notice of the hearing indicated that it specifically wished to hear from the parties on the proposed plan of allocation. Docket No. 640 ("The court suggests that the proposed plan of allocation should be a matter on which the parties focus.").

31.     The next day, I sent an email to Mr. Bruckner. In my email, I noted that Burnett's motion to defer the opt out was based in part on the current method of allocating settlement funds, which at that time was based on the average of a plaintiff's highest two years of purchases, applied as a surrogate for each of the nine years of the class period. I noted that such

allocation "favored spot purchasers and those who sporadically purchased in large numbers," and disadvantaged other companies that consistently purchased large amounts over the entire class period.

32.     I attached to the email very comprehensive analyses, conducted by my firm, of the sales data produced in the case and which had been provided to Burnett's counsel in late August. That analysis was startling. It showed that using the two highest years' average and applying that to each of the nine years resulted in an allocation to spot purchasers that was nearly four times more than their allocation would be using actual data during the class period. In contrast, for regular and sustained purchasers like Burnett, using the two-year average resulted in an "up-tick" in their respective allocations of only 1.4 times the actual data. In short, the analysis proved two things: (1) save for one year of the nine-year period, there was adequate data to construct an actual sales chart, and (2) use of the two-year snapshot resulted in gross and discriminatory variations from actual data.

33.     On the next day, with oral argument on the opt-out deferral motion looming, class counsel relented. Counsel agreed to an alteration of the plan of allocation consistent with Burnett's advocacy. Thus, rather than a two-year snapshot which was used as a surrogate for the full nine-year period, claimants would be obligated to use actual purchase data – with eight of the nine years of data to be provided by the class administrator in the form of pre-completed claim charts, based on the extensive data produced in discovery by defendants.

34.     Based on that concession, Burnett withdrew its motion to defer the opt out. Docket No. 645. This Court proceeded with a telephone hearing and gave preliminary approval to the proposed settlement. Docket No. 647. In that hearing, the Court indicated that Burnett's

motion had raised meritorious issues, and that the modification to the settlement appeared to represent an equitable improvement to the method of allocating settlement funds.

### Conclusion

35. As the largest member of the class of purchasers in general, and from Chemtura in particular, Burnett asked and expected to be consulted in the conduct of this litigation. Once the two defendants had admitted liability, the remaining issues were focused on class certification, the amount of damages, and the plan of allocation. With respect to the amount of settlement, class counsel settled with Chemtura without the promised consultation. With respect to the plan of allocation, class counsel forced Burnett to do the hard work in the case consisting of data assessment and calculations to demonstrate that the two-year snapshot was both inaccurate and unfair. Having demonstrated the inaccuracy and the unfairness to class counsel, and being prepared to argue it to the Court, Burnett ultimately convinced class counsel to adopt the preferred plan of allocation.

36. In light of all of the above, Burnett respectfully submits that the attorneys' fees for class counsel allowed by the settlement be limited to no more than 16% of the $33 million settlement amount recovered.

37. Since Burnett learned of the proposed Chemtura settlement on June 27, 2007, my firm has accrued the following time and fees:

| **Timekeeper** | **Date Range** | **Hours Worked** | **Rate** | **Amount** |
|---|---|---|---|---|
| William D. Coston | 06/27/07 – 12/31/07<br>01/01/08 – 01/17/08 | 77.50<br>13.90 | $640.00<br>$725.00 | $49,600.00<br>$10,077.50 |
| Martin L. Saad | 06/27/07 – 12/31/07<br>01/01/08 – 01/17/08 | 64.50<br>40.00 | $440.00<br>$510.00 | $28,380.00<br>$20,400.00 |
| Robert W. Collier | 06/27/07 – 12/31/07 | 42.00 | $145.00 | $6,090.00 |
| John Slefinger | 06/27/07 – 12/31/07 | 3.00 | $145.00 | $435.00 |
| **Totals** | | 240.90 | | $114,982.50 |

I declare under penalty and perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on January 18, 2008.

                Respectfully submitted,

                /s/ William D. Coston
                William D. Coston
                D.C. Bar No. 277244
                VENABLE, LLP
                575 7th Street, NW
                Washington, DC  20004-1601
                Tel.:  202-344-4000
                Fax:  202-344-8300
                wdcoston@venable.com

                ATTORNEY FOR WM. T. BURNETT & CO.

**CERTIFICATE OF SERVICE**

On January 18, 2008, a copy of the foregoing document was electronically filed with the Clerk of the Court through CM/ECF, which provides electronic service to each attorney registered for ECF notification.

      /s/ William D. Coston
      Attorney for Wm. T. Burnett & Co.