# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

_____  )
                                     )
**IN RE**                            )      **MDL No. 1616**
**URETHANE ANTITRUST**               )
**LITIGATION**                       )      **Civil No. 2:04-md-1616-JWL-DJW**
_____  )
                                     )
**This Document Relates To:**        )
**The Polyester Polyol Cases**       )
_____  )

---

### MEMORANDUM IN SUPPORT OF
### PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES, INCENTIVE AWARDS AND REIMBURSEMENT OF EXPENSES

Dated: February 5, 2008                    **STUEVE SIEGEL HANSON LLP**

/s/ Norman E. Siegel
Norman E. Siegel - D. Kan. 70354
George A. Hanson - KS 16805
460 Nichols Road, Suite 200
Kansas City MO 64112
Tel:      (816) 714-7100
Fax:      (816) 714-7101
**PLAINTIFFS' LIAISON COUNSEL**

Susan G. Kupfer                    W. Joseph Bruckner
Sylvie K. Kern                     Heidi M. Silton
GLANCY BINKOW & GOLDBERG LLP       Darla Jo Boggs
455 Market Street, Suite 1810      LOCKRIDGE GRINDAL NAUEN P.L.L.P.
San Francisco, CA  94105           100 Washington Avenue South, Suite 2200
                                   Minneapolis, MN  55401

Roy M. Bell                        Steven A. Kanner
Jason S. Hartley                   William H. London
ROSS, DIXON & BELL, LLP            Michael E. Moskovitz
550 West B Street  Suite 400       FREED KANNER LONDON
San Diego, CA  92101                & MILLEN LLC
                                   2201 Waukegan Road, Suite 130
                                   Bannockburn, IL  60015

### PLAINTIFFS' CO-LEAD COUNSEL

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ....................................................................................................1

QUESTIONS PRESENTED...................................................................................................3

ARGUMENT ........................................................................................................................3

I.    THE COURT SHOULD GRANT AN AWARD OF ATTORNEYS' FEES IN THE AMOUNT OF 30% OF THE SETTLEMENT FUND ......................................3

    A.    A Percentage-of-Recovery Approach Is the Preferred Method for Calculating Attorneys Fees ...................................................................4

    B.    A Fee Award Of 30% Is An Appropriate And Reasonable Percentage In Tenth Circuit Common Fund Cases.......................................................4

    C.    An Award of 30% Is Fair and Justified .........................................................5

        1.    The Result Achieved Was Significant ...............................................6

        2.    Class Counsel Devoted Significant Time And Labor To The Prosecution Of This Action ...........................................................6

        3.    The Litigation Was Complex and Presented Novel and Difficult Questions.....................................................................7

        4.    The Litigation Required a High Level of Skill ..................................8

        5.    Counsel Had to Forgo Other Employment to Litigate This Action............8

        6.    The 30% Award Request Is In Line With Customary Fees........................9

        7.    The Fee Is Contingent in Nature. ......................................................9

        8.    Time Limitations Were Not A Factor ..............................................10

        9.    Class Counsel Have Extensive Experience Litigating These Types Of Actions.................................................................10

        10.    The Case Was Not Undesirable. .......................................................11

        11.    The Nature And Length Of The Professional Relationship With The Client.........................................................................11

        12.    Similar Percentages Are Awarded in Other Complex Cases....................11

        13.    Reaction of Class Members .......................................................13

II.    REIMBURSEMENT OF EXPENSES IS APPROPRIATE .............................................14

III.    WM. T BURNETT & CO.'S OBJECTION TO ATTORNEYS' FEES LACKS MERIT .......................................................................................14

    A.    Burnett's Lone Objection Relates to Attorneys' Fees – Not the Settlement .........15

    B.    Burnett Ignores This Case's Litigation History ....................................17

  C.  Burnett's Involvement Was Motivated By and Resulted in a Benefit to Itself ....................................................................................................................18

  D.  Class Counsel Communicated and Cooperated Fully with Burnett.......................21

IV.  THE COURT SHOULD GRANT INCENTIVE AWARDS TO THE CLASS REPRESENTATIVES ....................................................................................................22

V.  CONCLUSION...............................................................................................................24

# TABLE OF AUTHORITIES

Cases

*Blum v. Stenson*, 465 U.S. 886 (1984) ....................................................................4

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)...........................................................3

*Bogosian v. Gulf Oil Corp.*, 621 F. Supp. 27 (E.D. Pa. 1985).........................................23

*Bradburn Parent Teacher Store, Inc. v. 3M* (Minnesota Mining and Manufacturing Company), 513 F. Supp. 2d 322 (E.D. Pa. 2007) .....................................................18

*Brown v. Phillips Petroleum Co.*, 838 F.2d 451 (10th Cir.), cert. denied, 488 U.S. 822 (1988)...............................................................................................................3, 4, 5, 6

*Cimarron Pipeline Const., Inc. v. Nat'l Council On Compensation Ins.*, No. CIV 89-822-T, CIV 89-1186-T, 1993 WL 355466 (W.D. Okla. June 8, 1993) ................................6, 12, 13

Civ. 99-0790(TFH), 2003 WL 22037741 (D.D.C. June 16, 2003) ........................................10, 14

*Fortner Enterp., Inc. v. U.S. Steel Corp.*, 349 U.S. 495 (1969)....................................23

*Gottlieb v. Barry*, 43 F.3d 474, 483 (10th Cir. 1994) ..............................................4, 5

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ..........................................................6

*In re Activision Sec. Litig.*, 723 F. Supp. 1373 (N.D. Cal. 1989) .................................5

*In re Catfish Antitrust Litig.*, 939 F. Supp. 493 (N.D. Miss. 1996) ...........................14, 23

*In re Cendant Corp. Prides Litig.*, 243 F.3d 722 (3d Cir. 2001) ....................................7

*In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303 (C.D. Cal. 1977) ........................8

*In re Linerboard Antitrust Litigation*, No. MDL 1261, Civ.A. 98-5055, Civ.A. 99-1000, Civ.A. 99-1341, 2004 WL 1221350 (E.D. Pa. 2004) ....................................................7

*In re Lorazepam & Clorazepate Antitrust Litig.*, No. MDL 1290(TFH), 99MS276(TFH)...........10

*Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77 C 39, 1984 WL 21981 (N.D. Ill. Sept. 14, 1984)...................................................................................................9

*Presley v. Carter Hawley Hale Profit Sharing Plan*, No. C9704316SC, 2000 WL 16437 (N.D. Cal. 2000)................................................................................................23

*In re M.D.C. Holdings Sec. Litig.*, No. CV89-0090 E (M), 1990 WL 454747 (S.D. Cal. 1990) ............................................................................................................9

