# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

---

**IN RE URETHANE ANTITRUST LITIGATION**

**MDL No. 1616**
Civil Action No. 04-md-01616-JWL
Judge John W. Lungstrum

---

**THIS DOCUMENT RELATES TO:**

***Carpenter Co. et al. v. BASF SE et al.,***
Civil Action No. 08-2617-JWL

***Woodbridge Foam Corporation, et al. v. BASF SE et al.,***
Civil Action No. 09-2026-JWL

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS ALL CLAIMS

*Submitted by*

BASF Canada Inc.
BASF Corporation
BASF SE
The Dow Chemical Company
Dow Chemical Canada Inc.
Huntsman International LLC

*Counsel Appear on Signature Page*

February 2, 2009

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

ALLEGATIONS OF THE COMPLAINTS ........................................................... 2

STANDARD OF REVIEW ................................................................................... 6

SUMMARY OF ARGUMENT ............................................................................. 7

ARGUMENT ........................................................................................................ 9

I.      THE STATE LAW CLAIMS SHOULD BE DISMISSED BECAUSE
        PLAINTIFFS FAIL TO ALLEGE THE NECESSARY ELEMENTS OF
        CONDUCT, EFFECTS, AND INJURY .......................................................... 9

        A.     The State Statutes Are Properly Construed Not to Have Extraterritorial
               Effect ................................................................................................ 11

        B.     Plaintiffs Fail to Allege the Elements of State Law ............................. 14

               1.      Indiana Antitrust Law Requires That the Alleged Anticompetitive
                       Agreement Be Made in Indiana. .......................................... 14

               2.      Plaintiffs Fail to Allege Plausible Direct and Substantial In-State
                       Effects on Colorado, Wisconsin, and Tennessee Commerce ................. 16

               3.      Plaintiffs Fail to Allege That They Suffered Antitrust Injury
                       Occurring in State Or Proximately Caused By In-State Effects of
                       Interstate Conduct. ......................................................... 21

        C.     Alternatively, Even If The Complaints Properly Alleged the Elements of
               State Law, Choice of Law Principles Would Require Dismissal of Claims
               With No Nexus to the State ................................................................. 25

        D.     Plaintiffs May Not Seek the Voiding of Contracts in Other States Under
               the Four States' Laws Even If the Contracts Had Substantial Effects in the
               Four States ........................................................................................ 26

        E.     This Court Should Decline Supplemental Jurisdiction Because of the
               Novelty and Complexity of the Issues of Extraterritorial Application of
               State Law .......................................................................................... 28

II.     THE INDIANA AND TENNESSEE STATE LAW CLAIMS ARE BARRED BY
        THE STATUTE OF LIMITATIONS .......................................................... 29

III.    THE COMPLAINT FAILS TO ALLEGE A PLAUSIBLE CLAIM FOR RELIEF
        FOR ALL EUROPEAN CLAIMS AND FOR ANY DOMESTIC CLAIMS
        ARISING PRIOR TO 2002 ....................................................................... 31

# TABLE OF CONTENTS
## (continued)

**Page**

A.    U.S. Purchase Claims .......................................................................... 32

B.    Foreign Purchase Claims ..................................................................... 34

IV.   THE COMPLAINTS SHOULD BE DISMISSED AS TO ALL CLAIMS
ARISING BEFORE 1999 ................................................................................. 35

A.    The Standards for Pleading Fraudulent Concealment Are "Stringent." ............. 36

B.    The Complaints Fail to Plead a Claim for Fraudulent Concealment for
1994-98 with the Required Particularity ............................................... 37

V.    THE CLAIMS BROUGHT BY OR ON BEHALF OF PARENTS AND
AFFILIATES SHOULD BE DISMISSED FOR LACK OF STANDING .................... 42

CONCLUSION ................................................................................................ 43

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aldrich v. McCulloch Props., Inc.*,
   627 F.2d 1036 (10th Cir. 1980) ............................................................35

*Allen v. Wright*,
   468 U.S. 737 (1984)............................................................................43

*American Pipe & Constr. Co. v. Utah*,
   414 U.S. 538 (1974)........................................................................29, 30

*Archer Daniels Midland Co. v. Seven-Up Bottling Co. of Jasper, Inc.*,
   746 So.2d 966 (Ala. 1999) ...................................................................15

*Bell Atlantic Corp. v. Twombly*,
   127 S. Ct. 1955 (2007)................................................................. passim

*Berghausen v. Microsoft Corp.*,
   765 N.E.2d 592 (Ind. Ct. App. 2002)......................................................15

*Bigelow v. Virginia*,
   421 U.S. 809 (1975)............................................................................27

*BMW of N. Am. v. Gore*,
   517 U.S. 559 (1996)........................................................................11, 27

*Bryson v. Gonzales*,
   534 F.3d 1282 (10th Cir. 2008) ....................................................6, 7, 14, 34

*California v. Infineon Techs. AG*,
   531 F. Supp. 2d 1124 (N.D. Cal. 2007) ...................................................20

*City of Chicago v. Int'l. Coll. of Surgeons*,
   522 U.S. 156(1997).............................................................................28

*Clulow v. Oklahoma*,
   700 F.2d 1291 (10th Cir. 1983) .............................................................36

*Conner v. Salina Regional Health Center, Inc.*,
   543 F.3d 1211 (10th Cir. 2008) ...............................................................7

*Crown Cork & Seal Co. v. Parker,*
    462 U.S. 345 (1983) (Powell, J., concurring) ........................................................30

*CSR Limited v. Cigna Corporation,*
    405 F. Supp. 2d 526 (D.N.J. 2005) ................................................................22, 23

*Curtis v. Campbell-Taggart, Inc.,*
    687 F.2d 336 (10th Cir. 1982) ........................................................................35

*Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.,*
    407 F.3d 1091 (10th Cir.2005) ........................................................................43

*Emergency One, Inc. v. Waterous Co.,*
    23 F. Supp. 2d 959 (E.D. Wis. 1998) ............................................................18, 19

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.,*
    417 F.3d 1267 (D.C. Cir. 2005) ....................................................................23, 24

*Erny v. Estate of Merola,*
    792 A.2d 1208 (N.J. 2002) ..............................................................................26

*Fink v. Ricoh Corp.,*
    839 A.2d 942 (N.J. Super. 2003) ......................................................................26

*Freeman Indus. v. Eastman Chem. Co.,*
    172 S.W.3d 512 (Tenn. 2005)................................................................... passim

*Gibson v. Miami Valley Milk Producers, Inc.,*
    299 N.E.2d 631 (Ind. Ct. App. 1973)................................................................30

*Hall v. Bellmon,*
    935 F.2d 1106 (10th Cir.1991) ..........................................................................6

*Hartford Fire Ins. Co. v. California,*
    509 U.S. 764 (1993)........................................................................................16

*Home Ins. Co. v. Dick,*
    281 U.S. 397 (1930)..................................................................................12, 27

*Howard v. Waide,*
    534 F.3d 1227 (10th Cir. 2008) ..........................................................................6

*Huntington v. Attrill,*
    146 U.S. 657 (1892)........................................................................................27

*In re Aluminum Phosphate Antitrust Litig.*,
    905 F. Supp. 1457 (D. Kan. 1995) .......................................................41

*In re Brand Name Prescription Drugs Antitrust Litigation*,
    123 F.3d 599 (7th Cir.1997) ...............................................................12

*In re Copper Antitrust Litigation*,
    436 F.3d 782 (7th Cir. 2006) (Cudahy, J., for the panel).......................30

*In re DES Cases*,
    789 F.Supp. 552 (E.D.N.Y. 1992) ........................................................24

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
    546 F.3d 981 (9th Cir. 2008) ...........................................................22, 23

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004)..................................................................33

*In re Hydrogen Peroxide Antitrust Litig.*,
    240 F.R.D. 163 (E.D. Pa. 2007).......................................................32, 33

*In re Late Fee and Over-Limit Fee Litigation*,
    528 F.Supp.2d 953 (N.D. Cal. 2007) ....................................................33

*In re Milk Prods. Antitrust Litig.*,
    84 F. Supp. 2d 1016 (D. Minn. 1997).....................................................38

*In re Parmalat*,
    383 F.Supp.2d 587 (S.D.N.Y. 2005).......................................................22

*In re Urethane Antitrust Litig.*,
    235 F.R.D. 507 (D. Kan. 2006) (Lungstrum, J.).......................35, 36, 38

*In' Porters, S.A. v. Hanes Printables, Inc.*,
    663 F.Supp. 494 (M.D.N.C. 1987) ........................................................21

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .........................................................31, 32

*King & King Enters. v. Champlin Petroleum Co.*,
    657 F.2d 1147 (10th Cir. 1981) ..................................................36, 40, 41

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)...............................................................................43

*KT & G Corp. v. Att'y Gen. of Okla.,*
535 F.3d 1114 (10th Cir. 2008) ...................................................................12

*Love Terminal Partners, L.P. v. City of Dallas,*
527 F. Supp. 2d 538 (N.D. Tex. 2007 .........................................................32

*Lyng v. Northwest Indian Cemetery ProtectiveAss'n,*
485 U.S. 439 (1988)......................................................................................27

*McLain v. Real Estate Bd. of New Orleans, Inc.,*
444 U.S. 232 (1980)......................................................................................16

*Meyers v. Bayer AG,*
735 N.W. 2d 448 (Wis. 2007)................................................................ passim

*Monsanto Co. v. Spray-Rite Service Corp.,*
465 U.S. 752 (1984)......................................................................................33

*Mountain View Pharmacy v. Abbott Labs.,*
630 F.2d 1383 (10th Cir. 1980) ...................................................................32

*N. Am. Philips v. Am. Vending Sales, Inc.,*
35 F.3d 1576 (Fed. Cir.1994)........................................................................24

*Newman v. Universal Pictures,*
813 F.2d 1519 (9th Cir. 1987) .....................................................................32

*N.Y. Life Ins. Co. v. Head,*
234 U.S. 149 (1914)......................................................................................27

*Olstad v. Microsoft Corp.,*
700 N.W.2d 139 (Wis. 2005)........................................................................17

*Over v. Byram Foundry Co.,*
77 NE. 302 (Ind. Ct. App. 1906) ...........................................................14, 15

*People v. North Ave. Furniture & Appliance, Inc.,*
645 P.2d 1291 (Colo. 1982)..........................................................................22

*Phillips Petroleum Co. v. Shutts,*
472 U.S. 797 (1985)................................................................................12, 25

*Photovest Corp. v. Fotomat Corp.,*
606 F.2d 704 (7th Cir. 1979) ........................................................................22

*Robbins v. Okla. ex rel. Dep't of Soc. Servs.*,
  519 F.3d 1242 (10th Cir. 2008) ................................................................6, 16

*Rozema v. Marshfield Clinic*,
  176 F.R.D. 295 (W.D. Wis. 1997) .....................................................................31

*Sandidge v. Rogers*,
  167 F. Supp. 553 (S.D. Ind. 1958) ....................................................................30

*Segall v. Hurwitz*,
  114 Wis. 2d 471, 339 N.W.2d 333 (Wisc. App. 1983)........................................31

*Smalley & Co. v. Emerson & Cuming, Inc.*,
  808 F. Supp. 1503, *aff'd*, 13 F.3d 366 (10th Cir. 1993) ......................................16

*Spitzer v.Feldman*,
  2003 WL 21576518 (S.D.N.Y. 2003) ................................................................30

*State ex rel. Leech v. Levi Strauss & Co.*,
  No. 79-722-III, 1980 WL 4696 (Tenn.Ch. 1980) ...........................................22, 31

*State v. Waste Management of Wisconsin, Inc.*,
  261 N.W.2d 147 (Wis. 1978)..........................................................................22

