Richard J. Leveridge
Elaine Metlin
Jodi Trulove
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006
(202) 420-2200

R. Bruce Holcomb
Christopher Leonardo
ADAMS HOLCOMB LLP
1875 Eye Street, N.W.
Suite 810
Washington, DC  20006
(202) 580-8820

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: URETHANE ANTITRUST LITIGATION | ) |
| | ) MDL 04-1616 (JWL/JPO) |
| This Document Relates To: | ) |
| The Polyether Polyol Cases | ) |
| | ) |
| WOODBRIDGE FOAM CORPORATION, | ) Docket No.: |
| WOODBRIDGE HOLDINGS INC., | ) 09-2026 (JWL/JPO) |
| WOODBRIDGE CORPORATION, | ) 08-5759 (D. N.J.) |
| WOODBRIDGE FOAM FABRICATING, INC., | ) |
| WOODBRIDGE SERVICES INC., | ) CIVIL ACTION |
| HAIRLOK LIMITED, WOODBRIDGE FOAM | ) |
| DEUTSCHLAND GMBH, AND WOODBRIDGE | ) **FIRST AMENDED** |
| FOAM (UK) LIMITED, | ) **COMPLAINT AND JURY** |
| | ) **DEMAND** |
| PLAINTIFFS, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |

DSMDB-2586788v01

| | |
|---|---|
| BASF SE, BASF CORPORATION, BASF COORDINATION CENTER Comm. V., THE DOW CHEMICAL COMPANY, HUNTSMAN INTERNATIONAL LLC, LYONDELL CHEMICAL COMPANY, JEAN-PIERRE DHANIS, and UWE HARTWIG, | ) ) ) ) ) ) |
| DEFENDANTS. | ) ) ) |

## FIRST AMENDED COMPLAINT

## JURY TRIAL DEMANDED

Plaintiffs Woodbridge Foam Corporation, Woodbridge Holdings Inc., Woodbridge Corporation, Woodbridge Foam Fabricating, Inc., and Woodbridge Services Inc. (collectively, "U.S. Purchase Plaintiffs"); and Plaintiffs Hairlok Limited, Woodbridge Foam Deutschland GmbH and Woodbridge Foam (UK) Limited (collectively, "Foreign Purchase Plaintiffs" and together with U.S. Purchase Plaintiffs, "Plaintiffs") bring this action against BASF SE (f/k/a BASF AG), BASF Corporation, BASF Coordination Center Comm. V., The Dow Chemical Company, Huntsman International LLC, and Lyondell Chemical Company (collectively, the "Corporate Defendants"), and Jean-Pierre Dhanis and Uwe Hartwig (together, the "Individual Defendants" and together with  Corporate Defendants, "Defendants"), arising out of Defendants' and their co-conspirators' global conspiracy to fix, raise, maintain, and stabilize prices of, and allocate customers and markets for, certain polyurethanes products specified below.  Plaintiffs seek:  (i) to recover treble damages and injunctive relief for violation of Section 1 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. § 1, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15, 26; (ii) to recover full consideration under the antitrust or similar laws of Tennessee and Wisconsin; and (iii) pursuant to Article 6 of the Council Regulation (EC) No. 1/2003 of 16 December 2002 ("Regulation 1/2003"), to recover

2

the present value of actual damages sustained, including aggravated and exemplary damages, with appropriate interest, for infringement of Article 81 of the Treaty on European Union and Consolidated Version of the Treaty Establishing the European Community, Maastricht, Rome, and Amsterdam, 7 February 1992, 25 March 1957, 2 October 1996 (36 I.L.M. 56 (1998)) ("EC Treaty" or "E.U. Law"), and any and all other applicable laws of the nations belonging to the European Union ("E.U. Member State"), including, but not limited to, Germany and the United Kingdom.  Plaintiffs demand a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure, and allege the following:

NATURE OF THE CASE

1.  Plaintiffs, and their predecessors-in-interest and assigns, are major purchasers of polyether polyols, monomeric or polymeric diphenylmethane diisocyanates ("MDI"), toluene diisocyanates ("TDI"), MDI-TDI blends, and/or polyether polyols systems (except those that also contain polyester polyols) (hereinafter collectively referred to as "Polyether Polyol Products").

2.  This antitrust action arises out of a worldwide combination and conspiracy among Defendants and their co-conspirators to, inter alia, fix, raise, maintain, and stabilize the prices at which Polyether Polyol Products were sold, and to allocate customers and markets for Polyether Polyol Products, throughout the world, including at least in the United States and Europe, from at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs (hereinafter the "conspiracy period").  In furtherance of their unlawful worldwide combination and conspiracy, Defendants and their co-conspirators combined and conspired to fix the prices of Polyether Polyol Products through a series of agreed price increases and price agreements, and agreed to allocate customers and markets for Polyether Polyol Products.  Defendants and their co-conspirators attended numerous meetings together throughout

DSMDB-2586788v01

the world, including in the United States, Europe, and Asia, and engaged in numerous communications to discuss, implement, and enforce their unlawful combination and conspiracy. Because of the continuous unlawful conspiracy of Defendants and their co-conspirators throughout the world, including in the United States, within the District of New Jersey, and in Europe, Plaintiffs paid artificially inflated prices for Polyether Polyol Products that they purchased from Defendants and their co-conspirators in the United States and/or Canada and in Europe from at least as early as 1994 through at least December 31, 2004, and possibly continuing through 2006 (hereinafter the "damages period").

3.   On November 23, 2004 and thereafter, a series of class actions were initiated against certain Defendants and their co-conspirators on behalf of a class of purchasers of Polyether Polyol Products in the United States.  At all relevant times, U.S. Purchase Plaintiffs were members of the putative plaintiff class.  Those actions were consolidated for pretrial purposes by the Judicial Panel on Multidistrict Litigation in the District of Kansas in *In re Urethane Antitrust Litigation*, MDL No. 1616 (D. Kan. 2004) (hereinafter the "Polyether Class Action").  The defendants currently named in the Polyether Class Action are BASF AG (now known as BASF SE), BASF Corporation, The Dow Chemical Company, Huntsman International LLC, and Lyondell Chemical Company.  Originally, co-conspirators Bayer AG, Bayer Corporation, Bayer MaterialScience AG, and Bayer MaterialScience LLC also were defendants in the Polyether Class Action, but a settlement with these defendants was reached in that class action in early 2006.

4.   On July 29, 2008, the District Court of Kansas granted class plaintiffs' motion for class certification in the Polyether Class Action and certified a class for Polyether Polyol Products purchases from certain Defendants in the United States during the period January 1,

DSMDB-2586788v01

1999 through December 31, 2004.[1]  Certain of the Defendants sought an appeal of the class

certification ruling pursuant to Fed. R. Civ. P. 23(f), but the Tenth Circuit Court of Appeals

denied that request.  On October 10, 2008, the District Court of Kansas authorized dissemination

of the notice of the certified class action to all class members.  On or before December 24, 2008,

U.S. Plaintiffs and their affiliates opted out of the Polyether Class Action.

JURISDICTION AND VENUE

5.  This Complaint is filed and these proceedings are instituted on behalf of U.S.

Purchase Plaintiffs under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to obtain,

inter alia, injunctive relief and to recover treble damages and the costs of suit, including

reasonable attorneys' fees, against Defendants for the injuries sustained by these Plaintiffs by

reason of Defendants' and their co-conspirators' violations of Section 1 of the Sherman Act

(15 U.S.C. § 1).  Certain U.S. Purchase Plaintiffs also bring these proceedings under the laws of

Tennessee and Wisconsin to recover full consideration for their purchases made in those states

against Defendants for the injuries sustained by these U.S. Purchase Plaintiffs under these states'

laws.

6.  This Complaint is filed and these proceedings are instituted on behalf of Foreign

Purchase Plaintiffs under Article 81 of the EC Treaty and all other applicable E.U. Member

States' laws, including but not limited to, Germany and the United Kingdom, pursuant to Article

6 of Regulation 1/2003, and pursuant to 28 U.S.C. § 1367(a), to recover, inter alia, the present

value of actual damages sustained by them, including aggravated and exemplary damages, with

appropriate interest, against Defendants for the injuries sustained by Foreign Purchase Plaintiffs

by reason of Defendants' and their co-conspirators' violations of E.U. Law and all other

---

[1] The litigation class ultimately certified in the Polyether Class Action includes propylene oxide-based polyether polyols only, while Plaintiffs' instant claims include both propylene oxide-based and ethylene oxide-based polyether polyols.

DSMDB-2586788v01

applicable E.U. Member States' laws.

