# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**IN RE URETHANE ANTITRUST LITIGATION**

**MDL No. 1616**
Civil Action No. 04-md-01616-JWL
Judge John W. Lungstrum

**THIS DOCUMENT RELATES TO:**

***Carpenter Co. et al. v. BASF SE et al.***,
Civil Action No. 08-2617-JWL

***Woodbridge Foam Corporation, et al. v. BASF SE et al.,***
Civil Action No. 09-2026-JWL

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS ALL CLAIMS

*Submitted by*

BASF Corporation
BASF SE
The Dow Chemical Company
Huntsman International LLC

*Counsel Appear on Signature Page*

April 23, 2009

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ALLEGATIONS OF THE COMPLAINTS ........................................................ 3

STANDARD OF REVIEW ................................................................................ 6

SUMMARY OF ARGUMENT .......................................................................... 7

ARGUMENT ...................................................................................................... 9

I.  THE COMPLAINT FAILS TO ALLEGE A PLAUSIBLE CLAIM FOR RELIEF FOR ALL EUROPEAN CLAIMS AND FOR ANY DOMESTIC CLAIMS ARISING PRIOR TO 2002 ....................................................... 9

    A.  U.S. Purchase Claims ........................................................................ 10

    B.  Foreign Purchase Claims .................................................................. 12

II.  THE COMPLAINTS SHOULD BE DISMISSED AS TO ALL CLAIMS ARISING BEFORE 1999 ............................................................. 12

    A.  The Standards for Pleading Fraudulent Concealment Are "Stringent." ............. 13

    B.  The Complaints Fail to Plead a Claim for Fraudulent Concealment for 1994-98 with the Required Particularity ................................ 15

III.  THE STATE LAW CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE THE NECESSARY ELEMENTS OF CONDUCT, EFFECTS, AND INJURY ........................................... 20

    A.  This Court Should Decline Supplemental Jurisdiction Over the State Law Claims Because of the Novelty and Complexity of the Remedy the Nine Plaintiffs Seek ................................................. 22

    B.  The Indiana and Tennessee State Law Claims Are Barred by the Statute of Limitations ........................................................................ 23

    C.  The State Law Claims Should Be Dismissed Because Plaintiffs Fail to Allege the Necessary Elements of Conduct, Effects, and Injury ................... 26

        1.  Indiana Antitrust Law Requires That the Alleged Anticompetitive Agreement Be Made in Indiana ...................................... 26

        2.  Plaintiffs Fail to Allege Plausible Direct and Substantial In-State Effects on Tennessee and Wisconsin Commerce. ................... 27

        3.  Plaintiffs Fail to Allege that They Suffered Antitrust Injury Occurring in State or Proximately Caused By In-State Effects of Interstate Conduct .................................................................. 33

## TABLE OF CONTENTS
### (continued)

**Page**

D.     The Nine Plaintiffs May Not Seek To Void Contracts in Other States Under the Three States' Laws Even If the Contracts Had Substantial Effects in the Three States ................................................................... 35

IV.     THE CLAIMS BROUGHT BY OR ON BEHALF OF PARENTS AND AFFILIATES SHOULD BE DISMISSED FOR LACK OF STANDING ..................... 37

CONCLUSION ........................................................................................................... 38

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ADM Co. v. Seven-Up Bottling Co. of Jasper, Inc.*,
746 So. 2d 966 (Ala. 1999) ............................................................................26

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974) .......................................................................................25

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007) ............................................................................ passim

*Berghausen v. Microsoft Corp.*,
765 N.E.2d 592 (Ind. Ct. App. 2002) .............................................................27

*Beverly Hills Fan Co v. Royal Sovereign Corp.*,
21 F.3d 1558 (Fed. Cir. 1994) .......................................................................35

*Bigelow v. Virginia*,
421 U.S. 809 (1975) .......................................................................................36

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996) ...............................................................................27, 36

*Bonaparte v. Tax Court*,
104 U.S. 592 (1881) ...............................................................................27, 36

*Bryson v. Gonzales*,
534 F.3d 1282 (10th Cir. 2008) ...................................................6, 7, 11, 33

*California v. Infineon Technologies AG*,
531 F. Supp. 2d 1124 (N.D. Cal. 2007) .........................................................31

*City of Chicago v. Int'l. Coll. of Surgeons*,
522 U.S. 156 (1997) .................................................................................2, 23

*Clulow v. Oklahoma*,
700 F.2d 1291 (10th Cir. 1983) .....................................................................13

*Coca-Cola Co. v. Harmar Bottling Co.*,
218 S.W.3d 671 (Tex. 2006) ....................................................................33, 36

*Crown Cork & Seal Co. v. Parker*,
462 U.S. 345 (1983) .......................................................................................25

*CSR Ltd. v. Cigna Corp.*,
  405 F. Supp. 2d 526 (D.N.J. 2005) ........................................................34

*Curtis v. Campbell-Taggart, Inc.*,
  687 F.2d 336 (10th Cir. 1982) ...............................................................12

*Doherty v. Teamsters Pension Trust Fund*,
  142 F. App'x 573 (3d Cir. 2005) ...........................................................23

*Emergency One, Inc. v. Waterous Co.*,
  23 F. Supp. 2d 959 (E.D. Wis. 1998) ........................................29, 32, 33

*Empagran, S.A. v. F. Hoffmann II*,
  417 F.3d 1267 (D.C. Cir. 2005) ......................................................30, 34

*F. Hoffmann-LaRoche, Ltd. v. Empagran, S.A.*,
  542 U.S. 155 (2004) .........................................................................29, 34

*Freeman Indus., LLC v. Eastman Chem. Co.*,
  172 S.W.3d 512 (Tenn. 2005) ..................................................... passim

*Ghem, Inc. v. Mapco Petrol., Inc.*,850
  S.W.2d 447 (Tenn. 1993) ......................................................................30

*Gibson v. Miami Valley Milk Producers, Inc.*,
  299 N.E.2d 631 (Ind. Ct. App. 1973) ....................................................23

*Hall v. Bellmon*,
  935 F.2d 1106 (10th Cir. 1991) ...............................................................6

*Home Ins. Co. v. Dick*,
  281 U.S. 397 (1930) .........................................................................35, 36

*Howard v. Waide*,
  534 F.3d 1227 (10th Cir. 2008) ...............................................................6

*Huntington v. Attrill*,
  146 U.S. 657 (1892) ...............................................................................36

*In Porters, S.A. v. Hanes Printables, Inc.*,
  663 F. Supp. 494 (M.D.N.C. 1987) .......................................................33

*In re Aluminum Phosphate Antitrust Litig.*,
  905 F. Supp. 1457 (D. Kan. 1995) .........................................................19

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  123 F.3d 599 (7th Cir. 1997) .................................................................28

-ii-

*In re Copper Antitrust Litig.*,
    436 F.3d 782 (7th Cir. 2006) ............................................................25

*In re DES Cases*,
    789 F. Supp. 552 (E.D.N.Y. 1992) ...................................................35

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    546 F.3d 981 (9th Cir. 2008) .......................................................33, 34

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004)..............................................................11

*In re Hydrogen Peroxide Antitrust Litig.*,
    240 F.R.D. 163 (E.D. Pa. 2007) ..........................................................9

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ...............................................11

*In re LTL Shipping Servs. Litig.*,
    No. 1:08-MD-01895-WSD, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009)................10

*In re Milk Prods. Antitrust Litig.*,
    84 F. Supp. 2d 1016 (D. Minn. 1997)................................................16

*In re Parmalat*,
    383 F. Supp. 2d 587 (S.D.N.Y. 2005)................................................33

*In re Urethane Antitrust Litig.*,
    235 F.R.D. 507 (D. Kan. 2006)................................................. passim

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .............................................................9

*King & King Enters. v. Champlin Petroleum Co.*,
    657 F.2d 1147 (10th Cir. 1981) ...........................................14, 17, 19

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)...........................................................................37

*KT & G Corp. v. Att'y Gen. of Okla.*,
    535 F.3d 1114 (10th Cir. 2008) .........................................................28

*Love Terminal Partners, L.P. v. City of Dallas*,
    527 F. Supp. 2d 538 (N.D. Tex. 2007) ................................................9

*Lyng v. N.W. Indian Cemetery Protective Ass'n*,
    485 U.S. 439 (1988)...........................................................................36

-iii-

*McLain v. Real Estate Bd. of New Orleans, Inc.*,
    444 U.S. 232 (1980).........................................................................................28

*Meyers v. Bayer AG*,
    735 N.W.2d 448 (Wis. 2007) .............................................................. passim

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984).........................................................................................11

*Mountain View Pharmacy v. Abbott Labs.*,
    630 F.2d 1383 (10th Cir. 1980) .....................................................................10

*N. Am. Philips v. Am. Vending Sales, Inc.*,
    35 F.3d 1576 (Fed. Cir. 1994)...................................................................35, 36

*New York Life Insurance Co. v. Head*,
    234 U.S. 149 (1914).........................................................................................35

*Newman v. Universal Pictures*,
    813 F.2d 1519 (9th Cir. 1987) .........................................................................9

*Olstad v. Microsoft Corp.,*,
    700 N.W. 2d 139 (Wis. 2005).............................................................28, 29, 30

*Over v. Byram Foundry Co.*,
    77 N.E. 302 (Ind. App. 1906) .......................................................................26

*Photovest Corp. v. Fotomat Corp.*,
    606 F.2d 704 (7th Cir. 1979) .........................................................................29

*Robbins v. Okla. ex rel. Dep't of Soc. Servs.*,
    519 F.3d 1242 (10th Cir. 2008) ..............................................................6, 7, 27

*Rodriguez v. Doral Mortgage Corp.*,
    57 F.3d 1168 (1st Cir. 1995)...........................................................................23

*Rozema v. Marshfield Clinic*,
    176 F.R.D. 295 (W.D. Wis. 1997)..................................................................24

*Sandidge v. Rogers*,
    167 F. Supp. 553 (S.D. Ind. 1958).................................................................23

*Segall v. Hurwitz*,
    114 Wis. 2d 471, 339 N.W.2d 333 (Wis. App. 1983) ....................................24

*State ex rel. Leech v. Levi Strauss & Co.*,
    No. 79-722 Ill, 1980 WL 4696 (Tenn. Ch. Sept. 25, 1980)...................24, 29

*State v. Waste Mgmt. of Wis., Inc.,*
    261 N.W.2d 147 (Wis. 1978) ................................................................29

*Tal v. Hogan,*
    453 F.3d 1244 (10th Cir. 2006) ....................................................27, 29

