IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: URETHANE ANTITRUST LITIGATION, | ) ) | MDL No. 1616 |
| _____) | ) | Case No. 04-1616-JWL |
| | ) | |
| This Document Relates to the following Polyether Polyol Cases: | ) ) | |
| | ) | |
| *Carpenter Co., et al. v. BASF SE, et al.*, | ) | Case No. 08-2617-JWL |
| | ) | |
| and | ) | |
| | ) | |
| *Woodbridge Foam Corporation, et al. v. BASF SE, et al*. | ) ) | Case No. 09-2026-JWL |
| | ) | |
| _____) | ) | |

## MEMORANDUM AND ORDER

This Memorandum and Order relates to two direct actions by plaintiffs who have

opted out of the class certified in the main action in this multi-district antitrust case, as

noted in the caption above. The direct actions are presently before the Court on

defendants' motion to dismiss the European plaintiffs' claims based on European law

(Doc. # 1179); defendants' motion to dismiss plaintiffs' claims that allege an antitrust

conspiracy prior to 1999 (Doc. # 1175); and the additional motion by individual

defendants Jean-Pierre Dhanis and Uwe Hartwig to dismiss all of plaintiffs' claims

against them on limitations grounds (Doc. # 1173).[1] On January 7, 2010, the Court heard

_____

[1]The first two motions listed have been filed on behalf of all named defendants
except Lyondell Chemical Company; that defendant has filed for bankruptcy, and all
(continued...)

oral argument on the motion to dismiss the European law claims.  For the reasons set forth below, the Court rules as follows:  The Court **grants in part** the motion relating to the European plaintiffs' claims; the Court in its discretion declines to exercise supplemental jurisdiction over the claims under European law, and those claims are therefore dismissed.  The Court **grants** the individual defendants' motion to dismiss based on limitations grounds, and the Court dismisses the claims against those defendants as time-barred.  Finally, the Court **denies** the remaining defendants' motion to dismiss plaintiffs' pre-1999 antitrust conspiracy claims.

## I.    <u>Background</u>

This multidistrict litigation includes class actions in which the plaintiffs claim that defendants engaged in unlawful price-fixing conspiracies with respect to urethane chemical products, in violation of the Sherman Act, 15 U.S.C. § 1.  The Court has consolidated two sets of cases relating to different types of urethane products: the Polyester Polyol cases, which have settled; and the Polyether Polyol cases, to which this order relates.

In the Polyether Polyol class actions, the plaintiffs have alleged a price-fixing conspiracy beginning in 1999, and the Court has certified a class of plaintiffs who purchased these products in the United States from defendants at any time from January

---

[1](...continued)
proceedings involving claims against it are therefore stayed.

1, 1999, to December 31, 2004. In the class actions, the Court ruled on various arguments by defendants for dismissal of the class claims in two separate orders: *In re Urethane Antitrust Litigation*, 409 F. Supp. 2d 1275 (D. Kan. 2006) (*Urethane I*); and *In re Urethane Antitrust Litigation*, 235 F.R.D. 507 (D. Kan. 2006) (*Urethane II*). The basic antitrust allegations by the class against defendants are set forth in those previous opinions.

In the present actions (*Carpenter* and *Woodbridge*), two sets of plaintiffs, comprising a total of 56 potential class members who have opted out of the class action, have filed their own direct actions against defendants. These direct actions go beyond the scope of the class action in a few significant ways. First, the direct action plaintiffs allege a conspiracy beginning in 1994. Second, a number of European plaintiffs bring antitrust claims not under the federal Sherman Act, but under a European Union treaty and other "applicable E.U. Member States' laws." Third, three additional defendants, including the two individual defendants, Messrs. Dhanis and Hartwig, have been added as parties.

On August 14, 2009, the Court ruled on defendants' motion to dismiss certain claims alleged by direct action plaintiffs in their first amended complaints. *See In re Urethane Antitrust Litigation*, __ F. Supp. 2d __, 2009 WL 3337247 (D. Kan. Aug. 14, 2009) (*Urethane III*) (Doc. # 1039). Defendants argued that with respect to certain claims, plaintiffs had not satisfied the pleading standards announced by the United States Supreme Court in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007). The

Court rejected that argument with respect to plaintiffs' claims relating to a conspiracy existing from 1999 to 2001 and their claims relating to a conspiracy to fix European prices. *See Urethane III*, 2009 WL 3337247, at *6-8. The Court granted the motion, however, with respect to plaintiffs' claims of a conspiracy existing prior to 1999, although the Court granted plaintiffs leave to amend to cure such pleading deficiency. *See id.* at *8-9. The Court noted that, under *Twombly*, plaintiffs could not merely allege, in a conclusory fashion, that a conspiracy existed during that time period; that plaintiffs had failed to allege any specific meetings or communications involving defendants relating to the conspiracy prior to 1999; and that plaintiffs had failed to provide any basis for alleging a conspiracy beginning specifically in 1994. *See id.* Accordingly, the Court concluded that plaintiffs had failed to state a claim for antitrust liability (under federal or European law) for the period from 1994 to 1998. *See id.* at *9.

The Court also addressed defendants' argument that the pre-1999 claims were time-barred on the basis that plaintiffs had not pleaded affirmative acts of fraudulent concealment during that period (by which plaintiffs sought to toll the statute of limitations) with sufficient particularity under Fed. R. Civ. P. 9(b). *See id.* at *9-10. The Court ruled that plaintiffs had sufficiently pleaded two announcements in 1994 and two letters in 1998 as affirmative acts of fraudulent concealment by defendants, but that plaintiffs had not pleaded any other such acts with sufficient particularity under Rule 9(b). *See id.* Again, however, the Court granted plaintiffs leave to amend their complaints to plead additional affirmative acts with the requisite particularity. *See id.*

4

at *10.[2]

Defendants moved for reconsideration of that order, arguing that the Court should have ruled that the fraudulent concealment allegations that did satisfy Rule 9(b) did not satisfy the *Twombly* pleading standards. The Court denied this motion on the basis that defendants had not made such an argument under *Twombly* for dismissal of the fraudulent concealment allegations in their motion to dismiss. *See* Order of Aug. 28, 2009 (Doc. # 1061).

On September 18, 2009, direct action plaintiffs filed their second amended complaints, in which they have attempted to cure the pleading deficiencies cited by the Court in *Urethane III*.[3] The Court now addresses defendants' challenges to those complaints.

---

[2]The Court also dismissed certain plaintiffs' claims under Indiana, Tennessee, and Wisconsin antitrust law, and dismissed any claims asserted by plaintiffs on behalf of unnamed affiliates. *See Urethane III*, 2009 WL 3337247, at *13-17. In their second amended complaints, plaintiffs have not asserted any claims under state law.

