IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE: URETHANE ANTITRUST )
LITIGATION )
) Case No. 04-MD-1616-JWL
This Order Relates to: )
Polyether Polyol Cases )
)
_____)

## MEMORANDUM AND ORDER

This multidistrict litigation consists of both class action and direct action lawsuits in which plaintiffs claim defendants engaged in unlawful price fixing and market-allocation conspiracies with respect to urethane chemicals, specifically polyether polyol products ("PPPs"), in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. Defendants have filed a motion to compel plaintiffs in the direct action lawsuits[1] to respond to certain discovery requests largely related to plaintiffs' communications with competitors regarding the price of foam products plaintiffs manufactured from PPPs **(doc. 1743)**. Also before the undersigned U.S. Magistrate Judge, James P. O'Hara, is the motion of a non-party, the United States of America, to stay discovery related to criminal investigations into a possible conspiracy among foam manufacturers, including many plaintiffs **(doc. 1616)**. For the reasons stated below, defendants' motion to compel is granted in part and denied in part, and

---

[1]The direct action plaintiffs are fifty-six potential class members who have opted out of the class certified in the main action and who have filed two separate lawsuits. In this memorandum and order, the term "plaintiffs" refers to the direct action plaintiffs.

the United States's motion is denied as moot.

## I. Background

This antitrust litigation involves allegations by plaintiffs, direct purchasers of PPPs, that defendants, chemical companies that create PPPs, conspired to fix the prices at which PPPs were sold, and to allocate customers and markets for PPPs in the United States and throughout the world. Plaintiffs contend defendants attempted to conceal such anticompetitive behavior by giving false and pretextual reasons for their parallel price increases of PPPs.[2] Many plaintiffs who purchased PPPs from defendants used the PPPs to manufacture foam, which they in turn supplied to manufacturers of goods such as furniture, mattresses, packaging, automobile seats, and appliances.

In November 2004 and thereafter, a series of class action lawsuits was initiated against manufacturers of PPPs on behalf of classes of purchasers of PPPs in the United States. The Judicial Panel on Multidistrict Litigation consolidated those actions for pretrial purposes in the District of Kansas. On July 29, 2008, John W. Lungstrum, the U.S. District Judge assigned to preside over the MDL in this district, certified a class of PPPs purchasers. Thereafter, plaintiffs timely opted out of the class action and filed two separate suits against defendants, which the Judicial Panel on Multidistrict Litigation transferred to this district in

---

[2]Parallel price increases are price increases of competitors that occur at or near the same point in time.

December 2008 and January 2009.³ Judge Lungstrum coordinated discovery for all the actions,⁴ and discovery is now in the end-stages, scheduled to end December 20, 2010.⁵

On July 28, 2010, it was publicly reported for the first time that the United States Department of Justice is conducting a grand jury investigation into a possible price-fixing conspiracy by manufacturers of foam products, including some direct action and class action plaintiffs.⁶ The Canadian Competition Bureau is conducting a parallel investigation into possible violations of Canadian antitrust laws. Related to those investigations, the United States and Canada have subpoenaed documents and seized evidence from foam manufacturers. On August 4, 2010, defendants served interrogatories and document requests on plaintiffs that sought information relating to plaintiffs' communications with competitors and the ongoing criminal investigations. Five days later, defendants noticed the depositions of twenty-six individuals allegedly implicated in the foam conspiracy, as well as five Rule 30(b)(6) depositions, that set forth topics related to plaintiffs' communications with competitors and the investigations.

---

³*See Carpenter Co., et al. v. BASF SE, et al.*, No. 08-2617-JWL; *Woodbridge Foam Corp., et al. v. BASF SE, et al.*, No. 09-2026-JWL.

⁴Doc. 1037.

⁵Scheduling Order No. 6, doc. 1659.

