IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: URETHANE ANTITRUST LITIGATION | No. 04-MD-1616-JWL |
| This Document Relates To:<br>The Polyether Polyol Cases | |

**DECLARATION OF CHARLENE YOUNG IN SUPPORT OF
CLASS PLAINTIFFS' MOTION TO COMPLETE THE DISTRIBUTION
OF THE BAYER SETTLEMENT FUND**

CHARLENE YOUNG, declares as follows:

1.  I am a Senior Project Administrator for Rust Consulting, Inc. ("Rust"). Rust is successor in interest to Complete Claim Solutions, LLC which was retained by Plaintiffs' Counsel as Claims Administrator for the Bayer Settlement within the above-captioned action (the "Action"). I am over 21 years of age and am not a party to this action. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.  I submit this declaration in support of Class Plaintiffs' Motion To Complete The Distribution of the Bayer Settlement Fund.

**DESCRIPTION OF INITIAL DISTRIBUTION ACTIVITY**

3.  In its Order Approving Distribution of the Bayer Settlement Fund dated December 14, 2010 (the "Initial Distribution Order"), the Court directed that the Bayer Settlement Escrow Account (the "Escrow Account"), less $3,701,891.44 for specified contingencies and $51,437 for claims administration, be transferred into a Bayer Distribution

Account. The Escrow Agent made the transfer as required, and the Bayer Distribution Account was funded on January 13, 2011, with $33,265,585.82.

4. Pursuant to the Initial Distribution Order, on January 21, 2011, Rust issued 1,452 checks and 5 wire transfers totaling $33,265,585.82 from the Distribution Account to the authorized claimants.

5. Pursuant to ¶ 11 of the Initial Distribution Order, the checks issued in January all stated "VOID AFTER 90 DAYS" but could be negotiated through May 21, 2011.

6. Between January 22, 2011 and July 22, 2011, 35 persons or entities contacted Rust or Class Counsel requesting that their checks be reissued due to changed addresses, account name changes, corporate name changes, and other "administrative" reasons. Rust complied or is in the process of complying with all of these requests.

7. Some of the 35 Class Members who requested check reissues informed Rust that they submitted a claim but did not receive a settlement check. In each case, Rust checked to see whether the check was returned by the USPS as undeliverable, and if so re-mailed the check to the address specified by the claimant. If USPS had not returned the check to Rust as undeliverable, Rust asked the claimant to send a written request for a new check, in order to avoid fraudulent requests and to allow Rust to stop payment on the original check.

8. The USPS returned three checks to Rust as undeliverable and without forwarding addresses. Using LexisNexis, an address database service to which Rust subscribes, Rust tried unsuccessfully to find updated addresses for the Class Members whose checks were returned as undeliverable. These three checks, which have a total value of $46.64, expired in May 2011.

9. Between March 21 and May 21, 2011, Rust telephoned 24 claimants who had not negotiated settlement checks in amounts of $1,000 or more and for whom Rust could find current

contact information. Rust encouraged these claimants to negotiate the checks before they became stale or agreed to -- and did -- re-issue the checks.

10. Between May 21 and July 1, 2011, Rust contacted 18 claimants who had not negotiated checks in the amount of $50.00 or more and for whom Rust had current contact information. Rust informed the claimants that their settlement checks had expired, and re-issued checks to them.

11. The Distribution Account balance as of July 26, 2011 is $239,072.26. Of this, $221,266.23 must be reserved to cover nine reissued checks that are not yet stale. (Despite repeated efforts of both Rust and Class Counsel, one claimant did not authorize reissuance of its checks to a successor entity until July 26, 2011; those checks have a total value of $203,620.59.)

12. The remaining Distribution Account balance of $17,806.03 is due to 35 claimants not having negotiated their original and/or reissued settlement checks. The uncashed checks range in value from $0.68 to $10,407.84. A listing of the uncashed checks is attached at Exhibit 1.