*In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 844 (N.D. Cal. 2005).....................23

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000)..............................23

*In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998).......................7

*In re Remeron Direct Purchaser Antitrust Litigation*, 2005 WL 3008808 (D. N.J., November 9, 2005) ........................................................................................................9, 12, 14

*In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491 (W.D. Pa. 2003) ................................................13

*In re Sequoia Sys, Inc. Sec. Litig.*, No. 92-11431-WD, 1993 WL 616694 (D. Mass. Sept. 10, 1993) ..................................................................................................................................14

*In re SmithKlineBeecham Corp. Sec. Litig.*, 751 F. Supp. 525 (E.D. Pa. 1990).....................14, 17

*In re Travel Agents Antitrust Litig.*, 953 F. Supp. 280 (D. Minn. 1997) .......................................14

*In re United Telecommunications, Inc.*, Securities Litigation 1994 WL 326007 (D. Kan. 1994) ...................................................................................................................4, 6, 7, 11

*In re Vitamins Antitrust Litig.*, No. MISC. 99-197(TFH), MDL 12852001 WL 34312839 (D. D.C. 2001) .................................................................................................................12

*J.N. Futia Co. v. Phelps Dodge Indus, Inc.*, No. 78 Civ. 4547, 1982 WL 1892 (S.D.N.Y. Sept. 17, 1982) ..................................................................................................................8

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)....................................4

*Millsap v. McDonnell Douglas Corp.*, 2003 WL 21277124 , (N. D. Okla. May 28, 2003)..........13

*Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989) .......................................5

*Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D.N.Y. 1997)..........................................................7

*Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) .................................5

*Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849 (10th Cir. 1993) .....................4

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 ...................................................................................5

*Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297 (D.N.J. 1995), aff'd, 66 F.3d 314 (3d Cir. 1995)....................................................................................................................7

*Williams v. Sprint/United Mgmt. Co.*, 2007 WL 2694029 (D. Kan. Sept. 11, 2007) ..............12, 14

<u>Federal Statutes</u>

15 U.S.C. § 1 ................................................................................................................................2, 8

## INTRODUCTION

After nearly four years of hard fought litigation, Plaintiffs Skypark Manufacturing LLC (f/k/a Burtin Urethane Corporation), Maine Industrial Tires Limited, and Urethane Product Industries, Inc. ("Plaintiffs") and their counsel recovered for the Plaintiff Class a combined settlement of $33 million from the two Defendant entities.[1]  Plaintiffs contemporaneously filed with this brief their Motion for Final Approval of the settlement with Chemtura, which sets forth the procedural background of the case.  The settlement with Bayer was finally approved by the Court on June 13, 2006.  [Doc. No. 380].

Upon final approval of the Chemtura settlement, Plaintiffs respectfully seek an award of attorneys fees of 30% of the combined settlement fund and reimbursement of expenses in the amount of $1,804,108.39.   Class Counsel believe such a fee award is justified as the settlements achieved are significant, and Class Counsel devoted significant time, skill and labor – entirely on a contingent basis – to the prosecution of this action.  The litigation itself was complex and presented difficult questions.  Moreover, a 30% fee award is in line with fee awards in similar cases.  Accordingly, Plaintiffs request that their petition be granted.

## STATEMENT OF FACTS

As explained in Plaintiffs' Motion for Final Approval of the Chemtura Settlement, Plaintiffs and others filed complaints alleging violations of antitrust laws in connection with the sale of Urethanes and Urethane Chemicals in multiple jurisdictions starting in March 2004.  The Judicial Panel on Multidistrict Litigation transferred and assigned all related cases to this Court for coordinated and consolidated proceedings on August 23, 2004.

---

[1] The Defendants were Bayer Corp., Bayer MaterialScience AG, Bayer MaterialScience LLC, Bayer AG (collectively "Bayer") and Chemtura Corporation (f/k/a Crompton Corporation) and Uniroyal Chemical Company Inc. (collectively "Chemtura").

Pursuant to this Court's pretrial Scheduling Order No. 1 [Doc. 37], on November 19, 2004, Plaintiffs filed a Consolidated Class Action Complaint alleging that the Chemtura Defendants, the Bayer Defendants, and their co-conspirators engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain or stabilize the prices of Urethanes and Urethane Chemicals and to allocate markets and customers for their sale in the United States, all in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs alleged that as a result of the conspiracy, they and other direct purchasers of Urethanes and Urethane Chemicals paid more for these products than they otherwise would have paid.

Plaintiffs then embarked on extensive class certification discovery, and moved for class certification on December 2, 2005. Defendants vigorously opposed Plaintiffs' motion. On April 25, 2006, in the midst of class certification briefing and prior to the Court's hearing of Plaintiffs' motion, Plaintiffs and the Bayer Defendants entered into a settlement in the amount of $18 million. This Court certified a Settlement Class and granted final approval of that settlement on October 17, 2006 [Doc. 456].

Chemtura, the remaining Defendant, continued its vigorous opposition to Plaintiffs' motion for class certification. After hearing oral argument on Plaintiffs' motion on July 24, 2006, this Court certified the litigation class on August 16, 2006 [Doc. 420].

Thereafter, Plaintiffs were involved in extensive depositions, both taking merits-based depositions and defending Plaintiff Class Representatives in additional depositions.

Following numerous rounds of extensive and involved negotiations and just prior to the anticipated close of merits discovery and the start of expert discovery, Plaintiffs and the Chemtura Defendants reached an agreement to settle this litigation, and filed their Settlement Agreement on August 2, 2007. [Doc. 620]. On October 25, 2007, the Court preliminarily

approved the Chemtura settlement and authorized dissemination of notice of the settlement to the Class. [Doc. 649].

Contemporaneous with the filing of this memorandum, Plaintiffs are filing a Motion for Final Approval of the Chemtura settlement. A hearing on Plaintiffs' motion for final approval (the "Fairness Hearing") is scheduled for February 25, 2008. Preliminary Approval Order, ¶ 3.

## QUESTIONS PRESENTED

I.     IS AN ATTORNEYS' FEE AWARD OF 30% OF THE SETTLEMENT FUND FAIR AND EQUITABLE GIVEN THE WORK PERFORMED IN THE LITIGATION AND THE SUCCESS ACHIEVE FOR THE PLAINTIFF CLASS?

II.    IS AN INCENTIVE AWARD OF $10,000 FOR EACH OF THE THREE NAMED REPRESENTATIVES APPROPRIATE GIVEN THEIR CONTRIBUTION TO THIS LITIGATION AND THE SUCCESS ACHIEVED FOR THE PLAINTIFF CLASS?