*Tal v. Hogan*,
  453 F.3d 1244 (10th Cir. 2006) ...................................................................16, 17

*Tecre Co., Inc. v. Buttonpro, Inc.*,
  387 F.Supp.2d 927 (E.D. Wis. 2005)..................................................................24

*Turicentro, S.A. v. American Airlines Inc.*,
  303 F.3d 293 (3d Cir. 2002)..............................................................................23

*United States v. Pearce*,
  912 F.2d 159 (6th Cir.1980) .............................................................................33

*White v. Graceland Coll. Ctr. for Prof. Dev. & Lifelong Learning, Inc.*,
  No. 07-2319-CM, 2008 WL 191422 (D. Kan. Jan. 22, 2008) .................................7

**FEDERAL STATUTES & RULES**

15 U.S.C. § 15(b) .............................................................................................35

28 U.S.C. § 1367 .............................................................................................28

Federal Rule of Civil Procedure 12(b)(6) ....................................................2, 6, 7

Rule 9(b) ..................................................................................................................36, 37

Rule 9's ............................................................................................................................40

**STATE STATUTES**

Colo. Rev. Stat. § 6-4-118(1) ..........................................................................................31

Colo. Rev. Stat. § 6-4-121 .........................................................................................10, 27

Colo. Rev. Stat. §§ 6-4-104 and 6-4-121 ..........................................................................9

Ind. Code § 24-1-1-5........................................................................................................27

Ind. Code §§ 24-1-1-5, 24-1-1 .........................................................................................10

Ind. Code § 34-11-2-4.......................................................................................................30

Ind. Code § 24-1-1-1 ............................................................................................10, 14, 15

Ind. Code §§ 24-1-1-1 and 24-1-1-5...................................................................................9

Tenn. Code § 47-25-106 ..............................................................................................10, 27

Tenn. Code §§ 47-25-101 and 47-25-106...........................................................................9

Wisc. Stat. §§ 133.03 and 133.14 ......................................................................................9

**OTHER AUTHORITIES**

Herbert Hovenkamp, *State Antitrust in the Federal Scheme*, 58 Ind. L.J. 375, 375 (1983)..........14

*Restatement (Second) of Conflict of Laws* §§ 145, 171 ................................................26

## **INTRODUCTION**

In the original class action complaint, filed in 2004, a host of U.S. plaintiffs asserted Sherman Act claims against the defendant chemical companies for an alleged conspiracy to fix the prices of polyether polyol products during the period 1999-2004.  Four years later, some 75 plaintiffs[1] from around the world have filed two opt-out complaints – *Carpenter Co. v. BASF SF*, Civil Action No. 08-2617-JWL ("Carpenter Compl.") and *Woodbridge Foam Corp. v. BASF SF*, Civil Action No. 09-2026-JWL ("Woodbridge Compl.") (collectively "Plaintiffs" and the "Complaints") – alleging Sherman Act and state law claims as well as foreign law claims based upon the European Community Treaty ("EC Treaty") and "any and all applicable laws" of its 27 Member states.[2]  For the reasons set forth below, all of Plaintiffs' claims, as pled, are deficient and warrant dismissal.

As an initial matter, Plaintiffs who purchased polyether products only in the United States are unsatisfied with the availability of treble damages under the Sherman Act.  In the hope of gaining an even more lucrative remedy, they ask this Court to give broad extraterritorial reach to the antitrust laws of Colorado, Indiana, Tennessee, and Wisconsin. Every Plaintiff who purchased a product anywhere in the United States asserts claims under the laws of those four states, even though the vast majority of the Plaintiffs have no nexus to any of those states, and even though the Complaints state no plausible allegations of the jurisdictional

---

[1] Plaintiffs also purport to bring these claims on behalf of a host of their parent and affiliate companies. As detailed at Part V, *infra*, these claims are due no consideration by the Court.

[2] Defendants have separately filed a motion to dismiss Plaintiffs' foreign law claims on jurisdictional and *forum non conveniens* grounds.  *See* Defendants' Motion for Dismissal of the European Union Claims of the Opt-Out Complaints, dated February 2, 2009 (filed concurrently herewith).

requisites of those states' statutes.  Moreover, the state antitrust claims are barred by the statute of limitations for at least two of the four states.

In addition, notwithstanding the limitations of the class action complaint, these opt-out Plaintiffs brazenly seek damages they allegedly sustained as far back as 1994 (five years before the class period), even though their Complaints contain nary an allegation of any unlawful agreement prior to 2002.  While some portion of the U.S. Plaintiffs' Sherman Act allegations might be sufficient to survive a motion to dismiss, the Complaints as filed assert claims that are time-barred, that are based on conduct pre-dating the alleged unlawful agreement, and that fail to satisfy the requirements of *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), and its progeny.

This Court should grant this motion to dismiss the foreign and state law counts in their entirety, and to dismiss the Sherman Act counts as pled, under Federal Rule of Civil Procedure 12(b)(6).

## ALLEGATIONS OF THE COMPLAINTS

The Plaintiffs in these two opt-out Complaints collectively seek damages and injunctive relief under federal, state, and foreign antitrust laws against seven defendants (BASF Canada Inc., BASF Corporation, BASF SE, The Dow Chemical Company, Dow Chemical Canada Inc., Huntsman International LLC, and Lyondell Chemical Co. (collectively "Defendants")).[3]  They allege that Defendants engaged in a "global conspiracy to fix, maintain, stabilize prices of, and allocate markets and customers for" polyether polyol products, including

---

[3] Lyondell has filed a bankruptcy petition, staying these actions as to it, and accordingly it does not participate in this motion.

-2-

in the United States and Europe.  Carpenter Compl. Intro.; Woodbridge Compl. Intro.  Polyether polyol products are "intermediate chemical compounds based on propylene oxide or ethylene oxide that, among other things, are used in the manufacture of flexible foams and rigid foams," and in "the manufacture of elastomers, adhesives, sealants, coatings, and binders."  Carpenter Compl. ¶ 78; Woodbridge Compl. ¶ 39.

*Plaintiffs/Claims.*  The Complaints divide the Plaintiffs into two mutually exclusive groups:  Plaintiffs who are alleged only to have purchased products in the United States are denominated the "U.S. Purchase Plaintiffs."  Carpenter Compl. Intro.; Woodbridge Compl. Intro.  Plaintiffs who are alleged only to have purchased products in Europe are denominated the "Foreign Purchase Plaintiffs."  *Id.*

The U.S. Purchase Plaintiffs allege not only violations of the Sherman Act, but also of certain state laws.  In the Carpenter complaint, 38 U.S. Purchase Plaintiffs collectively allege violations of the Colorado, Indiana, Tennessee, and Wisconsin antitrust statutes (Counts II-V respectively).  Carpenter Compl. ¶¶ 102-149.  Yet the complaint fails to allege any nexus whatsoever between 31 of the U.S. Purchase Plaintiffs and any of those four states.  Of the remaining seven Plaintiffs, one (Flexible Foam Products) is identified as either having maintained facilities in three of the states (Colorado, Indiana, and Wisconsin) in which polyether polyol products were used, or having purchased those products for use in those states.  *Id.* ¶¶ 129, 135, 147.  One Plaintiff in Indiana (Carpenter Co.) and five Plaintiffs in Tennessee (Nu-Foam, Pathway Polymers, Hickory, J.M. Huber, and Huber) also allegedly did the same in those states.  *Id.* ¶¶ 135, 141.  No conspiratorial conduct or agreement is alleged to have taken place in any of the four states.  At bottom, Plaintiffs have invoked those state laws for reasons of remedy:

they believe such laws entitle them to recover "the full consideration" they paid for polyether polyol products. *Id.* ¶¶ 1, 131, 137, 143, 149.

The Woodbridge complaint is brought on behalf of a smaller but even more geographically diverse group of plaintiffs. The so-called "U.S. Purchase Plaintiffs" in the Woodbridge complaint are six American corporations and eight foreign corporations from Canada, Barbados, Australia, Brazil, and Argentina. Woodbridge Compl. ¶¶ 18-25. In addition to alleging violations of the Sherman Act in Count I, the Woodbridge U.S. Purchase Plaintiffs seek remedies under the antitrust laws of Wisconsin and Tennessee in Counts II and III, *id.* ¶¶ 61-96, although only one of the 11 allege a nexus to each of those states, *id.* ¶¶ 88, 94.

Neither complaint alleges any conspiratorial conduct or agreement in any of the states. And both Complaints claim that the four states' laws entitle Plaintiffs to recover "the full consideration"—*i.e.*, the full amount—they paid for polyether polyol products. *Id.* ¶¶ 1, 131,137, 143, 149.

*Conspiracy Allegations*. The substantive allegations of the Complaints are identical (save for the differences noted above in the state laws invoked). The Complaints allege that Defendants engaged in a conspiracy "from at least as early as 1994 and continuing at least until December 31, 2004." Carpenter Compl. ¶¶ 88-93; Woodbridge Compl. ¶¶ 49-52. But the Complaints make no specific allegations to buttress that broad claim.

First, despite their assertion of a conspiracy commencing in 1994, the Complaints identify no specific meeting (much less agreement) prior to 1999.[4] As to the earlier period, the

---

[4] The Complaints do allege a meeting in Brussels of indeterminate date between unidentified persons occurring sometime "[d]uring the late 1990s or early 2000s." Carpenter Compl. ¶ 100.a; Woodbridge

Complaints instead state only vague generalities that "starting at least as early as 1994, the exact date(s) being unknown to Plaintiffs, Defendants BASF and Dow and co-conspirator Bayer engaged in numerous meetings, discussions, and/or communications regarding pricing of Polyether Polyol Products throughout the world, including at least in the United States and Europe." Carpenter Compl. ¶ 96; Woodbridge Compl. ¶ 55.

Second, there is no specific allegation of any agreement to fix prices before 2002; prior to that, Plaintiffs allege only meetings in which various representatives of Defendants "discussed" pricing, margins, and market share in the United States. Carpenter Compl. ¶ 100.a-e; Woodbridge Compl. ¶ 59.a-e. The first allegation of an agreement to set prices in the United States arises from a purported January 21, 2002 meeting between Dow and Bayer representatives. Carpenter Compl. ¶ 100.f; Woodbridge Compl. ¶ 59.f.

Third, despite inviting this Court to wade into the morass of E.U. competition law and "any and all applicable laws" of its 27 Member states, Plaintiffs do not allege any specific meeting in which Defendants agreed to fix, maintain, or stabilize European prices, or allocate European customers and markets. Instead, all that Plaintiffs could cobble together are two alleged instances where unnamed representatives of the Defendants met to discuss European pricing and market share; Plaintiffs do not allege that any unlawful agreement regarding European prices and markets was reached at those meetings. Carpenter Compl. ¶ 100.a,l; Woodbridge Compl. ¶ 59.a,l. The only other meetings alleged in the Complaints involve

---

Compl. 59.a. However, because Plaintiffs allege that "representatives of BASF, Lyondell, Dow, Huntsman, and Bayer attended this meeting," Carpenter Compl. ¶ 100.a; Woodbridge Compl. 59.a., and "Huntsman entered the Polyether Polyol Products markets in 1999 upon its acquisition of ICI's polyurethanes business," Carpenter Compl. ¶ 96; Woodbridge Compl. 55, it is apparent that this meeting is not alleged to have occurred before 1999.

discussions of *United States* pricing and customers. Carpenter Compl. ¶ 100.b-k; Woodbridge Compl. ¶ 59.b-k.