7.  This Court has subject matter jurisdiction over U.S. Purchase Plaintiffs' Sherman Act claims pursuant to 28 U.S.C. §§ 1331 and 1337, as well as under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

8.  This Court has supplemental jurisdiction over specified U.S. Purchase Plaintiffs' claims arising under state law and over Foreign Purchase Plaintiffs' claims arising under E.U. Law and all other applicable E.U. Member States' laws, pursuant to 28 U.S.C. § 1367, because these claims arise from the same nucleus of operative facts alleged in this Complaint and are so related to the Sherman Act claims over which this Court has original jurisdiction that they form part of the same case or controversy.

9.  Venue is proper in the District of New Jersey pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) and 28 U.S.C. § 1391 because each Defendant resides, maintains an office or agent, transacts business, or is found within the District of New Jersey, a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of New Jersey, and/or a substantial portion of the affected interstate commerce was carried out in the District of New Jersey.

10.  Personal jurisdiction exists over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the New Jersey Long-Arm Statute, N.J. Ct. R. 4:4-4 (2008), and each Defendant is within the jurisdiction of the District of New Jersey Court for purposes of service of process.

11.  The Corporate Defendants are major companies with sales and operations throughout the United States and/or worldwide.  Between 1994 and 2004, upon information and belief, the

6

Corporate Defendants sold over $36 billion worth of MDI, TDI, and polyether polyols throughout the United States.  Upon information and belief, these sales consisted of more than $7 billion by BASF, $12 billion by Bayer, $10 billion by Dow, $6 billion by Huntsman, and more than $1 billion by Lyondell.

12.  Defendants and/or their co-conspirators engaged in the interstate and international commerce described in this Complaint, a substantial part of which was carried out within the District of New Jersey.  Defendants and/or their co-conspirators performed substantial, unlawful acts in furtherance of their unlawful combination and conspiracy within the District of New Jersey, and throughout the United States and the world, that were expressly aimed at, directed toward, intended to affect, and did affect Plaintiffs and others located in the United States, including within the District of New Jersey, and Canada.  Defendants and their co-conspirators knew their unlawful combination and conspiracy would inflict injuries on purchasers of Polyether Polyol Products throughout the world, including at least those purchasing in the United States, Canada, and Europe, and including Plaintiffs and others purchasing Polyether Polyol Products in New Jersey.  Defendants and/or their co-conspirators acted in furtherance of the conspiracy in New Jersey by, inter alia:  (i) selling Polyether Polyol Products in New Jersey at artificially inflated prices; (ii) eliminating competition in New Jersey from non-conspirators; (iii) limiting supply of Polyether Polyol Products sold in New Jersey; (iv) providing false and pretextual reasons for price increases of Polyether Polyol Products in industry publications and to customers in New Jersey; and (v) committing other practices that constitute per se violations of the Sherman Act.

13.  Defendants and their co-conspirators engaged in conduct both inside and outside the U.S. that caused direct, substantial, and reasonably foreseeable anticompetitive effects upon

DSMDB-2586788v01

interstate commerce within the United States, which directly gave rise to U.S. Purchase
Plaintiffs' claims.

## PLAINTIFFS

14.  U.S. Purchase Plaintiffs purchased Polyether Polyol Products in the United States
and/or Canada during the damages period, and Foreign Purchase Plaintiffs purchased Polyether
Polyols Products in the European Union during the damages period, as set forth below.

## U.S. PURCHASE PLAINTIFFS

15.  Plaintiff Woodbridge Foam Corporation (hereinafter "Woodbridge Foam") is an
Ontario corporation with its principal place of business at 4240 Sherwoodtowne Boulevard,
Mississauga, Ontario, Canada L4Z 2G6.  Woodbridge Foam, including its subsidiaries, affiliates,
predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol
Products in the United States and Canada, for delivery in Canada, from one or more Defendants,
Defendants' agents, and/or their co-conspirators during the damages period and was injured by
Defendants' antitrust violations alleged herein.  Woodbridge Foam's purchases were negotiated
in whole or in part in the United States, were invoiced from the United States and Canada, and/or
were based on U.S. pricing.

16.  Plaintiff Woodbridge Holdings Inc. (hereinafter "Woodbridge Holdings") is a
Delaware corporation with its principal place of business at 202 Rock Run Road, Fairless Hills,
Pennsylvania 19030.  Woodbridge Holdings, including its subsidiaries, affiliates, predecessors-
in-interest, and assigns (including, but not limited to, Cartex Corporation, Dynaflex Corporation,
and SW Foam LLC, which duly assigned their claims to Woodbridge Holdings), purchased
substantial quantities of Polyether Polyol Products in the United States from one or more

DSMDB-2586788v01

Defendants or their co-conspirators during the damages period and was injured by Defendants'
antitrust violations alleged herein.

17.   Plaintiff Woodbridge Corporation (hereinafter "Woodbridge Corporation") is a
Wisconsin corporation with its principal place of business at 1901 Ten Eyck Road, Brodhead,
Wisconsin 53520, with facilities in, among other places, Wisconsin.  Woodbridge Corporation,
including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial
quantities of Polyether Polyol Products in the United States from one or more Defendants or
their co-conspirators during the damages period and was injured by Defendants' antitrust
violations alleged herein.

18.   Plaintiff Woodbridge Foam Fabricating, Inc. (hereinafter "Woodbridge Fabricating")
is a Tennessee corporation with its principal place of business at 1120 Judd Road, Chattanooga,
Tennessee 37406, with facilities in, among other places, Tennessee.  Woodbridge Fabricating,
including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial
quantities of Polyether Polyol Products in the United States from one or more Defendants or
their co-conspirators during the damages period and was injured by Defendants' antitrust
violations alleged herein.

19.   Plaintiff Woodbridge Services Inc. (hereinafter "Woodbridge Services") is a
Barbados corporation with its principal place of business at The Financial Services Centre, Suite
15, Bishop's Court Hill, St. Michael, Barbados.  Woodbridge Services, including its subsidiaries,
affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether
Polyol Products in the United States for delivery in Brazil from one or more Defendants or their
co-conspirators during the damages period and was injured by Defendants' antitrust violations

DSMDB-2586788v01

alleged herein.  Woodbridge Services' purchases were negotiated in whole or in part in the United States and were invoiced from the United States.

FOREIGN PURCHASE PLAINTIFFS

20.  Plaintiff Hairlok Limited (hereinafter "Hairlok") is a company incorporated in England with its principal place of business at c/o McCarthy Tetrault, 5 Old Bailey, 2nd Floor, London, England EC4M 7BA.  Hairlok, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Hairlok is a subsidiary of U.S. Purchase Plaintiff Woodbridge Foam and an affiliate of U.S. Purchase Plaintiffs Woodbridge Holdings, Woodbridge Corporation, Woodbridge Fabricating, and Woodbridge Services.

21.  Plaintiff Woodbridge Foam Deutschland GmbH (hereinafter "Woodbridge Germany") is a German corporation with its principal place of business at 32 64546 Morfelden - Walldorf, Morfelden, Germany 64546.  Woodbridge Germany, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein.  Woodbridge Germany is a subsidiary of U.S. Purchase Plaintiff Woodbridge Foam and an affiliate of U.S. Purchase Plaintiffs Woodbridge Holdings, Woodbridge Corporation, Woodbridge Fabricating, and Woodbridge Services.

22.  Plaintiff Woodbridge Foam (UK) Limited (hereinafter "Woodbridge UK") is incorporated under the laws of England with its principal place of business at Site A, Finlan

10

Road, Stakehill Industrial Estate Middleton, Manchester, England M24 2SJ. Woodbridge UK, including its subsidiaries, affiliates, predecessors-in-interest, and assigns, purchased substantial quantities of Polyether Polyol Products in the European Union from one or more Defendants or their co-conspirators during the damages period and was injured by Defendants' antitrust violations alleged herein. Woodbridge UK is a subsidiary of U.S. Purchase Plaintiff Woodbridge Foam and an affiliate of U.S. Purchase Plaintiffs Woodbridge Holdings, Woodbridge Corporation, Woodbridge Fabricating, and Woodbridge Services.

23. The aforementioned Plaintiffs maintain this action both on their own behalf and on behalf of their parents, subsidiaries, affiliates, predecessors-in-interest and assigns.