*Tecre Co., Inc. v. Buttonpro,*
    387 F. Supp. 2d 927 (E.D. Wis. 2005)...................................................35

*Turicentro, S.A. v. Am. Airlines Inc.,*
    303 F.3d 293 (3d Cir. 2002)...................................................................34

*United States v. Pearce,*
    912 F.2d 159 (6th Cir. 1980) .................................................................11

*United States ex rel. Conner v. Salina Reg. Health Ctr., Inc.*
    543 F.3d 1211 (10th Cir. 2008) ...............................................................7

*Wallin v. Dycus,*
    224 F. App'x 734 (10th Cir. 2007) ........................................................23

*Waste Connections of Kansas, Inc. v. City of Bel Aire,*
    191 F. Supp. 2d 1238 (D. Kan. 2002) ...................................................23

*White v. Graceland Coll. Ctr. for Prof. Dev. & Lifelong Learning, Inc.,*
    No. 07-2319-CM, 2008 WL 191422 (D. Kan. Jan. 22, 2008) ..................7

## STATUTES

15 U.S.C. § 15(b) ................................................................................................12

28 U.S.C. § 1367 ................................................................................................23

Indiana Code § 24-1-1-1 ......................................................................20, 26, 27

Indiana Code § 24-1-1-5 .....................................................................................20

Indiana Code § 34-11-2-4 ...................................................................................23

Tennessee Code § 47-25-101 ..............................................................................20

Tennessee Code § 47-25-106 ..............................................................................21

Wisconsin Statute § 133.14 .................................................................................20

Wisconsin Statute § 133.03 .................................................................................20

**RULES**

Fed. R. Civ. P. 8(a)(2)................................................................................................37

Fed. R. Civ. P 9.........................................................................................................16

Fed. R. Civ. P. 9(b)....................................................................................................14

Fed. R. Civ. P 12(b)(6)............................................................................................6, 7

## INTRODUCTION

In the original class action complaint, filed in 2004, a host of U.S. plaintiffs asserted Sherman Act claims against the defendant chemical companies for an alleged conspiracy to fix the prices of polyether polyol products during the period 1999-2004.  Almost four and a half years later, some 56 plaintiffs (on behalf of themselves and at least 23 other persons) from around the world have filed two amended opt-out complaints – *Carpenter Co. v. BASF SF*, Civil Action No. 08-2617-JWL ("Carpenter Compl.") and *Woodbridge Foam Corp. v. BASF SF*, Civil Action No. 09-2026-JWL ("Woodbridge Compl.") (collectively "Plaintiffs" and the "Complaints") – alleging Sherman Act and state law claims as well as foreign law claims based upon the European Community Treaty ("EC Treaty") and "any and all applicable laws" of the 27 EU Member states.[1]  For the reasons set forth below, Plaintiffs' claims, as pled, are deficient and warrant dismissal.

As an initial matter, notwithstanding the tolling limitations of the class action complaint and the fact that their Complaints are devoid of any allegations of unlawful agreement prior to 2002, these opt-out Plaintiffs seek damages they allegedly sustained as far back as 1994 (five years before the class period).  While it is conceivable that some portion of the U.S. Plaintiffs' Sherman Act allegations may ultimately survive a motion to dismiss, the Complaints as filed assert claims that are time-barred, based on conduct pre-dating the alleged unlawful agreement, and fail to satisfy the requirements of *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), and its progeny.

---

[1] Defendants have separately filed a motion to dismiss Plaintiffs' foreign law claims on jurisdictional and *forum non conveniens* grounds.  *See* Defendants' Motion for Dismissal of the European Union Claims of the Opt-Out Complaints, dated April 23, 2009 (filed concurrently herewith).

In addition, a small subset of Plaintiffs – apparently unsatisfied with the availability of treble damages under the Sherman Act – ask this Court to give broad effect to the rescissionary language contained in the antitrust laws of Indiana, Tennessee, and Wisconsin.[2]  In the hope of gaining a more lucrative remedy, these nine Plaintiffs seek to apply these statutes to *all* payments they made under their contracts, even those for which performance already has been received.  This Court should reject this ploy.  Exercising supplemental jurisdiction over such claims would not only strain "judicial economy, convenience, fairness and comity,"  *City of Chicago v. Int'l. Coll. of Surgeons*, 522 U.S. 156, 173 (1997), but the Plaintiffs asserting claims under the laws of Indiana and Tennessee failed to bring them within the relevant statute of limitations.  Moreover, even if this Court were to conclude that these nine Plaintiffs' claims were appropriate for resolution in this forum, the claims would still fail because they do not adequately allege substantial effects on in-state commerce or injury arising from such effects.

These inadequacies in Plaintiffs' Complaints are not new.  Plaintiffs originally filed their Complaints on October 17, 2008.  In response, Defendants moved to dismiss, plainly identifying (as they do now) the flaws in those Complaints.  Rather than file a response, however, Plaintiffs chose instead to amend their Complaints.  But as demonstrated below, those amendments were futile, as the Complaints remain deficient on their face.  This Court should dismiss the Sherman Act counts as pled, and dismiss the foreign and state law counts in their entirety.

---

[2] Plaintiffs originally asserted claims under the law of these states on behalf of *all* U.S. Purchase Plaintiffs, even those with no alleged nexus to the states.  Plaintiffs have withdrawn those claims in their amended Complaints after Defendants moved to dismiss these claims on constitutional and other grounds. *See* Mem. Supp. Defs.' R. 12(b)(6) Mot. Dismiss All Claims, Parts I.A., I.C., I.D., & I.E. (Dkt. 835).

## ALLEGATIONS OF THE COMPLAINTS

The Plaintiffs in these two opt-out Complaints collectively seek damages and injunctive relief under federal, state, and foreign antitrust laws against six corporate defendants (BASF SE (f/k/a BASF AG), BASF Corporation, BASF Coordination Center Comm. V., The Dow Chemical Company, Huntsman International LLC, and Lyondell Chemical Co.) and two individuals, Jean-Pierre Dhanis and Uwe Hartwig (collectively "Defendants").[3]  They allege that Defendants engaged in a "global conspiracy to fix, raise, maintain, and stabilize prices of, and allocate markets and customers for" polyether polyol products, including in the United States and Europe.  Carpenter Compl. Intro.; Woodbridge Compl. Intro.  Polyether polyol products are "intermediate chemical compounds based on propylene oxide or ethylene oxide that, among other things, are used in the manufacture of flexible foams and rigid foams," and in "the manufacture of elastomers, adhesives, sealants, coatings, and binders."  Carpenter Compl. ¶ 78; Woodbridge Compl. ¶ 37.

*Plaintiffs/Claims.*  The Complaints divide the Plaintiffs into two mutually exclusive groups:  Plaintiffs who are alleged only to have purchased products in the United States are denominated the "U.S. Purchase Plaintiffs."  Carpenter Compl. Intro., ¶ 6; Woodbridge Compl. Intro., ¶ 5.  Plaintiffs who are alleged only to have purchased products in Europe are denominated the "Foreign Purchase Plaintiffs."  *Id.*, ¶ 7; Woodbridge Compl. Intro, ¶ 6.

---

[3] Lyondell has filed a bankruptcy petition, staying these actions as to it, and accordingly it does not participate in this motion.  Defendants BASF Coordination Center Comm. V, Jean-Pierre Dhanis and Uwe Hartwig have not yet been served and therefore also do not participate in this motion.  *See* Joint Motion for Approval of Briefing Schedule for Responses to Direct Action Plaintiffs' First Amended Complaints, filed April 4, 2009 (Dkt. 908), at ¶11.

In addition to their Sherman Act claims, seven of the U.S. Purchase Plaintiffs in the Carpenter complaint separately allege violations of the Indiana, Tennessee, and Wisconsin antitrust statutes (Counts II-IV respectively).  Carpenter Compl. ¶¶ 125-145.  One Plaintiff (Flexible Foam Products) is identified as having maintained facilities in two of the states (Indiana and Wisconsin).  *Id.* ¶¶ 129, 143.  One Plaintiff in Indiana (Carpenter) and five Plaintiffs in Tennessee (Nu-Foam, Pathway Polymers, Hickory Springs, Huber, and J.M. Huber) also allegedly maintained facilities in those states.  *Id.* ¶¶ 129, 136.

The Woodbridge complaint is brought on behalf of a smaller but even more geographically diverse group of Plaintiffs.  The so-called "U.S. Purchase Plaintiffs" in the Woodbridge complaint are three American corporations and two foreign corporations from Canada and Barbados.[4]  Woodbridge Compl. ¶¶ 15-19.  In addition to alleging violations of the Sherman Act in Count I, two Woodbridge U.S. Purchase Plaintiffs seek remedies under the antitrust laws of Wisconsin and Tennessee. *Id.* ¶¶ 89, 96.

Neither of the Complaints alleges any conspiratorial sales or agreement in any of the states.  Both Complaints rely upon these state laws for reasons of remedy:  they claim that the three states' laws entitle the nine Plaintiffs to recover "the full consideration"—*i.e.*, the full amount—they paid for polyether polyol products during the relevant period.  Carpenter Compl. ¶¶ 1, 131, 138, 145; Woodbridge Compl. ¶¶ 1, 89, 96.

*Conspiracy Allegations*.  The remaining substantive allegations of the Complaints are identical.  Both Complaints allege that Defendants engaged in a conspiracy "from at least as

---

[4] Vitafoam Canada, a Plaintiff from the Carpenter complaint, is also a Canadian corporation claiming to be a "U.S. Purchase Plaintiff."

early as 1994 and continuing at least until December 31, 2004."  Carpenter Compl. ¶¶ 88-97;
Woodbridge Compl. ¶¶ 47-53.  Neither makes any specific allegations to support that broad
claim.

*First*, notwithstanding their claim that the alleged conspiracy began in 1994, the
Complaints identify no specific meeting (much less any agreement) prior to 1999.[5]  As to the
earlier period, the Complaints instead offer only vague statements that "starting at least as early
as 1994, the exact date(s) being unknown to Plaintiffs, Defendants BASF and Dow and co-
conspirator Bayer engaged in numerous meetings, discussions, and/or communications regarding
pricing of Polyether Polyol Products throughout the world, including at least in the United States
and Europe."  Carpenter Compl. ¶ 96; Woodbridge Compl. ¶ 55.