[3]The Court denied plaintiffs' motion to extend the time for filing their second amended complaints until after they could finish certain discovery. *See* Order of Sept. 11, 2009 (Doc. # 1105).

## II.    Motion to Dismiss European Law Claims (Doc. # 1179)

Defendants move to dismiss the antitrust claims by 26 European plaintiffs under European law.  With respect to these claims, plaintiffs have invoked only the Court's supplemental, pendent-party jurisdiction under 28 U.S.C. § 1367.  Defendants argue that this Court lacks jurisdiction over such claims on the bases that the Court may not enforce the public law of foreign nations and that plaintiffs are limited to proceeding on such claims in European courts because that remedy is inseparable from their antitrust rights under European law.  Second, defendants argue that the Court may not exercise supplemental jurisdiction in this case because the European law claims are not part of the same case or controversy as the Sherman Act claims.  *See* 28 U.S.C. § 1367(a).  Third, defendants argue the Court should in its discretion decline to exercise supplemental jurisdiction over these claims.  Fourth, defendants argue that these claims should be dismissed under the doctrine of forum non conveniens.

The Court, in its discretion under 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over the European law claims.  Accordingly, those claims are dismissed, and defendants' motion to dismiss is granted to that extent.  In light of that decision, the Court does not address defendants' other arguments for dismissal of the claims under European law.

Section 1367(c) provides that a district court may decline to exercise supplemental jurisdiction if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district

court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for denying jurisdiction." *Id.* Federal jurisdiction over pendent claims or parties is not mandatory; supplemental jurisdiction is a matter of judicial discretion, not of the litigants' right. *See Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1165 (10th Cir. 2004) (citing *City of Chicago v. International Coll. of Surgeons*, 522 U.S. 156, 173 (1997) and *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). The Court concludes that it should decline to exercise supplemental jurisdiction over the European law claims in this case for multiple reasons listed in section 1367(c).

The Court concludes that litigation of the European law claims in this case would raise novel and complex issues of European law. *See Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 825 F. Supp. 73, 76 (D. Del. 1993) ("the principles embodied in [28 U.S.C. § 1367(c)(1)] are implicated by complex issues of foreign as well as state law"); *Empagran S.A. v. F. Hoffman-La Roche Ltd.*, 453 F. Supp. 2d 1 (D.D.C. 2006) (citing novel, complex, and developing European antitrust law, among other factors, in declining to exercise supplemental jurisdiction under section 1367(c)).

Plaintiffs allege that defendants violated the antitrust prohibitions of the Treaty Establishing the European Community ("EC Treaty") and the applicable antitrust laws of various member nations among the 27 nations included within the European Union. As defendants note, the law of the EU and its member nations governing private antitrust

actions is sparse and varies widely among nations. For instance, the Ashurst Report, a 2004 report commissioned by the European Commission, found that there is "total underdevelopment" of actions for damages for breach of EC competition law, as well as "astonishing diversity" in the member nations' approaches to such actions. In the case of *In re Air Cargo Shipping Services Antitrust Litigation*, 2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008) (Report and Recommendation), the court noted the concern that, if EC Treaty claims were considered, it would face issues of first impression under European antitrust law. *See id.* at *29. That court cited the Ashurst Report in identifying a number of unsettled issues of European antitrust law:

> This litigation will raise unsettled issues of EU antitrust law, because the private enforcement of EU antitrust law is underdeveloped. A report, issued by the European Commission in 2004 found that member states had widely different causes of action and remedial schemes for enforcing [Article 101 of the EC Treaty regarding antitrust]. *See* Ashurst Report. Among the many unsettled issues identified by the Ashurst Report were the questions of whether indirect purchasers may recover damages, whether defendants are entitled to the pass-on defense, whether exemplary damages are available for Article [101] claims, and if so, what standards apply, and probably most fundamentally, what the standard is for proving causation. *Id.* This court would be forced to fly blind on these unsettled issues, because it does not have a mechanism by which to obtain an opinion from the [European Court of Justice ("ECJ")] on an unresolved issue of EU antitrust law [as European courts do].

*Id.* at *33; *see also Empagran*, 453 F. Supp. 2d at 12 (allowing supplemental jurisdiction over European antitrust claims would involve "the application of novel, complex and developing foreign law"); *Information Resources, Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411, 417-18 (S.D.N.Y. 2001) (application of European antitrust law to

claims involving six separate European markets "would present sufficiently novel and complex issues of foreign law to persuade this court to decline to exercise supplemental jurisdiction"). Defendants have identified other possible issues that could present complex questions for the Court under European antitrust law, such as the issue of cross-jurisdictional tolling from the filing of a class action complaint and the issue of the effect of some nations' joining the EU only after defendants' alleged price-fixing conduct. Moreover, as defendants note, allowing plaintiffs' European claims here would present the additional complexity of requiring the Court both to determine a particular nation's antitrust law and then also to determine whether such law comports with EU antitrust principles under the EC Treaty—tasks separately undertaken in the European framework by the member nation's courts and the ECJ respectively.

Plaintiffs do not dispute that "there are a significant number of unresolved issues of Member State law," but they argue that this Court could resolve any such issues. Certainly, the Court could determine any question of European law to the best of its ability. As noted by the court in *Air Cargo*, however, the Court would not have the benefit of review by and instruction from the ECJ and European Commission to aid in that task (with the possibility of amicus briefs from the Commission or member nations serving as a poor substitute). Given the state of European antitrust law, the Court has little doubt that such law would be more ably interpreted and applied in Europe. Accordingly, based on the presence of novel and complex issues of foreign law, *see* 28 U.S.C. § 1367(c)(1), the Court in its discretion declines to exercise supplemental

9

jurisdiction over plaintiffs' European law claims.

The Court also bases its decision to decline to exercise jurisdiction on the probability that the European law claims would substantially predominate over litigation of the Sherman Act claims. *See id.* § 1367(c)(2). For example, with respect to the European law claims, the Court would be required to engage in conflict-of-laws analyses involving up to 27 member nations' laws. (Although plaintiffs dispute that all 27 nations' laws will be implicated, they cannot say which nations' laws will apply, and they have identified at least nine such nations by name in their complaints.) As another example, the European Commission has recommended that member nations permit the passing-on defense as a part of their antitrust law (a defense not available under the Sherman Act), and that defense would likely require separate trials or at least the equivalent of mini-trials for each of the European plaintiffs. Moreover, permitting the litigation of the European law claims here would increase the costs and burdens on the parties and the Court, including with respect to such issues as additional discovery in Europe and an increased need for translation services for documents and witnesses.