⁶It is public knowledge that five direct action plaintiffs (including the lead direct action plaintiffs) and five class action plaintiffs are being investigated. However, the full extent of the government's investigation is unknown; Fed. R. Crim. P. 6(e) prohibits the government from publicly disclosing which specific plaintiffs are implicated.

Rather than respond to the discovery requests and notices, plaintiffs moved the court for a protective order to preclude the discovery sought (doc. 1596). At about the same time, the United States moved the court to allow it to intervene and to stay discovery related to the criminal investigations (doc. 1616).

Plaintiffs' primary argument in support of their motion was that the information sought relating to an alleged foam conspiracy and surrounding government investigations was not relevant to the issues in this action. The court denied the motion, ruling a protective order was not the appropriate vehicle for raising relevancy objections.[7] To bring the matter before the court in the proper procedural posture, the court granted plaintiffs leave to serve relevancy objections to the discovery requests, and set forth a schedule for defendants to thereafter file a motion to compel.

The United States asserted in its motion to stay that the discovery sought by defendants threatens the integrity of the ongoing criminal investigations, invites disclosure of confidential grand jury matters, and could lead to inappropriate discovery by likely criminal defendants (i.e., by co-plaintiffs in this action who might be co-defendants in a criminal case). After permitting the United States to intervene, the court took the request to stay discovery under advisement. The court noted that a determination of whether a stay should issue requires the court to consider the rights and interests implicated by the discovery contemplated, a question that is intertwined with relevancy considerations.

---

[7] To the extent plaintiffs' motion was based on other grounds, such as undue burden and expense, the court also rejected those arguments in denying the motion.

Defendants' motion to compel on relevancy grounds is now before the court. Defendants state that, in response to the meet-and-confer process, and to address the concerns expressed by the United States in its motion to stay, defendants only seek to compel discovery related to plaintiffs' conduct; defendants do not seek to compel discovery related to the details of the criminal investigations. Specifically, defendants now move to compel discovery in three broad areas:

1. *The sale of urethane products by defendants*, including information related to

    • plaintiffs' communications with other foam manufacturers/sellers regarding any notice or price increase announcement by a defendant regarding the prices of urethane products or increases in the costs of urethane raw materials.[8]

2. *The sale of foam products by plaintiffs*, including information related to

    • plaintiffs' communications with other foam manufacturers/sellers regarding the price of foam or other products made with PPPs;[9]

    • plaintiffs' communications with other foam manufacturers/sellers regarding market share and allocation of customers for foam products;[10]

    • plaintiffs' meetings with other foam manufacturers/sellers;[11]

    • plaintiffs' competitors' prices, capacity, and/or price increase

---

[8] *See* Defendants' Individual Dep. Notices Nos. 1–3, 7 (Aug. 9, 2010).

[9] *See* Defendants' 4th Set of Merits Interrogs. Nos. 5–6 (Aug. 4, 2010); Defendants' 3rd Set of Doc. Prod. Reqs. Nos. 6–7 (Aug. 4, 2010); Defendants' Individual Dep. Notices Nos. 4–7, 10 (Aug. 9, 2010).

[10] *See* Defendants' Individual Dep. Notices Nos. 6–7, 10 (Aug. 9, 2010).

[11] *See* Defendants' Individual Dep. Notices Nos. 8–9 (Aug. 9, 2010).

announcements;[12] and

- plaintiffs' antitrust policies, training, or compliance.[13]

3. *Government investigations into a possible conspiracy by plaintiffs*, including

- documents provided to any government agency related to an investigation into violations of antitrust law by manufacturers of foam or other products made with PPPs.[14]

## II. Defendants' Motion to Compel

Plaintiffs object to defendants' discovery requests on the grounds that they are "neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."[15] Plaintiffs assert that the issue in this case is whether defendants colluded with respect to the prices of PPPs, not whether plaintiffs engaged in a conspiracy with respect to the price of foam. In other words, plaintiffs argue, even if plaintiffs engaged in a "separate price-fixing conspiracy among foam producers," this "would in no way disprove the existence of a urethanes price-fixing conspiracy."[16] Defendants counter that their discovery requests are tailored to elicit evidence showing that defendants' conduct was not

---

[12]*See* Defendants' 2nd Set of Doc. Prod. Reqs. No. 3 (June 16, 2010).