13. Rust recently informed the four claimants with uncashed distribution checks of $1,000.00 or more that their settlement payments likely would be permanently forfeited if not negotiated by August 30, 2011. Rust will reissue checks to these claimants if necessary. If these four claimants negotiate their checks (which total $16,752.11), the balance in the Distribution Account will be $1,053.92.

14. Rust recommends that all checks, including reissued checks, that are not negotiated by August 30, 2011 be voided as of September 1, 2011. Rust further recommends that the funds represented by such voided checks be added to the Bayer Settlement Fund and distributed *pro rata* to the Authorized Claimants who negotiated their payments from the initial

distribution. Specifically, Rust recommends that the second distribution be made only to those claimants who negotiated their initial distribution payments.

15.     Since making the initial distribution on January 21, 2011, Rust has received one new claim, which is described in detail in paragraphs 28 and 29 below.

## PROPOSED SECOND DISTRIBUTION

A. <u>Claims Administration Fees and Expenses</u>

16.     The Initial Distribution Order set aside $51,437.00 for payment of Rust's fees and expenses to complete the Bayer Settlement distribution. Rust's actual fees and expenses for its services through February 28, 2011 were substantially higher than that amount. This was due in large part to additional work that Rust did not anticipate when preparing its original estimate of future fees and expenses. Class Counsel and Rust discussed the invoices and the work done, and Rust wrote off a significant amount of fees and expenses. Rust then submitted an invoice for $51,437.00 for Rust's services through February 28, 2011, and that invoice has been paid.

17.     Rust reasonably anticipates that its fees and expenses for completing the second distribution will total $23,707.00. This estimate includes stopping payment on all stale checks from both distributions, reconciling account balances, calculating the amounts to be paid to each claimant in the second distribution, preparing this declaration, generating and mailing the checks for the second distribution, coordinating check reissues and check forwarding, updating and maintaining the settlement hotline and website, preparing tax or informational returns, and finalizing and closing accounts after the second distribution is complete. Rust's itemized estimate of fees and expenses is attached as Exhibit 2.

18.     Rust respectfully requests payment of its professional fees and out-of-pocket expenses in the amount of $23,707.00.

B. Taxes And Tax Returns

19. Rust has been estimating the potential tax liabilities of the Bayer Escrow Account on a quarterly basis and filing necessary returns and informational forms. The Bayer Escrow Account's expenditures exceeded income in 2010 and so no tax was due or paid. We anticipate the same result for 2011.

20. Rust will close out the Bayer Distribution Account after all checks have been negotiated or have expired. We do not anticipate that the Bayer Distribution Account will owe any taxes.

21. The fees and costs associated with preparing future tax returns or forms for both the Bayer Escrow Account and the Bayer Distribution Account are included in Rust's $23,707 estimate to conclude the settlement. Therefore, we do not recommend withholding any monies for future tax return preparation or tax payments.

C. Unanticipated Claims Issues and Late Claims

22. As described above, Rust has addressed a number of inquiries from Class Members about misdirected checks, name and address changes, reissuance of checks to successor entities, checks that expired and had to be re-issued, and so forth. These were normal administrative inquiries encountered in most settlements and did not involve new claims or increase the dollar value of the Authorized Claims to be paid from the Distribution Account.

23. Rust did not receive any challenges from Class Members as to the amount of their settlement payments.

24. Rust has not received any correspondence or telephone calls in response to the letter attached hereto at Exhibit 3 and described in ¶ 26 of the Motion.

25. At Class Counsel's request, Rust has looked into several inquiries about submitting late claims and provided information about claims to Class Counsel but has only received late claims from one company, described in the following paragraphs. To protect the claimants' financial information, this declaration refers to the entity that submitted a late claim as "Company A."

26. On June 27, 2011, Rust mailed notices to members of the Litigation Class certified by this Court, informing them about the settlements with defendants Huntsman International LLC and Lyondell Chemical Company that the Court had preliminarily approved. Shortly afterward, Rust received late claims in the Bayer Settlement from "Company A."