III.   IS REIMBURSEMENT OF $1,804,108.39 IN ACTUAL EXPENSES APPROPRIATE GIVEN THE WORK PERFORMED IN THE LITIGATION AND THE SUCCESS ACHIEVED FOR THE PLAINTIFF CLASS?

## ARGUMENT

I.     **THE COURT SHOULD GRANT AN AWARD OF ATTORNEYS' FEES IN THE AMOUNT OF 30% OF THE SETTLEMENT FUND.**

The Supreme Court has recognized that "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980); *see also Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.), *cert. denied,* 488 U.S. 822 (1988) ("Common fund fees derive in part from the common law premise that a trustee is entitled to reimbursement from the fund administered.") Here, Plaintiffs' Class Counsel's efforts have produced a common fund in the amount of $33 million, plus interest accrued, for the benefit of the Class. The Court should award attorneys' fees at this time in the amount sought by Plaintiffs' Class Counsel, *i.e.,* 30% of the Settlement Fund, including interest earned. This

3

amount is consistent with Tenth Circuit precedent and reasonable in the context of this litigation, particularly where, as here, the reported lodestar of Plaintiffs' Class Counsel exceeds 30% of the settlement fund.

**A.      A Percentage-of-Recovery Approach Is the Preferred Method for Calculating Attorneys Fees.**

Under the common fund doctrine, a reasonable fee may be based "on a percentage of the fund bestowed on the class." *Blum v. Stenson,* 465 U.S. 886, 900 n.16 (1984).  The Tenth Circuit has repeatedly endorsed the use of this percentage-of-the-fund approach.  *See, e.g., Gottlieb v. Barry,* 43 F.3d 474, 483, 487-88 (10th Cir. 1994) (percentage of the fund method preferred); *Brown,* 838 F.2d 451; *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849 (10th Cir. 1993).

In the Tenth Circuit, courts combine the percentage-of-the-fund approach with an examination of the factors developed to analyze attorney fee requests in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974).  The *Johnson* factors traditionally have been used to analyze common fund fee applications to determine the appropriate fee percentage.  *Id.*   Courts in the Tenth Circuit also sometimes use a lodestar-times-multiplier analysis as a crosscheck on the reasonableness of the percentage-of-recovery award.  *See, e.g., In re United Telecommunications, Inc., Securities Litigation* 1994 WL 326007, *3  (D. Kan. 1994).  In setting a reasonable percentage of the fund to be awarded in a common fund case, the trial court acts as a fiduciary for the beneficiaries of the fund. *Brown*, 838 F.2d at 456. Accordingly, a percentage-of-the-fund approach is proper.

**B.      A Fee Award Of 30% Is An Appropriate And Reasonable Percentage In Tenth Circuit Common Fund Cases.**

The Tenth Circuit, like other Circuits, noted that a typical fee range in similar cases includes 30% of the common fund.  *Brown,* 838 F.2d at 455, n.2.  *See also Paul, Johnson, Alston*

& *Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1052 (appendix) (9th Cir. 2002) (summarizing awards in dozens of large common fund settlements, and finding that awards of 30% were commonplace); *In re Activision Sec. Litig.,* 723 F. Supp. 1373, 1375 (N.D. Cal. 1989) ("adoption of a policy of awarding approximately 30% of the fund as attorneys' fees in the ordinary case is well-justified in light of the lengthy line of cases which find such an award appropriate and reasonable"). Courts in other circuits and numerous commentators concur in the reasonableness of fees ranging from 25% to 33%. *See, e.g., Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F. Supp. 2d 942, 972 (E.D. Tex. 2000) ("this Court concluded that attorneys' fees in the range from . . . 25% to . . . 33.34% . . . have been routinely awarded in class actions).

**C.    An Award of 30% Is Fair and Justified.**

The *Johnson* Court applied twelve factors to determine the amount of attorneys' fees to award: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the requisite skill to perform the legal services properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *See Brown*, 838 F.2d at 454-55 (adopting twelve *Johnson* factors as applied to common fund awards); *Gottlieb,* 43 F.3d at 483.   In common fund cases, not every *Johnson* factor will apply, and the weight given to different factors may vary. *Brown,* 838 F.2d at 456; *Gottlieb,* 43 F.3d at 483.

When applied here, the *Johnson* factors warrant the award requested.

1. **The Result Achieved Was Significant**.

The major consideration in determining the amount of a fee award is the result achieved. *Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983) ("most critical factor is the degree of success obtained"). The result obtained may be given greater weight as a *Johnson* factor where "recovery was highly contingent and [] the efforts of counsel were instrumental in realizing recovery on behalf of the class." *Brown,* 838 F.2d at 456. Here, the Settlements provide significant benefits for the Class — a settlement fund totaling more than $33 million from the Bayer and Chemtura Defendants. In at least two prior cases where the amount recovered was between $28 million and $35 million, courts in the Tenth Circuit awarded 33% of the fund in attorneys' fees. *In re United Telecommunications, Inc., Securities Litigation*, 1994 WL 326007, *2-4 (D. Kan. 1994) (33 1/3 percent awarded in a case with a $28 million settlement that was characterized as substantial in light of the complexity, length, and riskiness of the litigation); *Cimarron Pipeline Const., Inc. v. Nat'l Council On Compensation Ins*., No. CIV 89-822-T, CIV 89-1186-T, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993) (33 1/3 percent awarded in a case with a $35 million settlement that was characterized as substantial). This factor, therefore, supports a 30% fee.

2. **Class Counsel Devoted Significant Time And Labor To The Prosecution Of This Action.**

In a statutory fee case, the time and labor required usually refers to the lodestar in a given action. Courts in the Tenth Circuit have found that an examination of the lodestar is unnecessary in a common fund case if a court determines that other factors are more important. *Brown,* 838 F.2d at 456. Nonetheless, a lodestar analysis supports the request for a 30% fee in this case, as a cross-check on the reasonableness of the fee request. *See, e.g., In re United*

*Telecommunications, Inc., Securities Litigation,* 1994 WL 326007, *3  (D. Kan. 1994); *see also Vizcaino,* 142 F. Supp. 2d at 1302.