## **STANDARD OF REVIEW**

In deciding a motion to dismiss under Rule 12(b)(6), this Court shall "accept all well-pleaded factual allegations in the complaint as true," *Howard v. Waide*, 534 F.3d 1227, 1242-43 (10th Cir. 2008), but not conclusory allegations. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Moreover, "the complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins v. Okla. ex rel. Dep't of Soc. Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)). "'[P]lausibility' in this context … refer[s] to the scope of the allegations in a complaint." *Id.* The complaint "must … provide enough factual allegations for a court to infer potential victory," *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008), and must state "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 127 S. Ct. at 1965. "This pleading requirement serves two purposes. First, it ensures that defendants know the actual grounds of the claim against them, and can therefore prepare a defense. Second, it avoids ginning up the costly machinery associated with our civil discovery regime on the basis of a largely groundless claim." *Bryson*, 534 F.3d at 1287 (internal quotation marks and brackets omitted); *Robbins*, 519 F.3d at 1248.

If the complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 127 S.Ct. at 1974).

> Plaintiffs thus omit important factual material at their peril. While a complaint must be "short and plain," it must also "show[ ]" (not merely assert) that relief is appropriate if it is true.  Fed. R. Civ. P. 8(a)(2).  Thus, despite the liberality of modern rules of pleading, a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.

*Bryson*, 534 F.3d at 1286.

The *Twombly* standard applies to all claims, whether arising under federal, state, or foreign law.  *See ex rel. Conner v. Salina Reg. Health Ctr., Inc.*  543 F.3d 1211, 1216-17 (10th Cir. 2008) (applying *Twombly* standard to state law claims under Rule 12(b)(6)); *White v. Graceland Col. Ctr. for Prof. Dev. & Lifelong Learning, Inc.*, No. 07-2319-CM, 2008 WL 191422, at *3 (D. Kan. Jan. 22, 2008) (same).

## SUMMARY OF ARGUMENT

The opt-out Plaintiffs' overreaching claims should be dismissed.  None of the four state laws invoked by Plaintiffs has the unconstitutionally broad extraterritorial reach that Plaintiffs claim.  The Indiana statute provides a remedy only for unlawful agreements in restraint of trade that are formed in Indiana; no such agreement is alleged in either complaint.  The Colorado, Tennessee and Wisconsin statutes require substantial effects on commerce in the state (not merely an effect on individual companies); the Complaints' allegations of such effects are wholly conclusory.  None of the invoked state laws provides redress for persons who are not injured in state (through the direct action of the defendant or by the effects of the alleged price-fixing conspiracy).  None of the Plaintiffs alleges it was injured by purchasing the product in any of the four states at falsely inflated prices; indeed, most of them allege no nexus to the four states at all.

In addition, even if Plaintiffs could correctly plead the elements of a state law claim, choice-of-law principles would not allow Plaintiffs to select the state law that they prefer; these matters are properly decided according to the law of the state with the most significant relationship to the plaintiff's injury as a whole.  And even if those hurdles could be overcome, the rescission remedy of those state laws cannot constitutionally be applied to void out-of-state contracts.

All told, Plaintiffs state no plausible claim of a state law violation that passes muster under the *Twombly* standard of fair notice pleading.  And in any event, the claims for at least two of the four states come too late:  they are barred by those states' statutes of limitation.

The Complaints suffer from other *Twombly* defects.  They fail to state a claim arising before 2002; there is no specific allegation of any agreement to fix U.S. prices prior to that date.  The European claims do not survive in any fashion; Plaintiffs make no specific and plausible allegation under *Twombly* of any agreement among Defendants to fix European prices at any time.   And, apart from the inadequacy of the substantive allegations of the Complaints, the fraudulent concealment allegations fall far short of meeting the stringent pleading standards that would permit Plaintiffs to justify stretching their claims backward from 1999 (the date alleged to be the beginning of the conspiracy by the class action complaint out of which Plaintiffs opted) to 1994.

## ARGUMENT

**I.   THE STATE LAW CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE THE NECESSARY ELEMENTS OF CONDUCT, EFFECTS, AND INJURY.**

The Carpenter complaint brings claims under the antitrust laws of four states: Colorado, Indiana, Tennessee and Wisconsin.[5]  The Woodbridge complaint brings claims under the laws of two states: Tennessee and Wisconsin.  The vast majority of both sets of Plaintiffs, however, have no nexus to any of the four states.[6]  Nonetheless, the Complaints bring each state law claim on behalf of each and every one of the 49 "U.S. Purchase Plaintiffs," including six foreign corporations.[7]  And they seek to recover under these state law remedies for *all* purchases made anywhere in the United States, including purchases not completed in any of the four states.

The reason Plaintiffs do so is obvious:  the local antitrust provisions of the four states have unique "full consideration" remedy language that, Plaintiffs believe, would permit them to obtain the return of all payments made on contracts found to violate state law, *regardless*

---

[5] Colorado Revised Statutes §§ 6-4-104 and 6-4-121, Indiana Code §§ 24-1-1-1 and 24-1-1-5, Tennessee Code §§ 47-25-101 and 47-25-106, and Wisconsin Statutes §§ 133.03 and 133.14. http://www.michie.com/colorado/lpext.dll?f=templates&fn=main-h.htm&cp=, http://www.in.gov/legislative/ic/code/title24/ar1/ch1.html, http://www.michie.com/tennessee/lpext.dll?f=templates&fn=main-h.htm&cp=tncode, http://nxt.legis.state.wi.us/nxt/gateway.dll?f=templates&fn=default.htm&d=stats&jd=133.04

[6] Only one plaintiff, Flexible Foam Products, claims a nexus to Colorado; only two plaintiffs, Carpenter and Flexible Foam Products, claim a nexus to Tennessee; only six plaintiffs, Hickory Springs, Huber, J.M. Huber, Nu-Foam Products, Pathway Polymers, and Woodbridge Corporation, claim a nexus to Tennessee; and only two plaintiffs, Flexible Foam Products and Woodbridge Foam Fabricating, Inc., claim a nexus to Wisconsin.

[7] Woodbridge Foam Corporation (Canada); PWA Poliuretanos Woodbridge de Argentina (Argentina); T.W. Espumas Ltda. (Brazil); Woodbridge Australia Group Pty. Ltd. (Australia); Carpenter Canada Co. (Canada); and Vitafoam Canada (Canada).

-9-

of the actual damages suffered.  For example, the Colorado statute (titled "Void Contracts –

refund") reads:

> All contracts or agreements made by any person while a member
> of any combination [or] conspiracy … prohibited under this article
> which are founded upon, or are the result of, or grow out of, or are
> connected with any violation of this article … shall be void … Any
> payments made upon, under, or pursuant to such contract or
> agreement … may be recovered in an action by the party making
> the payment …

Colo. Rev. Stat. § 6-4-121.  The Wisconsin statute (titled "Illegal contracts void; recovery") is

nearly identical.  Wisc. Stat. § 133.14.  The Indiana statute, dating from 1897, authorizes suit to

recover "the full consideration or sum paid by" a purchaser for articles "the sale of which is

controlled by [a] combination or trust" prohibited under the state's "[c]ontracts against public

policy; null and void contracts" provision.  Ind. Code §§ 24-1-1-5, 24-1-1.[8]  The Tennessee

statute, which dates to 1891, uses the same "recover … the full consideration or sum paid"

language.  Tenn. Code § 47-25-106.

These "full consideration" clauses are largely untested in modern-day antitrust

litigation.  Plaintiffs here, already test-driving their expansive E.U. law claims on behalf of the

European Plaintiffs, also ask this Court to invoke these untested state provisions to permit "U.S.

Purchase Plaintiffs … to recover any payments made upon, under or pursuant to such contracts

---

[8] The Indiana provision on "[c]ontracts against public policy; null and void contracts" reads (§24-1-1-1):

> From and after April 14, 1897, all arrangements, contracts, agreements, trusts, or
> combinations between persons or corporations who control the output of any article of
> merchandise, made with a view to lessen, or which tend to lessen, full and free
> competition in the importation or sale of articles imported into this state, and all
> arrangements, contracts, agreements, trusts, or combinations between persons or
> corporations who control the output of said article of merchandise, designed, or which
> tend to advance, reduce, or control the price or cost to the producer or to the consumer of
> any such product or article, are hereby declared to be against public policy, unlawful, and
> void.

-10-

or agreements, plus interest."  Carpenter Compl. ¶¶ 96, 131, 137, 143; Woodbridge Compl. ¶¶ 90, 96.

This Court should reject that invitation for at least three reasons.  *First*, Plaintiffs ask this Court to treat the four statutes as extraterritorial legislation that voids any contract related to the alleged price-fixing conspiracy, even when the Plaintiffs were not injured in the state and even when the contracts were executed and performed outside the state.  Plaintiffs' claims are untenable; this Court cannot construe the statutes to exceed the authority of states to regulate out-of-state commerce under principles of federalism and due process.  *Second*, because Plaintiffs misconceive the reach of the state laws they invoke, both Complaints suffer from severe *Twombly* defects.  The Complaints do not allege that the supposed anticompetitive conduct substantially affected in-state commerce or took place in each of the four states, or that Plaintiffs in the four states have suffered the requisite injury in the state to satisfy requirements of antitrust standing (and avoid extraterritorial application of state law).  *Third*, even if state law applied to any of the Plaintiffs' claims, the "full consideration" rescission remedy cannot constitutionally be applied to out-of-state contracts.  The state law claims in Counts II-V of the Carpenter complaint and Counts II and III of the Woodbridge complaint should be dismissed in their entirety.

**A.      The State Statutes Are Properly Construed Not to Have Extraterritorial Effect.**

In fashioning claims that would result in recovery of payments made by an out-of-state Plaintiff for out-of-state transactions, Plaintiffs greatly overreach.  It is a core principle of our federal system that "[n]o state can legislate except with reference to its own jurisdiction." *BMW of N. Am. v. Gore*, 517 U.S. 559, 571 (1996) (quoting *Bonaparte v. Tax Court*, 104 U.S.

592, 594 (1881)).  Under this principle, a state may not regulate conduct occurring beyond its

borders *unless* the conduct affects in-state persons.  *See KT & G Corp. v. Att'y Gen. of Okla.*, 535

F.3d 1114, 1143 (10th Cir. 2008) ("a statute will be invalid per se if it has the practical effect of

extraterritorial control of commerce occurring entirely outside the boundaries of the state in

question.") (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 326 (1989); *In re Brand Name*

*Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 613 (7th Cir. 1997) ("State A cannot use its

antitrust law to make a seller in State B charge a lower price to a buyer in C.  Insofar as the

Alabama suit challenges sales from plants or offices in other states to pharmacies in other states,

it exceeds the constitutional scope of the Alabama antitrust law.") (citations omitted).

      The Due Process Clause similarly limits "states' power to regulate economic

activities in other states," particularly where a state applies its law to a transaction with which the

state has no nexus.  *Brand Name*, 123 F.3d at 611 (citing Herbert Hovenkamp, *Federal Antitrust*

*Policy, The Law Of Competition And Its Practice* § 20.8 (3d ed. 2005)).  Thus, the Due Process

Clause prevents a Tennessee purchaser from suing a Michigan seller (*e.g.*, Dow) in Wisconsin

under Wisconsin law, if neither the parties nor the transaction had any nexus to Wisconsin.

Kansas courts have direct experience with this rule.  *See Phillips Petroleum Co. v. Shutt*s, 472

U.S. 797 (1985) (Due Process Clause prevents a state from applying its law to transactions with

which it had virtually no contact); *Home Ins. Co. v. Dick*, 281 U.S. 397 (1930) (same).