## DEFENDANTS AND CO-CONSPIRATORS

24. Defendant BASF SE (f/k/a BASF AG) is a German corporation with its principal place of business at D-67056 Ludwigshafen, Germany. BASF SE takes the central role as the largest operating company in the BASF Group and has extensive operations in the United States, Europe, and throughout the world. During the damages period, BASF SE manufactured and sold Polyether Polyol Products, either directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including, but not limited to, Defendant BASF Corporation, Defendant BASF Coordination Center Comm. V., BASF Canada Inc. (Canada), BASF Antwerpen NV (Belgium), BASF Schwarzheide GmbH (Germany), Elastogran GmbH (Germany), and Elastogran UK Ltd. (United Kingdom) (collectively, the "BASF subsidiaries"), to purchasers throughout the world, including at least in the United States, Canada, and Europe and including Plaintiffs in this action and in New Jersey. At all relevant times, BASF SE wholly owned and/or controlled the BASF subsidiaries, both generally and with respect to the conduct of any of these subsidiaries and/or affiliates in furtherance of the unlawful acts alleged herein. Upon information and belief, BASF SE participated in the combination and conspiracy alleged

DSMDB-2586788v01

herein both directly and through its control over the BASF subsidiaries.

25. Defendant BASF Corporation is a Delaware corporation with its principal place of business at 100 Campus Drive, Florham Park, New Jersey 07932. During the damages period, BASF Corporation manufactured and sold, either directly or through its agents, including, but not limited to, its affiliate BASF Canada, Polyether Polyol Products to purchasers in the United States, Canada and elsewhere, including Plaintiffs in this action and in New Jersey. Upon information and belief, BASF Corporation participated in the combination and conspiracy alleged herein both directly and through its agents, including, but not limited to, BASF Canada.

26. Defendant BASF Coordination Center Comm. V. ("BASF Coordination Center") is a Belgian corporation with its principal place of business at 600 Scheldelaan, Antwerpen, Belgium. BASF Coordination Center is BASF's Global Polyurethanes Division. BASF Coordination Center is a wholly owned and/or controlled subsidiary of BASF SE and is an affiliate of BASF Corporation. Upon information and belief, BASF Coordination Center developed a global strategy for BASF's polyurethanes business and participated directly in the worldwide combination and conspiracy alleged herein, which was directed at and specifically targeted the United States and Europe. BASF SE, BASF Corporation, and BASF Coordination Center are collectively referred to herein as "BASF."

27. Defendant The Dow Chemical Company is a Delaware corporation with its principal place of business at 2030 Dow Center, Midland, Michigan 48674. During the damages period, Dow manufactured and sold Polyether Polyol Products, either directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including, but not limited to, Dow Chemical Canada Inc. (Canada), Dow Benelux NV (Belgium), Dow Chemical Company Limited (England), Dow Europe GmbH (Switzerland), Dow France S.A. (France),

DSMDB-2586788v01

Dow Poliuretani Italia Srl (Italy), and Dow Stac Polyurethane S.A.S. (France) (collectively, the "Dow subsidiaries"), to purchasers throughout the world, including at least in the United States, Canada, and Europe, and including Plaintiffs in this action and in New Jersey.  At all relevant times, Dow wholly owned and/or controlled the Dow subsidiaries, both generally and with respect to the conduct of any of these subsidiaries and affiliates in furtherance of the unlawful acts alleged herein.  Upon information and belief, Dow participated in the combination and conspiracy alleged herein both directly and through its control over the Dow subsidiaries.

28.  Defendant Huntsman International LLC (f/k/a Huntsman ICI Chemicals LLC) (hereinafter "Huntsman") is a Delaware limited liability company with its principal place of business at 500 Huntsman Way, Salt Lake City, Utah 84108.  Huntsman was formed in 1999, in connection with the acquisition of the polyurethanes chemicals business of Imperial Chemicals Industries Ltd. ("ICI").  Prior to the sale of its polyurethanes business to Huntsman, ICI manufactured and sold Polyether Polyol Products to purchasers in the United States, Canada, and Europe, including Plaintiffs in this action.  As part of that acquisition, Huntsman acquired ICI's liabilities.  Thereafter, Huntsman, its parents, subsidiaries, and affiliates, manufactured and sold Polyether Polyol Products to purchasers throughout the world, including at least in the United States, Canada, and Europe, and including Plaintiffs in this action and in New Jersey.  Upon information and belief, Huntsman participated directly in the combination and conspiracy alleged herein.

29.  Defendant Lyondell Chemical Company (f/k/a Lyondell Petrochemical Company) (hereinafter "Lyondell") is a Delaware corporation with its principal place of business at One Houston Center, 1221 McKinney Street, Houston, Texas 77010.  In or around 1998, Lyondell acquired Arco Chemical Company's polyurethanes business, and in 2000, Bayer acquired Lyondell's polyether polyols business.  During the damages period, Lyondell manufactured and

DSMDB-2586788v01

sold Polyether Polyol Products, either directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including, but not limited to, Lyondell Chemical Nederland B.V. (Netherlands and France), Lyondell Chemical Nederland, Ltd. (Netherland), Lyondell Chemie TDI SCA (France), and Lyondell Chemical Canada (Canada) (collectively, the "Lyondell subsidiaries"), to purchasers throughout the world, including at least in the United States, Canada, and Europe, and including Plaintiffs in this action.  Upon information and belief, Lyondell participated in the combination and conspiracy alleged herein both directly and through its control over the Lyondell subsidiaries.

30.  Individual Defendant Jean-Pierre Dhanis ("Dhanis") was President of BASF's Global Polyurethanes Division from at least December 1998 until May 1, 2006.  BASF's Global Polyurethanes Division is organized as BASF SE's wholly owned and controlled subsidiary BASF Coordination Center, Dhanis' employer during this period.  Upon information and belief, Dhanis approved of, and directly and intentionally participated in, the global combination and conspiracy alleged herein, which was directed at and specifically targeted the United States and Europe.  Upon information and belief, Dhanis had systematic and continuous contacts with the United States, including New Jersey, where Defendant BASF Corporation has its principal place of business.  Upon information and belief, Dhanis organized and attended meetings with competitors during which, among other things, they discussed, formed and implemented agreements to fix, raise, maintain, and stabilize prices of Polyether Polyol Products, including such products sold in the United States, Canada, and Europe, and to allocate customers and markets for Polyether Polyol Products, including those in the United States, Canada, and Europe.  Upon information and belief, Dhanis knew and intended that, as a result of the unlawful combination and conspiracy alleged herein, purchasers, including Plaintiffs, would be compelled to pay prices for Polyether Polyol Products, including such products sold in the United States,

DSMDB-2586788v01

Canada, and Europe, that were substantially greater than what Plaintiffs would have paid absent Defendants' conduct.

31. Individual Defendant Uwe Hartwig ("Hartwig") has been Group Vice-President and/or Managing Director of BASF's Polyurethanes Europe Regional Business Unit from at least October 2005 to the present. BASF's Polyurethanes Europe Regional Business Unit is organized as BASF SE's wholly owned and controlled subsidiary Elastogran GmbH. From at least January 2002 through October 2005, Hartwig was Head of BASF's Global Marketing Coordination for Polyurethanes at BASF Coordination Center. Upon information and belief, Hartwig approved of, and directly and intentionally participated in, the global combination and conspiracy alleged herein, which was directed at and specifically targeted the United States and Europe. Upon information and belief, Hartwig had systematic and continuous contacts with the United States, including New Jersey, where Defendant BASF Corporation has its principal place of business. Upon information and belief, Hartwig organized and attended meetings with competitors during which, among other things, they discussed, formed and implemented agreements to fix, raise, maintain, and stabilize prices of Polyether Polyol Products, including such products sold in the United States, Canada, and Europe, and to allocate customers and markets for Polyether Polyol Products, including those in the United States, Canada, and Europe. Upon information and belief, Hartwig knew and intended that as a result of the unlawful combination and conspiracy alleged herein, purchasers, including Plaintiffs, would be compelled to pay prices for Polyether Polyol Products, including such products sold in the United States, Canada, and Europe, that were substantially greater than what Plaintiffs would have paid absent Defendants' conduct.

32. Co-conspirators Bayer AG, Bayer Corporation, Bayer MaterialScience AG, and Bayer MaterialScience LLC (collectively, "Bayer") are Defendants' co-conspirators with respect to the unlawful conduct and conspiracy alleged herein. Bayer AG and Bayer Material Science

DSMDB-2586788v01

AG are German corporations, and Bayer Corporation and Bayer Material Science LLC are U.S. companies with their principal places of business in Pennsylvania. At all relevant times, Bayer Corporation, Bayer Material Science LLC, and Bayer Material Science AG were wholly owned and/or controlled subsidiaries of Bayer AG. During the damages period, Bayer manufactured and sold Polyether Polyol Products, either directly or through their wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, including, but not limited to, Bayer Antwerpen N.V. (Belgium), Bayer Inc. (Canada), Bayer Material Science Customer Services GmbH, & Co KG (Germany), Bayer Polymers Customer Services GmbH, & Co KG (Germany), Bayer Polyurethane Business Centre GmbH & Co KG (Germany), and Bayer Polyurethanes B.V. (Netherlands) (collectively, the "Bayer subsidiaries"), to purchasers throughout the world, including at least in the United States, Canada, and Europe, and including Plaintiffs in this action and in New Jersey. Upon information and belief, Bayer participated in the combination and conspiracy alleged herein both directly and through its control over the Bayer subsidiaries. Bayer's conduct and actions in furtherance of the conspiracy are attributable to its Defendant co-conspirators.