*Second*, there is no specific allegation of any agreement to fix prices before 2002; prior to
that, Plaintiffs allege only meetings in which various representatives of Defendants "discussed"
pricing, margins, and market share in the United States.  Carpenter Compl. ¶ 99.a-e; Woodbridge
Compl. ¶ 57.a-e.  According to the Complaints the first "agreement" to set prices in the United
States arises from a purported January 21, 2002 meeting between Dow and Bayer
representatives.  Carpenter Compl. ¶ 99.f; Woodbridge Compl. ¶ 57.f.

*Third*, despite inviting this Court to wade into the morass of E.U. competition law and
"any and all applicable laws" of its 27 Member states, Plaintiffs do not allege any specific

---

[5] The Complaints do allege a meeting in Brussels of indeterminate date between unidentified persons
occurring sometime "[d]uring the late 1990s or early 2000s."  Carpenter Compl. ¶ 99.a; Woodbridge
Compl. ¶ 57.a.  However, because Plaintiffs allege that "representatives of BASF, Lyondell, Dow,
Huntsman, and Bayer attended this meeting," Carpenter Compl. ¶ 99.a; Woodbridge Compl. ¶ 57.a., and
"Huntsman entered the Polyether Polyol Products markets in 1999 upon its acquisition of ICI's
polyurethanes business," Carpenter Compl. ¶ 95; Woodbridge Compl. ¶ 53, it is apparent that this
meeting is alleged to have occurred no earlier than 1999.

meeting in which Defendants agreed to fix, maintain, or stabilize European prices, or allocate European customers and markets. Instead, all that Plaintiffs could cobble together are two alleged instances where unnamed representatives of the Defendants met to discuss European pricing and market share; Plaintiffs do not allege that any unlawful agreement regarding European prices and markets was reached at those meetings. Carpenter Compl. ¶¶ 99.a, m; Woodbridge Compl. ¶ 57.a, m. The only other meetings alleged in the Complaints involve discussions of *United States* pricing and customers. Carpenter Compl. ¶¶ 99.b-l; Woodbridge Compl. ¶ 57.b-l.

## **STANDARD OF REVIEW**

In deciding a motion to dismiss under Rule 12(b)(6), this Court shall "accept all well-pleaded factual allegations in the complaint as true," *Howard v. Waide*, 534 F.3d 1227, 1242-43 (10th Cir. 2008), but need not accept conclusory allegations, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Moreover, "the complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins v. Okla. ex rel. Dep't of Soc. Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 127 S. Ct. at 1974). "'[P]lausibility' in this context … refer[s] to the scope of the allegations in a complaint." *Id.* The complaint "must … provide enough factual allegations for a court to infer potential victory," *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008), and must state "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 127 S. Ct. at 1965. "This pleading requirement serves two purposes. First, it ensures that defendants know the actual grounds of the claim against them, and can therefore prepare a defense. Second, it avoids ginning up the costly machinery associated with our civil discovery regime on the basis of a

largely groundless claim." *Bryson*, 534 F.3d at 1287 (internal quotation marks and brackets omitted); *Robbins*, 519 F.3d at 1248.

If the complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 127 S.Ct. at 1974).

> Plaintiffs thus omit important factual material at their peril. While a complaint must be "short and plain," it must also "show[ ]" (not merely assert) that relief is appropriate if it is true. Fed. R. Civ. P. 8(a)(2). Thus, despite the liberality of modern rules of pleading, a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.

*Bryson*, 534 F.3d at 1286.

This is true for all claims, whether arising under federal, state, or foreign law. *See ex rel. Conner v. Salina Reg. Health Ctr., Inc.* 543 F.3d 1211, 1216-17 (10th Cir. 2008) (applying *Twombly* standard to state law claims under Rule 12(b)(6)); *White v. Graceland Coll. Ctr. for Prof. Dev. & Lifelong Learning, Inc.*, No. 07-2319-CM, 2008 WL 191422, at *3 (D. Kan. Jan. 22, 2008) (same).

## SUMMARY OF ARGUMENT

Plaintiffs' claims should be dismissed. Not only do they fail to state a claim arising before 2002, but there is no specific allegation of any agreement to fix U.S. prices prior to that date. The European claims do not survive in any fashion; Plaintiffs make no specific and plausible allegation under *Twombly* of any agreement among Defendants to fix European prices at any time.

And, apart from the inadequacy of the substantive allegations of the Complaints, the fraudulent concealment allegations fall far short of meeting the stringent pleading standards that would permit Plaintiffs to justify stretching their claims backward from 1999 (the date alleged to be the beginning of the conspiracy by the class action complaint from which Plaintiffs opted out) to 1994.

Nor should this Court exercise its discretion to entertain any of the state law claims asserted by the small subset of Plaintiffs that now asserts them.  To begin with, the claims for at least two of the three states are barred by those states' statutes of limitation, leaving, at most, the claims of two Plaintiffs under Wisconsin law.  Moreover, none of the three state laws invoked by the nine Plaintiffs has the broad extraterritorial reach that Plaintiffs claim.  The Indiana statute provides a remedy only for unlawful agreements in restraint of trade that are formed in Indiana (no such agreement is alleged in either complaint).  And the Tennessee and Wisconsin statutes require "substantial effects" on commerce in the state, not merely an effect on individual companies.  The Complaints' allegations of such effects are wholly conclusory.  Furthermore, none of the invoked state laws provides redress for persons who are not proximately injured in conjunction with an injury to in-state consumers (through the direct action of the defendant or by the effects of the alleged price-fixing conspiracy).  And none of the nine Plaintiffs alleges that in-state consumers were injured by purchasing the product in any of the three states at falsely inflated prices; indeed, each fails to distinguish between injury to itself and injury to in-state commerce.

Even if the nine Plaintiffs could correctly plead the elements of a state law claim – and they cannot – their purported rescission remedy cannot constitutionally be applied to void out-of-

state contracts.  Under the doctrine of constitutional avoidance, the state statutes here cannot be construed to provide the remedy Plaintiffs seek.

## **ARGUMENT**

## I.     **THE COMPLAINT FAILS TO ALLEGE A PLAUSIBLE CLAIM FOR RELIEF FOR ALL EUROPEAN CLAIMS AND FOR ANY DOMESTIC CLAIMS ARISING PRIOR TO 2002.**

Extraterritoriality issues aside, the Complaints do not remotely meet the *Twombly* standard as to any U.S. conspiracy claims prior to 2002, or as to any of the EU conspiracy claims.  Under *Twombly*, "to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a specific time, place, or person involved in the alleged conspiracies to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (internal quotation marks omitted).  The plaintiff "must plead not just ultimate facts" such as "'conspiracy' or even 'agreement,'" but must also "plead the necessary evidentiary facts to support those conclusions."  *Id.* at 1047-48.  When a multiyear conspiracy is alleged, the complaint must also contain plausible allegations that a conspiracy had been formed as of the dates alleged.  *See Love Terminal Partners, L.P. v. City of Dallas*, 527 F. Supp. 2d 538, 553-54 (N.D. Tex. 2007) (dismissing under *Twombly* allegations of an alleged conspiracy before March 2006; "[t]he court holds that concerning the period before early 2006, the complaint lacks 'enough heft to show that [plaintiffs are] entitled to relief'"); *see also Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir. 1987) (affirming dismissal of alleged antitrust violation where plaintiffs' purported injury occurred before conspiracy commenced); *In re Hydrogen Peroxide Antitrust Litig.*, 240 F.R.D. 163, 177 (E.D. Pa. 2007) (on class certification, striking

allegations of price fixing before September 14, 1994, based only on "unsupported allegations that defendants engaged in a conspiracy"). Furthermore, "[t]o provide adequate notice, a complaint in a complex, multi-party suit may require more information than a simple, single party case." *Mountain View Pharmacy v. Abbott Labs.*, 630 F.2d 1383, 1386-87 (10th Cir. 1980).

### A.      U.S. Purchase Claims

Despite their assertion of a conspiracy beginning in 1994, the Complaints identify no specific meetings among Defendants prior to 1999. Instead, all that Plaintiffs can muster is that "starting at least as early 1994, the exact date(s) being unknown to Plaintiffs, Defendants BASF and Dow and co-conspirator Bayer engaged in numerous meetings, discussions, and/or communications regarding pricing of Polyether Polyol Products throughout the world, including at least in the United States and Europe." Carpenter Compl. ¶ 95; Woodbridge Compl. ¶ 53. Such vague allegations without specificity as to time, place, person, or content do not satisfy *Twombly*. 127 S. Ct. at 1971 n.10; *see also In re LTL Shipping Servs. Litig.*, No. 1:08-MD-01895-WSD, 2009 WL 323219, at *10 (N.D. Ga. Jan. 28, 2009) ("for allegations of conspiracy to reach the plausibility threshold required by *Twombly*, they often must include factual allegations such as the specific time, place, and persons involved in the conspiracy alleged.") (citing *In re S.E. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 942 (E.D. Tenn. 2008)).

Further, the Complaints allege no actual agreement before 2002 (and simply alleging meetings is not enough). Carpenter Compl. ¶ 99.f; Woodbridge Compl. ¶ 57.f. This failure is fatal to Plaintiffs' claims for damages prior to that date: "The existence of an agreement is '[t]he very essence of a section 1 claim.'" *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir.

-10-

2004).  As the Supreme Court in *Twombly* made clear:  a complaint must allege "enough factual matter (taken as true) to suggest that *an agreement was made*," 127 S. Ct. at 1965 (emphasis added), and complaints that "furnish[] no clue as to which of the … [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place," are insufficient, *id.* at 1971 n. 10.  *See also In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (*Twombly* requires "concrete allegations about the content and circumstances of any actual agreement").  As in *Twombly*, the Complaints here contain no direct or inferential allegation of an agreement to fix prices before 2002, *i.e.*, a "unity of purpose or a common design and understanding or a meeting of minds" or "a conscious commitment to a common scheme."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation marks omitted); *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1980) ("[M]ere association with conspirators is not enough to establish participation in a conspiracy."); *Bryson*, 534 F.3d at 1286.  Nor do the scattered allegations that the Plaintiffs "discussed" pricing, margins, and market share in the United States in meetings between 1999 and 2002 constitute a plausible allegation that any of the Defendants actually agreed to fix prices or allocate markets in that time period.  Carpenter Compl. ¶ 99.a-e; Woodbridge Compl. ¶ 57.a-e.[6]

---

[6] Notably, the first allegation of any agreement to fix prices in the United States is made in connection with a purported January 21, 2002 meeting between Dow and Bayer representatives.  Carpenter Compl. ¶ 99.f; Woodbridge Compl. ¶ 57.f.  Plaintiffs' specific (albeit incorrect) averment of an agreement arising from that meeting, but not from earlier meetings, establishes that they lack the factual basis to allege agreement in prior periods (or they presumably would have made appropriate allegations).  Even in amending their Complaints, Plaintiffs have been unable to allege that an agreement was reached at any specific meeting.  Their amended catch-all paragraph merely adds that "Defendants had numerous other meetings and communications" in the United States and Europe "to agree" on price-fixing in the United States and abroad.  Carpenter Compl. ¶ 99.n; Woodbridge Compl. ¶ 57.n; *compare* Original Carpenter Compl. ¶ 101; Original Woodbridge Compl. ¶ 60.  But such a half-hearted allegation is inadequate under *Twombly*, and Plaintiffs' inability to make a substantive amendment to any other paragraph underscores the fatal deficiency of the Complaints.