Plaintiffs dispute that litigating the European claims as well in this case would greatly increase discovery and other costs. Plaintiffs concede, however, that the European claims would not necessarily be tried with the Sherman Act claims or even all together in one trial for all of the European plaintiffs. Thus, plaintiffs cannot explain how litigation of the European law claims in this action promotes efficiency. For the reasons set forth, the Court is convinced that if litigated here, the European law claims

would likely predominate over the Sherman Act claims, and supplemental jurisdiction is therefore not appropriate in this case.

The Court also declines to exercise supplemental jurisdiction over the European law claims in light of the exceptional circumstances present in this case. *See* 28 U.S.C. § 1367(c)(4). First, the Court concludes that resolving plaintiffs' European law claims here would undermine principles of comity. *See Societe Nationale Industrielle Aerospatiale v. United States Dist. Ct. for the S.D. of Iowa*, 482 U.S. 522, 543 n.27 (1987) ("Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interest of other sovereign states."). In *Air Cargo*, the court provided an extensive and persuasive analysis of this issue in concluding that "the adjudication of European Union antitrust claims would undermine the principles of international comity, as well as show a lack of respect for Europe's sovereign interest in maintaining its antitrust enforcement framework." *See Air Cargo*, 2008 WL 5958061, at *30-34; *see also id.* at *37 (citing comity as exceptional circumstance that provided substantial reason for declining supplemental jurisdiction over European antitrust claims).

The *Air Cargo* court first described the European antitrust framework, including the dual system that involves adjudication in member nations' courts and oversight by the ECJ and European Commission. *See id.* at *31-33. The court noted the deference that national courts must pay to the Commission, the particular procedures intended to promote uniformity of application of the law throughout the EU, and the fact that the

framework incorporates a "uniquely European approach." *See id.* at \*31-32. The court concluded that adjudication of such claims in this country would not take place within that framework and thus "would disturb the uniformity of EC competition law, and would undermine the European interest in developing its own European antitrust law." *See id.* at \*33. The court also cited the fact that the litigation of the foreign claims would raise unsettled issues of EU antitrust law, in light of the underdeveloped state of that law (as set forth above). *See id.* The *Air Cargo* court noted that other federal courts had refused to exercise jurisdiction over European antitrust claims. *See id.* at \*34 (citing *Information Resources*, 127 F. Supp. 2d at 417 and *Empagran*, 453 F. Supp. 2d at 12).[4] Finally, the court concluded that practicing comity and refusing jurisdiction would further the interest of courts in the United States because otherwise European parties would seek to litigate their antitrust claims here, thereby crowding American dockets with cases having no connection this country and hampering the development of jurisprudence and robust private enforcement litigation in Europe. *See id.*

The Court agrees with the *Air Cargo* court's well-reasoned analysis of this issue and adopts its reasoning. *See also Empagran*, 453 F. Supp. 2d at 3 (citing comity as one basis for originally declining supplemental jurisdiction over European antitrust law claims). The Court is especially impressed in this regard by the particularly European

---

[4]Plaintiffs in the present case have been unable to identify any reported case in which a court in the United States exercised jurisdiction over antitrust claims asserted under European law.

framework developed in the EU for antitrust litigation, including the dual system of adjudication in the member nations' courts and review in and oversight and instruction by the ECJ and European Commission. Plaintiffs point out that, under that framework, some of the procedures that permit the involvement of the Commission in a case in a national court are not mandatory. There is no question, however, that the European system does involve two separate layers of scrutiny intended to promote uniformity within EU antitrust litigation. Litigation of such claims in this Court does not allow for adherence to that particular system of adjudication and uniformity. The Court also rejects plaintiffs' suggestion that, by this reasoning, American courts could never apply foreign law in any case. This litigation does not present the typical case requiring the application of foreign law (for instance, some element of foreign contract law); rather, it involves the application of underdeveloped and complex European antitrust law under a specialized dual framework. The Court is convinced that plaintiffs' claims under European antitrust law are simply more appropriately heard within the European framework, and that adjudicating such claims in this Court would run afoul of principles of international comity.

Another exceptional circumstance present in this case, *see* 28 U.S.C. § 1367(c)(4), is the fact that dismissal of the claims under European law would also be appropriate under the doctrine of forum non conveniens. *See Air Cargo*, 2008 WL 5958061, at *24-30, 37 (recommending dismissal of European antitrust claims based on doctrine of forum non conveniens and citing doctrine as exceptional circumstance providing substantial

reason for declining supplemental jurisdiction).[5]  First, the national courts of Europe

would provide adequate alternative forums for plaintiffs' claims.  *See Alpine Atlantic*

*Asset Mgmt. AG v. Comstock*, 552 F. Supp. 2d 1268, 1275 (D. Kan. 2008) (setting out

forum non conveniens standards under Tenth Circuit law).  At oral argument, plaintiffs

could not dispute that defendants would be amenable to service of process in any

European jurisdiction in which they engaged in illegal conduct.  Second, these claims

are asserted specifically under foreign law.  Third, the private interest factors weigh in

favor of applying the doctrine here, as most of the evidence and witnesses relating to

these claims would be located in Europe; discovery and compulsory process relating to

these claims would be more available and less costly if the claims were litigated in

Europe; and, as plaintiffs concede, there is at least a risk that a judgment here on these

claims would not be fully enforceable in Europe.  Fourth, the public interest factors

weigh in favor of applying the doctrine here:  Europe has a greater interest in

adjudicating claims of anticompetitive conduct occurring in Europe; the claims have

little connection to the United States, other than presence of some defendants here; and

the claims are more appropriately adjudicated by courts more familiar with European

law.

        The Court has little trouble concluding that these claims are more conveniently

---

[5]As noted above, the Court does not base its dismissal of the European law claims
on this doctrine, but rather notes the doctrine's applicability as a factor supporting the
Court's decision to decline to exercise supplemental jurisdiction under section 1367(c).

litigated in Europe. Therefore, the applicability of the doctrine of forum non conveniens provides another exceptional circumstance that supports the Court's decision not to exercise supplemental jurisdiction in this case.

For all of these reasons listed in section 1367(c), the Court, in its discretion, declines to exercise supplemental jurisdiction over the European plaintiffs' antitrust claims under European law. Accordingly, the claims of each of the 26 European plaintiffs are dismissed.


### III.    Individual Defendants' Motion to Dismiss (Doc. # 1173)

In addition to joining the other motions to dismiss, individual defendants Jean-Pierre Dhanis and Uwe Hartwig have filed a separate motion seeking dismissal of the antitrust claims asserted against them on the basis of the applicable four-year statute of limitations. *See* 15 U.S.C. § 15b (four-year limitations period); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188-89 (1997) (antitrust statute of limitations runs from time of defendant's injurious act; in case of antitrust conspiracy, each purchase by plaintiff starts the statute running for that injury). The individual defendants were first made parties to these direct actions on March 19, 2009, when plaintiffs filed their first amended complaints.