[13]*See* Defendants' 2nd Set of Doc. Prod. Reqs. Nos. 1–2 (June 16, 2010).

[14]*See* Defendants' 3rd Set of Doc. Prod. Reqs. No. 1 (Aug. 4, 2010).

[15]Doc. 1747, Exh. 6 (Plaintiffs' Collective Objections to Defendants' 3rd Set of Doc. Prod. Reqs. Nos.1, 6, 7), Exh. 7, (Plaintiffs' Collective Objections to Defendants' 2nd Set of Doc. Prod. Reqs. Nos. 1–3), Exh. 8 (Plaintiffs' Collective Objections to Defendants' 4th Set of Merits Interrogs. No. 5).

[16]Doc. 1764 at 3.

conspiratorial or unlawful. Defendants assert the discovery is relevant to both liability and damages.

**A.     Legal Standards**

In civil actions, liberal discovery is typically permitted under the theory that the "search for the truth" should be "nearly unencumbered."[17] To this end, Fed. R. Civ. P. 26(b)(1) provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."[18] At least as a general proposition, information is deemed relevant and discoverable "unless it is clear that [it] can have no possible bearing on the claim or defense of a party."[19]

If a discovery request appears relevant on its face, the party opposing discovery has the burden of showing the request falls outside the scope of Rule 26(b)(1).[20] But if the

---

[17]*Cotracom Commodity Trading Co. v. Seaboard Corp.*, No. 97-2391, 2000 WL 796142, at *2 (D. Kan. June 14, 2000); *see also Herbert v. Lando*, 441 U.S. 153, 177 (1979) ("The Court has more than once declared that the deposition-discovery rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil trials.").

[18]Fed. R. Civ. P. 26(b)(1); *see also Mackey v. IBM*, 167 F.R.D. 186, 193 (D. Kan. 1996) ("A party does not have to prove a prima facie case to justify a request which appears reasonably calculated to lead to the discovery of admissible evidence.").

[19]*Sheldon v. Vermonty*, 204 F.R.D. 679, 689–90 (D. Kan. 2001) (internal quotations and citations omitted).

[20]*Cardenas v. Dorel Juvenile Group, Inc.*, 232 F.R.D. 377, 382 (D. Kan. 2005).

relevance of the discovery request is not readily apparent, the party requesting the discovery has the burden of showing its relevance.[21] Here, the relevance of defendants' discovery requests related to possible anti-competitive conduct *by plaintiffs* is not readily apparent to the court from the face of the requests, and thus the court finds defendants bear the burden of establishing relevance.[22]

**B.     Analysis**

As mentioned above, the discovery requests defendants ask the court to enforce in the instant motion fall into three broad categories. The court will address the relevancy aspects of each category in turn.

    **1.     The sale of urethane products by defendants**

Defendants move to compel responses to discovery requests that seek information related to plaintiffs' communications with other foam manufacturers regarding any notice or price increase announcement by a defendant regarding the prices of urethane products or increases in the costs of urethane raw materials.

Defendants first assert this information is relevant because it may refute plaintiffs'

---

[21]*Id*. at 382–83.