27. If Company A's claims were allowed in full, Company A would receive a total Bayer Settlement distribution of approximately $248,000.

28. The estimated schedule of distribution attached at Exhibit 4 and explained below assumes that the Court allows the late claims of Company A.

## FUNDS AVAILABLE FOR DISTRIBUTION

29. The balance of the Bayer Escrow Account as of July 26, 2011 is $ 3,702,510.58. Rust requests that $23,707 be retained in this account for payment of Rust's invoices to complete the second distribution, and that the remainder be transferred to the Bayer Distribution Account.

30. The balance of the Bayer Distribution Account as of July 26, 2011 is $239,072.26, all of which is due to checks that were never negotiated. If all of the unexpired checks and all stale checks of at least $1,000 are negotiated by August 30, 2011, then the Distribution Account balance is likely to be approximately $1,054 by September 1, 2011.

31. Rust recommends that the value of all checks that are not negotiated by August 30, 2011 be redistributed to Authorized Claimants on a *pro rata* basis.

32. Attached as Exhibit 4 is an Estimated Schedule for Second Distribution. It assumes that: (a) all checks of $1,000 or more from the initial distribution are negotiated by August 30, and (b) the second distribution is made only to claimants who negotiated their payments from the initial distribution.

33. In Rust's experience, it is neither cost-efficient nor effective to mail settlement checks in small dollar (or cent) amounts to business claimants. Among other things, businesses often do not negotiate settlement checks for small amounts, such as under $10.00. As the attached Exhibit 4 demonstrates, absent a threshold for payments, Rust would mail over 350 checks with face values of less than $10.00, and in some instances the claimant's check would be less than the cost of postage. Instead of making hundreds of such *de mimimis* payments, Rust recommends that payment be made only to claimants who would receive at least $10.00 in this second distribution, and that the monetary value of the under-$10.00 payments be redistributed to the claimants receiving at least $10.00.

## CALCULATION OF SECOND DISTRIBUTION AMOUNTS

34. The Estimated Schedule for Second Distribution attached as Exhibit 4 was calculated described as follows.

35. The initial distribution in January 2011 was based on Allowed Purchases totaling $10,870,975,853.25. To this sum, Rust added the eligible purchases for Company A (see paragraphs 25 - 28 above), yielding a Final Total Allowed Purchases amount of $10,944,687,708.25.

36. Each Authorized Claimant's *pro rata* share of the Authorized Purchases is a fraction in which the numerator is the sum of the Claimant's Authorized Purchases in dollars and the denominator is the Final Total Allowed Purchases in dollars:

      Claimant's Allowed Purchases divided by Final Total Allowed Purchases =
Claimant's total *pro rata* share of Allowed Purchases.

37.    Rust determined the total amount of money available for this second distribution as follows:

| | |
|---|---:|
| Bayer Distribution Account as of 7/26/11 | $ 239,072.26 |
|     Minus: unexpired reissued checks | (221,266.23) |
|     Minus: expected check reissues | (16,752.11) |
|         Equals | $ 1,053.92 |

Plus

| | |
|---|---:|
| Bayer Escrow Account as of 7/26/11 | $ 3,702,510.58 |
|     Minus: Claims Administrator's estimated fees and expenses: | (23,707.00) |
|     Minus: Company A's first distribution: | (225,566.11) |
|         Equals | $3,453,237.47 |
| Equals total available for second distribution: | $3,454,291.39 |

38.    Rust added the total amount that was disbursed in the first distribution ($33,265,585.82 plus $225,566.11 for Company A equals $33,491,151.93) to the estimated total amount available for the second distribution ($3,454, 291.39) to obtain the estimated Total Bayer Settlement Distribution Amount: $36,945,443.32.

39.    Rust then calculated the total compensation under the Bayer Settlement for Company A and each Authorized Claimant who negotiated or is expected to negotiate its settlement check from the initial distribution by multiplying those claimants' *pro rata* shares of Authorized Purchases by the Total Bayer Settlement Distribution Amount:

      Claimant's *pro rata* share of Authorized Purchases times Total Bayer Settlement
Distribution Amount = Total Distribution to Claimant.