Here a cross-check confirms that the requested 30% fee is reasonable.  Plaintiffs' Counsel reported that their fees for work performed in this litigation, when charged at historical hourly rates, generated a reported lodestar, as of December 31, 2007 of $12,001,891.68.  Because it was necessary for Plaintiffs' Counsel to expend significant resources in the prosecution of this action (set forth in more detail below), the award sought here will not even permit counsel to recover their entire lodestar.  The fee produced by the percentage method in this case equals a multiplier of less than 1.0 when considering the lodestar crosscheck.  Obviously a multiplier that results in a loss of fees is *significantly* less than the multipliers found to be reasonable cross-checks in similar class actions.[2]

3.     **The Litigation Was Complex and Presented Novel and Difficult Questions.**

Antitrust price-fixing cases are notoriously complex and difficult to litigate.  *See, e.g., In re Linerboard Antitrust Litigation,* No. MDL 1261, Civ.A. 98-5055, Civ.A. 99-1000, Civ.A. 99-1341, 2004 WL 1221350 (E.D. Pa. 2004), at *10 (finding an antitrust class action "is arguably the most complex action to prosecute") (quotation omitted).  In addition, *Johnson* and later Tenth Circuit courts recognize that the novelty and difficulty of issues are significant factors to be considered in making a fee award.

---

[2] *See, e.g., In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding multiplier of 3.97); *Weiss v. Mercedes-Benz of N. Am.,* 899 F. Supp. 1297, 1304 (D.N.J. 1995) (awarding fee equaling multiplier of 9.3 times hourly rate), *aff'd,* 66 F.3d 314 (3d Cir. 1995); *Roberts v. Texaco, Inc.,* 979 F. Supp. 185, 198 (S.D.N.Y. 1997) (awarding a 5.5 multiplier).  *See also In re Cendant Corp. Prides Litig.,* 243 F.3d 722, 742 (3d Cir. 2001) (finding range of lodestar multiples in large class actions to be between 1.35 and 2.99).

Here, Class Counsel litigated a complex nationwide antitrust action against the Bayer and Chemtura Defendants for over three years. Not only did counsel succeed in obtaining certification of a litigation class in a highly contested proceeding, but the litigation presented complicated matters of first impression regarding the scope and effect of the Antitrust Criminal Penalties Enhancement Reform Act, 15 U.S.C.A. § 1 ("ACPERA") as applied to the Chemtura Defendants.

### 4.       The Litigation Required a High Level of Skill.

The litigation required not only expertise in antitrust matters and knowledge of federal civil procedure, it also required substantial experience in litigating and managing nationwide class actions. Class Counsel devoted the requisite skills to prosecute this action and their collective background and experience are a measure of the significance of the resources devoted to the litigation by the Plaintiffs' attorneys.

In addition, the caliber of opposing counsel is relevant in assessing the quality of counsel's work. *See, e.g., Vizcaino,* 142 F. Supp. 2d at 1033; *In re Equity Funding Corp. Sec. Litig.,* 438 F. Supp. 1303, 1337 (C.D. Cal. 1977); *J.N. Futia Co. v. Phelps Dodge Indus, Inc.,* No. 78 Civ. 4547, 1982 WL 1892 (S.D.N.Y. Sept. 17, 1982). Here, Plaintiffs' Counsel was opposed by highly skilled attorneys from some of the largest law firms in the country, with substantial resources at their disposal and recognized antitrust expertise. These attorneys included senior litigators from the firms of Jones Day and O'Melveny & Myers, who vigorously opposed Plaintiffs' efforts throughout.

### 5.       Counsel Had to Forgo Other Employment to Litigate This Action.

Plaintiffs' Counsel have forgone other employment in order to pursue this litigation. From the outset, counsel understood that they would be involved in complex, protracted and

expensive litigation offering no guarantee of compensation, and they committed to provide considerable funding and other resources to pursue Plaintiffs' claims.  This proved to be the case.

### 6.    The 30% Award Request Is In Line With Customary Fees.

As noted above, the customary fee award in common fund class actions is squarely in the 30% range.  The customary fees paid in contingent fee, non-class actions are also a factor in this analysis.  *See, e.g., In re Remeron Direct Purchaser Antitrust Litigation,* 2005 WL 3008808 (D. N.J., November 9, 2005) at *16 ("The percentage-of-the-fund method of awarding attorneys' fees in class actions should approximate the fee which would be negotiated if the lawyer were offering his or her services in the private marketplace.").  Some contingent cases provide for fees equaling 30-40% of the recovery.  *See, e.g., In re M.D.C. Holdings Sec. Litig.,* No. CV89-0090 E (M), 1990 WL 454747, at *7 (S.D. Cal. 1990) ("In private contingent litigation, fee contracts have traditionally ranged between 30% and 40% of the total recovery."); *Phemister v. Harcourt Brace Jovanovich, Inc.,* No. 77 C 39, 1984 WL 21981, at *15 (N.D. Ill. Sept. 14, 1984) ("Contingent fee arrangements in non-class action damage lawsuits use the simple method of paying the attorney a percentage of what is recovered for the client.  The more the recovery, the more the fee.  The percentages agreed on vary, with one-third [33%] being particularly common.").

### 7.    The Fee Is Contingent in Nature.

A fair fee award must include consideration of the contingent nature of a fee, which provides no assurance of attorneys' fees or the reimbursement of expenses.  Fee awards must be sufficient to encourage the most skilled and determined counsel to take on difficult cases and see them through to completion.  *See generally In re Lorazepam & Clorazepate Antitrust Litig.,* No.

MDL 1290(TFH), 99MS276(TFH), Civ. 99-0790(TFH), 2003 WL 22037741, at *9 (D.D.C. June 16, 2003).

Class Counsel litigated these actions for nearly four years and incurred over $12,001,891.68 in reported time as of December 31, 2007 and $1,804,108.39 in expenses in their work on behalf of the Settlement Class.  Joint Declaration of W. Joseph Bruckner and Steven A. Kanner ("Joint Decl."), filed concurrently ¶ 25. A substantial likelihood existed from the outset that, despite their best efforts, no significant recovery would be achieved, given the risks associated with proving that the Defendants' conspiracy caused an antitrust impact and damages.

8.     **Time Limitations Were Not A Factor**.

Here there were no unusual time limitations to be considered as a *Johnson* factor. Instead, as discussed above, the litigation progressed over a period of nearly four years, with a vigorously contested class certification motion, with significant discovery and expert analysis at class certification and later on the merits.[3]   The protracted nature of this complex litigation required Class Counsel to incur substantial fees and expenses.

9.     **Class Counsel Have Extensive Experience Litigating These Types Of Actions**.

The four lead Plaintiffs' Counsel all have extensive experience litigating antitrust class actions.  The experience of Class Counsel was set forth in detail in their submissions in support of their motions for appointment as lead counsel filed at the outset of this litigation.

---

[3] The final settlement in this litigation was reached after merits discovery was nearly concluded and immediately before the commencement of expert discovery on liability and damages.