      This set of principles, recently underscored by the Supreme Court's *BMW*

opinion, is "so obviously the necessary result of the Constitution that it has rarely been called in

question and hence authorities directly dealing with it do not abound."  *Coca-Cola Bottling Co.*

*v. Harmar Bottling Co.*, 218 S.W.3d 671, 680 (Tex. 2006) (quoting *New York Life Ins. Co. v.*

-12-

*Head*, 234 U.S. 149, 161 (1914)).  In *Coca-Cola Bottling*, the Texas Supreme Court rejected

attempts to use the Texas statute—a statute Plaintiffs conspicuously omit from their select set of

state law claims —to apply to extraterritorial conduct with solely extraterritorial effects:  "[I]t

would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that

State and in the State of New York and there destroy freedom of contract without throwing down

the constitutional barriers …."  *Id.* at 680 (citing *BMW*, 517 U.S. at 571 n.16 (quoting *New York*

*Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914)).  The court went on to hold that regulation of

"economic competition beyond [a state's] borders" is "an especially sensitive matter. …  [as]

such laws necessarily reflect fundamental policy choices that the people of one jurisdiction

should not impose on the people of another."  *Id.* at 680-81.[9]

        Here there is no basis for construing the four state laws to have the extraterritorial

reach that Plaintiffs claim.  Defendants have found no reported case in which an out-of-state

plaintiff injured by out-of-state conduct has ever recovered under the state antitrust laws of any

of the four states.  And it is no surprise that "authorities directly dealing with [this prospect] do

not abound" in the four states:  the same principles that are "so obviously the necessary result of

the Constitution," *id.* at 680, apply with full force here.  As a leading antitrust commentator

observed, "[a]s a matter of policy, extraterritorial application of state antitrust law ought to be

limited to those instances when a state court has specific personal jurisdiction over the

---

[9] Avoiding extraterritorial application of state law is not only a constitutional command but a fundamental principle of interstate comity.  "For a court in one state to undertake to determine what would benefit competition and consumers in another state would pose a significant affront to the interstate comity sister states should accord each other in our federal system."  *Id.* at 685.  Similarly, because "'varying times and circumstances' give antitrust law 'changing content,'" it is improper that "the courts of one state should determine for another state the economic theory and social needs and values that provide content to its antitrust laws."  *Id.* (quoting *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 731 (1988)).

-13-

defendants"—that is, jurisdiction that arises from the defendant's specific transaction-related contacts with the state, not its general conduct of business there—"or when the cause arises out of the defendant's activities within the forum state."  Herbert Hovenkamp, *State Antitrust in the Federal Scheme*, 58 Ind. L.J. 375, 375 (1983).

The state laws in question therefore are properly construed to respect the territorial limits on state power both as to the *conduct* that is actionable and the type of *injury* that is redressed.  The Indiana statute, for example, has long been read to reach only anticompetitive agreements made *within* Indiana.  *See Over v. Byram Foundry Co.*, 77 N.E. 302, 304 (Ind. Ct. App. 1906).  The Tennessee and Wisconsin statutes (and by analogy the Colorado statute) are limited to out-of-state conduct with a direct and foreseeable *in-state* effect.  *See Meyers v. Bayer AG,* 735 N.W. 2d 448, 464 (Wis. 2007) (citing *Olstad v. Microsoft Corp.,* 700 N.W.2d 139, 141 (Wis. 2005)); *Freeman Indus. v. Eastman Chem. Co.*, 172 S.W.3d 512, 523 (Tenn. 2005).  Moreover, no plaintiff has standing to bring a claim under any of those state laws unless the plaintiff suffers injury in the state, or injury that is proximately caused by the substantial effects on in-state commerce arising from the violation.  Plaintiffs fail to state a plausible claim under *Twombly* because they do not properly "allege the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286.

**B.    Plaintiffs Fail to Allege the Elements of State Law.**

**1.    Indiana Antitrust Law Requires That the Alleged Anticompetitive Agreement Be Made in Indiana.**

Plaintiffs seek to assert a claim under Indiana Code § 24-1-1-1, *see supra* n.5, which declares void as against public policy certain agreements and contracts that are "made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale

-14-

of articles imported into this state" or are "designed, or which tend to advance, reduce, or control the price or the cost to the producer or to the consumer of any such product or article."  Thus, Indiana Code § 24-1-1-1, by its terms, limits itself to anticompetitive conduct regarding "the importation or sale of articles imported into this state."  *Id.*  Indiana courts have interpreted the provision's predecessor statute as requiring the anticompetitive agreement to be made in Indiana for § 24-1-1-1 to apply.  *Byram Foundry*, 77 N.E. at 304 ("The contract [proscribed by the statute] must be made within the state, but the monopoly, in the legislative mind, could not have been limited to the state, since the thing guarded against has relation wholly to goods made without the state.").  Other state courts recently have upheld similar statutes requiring in-state conduct for their antitrust laws to apply.  *See, e.g.*, *ADM Co. v. Seven-Up Bottling Co. of Jasper, Inc.*, 746 So. 2d 966, 989-90  (Ala. 1999).

The Complaints do not allege that any part of the agreement to engage in anticompetitive conduct occurred in Indiana.  *See, e.g.*, Carpenter Compl. ¶¶ 132-137.  Thus, the conspiratorial agreement alleged in the Complaints is not actionable under Indiana law. Moreover, Plaintiffs cannot satisfy the injury requirement of Indiana law.  Plaintiffs allege no more than that one Plaintiff in each case purchased urethane products for use in facilities that that Plaintiff maintained in Indiana or "for use in Indiana."[10]  *Id.* ¶ 135.  But that is a far cry from alleging injury from an unlawful contract formed in Indiana.  Indeed, the vast majority of U.S. Purchase Plaintiffs do not allege even that; they allege no nexus to Indiana whatsoever.  The

---

[10] Indiana law bars indirect purchasers from bringing suit in antitrust cases, *Berghausen v. Microsoft Corp.*, 765 N.E.2d 592, 597 (Ind. Ct. App. 2002).  Thus, to the extent Plaintiffs' allegation concerning articles "for use in Indiana" refers to purchases of polyether-containing end products by Indiana indirect buyers, the claim would fail under state law.

Indiana claim accordingly should be dismissed.  *Robbins*, 519 F.3d at 1247 (citing *Twombly*, 127 S. Ct. at 1974); *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006).

> **2.      Plaintiffs Fail to Allege Plausible Direct and Substantial In-State Effects on Colorado, Wisconsin, and Tennessee Commerce.**

The antitrust laws of Colorado, Tennessee, and Wisconsin reach interstate conduct only where "(1) actionable conduct, such as the formation of a combination or conspiracy, occurred within this state, even if its effects are felt primarily outside [the state]; or (2) the conduct complained of "*substantially affects*" the people of [the state] and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state."  *Meyers*, 735 N.W. 2d at 464 (under Wisconsin law); *Freeman*, 172 S.W.3d at 523 (under Tennessee law) (both quoting *Olstad*, 700 N.W.2d at 141) (emphasis added).[11]  This standard is derived from the substantial effects standard applied by federal courts in deciding whether the Sherman Act applies to foreign anticompetitive conduct, and requires a "direct, substantial and reasonably foreseeable effect within the state."  *Freeman*, 172 S.W.3d at 523 (quoting *Amarel v. Connell*, 248 Cal. Rptr. 276, 284 (Cal. App. 1988); citing *Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764, 796 (1993); *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232 (1980)).  Moreover, "[t]he public interest and welfare of the people of [the state] are substantially affected if prices of a product are fixed or supplies thereof are restricted as the

---

[11] While there is no Colorado decisional law directly on point regarding the in-state nexus necessary to state a claim under § 6-4-104, a Colorado court would likely find Wisconsin and Tennessee decisional law persuasive on this subject.  *See Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F. Supp. 1503, 1516, *aff'd*, 13 F.3d 366 (10th Cir. 1993) (noting that Colorado antitrust statute was modeled after the substantive provisions of Wisconsin's antitrust statute); *Freeman*, 172 S.W.3d at 523 (noting similarity between Wisconsin and Tennessee tests); *see also* pp. 22-23 *infra* (discussing Foreign Trade and Antitrust Improvement Act test).

result of an illegal combination or conspiracy." *Meyers*, 735 N.W. 2d at 454 (quoting *State v. Allied Chem. & Dye Corp.*, 101 N.W.2d 133 (Wis. 1960)).

Under the "substantial effects" test, "a complaint must allege effects on [the state], and not merely nationwide effects." *Id.* at 463-64; *Freeman*, 172 S.W.3d at 524 (focus of the test is not on conduct but "the *effects* of the conduct on Tennessee commerce"). The test also requires *more* than a minimum contacts-style analysis or a choice of law-style analysis. *Id.* at 459 & n.11 (citing *Emergency One, Inc. v. Waterous Co.*, 23 F. Supp. 2d 959, 969-70 (E.D. Wis. 1998)); *Tal*, 453 F.3d at 1253. Either of the above standards would be problematic "in cases involving nationwide sales, [as] application of [those] standard[s] might result in application of state antitrust law when no significant injury to trade and economic competition occurred in the state." *Id.* at 460 n.11.

Constitutional concerns militate against a more liberal "substantial effects" test, as such a standard "would jeopardize the action, undermine the validity of our antitrust statute, and create the spectacle of Lilliputian harassment in Wisconsin courts." *Olstad*, 700 N.W.2d at 158; *Freeman*, 172 S.W.3d at 522 (noting constitutional concerns in adopting test). Similarly, "[q]uestions of provincialism, favoritism, and undue burden on interstate commerce should be determined by resort to contemporary federal commerce clause jurisprudence." *Olstad,* 700 N.W.2d at 158. Otherwise, the individual state laws would encroach upon those of other states and the federal government's prerogatives. *Id.*; *Freeman*, 172 S.W.3d at 522. The "substantial effects" test thus interprets state antitrust law as limited to claims: (1) substantially affecting trade or commerce in the state; (2) which results in injury to plaintiffs; and (3) the alleged injury itself must have a nexus to the state. *Id.*

-17-

The Complaints' allegations as to how the trade and commerce of the three states were affected by the alleged anticompetitive conduct are woefully inadequate under this standard.   Plaintiffs merely state conclusorily that each of the three states' laws was violated and such violations "substantially affected the people" of those states.  Carpenter Compl. ¶¶ 127, 139, 145; Woodbridge Compl. ¶¶ 86, 92.  But the Complaints' allegations are limited to the claim that a small number of the Plaintiffs purchased the product "for use in" any of the three states.  Carpenter Compl. ¶¶ 129, 141, 147; Woodbridge Compl. ¶¶ 88, 94.

But injury to one purchaser (or a few purchasers) in the state does not constitute a substantial effect on in-state commerce.  Indeed, in *Emergency One*, a fact pattern similar to that alleged by Plaintiffs was deemed inadequate to save a § 133 claim under Wisconsin law.  22 F. Supp. 2d at 970-71.  In that case, the plaintiff alleged he owned a dealership in Wisconsin, but did not otherwise plead any of the types of facts that could have established an effect on in-state commerce from the alleged anticompetitive conduct.  The complaint (1) did not estimate the amount of sales at such dealerships in a certain time frame; (2) did not suggest what proportion of those sales were affected by defendants' conduct; (3) did not indicate how many fire trucks were sold annually in Wisconsin, by plaintiff, or by plaintiff's competitors; and (4) did not identify a single fire truck contract in Wisconsin from which plaintiff was precluded from bidding based on the unavailability of one defendant's pumps.  *Id*.; *Meyers*, 735 N.W. 2d at 460.  The *Emergency One* court concluded that "[w]ithout this type of information, the amended complaint does not suggest that injury to E-One also constituted significant injury to trade and commerce related to fire truck sales in Wisconsin," that the complaint "made no … allegations" of "any significant adverse effects on trade and economic competition within Wisconsin," and

-18-

that "the only significant and adverse effect alleged by plaintiff is to plaintiff itself."  *Id*. at 970-71; *Meyers*, 735 N.W. 2d at 460, 461.