33. Various other individuals, companies, corporations, firms, partnerships, associations, and other legal entities, the identities of which are presently unknown and which are not named as defendants or co-conspirators in this action, may have participated as co-conspirators with Defendants in the violations alleged herein, and have performed substantial acts and made statements in New Jersey and elsewhere throughout the United States and the world in furtherance thereof. All references to "Defendants" and "co-conspirators" include the named entities herein and their predecessors-in-interest, as well as these unknown individuals, companies, corporations, firms, partnerships, associations, and other legal entities.

34. The acts charged in this Complaint as having been done by Corporate Defendants

DSMDB-2586788v01

and their co-conspirators were authorized, ordered or done by or through their officers, directors, agents, employees or representatives, including Individual Defendants Hartwig and Dhanis, while they were actively engaged in the management, direction, control or transaction of Corporate Defendants' and their co-conspirators' businesses or affairs.

## TRADE AND COMMERCE

35.  During the damages period, Defendants and their co-conspirators manufactured, distributed, sold, and shipped Polyether Polyol Products in a continuous and uninterrupted flow of interstate and international commerce to customers located in states other than those states in which the Defendants produced these products and to customers throughout the world, including in E.U. Member States.  In addition, the primary raw materials used to manufacture Polyether Polyol Products were purchased and shipped in a continuous and uninterrupted flow of interstate and international commerce.

36.  The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate and international commerce.  The conspiracy alleged herein in which Defendants and their co-conspirators participated was purposefully directed at the United States and Europe and had a direct, substantial, and reasonably foreseeable effect on the United States and Europe and on United States and international commerce.

37.  Polyether polyols are intermediate chemical compounds based on propylene oxide or ethylene oxide that, among other things, are used in the manufacture of flexible foams and rigid foams.  While the large majority of polyether polyols are used to make flexible and rigid foams, polyether polyols also are used in the manufacture of elastomers, adhesives, sealants, coatings, and binders.  Polyether polyols are combined with isocyanates such as toluene diisocyanates

DSMDB-2586788v01

("TDI") and monomeric or polymeric diphenylmethane diisocyanates ("MDI") to make polyurethanes. Defendants and Bayer were the largest producers of polyether polyols during the conspiracy period.

38. TDI is a diisocyanate used in combination with polyether polyols primarily to manufacture flexible foams. These flexible foams are used for, among other things, furniture, bedding, car seating, packing, textiles, and carpet underlay. TDI also is used in the production of coatings, adhesives coatings, adhesives, sealants, and elastomers ("CASE") applications. Defendants and Bayer were the largest producers of TDI during the conspiracy period, and by 2005, Defendants and Bayer owned and controlled 100% of the U.S. production capacity of TDI, 100% of Western European capacity, and most of European capacity. The critical inputs for the production of TDI are toluene and phosgene. All of the Defendants are vertically integrated with respect to phosgene, and Dow and Lyondell also are vertically integrated with respect to toluene.

39. MDI is a diisocyanate used in combination with polyether polyols to, among other things, manufacture rigid foams, binders, and in some cases, flexible foam. Polymeric MDI is used primarily to make rigid and semi-rigid polyurethane foams, and pure or monomeric MDI is used primarily for injection molding. Rigid foams are used for construction, appliances, packing, insulation, and transportation. Defendants and Bayer were among the largest producers of MDI during the conspiracy period, and by 2005, Defendants and Bayer owned and controlled 100% of U.S. production capacity of MDI, 100% of Western European capacity, and almost 100% of European capacity. The critical inputs for the production of MDI are aniline and phosgene. All of the Defendants are vertically integrated with respect to phosgene, and BASF, Bayer, and Huntsman also are vertically integrated with respect to aniline.

40. Polyether polyols systems are formulated packages of chemicals that include both an

DSMDB-2586788v01

"A" side consisting of a diisocyanate (MDI or TDI) and a "B" side consisting of a polyether polyol and catalysts, foaming agents, and other chemicals. The "A" side and the "B" side are mixed together and react to form polyurethane foams. In some cases (e.g., depending on geographical location or the end use of the systems), the "A" side and "B" side labels are reversed.

41. The structure of the markets for MDI, TDI, and polyether polyols are such that they facilitate unlawful collusion among the Defendants and their co-conspirators and facilitate the raising of prices above competitive levels.

42. During the conspiracy period, MDI, TDI, and polyether polyols were each largely commodity products with no reasonable substitutes.

43. The Polyether Polyol Products industry is a multi-billion dollar, international business. During the conspiracy period, annual sales of Polyether Polyol Products were more than $3 billion in the United States and more than $3 billion in Europe.

44. Defendants and Bayer were the largest suppliers of Polyether Polyol Products in the United States and the world during the conspiracy period. There were a limited number of common producers during the conspiracy period, and the markets for Polyether Polyol Products were highly concentrated. There are high barriers to entry given the capital intensive nature of the business and environmental laws and regulations. Given Defendants' and Bayer's collective high market share and control over these markets, Defendants and Bayer were able to exercise market power, including controlling prices.

45. Pricing for Polyether Polyol Products was interrelated during the conspiracy period. On a number of occasions during the conspiracy period, price increases for Polyether Polyol

DSMDB-2586788v01

Products were announced and/or became effective at or around the same time.  Some examples are included below at paragraphs 76 and 78.

46.  Defendants' and their co-conspirators' illegal conduct throughout the world, including in the United States and in Europe, directly affected the flow of interstate and international trade and commerce.  In furtherance of their global conspiracy, Defendants and their co-conspirators purposefully directed their illegal conduct at the United States and Europe with the knowledge and intent that the effects of their illegal conduct would be felt in at least those places.  In particular, as a result of their unlawful combination and conspiracy to artificially fix, raise, maintain, and stabilize the price of, and allocate customers and markets for, Polyether Polyol Products, Defendants and their co-conspirators knowingly:  (a) eliminated or suppressed competition in the production, distribution and/or sale of Polyether Polyol Products in at least the United States, Canada, and Europe; and (b) inflated the prices that Plaintiffs and others paid for Polyether Polyol Products in at least the United States (and/or Canada) and Europe.

## THE CONSPIRACY

47.  From at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a continuing combination, conspiracy, and agreement in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (as amended by the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, 118 Stat. 662 (2004)).

48.  From at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in an unlawful arrangement, agreement, or combination made with a view to and which tended to: (1)

DSMDB-2586788v01

lessen full and free competition in the importation and sale of Polyether Polyol Products into Tennessee; and (2) advance and control the price and cost of Polyether Polyol Products to Plaintiffs, in violation of Tennessee Code section 47-25-101.

49.  From at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a combination and conspiracy to restrain trade and commerce in violation of Wisconsin Statute section 133.03.

50.  From at least as early as 1994 and continuing through at least December 31, 2004, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a continuing combination, conspiracy and agreement and engaged in concerted practices that constituted an infringement of Article 81(1) of the EC Treaty and all other applicable E.U. Member States' laws, including, but not limited to, Germany and the United Kingdom.

51.  The combination and conspiracy alleged in this Complaint consisted of an agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms and/or the purpose of which was to fix, raise, stabilize, and maintain at artificially high levels the prices of Polyether Polyol Products throughout the world, including at least in the United States and Europe.

52.  For the purpose of forming and effectuating their combination and conspiracy, Defendants and their co-conspirators, among other things, discussed, formed and implemented agreements to fix, raise, maintain, and stabilize prices, and to allocate customers and markets, for Polyether Polyol Products.