B.     **Foreign Purchase Claims**

The Complaints serve even thinner gruel with regard to the claims of the Foreign

Purchase Plaintiffs.  They make no specific allegations *for any time period* of any agreement to

fix European prices or allocate European customers and markets.  The sole allegations regarding

European markets are perfunctory assertions "upon information and belief" that in Brussels in

1994 and then again "[d]uring the late 1990s or early 2000s" representatives of Defendants

"discussed pricing and stability of market share for Polyether Polyol Products."  Carpenter

Compl. ¶¶ 99.a, m; Woodbridge Compl. ¶ 57.a, m.  The other meetings alleged concern only

*United States* pricing and customers.  *See* Carpenter Compl. ¶¶ 99.b-l; Woodbridge Compl.

¶ 57.b-l.  Thus, even if the EU claims are not dismissed for jurisdictional or *forum non*

*convenience* reasons (*see supra* at 3, n.3), they must be dismissed under *Twombly* because the

Complaints are devoid of any plausible and concrete allegation of an agreement to restrict

competition in Europe.


II.     **THE COMPLAINTS SHOULD BE DISMISSED AS TO ALL CLAIMS**
        **ARISING BEFORE 1999.**

The Sherman Act requires a plaintiff to bring claims within a four-year period.  15 U.S.C.

§ 15(b); *Curtis v. Campbell-Taggart, Inc.*, 687 F.2d 336, 337 (10th Cir. 1982).  The Complaints,

originally filed in late 2008, allege a conspiracy beginning as early as 1994 and continuing

through at least December 2004.  Carpenter Compl. ¶ 2; Woodbridge Compl. ¶ 2.  Although this

fact ordinarily would bar the majority of Plaintiffs' claims, this Court previously has ruled, in

connection with the class complaint, that the fraudulent concealment allegations asserted by the

class were sufficiently pled to survive threshold review.  *In re Urethane Antitrust Litig.*, 235

-12-

F.R.D. 507, 518 (D. Kan. 2006) (Lungstrum, J.) (hereinafter *Urethanes*) (permitting claims for 1999-2000, beyond the four-year limitations period).

But the opt-out Plaintiffs attempt to expand dramatically, without any reasonable limitation whatsoever, on the claims revived by the Court's ruling.  These Complaints purport to state an eleven-year conspiracy period, adding the years 1994-1998 to the period covered by the class claims.  Carpenter Compl. ¶¶ 109-24; Woodbridge Compl. ¶ 67-82.  Plaintiffs profess to have found evidence both of a price-fixing conspiracy in 1994-1998 (although they make no specific allegations of agreement in that period), and of a consistent program of concealment of that conduct that lasted (so the Complaints allege) until the opt-outs reached their own settlement with Bayer.  Carpenter Compl. ¶ 112; Woodbridge Compl. ¶ 71.  Following that settlement, Plaintiffs claim they "diligently pursued cooperation" and "acquired information" from Bayer that unshrouded the supposed conspiratorial conduct that began in 1994 and continued throughout the five-year period prior to 1999.  *Id.*  But even these allegations fail to save Plaintiffs' claims from dismissal.

### A.   The Standards for Pleading Fraudulent Concealment Are "Stringent."

To establish a claim for fraudulent concealment, a plaintiff is "required to 'allege facts showing affirmative conduct upon the part of the defendant which would … lead a reasonable person to believe that he did not have a claim for relief.'"  *Clulow v. Oklahoma*, 700 F.2d 1291, 1301 (10th Cir. 1983) (quoting *Rutledge v. Boston Woven House & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978)).  A party seeking to toll the statute of limitations based on fraudulent concealment must allege:  (1) the use of fraudulent means by the defendants; (2) successful concealment from the plaintiffs; and (3) that the plaintiffs did not know or by the exercise of due

-13-

diligence could not have known that they might have a cause of action. *Urethanes*, 235 F.R.D. at 518 (citing *Ballen v. Prudential Bache Sec., Inc.*, 23 F.3d 335, 337 (10th Cir. 1994)).

Courts in this Circuit recognize this as a "stringent" standard, *King & King Enters. v. Champlin Petroleum Co.*, 657 F.2d 1147, 1154 (10th Cir. 1981), and "a claim of fraudulent concealment to toll the statute of limitations is subject to dismissal if a plaintiff fails to plead the first element … with particularity as required by Rule 9(b)." *Urethanes*, 235 F.R.D. at 517; *see* Fed. R. Civ. P. 9(b) ("in all averments of fraud …, the circumstances constituting fraud … shall be stated with particularity."). Vague and general allegations do not suffice. Rather, "a complaint alleging fraud must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *Id.* (quoting *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000)). Put differently, a plaintiff must "set out the 'who, what, where and when' of the alleged fraud." *Id.*

Judged under the standards laid out in the Court's prior ruling in this very case, the Complaints fail to plead facts with the particularity required to support an allegation of fraudulent concealment in the five-year period prior to 1999.

### B.   The Complaints Fail to Plead a Claim for Fraudulent Concealment for 1994-98 with the Required Particularity.

Plaintiffs attempt to satisfy the first prong of the fraudulent concealment test by including five examples of alleged affirmative acts taken by the Defendants to conceal the purported conspiracy. Carpenter Compl. ¶ 114; Woodbridge Compl. ¶ 72. The first three relate to alleged "secret" meetings among representatives of the defendants and purported "agreements" reached at these meetings. Carpenter Compl. ¶ 114.a-c; Woodbridge Compl. ¶ 72.a-c. The other two

-14-

relate to purported "pretexts" used by Defendants in their communications with Plaintiffs, and Defendants' "denial" of the conspiracy throughout this litigation.

As to the alleged "secret" meetings, although Plaintiffs cross-reference paragraphs of the Complaints that purportedly describe these alleged meetings, a careful review of those paragraphs reveals not a single specific allegation of a meeting or agreement in any of the five years prior to 1999.[7] Carpenter Compl. ¶¶ 95, 96, 98, 99; Woodbridge Compl. ¶¶ 53, 54, 56, 57.

The other paragraphs cited as support for alleged pre-1999 meetings and agreements offer only vague generalities that fall far short of Plaintiffs' obligation to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Urethanes*, 235 F.R.D. at 517 (internal citations omitted). The Complaints claim that the purported conspiracy began in 1994 and involved alleged "meetings, discussions, and/or communications" between Dow, BASF and Bayer, but fail to set forth any allegation of who attended these meetings, the location and date they occurred, what was discussed, or what agreements were purportedly reached. Carpenter Compl. ¶ 95; Woodbridge Compl. ¶ 53. And the Complaints' assertion that meetings and telephone conversations occurred throughout the world, Carpenter Compl. ¶ 97; Woodbridge Compl. 54, and that conspiratorial "communications" occurred at trade association events, without any identification of any specific meeting or participant, Carpenter Compl. ¶ 98; Woodbridge Compl. ¶ 56, is just more of the same.

---

[7] One meeting is alleged to have occurred "[d]uring the late 1990s or early 2000s," but it is readily apparent that any such meeting must have occurred subsequent to January 1999 since Huntsman is alleged to have participated. *See* n. 4 *supra*. In any event, the Complaints' vague claim that "[u]pon information and belief, representatives of BASF, Lyondell, Dow, Huntsman, and Bayer attended this meeting" without any supporting detail would be insufficient under this Court's particularity standard as laid out in *Urethanes*. Carpenter Compl. ¶ 99.a; Woodbridge Compl. ¶ 57.a.

But as this Court correctly discerned in previously rejecting such generic pleading of "meetings" and "agreements," it is beyond easy for antitrust plaintiffs to allege that industry producers met or discussed or agreed.  Producers do so regularly, for entirely legitimate reasons.  Rote pleading of "meetings" and "agreements" – particularly for meetings that would extend the expired statute of limitations back five years – does not satisfy the particularity requirement for accusing them of executing a fraud to conceal misconduct.  Where "plaintiffs' complaint still fails to provide any detail regarding the allegedly secret meetings among the defendants or any agreement(s) among them not to disclose their alleged price-fixing conspiracy," Rule 9's standard is not met; "plaintiffs cannot rely on those allegations … because those allegations are not pled with particularity."  *Urethanes*, 235 F.R.D. at 517; *see also In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997) ("Vaguely alleging that 'something' occurred at 'sometime' fails to satisfy the [affirmative concealment] requirement.").

Similarly deficient are the Complaints' allegations that Defendants gave false and pretextual reasons for price increases.  Here again, the paucity of allegations regarding pre-1999 conduct is glaring, particularly for Plaintiffs that had full access to Bayer cooperation and surely could have assembled evidence of specific instances in which Defendants colluded on pretextual reasons to support price announcements, if such evidence existed.

The Complaints allege eleven instances in which industry publications reported price announcements that, Plaintiffs contend, were bathed in pretext.  Carpenter Compl. ¶ 118; Woodbridge Compl. ¶ 76.  But only two such announcements occurred prior to 1999, and the circumstances of neither are pled with any particularity.  Plaintiffs cite a statement in a September 1994 article by a U.S. subsidiary of one alleged conspirator that it "had advised that

U.S. prices for isocyanates *might* be increased industry wide in the first half of 1995, due to pent-up demand."  Carpenter Compl. ¶ 118.b (emphasis added); Woodbridge Compl. ¶ 76.b.  But there is, of course, nothing fraudulent on the face of a statement that pent-up demand might result in higher prices in the future.  And Plaintiffs offer nothing to suggest that the company making this statement did not have reason to believe it.  (Indeed, demand is not a factor the purported conspirators could control, and it is an odd conspiracy that relies for its mechanism of concealment on false statements of easily verifiable facts to an industry magazine that could quickly disprove them.)  Nor do they explain why a similar non-specific statement by another Defendant related to a July 1994 MDI price increase provides the specificity required to show the type of "affirmative act" of concealment a plaintiff must plead in support of a claim of fraudulent concealment.  Carpenter Compl. ¶ 118.a; Woodbridge Compl. ¶ 76.a.; *King & King*, 657 F.2d at 1155.  They do not explain it, because they cannot.