Plaintiffs have alleged that the statute of limitations was tolled by acts of fraudulent concealment. To toll the statute of limitations based on fraudulent concealment, plaintiffs must show defendants' use of fraudulent means, successful

concealment from plaintiffs, and the fact that plaintiffs did not know or could not have known by due diligence of their cause of action. *See Ballen v. Prudential Bache Sec.*, 23 F.3d 335, 337 (10th Cir. 1994).

Plaintiffs have admitted in their complaint, however, that they first learned of the alleged antitrust conspiracy on November 23, 2004, when the first Polyether Polyols class action was filed. Defendants[6] thus argue that any tolling ceased and the four-year limitations period began to run on that date in November 2004, thereby making the claims asserted against them in March 2009 untimely.[7] Plaintiffs respond that defendants' acts of fraudulent concealment tolled the statute of limitations for claims against the individuals until their discovery of a cause of action *against these particular defendants*. In their complaints, plaintiffs allege that they did not discover that they had claims against the individuals (BASF executives) until December 2007, when they received information from cooperating co-conspirator Bayer, who has settled all claims against it. Plaintiffs insist that, having opted out as parties to the class action and without access to sealed filing in that case, they had no means, through discovery or otherwise, to discover the individuals' involvement in the conspiracy prior to December 2007.

---

[6]In this section of the Memorandum and Order, the Court may refer to the individual movants generically as "defendants".

[7]In opposing this motion, plaintiffs have stated that they do not argue that, for limitations purposes, the March 2009 amendments adding these defendants "relate back" to the date of the filing of the original direct action complaints in October 2008 under Fed. R. Civ. P. 15(c).

Plaintiffs thus argue that the four-year statute did not run with respect to the individuals until 2007, and that their claims against those defendants are therefore timely. In reply, the individual defendants insist that the statute began to run for all defendants who caused plaintiffs' injuries once plaintiffs discovered those injuries and the existence of an antitrust conspiracy claim in 2004.[8]

The individual defendants also argue in the alternative that, even if they could be subject to a different limitations period than the other alleged co-conspirators, plaintiffs should have discovered, in the exercise of due diligence, the involvement of—and therefore a claim against—the individuals at the same time, in 2004. In support of this argument, defendants point to the publicly-available information about their management positions with BASF. As plaintiffs note, however, "[t]he question of whether a plaintiff should have discovered the basis of his suit under the doctrine of equitable tolling does not lend itself to determination as a matter of law." *See Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1042 (10th Cir. 1980). Thus, the Court will not decide any factual

---

[8]Defendants do not dispute plaintiffs' assertion of the general rule that, in the event of fraudulent concealment, the statute of limitations runs when the violation is or should have been discovered, and that a plaintiff then has the full four years in which to file, even if the discovery occurred within the original four-year limitations period as if applied without tolling. *See Norton-Children's Hospitals, Inc. v. James E. Smith & Sons, Inc.*, 658 F.2d 440, 443-45 (6th Cir. 1981) (overwhelming weight of authority supports this rule). Thus, if plaintiffs were correct that different limitations periods could apply to the individuals and to the other members of the alleged conspiracy, then the four-year period for the individuals would start from the discovery of a claim against them (allegedly occurring in 2007), even if that discovery took place within four years of the running of the statute with respect to the other members of the conspiracy (allegedly running from 2004).

question of when plaintiffs should have discovered their claims against any of the defendants at this stage of the litigation.

Thus, the issue before the Court is whether tolling on the basis of fraudulent concealment ends and the statute of limitations begins to run when a plaintiff discovers that it has been injured and has a cause of action generally (as defendants assert) or rather when the plaintiff discovers that it has a cause of action specifically against particular defendants, even if it previously knew of a cause of action against other defendants for the same injury (as plaintiffs here assert). In other words, the question is whether claims against different defendants alleging the same injury, inflicted at the same time by joint conduct of all of the defendants, can be subject to limitations periods running from different dates.

Plaintiffs have failed to cite any authority addressing this particular question. Instead, plaintiffs rely only on the general rule that fraudulent concealment tolling ends upon discovery of a cause of action, and they argue that the rule must mean the discovery of a cause of action against the particular defendant.

Defendants have not cited any cases addressing this question under federal law.[9] Defendants do cite the case of *LeBlang Motors, Ltd. v. Subaru of America, Inc.*, 148 F.3d 680 (7th Cir. 1998), which was decided under Illinois state law. In that case, the Seventh

---

[9]The Court does not find any of the "relation back" cases cited by defendants to be helpful, as those cases turned on an interpretation of Rule 15(c). As explained above, plaintiffs do not rely on the relation back doctrine in this case.

Circuit rejected the plaintiff's argument that its claim against two individuals accrued later than the date of the accrual of its claim against the individuals' employer because it learned of the individuals' culpability only later, during discovery in its suit against the employer. *See id.* at 691. The court concluded that once the plaintiff was aware of a wrongfully-inflicted injury, it was required to investigate the potential liability of all those involved in the transaction during the limitations period, which ran for all potential defendants at the same time. *See id.* at 691-92.

Because *LeBlang* was decided under Illinois state law, the Court does not find that case particularly helpful in the absence of any showing that a great majority of jurisdictions apply their discovery rule in one way or the other. As noted above, neither side has cited any other cases directly addressing this question. A quick survey of federal cases applying state limitations law in a variety of contexts reveals that in a number of states, in some contexts, a limitations period begins to run under the discovery rule only upon discovery (actual or constructive) of a cause of action and the identity of the particular defendant;[10] while in a number of other states, a particular limitations period may run under the discovery rule even without knowledge of the identity of the

---

[10]*See, e.g.*, *In re Bridgestone / Firestone, Inc.*, 200 F. Supp. 2d 983, 992 (S.D. Ind. 2002) (Arizona law); *Travis v. Knappenberger*, 204 F.R.D. 652, 655-56 (D. Or. 2001) (Oregon law); *Espada v. Lugo*, 312 F.3d 1, 3 (1st Cir. 2002) (Puerto Rico law); *Whittlesey v. Cole*, 142 F.3d 340, 343 (6th Cir. 1998) (Tennessee law); *Hammack v. DeLonghi, S.p.A.*, 914 F. Supp. 303, 305 (E.D. Wis. 1996) (Wisconsin law).

particular defendant.[11]  Thus, the Court cannot determine that the overwhelming weight of authority from other jurisdictions favors either side in this dispute.