[22]Defendants do not address which side bears the burden of proof, despite the court's fairly explicit guidance on this point in its October 21, 2010 memorandum and order. Defendants appear to erroneously place the burden on plaintiffs. That is, instead of framing the argument in a way that demonstrates why the discovery defendants seek is relevant, they merely attack plaintiffs' assertions that the discovery is irrelevant. This approach unwisely leaves it to the court to interpret defendants' relevancy arguments to the extent possible given the record presented. At the risk of stating what should be obvious, it would be a profound mistake for defense counsel to assume the court will be so indulgent in the future.

claims that defendants' parallel price increases were indicative of collusion; the information might show defendants' parallel price increases were instead the result of plaintiffs contacting individual defendants and asking multiple defendants to raise prices so as to facilitate plaintiffs' foam conspiracy.[23] In other words, the discovery might help defendants prove they raised their prices as a response to their customers' requests, rather than as a result of a conspiracy. The court agrees the discovery sought related to plaintiffs' communications about the prices of urethane products or increases in the costs of urethane raw materials is relevant because it could bear on whether (or not) the prices set by defendants were the result of defendants' anticompetitive conduct.

Plaintiffs object on the ground that, even if the discovery sought were to show plaintiffs solicited price increases from defendants, defendants cannot use such information because showing a victim of a conspiracy took advantage of the collusion cannot be used as a defense to antitrust liability.[24] However, this argument fails to recognize defendants are not attempting to use the information as a defense to collusion. Rather, defendants would use the information to show they did not engage in anti-competitive conduct in the first

---

[23]Defendants cite in support an internal email from defendant The Dow Chemical Company ("Dow") stating that a Dow customer had requested that Dow raise its prices for MDI to the customer "and the industry" because "[t]hey need it to get their prices up." Exh. 16 to doc. 1747. Although plaintiffs note that the Dow customer is a plaintiff in the class action lawsuits, not a plaintiff in the direct action lawsuits, the email nonetheless indicates that defendants' theory of defense is not completely speculative.

[24]*See Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968) (overruled on other grounds by *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 765–66 (1984)). For an additional discussion of the *Perma Life* holding, see footnote 30 and accompanying text.

place.

Defendants further assert the information is relevant because it may indicate plaintiffs had notice of defendants' conduct and thus defeat plaintiffs' claims of fraudulent concealment. To overcome a statute-of-limitations bar to plaintiffs' pre-1999 claims, they must prove: "(1) the use of fraudulent means by the defendants; (2) successful concealment from plaintiffs; and (3) that plaintiffs did not know or by the exercise of due diligence could not have known that they might have a cause of action."[25] Pursuant to the third element, plaintiffs pleaded that they did not know and could not have known through the exercise of reasonable diligence that defendants' price increases were the result of defendants' conspiracy. Plaintiffs alleged they believed the reasons defendants gave for defendants' price increases (including increases in raw material costs, competitive market forces, and supply/demand factors). However, if the discovery defendants seek indicates plaintiffs solicited price hikes from defendants, encouraged defendants to standardize their prices, or closely followed and discussed increases in raw material costs for PPPs, then plaintiffs' allegations of reliance may be effectively attacked.

Plaintiffs argue that whether they solicited price increases from defendants or monitored urethane prices is not relevant because defendants nonetheless failed to disclose defendants' price increases were *in part* attributable to a urethane conspiracy and because such facts would not demonstrate plaintiffs had knowledge of a urethane conspiracy. The court flatly rejects this argument. If the discovery sought were to reveal plaintiffs were in

---

[25]*In re Urethane Antitrust Litig.*, 235 F.R.D. 507, 518 (D. Kan. 2006).

fact encouraging defendants to standardize their prices, and/or closely following and discussing increases in raw material costs for PPPs, then defendants would have a tenable argument that plaintiffs reasonably should have known defendants' price increases were due at least in part to a conspiracy. Defendants' discovery requests seeking information related to plaintiffs' communications about defendants' prices of urethane products and increases in the costs of urethane raw materials is therefore relevant to a claim or defense in this litigation.

Defendants' motion to compel is granted to the extent it seeks discovery into this first category of information.

### 2. The sale of foam products by plaintiffs

Next, defendants move to compel responses to discovery requests that seek information related to plaintiffs' communications with competitors that may indicate anticompetitive conduct by plaintiffs in setting the price of foam and other products manufactured with PPPs. Defendants contend plaintiffs' pricing and sales practices for foam products is relevant to liability and damages.