40.    Finally, Rust calculated the estimated amount due in this second distribution to Company A and each Authorized Claimant who negotiated or is expected to negotiate its check

from the initial distribution by subtracting however much was paid to that claimant in the initial distribution from the Total Distribution to Claimant. The resulting dollar amounts appear on the Estimated Schedule for Second Distribution attached as Exhibit 4.

41. The schedule attached at Exhibit 4 is an estimate. The amount ultimately distributed to claimants will depend on how much interest the Bayer Settlement Escrow Account earns before the money is transferred to the Distribution Account, how many of the uncashed settlement checks listed on Exhibit 1 are cashed before the final distribution is made, whether Company A's claims are allowed, whether the second distribution is made only to claimants who negotiated their initial distributions, and whether there is a threshold amount (such as the recommended $10.00) for participation in the second distribution.

## DISPOSITION OF UNCASHED CHECKS FROM SECOND DISTRIBUTION

42. Rust recommends that as with the first distribution, the checks issued for this second distribution bear the legend "VOID AFTER 90 DAYS." If any checks of $50.00 or more remain uncashed after approximately 90 days, Rust will follow up with the associated claimants to ask them to negotiate the checks or arrange to reissue the checks.

43. Rust recommends that Rust be authorized to void and stop payment on any checks that are not negotiated within 120 days of issuance, or, in the case of reissued checks, within 45 days of reissuance.

44. Rust expects that the amount remaining in the Bayer Distribution Account from uncashed checks from the second distribution will not be large enough to allow for an efficient third distribution to the Bayer Settlement Class.

45. Rust recommends that if the Court grants final approval to Plaintiffs' proposed settlement with Huntsman International, LLC and any funds remain in the Bayer Distribution

Account due to uncashed checks after this second distribution, then any such remaining funds should be transferred to the Huntsman Settlement Fund for later distribution to the Litigation Class.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of August, 2011 in Palm Beach Gardens, Florida.

Charlene Young

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on this 2nd day of August, 2011, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel who have registered for receipt of documents filed in this matter. I also certify that I mailed a true copy of the foregoing document by first mail to the following non-CM/ECF participants:

Mark V. Chester
Johnson & Colmar
2201 Waukegan Rd., Suite 260
Bannockburn, IL 60015

Judith A. Shimm
Zelle, Hofmann, Voelbel, Mason & Gette, LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104

Michael F. Tubach
O'Melveny & Myers, LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823

Daniel R. Karon
Goldman Scarlato & Karon, P.C.
700 W. St. Clair Ave., Suite 204
Cleveland OH 44113

Steven A. Kanner
William H. London
Freed Kanner London & Millen LLC
2201 Waukegan Rd., Suite 130
Bannockburn, IL 60015

Krishna Narine
Schiffrin & Barroway LLC
280 King of Prussia Road
Radnor, PA 19087

Jason S. Hartley
Timothy Irving
Troutman Sanders LLP
550 West B Street, Suite 400
San Diego, CA 92101-3599

John W. Mackey
Justin T. Toth
Ray, Quinney & Nebeker
36 S. State Street, Suite 1400
Salt Lake City, UT 84111

William J. Pinilis
Pinilis Halpern, LLP
160 Morris Street
Morristown, NJ 07960

Andrew B. Sacks
Sacks & Weston, LLC
114 York Rd.
Jenkintown, PA 19046-3233

Donna Siegel Moffa
Trujillo Rodriquez & Richards, LLP
258 Kings Highway East
Haddonfield, NJ 08033

Simon Bahne Paris
David J. Cohen
Patrick Howard
SALTZ MONGELUZZI BARRETT &
BENDESKY, P.C.
1650 Market Street
One Liberty Place, 52nd Floor
Philadelphia, PA 19103

                                                      s/Robert W. Coykendall
                                                      Robert W. Coykendall, #10137