10.     **The Case Was Not Undesirable.**

Notwithstanding significant issues on class certification and damages, and the resources Class Counsel knew would have to be committed to bring the case to a successful conclusion against such well-heeled and well-represented Defendants, the present case was not undesirable from the perspective of Plaintiffs' Counsel; thus this *Johnson* factor has little weight.

11.     **The Nature And Length Of The Professional Relationship With The Client.**

Class Counsel had good relationships with the Class representatives, some preexisting this litigation.  Plaintiffs' Counsel consulted with Class representatives at important stages of the litigation.  Plaintiffs assisted greatly in factual research, understanding the market and industry, even before filing their complaints; they helped analyze and parse Defendants' data and representations regarding the products at issue, submitted to multiple depositions and produced large volumes of documents and other information.

12.     **Similar Percentages Are Awarded in Other Complex Cases**.

The 30% fee requested here compares favorably to fees awarded in other Tenth Circuit common fund cases.  The Court in *In re United Telecommunications, Inc., Securities Litigation*, 1994 WL 326007, awarded 33 1/3 % in fees out of a $28 million dollar common fund.  The Court based its decision on the following findings: the settlement fund was substantial in light of the complexity, length, and riskiness of the litigation; 33 1/3 % is within the range of reasonable awards; the award was only 1.1 times the lodestar and well within lodestar crosscheck ranges; the rates were reasonable and the hours were normal; the case needed a high degree of skill and expertise; the litigation lasted for four years and at certain points required full attorney attention; the case had difficult facts and legal questions; the court kept everyone on an ambitious time

11

table; discovery battles were hard-fought; and there was a large element of risk to the action.  *Id.* at **2-4.  In *Cimarron Pipeline Const., Inc. v. Nat'l Council On Compensation Ins.*, No. CIV 89-822-T, CIV 89-1186-T, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993), the court had similar findings when it awarded counsel 33 1/3 % of the $35 million common fund.  The Court found the $35 million dollar settlement to be substantial, and the result excellent because the class was to receive 100% of their overcharges; no one objected to the fee award application; the court found that 30-40% fees are common and in line with other similar cases as well as other fee award percentages awarded in the Tenth Circuit; and the case did not settle early, but was in fact almost entirely prepared for trial.  *Id.*  In *Williams v. Sprint/United Mgmt. Co.*, 2007 WL 2694029, at *6 (D. Kan. Sept. 11, 2007) (Lungstrum, J.), this Court found a 35% award to be an appropriate percentage under the common fund doctrine and where there were no objections by either plaintiffs or defense counsel to the fee award.[4]

In the light of this precedent, an award of 30% is more than reasonable as counsel here were able to obtain a $33 million settlement after litigating the case for nearly four years and engaging in significant discovery and litigation, in order to obtain information that led the parties to the settlement table.  Plaintiffs faced significant issues, including product definition, the class period, antitrust impact, and damages.  This case was also in the advanced stages of litigation, having gone through class certification and the majority of merits discovery, including several depositions of the parties and experts on both class and merit issues.  In addition, counsel is

---

[4] The 30% fee requested here is also in line with fees awarded in other antitrust cases. *See, e.g., In re Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808 (D.N.J. November 9, 2005) at *17 (awarding 33.33% of $75 million settlement fund); *In re Vitamins Antitrust Litig.*, No. MISC. 99-197(TFH), MDL 12852001 WL 34312839 (D. D.C. 2001), at *14 (34.6% of $365 million settlement). *Remeron* also lists several recent antitrust cases granting fee awards of 30% or more.  2005 WL 3008808, at *16.

seeking less in a fee award than the value of their lodestar: counsel are only seeking 30% in fees, or about $10,138,425, even though their reported collective lodestar through December 31, 2007 is actually $12,001,891.68.[5]  Considering the amount of work required to reach this stage of the litigation, these hours were reasonable, and the rates charged are reasonable.  Furthermore, there was only one objection to the attorneys' fees out of nearly 1,500 Class members, submitted by outside counsel for a Class member, who is actually seeking his own attorneys' fees from the fund.  In sum, 30% of the settlement fund as a fee award is fair and reasonable.

13.  **Reaction of Class Members.**

Though not specifically a *Johnson* factor, the reasonableness of the fee award requested is also confirmed by the absence of objections by Class members, save one, discussed in Section III below.  *See Millsap v. McDonnell Douglas Corp.,* 2003 WL 21277124, *14 (N. D. Okla. May 28, 2003) (fee award appropriate where only three out of 1,074 class members objected to the fees requested); *In re Rent-Way Sec. Litig.,* 305 F. Supp. 2d 491, 514 (W.D. Pa. 2003) ("the absence of substantial objections by other class members to the fee application supports the reasonableness of Lead Counsel's request"); *see also Cimarron Pipeline Const., Inc. v. Nat'l Council On Compensation Ins.*, No. CIV 89-822-T, CIV 89-1186-T, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993); *Williams v. Sprint/United Mgmt. Co.*, 2007 WL 2694029, at *6 (D. Kan. Sept. 11, 2007).   The Claims Administrator sent nearly 1500 notices of the pending settlements to potential Class members.  Declaration of Richard Sartory ("Sartory Decl.") ¶¶ 7-9 (filed with Plaintiffs' Motion for Final Approval, concurrently).   The Settlement Class Notice and the Publication Notice both advised that Plaintiffs' Counsel would be seeking fees and

---

[5] The current combined balance of the settlement funds is $33,794,750.46, exclusive of funds in the settlement administration account.

described the amount being requested.   Other than the objection of Wm.T. Burnett & Co., discussed below, not one objection was received.  *Id.* ¶ 17.

In this case the Plaintiff Class consists of sophisticated business entities that can be expected to oppose an unreasonable fee request.   Therefore, the nearly complete absence of objections "indicates the appropriateness of the [fee] request."  *Remeron*, 2005 WL 3008808 at *13 n.1 (citation omitted); see also *In re Sequoia Sys, Inc. Sec. Litig.*, No. 92-11431-WD, 1993 WL 616694, at *1 (D. Mass. Sept. 10, 1993) (finding "influential" the fact that no class member objected to fee request of one-third).

## II.   **REIMBURSEMENT OF EXPENSES IS APPROPRIATE.**

Attorneys in common fund cases ordinarily are also reimbursed for reasonable expenses. *See, e.g. Williams v. Sprint/United Mgmt. Co.*, 2007 WL 2694029, at *6 (D. Kan. Sept. 11, 2007); *Lorazepam*,  2003 WL 22037741, at *305; *In re Travel Agents Antitrust Litig.*, 953 F. Supp. 280, 286 (D. Minn. 1997); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 503 (N.D. Miss. 1996); *In re SmithKlineBeecham Corp. Sec. Litig.*, 751 F. Supp. 525, 534 (E.D. Pa. 1990).