Here, like the plaintiff in *Emergency One*, Plaintiffs fall far short of making specific and credible allegations that the alleged conspiracy had direct, foreseeable, and substantial effects on commerce in any of the three states.  Wholly absent from the Complaints are any averments regarding (1) specific facilities they maintained in the three states; (2) any estimate of the amount of sales of the relevant product; (3) what proportion of those sales were affected by defendants' conduct; (4) what volume of the product was bought or sold in the state; or (5) the identity of even a single contract regarding the product bought or sold in the three states.  *Id*. at 971.  Instead, Plaintiffs merely allege that a handful of the many named Plaintiffs are residents of or maintained facilities in the three states.  Carpenter Compl. ¶¶ 129, 135, 147; Woodbridge Compl. ¶¶ 88, 94.  Without more, this is insufficient to demonstrate a material effect on commerce or trade in the three states.  *Cf. Meyers*, 735 N.W. 2d at 462 (finding "a basis for recovery" under the Wisconsin antitrust statutes where plaintiffs alleged that "thousands of Wisconsin consumers paid supracompetitive prices as a result of conduct by an interstate seller.")  This defect requires dismissal of their Wisconsin law claims.  *Twombly*, 127 S. Ct. at 1974.

Similarly, the Tennessee Supreme Court has held that "the bare allegation without more" that an in-state defendant implemented a price-fixing scheme originating in Tennessee was insufficient to establish a substantial effect on Tennessee commerce.  *Freeman*, 172 S.W.3d at 524.  The *Freeman* court emphasized that a plaintiff must trace goods from a specific Tennessee defendant to Tennessee to establish a nexus to the state, as there was "no indication

-19-

that the items that [plaintiff] purchased contained sorbates manufactured by Eastman, the lone

defendant with ties to Tennessee." *Id.* The court therefore concluded that plaintiff's claim did

not fall within the scope of the Tennessee antitrust statute. The "substantial effects" test thus

requires a plaintiff to allege specific transactions between a particular plaintiff, a particular

defendant, and a particular transaction with a significant nexus to Tennessee trade or commerce.

These Complaints fail to do so. As in *Freeman*, Plaintiffs fail to allege from which defendants

they purchased the product, or how any purchase of the product has a nexus to Tennessee or the

other states.

The recent opinion in the *California v. Infineon Technologies AG*, 531 F. Supp.

2d 1124 (N.D. Cal. 2007), federal antitrust MDL action in which the court dismissed a case for

failure to plead sufficiently substantial effects on Tennessee commerce, is also instructive. In

that case, the *Infineon* court found the complaint inadequate because the plaintiffs did "not

specifically allege that any defendant engaged in sales in [the state] specifically," and the

Plaintiffs' allegations were made with no differentiation among particular states as to which

Plaintiffs and consumers paid the artificially high prices, or even purchased [the] products." *Id*.

1159-60.

These Complaints are similarly flawed. Plaintiffs allege that the products were

purchased for use by facilities they maintained in Colorado, Tennessee and/or Wisconsin *or* "for

use in" the three states, but fail to allege whether the product was actually *purchased in* the three

states and by which particular Plaintiff. Carpenter Compl. ¶¶ 127, 139, 145; Woodbridge

Compl. ¶¶ 86, 92. Plaintiffs also fail to "specifically allege" any purchases within the state "at

artificially raised prices," *Infineon*, 531 F. Supp. 2d at 1159-60, instead offering only a rote

-20-

recital that defendants "violated [a state law] and substantially affected the people of" the three

states.  Carpenter Compl. ¶ 139; Woodbridge Compl. ¶ 86.  Having failed to allege the requisite

substantial effects in any of the states, Plaintiffs' state law claims under Colorado, Tennessee,

and Wisconsin law must be dismissed.  *See Twombly*, 127 S. Ct. at 1974.

### 3.  Plaintiffs Fail to Allege That They Suffered Antitrust Injury Occurring in State Or Proximately Caused By In-State Effects of Interstate Conduct.

Even if Plaintiffs adequately had alleged that Defendants' purported conduct had

a substantial effect on in-state commerce (which they do not), they nonetheless fail to allege that

they were injured in the state *or* that any injury occurring out of state was proximately caused by

a substantial effect on in-state commerce.  As such, their claims should be dismissed.

The four states' laws should be construed to require either in-state conduct or in-

state injury, as states are presumed not to intend that their statutes have extraterritorial effect.[12]

*See Coca-Cola Bottling*, 218 S.W.2d at 682.  ("[A] statute will not be given extraterritorial effect

by implication but only when such intent is clear.")  For example, the Texas Supreme Court

concluded that the Texas antitrust act "does not, in clear language, afford a cause of action for

injury outside the state, and we will not imply one." *Id.* at 683.  Although the underlying Texas

statute was broad enough to encompass extraterritorial or interstate *conduct* that caused injury in

Texas, the court held that the Act's purpose of benefiting Texas consumers would not be

furthered by "promoting competition outside Texas, as by remedying extraterritorial injury." *Id.*

at 682-83; s*ee also 'IN' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 502 (M.D.N.C.

---

[12] In *Freeman*, the Tennessee Supreme Court held that an out-of-state indirect purchaser may sue under the Tennessee Trade Practices Act.  172 S.W.2d at 517.  However, the alleged unlawful conduct occurred in the state of Tennessee.  Even so, *Freeman* upheld the dismissal of the claim because of a failure to allege a substantial effect on Tennessee commerce.  *Id.* at 524.

-21-

1987) (construing North Carolina unfair competition statute to require in-state injuries); *In re Parmalat*, 383 F. Supp. 2d 587, 603-04 (S.D.N.Y. 2005) (same).  Here, nothing in any of the four statutes indicates any intent to extend their remedies to injury arising out of state.  Indeed, the "substantial effects" requirement discussed above mandates just the opposite.

Moreover, federal jurisprudence under the Sherman Act, which is persuasive authority in interpreting the state statutes, leads to the same result.  *See People v. North Ave. Furniture & Appliance, Inc.*, 645 P.2d 1291, 1295-96 (Colo. 1982); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 721 n.27 (7th Cir. 1979); *State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, *2 n.2 (Tenn.Ch. 1980); *State v. Waste Management of Wisconsin, Inc.*, 261 N.W.2d 147, 153 & n.12 (Wis. 1978).  It thus follows that federal case law analyzing the Foreign Trade Antitrust Improvement Act (FTAIA), which defines the extraterritorial reach of the Sherman Act, should be of equal effect here.  *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 985 (9th Cir. 2008) (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272i (3d ed. 2006)).  Under the  FTAIA, the Sherman Act is applicable to "trade or commerce…with foreign nations" only where the foreign conduct "(1) has a 'direct, substantial, and reasonably foreseeable effect' on domestic commerce, and (2) 'such effect gives rise to a [Sherman Act] claim.'" *Id.* at 985-86 (quoting *Empagran*, 542 U.S. at 159).  As the Supreme Court has stated, the Sherman Act remedies "domestic antitrust injury that foreign anticompetitive conduct has caused," but not purely foreign injury.  *Empagran*, 542 U.S. at 165-66.

The proper focus under an FTAIA analysis, then, is on the nexus between the state and the effect resulting from the defendant's challenged conduct.  *See CSR Ltd. v. Cigna*

-22-

*Corp.*, 405 F. Supp. 2d 526, 539 (D.N.J. 2005); *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 305 n.13 (3d Cir. 2002).  "'[T]he "effect" providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws.'" *Id.* at 545 (quoting *Turicentro*, 303 F.3d at 305 n.14 (quoting H.R. Rep. No. 97-686, *reprinted in* 1982 U.S.S.C.A.N. 2496-97)). Accordingly, the effects of anticompetitive conduct on the U.S. marketplace must be the proximate cause of the plaintiff's injury.  *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005) (hereinafter *Empagran II*); *DRAM*, 546 F.3d at 987.

Applying this rule to claims brought under state law dictates that a plaintiff has standing to bring a state law claim only if it suffers injury proximately caused by the effects on the state's commerce by the unlawful act.  The effect on the state's commerce or state interests engaged in interstate commerce should be "direct, substantial and reasonably foreseeable" and "giv[e] rise to the state antitrust claim" (*i.e.*, the injury must occur in the state).  *DRAM*, 546 F.3d at 985-86.  Adoption of such a test not only obviates undue conflicts between the states in the application of their antitrust laws, *see CSR*, 405 F. Supp. 2d at 545, it respects the states' ability to regulate out-of-state conduct with in-state effects, preserves the legislative prerogatives of states whose statutes have not been invoked, and avoids the unfairness associated with forcing a defendant to litigate under state laws to which it has no connection.  Indeed, Tennessee explicitly has adopted just such an approach.  *See Freeman*, 172 S.W.3d at 523 (citations omitted).

Plaintiffs fail to allege any cognizable injury under the laws of Colorado, Tennessee or Wisconsin.  They not only fail to allege that the alleged interstate *conduct* was actionable (*i.e.*, that it had substantial effects on consumers within the states), but they also fail to

-23-

plead with plausibility that they suffered *injury* from such effects (*i.e.*, that the substantial effects give rise to their antitrust claim).

To show that an alleged interstate price-fixing conspiracy had substantial effects in a state, plaintiffs must generally show that prices for the product actually rose *in that state* above the level that otherwise would have obtained. *Empagran II*, 417 F.3d at 1271. But those in-state effects (higher prices) give rise to an antitrust claim only if the plaintiff paid the higher in-state prices, which requires the plaintiff to actually be a purchaser within the state. Plaintiffs do not allege that they purchased polyether polyol products in Colorado, Tennessee, or Wisconsin nor do they allege any other set of facts in which the in-state effects of the conspiracy proximately caused their injuries.

Instead, a handful of Plaintiffs allege disjunctively that the products may have been purchased for use in each state *or* purchased for use of facilities in each state. Carpenter Compl. ¶¶ 129, 135, 147; Woodbridge Compl. ¶¶ 88, 94. This is plainly inadequate to plead injury: "the situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff." *In re DES Cases*, 789 F. Supp. 552, 570 (E.D.N.Y. 1992). The situs of injury in an alleged price-fixing conspiracy is the state where the product was purchased at an inflated price.[13] Because Plaintiffs do not allege that they purchased polyether polyol products in one of the four states at inflated

---

[13] *See Tecre Co., Inc. v. Buttonpro*, 387 F.Supp. 2d 927, 931 (E.D. Wis. 2005) (finding no injury in Wisconsin under long-arm statute because infringing sale did not take place there); *Beverly Hills Fan Co.*, 21 F.3d 1558, 1571 (1994) (situs of injury of patent infringement is place where the infringing sale is made rather than where the patentee resides); *N. Am. Philips v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) (defining the rule further so that the injury of patent infringement occurs where the offending act of making, using or selling the infringing device or process occurs).

-24-

prices, or any other injury proximately caused by any in-state effects of the conspiracy, the

claims of Plaintiffs with in-state facilities cannot survive.  Carpenter Compl. ¶¶ 144-149;

Woodbridge Compl. ¶¶ 91-96.[14]  *A fortiori*, the claims of Plaintiffs with no in-state nexus at all

must be dismissed.

> **C.**   **Alternatively, Even If The Complaints Properly Alleged the Elements
> of State Law, Choice of Law Principles Would Require Dismissal of
> Claims With No Nexus to the State**

Similarly, choice-of-law principles under the Due Process Clause require that

there be a "significant contact or aggregation of contacts to the claims asserted by each member

of the plaintiff class" so that the application of the forum law "will not be arbitrary or unfair."

*Shutts*, 472 U.S. at 821-22.  Many Plaintiffs allege no nexus whatsoever with the four states.  At

the very least, the Complaints must allege facts sufficient for this Court to determine if any given

Plaintiff has a sufficient nexus with each of the four states to ensure that application of each

state's law is "not arbitrary or unfair."  The Complaints therefore allege insufficient facts to

determine whether applying the four states' laws to defendants and Plaintiffs lacking any nexus

to the state law claims is justifiable under the Due Process Clause.