53.  Starting at least as early as 1994, the exact date(s) being unknown to Plaintiffs,

DSMDB-2586788v01

Defendants Dow and BASF and co-conspirator Bayer engaged in numerous meetings, discussions, and/or communications regarding Polyether Polyol Products pricing throughout the world, including at least in the United States and Europe, and agreed to fix, raise, maintain, and stabilize the prices of Polyether Polyol Products and to allocate customers and markets for Polyether Polyol Products. While the exact dates are unknown to Plaintiffs, Defendants Lyondell and Huntsman subsequently joined the unlawful combination and conspiracy. Upon information and belief, Lyondell entered the Polyether Polyol Products markets in 1998 upon its acquisition of Arco Chemical Company, and Huntsman entered the Polyether Polyol Products markets in 1999 upon its acquisition of ICI's polyurethanes business. While the exact dates of Dhanis' and Hartwig's participation are unknown to Plaintiffs, upon information and belief, Defendants Dhanis and Hartwig joined and/or directed the unlawful combination and conspiracy beginning at least as early as the date they became senior employees of BASF's Polyurethanes division as alleged above, and possibly earlier.

54.  In furtherance of their illegal combination and conspiracy, Defendants and their co-conspirators conducted multilateral and bilateral meetings in various locations throughout the world including in the United States, Europe and Asia, and they engaged in numerous telephone conversations to discuss Polyether Polyol Products pricing. Defendants and their co-conspirators also shared confidential pricing and customer information with one another with respect to Polyether Polyol Products. They conspired, combined, and agreed to fix, raise, stabilize, and maintain prices for Polyether Polyol Products throughout the world, including at least in the United States and Europe, agreed to specific price increases, agreed to allocate customers and markets for Polyether Polyol Products, and acted in concert in implementing and enforcing those illegal agreements. On numerous occasions, Defendants and their co-conspirators discussed and collaborated on specific price increases, whether they were planned, announced, or already

22

implemented.

55.  Defendants' and their co-conspirators' meetings and communications in furtherance of their illegal combination and conspiracy continued until at least December 31, 2004, the exact dates being unknown to Plaintiffs.  Plaintiffs' prices for Polyether Polyol Products may have continued to be inflated as a result of Defendants' and their co-conspirators' conspiracy through 2006.

56.  Defendants and their co-conspirators often had communications in furtherance of their unlawful combination and conspiracy while they were at industry trade group meetings, such as those of the American Chemistry Council ("ACC"), Alliance for Polyurethanes Industry ("API"), and International Isocyanate Institute ("III"), among other places.

57.

**CONFIDENTIAL INFORMATION REDACTED**

**SUBJECT TO PROTECTIVE ORDER IN *IN RE URETHANE***

***ANTITRUST LITIGATION*, MDL NO. 1616 (D. KAN.)**

DSMDB-2586788v01

**CONFIDENTIAL INFORMATION REDACTED**

**SUBJECT TO PROTECTIVE ORDER IN *IN RE URETHANE***

***ANTITRUST LITIGATION*, MDL NO. 1616 (D. KAN.)**

DSMDB-2586788v01

**CONFIDENTIAL INFORMATION REDACTED**

**SUBJECT TO PROTECTIVE ORDER IN *IN RE URETHANE***

***ANTITRUST LITIGATION*, MDL NO. 1616 (D. KAN.)**

n. In addition to these meetings, Defendants and their co-conspirators had numerous other meetings and communications in the United States during the conspiracy period to discuss and agree on global and/or United States pricing of Polyether Polyol Products, as well as meetings throughout Europe during the conspiracy period, including in Brussels, Frankfurt, Milan, and Paris, to discuss and agree on global and/or European pricing of Polyether Polyol Products. Defendants and their co-conspirators discussed and agreed on pricing and price ranges for Polyether Polyol Products and often discussed specific customers' pricing. Defendants and their co-conspirators also engaged in a number of telephone conversations designed to monitor implementation and enforcement of their pricing agreements.

<u>COUNT I</u>
(on behalf of U.S. Purchase Plaintiffs)

<u>VIOLATION OF SECTION ONE OF THE SHERMAN ACT</u>

58. Plaintiffs incorporate by reference paragraphs 1-57 above as if fully set forth herein.

59. As a result of the foregoing, prices for Polyether Polyol Products were artificially raised, fixed, maintained, and stabilized in violation of Section 1 of the Sherman Act during the period of unlawful conduct between at least as early as 1994 and December 31, 2004, with the

DSMDB-2586788v01

effects possibly continuing through 2006.

60.  The purpose and effect of Defendants' and their co-conspirators' unlawful combination and conspiracy was to fix, raise, maintain and stabilize the prices that Plaintiffs and others paid for Polyether Polyol Products in the United States, Canada, and throughout the world, to deprive Plaintiffs and others of the benefit of free and open competition in their purchases of Polyether Polyol Products, and to restrain, suppress, and eliminate competition in the production, distribution, and sale of Polyether Polyol Products in the United States and throughout the world between at least as early as 1994 and December 31, 2004 and possibly continuing through 2006.

61.  By reason of the alleged violations of the U.S. antitrust laws, U.S. Purchase Plaintiffs paid more for Polyether Polyol Products than they would have paid in the absence of the illegal combination and conspiracy during the period between at least as early as 1994 and December 31, 2004 and possibly continuing through 2006.  As a direct and proximate result, Plaintiffs have been injured in their business and property and have suffered damages in an amount presently undetermined.

<u>INJURY TO U.S. PURCHASE PLAINTIFFS</u>

62.  Plaintiffs incorporate by reference paragraphs 1-61 above as if fully set forth herein.

63.  During the period between at least as early as 1994 and December 31, 2006, U.S. Purchase Plaintiffs purchased substantial amounts of Polyether Polyol Products from Defendants and/or their co-conspirators.  As a result of Defendants' and their co-conspirators' *per se* unlawful combination and conspiracy, U.S. Purchase Plaintiffs were compelled to pay, and did pay, prices for Polyether Polyol Products that were substantially greater than what U.S. Purchase Plaintiffs would have paid absent Defendants' and their co-conspirators' illegal conduct.  The

DSMDB-2586788v01

full amount of U.S. Purchase Plaintiffs' damages will be calculated after discovery and upon proof at trial.

64. To the extent U.S. Purchase Plaintiffs purchased Polyether Polyol Products in the United States for delivery abroad, these purchases were U.S. purchases for which damages are recoverable under Section 1 of the Sherman Act. In the alternative, these purchases were negotiated in whole or in part in the United States, invoiced from the U.S. and Canada, and/or were based on U.S. pricing. Therefore, Defendants' and their co-conspirators' *per se* unlawful combination and conspiracy had a direct, substantial and reasonably foreseeable effect on U.S. commerce that gave rise to and was the proximate cause of the injury to these U.S. Purchase Plaintiffs for which damages are recoverable under the Sherman Act.

## INJUNCTIVE RELIEF

65. Plaintiffs incorporate by reference paragraphs 1-64 above as if fully set forth herein.

66. Defendants and their co-conspirators have engaged in a persistent and continuing pattern and practice of antitrust violations that is likely to recur unless each is permanently enjoined from engaging in such unlawful conduct in the future.

## FRAUDULENT CONCEALMENT AND TOLLING

67. Plaintiffs incorporate by reference paragraphs 1-66 above as if fully set forth herein.

68. At all relevant times, Defendants and their co-conspirators engaged in an illegal price-fixing conspiracy, which Defendants and their co-conspirators affirmatively and fraudulently concealed from Plaintiffs and others, and which, by its very nature, was inherently self-concealing.

69. Plaintiffs did not discover, nor could they have discovered through reasonable diligence, which they in fact exercised, that Defendants and their co-conspirators were engaged

DSMDB-2586788v01

in a combination and conspiracy with respect to Polyether Polyol Products from January 1999

through December 2004, until at least November 23, 2004 when one of a series of class actions

was filed alleging that Defendants and their co-conspirators engaged in an unlawful price-fixing

conspiracy with respect to Polyether Polyol Products sold in the United States.  Prior to the filing

of these class actions, which assert claims for the period 1999-2004, Plaintiffs did not discover

and could not have discovered, through the exercise of due diligence or otherwise, that

Defendants and their co-conspirators were engaged in a price-fixing conspiracy regarding

Polyether Polyol Products between 1999 and 2004 because Defendants and their co-conspirators

used and continue to use deceptive and secret methods to avoid detection and to affirmatively

conceal their violations.  Plaintiffs also did not discover and could not have discovered, through

the exercise of reasonable diligence or otherwise, that Defendants and their co-conspirators were

engaged in a price-fixing conspiracy because the conspiracy, by its very nature, was inherently

self-concealing.