In the same vein, the Complaints assert that the reasons given by Defendants for the price increases in the letters to Plaintiffs were false and pretextual.  But once again, these allegations provide no basis for reviving pre-1999 claims.  Seven of the eight price announcements identified by Plaintiffs occurred after 1999.  Carpenter Compl. ¶ 120; Woodbridge Compl. ¶ 78.  And the sole pre-1999 increase allegedly took effect in July 1998.  Of course, Plaintiffs never explain how a July 1998 price announcement, even if pretextual, justifies extending the limitations period back to 1994.  If there truly was a continuous conspiracy to conceal price-fixing dating from 1994, a lone announcement in mid-1998 would hardly constitute the "stringent" proof required to demonstrate it.  Moreover, the Complaints allege only that "BASF" described this increase as related to its "ability to make investments to support urethanes growth," and that Bayer described its increase as countering erosion of margins due to

-17-

"continued increases in environmental and transportation costs."  Carpenter Compl. ¶ 120.a; Woodbridge Compl. ¶ 78.a.  (The Complaints do not state how Dow explained the increase, and thus provides no basis for inferring that Dow used a pretext in connection with this announcement.)  But Plaintiffs do not allege, much less offer a concrete basis for believing, that Defendants' explanations were anything less than truthful.  Under this Court's earlier opinion, conclusory assertions that such statements were "false and pretextual" hardly constitute the "stringent" proof required to demonstrate fraudulent concealment.  *Urethanes*, 235 F.R.D. at 517 (vague generalities fall far short of Plaintiffs' obligation to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof") (internal citations omitted).

Finally, Plaintiffs' throwaway line that Defendants have "den[ied] the existence of the conspiracy in connection with" the ongoing class action (thereby implying that those denials are affirmative acts sufficient to support a fraudulent concealment claim) is just that, a throwaway. Carpenter Compl. ¶ 114.e; Woodbridge Compl. ¶ 72.e.  It is well established in this Circuit that such an argument has no merit.  *See King & King*, 657 F.2d at 1155 ("A denial of an accusation of wrongdoing does not constitute fraudulent concealment"); *see also In re Aluminum Phosphate Antitrust Litig.*, 905 F. Supp. 1457, 1470 (D. Kan. 1995) ("The fact that defendants did not confess their price-fixing conspiracy to the Department of Justice does not comprise a fraudulent act of concealment.").[8]

---

[8] The Department of Justice concluded its investigation into Polyether Polyol Products without charging any of the defendants.  *See* Defendants' Joint Mem. in Opp. to Plaintiffs' Motion for Class Certification for MDI, TDI, and Polyether Polyols at 7-8 (Dkt. 686).

At bottom, Plaintiffs' failure to plead affirmative conduct with sufficient particularity to satisfy the fraudulent concealment test is striking in light of Plaintiffs' heavy touting of their "diligent[] pursui[t]" of information obtained through their cooperation agreement with Bayer. Carpenter Compl. ¶ 112; Woodbridge Compl. ¶ 70.  Yet those many months of cooperation produced less than a smattering of vague references to acts and statements in the 1994-98 period that on their face are completely innocent.  Defendants are not surprised.  What Bayer proffered to the Department of Justice was not enough to lead the government to seek pleas or indictments from the other polyether polyol producers.  Why should its cooperation with the opt-out Plaintiffs produce a different result?  The Court should dismiss Plaintiffs' damages claims for the 1994-1998 period.

## III.   THE STATE LAW CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE THE NECESSARY ELEMENTS OF CONDUCT, EFFECTS, AND INJURY.

In addition to their Sherman Act claims, nine out of the 79 Plaintiffs tack on additional claims under the antitrust laws of three states:  Indiana, Tennessee, and Wisconsin.[9]  The selection of these three states is not an accident:  the antitrust provisions of all three states' statutes contain unique "full consideration" remedy language that purportedly would permit these Plaintiffs to obtain the return of *all* payments made on contracts found to violate state law, *regardless* of the actual damages suffered.  The Wisconsin statute (titled "Illegal contracts void; recovery") reads:

---

[9] Indiana Code §§ 24-1-1-1 and 24-1-1-5, *available at* http://www.in.gov/legislative/ic/code/title24/ar1/ch1.html; Tennessee Code §§ 47-25-101 and 47-25-106, *available at* http://www.michie.com/tennessee/lpext.dll?f=templates&fn=main-h.htm&cp=tncode; and Wisconsin Statutes §§ 133.03 and 133.14, *available at* http://nxt.legis.state.wi.us/nxt/gateway.dll?f=templates&fn=default.htm&d=stats&jd=133.04.

-19-

> All contracts or agreements made by any person while a member
> of any combination or conspiracy prohibited by s. 133.03, and
> which contract or agreement is founded upon, is the result of,
> grows out of or is connected with any violation of such section,
> either directly or indirectly, shall be void and no recovery thereon
> or benefit therefrom may be had by or for such person. Any
> payment made upon, under or pursuant to such contract or
> agreement to or for the benefit of any person may be recovered
> from any person who received or benefited from such payment …

Wisconsin Statute § 133.14.  The Indiana statute, dating from 1897, similarly authorizes suits to recover "the full consideration or sum paid by" a purchaser for articles "the sale of which is controlled by [a] combination or trust" prohibited under the state's "[c]ontracts against public policy; null and void contracts" provision.  Indiana Code §§ 24-1-1-5, 24-1-1-1.[10]  And the Tennessee statute, which dates from 1891, uses the same "recover … the full consideration or sum paid" language.  Tennessee Code § 47-25-106.  Based upon these statutes – which are largely untested in modern-day antitrust litigation – Plaintiffs ask this Court to "[e]nter judgment in favor of U.S. Purchase Plaintiffs … for the full consideration paid by certain U.S. Purchase Plaintiffs … during the damages period in the states of Indiana, Tennessee, and Wisconsin."[11] Carpenter Compl. Prayer c..; Woodbridge Compl. Prayer c.

---

[10] The Indiana provision on "[c]ontracts against public policy; null and void contracts" reads (§24-1-1-1):

> From and after April 14, 1897, all arrangements, contracts, agreements, trusts, or
> combinations between persons or corporations who control the output of any article of
> merchandise, made with a view to lessen, or which tend to lessen, full and free
> competition in the importation or sale of articles imported into this state, and all
> arrangements, contracts, agreements, trusts, or combinations between persons or
> corporations who control the output of said article of merchandise, designed, or which
> tend to advance, reduce, or control the price or cost to the producer or to the consumer of
> any such product or article, are hereby declared to be against public policy, unlawful, and
> void.

[11] While the state law counts in the Complaints are brought on behalf of the nine identified Plaintiffs, the prayer for relief in each Complaint could be read to imply that *all* 30 U.S. Purchase Plaintiffs may recover the consideration paid by "certain U.S. Purchase Plaintiffs."  Carpenter Compl. Prayer c.; Woodbridge Compl. Prayer c.  Judgment cannot be entered on behalf of plaintiffs who raise no state law

-20-

This Court should reject Plaintiffs' invitation for at least four reasons.  *First*, this Court should decline to exercise supplemental jurisdiction over the state law claims.  There is no need for this Court to adjudicate claims that only will distract from resolving this already expansive MDL action.  Courts in the respective states unquestionably are better situated to address the novel state law remedies that these Plaintiffs seek.  *Second*, even if this Court were to exercise jurisdiction, it should reject the claims brought under Indiana and Tennessee law because they were not brought within the applicable statute of limitations.  *Third*, because Plaintiffs misconceive the reach of these state laws, the Complaints suffer from severe *Twombly* defects. The Complaints, for example, do not make any plausible averments that the supposed anticompetitive conduct occurred in the three states much less substantially affected in-state commerce.  They similarly fail to allege that Plaintiffs in the three states suffered the requisite injury to satisfy requirements of antitrust standing (and avoid extraterritorial application of state law).  *Fourth*, even if state law applied to any of Plaintiffs' claims, the rescissionary "full consideration" remedy cannot constitutionally be applied to void out-of-state contracts.  The state law claims in Counts II-IV of the Carpenter complaint and Counts II-III of the Woodbridge complaint should be dismissed in their entirety.

### A.   This Court Should Decline Supplemental Jurisdiction Over the State Law Claims Because of the Novelty and Complexity of the Remedy the Nine Plaintiffs Seek.

This Court has a full plate with the pending MDL class claims and with what little of these opt-out Complaints may remain.  As such, it is not obligated to extend Kansas hospitality to these nine Plaintiffs' effort to complicate matters further by entertaining constitutionally

---

claims, and Defendants assume for purposes of this motion that only the nine Plaintiffs named in the state law Counts seek to recover under the respective state laws.

suspect state law remedies that have no connection to this Court, or to the transferor court in New Jersey, or indeed the vast majority of the Plaintiffs.

The nine Plaintiffs' attempt to hijack state rescissionary remedies for void contracts and to elevate those remedies to equal standing with the federal antitrust damages rules of the Sherman and Clayton Acts reflects vast overreaching.

But even if those remedies could be interpreted under the laws of Indiana, Tennessee, or Wisconsin to extend as far as these nine Plaintiffs wish, this Court would have good reason to decline to entertain them under federal supplemental jurisdiction, in the interests of "judicial economy, convenience, fairness and comity."  28 U.S.C. § 1367; *City of Chicago v. Int'l. Coll. of Surgeons*, 522 U.S. 156, 173 (1997).  This is particularly true where, as here, adjudication of these claims would present the Court with a welter of novel and complex issues of state law in multiple jurisdictions.  *Wallin v. Dycus*, 224 F. App'x 734, 740 & n.5 (10th Cir. 2007) (noting that district court declining supplemental jurisdiction owing to state law complexity was appropriate even where there are a "number of precedents indicating a trend" in state law at issue); *Doherty v. Teamsters Pension Trust Fund*, 142 F. App'x 573, 575 (3d Cir. 2005) (finding abuse of discretion where district court exercised supplemental jurisdiction where novel and complex issue of assignability of legal malpractice claims was as of yet undecided in New Jersey); *Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995) (noting that it "may be wise to forgo the exercise of supplemental jurisdiction when the state law that undergirds the nonfederal claim is of dubious scope and application"); *Waste Connections of Kansas, Inc. v. City of Bel Aire*, 191 F. Supp. 2d 1238, 1243 n.6 (D. Kan. 2002) (requiring parties to show cause as to why the court should exercise supplemental jurisdiction owing to novelty of state law claims) (internal citations omitted).