The Court has not located any cases addressing the relevant issue in the context of tolling based on fraudulent concealment under federal law.  In *Robertson v. Seidman & Seidman*, 609 F.2d 583 (2d Cir. 1979), a securities fraud case, the court analyzed a particular defendant separately for purposes of applying the discovery rule for the accrual of a fraud claim, and noted that while the plaintiff had a reason to suspect fraud, he did not have a reason to suspect the involvement of the particular defendant.  *See id.* at 591-92.  Citing to *Robertson* and other New York federal district court cases, the court in *Butala v. Agashiwala*, 1997 WL 79845 (S.D.N.Y. 1997), a RICO case, stated that "[a]lthough a plaintiff may have knowledge of the underlying fraud, inquiry notice for statute of limitations purposes is only triggered when the plaintiff is placed on notice of the fraudulent activities of the particular defendants being sued."  *See id.* at *5.  On the other hand, in *T.L. ex rel. Ingram v. United States*, 443 F.3d 956 (8th Cir. 2006), the court held that the limitations period for a claim under the Federal Tort Claims Act was not tolled simply because a plaintiff is unaware that an alleged tortfeasor is a federal employee and that the United States is therefore subject to suit under the Act.  *See id.* at

---

[11]*See, e.g.*, *In re Bridgestone / Firestone, Inc.*, 200 F. Supp. 2d at 988 (California law); *Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 488-92 (D.N.J. 1995) (New Jersey law); *Yacub v. Sandoz Pharmaceuticals Corp.*, 101 F. Supp. 2d 852, 865 (S.D. Ohio 1998) (Ohio law); *In re Mushroom Transp. Co., Inc.*, 247 B.R. 395, 400 (E.D. Pa. 2000) (Pennsylvania law); *Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480, 486 (D.S.C. 2001).

964. The Court does not find these few cases to be particularly helpful, however, in determining how tolling on the basis of fraudulent concealment should be applied under the Tenth Circuit law to claims against employees of a known participant in a price-fixing conspiracy.

The Court thus turns to the Tenth Circuit's actual statements of the rule for tolling based on fraudulent concealment and the discovery rule under federal law. In *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147 (10th Cir. 1981), the court, in stating a plaintiff's required showing for fraudulent concealment, referred to the plaintiff's not knowing "that he might have a cause of action." *See id.* at 1154. In *Clulow v. State of Oklahoma*, 700 F.2d 1291 (10th Cir. 1993), the Tenth Circuit stated that to establish tolling based on fraudulent concealment, the plaintiff must show a lack of knowledge of "the facts constituting his claim for relief" and must show affirmative acts leading "a reasonable person to believe that he did not have a claim for relief." *See id.* at 1301. In *Baker v. Board of Regents of State of Kansas*, 991 F.2d 628 (10th Cir. 1993), the court described its fraudulent concealment tolling standard as involving the concealment of facts "giving rise to the claim." *See id.* at 633 n.4. In *Baker*, the court also noted that "[a] civil rights action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action," and that a plaintiff need not "know all of the evidence ultimately relied on for the cause of action to accrue." *See id.* at 632. In *Industrial Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963 (10th Cir. 1994), the court stated the discovery rule and the law of fraudulent concealment as

follows:

> The statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action. A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence. Fraudulent concealment by Defendants will in some instances toll the statute of limitations; however, to prove that the statute of limitations was tolled by a defendant's fraudulent concealment, a plaintiff must show that his ignorance of his cause of action was not the result of his lack of diligence, but was due to affirmative acts or active deception by the Defendant to conceal the facts giving rise to the claim. A plaintiff need not know the full extent of his injuries before the statute of limitations begins to run.

*Id.* at 969 (citations omitted). In *Ballen v. Prudential Bache Securities, Inc.*, 23 F.3d 335 (10th Cir. 1994), the court quoted the statement of the fraudulent concealment elements from *King & King*, including the plaintiff's inability to know "that he might have a cause of action." *See id.* at 337.

Thus, in referring to the doctrine of fraudulent concealment, the Tenth Circuit has referred to the plaintiff's discovery of a "cause of action" or a "claim". The Tenth Circuit has never referred to the plaintiff's discovery also of the identity of a particular defendant or wrongdoer, or the discovery of a claim against a particular party. The Tenth Circuit has also noted that a plaintiff need not know all of the evidence for a cause of action to accrue. The Court is unwilling to make the leap that plaintiffs propose and conclude that the Tenth Circuit must have also meant that the plaintiff must have discovered the identity of the particular defendant.

The Court emphasizes that it need not decide in this case whether, under Tenth

Circuit law, a statute of limitation always runs at the same time for all possible defendants responsible for an injury. Nor need it decide whether such a rule applies in antitrust actions, or whether a statute of limitations must always run concurrently with respect to all members of a conspiracy. Rather, in this case, the Court need only decide a much narrower question—whether the statute runs also with respect to individual representatives or employees of an alleged corporate co-conspirator from the date that the plaintiff discovers its claim against that corporate co-conspirator.

The Court answers that narrow question in the affirmative, and it concludes as a matter of law that when a plaintiff relying on the doctrine of fraudulent concealment discovers (or should have discovered, through the exercise of due diligence) that it has an antitrust conspiracy claim against a particular corporate actor, the statute of limitations also begins to run with respect to claims against individuals who acted on behalf of the corporate actor and may therefore also be individually liable as co-conspirators. Thus, in this case, once plaintiffs discovered in November 2004 that BASF was a member of the alleged price-fixing conspiracy, they had four years in which to investigate and discover the identity of additional individual defendants who acted on behalf of BASF. In this case, as plaintiffs concede in their complaints, they actually did discover that they had claims also against Messrs. Dhanis and Hartwig within that four-year period (in December 2007), although they have not explained why they did not add

those individuals as defendants at that time or before November 2008.[12]

The Court believes that this narrow ruling best preserves the principles of adherence to statutes of limitations as well as the principles behind the doctrine of tolling based on fraudulent concealment. Thus, a plaintiff is still protected when the existence of a claim is concealed from it, but once it knows of a claim against a company, it cannot merely sit on its rights, but must exercise diligence and investigate the possible involvement of individuals at that company within the limitations period. This is not a situation in which a plaintiff may be unaware that there are other co-conspirators involved; plaintiffs here knew that the company must have acted through individuals and therefore that there are other potential co-conspirators that could be named as defendants. *See, e.g.*, *Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 490-92 (D.N.J. 2002) (under New Jersey law, if plaintiff should appreciate that there may be other potential defendants responsible for his injury, then limitations period runs concurrently for all defendants involved in the wrongdoing once the plaintiff discovers the claim). The four-year antitrust statute of limitations grants a plaintiff ample time in which to conduct that investigation and identify the responsible individuals. A plaintiff

---

[12]Plaintiffs insist that they had no means to discover the identities of the individuals in light of the sealed class action proceedings. Nothing prevented plaintiffs from filing their direct actions early enough within the four-year period, however, to allow for discovery before the expiration of that period. Moreover, plaintiffs cannot claim that the application of this rule is especially harsh in this case in light of the fact that plaintiffs actually did discover the identity of the individual defendants within the four years after they allegedly discovered the claims against the other defendants.

who nonetheless fails to discover the identity of such individuals within that period is not left without recourse, as it has previously discovered the existence of a claim against the company.