#### i. Relevance to liability

First, defendants assert the information sought related to plaintiffs' contacts with competitors and plaintiffs' parallel price increases is relevant to the issue of liability because it will help defendants refute plaintiffs' claims that similar conduct by defendants is indicative of collusion. Defendants contend that, if plaintiffs themselves engaged in conduct plaintiffs have said is circumstantial evidence of conspiracy (such as unscripted meetings and

telephone calls with competitors), then plaintiffs' liability claims are undermined.

The court agrees, under the liberal discovery standards which apply, plaintiffs' parallel price increases and communication with competitors in setting the price of foam could possibly bear on plaintiffs' claims that similar actions by defendants are indicative of a urethane conspiracy. Although plaintiffs argue they "do not intend to rely *solely* on [defendants'] contacts with competitors, attendance at trade association meetings or parallel price increases to prove the existence of a urethanes conspiracy,"[26] the fact remains plaintiffs have pointed to these actions as *some* evidence of collusion.[27] Defendants are entitled to seek information that might refute this assertion, such as possible statements by plaintiffs that such conduct is consistent with legal business behavior. While two wrongs don't make a right and it is possible the facts might show both defendants and plaintiffs engaged in anticompetitive conduct (rather than both engaged in legal conduct), at the discovery stage the focus is on placing all pertinent facts (i.e., facts that may have a bearing on a claim or defense in the case) on the table. The admissibility of those facts, as well as the conclusions to be drawn from them, will be addressed at trial.

Second, as noted by defendants, the court previously has determined that information

---

[26] Doc. 1747, Exh. 6 (Plaintiffs' Collective Objections to Defendants' 3rd Set of Doc. Prod. Reqs. Nos.1, 6, 7) (emphasis added), & Exh. 8 (Plaintiffs' Collective Objections to Defendants' 4th Set of Merits Interrogs. No. 5) (emphasis added); *see also* doc. 1764 at 4–5.

[27] The court therefore places little weight on caselaw holding communications among plaintiff competitors is not relevant to rebut an inference that such conduct necessarily indicates a conspiracy because the law requires more. *See, e.g., In re Polyester Staple Antitrust Litig.*, No. 3:03CV1516, 2005 WL 6457181 (W.D. N.C. May 9, 2005).

regarding "the willingness and ability of plaintiffs to raise the prices of the products that plaintiffs made from PPPs" is relevant to defendants' assertion that the prices defendants set for PPPs were the result of legitimate factors, rather than collusion.[28] If discovery indicates plaintiffs entered agreements to set the prices of foam and other products manufactured from PPPs, such discovery could bear on the reason for defendants' prices, which defendants assert were influenced by demand for plaintiffs' products and plaintiffs' ability to raise the prices thereof, not defendants' collusion.[29]

Plaintiffs argue, even if certain plaintiffs engaged in a foam conspiracy, plaintiffs' unlawful conduct would not excuse anticompetitive conduct by defendants. The court agrees (as do defendants).[30] The undersigned magistrate certainly does not presume to speak

---

[28] Memorandum and Order of January 20, 2010 (doc. 1288) at 10; *see also, id.* at 7–11.

[29] *See J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, No. C-1-01-704, slip op. at 6 (S.D. Ohio June 7, 2004) ("Put another way, we believe that whether the indirect purchasers were passive victims of price increases or active promoters of such activity is an important issue [in determining the reason behind defendant's price increases.]"); *see also id.* at 10 ("While we believe that Wyeth, a manufacturer, will find it difficult to convince the fact finder that its price was somehow determined by the practices of those to whom it sells, we cannot foreclose the use of downstream information during the discovery phase of the case on the basis of relevance.").

[30] In *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, the Supreme Court approved a jury instruction that the alleged participation by the plaintiffs, liquor wholesalers, in a conspiracy to set the minimum price for the sale of liquor was *not* a defense to the plaintiffs' antitrust action against the defendants, liquor distributors, for allegedly conspiring to fix maximum prices above which wholesalers could not resell liquor. 340 U.S. 211, 214 (1951) (overruled on other grounds by *Copperweld Corp.*, 467 U.S. at 765–66).