Plaintiffs' Counsel incurred unreimbursed litigation expenses of $1,804,108.39 as of this point in the litigation.  Joint Decl. ¶ 25.  These expenses were necessary to litigate this action. They include costs of computer-based research, copying costs, expert fees, travel expenses, and other typical litigation expenses.  *Id.*  An award covering these expenses, advanced by Plaintiffs' Counsel for the benefit of the Class, is appropriate.

## III.   **WM. T BURNETT & CO.'S OBJECTION TO ATTORNEYS' FEES LACKS MERIT.**

Only one Class member, Wm. T. Burnett & Co., objected to the fee request.  Burnett, in one filing, requested a substantial reduction in the attorneys' fees sought by Class Counsel while

at the same time, in another filing, sought an award of its own attorneys' fees from the common settlement fund.

Burnett's objection to the attorneys' fees sought by Class Counsel should be rejected because it was based on two fundamentally flawed propositions. First, contrary to Burnett's argument that, because there was a guilty plea to the DOJ criminal action, the civil class action must be a "walk in the park," a recovery for the Plaintiff Class was by no means assured, and Class Counsel faced significant  risk and complex litigation to achieve the Class settlements. Second, contrary to Burnett's implication, Class Counsel communicated and cooperated fully with Burnett.  But Burnett simply is wrong when it suggests that its counsel should have been elevated to a *de facto* fifth Lead Counsel position, requiring Burnett's participation in every aspect of the case, including confidential settlement negotiations.  Both propositions lack any basis in fact or law.

Clearly, if the civil litigation were a veritable cakewalk – as Burnett claims without citing any evidence or relevant legal authority – then Burnett could have exercised its right to opt out of the Class, and pursued its own recovery.[6]  In any case, Class Counsel fulfilled its obligations to Class members, including Burnett, and fully cooperated with Burnett's counsel.  As more fully set forth below, because Burnett's objection is factually and legally inaccurate, it should be rejected.

### A.    Burnett's Lone Objection Relates to Attorneys' Fees – Not the Settlement.

It is notable that no Class member objected to the settlement itself - not even Burnett. Moreover, *only* Burnett objected to Class Counsel's fee request.  The complete absence of objections to both settlements supports Class Counsel's fee request as the entire Class implicitly

---

[6]  Burnett filed a Motion to Defer Opt Out Decision [Doc. No. 625].  Subsequently, Burnett withdrew its Motion.  [Doc. No. 645].  Burnett's *lone* objection to the settlement relates only to Class Counsel's request for attorneys' fees.

acknowledged the value of the settlements Class Counsel obtained.  Ironically,  Burnett objects to Class Counsel's fees while requesting reimbursement of its own fees for becoming involved in this case at the eleventh hour, meanwhile relying entirely on the hard work of Plaintiffs and Class Counsel to secure a substantial payment to Burnett.

Despite nearly four years notice,  Burnett never filed a complaint in this litigation. It did not get involved when many other Class members did (including the named Plaintiffs), upon Chemtura's March 2004 announcement of its amnesty application in the criminal investigation by the Department of Justice.  Burnett did not file after the Judicial Panel on Multidistrict Litigation consolidated and transferred those dozens of cases to this Court for pretrial proceedings.  It did not surface when Bayer pled guilty to criminal antitrust violations; nor did it do anything even when it received notice, along with all Class members, of the Class settlement with the Bayer Defendants and the Court's certification of the related settlement class.[7]

As Burnett's behavior indicates, it never intended to sue Defendants on its own or it would have done so.  Unlike the named Plaintiffs in this case, Burnett did not produce documents in the case, submit to multiple depositions, nor monitor or research this case throughout the litigation.  Instead, Burnett decided to remain in the background, and now will benefit greatly from the hard work of others.  Burnett's criticisms are unfounded, and provide no basis to deny or reduce a fair award of attorneys' fees to Class Counsel.

---

[7] Burnett has repeatedly argued that the first notice of its claim in this action came with the notice of the Court's certification of the litigated class, and that it ignored the prior notice it received of the Bayer settlement and the related  certification of the settlement class because it did not purchase urethane chemicals from Bayer.  Burnett's position not only is contrary to the plain language of the Bayer settlement notice itself, it demonstrates a fundamental and persistent failure to grasp a basic tenet of antitrust law, *i.e.,* joint and several liability among co-conspirators.

B.      **Burnett Ignores This Case's Litigation History.**

The settlement reached here by Class Counsel was the result of a prolonged effort by a skilled team of attorneys litigating for nearly four years against two of the country's largest law firms and well-financed Defendants.  Even a cursory review of the docket reflects the enormous amount of work performed by Class Counsel.  While Burnett argues, for example, that class certification was easily obtained, the Court stated in its order that "Chemtura vigorously opposes class certification."  (Class Certification Order at 3).[8]  Bayer also vigorously opposed class certification until its settlement.  On the critical and dispositive issue of whether common questions would predominate, the Court discussed at length the difficult issue of whether Plaintiffs could demonstrate common antitrust impact, noting Chemtura's strong opposition.  *Id.* at 18-22.

Burnett's dismissive remark that the Court "did not appear to have much trouble" (Burnett Opposition p. 9) rejecting Chemtura's arguments against class certification and its inaccurate conclusion that there was no discovery on damages (*id.*) demonstrates the myopic and uninformed nature of Burnett's view of the litigation.  It is only because of the extensive amount of work in this case that Plaintiffs succeeded in obtaining class certification, in the face of aggressive, animated and determined opposing counsel supported by considerable resources. The volume of documents, data, and depositions analyzed and studied for both class certification and for the liability and damages phase of the case was great.  In fact, the extensive damages analyses of Plaintiffs and their economic experts were shared in depth and detail with Burnett's counsel.  Joint Decl. ¶¶6, 18-20.  It is disingenuous for Burnett to claim "the parties settled even before expert discovery" on damages issues.  (Burnett Opposition at 9).

---

[8] In fact, Chemtura sought leave to appeal this Court's class certification order, as only one illustration of its scorched earth approach to litigating this case.