The same result would follow under New Jersey choice-of-law principles.

Plaintiffs are not entitled to choose the substantive law governing the claims in the action, having

selected the forum already; rather, the appropriate state law would have to be determined by the

choice-of-law principles of New Jersey, the forum for trial of this matter.  New Jersey

"employ[s] a flexible 'governmental-interest' analysis to determine which state has the greatest

---

[14] If this Court were to accept Plaintiffs' theory that the place of use, and not the place of purchase, is the important factor in deciding whether any of the three states has a sufficient nexus to their alleged antitrust injuries to apply that state's law, then the Sherman Act and state-law claims of the six foreign corporations who are "U.S. Purchase Plaintiffs" but used the products abroad must be dismissed.

interest in governing *the specific issue* that arises in the underlying litigation." *Erny v. Estate of Merola*, 792 A.2d 1208 (N.J. 2002) (emphasis added).  "Ordinarily, choice-of-law determinations are made on an issue-by-issue basis, with each issue receiving separate analysis," such that, for example, one jurisdiction's laws may govern liability, and another's laws may govern damages.  *Id.* (New Jersey follows *Restatement* approach of identifying "the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties" (quoting *Restatement (Second) of Conflict of Laws*  § 145(1) (1971)).  Choice of law is determined on each issue for each claim of the different plaintiffs.  *Fink v. Ricoh Corp.*, 839 A.2d 942, 974 (N.J. Super. 2003).  In considering which jurisdiction has the most significant relationship to the determination of damages, a court may consider where the injury occurred; where the conduct occurred; where the parties are domiciled, resident, or principally engaged in business; and where the relationship is principally entered.  *Restatement (Second) of Conflict of Laws* §§ 145, 171.  While perhaps choice-of-law issues cannot be resolved on the face of the Complaints for some Plaintiffs having a nexus to one of the four states, *see* n.4, *supra*, at a minimum it is a clear that the laws of Colorado, Indiana, Tennessee, and Wisconsin would never be chosen under New Jersey and Restatement principles for the claims of Plaintiffs with no nexus to the respective states.  The state-law claims of those Plaintiffs should accordingly be dismissed.

> **D.    Plaintiffs May Not Seek the Voiding of Contracts in Other States Under the Four States' Laws Even If the Contracts Had Substantial Effects in the Four States.**

The rescissionary remedies contemplated by the "full consideration" or "any payments made" recovery language of the four state statutes cannot be construed to apply to out-

of-state contracts under the Due Process Clause.  In *New York Life Insurance Co v. Head*, 234 U.S. 149 (1914), the Supreme Court held that a Missouri law could not invalidate a contract, made in Missouri between a New York insurer and a New Mexico resident, for failure to follow Missouri insurance law procedures in issuing the contract, where the contract's terms specifically called for application of New York law.  234 U.S. at 161; *see also Home Ins. Co. v. Dick*, 281 U.S. 397, 407-08 (1930) (state law provision restricting statute of limitations on contracts that essentially voided contract made out of state, where contract was legal as written, violated due process guaranty against deprivation of property without due process of law).  Moreover, just as a state "does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its citizens may be affected when they travel to that state," a contract that is legal in one state cannot be invalidated by another state.  *Bigelow v. Virginia*, 421 U.S. 809, 824 (1975); *see also Huntington v. Attrill*, 146 U.S. 657, 669 (1892) ("Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of other States").

Plaintiffs seek to have this Court apply the four state statutes to void out-of-state contracts.  *See* Colo. Rev. Stat. § 6-4-121; Ind. Code § 24-1-1-5; Tenn. Code § 47-25-106; Wis. Stat. § 133.14.  The statutes should be construed to avoid the serious constitutional questions that would arise if that were the statutes' intended effect, *Lyng v. N.W. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988), but in all events this Court should dismiss the claims as requiring application of the statutes in contravention of the Due Process Clause.[15]

---

[15] Cases such as *Head, Dick*, and *Bonaparte* continue to retain vitality, as evidenced by their prominent role in recent cases such as *BMW*, 517 U.S. at 571, and *Coca-Cola Bottling*, 218 S.W.3d at 680.

Thus, to summarize:  Plaintiffs are not entitled to cherry-pick state laws for extraterritorial effect simply because they favor the remedy.  They can invoke state law only if they plead both (1) actionable conduct (conduct occurring in the state, or (in Colorado, Tennessee, and Wisconsin) interstate conduct having direct, foreseeable, and substantial effects in the state), and (2) injury that arises from that in-state conduct or effects.  No Plaintiff has alleged either element with the specificity and plausibility required by *Twombly*; in any event, the rescissionary "full consideration" remedy cannot constitutionally be applied to void out-of-state contracts.  All the state law claims should be dismissed.

**E.     This Court Should Decline Supplemental Jurisdiction Because of the Novelty and Complexity of the Issues of Extraterritorial Application of State Law.**

For the foregoing reasons, Plaintiffs' attempts to hijack state rescissionary remedies for void contracts and to elevate those remedies to equal standing with the federal antitrust damages rules of the Sherman and Clayton Acts reflect vast overreaching.  Even if those remedies could be interpreted under the laws of Colorado or Indiana or Tennessee or Wisconsin to extend as far as Plaintiffs wish, this Court would have good reason to decline to entertain them under federal supplemental jurisdiction.  These claims would present the Court with a welter of novel and complex issues of state law in multiple jurisdictions.

Under 29 U.S.C. Section 1367, the Court is free to decline to exercise jurisdiction where doing so would strain "judicial economy, convenience, fairness and comity."  *City of Chicago v. Int'l. Coll. of Surgeons*, 522 U.S. 156 (1997) at 173.  This Court has a full plate with the pending MDL class claims and with the balance of these opt-out Complaints.  It need not extend Kansas hospitality to Plaintiffs' effort to open a new and expansive front for antitrust

-28-

litigation based on state laws that have no connection to this Court or to the transferor court in New Jersey.

## II.   THE INDIANA AND TENNESSEE STATE LAW CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

In addition to the myriad deficiencies identified above, these opt-out Plaintiffs have serious statute of limitations problems.  Both Complaints contend that "[t]he filing of class plaintiffs' class action on November 23, 2004" – the *Seegott* and related complaints, now MDL'd to this Court – "and of other subsequently filed related class actions tolled the statute of limitations for all class members, including the U.S. Purchase Plaintiffs, and also tolled the statute of limitations with respect to Foreign Purchase Plaintiffs' claims."  Carpenter Compl. ¶ 125; Woodbridge Compl. ¶ 84.

But the *Seegott* class complaints asserted only federal Sherman Act claims. Those complaints created no tolling effect on claims that class members, including opt-out Plaintiffs, might have under any *other* law.  As such, the bulk of Plaintiffs' non-federal claims (*i.e.*, the state law claims that follow Count I of each of the Complaints) all of which made their first appearance in the two opt-out Complaints at issue are barred by the applicable statutes of limitations, and are not rescued by any tolling effect of the *Seegott* proceeding.

The tolling law is simple.  Filing a complaint on behalf of a putative class tolls the statute of limitations as to prospective class members, but *only* for the claims that are pled in the class action.  "[T]he commencement of a class action suspends *the applicable* statute of limitations as to all asserted members of the class" during the period in which the class claims are pending. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) (emphasis added).

-29-

But the *American Pipe* rule is available only to the extent the later-filed case proceeds under the *same* legal basis as the earlier one. *In re Copper Antitrust Litig.*, 436 F.3d 782, 793-96 (7th Cir. 2006) (Cudahy, J., for the panel); *see also Crown Cork & Seal Co. v. Parker*, 462 U.S. 345, 355 (1983) (Powell, J., concurring) (rule permitting tolling of class member claim "should not be read, however, as leaving a plaintiff free to raise different or peripheral claims" after opting out or denial of class certification). It does not matter even if the later-filed antitrust claims are "functionally equivalent" to the earlier-filed claims: "[f]unctional equivalence … is not enough to trigger tolling," even where the claims asserted are both antitrust counts under the federal Sherman Act and under a state's comparable antitrust statute. *Id.* at 796. "[T]he applicable statute of limitations," *American Pipe*, 414 U.S. at 554, therefore, that would be tolled by a class suit alleging a Sherman Act violation would be the Clayton Act limitations period on the federal claim only. So whatever tolling effect the *Seegott* cases had on the federal claims of these opt-out Plaintiffs, they had *no* tolling effect as to the claims pled under Colorado, Indiana, Tennessee, or Wisconsin state law, nor any effect as to the EU law claims.

Although Indiana and Tennessee have slightly different limitations periods, both bar Plaintiffs' claims here. Indiana's limitations period is two years.[16] The opt-out Plaintiffs clearly had notice of the claims not later than the filing of the *Seegott* actions, and thus were required to file any Indiana state antitrust claims before November 2006. They did not do so.[17]

---

[16] Ind. Code § 34-11-2-4; *Gibson v. Miami Valley Milk Producers, Inc.*, 299 N.E.2d 631, 637 (Ind. Ct. App. 1973); *Sandidge v. Rogers*, 167 F. Supp. 553 (S.D. Ind. 1958).

[17] Certain opt-out Plaintiffs executed tolling agreements with Defendants, but those tolling agreements were not negotiated or executed until February 2008. Further, those agreements provide that "[n]othing in this Agreement tolls the Statute of Limitations for claims other than the U.S. Antitrust Claims." Tolling Agreements ¶ 5. The brief tolling agreements therefore would have no bearing on the state antitrust claims or EU claims asserted in the opt-out complaints. *Compare Ex rel. Spitzer v.Feldman*,

-30-

Similarly, under Tennessee's three-year limitations period, Plaintiffs' opportunity to bring their state law claims expired no later than November 2007.[18]  Colorado permits actions under the same four-year limitations period as the Clayton Act; Wisconsin has a six-year statute of limitations.[19]

It is of no moment that Plaintiffs include the customary "fraudulent concealment" allegations – they cannot, and do not appear to, contend that the violations were fraudulently concealed after the *Seegott* complaints were filed.  The Indiana and Tennessee state antitrust claims, accordingly, are barred by the applicable statutes of limitations and must be dismissed.[20]

## III.    THE COMPLAINT FAILS TO ALLEGE A PLAUSIBLE CLAIM FOR RELIEF FOR ALL EUROPEAN CLAIMS AND FOR ANY DOMESTIC CLAIMS ARISING PRIOR TO 2002.

Setting aside issues of extraterritoriality, the Complaints do not remotely meet the *Twombly* standard as to any U.S. conspiracy claims prior to 2002 under state and federal law, nor as to the EU conspiracy claims for any period.  Under *Twombly*, "to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a specific time, place, or person involved in the alleged conspiracies to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th

---

2003 WL 21576518, at *4 & n.13 (S.D.N.Y. 2003) (tolling agreement for antitrust claims under New York law did not toll California and Maryland antitrust claims).

[18] *Leech v. Levi Strauss & Co.*, No. 79-722 Ill, 1980 WL 4696, at *3 (Tenn. Ch. Sept. 25, 1980).

[19] Colo. Rev. Stat. § 6-4-118(1); *Rozema v. Marshfield Clinic*, 176 F.R.D. 295, 302 (W.D. Wis. 1997) (citing Wis. Stat. Ann. § 133.18(2)); *Segall v. Hurwitz*, 114 Wis. 2d 471, 339 N.W.2d 333, 339-40 (Wisc. App. 1983) (discussing change from two-year to six-year limitations period in 1980 amendment).