70.  Until December 2007, Plaintiffs did not discover and could not have discovered,

through the exercise of reasonable diligence or otherwise, that the price-fixing conspiracy

alleged herein was in existence prior to 1999 or that it extended to Polyether Polyol Products

pricing, customers, and markets in Europe.  Plaintiffs exercised due diligence in investigating

their potential claims relating to these products and did not discover, and could not have

discovered, the earlier unlawful conduct or conduct related to Europe by Defendants and their

co-conspirators until December 2007.  It was only in December 2007 that Plaintiffs, through the

exercise of due diligence, could have acquired information, for the very first time, from a

cooperating co-conspirator, indicating that the price-fixing conspiracy alleged herein was in

existence prior to 1999, extending back to at least 1994 and that it extended to Polyether Polyol

Products pricing, customers, and markets in Europe.  Plaintiffs could not have had access to this

DSMDB-2586788v01

information until December 2007.  Prior to December 2007, Plaintiffs did not have any facts or evidence, nor could they, through the exercise of reasonable diligence, have been aware of any facts or evidence, that Defendants' and their co-conspirators' unlawful conduct began prior to 1999, or that such conduct extended to Polyether Polyol Products pricing, customers, and markets in Europe because Defendants, Bayer, and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal the existence of their illegal conduct.  In addition, prior to December 2007, Plaintiffs did not discover, and could not have discovered, through the exercise of reasonable diligence or otherwise, that the conspiracy was in existence prior to 1999 or that it extended to Polyether Polyol Products pricing, customers, and markets in Europe because the conspiracy, by its nature, was inherently self-concealing.

71.  Plaintiffs did not discover, and could not have discovered, through the exercise of reasonable diligence or otherwise, Defendants' unlawful conduct prior to the time periods set forth above because Defendants and their co-conspirators conducted their conspiracy secretly, deliberately and affirmatively concealed the true nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various means, methods, and affirmative acts designed to avoid detection by Plaintiffs and others.

72.  Throughout the relevant time period (i.e., until November 23, 2004 for January 1999 to December 2004 claims, and until December 2007 for claims prior to 1999 and foreign claims), Defendants and their co-conspirators successfully concealed from Plaintiffs the existence of their illegal combination and conspiracy alleged herein through affirmative acts of fraudulent concealment including, but not limited to:

a.  Meeting and communicating secretly with one another, including by telephone, to discuss prices, customers, and markets for Polyether Polyol Products sold in the U.S. and

29

Europe, and to effectuate the collusive increases described herein. Defendants and their co-conspirators affirmatively concealed their meetings and communications.

## CONFIDENTIAL INFORMATION REDACTED

In addition to being affirmatively concealed, all of Defendants' and their co-conspirators' secret, conspiratorial communications were, by their very nature, self-concealing in nature and not discoverable by Plaintiffs in the exercise of reasonable diligence.

## CONFIDENTIAL INFORMATION REDACTED

b. Meeting secretly outside of the United States on a number of occasions in an effort to avoid detection and liability in the United States, to discuss prices, customers, and markets for Polyether Polyol Products sold in the U.S. and Europe and around the world, and to effectuate the collusive increases described herein. Defendants and their co-conspirators affirmatively concealed these meetings and communications.

## CONFIDENTIAL INFORMATION REDACTED

In addition, these secret conspiratorial meetings and communications were, by their very nature, self-concealing in nature and not discoverable by Plaintiffs in the exercise of reasonable diligence.

## CONFIDENTIAL INFORMATION REDACTED

c. Agreeing among themselves at meetings and in communications not to disclose or discuss publicly or privately beyond those involved, the true nature and substance of the acts and communications in furtherance of the alleged combination and conspiracy. Defendants and their co-conspirators knew that their conduct was illegal, and specifically agreed that they should not disclose their meetings or communications.

## CONFIDENTIAL INFORMATION REDACTED

d. Giving deliberately false and pretextual reasons for the price increases of Polyether Polyol Products sold by Defendants and their co-conspirators during the conspiracy period, and falsely attributing such pricing as being the result of competitive factors and natural market forces rather than unlawful conspiratorial conduct. Defendants' and their co-conspirators' explanations were false and misleading and were intended to and did conceal their illegal combination and conspiracy. Examples of these false and pretextual statements are set forth at paragraphs 76 and 78 below.

e. Denying the existence of the conspiracy in connection with the Polyether Class

Action.

73. It was not uncommon in the Polyether Polyol Products industry for the producers to periodically announce price increases for Polyether Polyol Products. In dealing with Defendants and their co-conspirators, Plaintiffs were accustomed to price increases from time to time as a part of what Plaintiffs believed was a competitive industry and normal, legitimate business practices.

74. During the conspiracy period, Defendants and their co-conspirators issued price increase announcements and made numerous statements about price increases in industry publications reviewed by Plaintiffs and issued price increase letters that were distributed to and relied on by Plaintiffs. These price increase announcements, statements, and letters contained deliberately false and pretextual explanations for price increases of Polyether Polyol Products.

75. Defendants and their co-conspirators consistently attributed their price increases of Polyether Polyol Products – both before and after they were announced – to normal, rational competitive market forces, including, but not limited to, raw material cost increases, low margins, desire to increase return on investment, and supply and demand factors. These price increases, instead, were agreed on by Defendants and their co-conspirators, and were the direct result of their unlawful combination and conspiracy alleged herein. Defendants' and their co-conspirators' false and pretextual explanations for the price increases were designed to conceal the true reasons for the price increases and to mislead Plaintiffs into believing that normal market forces justified the price increases. Plaintiffs reasonably believed Defendants' and their co-conspirators' stated reasons for the increases. Plaintiffs did not know, and could not have known until November 23, 2004 for 1999-2004 claims and until December 2007 for pre-1999 claims and foreign claims that the justifications provided by Defendants and their co-conspirators were false and designed to conceal Defendants' and their co-conspirators' unlawful combination and

DSMDB-2586788v01

conspiracy.

76. Some examples of Defendants' and their co-conspirators' many false and pretextual price increase announcements and/or statements in industry publications include the following:

  a. In an August 8, 1994 article, Chemical Marketing Reporter reported that MDI prices in the United States had gone up in July of 1994 and quoted defendant Dow as stating that "'[t]he two leading factors in the increase were the high operating rates and the fact that the industry had gone 12 months without a raise.'"

  b. In a September 28, 1994 article, Chemical Week reported that Bayer's then U.S. subsidiary, Miles, had advised that U.S. prices for isocyanates might be increased industrywide in the first half of 1995, due to pent-up demand.

  c. In its April/May 2000 publication, Urethanes Technology reported that Dow attributed industrywide price increases on TDI and MDI to increased feedstock prices, leading to pressure on margins.

  d. In its June/July 2000 publication, Urethanes Technology reported Lyondell's statements that industrywide price increases on polyols were needed to support reinvestment in capacity. The increased cost of feedstock propylene also was cited as a reason for polyol price increases.

  e. In a December 2000/January 2001 Urethanes Technology article, BASF AG and its subsidiary, Elastogran GmbH, made public statements indicating that they expected prices of polyols, TDI, and MDI to rise globally because of "increasing demand" and the "tight supply situation." BASF also blamed high prices on "higher crude oil prices" and noted the need for "price development" to justify investment in new plants. BASF went on to state that it had had "rounds of discussions with customers" on this. In the same edition of Urethanes Technology, Lyondell defended a recent U.S. price increase by Lyondell and other suppliers as an indication of "how tight the market is."

  f. In a May 2002 publication, Chemical Market Reporter quoted Lyondell as stating that "production costs" in addition to "the uptick in demand" were strong reasons for the U.S. price increase on TDI. Dow was quoted as attributing its global price increase on polyols to the need to "partially recover eroded margins." Huntsman noted "unacceptable margins" that "will not support expansions necessary for keeping pace with demand" in connection with U.S. price increases on TDI and MDI.

  g. In an October 2002 publication, Urethanes Technology reported that Dow increased European prices for TDI and polyols in September 2002 and MDI and polyols in October 2002. Dow blamed the price increases on margins that "do not warrant necessary future investments in technology and capacity that would allow us to keep up with market growth."