**B.    The Indiana and Tennessee State Law Claims Are Barred by the Statute of Limitations.**

Were the Court to accept the Complaints' allegations of fraudulent concealment, the claims of certain Plaintiffs under Indiana and Tennessee law nonetheless are time-barred. Indiana's limitations period is two years.[12]  The opt-out Plaintiffs clearly had notice of the claims no later than the filing of the *Seegott* actions, and thus were required to file any Indiana state antitrust claims before November 2006.  They failed to do so.  Similarly, under Tennessee's three-year limitations period, Plaintiffs' opportunity to bring their state law claims expired no later than November 2007.[13]

Apparently recognizing this, Plaintiffs attempt to rely on the filing of the class actions to salvage their untimely claims.  Both Complaints contend that "[t]he filing of class plaintiffs' class action on November 23, 2004" – the *Seegott* and related complaints – "and of other subsequently filed related class actions tolled the statute of limitations for all class members, including the U.S. Purchase Plaintiffs, and also tolled the statute of limitations with respect to Foreign Purchase Plaintiffs' claims."  Carpenter Compl. ¶ 124; Woodbridge Compl. ¶ 82.  But the *Seegott* class complaints asserted only federal Sherman Act claims and therefore created no tolling effect on claims that class members, including opt-out Plaintiffs, might have under any *other* law.  As discussed below, the Plaintiffs that assert claims under Indiana and Tennessee law – which made their first appearance in the two opt-out Complaints at issue – are barred by the

---

[12] Ind. Code § 34-11-2-4; *Gibson v. Miami Valley Milk Producers, Inc.*, 299 N.E.2d 631, 637 (Ind. Ct. App. 1973); *Sandidge v. Rogers*, 167 F. Supp. 553 (S.D. Ind. 1958).

[13] *State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722 Ill, 1980 WL 4696, at *3 (Tenn. Ch. Sept. 25, 1980).  Wisconsin has a limitations period of six years, and Defendants do not move to dismiss the 1999-2004 claims of the amended Complaints as time-barred under Wisconsin law.  *Rozema v. Marshfield Clinic*, 176 F.R.D. 295, 302 (W.D. Wis. 1997) (citing Wis. Stat. Ann. § 133.18(2)); *Segall v. Hurwitz*, 114 Wis. 2d 471, 339 N.W.2d 333, 339-40 (Wis. App. 1983) (discussing change from two-year to six-year limitations period in 1980 amendment).

-23-

applicable statutes of limitations, and cannot be rescued by any tolling effect of the *Seegott* proceeding.

Tolling law is simple.  Filing a complaint on behalf of a putative class tolls the statute of limitations as to prospective class members, but *only* for the claims that are pled against defendants in the class action.  "[T]he commencement of a class action suspends *the applicable* statute of limitations as to all asserted members of the class" during the period in which the class claims are pending.  *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) (emphasis added).  This rule, however, "should not be read, however, as leaving a plaintiff free to raise different or peripheral claims" after opting out or denial of class certification.  *Crown Cork & Seal Co. v. Parker*, 462 U.S. 345, 355 (1983) (Powell, J., concurring).  And it does not matter if the later-filed antitrust claims are "functionally equivalent" to the earlier-filed claims: "[f]unctional equivalence … is not enough to trigger tolling," even where the claims asserted are both antitrust counts under the federal Sherman Act and under a state's comparable antitrust statute.  *In re Copper Antitrust Litig.*, 436 F.3d 782, 793-96 (7th Cir. 2006) (Cudahy, J., for the panel).  To the contrary, the *American Pipe* rule is available only to the extent the later-filed case proceeds under the *same* legal basis as the earlier one.  *Id.*

In short, whatever tolling effect *Seegott* had on the federal claims of these opt-out Plaintiffs, it had *no* tolling effect as to the claims pled under Indiana, Tennessee, or Wisconsin state law, nor any effect as to the EU law claims.[14]   The Indiana and Tennessee state antitrust

---

[14] Plaintiffs declare that the filing of the *Seegott* class action "tolled the statute of limitations with respect to the Foreign Purchase Plaintiffs' claims."  Carpenter Compl. ¶ 124; Woodbridge Compl. ¶ 82.  The Foreign Purchase Plaintiffs (who are not alleged to have purchased polyester polyol products in the U.S. and bring no Sherman Act or other U.S. claims) are not members of the *Seegott* class.  *See* Mem. & Order at 8 (defining class as U.S. purchasers) (Dkt. 708).  They therefore can claim no tolling effect from claims that were not brought in *Seegott.*  Moreover, it is improbable that European laws that do not permit class

claims, accordingly, are barred by the applicable statutes of limitations and must be dismissed.

    **C.**    **The State Law Claims Should Be Dismissed Because Plaintiffs Fail to Allege the Necessary Elements of Conduct, Effects, and Injury.**

        **1.**    **Indiana Antitrust Law Requires That the Alleged Anticompetitive Agreement Be Made in Indiana.**

Two Plaintiffs, Carpenter and Flexible Foam Products, seek to assert a claim under Ind. Code § 24-1-1-1, *see* n. 10, *supra*, which declares void as against public policy certain agreements and contracts that are "made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state" or are "designed, or which tend to advance, reduce, or control the price or the cost to the producer or to the consumer of any such product or article." Thus, Indiana Code § 24-1-1-1, by its terms, limits itself to anticompetitive conduct regarding "the importation or sale of articles imported into this state." *Id.* Indiana courts have interpreted the provision's predecessor statute as requiring the anticompetitive agreement to be made in Indiana for § 24-1-1-1 to apply. *Over Byram Foundry Co.*, 77 N.E. 302, 304 (Ind. App. 1906)("The contract [proscribed by the statute] must be made within the state, but the monopoly, in the legislative mind, could not have been limited to the state, since the thing guarded against has relation wholly to goods made without the state."). Other state courts recently have upheld similar statutes requiring in-state conduct for their antitrust laws to apply. *See, e.g.*, *ADM Co. v. Seven-Up Bottling Co. of Jasper, Inc.*, 746 So. 2d 966, 989-90 (Ala. 1999). Here, because the Complaints do not claim that any part of the alleged

---

actions would authorize class action tolling. And in any event, the amended Complaint does not provide information sufficient to know which of the laws of the 27 EU Member States govern each of the Foreign Purchase Plaintiffs' claims, and thus govern questions of limitations periods, tolling, and fraudulent concealment. As noted in the companion briefing on the motion to dismiss the EU claims (*see* Part I.C.3 of the legal memorandum filed today in support of the motion to dismiss the EU claims), the EU claims asserted in the opt-out Complaints would encounter serious statute of limitations problems if they are permitted to proceed in this Court.

agreement to engage in anticompetitive conduct occurred in Indiana,[15] they are not actionable under Indiana law.  *Byram Foundry*, 77 N.E. at 304.

Moreover, neither Plaintiff can satisfy the injury requirement of Indiana law.  The Carpenter complaint alleges that the two Plaintiffs purchased urethane products for use in facilities maintained by those Plaintiffs in Indiana or "for use in Indiana."  Carpenter Compl. ¶ 129.  But this is different from alleging injury from an unlawful agreement formed in Indiana. Moreover, Indiana law bars indirect purchasers from bringing suit in antitrust cases in the first place.  *Berghausen v. Microsoft Corp.*, 765 N.E.2d 592, 597 (Ind. Ct. App. 2002).  Thus, to the extent Plaintiffs' allegation concerning articles "for use in Indiana" refers to purchases of polyether-containing end products by Indiana indirect buyers, the claim would fail under Indiana law.

The Indiana claim should be dismissed.  *Robbins*, 519 F.3d at 1247 (citing *Twombly*, 127 S. Ct. at 1974); *Tal*, 453 F.3d at 1253.

### 2.      Plaintiffs Fail to Allege Plausible Direct and Substantial In-State Effects on Tennessee and Wisconsin Commerce. [16]

It is a core principle of our federal system that "[n]o state can legislate except with reference to its own jurisdiction."  *BMW of N. Am. v. Gore*, 517 U.S. 559, 571 (1996) (quoting

---

[15] *See, e.g.*, Carpenter Compl. ¶¶ 125-131.  While Plaintiffs allege that "[c]ontracts or agreements, pursuant to which Plaintiffs Carpenter and Flexible Foam Products purchased Polyether Polyol Products, were the result of, grew out of, or were otherwise connected with, the violation of Ind. Code §§ 24-1-1-1 and 24-1-1-5," they do not specify that the contract was, in fact, entered into in Indiana.  *Id.* ¶ 131.  This is insufficient under *Twombly*, as Plaintiffs' allegation as to the violation is conclusory in nature and does not explain *how* the alleged contract violated sections 24-1-1-1 and 24-1-1-5.  *Robbins*, 519 F.3d at 1247 (citing *Twombly*, 127 S. Ct. at 1974); *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006).

[16] It would be improper for a federal court to depart from a state supreme court's prior interpretation of a state statute, but if this Court were to hold that the Indiana antitrust state would reach extraterritorial contracts that have substantial effects on Indiana commerce, the discussion in this section would equally apply to the Indiana statute and foreclose Plaintiffs' Indiana claims.

*Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881)).  Under this rule, a state may not regulate

conduct occurring beyond its borders *unless* the conduct substantially affects in-state persons.

*See KT & G Corp. v. Att'y Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008) ("a statute will

be invalid per se if it has the practical effect of extraterritorial control of commerce occurring

entirely outside the boundaries of the state in question.") (quoting *Healy v. Beer Inst.*, 491 U.S.

324, 326 (1989); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 613 (7th

Cir. 1997) ("State A cannot use its antitrust law to make a seller in State B charge a lower price

to a buyer in C.  Insofar as the Alabama suit challenges sales from plants or offices in other states

to pharmacies in other states, it exceeds the constitutional scope of the Alabama antitrust law.")

(citations omitted).

 While it is true that the antitrust laws of Tennessee and Wisconsin prohibit price-fixing

conspiracies, the courts of those jurisdictions have interpreted those statutes to apply only where

"(1) actionable conduct, such as the formation of a combination or conspiracy, occurred within

this state, even if its effects are felt primarily outside [the state]; or (2) the conduct complained of

*substantially affect*s the people of [the state] and has impacts in this state, even if the illegal

activity resulting in those impacts occurred predominantly or exclusively outside this state."