Accordingly, the Court concludes as a matter of law, from the face of plaintiffs' complaints, that the four-year statute of limitations for plaintiffs' claims against the individual defendants began to run, at the latest, on November 23, 2004, when plaintiffs admittedly discovered the existence of a claim against these defendants' employer. Plaintiffs' claims against the individual defendants are therefore dismissed as time-barred.

**IV.** **Motion to Dismiss Pre-1999 Claims (Doc. # 1175)**

The remaining defendants seek to dismiss plaintiffs' claims based on a conspiracy allegedly existing prior to 1999. Defendants first argue that plaintiffs have not satisfied the requirement from *Twombly* that they allege sufficient facts to support a plausible claim that such a conspiracy existed. Defendants also argue that the pre-1999 claims should be dismissed as time-barred because plaintiffs have not sufficiently pleaded acts of fraudulent concealment in that period. For the reasons set forth below, the Court rejects both arguments.

*A.* Twombly *Pleading Standards*

In *Urethane III*, the Court discussed at some length the pleading standards announced by the Supreme Court in *Twombly* and *Ashcroft v. Iqbal*, __ U.S. __, 129 S.

Ct. 1937 (2009). *See Urethane III*, 2009 WL 3337247, at * 2-6. Those standards were summarized by the Supreme Court in *Iqbal* as follows:

> [T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.
>
> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Rule 8 marks a notable and generous departure from the hyper-technical code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief.
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they

> must be supported by factual allegations. When there are well-pleaded
> factual allegations, a court should assume their veracity and then
> determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 129 S. Ct. at 1949-50 (citations and internal quotations omitted) (quoting

*Twombly*, 550 U.S. at 555-57, 570; Fed. R. Civ. P. 8(a)).

Shortly after *Twombly*, the Tenth Circuit described that opinion as one that "seeks

to find a middle ground between 'heightened fact pleading,' which is expressly rejected,

and allowing complaints that are no more than 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action,' which the [Supreme] Court stated 'will

not do.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citations omitted)

(quoting *Twombly*, 550 U.S. at 555, 570). The Tenth Circuit also clarified the meaning

of "plausible" under the *Twombly* standard:

> Thus, "plausible" cannot mean "likely to be true." Rather, "plausibility"
> in this context must refer to the scope of the allegations in a complaint:
> if they are so general that they encompass a wide swath of conduct, much
> of it innocent, then the plaintiffs "have not nudged their claims across the
> line from conceivable to plausible." The allegations must be enough that,
> if assumed to be true, the plaintiff plausibly (not just speculatively) has a
> claim for relief.

*Id.* (citations omitted) (quoting *Twombly*, 550 U.S. at 570). The Tenth Circuit noted that

"[t]his requirement of plausibility serves not only to weed out claims that do not (in the

absence of additional allegations) have a reasonable prospect of success, but also to

inform the defendants of the actual grounds of the claim against them." *Id.* at 1248.

Finally, in *Urethane III*, the Court summarized the relevant inquiry in the present

case as follows:

Thus, the United States Supreme Court has made clear the Court's task in the present case: The Court need not assume as true conclusory statements in plaintiffs' complaints, including the mere recitation of the existence of a conspiracy or other elements of the claims. Rather, the Court must ensure that plaintiffs have alleged facts to support those elements sufficient to provide the "heft" to show an entitlement to relief and to "nudge" plaintiffs' claims over the line from [mere] possibility or speculation to plausibility. In an antitrust case such as this one, sufficient facts would tend to include details concerning the conspirators' actual agreement to fix prices.

*Urethane III*, 2009 WL 3337247, at *6.

### B. Allegations of a Conspiracy Prior to 1999

In *Urethane III*, the Court first addressed defendants' argument for dismissal of plaintiffs' claims based on an alleged conspiracy existing between 1999 and 2001, and it had "no trouble" finding those allegations to be sufficient under *Twombly*. *See id.* at *6-7. The Court first noted that it had rejected such a challenge to the class complaints in *Urethane I*:

In concluding that the allegations sufficiently gave defendants fair notice of the basis for plaintiffs' claims, the Court identified a number of nonconclusory facts alleged in the class complaint relating to the existence of a conspiracy, including the facts that defendants agreed to fix prices for the products at issue; that the characteristics of the markets for these products facilitated anticompetitive collusion; that interrelated price increases and announcements for these products were made by defendants; and that defendants accomplished this by participating in meetings and conversations in which they agreed to set prices and allocate customers.

*Id.* at *7 (citing *Urethane I*, 409 F. Supp. 2d at 1281-82, 1283). The Court then noted that the direct action plaintiffs' complaints went beyond the class complaint "by giving details (dates, parties involved, locations) about a number of meetings and

28

communications between and among defendants, as well as details about various announcements by defendants and industry publications that relate to contemporaneous price increases." *See id.* The Court rejected defendants' argument that the allegations for this time period were deficient because the allegations relating to each meeting or communication occurring from 1999 to 2001 did not include the specific allegation that a particular agreement was reached at that time:

> The Court rejects defendants' attempt to impose such a strict pleading standard in this case. *Twombly* does not require that plaintiffs prove their case or include every factual detail in support of their claims in their complaints. Rather, they must include sufficient facts supporting the existence of a conspiracy, beyond the conclusory allegation that a conspiracy did exist. For the period beginning in 1999, plaintiffs have alleged a number of specific meetings and communications between and among defendants relating to prices and markets for these products, occurring in a market that facilitated collusion and saw contemporaneous price increases, as well as specific measures taken by the participants to keep those meetings and communications secret (for instance, sweeps for surveillance devices and the use of pay phones away from offices). Such specific, nonconclusory factual allegations satisfy the plausibility standard and (taken as true) are sufficient to create the inference that a conspiracy existed beginning in 1999.

*See id.*[13]

In *Urethane III*, the Court agreed with defendants that plaintiffs had not alleged sufficient facts to support a plausible claim based on a conspiracy existing before 1999.

---

[13]In a footnote, defendants state that, "[t]o preserve the issues," they also move at this time to dismiss the 1999-2001 claims as deficient under *Twombly*, although they "respect that the Court has already ruled on these contentions." The Court denies this *pro forma* motion for dismissal of the 1999-2001 claims for the same reasons set forth in its prior opinion.