Similarly, in *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, the Supreme Court disapproved of the common law doctrine of *in pari delicto* (literally meaning "of equal fault") in antitrust cases. 392 U.S. 134, 140 (1968) (overruled on other grounds by *Copperweld Corp.*, 467 U.S. at 765–66). The plaintiffs had participated in the conspiracy

for the various U.S. District Judges who will preside over trials following remand to the transferor courts in this MDL. Although it is highly unlikely defendants will be permitted at trial to pursue a theory that a conspiracy by plaintiffs is a defense or bar to plaintiffs' antitrust action against defendants, that is not a reason to disallow the requested discovery. Defendants do not seek discovery of plaintiffs' conduct for the purpose of presenting an absolute defense to plaintiffs' allegations of a urethane conspiracy or as a barrier to the bringing of an antitrust action. Rather, as noted above, defendants assert the discovery is relevant to counter plaintiffs' assertions that contacts with competitors, attendance at trade association meetings, or parallel price increases are evidence of a conspiracy, and/or to show increases in the prices defendants set for PPPs were the result of plaintiffs' willingness and ability to raise the price of foam. Thus, plaintiffs' argument on this point is inapposite.

Defendants' motion to compel is granted to the extent it seeks discovery into this second category of information as relevant to liability.[31]

---

by utilizing and profiting from the defendants' illegal arrangements, and it was this participation that was urged as a bar to their bringing actions against the active participants. *Id.* at 138. The Court held that the fact that the plaintiffs had benefitted from the defendants' restrictive arrangements did not prevent their suing under the antitrust laws. The Court reasoned that there was nothing in the language of the antitrust acts showing an intent by Congress to make a common law doctrine a defense to a private suit that serves important public purposes. *Id.*

[31]Defendants raise a third argument that this discovery could be used to impeach the credibility of witnesses who testified during depositions that they did not speak with competitors about foam pricing or monitor their competitors' prices. However, defendants have cited no authority, and the court can find none, holding that discovery may be compelled simply because it may give rise to impeaching information. Nevertheless, the discovery in this second category is ordered compelled for the other reasons discussed.

### ii.  Relevance to damages

Defendants next contend evidence of plaintiffs' conduct affecting the price of foam is relevant to a determination of plaintiffs' damages arising from the alleged urethane conspiracy. To establish damages, plaintiffs will need to prove the price they paid for PPPs was higher than the price they would have paid "but for" the anti-competitive conduct of defendants. Defendants argue that, under their damages model, information about plaintiffs' downstream actions is relevant to an expert prediction of what defendants' pricing would have been. Defendants submit the declaration of economist Svelta Tzenova, who opines that, if plaintiffs' conduct led to an increase in the price of foam, the demand for foam likely would have been reduced. As a result, the demand for chemicals used to make foam, i.e., for defendants' products, would have also been reduced. According to Dr. Tzenova, a reduced demand for defendants' products could have led defendants to decrease production of those products, which in turn would have changed defendants' marginal production costs, which may have led defendants to set different prices for their products. Thus, Dr. Tzenova concludes, anti-competitive conduct by plaintiffs might have affected defendants' prices of PPPs and "is therefore highly relevant for the calculation of damages in the case."[32]

---

[32]Exh. 18 to doc. 1747, ¶ 10.  Although not asserted by defendants, the court notes that, to the extent plaintiffs are seeking separate damages for injury in their business and property (*see, e.g.,* doc. 1124, *Woodbridge* Second Amended Complaint, at 27), information to test whether such purported injury was attributable to factors other than defendants' alleged anticompetitive conduct may be relevant. *See Air Tech Equip., LTD v. Humidity Ventilation Sys., Inc.*, No. 05-CV-77, 2006 WL 3193720, at *2 (E.D.N.Y. Nov. 2, 2006) ("particularly in light of defendants' specific allegations of injury in pleading their counterclaims, the Court concludes that plaintiffs are entitled to some information to test whether defendants' purported loss of business was attributable to factors other than