It is naïve to suggest that the existence of a criminal guilty plea necessarily means defendants will "roll over" in the civil case and admit class certification, liability and damages to plaintiffs and all members of the proposed class.  For example, in the analogous situation of established liability from a prior civil action, the court in *Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company),* 513 F. Supp. 2d 322 (E.D. Pa. 2007), stated that "antitrust class actions are perhaps the most complex cases to litigate." *Id.* at 330 (*quoting In re Linerboard Antitrust Litig.,* 296 F.Supp.2d 568, 577 (E.D.Pa. 2003)).  The court reasoned that, although the plaintiffs obtained an estoppel ruling, the action required significant litigation over class certification, liability issues, and damages.  *Id.*  Accordingly, the district court awarded attorneys' fees of 35% of the settlement fund.  *Id.* at 338-41.  Here, Defendants certainly did not roll over, having fought tooth and nail the entire time, hoping to defeat class certification based on the purported absence of antitrust impact as well as other issues, and continuing to litigate the matter in an effort to circumscribe their damages exposure.

Moreover, the guilty plea in this case did not define the scope of the relief obtained in this litigation, which was markedly broader than the criminal case in time period and affected products.  In the face of strenuous opposition from Defendants, Class Counsel successfully prosecuted and obtained a settlement that benefits purchasers during a longer period of time than what was pled in the criminal case and for a greater number of products.  Burnett ignores the fact that Class Counsel conferred a tangible additional benefit upon the Class beyond the scope of the criminal case.

**C.**    **Burnett's Involvement Was Motivated By and Resulted in a Benefit to Itself.**

Burnett was motivated solely by its desire to increase its own share of the settlement, not to benefit the Class overall; moreover, its actions in this case, while benefiting itself, did not result in any additional benefit for other Class members or for the Class overall.  While Burnett's

motivation is legitimate for itself, it does not warrant either a reduction in Class Counsel's fees or an award of fees to Burnett from the Class settlement fund.

Class Counsel's initial proposed plan of allocation of the settlement fund provided that qualified Class member claimants, instead of having to substantiate their purchases for all years in the Class Period going back to 1998, instead could provide purchase data from a two-year "proxy period."  Joint Decl. ¶22.  Burnett objected to this approach, and instead insisted that claimants should be required to substantiate their purchases for the entire Class Period.  *Id.* Burnett knew that because it possessed purchase data for most or all of the entire Class Period and at least some other Class members likely did not, Burnett would be advantaged under its proposed allocation plan. In other words, an allocation plan that required each and every Class member to quantifiably identify its total purchases annually for the entire Class Period, and provide documentary support, would have resulted in a significant advantage to Burnett and a corollary disadvantage to other Class members, as the settlement fund would be distributed *pro rata* to Class members who submitted qualified claims.   Class Counsel could not and did not agree with Burnett's proposal because it would have prejudiced the likely great number of Class members who did not maintain all purchase records going back 10 years.  *Id.* ¶22.

The amended allocation plan *devised by Class Counsel* and ultimately used was markedly different from what Burnett proposed.  *Id.* ¶23.  Class Counsel's goals in both of their proposed allocation plans were first, to treat all Class members fairly, and second, to make the process as easy as possible for Class members, thereby maximizing the likely rate of claims by qualified Class members against the settlement fund and benefiting as much as possible the largest number of Class members.  *Id.*  Both the first proposed "proxy period" plan of allocation and the

ultimately-adopted "pre-filled claim forms" approach accomplished those goals. The plan proposed by Burnett did not. *Id.* ¶24.

The final "pre-filled claim forms" allocation plan did not require Class members to search for, identify and verify their own purchases. Instead, Class Counsel was able, by working extensively with Defendants and their sales data, the claims administrator and Plaintiffs' experts, to pre-fill each Class member's purchase amounts on their claim forms for much – but not all – of the Class Period, and to allow a claimant to submit its own purchase data if it disagreed with the "pre-filled" amount derived from Defendants' sales data. *Id.* ¶23. By doing so, Class Counsel avoided the very threat of unfair allocation to the Class that was the reason for the proxy period approach: namely the likely possibility that Class members would not possess purchase records for the subject products going back nearly 10 years – the entire Class Period. *Id.* Notably, Class Counsel, *not* Burnett's counsel, devised this modified plan of allocation, which was ultimately adopted in this case. *Id.* ¶23.

Class Counsel revised the allocation plan to adopt the "pre-filled" method after analyzing and concluding that the classwide difference between the amended "pre-filled" proposal and the earlier "proxy period" method was nominal. *Id.* ¶24. As an illustration, the greatest difference in recovery between the proxy plan and the plan with pre-filled claim forms was only 2.45 percentage points – and that was for a single Class member. *Id.* ¶24. For all but three Class members (that is, for hundreds and hundreds of members) the difference in the distribution amount between the two plans was less than 1%. *Id.* Both the initially proposed proxy period and the plan eventually adopted were fair to the Class.

Class Counsel recognizes that any such decision to award Burnett attorneys' fees is within the Court's sound discretion. Class Counsel, however, do not see the basis for any such

separate fee award because, for the reasons set forth above, Burnett's conduct was motivated by self interest rather than the interest of the Class. Moreover, its actions did not result in any additional benefit to other Class members or to the Class overall, but only to itself.

D.   **Class Counsel Communicated and Cooperated Fully with Burnett.**

Burnett implies that it was promised a role in negotiating a settlement with Chemtura in exchange for its promise not to opt out. Coston Decl. ¶¶10-11. This is neither accurate nor plausible for a number of reasons.

First, although Class Counsel believed then and believe now that it certainly was in the interest of the Class overall that Burnett remain in the Class, Class Counsel did not promise to include Burnett in settlement discussions in return for Burnett's decision not to opt out. Joint Decl. ¶¶5, 16. Of course, Class Counsel's duty is to all Class members, not only Burnett. Consistent with its duty to the Class, Class Counsel certainly would have wanted Burnett to remain in the Class, because for a class member as large as Burnett to opt out and pursue litigation on its own against these Defendants would almost certainly make a classwide resolution of the litigation more difficult. Class Counsel also were aware that Burnett was represented by experienced and sophisticated counsel, and would decide whether to remain in the Class based on its own interests. Joint Decl. ¶ 5.

Second, all settlement discussions were extremely confidential. Chemtura insisted upon such confidentiality promises as a condition to negotiations.

Third, Class Counsel communicated and cooperated fully and completely with Burnett. Joint Decl. ¶6. As the record shows, Class Counsel produced significant amounts of confidential data to Burnett, intervened on Burnett's behalf with Defendants to obtain those Defendants' permission for Burnett to have access to such information, and met and conferred regularly and thoroughly with Burnett and its counsel not only about the Class litigation but about Burnett's

21

own independent interests in the litigation, and provided Burnett's counsel with full access to Class Plaintiffs' economic experts and the results of their analyses.  Joint Decl. ¶¶6-16, 18-20.