[20] Similarly, the EU claims asserted in the opt-out complaints would encounter serious statute of limitations problems if they are permitted to proceed in this Court.  This point is covered in the companion briefing on the motion to dismiss the EU claims (*see* Part I.C.3 of the legal memorandum filed today in support of the motion to dismiss the EU claims).

Cir. 2008) (internal quotation marks omitted).  The plaintiff "must plead not just ultimate facts"

such as "'conspiracy' or even 'agreement,'" but must also "plead the necessary evidentiary facts

to support those conclusions." *Id.* at 1047-48.  Furthermore, "[t]o provide adequate notice, a

complaint in a complex, multi-party suit may require more information than a simple, single

party case." *Mountain View Pharmacy v. Abbott Labs.*, 630 F.2d 1383, 1386-87 (10th Cir.

1980).

    When a multiyear conspiracy is alleged, the complaint must also contain plausible

allegations that a conspiracy had been formed as of the dates alleged.  *See Love Terminal*

*Partners, L.P. v. City of Dallas*, 527 F. Supp. 2d 538, 553-54 (N.D. Tex. 2007) (dismissing under

*Twombly* allegations of an alleged conspiracy before March 2006; "[t]he court holds that

concerning the period before early 2006, the complaint lacks 'enough heft to show that [plaintiffs

are] entitled to relief'"); *see also Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir.

1987) (affirming dismissal of alleged antitrust violation where plaintiffs' purported injury

occurred before conspiracy commenced); *In re Hydrogen Peroxide Antitrust Litig.*, 240 F.R.D.

163, 177 (E.D. Pa. 2007) (on class certification, striking allegations of price fixing before

September 14, 1994, based only on "unsupported allegations that defendants engaged in a

conspiracy").

  **A.**  **U.S. Purchase Claims**

    As noted previously, despite the assertion of a conspiracy commencing in 1994,

the Complaints identify no specific meeting prior to 1999.  Prior to that, the best Plaintiffs can

muster is that "starting at least as early 1994, the exact date(s) being unknown to Plaintiffs,

Defendants BASF and Dow and co-conspirator Bayer engaged in numerous meetings, discussions, and/or communications regarding pricing of Polyether Polyol Products throughout the world, including at least in the United States and Europe."  Carpenter Compl. ¶ 96; Woodbridge Compl. ¶ 55.  Such vague allegations without specificity as to time, place, person, or content do not satisfy *Twombly*.  127 S. Ct. at 1971 n.10.

Further, the Complaints allege no actual agreement before 2002; simply alleging meetings is not enough.  Carpenter Compl. ¶ 100.f; Woodbridge Compl. ¶ 59.f.  That failure is fatal to Plaintiffs' claims for damages prior to that date. "The existence of an agreement is '[t]he very essence of a section 1 claim.'" *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir. 2004).  Accordingly, the Supreme Court in *Twombly* required the complaint to allege "enough factual matter (taken as true) to suggest that *an agreement was made*," 127 S. Ct. at 1965 (emphasis added), and held insufficient a complaint that "furnishes no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place," *id.* at 1971 n. 10; *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (*Twombly* requires "concrete allegations about the content and circumstances of any actual agreement").  As in *Twombly*, the Complaints here contain no direct or inferential allegation of an agreement to fix prices before 2002, *i.e.*, a "unity of purpose or a common design and understanding or a meeting of minds" or "a conscious commitment to a common scheme." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation marks omitted).  "[M]ere association with conspirators is not enough to establish participation in a conspiracy." *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1980).  Nor do the scattered allegations that the Plaintiffs "discussed" pricing, margins, and market share in

-33-

the United States in meetings between 1999 and 2002 constitute a plausible allegation that any of the Defendants actually agreed to fix prices or allocate markets in that time period. Carpenter Compl. ¶ 100.a-e; Woodbridge Compl. ¶ 59.a-e.

Notably, the first allegation of an agreement to set prices in the United States is made in connection with a purported January 21, 2002 meeting between Dow and Bayer representatives. Carpenter Compl. ¶ 100.f; Woodbridge Compl. ¶ 59.f. Plaintiffs' specific averment of an agreement arising from that meeting, but not from earlier meetings, establishes that they lack the factual basis to allege agreement in prior periods. Because there are no "direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory" prior to 2002, *Bryson*, 534 F.3d at 1286, the Sherman Act and state law claims should be dismissed as pled.

### B.     Foreign Purchase Claims

The Complaints serve even thinner gruel with regard to the claims of the Foreign Purchase Plaintiffs. They make no specific allegations *for any time period* of any agreement to fix European prices or allocate European customers and markets sufficient to meet the *Twombly* plausibility standard. The sole allegations regarding European markets are perfunctory assertions "upon information and belief" that in Brussels in 1994 and then again "[d]uring the late 1990s or early 2000s" representatives of Defendants "discussed pricing and stability of market share for Polyether Polyol Products." Carpenter Compl. ¶¶ 100.a, l; Woodbridge Compl. ¶ 59.a, l. The other meetings alleged concerned only *United States* pricing and customers. *See* Carpenter Compl. ¶¶ 100.b-k; Woodbridge Compl. ¶ 59.b-k. Thus, even if the EU claims are not dismissed for jurisdictional or forum-convenience reasons, they must be dismissed under

-34-

*Twombly* because the Complaints are devoid of any plausible and concrete allegation of an agreement to restrict competition in Europe in violation of Article 81.

## IV.  THE COMPLAINTS SHOULD BE DISMISSED AS TO ALL CLAIMS ARISING BEFORE 1999.

It is axiomatic that statute of limitations questions may be resolved on a motion to dismiss. *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980) ("[W]hen the dates given in the complaint make clear that the right sued upon has been extinguished, the plaintiff has the burden of establishing a factual basis for tolling the statute.")

The Sherman Act requires a plaintiff to bring claims within a four-year period.  15 U.S.C. § 15(b); *Curtis v. Campbell-Taggart, Inc.*, 687 F.2d 336, 337 (10th Cir. 1982).  The Complaints, filed in late 2008, allege a conspiracy beginning as early as 1994 and continuing through at least December 2004.  Carpenter Compl. ¶ 2; Woodbridge Compl. ¶ 2.  This Court has ruled previously, with respect to the allegations of the class complaint, that the fraudulent concealment allegations asserted by the class were sufficiently pled to survive threshold review. *In re Urethane Antitrust Litig.*, 235 F.R.D. 507, 518 (D. Kan. 2006) (Lungstrum, J.) (hereinafter *Urethanes*) (permitting claims for 1999-2000, beyond the four-year limitations period).

The opt-out Plaintiffs here attempt to expand dramatically on the claims revived by the inclusion of fraudulent concealment allegations.  These Complaints purport to state an eleven-year conspiracy period, adding the years 1994-1998 to the period covered in the class claims.  Carpenter Compl. ¶¶ 110-25; Woodbridge Compl. ¶ 69-84.  Plaintiffs profess to have found evidence both of price-fixing in 1994-98, and of a consistent program of concealment of that conduct that lasted (so the Complaints allege) until the opt-outs reached their own settlement

with Bayer.  Carpenter Compl. ¶ 113; Woodbridge Compl. ¶ 72.  Following that settlement,

Plaintiffs claim they "diligently pursued cooperation" and "acquired information" from Bayer

that unshrouded the supposed conspiratorial conduct that began in 1994 and continued

throughout the five-year period prior to 1999.  *Id.*

### A.     The Standards for Pleading Fraudulent Concealment Are "Stringent."

To establish a claim for fraudulent concealment, plaintiffs are "required to 'allege

facts showing affirmative conduct upon the part of the defendant which would … lead a

reasonable person to believe that he did not have a claim for relief.'"  *Clulow v. Oklahoma*, 700

F.2d 1291, 1301 (10th Cir. 1983) (quoting *Rutledge v. Boston Woven House & Rubber Co.*, 576

F.2d 248, 250 (9th Cir. 1978)).  A party seeking to toll the statute of limitations based on

fraudulent concealment must allege:  (1) the use of fraudulent means by the defendants; (2)

successful concealment from the plaintiffs; and (3) that the plaintiffs did not know or by the

exercise of due diligence could not have known that they might have a cause of action.

*Urethanes*, 235 F.R.D. at 518 (citing *Ballen v. Prudential Bache Sec., Inc.*, 23 F.3d 335, 337

(10th Cir. 1994)).

Courts in this Circuit recognize this as a "stringent" standard, *King & King

Enters. v. Champlin Petroleum Co.*, 657 F.2d 1147, 1154 (10th Cir. 1981), and "a claim of

fraudulent concealment to toll the statute of limitations is subject to dismissal if a plaintiff fails to

plead the first element … with particularity as required by Rule 9(b)."  *Urethanes*, 235 F.R.D. at

517; *see* Fed. R. Civ. P. 9(b) ("in all averments of fraud …, the circumstances constituting fraud

… shall be stated with particularity.").  Vague and general allegations do not suffice.  Rather, "a

complaint alleging fraud must 'set forth the time, place and contents of the false representation,

the identity of the party making the false statements and the consequences thereof.'" *Id.* (quoting *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000)).  Put differently, a plaintiff must "set out the who, what, where and when of the alleged fraud." *Id.*

Judged under the standards laid out in the Court's prior ruling in this very case, the Complaints fail to plead facts with the particularity required to support an allegation of fraudulent concealment in the five-year period prior to 1999.

### B.    The Complaints Fail to Plead a Claim for Fraudulent Concealment for 1994-98 with the Required Particularity.

Plaintiffs attempt to satisfy the first prong of the fraudulent concealment test by including five examples of alleged affirmative acts taken by the Defendants to conceal the purported conspiracy.  Carpenter Compl. ¶ 115; Woodbridge Compl. ¶ 74.  The first three relate to alleged "secret" meetings among representatives of the defendants and purported "agreements" reached at these meetings.  Carpenter Compl. ¶ 115.a-c; Woodbridge Compl. ¶ 74.a-c.  Although Plaintiffs cross-reference paragraphs of the Complaints that purportedly describe these alleged meetings, a careful review of those paragraphs reveals not a single specific allegation of a meeting or agreement in any of the five years prior to 1999. Carpenter Compl. ¶¶ 96, 97, 99, 100; Woodbridge Compl. ¶¶ 55, 56, 58, 59.

None of the purported meetings occurred earlier than 1999.[21]  Carpenter Compl. ¶ 100; Woodbridge Compl. ¶ 59.  The other paragraphs cited as support for alleged pre-1999

---

[21] One meeting is alleged to have occurred "[d]uring the late 1990s or early 2000s," but it is readily apparent that any such meeting must have occurred subsequent to January 1999 since Huntsman is alleged to have participated.  *See* n. 4 *supra*.  In any event, the Complaints' vague claim that "[u]pon information and belief, representatives of BASF, Lyondell, Dow, Huntsman, and Bayer attended this meeting" without any supporting detail would be insufficient under this Court's particularity standard as laid out in *Urethanes*.  Carpenter Compl. ¶ 100; Woodbridge Compl. ¶ 59.

meetings and agreements offer only vague generalities that fall far short of Plaintiffs' obligation to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."  *Urethanes*, 235 F.R.D. at 517 (internal citations omitted).  The Complaints claim that the purported conspiracy began in 1994 and involved alleged "meetings, discussions, and/or communications" between Dow, BASF and Bayer, but fail to set forth any allegation of who attended these meetings, the location and date they occurred, what was discussed, or what agreements were purportedly reached.  Carpenter Compl. ¶ 96; Woodbridge Compl. ¶ 55.  The Complaints assert that meetings and telephone conversations occurred throughout the world, but identify no specific meeting, date, or participant from any of the Defendants.  Carpenter Compl. ¶ 98; Woodbridge Compl. 56.  The Complaints further allege that conspiratorial "communications" occurred at trade association events, but identify no specific meeting or participant.  Carpenter Compl. ¶ 99; Woodbridge Compl. ¶ 58.