DSMDB-2586788v01

h. In its February/March 2003 publication, Urethanes Technology reported that Lyondell said that "it achieved price increases and improved margins on TDI due to a tight supply situation in the market throughout 2002." In the same publication, Dow indicated that margins on TDI, MDI, and polyols were "still below satisfactory levels," and that, for all regions, "the need for margin restoration is critical. . .Dow must take immediate action to improve pricing to reasonable levels. . . . Our price increases are ongoing. . . . There will be future announcements as well and they will be implemented as quickly as possible for all products and for all regions."

i. In a March 2003 publication, Rubber & Plastic News reported that Dow, BASF, and Huntsman intended to increase U.S. prices for MDI, TDI and polyols in April 2003. BASF attributed the increase to "falling margins caused by significant and ongoing increases in raw material, energy and transportation costs." Huntsman blamed the price increase on "record highs" for raw materials, strong demand, and the need to invest in manufacturing capability. Dow cited "high and volatile oil and energy pricing . . . creating escalated raw material and distribution costs and a subsequent decrease in margins."

j. In a June 2003 article, Chemical Market Reporter quoted Huntsman as stating that its global price increases had "partly offset higher energy costs, but they have not been sufficient to return acceptable margins or protect the industry from future energy hikes." In the same article, Dow, having raised prices in the United States, stated that "[g]enerally, the overall global TDI increase is being driven by margin recovery initiatives and high energy and feedstock costs."

k. In an April 2004 article, Chemical Market Reporter quoted Huntsman as stating that favorable market conditions have resulted in some price increases on MDI, but that "any margin improvements have largely been eroded by high feedstock costs" and that Huntsman's goal, therefore, "is to see prices rise to a level at which reinvestment can be sustained." Bayer stated that its recent price increase on MDI was successfully implemented, but that the "overall performance of the TDI/MDI business continues to labor under the heavy weight of high energy and raw material costs." Dow cited "margin compression" and the high cost of raw materials and energy in connection with its U.S. price increases on MDI, TDI, and polyols. BASF blamed current market conditions and "low investment levels" for its isocyanates increases.

77. Industry publications such as Chemical Market Reporter, Urethanes Technology, Chemical Week, and others in which Defendants and their co-conspirators made representations about the reasons for price increases were widely published and reviewed by purchasers of Polyether Polyol Products, including Plaintiffs in this action. Defendants' and their co-conspirators' representations were false and pretextual and were designed to affirmatively conceal that these price increases were instead the result of Defendants' and their co-

DSMDB-2586788v01

conspirators' unlawful combination and conspiracy.  These false explanations successfully

misled Plaintiffs into believing that these increases were the result of competitive market forces

rather than unlawful collusion.  Plaintiffs could not have discovered Defendants' and their co-

conspirators' conduct because they did not have access to contemporaneous information

sufficient to allow Plaintiffs to determine that Defendants' and their co-conspirators'

justifications were false and pretextual.

78.  In addition to providing false information to be published in industry trade

publications, Defendants and their co-conspirators provided false and pretextual reasons for their

price increases in numerous letters to Plaintiffs announcing these increases at or around the same

time.  A few examples include the following:

a.  BASF, Lyondell, and Bayer all announced a polyols price increase of $.08/lb,
effective April 1, 2000.  BASF and Dow also announced a TDI price increase of $.10/lb, and
Bayer announced a TDI price increase of $.08/lb, effective April 1, 2000.  BASF's letter
regarding polyols and TDI was dated February 22, 2000, Lyondell's letter regarding polyols was
dated February 25, 2000, Bayer's letter regarding polyols and TDI was dated February 25, 2000,
and Dow's letter regarding TDI was dated February 25, 2000.  Bayer attributed the polyol and
TDI price increases to "continuing increases in raw material and energy costs" and "high levels
of demand." Lyondell blamed the polyols price increase on "rapid and sustained rise in raw
material costs."  Dow's letter regarding TDI cited "limited availability of production capabilities
and inventory."

b.  BASF and Bayer announced a MDI price increase of $.08/lb and announced
polyols and TDI price increases of $.07/lb, all effective July 1, 2000.  Bayer also announced a
polyurethanes systems price increase of $.07/lb, effective July 1, 2000.  BASF's letters regarding
MDI, polyols, and TDI were dated May 31, 2000. Bayer's letters regarding MDI and systems
were dated May 30, 2000, and its letters regarding polyols and TDI were dated May 30, 2000
and May 31, 2000.  BASF blamed the MDI price increase on "continuing deterioration of
margins" and likewise blamed the polyols and TDI price increases on "continuing deterioration
of margins" and "supply/demand" imbalances.  Bayer attributed the MDI price increase to
"significant increases in raw material and energy costs" and "rapid growth in demand."  Bayer
blamed its polyols and TDI price increases on raw material increases, energy costs, and rapid
growth in demand.  Bayer similarly blamed its systems price increase on "raw material and
energy costs."

c.  BASF, Dow, Lyondell, and Bayer announced a TDI price increase of $.12/lb,
and BASF, Bayer and Dow announced a polyols price increase of $.10/lb, all effective January 1,

DSMDB-2586788v01

2001.  In addition, Dow announced a MDI price increase of $.08/lb, effective January 1, 2001. BASF's letter regarding TDI and polyols was dated November 27, 2000, Dow's letter regarding TDI was dated November 22, 2000, its letter regarding polyols was dated November 9, 2000, and its letter regarding MDI was dated December 6, 2000, Lyondell's letter regarding TDI was dated November 29, 2000, and Bayer's letter regarding TDI and polyols was dated November 17, 2000.  BASF blamed the polyols and TDI price increases on "energy and raw material price increases" and "issues of availability of product."  Dow blamed the TDI, polyols, and MDI price increases on the "increase in raw material costs" and "erosion in margins and profitability." Lyondell cited "significant and sustained increase in raw material costs" and the "tight supply situation" as the justification for the TDI price increase.  Bayer attributed the polyols and TDI price increases to "high raw material costs" and "dramatic increases in energy costs."

79.  The reasons and justifications that Defendants and their co-conspirators provided for price increases of Polyether Polyol Products in their letters to Plaintiffs during the conspiracy period were false and pretextual and were designed by Defendants and their co-conspirators to affirmatively conceal that these price increases were instead the result of Defendants' and their co-conspirators' unlawful combination and conspiracy.  These false explanations successfully misled Plaintiffs into believing that these increases were the result of competitive market forces rather than unlawful collusion.  Plaintiffs could not have discovered Defendants' and their co-conspirators' conduct because Plaintiffs did not have access to contemporaneous information sufficient to allow Plaintiffs to determine that Defendants' and their co-conspirators' justifications were false and pretextual.

80.  The District Court of Kansas in the Polyether Class Action has already found that Defendants' false and pretextual reasons such as those alleged above constitute sufficient pleading of fraudulent concealment.

81.  Because the conspiracy was self-concealing, and Defendants and their co-conspirators also affirmatively and actively concealed the combination and conspiracy alleged herein, Plaintiffs were unaware of the fact that prices for Polyether Polyol Products had been secretly agreed upon and fixed by Defendants and their co-conspirators and could not, through the exercise of reasonable diligence, which they in fact exercised, have discovered until

DSMDB-2586788v01

November 23, 2004 that a conspiracy existed from 1999 through 2004 and could not have discovered until December 2007 that a conspiracy started before 1999 or extended to Polyether Polyol Products pricing, markets, and customers in Europe.

82. The filing of class plaintiffs' class action on November 23, 2004 and of subsequently filed related class actions tolled the statute of limitations for all class members, including U.S. Purchase Plaintiffs, and also tolled the statute of limitations with respect to Foreign Purchase Plaintiffs' claims.

COUNT II
(on behalf of Plaintiff Woodbridge Fabricating)

VIOLATION OF TENNESSEE LAW

83. Plaintiffs incorporate by reference paragraphs 1-82 as if fully set forth herein.

84. The acts committed by Defendants and their co-conspirators, as alleged herein, violated Tennessee Code section 47-25-101 and substantially affected the people and commerce of Tennessee and had impacts within the State of Tennessee. Defendants and their co-conspirators entered into an unlawful arrangement, agreement or combination:

a. Made with a view to lessen, or which tended to lessen, full and free competition in the importation or sale of Polyether Polyol Products into Tennessee; and

b. Designed, or which tended to advance or control, the prices that consumers, including U.S. Purchase Plaintiffs, paid for Polyether Polyol Products.

85. Defendants and/or their co-conspirators manufactured Polyether Polyol Products and shipped millions of dollars of Polyether Polyol Products in to the State of Tennessee to Plaintiff Woodbridge Fabricating at artificially raised prices. Additionally, defendants and/or their co-conspirators manufactured Polyether Polyol Products and shipped hundreds of millions of dollars of Polyether Polyol Products in to the State of Tennessee to other consumers in the State of Tennessee, at artificially raised prices.

DSMDB-2586788v01

86. Each of the above acts constitutes a per se violation of Tennessee Code sections 47-25-101 and 47-25-106, substantially affected the people and commerce of Tennessee and had impacts within the State of Tennessee.

87. Plaintiff Woodbridge Fabricating, which has been and is a resident of Tennessee, maintained manufacturing facilities in Tennessee for which Polyether Polyol Products were purchased from one or more of the Defendants and/or their co-conspirators, or purchased for use in Tennessee Polyether Polyol Products from one or more of the Defendants and/or their co-conspirators.