*Meyers v. Bayer AG*, 735 N.W.2d 448, 464 (Wis. 2007) (under Wisconsin law); *Freeman Indus.,*

*LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 523 (Tenn. 2005) (under Tennessee law) (both

quoting *Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 141 (Wis. 2005)) (emphasis added).  This

extraterritoriality standard is derived from the substantial effects standard applied by federal

courts in deciding whether the Sherman Act applies to foreign anticompetitive conduct, and

requires a "direct, substantial and reasonably foreseeable effect within the state."  *Freeman*, 172

S.W.3d at 523 (quoting *Amarel v. Connell*, 248 Cal. Rptr. 276, 248 (Cal. App. 1988); citing

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993); and *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 242 (1980)).  Under the federal standard, the Sherman Act remedies "domestic antitrust injury that foreign anticompetitive conduct has caused," but not purely foreign injury.  *F. Hoffmann-LaRoche, Ltd.  v. Empagran, S.A.*, 542 U.S. 155, 165-66 (2004).  The same is true under these states' laws.  *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 721 n.27 (7th Cir. 1979) (federal case law interpreting the extraterritorial reach of the Sherman Act is persuasive authority in interpreting state statutes); *Levi Strauss & Co.*, 1980 WL 4696, at *2 n.2 (same); *State v. Waste Mgmt. of Wis., Inc.*, 261 N.W.2d 147, 153 & n.12 (Wis. 1978) (same).

Indeed, Wisconsin and Tennessee adhere to the demanding "substantial effects" test precisely to mitigate constitutional concerns, fearing that a more liberal standard "would jeopardize the action, undermine the validity of our antitrust statute, and create the spectacle of Lilliputian harassment in Wisconsin courts."  *Olstad*, 700 N.W.2d at 158; *Freeman*, 172 S.W.3d at 522 (noting constitutional concerns in adopting test).

Under the "substantial effects" test, "a complaint must allege effects on [the state], and not merely nationwide effects."  *Meyers*, 735 N.W.2d at 463-64; *Freeman*, 172 S.W.3d at 524 (focus of the test is not on conduct but "the *effects* of the conduct on Tennessee commerce").  The test also requires *more* than a minimum contacts-style analysis or a choice of law-style analysis.  *Meyers*, 735 N.W.2d at 459 & n.11 (citing *Emergency One, Inc. v. Waterous Co.*, 23 F. Supp. 2d 959, 969-70 (E.D. Wis. 1998)); *Tal*, 453 F.3d at 1253.  Either of the above standards would be problematic "in cases involving nationwide sales, [as] application of [those] standard[s] might result in application of state antitrust law when no significant injury to trade

-28-

and economic competition occurred in the state." *Meyers*, 735 N.W.2d at 460 n.11.  Otherwise,

the individual state laws would encroach upon those of other states and the federal government's

prerogatives. *Id.*; *Freeman*, 172 S.W.3d at 522.  Under the *Twombly* "plausibility" pleading

requirement, the amended Complaints do not even come close to meeting this standard.  First, in

state as in federal law, the effect of the extraterritorial conduct on in-state commerce must be a

"significant injury to trade and economic competition occur[ing] in the state," *Meyers*, 735

N.W.2d at 460 n.11.  "The antitrust laws were enacted for the protection of competition, not

*competitors*." *Ghem, Inc. v. Mapco Petrol., Inc.*, 850 S.W.2d 447, 455-56 (Tenn. 1993) (quoting

*Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 337-38 (1990) (quoting *Brown Shoe

Co. v. United States*, 370 U.S. 294, 320 (1962) (quotations omitted)); *accord Olstad*, 700

N.W.2d at 157 ("It is competition, not competitors, that antitrust law protects."); *see also

Meyers*, 735 N.W.2d at 458 ("the Wisconsin antitrust statute was enacted to protect state

consumers from the effects of monopolistic practices.").

    Second, for an alleged extraterritorial price-fixing conspiracy to have substantial effects

on commerce within the jurisdiction, a plaintiff must allege that the conspiracy had the "effect"

of raising the prices that purchasers paid for (or restricting the supply of) the product in that

jurisdiction. *Empagran, S.A. v. F. Hoffmann II*, 417 F.3d 1267, 1271 (D.C. Cir. 2005); *Meyers*,

735 N.W. 2d at 454, 462 (noting that "'[t]he public interest and welfare of the people of [the

state] are substantially affected if prices of a product are fixed or supplies thereof are restricted as

the result of an illegal combination or conspiracy,'" and finding "a basis for recovery" under the

Wisconsin antitrust statutes where plaintiffs alleged that "thousands of Wisconsin consumers

paid supracompetitive prices as a result of conduct by an interstate seller.") (quoting *State v.

Allied Chem. & Dye Corp.*, 101 N.W.2d 133 (Wis. 1960)).

Here, the Plaintiffs bringing claims under Tennessee or Wisconsin law do not allege that Defendants engaged in any sales of polyether polyol products in Tennessee or Wisconsin, much less at prices inflated by the conspiracy, or that they themselves purchased such products in either state.  Instead, the Complaints conclusorily state certain elements of a conspiracy claim under state law, Carpenter Compl. ¶¶ 133, 140; Woodbridge Compl. ¶¶ 85-86, 92-93; assert that polyether polyol products were "shipped" to the eight plaintiffs and "other consumers" in each state "for use" in the state; and assert that such violations "substantially affected the people and commerce" and "had impacts within" those states.  Carpenter Compl. ¶¶ 134-135, 141-143; Woodbridge Compl. ¶¶ 85-86, 92-94.  Mere physical shipment of products purchased elsewhere into Tennessee or Wisconsin does not constitute a "direct, substantial and reasonably foreseeable effect within the state" of the price-fixing conspiracy upon competition in those states.  *Freeman*, 172 S.W.3d at 523.  *Accord California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1159-60 (N.D. Cal. 2007) (dismissing a Tennessee law claim because plaintiffs did "not specifically allege that any defendant engaged in sales in [the state] specifically," and the allegations were made "with no differentiation among particular states as to which Plaintiffs and consumers paid the artificially high prices, or even purchased [the] products."); *see also Twombly*, 127 S. Ct. at 1974.

Plaintiffs also do not claim (nor can they) that the purported price-fixing conspiracy had substantial effects on competition in the downstream markets in Wisconsin or Tennessee for the products they sell that use polyether polyol chemicals (*i.e.*, markets for "flexible foams and rigid foams" or "elastomers, adhesives, sealants, coatings, and binders," Carpenter Compl. ¶ 78; Woodbridge Compl. ¶ 37).  Injury to competition in downstream markets is extraordinarily hard to prove as a "direct, substantial and reasonably foreseeable effect" of a conspiracy to fix prices

-30-

of ingredients.  In any event, Plaintiffs make absolutely no allegations in this regard, much less plausible allegations that could survive *Twombly* review.  They include no allegations regarding the type of downstream products sold in those states; or the number or dollar amount of sales of the affected downstream products; or the nature of the Tennessee and Wisconsin markets for downstream products; or the nature of the injury to or effects on competition in these downstream markets from the alleged conspiracy to fix the price of polyether polyol chemicals. Instead, they recite only that the products shipped to them and to other polyether polyol "consumers" and used in the state were worth "millions of dollars."  Carpenter Compl. ¶¶ 134, 141; Woodbridge Compl. ¶¶ 85-92.  Such averments do not suffice even to allege competitive injury to the named plaintiffs in Tennessee or Wisconsin, and certainly fall far short of alleging the substantial effect on commerce and competition that those states' antitrust laws require.

Similarly scant allegations were held inadequate by the federal court in *Emergency One* to save a § 133 claim under Wisconsin law.  23 F. Supp. 2d at 970-71.  In that case, the plaintiff alleged he owned a dealership in Wisconsin, but did not plead (1) the amount of sales at such dealerships in a certain time frame; (2) what proportion of those sales were affected by defendants' conduct; (3) how many fire trucks were sold annually in Wisconsin, by plaintiff, or by plaintiff's competitors; and (4) whether there was a single fire truck contract in Wisconsin from which plaintiff was precluded from bidding based on the unavailability of one defendant's pumps.  *Id.*; *Meyers*, 735 N.W. 2d at 460.  The *Emergency One* court concluded that "[w]ithout this type of information, the amended complaint does not suggest that injury to E-One also constituted significant injury to trade and commerce related to fire truck sales in Wisconsin," that the complaint "made no … allegations" of "any significant adverse effects on trade and economic competition within Wisconsin," and that "the only significant and adverse effect

-31-

alleged by plaintiff is to plaintiff itself." *Id*. at 970-71; *Meyers*, 735 N.W. 2d at 460, 461.  Here,

like the plaintiff in *Emergency One*, the Wisconsin and Tennessee Plaintiffs fail to make specific

and credible allegations that the alleged conspiracy had direct, foreseeable, and substantial

effects on commerce in any of the two states.  At a minimum, the Plaintiffs have not "provide[d]

enough factual allegations for a court to infer potential victory."  *Bryson*, 534 F.3d at 1286.

Plaintiffs' Wisconsin and Tennessee law claims should be dismissed.  *Twombly*, 127 S. Ct. at

1974.

> **3.      Plaintiffs Fail to Allege that They Suffered Antitrust Injury
> Occurring in State or Proximately Caused By In-State Effects
> of Interstate Conduct.**

In keeping with the prohibition on extraterritorial legislation, state laws do not provide

remedies for injuries that lack a substantial nexus to the jurisdiction.  *See Coca-Cola Co. v.

Harmar Bottling Co.*, 218 S.W.3d 671, 682-83 (Tex. 2006) (holding that the Texas antitrust act

"does not, in clear language, afford a cause of action for injury outside the state, and we will not

imply one," for the Act's purpose of benefiting Texas consumers would not be furthered "by

remedying extraterritorial injury"); s*ee also 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F.

Supp. 494, 502 (M.D.N.C. 1987) (construing North Carolina unfair competition statute to require

in-state injuries); *In re Parmalat*, 383 F. Supp. 2d 587, 603-04 (S.D.N.Y. 2005) (same).  Under

persuasive federal authority, *see supra* at 29, if plaintiffs claim that extraterritorial conduct

causes substantial effects on commerce within the jurisdiction, they must show that such effects

"give rise to" their claim.  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546

F.3d 981, 985-86 (9th Cir. 2008) (quoting *Empagran*, 542 U.S. at 159); *Turicentro, S.A. v. Am.