*See id.* at *8-9.  The Court reasoned as follows:

> Plaintiffs have not alleged any specific meeting or communication involving defendants occurring prior to 1999.  Plaintiffs have alleged generally that such meetings and communications began in 1994; without any supporting factual allegations, however, such a general allegation is no better than a conclusory allegation that defendants conspired beginning in 1994, and *Twombly* teaches that such an allegation does not suffice.  In support of their claims of conspiracy, plaintiffs have also identified two 1994 articles and two 1998 letters relating to price increases in the market.  The mere fact of such increases, however, does not raise the plausible inference that they resulted from an illegal conspiracy beginning in 1994 and not from independent conduct or legitimate circumstances; thus, as in *Twombly*, those allegations do not plausibly support the existence of a conspiracy during the time period at issue.

> A review of plaintiffs' complaints fails to reveal any specifically alleged factual basis for plaintiffs' decision to use 1994 as the starting point of the conspiracy.  (Nor have plaintiffs stated in their opposition brief why they chose that date.)  There are certainly no allegations of specific meetings or communications occurring during that period, as there are for the period beginning in 1999; as the Supreme Court noted, allegations of an agreement would normally include details about the formation of that agreement.  Thus, there are no allegations in these complaints that would give defendants fair notice of the basis for plaintiffs' claim of a conspiracy beginning in 1994.

> Plaintiffs insist that they need not allege specific meetings or communications occurring during each year during the alleged conspiracy.  That argument misses the point, however.  Under *Twombly*, plaintiffs cannot simply allege a conspiracy beginning at a particular time; rather, they must allege facts to support the existence of a conspiracy during the entire period.  Plaintiffs may not need to allege meetings occurring at any particular intervals; they must at least provide a factual basis for their starting date, however, in order to show an entitlement to relief beginning on that date.  Plaintiffs have not done so here; accordingly, plaintiffs have not stated a claim for antitrust liability (under either the federal or state statutes or European law) for the period from 1994 to 1998, and therefore such claims are subject to dismissal.

*Id.* (citations and footnote omitted).  The Court also noted that plaintiffs, in pleading

fraudulent concealment, had alleged that they learned in December 2007 from Bayer, a cooperating conspirator, that the conspiracy extended back to 1994; but that plaintiffs had not included that allegation as a basis to support their conspiracy allegations or alleged any facts learned from that conspirator for the pre-1999 period. *See id.* at *8 n.5.

In support of their conspiracy allegations, plaintiffs' second amended complaints now include the allegation that Bayer provided information concerning various meetings and communications in furtherance of the alleged conspiracy. Plaintiffs have also added a number of allegations relating to the period prior to 1999, including allegations of meetings and communications involving specific participants and specific locations.

Defendants argue that the new allegations are still too vague to satisfy the *Twombly* pleading standards. In that regard, defendants argue that plaintiffs have failed to allege specifically the particular dates, participants, products discussed, markets discussed, agreements reached, and actions taken as a result for each meeting or communication alleged for that time period, as well as the specific way in which all of the meetings and communications were connected. The Court rejects defendants' argument that plaintiffs have not pleaded sufficient non-conclusory facts to state a plausible claim for the pre-1999 period.

Once again, defendants have attempted to impose an overly strict pleading standard. As noted above, in *Urethane III* the Court based its decision on plaintiff's failure to allege any meetings or communications occurring prior to 1999 or to provide any basis for extending the alleged conspiracy back to 1994. Plaintiffs have corrected

that omission in their second amended complaints. First, plaintiffs have now alleged various meetings and communications dating back at least to 1994, involving specific participants (plaintiffs have now identified 21 executives involved during that time period, including at least one from each defendant), and occurring in specific locations. Contrary to defendants' argument, plaintiffs are not required to allege every detail for every meeting or communication occurring during the relevant time period. Rather, plaintiffs need only allege enough facts to support a plausible claim of the existence of a conspiracy that does not merely rest on purely conclusory allegations. Plaintiffs have done so here. The applicable standard is not whether any unanswered questions remain about the alleged meetings and communications during the time period, as defendants seem to suggest.

The Court also rejects defendants' argument that plaintiffs have not sufficiently linked its pre-1999 conspiracy allegations to conduct in the United States and an effect on United States markets. Plaintiff have clearly alleged that the conspiracy involved both European and American pricing, and they have identified communications involving executives in the United States. Those factual allegations support a plausible claim of a pre-1999 conspiracy that affected United States pricing.

In their second amended complaints, plaintiffs have also specifically mentioned the information from Bayer in support of their conspiracy allegations. Thus, plaintiffs now allege that a participating co-conspirator has indicated that the alleged conspiracy, involving both United States and European pricing, extended back to 1994. Defendants

have not explained why that allegation, in and of itself, is not sufficient to make plaintiff's claim of a pre-1999 conspiracy plausible under *Twombly*. Accordingly, the Court denies defendants' motion to dismiss the pre-1999 claims on this basis.

Defendant Huntsman International LLC ("Huntsman") has filed its own brief in which it argues that plaintiffs have failed to allege a plausible claim specifically against it for the pre-1999 period. Plaintiffs have alleged that Huntsman was formed in 1999 when it acquired the business and liabilities of Imperial Chemicals Industries Ltd. ("ICI"); that ICI participated in the alleged conspiracy prior to 1999; and that Huntsman joined the conspiracy after that acquisition.

Huntsman argues that plaintiffs have failed to alleged sufficient facts supporting the allegation that ICI participated in the conspiracy prior to 1999. As it did with respect to defendants generally, however, the Court rejects Huntsman's argument that plaintiffs were required to allege every detail of any meeting or communication involving ICI. As concluded above, plaintiffs have sufficiently alleged that a conspiracy existed during that time period. Plaintiffs have also alleged that a particular representative from ICI participated in communications and agreed on price ranges with other members of the conspiracy during that time period. Thus, plaintiffs have pleaded facts from which one could plausibly infer that ICI was involved in the conspiracy that extended back to 1994. Moreover, one may reasonably infer from the complaints that Bayer, a co-conspirator, identified ICI as a member of a price-fixing conspiracy that extended to that date.

Finally, the Court also concludes that plaintiffs have pleaded sufficient facts from

which one could plausibly infer that Huntsman joined the conspiracy with knowledge of the prior conduct and with the intent to pursue the same objectives, thereby allowing Huntsman to be held liable for the pre-1999 period on an alternative basis. *See, e.g.*, *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980). In that regard, the fact that Bayer has indicated that the same conspiracy extended back to 1994 raises the plausible inference that the pre-1999 and post-1999 conspiracies alleged by plaintiffs were connected.