Plaintiffs disagree. Plaintiffs argue that Dr. Tzenova's theory is simply that a *quantitative* decrease in demand for foam and other products produced from PPPs could have led to defendants raising their prices for PPPs. But information regarding the demand for foam and products containing PPPs already has been produced by plaintiffs pursuant to the court's January 3, 2010 memorandum and order.[33] Moreover, plaintiffs argue, the demand for foam products can be measured by publicly available information.[34] Finally, plaintiffs argue other *qualitative* information, such as information about plaintiffs' communication and decision making, has no relevance to damages, even under Dr. Tzenova's theory.

Plaintiffs also note they must establish the "but for" price of PPPs absent a urethane conspiracy with all other factors—including a foam conspiracy—being equal. Plaintiffs submit the declaration of economist Charles L. Miller Jr., in which he opines that evidence

---

plaintiffs' alleged anticompetitive conduct"); *see also In re Folding Cartons Antitrust Litig.*, No. MDL 250, 1978 U.S. Dist. Lexis 20409, at *11–12 (N.D. Ill. May 5, 1978) (noting that if the direct-action plaintiffs were to "seek to recover lost profits or for injury to business, defendants would be entitled to discover their financial data").

[33]Doc. 1288 at 3 (ordering the production of "[e]valuations or analyses of the market for products containing Polyether Polyol Products, including the current and forecasted demand for such products").

[34]*See In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2006 WL 1479819, at *8 (E.D. Pa. May 26, 2006) ("accept[ing] the rationale of *In re Vitamins* [*Antitrust Litig.*, 198 F.R.D. 296, 298–301 (D. D.C. 2000)]" that the "impact of demand on damages . . . could have been determined just as easily using either public information of overall market demand or sales data provided by the manufacturer defendants").

of a foam conspiracy would not affect this analysis.[35]

Finally, plaintiffs assert that "passing on" an overcharge is not a defense to liability in an antitrust case.[36] In other words, "[w]hether a purchaser absorbed, passed-on, or made a profit on the overcharges in comparison with the industry generally is irrelevant, and investigations into such matter are proscribed by *Illinois Brick*."[37] The court agrees that, *if* defendants where seeking the discovery under a pass-on defense theory, there would be no justification for compelling the discovery. However, defendants have again affirmatively stated they will not present a pass-on defense; rather, defendants advanced other theories for the relevance of the discovery.[38]

While both defendants and plaintiffs make compelling arguments regarding the relevance to a damages calculation of discovery relating to plaintiffs' contacts with competitors as to the price of foam, this ultimately becomes a moot issue. Because the court has found such information discoverable as relevant to liability, the court need not decide

---

[35]Exh. K to doc. 1764.

[36]*See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 724–25 (1977).

[37]*In re Auto. Refinishing Paint*, 2006 WL 1479819, at *8 (quoting *In re Folding Cartons*, 1978 U.S. Dist. Lexis 20409, at *8 (internal modifications to quote not shown)).

[38]*See In re Vitamins*, 198 F.R.D. at 299 ("Defendants are correct that *Hanover Shoe* [*Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968)] and its progeny do not render irrelevant plaintiffs' individualized downstream data because defendants are not seeking discovery of this data in order to assert a pass-on defense; rather defendants contend that this information is relevant to the determination of consumer demand which, according to Beyer's first affidavit, is a relevant factor in the calculation of "but for" prices that will be determinative of plaintiffs' damages.").

whether it is discoverable on damages grounds as well. The court notes, however, expert theories (and challenges to those theories) for establishing the "but for" price in calculating damages will undoubtedly be raised in *Daubert*-related motions, which are currently due by November 14, 2011.[39]

### 3. Government investigations into a possible conspiracy by plaintiffs

Defendants move to compel a document request that seems to fall into a third broad category: documents plaintiffs provided to any government agency in the United States or Canada related to an investigation into violations of antitrust law by manufacturers of foam or other products made with PPPs.[40] Defendants' motion states they are "not at this time moving to compel plaintiffs to produce documents and information relating to those discovery requests seeking details of the Government's investigation of the plaintiff-foamers."[41] Defendants' memorandum in support of their motion to compel indicates they have "[n]arrow[ed] defendants' discovery to the *facts* regarding plaintiffs' sales practices—as opposed to the investigation itself."[42]

Once again, defendants have created a confusing record. Moving to compel a response to a document request that focuses on government investigations of a possible foamer conspiracy appears inconsistent with defendants' express statements that they are not

---

[39]Scheduling Order No. 6, doc. 1659, at 6.

[40]*See* Defendants' 3rd Set of Doc. Prod. Reqs. No. 1 (Aug. 4, 2010).

[41]Doc. 1743 at 7.

[42]Doc. 1747 at 2 (emphasis in original).

seeking discovery into an investigation, but instead are focusing on plaintiffs' actions and sales practices. In any event, defendants have presented no persuasive argument or authority that information about an *investigation* into a possible conspiracy by plaintiffs (as opposed to plaintiffs' underlying actions) is relevant to a claim or defense in this litigation. Therefore, to the extent defendants seek to compel production of documents not otherwise covered by the analysis in sub-sections 1 and 2 above, their motion is respectfully denied.

### III. The United States's Motion to Stay Discovery

The United States's motion, which was filed and fully briefed before defendants limited their discovery requests in filing their motion to compel, asks the court to stay discovery "relate[d] to criminal investigations into possible collusion among foam manufacturers."[43] The United States asserts such discovery would threaten the integrity of ongoing criminal investigations, invite disclosure of confidential grand jury matters, and lead to inappropriate discovery by likely criminal defendants (i.e., by co-plaintiffs in this action who might be co-defendants in a criminal case). The motion makes clear "[t]he United States asks this Court to stay only the discovery into those criminal investigations."[44]

The United States's motion to stay has become moot. First, as discussed above, defendants greatly narrowed their discovery requests to focus solely on plaintiffs' conduct,

---

[43] Doc. 1616 at 1. The United States asserted that defendants' discovery requests "ask[ed] solely for documents and other information related to the governments' criminal investigations, and not to any aspect of this civil case." *Id.* at 2.

[44] *Id.* at 3. It appears the United States is most concerned about disclosure of "information given to or seized by the United States or Canadian governments, or information subpoenaed by the grand jury." Doc. 1675 at 2.

rather than the criminal investigations into that conduct. Second, to the extent defendants continued to pursue a single document request seeking documents plaintiffs provided to a government agency in the criminal investigations, plaintiffs have refused to provide such documents and the court has herein denied defendants' motion to compel their production. Thus, the United States's concerns that pending discovery might disclose grand jury testimony or threaten a criminal investigation are no longer germane. The motion to stay discovery is accordingly denied.

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1. Defendants' motion to compel (doc. 1743) is granted in part and denied in part.

2. The United States's motion to stay discovery (doc. 1616) is denied as moot.

3. To give the parties an opportunity to file objections to this memorandum and order, as well as the memorandum and order issued on October 21, 2010 (doc. 1703), as contemplated in the court's October 25, 2010 order (doc. 1713), plaintiffs need not respond to the discovery requests (to the extent the court has herein granted the motion to compel) until **January 7, 2011**.[45]

Dated December 17, 2010, at Kansas City, Kansas.

                                        s/ James P. O'Hara  
                                        James P. O'Hara  
                                        U.S. Magistrate Judge

---

[45] Of course, should objections be filed, plaintiffs may apply for a stay of the undersigned's orders pursuant to D. Kan. R. 72.1.4(d).