Fourth, Burnett did not intend to opt out of the Class in any event.  Burnett and its counsel made its own fully informed decision not to opt out because, being fully advised, it determined that remaining in the Class was its best option.  The basis for Class Counsel's knowledge of this fact derive not only from the fact that it did not opt out despite having had two opportunities to do so,[9] but also from the many discussions Class Counsel had with Burnett and its counsel between March and October 2007.  Joint Decl. ¶17.  Burnett and its counsel insisted at the time of these discussions with Class Counsel that the fact and substance of their communications were strictly confidential.  Joint Decl. ¶17.  Although Burnett arguably now has waived any claim of confidentiality for such communications by revealing them in part, but not in whole, Class Counsel have discussed their basis in a separate declaration of Mr. Bruckner and Mr. Kanner, and are prepared to submit a supplemental declaration filed under seal with the Court and served only on counsel for Burnett, or to address the Court's questions *in camera* at the Fairness Hearing.[10]  *Id.*

## IV.   THE COURT SHOULD GRANT INCENTIVE AWARDS TO THE CLASS REPRESENTATIVES.

Plaintiffs also request that the Court award each class representative (Maine Industrial Tires Limited, Urethane Product Industries, Inc. and Skypark Manufacturing LLC (f/k/a Burtin Urethane Corporation)) an incentive payment of $10,000 for their willingness to step forward in this litigation and for the time and effort they have expended on behalf of the Class.

---

[9] Like every other Class member, Burnett had the opportunity to opt out of the Bayer settlement class, certified in June 2006, and of the litigated class, certified in August 2006.

[10] Of course, if Burnett affirmatively waives any claim of confidentiality for such communications, or if in the alternative the Court deems that such matters should not be under seal or *in camera,* Class Plaintiffs take no position on the issue.

As the Supreme Court has recognized, "Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition." *Fortner Enterp., Inc. v. U.S. Steel Corp.,* 349 U.S. 495, 502 (1969). Courts have acknowledged the public benefits of private enforcement efforts in antitrust and similar types of litigation by rewarding representative plaintiffs who have been instrumental in obtaining relief on behalf of persons other than themselves. *See, e.g., In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 463 (9th Cir. 2000) (affirming incentive awards to class representatives); *Lorazepam,* 205 F.R.D. at 400  *Catfish,* 939 F. Supp. at 503-04 (citing cases); *see also, e.g., Bogosian v. Gulf Oil Corp.,* 621 F. Supp. 27 (E.D. Pa. 1985) (approving $20,000 award to each named plaintiff in antitrust actions).

A $10,000 incentive award per representative is a modest amount and within the range deemed acceptable by courts. *See, e.g., In re McKesson HBOC, Inc. ERISA Litig.,* 391 F. Supp. 2d 844, 851 (N.D. Cal. 2005) (approving $5,000 incentive awards); *Presley v. Carter Hawley Hale Profit Sharing Plan,* No. C9704316SC, 2000 WL 16437, at *2 (N.D. Cal. 2000) (approving $25,000 incentive awards).

Here, the Class Representatives produced numerous documents regarding their purchases of urethane chemicals and the organization and operation of their businesses, prepared for and then sat for multiple depositions during the class certification and merits discovery phases of the litigation, and consulted with and advised Class Counsel throughout the litigation. Their willingness to step forward to represent Class members and their efforts toward the successful completion of the litigation benefited the entire Class.

The Class Notice disseminated to Class members notified them that the Court might be asked to approve incentive awards of up to $10,000 to each Class Representative. Sartory Decl.

¶2, Exs. 1, 2.  No objections from class members have been received. Sartory Decl. ¶ 17.  In light of the benefits conferred upon the Class, the role of the Class Representatives should be recognized with a reasonable payment. Class Counsel move for an award of $10,000 to each of the three named Class Representatives.

## V. <u>CONCLUSION</u>

Plaintiffs respectfully request the Court award Class Counsel attorneys' fees in the amount of 30% of the settlement fund, plus all actual expenses, together with incentive awards to each of the three named Class Representatives.  An analysis of the *Johnson* factors supports such an award.

The settlements achieved in this case are significant, and Class Counsel devoted significant time, skill and labor – entirely on a contingent basis -- to the prosecution of this action.  The litigation itself was complex and presented difficult questions.  Moreover, a 30% fee award is in line with fee awards in similar cases.

Finally, no Class member has objected to the settlement itself.  Furthermore, with the exception of one, no Class member has objected specifically to Class Counsel's request for an award of attorneys' fees.  As to that lone Class member, Class Counsel submits that its objection is unfounded.

Accordingly, Plaintiffs respectfully request that their petition be granted.

Dated: February 5, 2008

**STUEVE SIEGEL HANSON LLP**


/s/ Norman E. Siegel
Norman E. Siegel - D. Kan. 70354
George A. Hanson - KS 16805
460 Nichols Road, Suite 200
Kansas City MO 64112
Tel:        (816) 714-7100
Fax:        (816) 714-7101

**PLAINTIFFS' LIAISON COUNSEL**

| | |
|---|---|
| Susan G. Kupfer | W. Joseph Bruckner |
| Sylvie K. Kern | Heidi M. Silton |
| GLANCY BINKOW & GOLDBERG LLP | Darla Jo Boggs |
| 455 Market Street, Suite 1810 | LOCKRIDGE GRINDAL NAUEN P.L.L.P. |
| San Francisco, CA  94105 | 100 Washington Avenue South, Suite 2200 |
| Tel:    (415) 972-8160 | Minneapolis, MN  55401 |
| Fax:    (415) 972-8166 | Tel:    (612) 339-6900 |
| | Fax:    (612) 339-0981 |
| | |
| Roy M. Bell | Steven A. Kanner |
| Jason S. Hartley | William H. London |
| ROSS, DIXON & BELL, LLP | Michael E. Moskovitz |
| 550 West B Street  Suite 400 | FREED KANNER LONDON |
| San Diego, CA  92101 | & MILLEN LLC |
| Telephone: (619)235-4040 | 2201 Waukegan Road, Suite 130 |
| | Bannockburn, IL  60015 |
| | Tel: (224) 632-4500 |


**PLAINTIFFS' CO-LEAD COUNSEL**

## **CERTIFICATE OF SERVICE**

Plaintiffs' Liaison Counsel hereby certifies the following documents were electronically filed with the Clerk of Court through ECF, and that ECF notification was sent to at least one attorney from each law firm that represents one or more of the defendants, and was mailed, via U.S. Mail, postage prepaid, this 5th day of February, 2008 upon at least one attorney at each law firm that represents one or more of the plaintiffs that is not registered for ECF notification.

    /s/ Norman E. Siegel
Plaintiffs' Liaison Counsel