As this Court correctly discerned in previously rejecting such generic pleading of "meetings" and "agreements," it is beyond easy for antitrust plaintiffs to allege that industry producers met or discussed or agreed.  They do so regularly, for entirely legitimate reasons.  But rote pleading of "meetings" and "agreements" – particularly for meetings that would extend the expired statute of limitations back five years – does not satisfy the particularity requirement for accusing them of executing a fraud to conceal misconduct.  Where "plaintiffs' complaint still fails to provide any detail regarding the allegedly secret meetings among the defendants or any agreement(s) among them not to disclose their alleged price-fixing conspiracy," Rule 9's standard is not met; "plaintiffs cannot rely on those allegations … because those allegations are

not pled with particularity." *Urethanes*, 235 F.R.D. at 517; *see also In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997) ("Vaguely alleging that 'something' occurred at 'sometime' fails to satisfy the [affirmative concealment] requirement.").

Nor are the Complaints' allegations that Defendants gave false and pretextual reasons for price increases adequate to satisfy the fraudulent concealment standard. Again, the paucity of allegations regarding pre-1999 conduct is glaring, particularly for Plaintiffs that had full access to Bayer cooperation and surely could have assembled evidence of specific instances in which Defendants colluded on pretextual reasons to support price announcements, if such evidence existed.

The Complaints allege eleven instances in which industry publications reported price announcements that, Plaintiffs contend, were bathed in pretext. Carpenter Compl. ¶ 119; Woodbridge Compl. ¶ 78. But only two such announcements occurred prior to 1999, and the circumstances of neither are pled with any particularity. Plaintiffs cite a statement in a September 1994 article by a U.S. subsidiary of one alleged conspirator that it "had advised that U.S. prices for isocyanates *might* be increased industry wide in the first half of 1995, due to pent-up. [sic]" Carpenter Compl. ¶ 119.b (emphasis added); Woodbridge Compl. ¶ 78.b. There is, of course, nothing fraudulent on the face of a plain vanilla statement that pent-up demand might result in higher prices a few months hence. Plaintiffs offer nothing to suggest that the company making this statement to a trade publication did not have reason to believe it. (Indeed, demand is not a factor the purported conspirators could control, and it is an odd conspiracy that relies for its mechanism of concealment on false statements of easily verifiable facts to an industry magazine that could quickly disprove them.) The Complaints refer to a similar non-specific statement by

-39-

another Defendant related to a July 1994 MDI price increase, again with none of the specificity required to show the type of "affirmative act" of concealment a plaintiff must plead in support of a claim of fraudulent concealment.  Carpenter Compl. ¶ 119.a; Woodbridge Compl. ¶ 78.a.  *King & King v. Enter. v. Champlin Petroleum Co*, 657 F.2d 1147 (10th Cir. 1981) at 1155.

In the same vein, the Complaints assert that the reasons given by Defendants for increases in the price announcement letters to Plaintiffs were false and pretextual.  Once again, virtually no basis is offered for reviving pre-1999 claims.  Seven of the eight price announcements listed occurred after 1999.  Carpenter Compl. ¶ 121; Woodbridge Compl. ¶ 80. The sole pre-1999 increase allegedly took effect in July 1998.  In the first place, how a July 1998 price announcement, even if pretextual, justifies extending the limitations period back to 1994 is nowhere explained by Plaintiffs.  If there truly was a continuous conspiracy to conceal price-fixing dating from 1994, a lone announcement in mid-1998 would hardly constitute the "stringent" proof required to demonstrate it.  Moreover, the Complaints allege only that "BASF" described its increase as related to its "ability to make investments to support urethanes growth," and that Bayer described its increase as countering erosion of margins due to "continued increases in environmental and transportation costs."  Carpenter Compl. ¶ 121.a; Woodbridge Compl. ¶ 80.a.  (The Complaints do not state how Dow explained the increase, and thus provides no basis for inferring that Dow used a pretext in connection with this announcement.)  Plaintiffs do not allege, much less offer a concrete basis for believing, that "BASF" was not seeking to fund new urethane plant expansion, or that Bayer was not incurring greater environmental and transportation costs that eroded margins.  Accordingly, they supply none of the specificity required to meet the particularity standard articulated by this Court.  Conclusory assertions that

the statements were "false and pretextual" do not suffice. Carpenter Compl. ¶ 122; Woodbridge Compl. ¶ 81.

Plaintiffs offer a final throwaway line that Defendants have "den[ied] the existence of the conspiracy in connection with" the ongoing class action, thereby implying that those denials are affirmative acts sufficient to support a fraudulent concealment claim. Carpenter Compl. ¶ 115.e; Woodbridge Compl. ¶ 74.e. It is well established in this Circuit that such an argument has no traction. *See King & King*, 657 F.2d at 1155 ("A denial of an accusation of wrongdoing does not constitute fraudulent concealment"); *see also In re Aluminum Phosphate Antitrust Litig.*, 905 F. Supp. 1457, 1470 (D. Kan. 1995) ("The fact that defendants did not confess their price-fixing conspiracy to the Department of Justice does not comprise a fraudulent act of concealment.").[22]

In sum, the Complaints fail to plead affirmative conduct with sufficient particularity to satisfy the fraudulent concealment test. This failure is striking in light of Plaintiffs' heavy touting of their "diligent pursuit" of information obtained through their cooperation agreement with Bayer. Carpenter Compl. ¶ 113; Woodbridge Compl. ¶ 72. Yet those many months of cooperation produced less than a scattering of non-specific references to acts and statements in the 1994-98 period that on their face are entirely innocent. And the Complaints exhibit no effort to gather or present facts that might affirmatively demonstrate these acts and statements were taken with nefarious intent to conceal.

---

[22] The Department of Justice concluded its investigation into Polyether Polyol Products without charging any of the defendants. *See* Defendants' Joint Mem. in Opp. to Plaintiffs' Motion for Class Certification for MDI, TDI, and Polyether Polyols at 7-8 (Docket #686).

Defendants are not surprised.  What Bayer proffered to the Department of Justice was not enough to lead the government to seek pleas or indictments from the other polyether polyol producers.  It is therefore unsurprising that Bayer's cooperation with the opt-out Plaintiffs produced crumbs that, even when strung together, do not support a suspension of the statute of limitations.  The Court therefore should dismiss the fraudulent concealment allegations insofar as they purport to reach 1994-98 polyether sales.

## V.    THE CLAIMS BROUGHT BY OR ON BEHALF OF PARENTS AND AFFILIATES SHOULD BE DISMISSED FOR LACK OF STANDING.

Buried in Plaintiffs' overreaching state claims and unsubstantiated fraudulent concealment allegations are claims that certain parents and affiliates of the various Plaintiffs are somehow full participants in this litigation.  Nothing could be further from the truth.

In a curious form of pleading, the Carpenter complaint asserts that not only the Plaintiffs described in the body of the Carpenter complaint but also their "respective parents, subsidiaries, and affiliates listed on Attachment A bring this action …."  Carpenter Compl. ¶ Intro.  Yet the complaint contains no allegation that the 12 "Attachment A" entities were themselves purchasers or that they were injured by any alleged unlawful conduct of Defendants.  The Woodbridge complaint contains a similar recitation that it is brought by, in addition to the Plaintiff entities specifically described, "Plaintiffs' respective subsidiaries and affiliates listed on Attachment A."  Woodbridge Compl. Intro.  The Woodbridge "Attachment A" lists the names of three entities that are affiliated with Woodbridge Foam Corporation, itself an Ontario, Canada entity.  *Id.* ¶ 15.  Neither complaint provides addresses, descriptions, or allegations related to any Attachment A entity.

-42-

In short, these Attachment A "plaintiffs" have not satisfied the Article III requirement that "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). Nor have they satisfied the requirement to allege antitrust injury under the federal and state statutes invoked. *See, e.g.*, *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124 (10th Cir. 2005) (plaintiffs must allege "an antitrust injury and must have standing to bring an antitrust claim").

Similarly defective is the airy attempt of Foreign Purchase Plaintiffs in both the Complaints to bring not only their own claims but also claims "on behalf of their parents, subsidiaries, affiliates, predecessors-in-interest, and assigns," none of whom are alleged to be injured. Carpenter Compl. ¶ 65; Woodbridge Compl. ¶ 26. Those claims (if claims they be) fail because they assert no injury, no standing, and no claims. This is "bare-bones" pleading without even any bones.

Finally, those claims purportedly brought on behalf of Plaintiffs' unidentified and undescribed affiliates fail because no Plaintiff has alleged any basis for asserting third-party standing to bring claims on behalf of those persons. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (general rule that a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

## **CONCLUSION**

The opt-out Plaintiffs are not entitled to seize on a cherry-picked set of state illicit-contract laws to weight this case down with untested questions of the scope and reach of state statutes. In any event they fail to allege plausibly either standing or the elements of a claim

-43-

under those statutes.  Nor have they offered any basis for waving away the time period covered by the class claims and extending the opt-out claims to the early years of the first Clinton Administration.  The Court should grant this motion.

Dated: February 2, 2009                              Respectfully submitted,

  /s/ David F. Oliver                                   /s/ Floyd R. Finch
David F. Oliver (KS Bar # 70731)                    Floyd R. Finch, Jr. (KS Bar #16993)
BERKOWITZ OLIVER WILLIAMS                           Shelley A. Runion (KS Bar # 14941)
SHAW & EISENBRANDT LLP                              HUSCH BLACKWELL SANDERS LLP
2600 Grand Boulevard, Suite 1200                    4801 Main Street, Suite 1000
Kansas City, MO  64108                              Kansas City, MO 64112
Telephone: (816) 561-7007                           Telephone: (816) 983-8000
Facsimile: (816) 561-1888                           Facsimile: (816) 983-8080

Andrew S. Marovitz                                  Hamilton Loeb
Jason Fliegel                                       Stephen B. Kinnaird
Michael S. Paik                                     Jeremy P. Evans
MAYER BROWN LLP                                     John P. Gebauer
71 South Wacker Drive                               PAUL HASTINGS JANOFSKY & WALKER LLP
Chicago, IL   60606                                 875 15th Street, N.W.
Telephone: (312) 782-0600                           Washington, D.C.  20005
Facsimile: (312) 701-7711                           Telephone: (202) 551-1700
                                                    Facsimile: (202) 551-1705

*Counsel for BASF SE, BASF Corporation,*            *Counsel for The Dow Chemical Company and*
*BASF Canada Inc.*                                  *Dow Chemical Canada Inc.*

  /s/ Brian R. Markley
Brian R. Markley (KS Bar # 17485)                   Harry M. Reasoner
STINSON MORRISON HECKER LLP                         David T. Harvin
1201 Walnut, Suite 2200                             Erica Krennerich
Kansas City, MO  64106                              VINSON & ELKINS LLP
Direct Dial: (816) 691-3215                         First City Tower
Facsimile: (888) 290-2657                           1001 Fannin Street, Suite 2500
                                                    Houston, TX  77002-6760
Justin T. Toth                                      Telephone: (713) 758-2368
John W. Mackay                                      Facsimile: (713) 615-5269
RAY QUINNEY & NEBEKER PC
36 South State Street, Suite 1400
Salt Lake City, UT  84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543

      *Counsel for Huntsman International LLC*

-45-

<u>**CERTIFICATE OF SERVICE**</u>

On February 2, 2009, a copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS ALL CLAIMS** was electronically filed with the Clerk of the Court through CM/ECF, which provides electronic service on Plaintiffs' liaison counsel and each attorney registered for ECF notification.

<u>/s/ Floyd R. Finch, Jr.</u>
Counsel for The Dow Chemical Company

LEGAL_US_E # 82543016.5

-46-