88. The Tennessee statute of limitations in this action was tolled by Defendants' and their co-conspirators' acts of fraudulent concealment and the filing of the Polyether Class Action.

89. Contracts or agreements, pursuant to which Plaintiff Woodbridge Fabricating purchased Polyether Polyol Products, were the result of, grew out of, or were otherwise connected with, the violation of Tennessee Code section 47-25-101. Plaintiff Woodbridge Fabricating is entitled to recover any payments made upon, under or pursuant to such contracts or agreements, plus interest.

COUNT III
(on behalf of Plaintiff Woodbridge Corporation)

VIOLATION OF WISCONSIN LAW

90. Plaintiffs incorporate by reference paragraphs 1-82 as if fully set forth herein.

91. The acts committed by Defendants and their co-conspirators, as alleged herein, violated Wisconsin Statute section 133.03 and substantially affected the people and commerce of Wisconsin and had impacts within the State of Wisconsin. Defendants and their co-conspirators illegally combined the acts of two or more persons for the purposes of:

DSMDB-2586788v01

a. Creating or carrying out unreasonable restraints of trade or commerce in Wisconsin; and

b. Advancing and controlling the prices that consumers, including U.S. Purchase Plaintiffs, paid for Polyether Polyol Products in Wisconsin.

92. Defendants and/or their co-conspirators manufactured Polyether Polyol Products and shipped millions of dollars of Polyether Polyol Products in to the State of Wisconsin to Plaintiff Woodbridge Corporation, and other consumers in the State of Wisconsin, at artificially raised prices.

93. Each of the above acts constitutes a contract, combination and conspiracy in restraint of trade or commerce in violation of Wisconsin Statute sections 133.03 and 133.14, and substantially affected the people of Wisconsin, substantially affected the people and commerce of Wisconsin, and had impacts within the State of Wisconsin.

94. Plaintiff Woodbridge Corporation, which has been and is a resident of Wisconsin, maintained manufacturing facilities in Wisconsin for which Polyether Polyol Products were purchased from one or more of the Defendants and/or their co-conspirators, or purchased for use in Wisconsin Polyether Polyol Products from one or more of the Defendants and/or their co-conspirators.

95. The Wisconsin statute of limitations in this action was tolled by Defendants' and their co-conspirators' acts of fraudulent concealment and the filing of the Polyether Class Action.

96. Contracts or agreements, pursuant to which Plaintiff Woodbridge Corporation purchased Polyether Polyol Products, were the result of, grew out of, or were otherwise connected with, the violation of Wis. Stat. § 133.03. Plaintiff Woodbridge Corporation is entitled to recover any payments made upon, under or pursuant to such contracts or agreements, plus interest.

DSMDB-2586788v01

COUNT IV
(on behalf of Foreign Purchase Plaintiffs)

VIOLATION OF E.U. LAW AND E.U. MEMBER STATES' LAWS

97.  Plaintiffs incorporate by reference paragraphs 1-82 as if fully set forth herein.

98.  During the damages period, Foreign Purchase Plaintiffs purchased Polyether Polyol
Products in the European Union and have suffered pecuniary injury as a result of the
infringements of E.U. Law and all other applicable E.U. Member States' laws, including, but not
limited to, Germany and the United Kingdom.

99.  Defendants' and their co-conspirators' agreements and concerted practices, as
complained of herein, had the following effects, among others:

     a.  The selling prices of Polyether Polyol Products were directly or indirectly
fixed by Defendants and their co-conspirators at supra-competitive levels; and

     b.  Competition within the common market has been prevented, restricted, or
distorted.

100.  If the cartel had not been implemented and/or given effect, the Foreign Purchase
Plaintiffs would have been able to buy Polyether Polyol Products at lower prices.

101.  By reason of these breaches, Foreign Purchase Plaintiffs have suffered loss and
damage.

102.  During the damages period, Defendants and their co-conspirators sold Polyether
Polyol Products and received payment for Polyether Polyol Products in the European Union,
including, but not limited to, in Germany and the United Kingdom.

103.  Defendants and their co-conspirators agreed to and engaged in concerted practices
which appreciably and foreseeably affected trade between and among E.U. Member States, and

DSMDB-2586788v01

prejudiced the realization of a market between and among E.U. Member States. These concerted practices had as their object and effect the prevention, restriction and distortion of competition within the common market and were conducted in a manner incompatible with the common market.

104.   Through the agreements and concerted practices complained of herein, Defendants and their co-conspirators directly or indirectly fixed selling prices of Polyether Polyol Products, in breach of Article 81(1) of the EC Treaty, and any and all other applicable E.U. Member State laws, including, but not limited to, Germany and the United Kingdom.

105.   Defendants' and their co-conspirators' agreements and concerted practices as complained of herein were not indispensable to the attainment of improved production or distribution of goods or the promotion of technical or economic progress, and did not allow consumers a fair share of any resulting benefit.

106.   These agreements and concerted practices introduced the possibility of eliminating competition in respect of Polyether Polyol Products.

107.   Defendants' and their co-conspirators' wrongful actions were carried out with knowledge of and willful disregard of the rights of the Foreign Purchase Plaintiffs, in a calculating fashion and/or with the expectation of profiting therefrom by exceeding the amounts payable to them by the Foreign Purchase Plaintiffs as a result of such wrongful actions, warranting aggravated and exemplary damages accordingly.

108.   By reason of their implementation of and/or giving effect to the Polyether Polyol Products cartel, Defendants acted in breach of:

      a.   A statutory duty imposed under Article 81(1) of the EC Treaty; and

DSMDB-2586788v01

b.  A statutory duty imposed under any and all other E.U. Member State laws not to infringe Article 81(1) of the EC Treaty, including, but not limited to, the laws of Germany and the United Kingdom.

109.  Defendants' and their co-conspirators' anticompetitive agreements and practices and their foreign effects have caused injury to the Foreign Purchase Plaintiffs in the E.U. Member States.  The Foreign Purchase Plaintiffs seek injunctive relief, and to recover the present value of actual damages sustained by them, including aggravated and exemplary damages, with appropriate interest, and any other such relief that the Court deems necessary and appropriate.

110.  The limitations periods for all claims under E.U. Law, as well as those under all other applicable E.U. Member States' laws, were tolled as a result of Defendants' and their co-conspirators' active and fraudulent concealment of their unlawful conduct, as well as by the Polyether Class Action and by the filing of the original Complaint by the Plaintiffs in the District of New Jersey on November 21, 2008.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the Court to:

a.  Enter judgment for U.S. Purchase Plaintiffs declaring that the foregoing combination and conspiracy, and the acts done in furtherance thereof, were an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

b.  Enter judgment in favor of U.S. Purchase Plaintiffs for the damages period and jointly and severally against Defendants for treble the amount of the jury verdict and for attorney's fees, costs and prejudgment interest as provided for in Section 4 of the Clayton Act;

c.  Enter judgment in favor of U.S. Purchase Plaintiffs and jointly and severally against Defendants for the full consideration paid by certain U.S. Purchase Plaintiffs for Polyether Polyol Products purchased from Defendants and their co-conspirators during the damages period in the states of Tennessee and Wisconsin.

DSMDB-2586788v01

d.  Enter judgment in favor of Foreign Purchase Plaintiffs declaring that the implementation and effect of the cartel alleged herein constitutes a breach of Article 81(1) of the EC Treaty and all other applicable E.U. Member States' laws, including, but not limited to, Germany and the United Kingdom, not to infringe Article 81(1) of the EC Treaty.

e.  Enter judgment in favor of Foreign Purchase Plaintiffs for the present value of actual damages determined to have been sustained by them by virtue of Defendants' infringements of E.U. Law, and for aggravated and exemplary damages, with appropriate interest, as allowed by law.

f.  Enjoin Defendants from continuing the unlawful conspiracy alleged herein, and from entering into any other combination, conspiracy or agreement having similar purposes or effects; and

g.  Enter, and retain jurisdiction to enter, such further orders and decrees as may be necessary or appropriate to remedy the injury to Plaintiffs or as the Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

DSMDB-2586788v01

Dated:  March 18, 2009                     Respectfully submitted,

ADAMS HOLCOMB                              DICKSTEIN SHAPIRO LLP


   R. Bruce Holcomb                        <u>/s/ Jodi Trulove</u>
   Christopher Leonardo                    Jodi Trulove
   1875 Eye Street NW, Suite 810           Richard J. Leveridge
   Washington, DC 20006                    Elaine Metlin
   (202) 580-8820                           1825 Eye Street, NW
                              Washington, DC  20006
                              (202) 420-2200

                              Attorneys for Plaintiffs

DSMDB-2586788v01