Airlines Inc.*, 303 F.3d 293, 305 n.13 (3d Cir. 2002).  In other words, "'the "effect" providing the

jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws.'" *See CSR Ltd. v. Cigna Corp.*, 405 F. Supp. 2d 526, 545 (D.N.J. 2005) (quoting *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 305 n.14 (3d Cir. 2002) (quoting H.R. Rep. No. 97-686, *reprinted in* 1982 U.S.S.C.A.N. 2496-97)); *Empagran*, 417 F.3d at 1271 (the effects of anticompetitive conduct on commerce within the jurisdiction must be the proximate cause of the plaintiff's injury); *DRAM*, 546 F.3d at 987.  Indeed, Tennessee has adopted just such an approach.  *See Freeman*, 172 S.W.3d at 523.[17]

These Plaintiffs fail to allege any cognizable injury under the laws of Tennessee or Wisconsin much less one that gives rise to their claims.  They not only fail to allege properly that the alleged interstate *conduct* was actionable (*i.e.*, that it had substantial effects on consumers within the states), but they also fail to plead with plausibility that they suffered *injury* from such effects.  *E.g.*, Carpenter Compl. ¶ 135.  To the extent Plaintiffs were injured by the alleged conspiracy, they were injured by the purchase of polyether polyol products at inflated prices. That injury occurred in the state of purchase; there is no injury simply from the later use of such products in their Tennessee and Wisconsin facilities.  "The situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff."  *In re DES Cases*, 789 F. Supp. 552, 570 (E.D.N.Y. 1992).[18]

---

[17] In *Freeman*, the Tennessee Supreme Court held that an out-of-state indirect purchaser may sue under the Tennessee Trade Practices Act.  172 S.W.2d at 517.  The alleged unlawful conduct, however, occurred in the state of Tennessee.  Even so, *Freeman* upheld the dismissal of the claim because of a failure to allege a substantial effect on Tennessee commerce.  *Id.* at 524.

[18] *See Tecre Co., Inc. v. Buttonpro*, 387 F. Supp. 2d 927, 931 (E.D. Wis. 2005) (finding no injury in Wisconsin under long-arm statute because infringing sale did not take place there); *Beverly Hills Fan Co v. Royal Sovereign Corp.*, 21 F.3d 1558, 1571 (Fed. Cir. 1994) (situs of injury of patent infringement is place where the infringing sale is made rather than where the patentee resides); *N. Am. Philips v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) (defining the rule further so that the injury of patent infringement occurs where the offending act of making, using or selling the infringing device or

Because Plaintiffs do not allege that they purchased polyether polyol products in either Tennessee or Wisconsin at inflated prices, or any other injury proximately caused by some other effect of the alleged conspiracy in those states, their Tennessee and Wisconsin claims cannot survive.[19]

> **D.** **The Nine Plaintiffs May Not Seek To Void Contracts in Other States Under the Three States' Laws Even If the Contracts Had Substantial Effects in the Three States.**

Finally, the rescissionary remedies contemplated by the "full consideration" or "any payments made" recovery language of the three state statutes cannot be construed to apply to out-of-state contracts under the Due Process Clause.  In *New York Life Insurance Co. v. Head*, 234 U.S. 149 (1914), the Supreme Court held that a Missouri law could not invalidate a contract, made in Missouri between a New York insurer and a New Mexico resident, for failure to follow Missouri insurance law procedures in issuing the contract, where the contract's terms specifically called for application of New York law.  234 U.S. at 161; *see also Home Ins. Co. v. Dick*, 281 U.S. 397, 407-08 (1930) (state law provision restricting statute of limitations on contracts that essentially voided contract made out of state, where contract was legal as written, violated due process guaranty against deprivation of property without due process of law).  Moreover, just as a state "does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its citizens may be affected when they travel to that state," a contract that is legal in one state cannot be invalidated by another state.  *Bigelow v. Virginia*, 421

---

process occurs).

[19] If this Court were to accept the nine Plaintiffs' theory that the place of use, and not the place of purchase, is the important factor in deciding whether any of the three states has a sufficient nexus to their alleged antitrust injuries to apply that state's law, then the Sherman Act and state-law claims of the three foreign corporations (Vitafoam Canada, Woodbridge Foam Corporation, and Woodbridge Services) who are "U.S. Purchase Plaintiffs" but used the products abroad must be dismissed.

U.S. 809, 824 (1975); *see also Huntington v. Attrill*, 146 U.S. 657, 669 (1892) ("Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of other States").[20]  Thus, to the extent that the Court entertains Plaintiffs' state law claims at all, it should construe the state statutes to avoid the serious constitutional questions that would arise if the statutes voided out-of-state contracts, *Lyng v. N.W. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988), and Plaintiffs should be denied the remedy of full consideration.

* * *

The motivation behind Plaintiffs' selection of state laws is clear:  Plaintiffs hope that this Court will read the "full consideration" language in those states' laws to permit them to recover everything they paid for product that was delivered to them, regardless of actual injury.  But the law is clear – Plaintiffs can invoke state law only if they plead both (1) actionable conduct (conduct occurring in the state, or – in Tennessee and Wisconsin – interstate conduct having direct, foreseeable, and substantial effects in the state), and (2) injury that arises from that in-state conduct or effects.  None of the nine Plaintiffs has alleged either element with the specificity and plausibility required by *Twombly*, and, in any event, the rescissionary "full consideration" remedy cannot constitutionally be applied to void out-of-state contracts.  All of Plaintiffs' state law claims should be dismissed.

---

[20] Cases such as *Head, Dick*, and *Bonaparte* continue to retain vitality, as evidenced by their prominent role in recent cases such as *BMW*, 517 U.S. at 571, and *Coca-Cola Co.*, 218 S.W.3d at 680.

IV.     **THE CLAIMS BROUGHT BY OR ON BEHALF OF PARENTS AND AFFILIATES SHOULD BE DISMISSED FOR LACK OF STANDING.**

Buried in the hundreds of pages of Plaintiffs' amended Complaints is the novel claim that certain parents and affiliates of the various Plaintiffs are somehow full participants in this litigation.  Nothing could be further from the truth.

Every one of the 56 Plaintiffs attempt to bring not only their own claims but also claims on behalf of their unnamed "parents, subsidiaries, affiliates, predecessors-in-interest, and assigns." Carpenter Compl. ¶ 64; Woodbridge Compl. ¶ 23.  And each plaintiff makes the rote allegation that its "subsidiaries, affiliates, predecessors-in-interest, and assigns purchased substantial quantities of Polyether Polyol Products" from a defendant in the U.S. or Europe "during the damages period and was injured by the antitrust violations alleged herein." Carpenter Compl. ¶¶ 16-63; Woodbridge Compl. ¶¶ 15-22.  While it is improbable that *all* the subsidiaries, affiliates, predecessors-in-interest, and assigns of the 56 plaintiffs in fact did so, at a minimum, it is clear that plaintiffs made no factual or legal investigation to identify which (if any) entity related to the Plaintiffs has a claim under federal, state, or European law.

Regardless, such vague allegations of injury to unnamed parties fall far short of Rule 8's requirement of a "short and plain statement of the claim showing that *the pleader* is entitled to relief,"  Fed. R. Civ. P. 8(a)(2) (emphasis added), and no Plaintiff has alleged any basis for asserting third-party standing to litigate claims belonging to those persons.  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (stating general rule that a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").  All such claims should be dismissed.

## <u>CONCLUSION</u>

The opt-out Plaintiffs have offered no basis for expanding the time period covered by the class claims and extending the opt-out claims to reach back to the early years of the first Clinton Administration.  A small subset of the Plaintiffs is not entitled to rely upon a cherry-picked set of state illicit-contract laws, which do not properly apply to the facts alleged here, to weigh this case down with untested questions of state law.  The time has come for Plaintiffs' overreaching to be reigned in and for the parties and the Court to get to work on the viable claims in this MDL litigation.  Defendants' motion should be granted.

Dated: April 23, 2009                                   Respectfully submitted,


  /s/ David F. Oliver_____              __/s/ Floyd R. Finch_____
David F. Oliver (KS Bar # 70731)            Floyd R. Finch, Jr. (KS Bar #16993)
BERKOWITZ OLIVER WILLIAMS                Shelley A. Runion (KS Bar # 14941)
SHAW & EISENBRANDT LLP                    HUSCH BLACKWELL SANDERS LLP
2600 Grand Boulevard, Suite 1200            4801 Main Street, Suite 1000
Kansas City, MO  64108                           Kansas City, MO 64112
Telephone: (816) 561-7007                        Telephone: (816) 983-8000
Facsimile: (816) 561-1888                          Facsimile: (816) 983-8080


Andrew S. Marovitz                                  Hamilton Loeb
Jason Fliegel                                              Stephen B. Kinnaird
Michael S. Paik                                         Jeremy P. Evans
MAYER BROWN LLP                              John P. Gebauer
71 South Wacker Drive                             PAUL HASTINGS JANOFSKY & WALKER LLP
Chicago, IL   60606                                   875 15th Street, N.W.
Telephone: (312) 782-0600                        Washington, D.C.  20005
Facsimile: (312) 701-7711                          Telephone: (202) 551-1700
                                                              Facsimile: (202) 551-1705
*Counsel for BASF SE and BASF Corporation*
                                                              *Counsel for The Dow Chemical Company*

/s/ Brian R. Markley
Brian R. Markley (KS Bar # 17485)
STINSON MORRISON HECKER LLP
1201 Walnut, Suite 2200
Kansas City, MO  64106
Direct Dial: (816) 691-3215
Facsimile: (888) 290-2657

Justin T. Toth
John W. Mackay
RAY QUINNEY & NEBEKER PC
36 South State Street, Suite 1400
Salt Lake City, UT  84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543

Harry M. Reasoner
David T. Harvin
Erica Krennerich
VINSON & ELKINS LLP
First City Tower
1001 Fannin Street, Suite 2500
Houston, TX  77002-6760
Telephone: (713) 758-2368
Facsimile: (713) 615-5269

*Counsel for Huntsman International LLC*

<u>**CERTIFICATE OF SERVICE**</u>

On April 23, 2009, a copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS ALL CLAIMS** was electronically filed with the Clerk of the Court through CM/ECF, which provides electronic service on Plaintiffs' liaison counsel and each attorney registered for ECF notification.

/s/ Floyd R. Finch, Jr.

Counsel for The Dow Chemical Company

LEGAL_US_E # 83477894.2