For these reasons, the Court denies Huntsman's separate request for dismissal of the pre-1999 claims against it.

### C. Allegations of Fraudulent Concealment Prior to 1999

Defendants also argue that plaintiffs' pre-1999 claims should be dismissed as time-barred on the ground that plaintiffs have not sufficiently alleged affirmative acts of fraudulent concealment for that time period. The Court rejects this basis for dismissal.

In their first amended complaints, plaintiffs alleged the following affirmative fraudulent acts by defendants: secret meetings and communications, including agreements to conceal their price-fixing activities; false and pretextual letters and announcements regarding price increases; and defendants' denial of a price-fixing conspiracy throughout the class litigation. Defendants challenged those allegations as they related to the period from 1994 through 1998 as deficient under Rule 9(b)'s particularity requirement. In *Urethane III*, the Court concluded that plaintiffs had failed to allege with particularity any secret meetings or agreements to conceal occurring prior

to 1999; that plaintiffs had pleaded only two 1994 announcements and two 1998 letters with particularity; and that defendants' alleged denial of wrongdoing could not constitute fraudulent concealment. *See Urethane III*, 2009 WL 3337247, at *10. With leave of the Court, plaintiffs subsequently filed second amended complaints, in which they added new allegations of pre-1999 meetings, communications, announcements, and letters.[14]

### 1. FALSE AND PRETEXTUAL STATEMENTS

Defendants argue that plaintiffs cannot rely on their allegations of false and pretextual announcements and letters as acts of fraudulent concealment because they have not alleged specifically how those statements concerning price increases were false. For instance, defendants argue that, with respect to a statement that prices were being increased because of rising costs, plaintiffs should have alleged facts showing that costs were not in fact rising.

First, the Court does not agree that Rule 9(b) required plaintiffs to plead with particularity why the alleged misrepresentations were actually false. *See Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (under Rule 9(b), complaints must "set forth the time, place and contents of the false representations, the identity of the party making the false statements and the consequences thereof") (internal quotation omitted).

---

[14]Plaintiffs' second amended complaints again allege defendants' denial of a conspiracy during the class action litigation as an act of fraudulent concealment, and defendants have not specifically challenged that allegation in their renewed motion to dismiss.

The Tenth Circuit case on which defendants rely for this argument set forth a specific standard for securities fraud allegations, based on other securities fraud cases, and is therefore inapposite. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997); *cf. also Ames v. Uranus, Inc.*, 1993 WL 106896, at *5-6 (D. Kan. Mar. 17, 1993) (inapposite for same reason).

Moreover, even if Rule 9(b) did require plaintiffs to plead how the statements were false, plaintiffs have done so here. In the alleged statements, defendants attributed price increases to various causes. Plaintiffs have alleged that those statements were false because the increases actually resulted from the alleged price-fixing conspiracy. Thus, plaintiffs have alleged how the statements were false.

Defendants also argue that these fraudulent concealment allegations cannot be plausible under *Twombly* in light of plaintiffs' failure to allege facts to refute the stated (and allegedly pretextual) reasons for the price increases. In essence, defendants are arguing that without such a refutation, plaintiffs have not alleged any facts to support a plausible claim of pretext. The Court rejects this argument as well. The fact that defendants had entered into an agreement to fix prices (as sufficiently alleged by plaintiffs, in part in reliance on information from a member of the conspiracy) gives rise to the reasonable inference that subsequent price increases resulted from that agreement—whether or not the increases might also have been justified in whole or in part by conditions such as rising costs. Perhaps costs were rising, but under these circumstances it is plausible that competitive pressures would have held prices down

absent an agreement. Therefore, plaintiffs have plausibly alleged that defendants' pre-1999 statements were false and pretextual.

Finally, defendants cite to cases in which plaintiffs were not permitted simply to allege the defendants' denial of wrongdoing as affirmative acts of fraudulent concealment. *See Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987); *Go Computer, Inc. v. Microsoft Corp.*, 437 F. Supp. 2d 497, 501 (D. Md. 2006) (citing *Pocahontas*), *aff'd*, 508 F.3d 170 (4th Cir. 2007). In this case, however, defendants did not simply deny the existence of a conspiracy; rather, plaintiffs have alleged that defendants made affirmative misrepresentations about the true causes of price increases. Therefore, the Court rejects this basis for dismissal.

### 2. SECRET COMMUNICATIONS AND AGREEMENTS TO CONCEAL

Finally, defendants argue that in alleging "secret" meetings occurring before 1999, plaintiffs have merely alleged communications that were private, and thus have not alleged affirmative acts of concealment. The Court rejects this argument. Plaintiffs have alleged that defendants affirmatively acted to make sure that their meetings and communications were not discovered and their agreements remained concealed, for example by meeting and communicating in ways and in places where they could not be observed, such as in hallways, cafes, and private homes; by meeting outside the United States to avoid detection here; by agreeing to destroy evidence; and by agreeing to conceal their price-fixing activities. Defendants note that the only instances in which

plaintiffs specifically identified particular acts by date involved acts occurring after 1999. Nonetheless, plaintiffs' fraudulent concealment allegations explicitly refer back to their allegations of meetings and communications occurring prior to 1999. Thus, plaintiffs have alleged affirmative acts of concealment with respect to meetings and communications occurring prior to 1999.[15]

IT IS THEREFORE ORDERED BY THE COURT THAT defendants' motion to dismiss the European plaintiffs' claims under European law (Doc. # 1179) is **granted in part**; the Court declines to exercise supplemental jurisdiction over those claims, which are hereby dismissed.

IT IS FURTHER ORDERED BY THE COURT THAT the motion by individual defendants Jean-Pierre Dhanis and Uwe Hartwig to dismiss plaintiffs' claims against them on limitations grounds (Doc. # 1173) is **granted**, and all claims against those defendants are hereby dismissed.

---

[15]Defendants have argued that plaintiffs may not toll the statute of limitations solely based on their allegation that defendants' conspiracy was self-concealing. Because the Court has rejected defendants' challenges to the affirmative acts of fraudulent concealment alleged by plaintiffs, it need not address the viability of the self-concealing standard under Tenth Circuit law at this stage. *See Urethane III*, 2009 WL 3337247, at *10 n.7 (declining to decide whether the Tenth Circuit would adopt the self-concealing standard in light of plaintiffs' satisfaction of the intermediate "affirmative acts" standard).

IT IS FURTHER ORDERED BY THE COURT THAT the remaining defendants' motion to dismiss plaintiffs' pre-1999 antitrust conspiracy claims (Doc. # 1175) is **denied**.


IT IS SO ORDERED.


Dated this 25th day of January, 2010, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge