IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | ) | |
|---|---|---|
| IN RE: URETHANE ANTITRUST LITIGATION | ) ) ) | MDL 1616 |
| | ) ) | Civil No. 04-md-1616-JWL-JPO |
| This Document Relates To: The Polyether Polyol Cases | ) ) ) | |

CLASS PLAINTIFFS' MOTION TO
APPROVE DISTRIBUTIONS FROM THE
HUNTSMAN AND BASF SETTLEMENT FUNDS

## I. INTRODUCTION

1. Class Plaintiffs ("Plaintiffs"), by their undersigned counsel, hereby respectfully move this Court to approve: (a) the procedures used, the actions taken, and the determinations made by the Claims Administrator, Rust Consulting, Inc. ("Rust"), and by the undersigned Class Counsel relating to the administration of, and proposed distributions from, two settlement funds established in accordance with Settlement Agreements approved by this Court, including the administrative determinations of the Claims Administrator and Class Counsel in accepting, revising, and rejecting claims in connection therewith; (b) payment of certain invoices associated with claims administration; and (c) distribution of settlement funds to approved claimants. Former Defendants BASF and Huntsman International are funding their respective settlement accounts in installments over a period of three years. Accordingly, Class Plaintiffs' Plan Of Allocation And Distribution For The Huntsman And BASF Settlement Funds ("Plan of Allocation") (Docket No. 2139-1) approved by the Court calls for settlement funds to be distributed in installments as well. Plaintiffs seek approval here for the first distribution, in the amount of $33,545,945.54.

2.     The proposed distribution to Class Members is based on calculations utilizing Class Members' purchase data. To ensure the confidentiality of such information, claimants' names are redacted on the Preliminary Schedule of Distribution being submitted to the Court with this Motion.

## II.   BACKGROUND

3.     The Court certified the Litigation Class by Order dated July 29, 2008 (Dkt. No. 708); granted final approval to the Huntsman Settlement by Order dated September 27, 2011 (Dkt. No. 2078); and granted final approval to the BASF Settlement by Order dated December 12, 2011 (Dkt. No. 2208).

4.     On December 12, 2011, the District Court also approved Class Plaintiffs' proposed Plan of Allocation for the Huntsman and BASF Settlement Funds (Dkt. No. 2209) and Class Counsel's request for payment of attorneys' fees and reimbursement of litigation expenses (Dkt. No. 2210).

5.     The current balance of the BASF Settlement Fund is $27,187,643.53. The current balance of the Huntsman Settlement Fund is $17,593,205.74. Declaration of April Hyduk Re: Claims Administration and Calculation In Support of Class Plaintiffs' Motion To Approve Distributions From the Huntsman and BASF Settlement Funds, attached hereto as Exhibit 1 ("Hyduk Decl."), ¶ 34. A Balance Statement for both settlement funds is attached at Exhibit 6 to the Hyduk Declaration.

6.     For the reasons set forth in paragraphs 37 through 40 below, Class Plaintiffs recommend retaining $11,234,903.73 in the two settlement fund accounts and transferring $33,545,945.54 into a new Distribution Account. The monies in the Distribution Account will

2

be distributed to claimants on a *pro rata* basis and in accordance with the Preliminary Schedule of Distribution, attached as Exhibit 9 to the Hyduk Declaration.

7. The Preliminary Schedule of Distribution is "preliminary" in nature because percentages and distribution amounts could change slightly before the actual distribution if, for example, claimants fail to cure certain deficiencies (such as the absence of a required signature) before the hearing on this Motion, or if the Court orders any changes to the treatment of specific claims. Should percentages or distribution amounts change, Plaintiffs will submit a revised recommended schedule of distribution to the Court, as they did in the Bayer Settlement distribution process (Dkt. No. 1853).

## III.  CLAIMS ADMINISTRATION PROCESS

8. With the Court's approval, Class Counsel engaged Rust Consulting, Inc. ("Rust") to act as the Claims Administrator, under the supervision of Class Counsel. Rust, a certified public accounting firm experienced in handling class action settlement notice programs and claims administration, also administered the distribution of the Bayer Settlement Funds to claimants in 2011. Using the information gleaned from the Bayer Settlement distribution process, Rust and Class Counsel were able to streamline and enhance the efficiency of the claims administration process for the Huntsman and BASF Settlements.

9. In its capacity as Claims Administrator, Rust was authorized to: prepare and mail proof of claim forms to Class Members; receive, review and enter data regarding the claim forms that were filed; audit claims when appropriate and necessary; recommend the dollar volume of eligible (and, where appropriate, ineligible) purchases as to each claim filed; and otherwise assist Class Counsel in the claims administration process. Rust's efforts are summarized in the Hyduk Declaration.

10. The Plan of Allocation for the Huntsman and BASF Settlements called for sending Class Members individualized proof of claim forms that showed their net purchases of eligible Polyether Polyol Products directly from Defendants in the United States and its territories during the Class Period. Rust sent similar individualized proof of claim forms to members of the Bayer Settlement Class, but that work product could not be re-used for the Huntsman and BASF Settlement administration because the Huntsman and BASF Settlements were governed by a narrower class definition established in the order certifying the Litigation Class. In addition, the Defendants have provided new transaction data since the Bayer Settlement administration process, some of which supplemented earlier data productions, and some of which were wholesale replacements for earlier-produced data sets. Because of these differences in data and class definitions, Plaintiffs called upon their damages expert, Dr. James T. McClave, the President and CEO of InfoTech, Inc., to assist with identification of the Class Member purchase data to be used in the administration of the Huntsman and BASF Settlements. Dr. McClave and InfoTech already were familiar with the purchase data, having worked extensively with it for several years in the course of supporting Dr. McClave's analyses.

11. In 2011, Plaintiffs requested that InfoTech analyze the Defendants' sales data to calculate purchase amounts for each Litigation Class Member based on the Polyether Polyol Product definition as certified by the Court. Class Counsel explained to InfoTech that as defined for the Litigation Class, "Polyether Polyol Products" exclude prepolymers, certain products containing polyester polyols, and non-propylene-oxide based polyols.

12. InfoTech devoted a significant amount of work to organizing the various Defendants' transaction data by customer. This involved synthesizing multiple data sets from

4

different Defendants that frequently identified customers using different names and street addresses, and identifying which transactions were associated with which customer.

13. To analyze class member expenditures during the relevant period (1999-2004), InfoTech identified and created a list of trade names and other identifying names for Polyether Polyol Products as defined in the order certifying the Litigation Class ("Eligible Products").

14. Conversely, InfoTech also identified and created a list of trade names and other identifying names for products excluded from the Litigation Class definition, namely, prepolymers, systems containing polyester polyols, and non-propylene-oxide based polyols ("Ineligible Products").

15. At various points in the course of its analysis, InfoTech reconciled its analysis against the data used to prepare claim forms in the Bayer Settlement, taking into consideration the difference in Class definitions and consequent difference in Eligible Products.

16. For each Class Member identified by Defendants' sales data, InfoTech calculated: (i) the dollar volume of the Class Member's purchases of Eligible Products from each of the Defendants; (ii) the dollar volume of its purchases of ineligible prepolymers from each of the Defendants; and (iii) the dollar volume of its purchases of other ineligible products from each of the Defendants.

17. InfoTech then prepared a database consisting of Class Member names, most current or best street addresses as derived from Defendants' sales data, and purchases of Eligible Products from each Defendant during the Class Period. InfoTech provided this database to Rust and worked with Rust to integrate the information with Rust's database and systems for preparation of personalized claim forms for Class Members who had not timely excluded themselves from the Litigation Class.

18. Using Defendants' sales data as refined by InfoTech, Rust created and sent 9,020 personalized, pre-printed proof of claim forms to members of the Class. Hyduk Decl. ¶¶ 6, 7. The proof of claim forms were substantially similar to those sent in the Bayer Settlement, but edited to be clearer and address some of the questions that arose during the prior claims administration process. InfoTech, Rust, and Class Counsel also consulted to ensure the accuracy and completeness of the data used to prepare personalized claim forms for Class Members.

19. The personalized proof of claim forms specified the dollar value of each Class Member's purchases of Eligible Products from each Defendant during the Class Period, as derived from Defendants' Data. The forms also informed Class Members that their Eligible Purchases amounts might not be the same as in the Bayer Settlement because the products eligible for compensation under the BASF and Huntsman Settlements are not identical to those eligible in the Bayer Settlement. The proof of claim forms instructed claimants that they had two options: (a) they could accept the pre-printed Defendants' Data appearing on the claim form, in which case claimants did not have to provide any additional proof of their purchases, or (b) they could claim different amounts, in which case claimants were instructed to submit adequate proof that they had purchased the claimed amount of Eligible Products directly from the Defendants in the United States or its territories during the Class Period. Hyduk Decl. ¶ 18. The proof of claim forms also instructed Class Members that the form submitted for this first distribution will cover all distributions from the Huntsman and BASF Settlement Funds. A sample proof of claim form is attached as Exhibit 1 to the Hyduk Declaration.

20. Defendants' sales data included "zero data" customers, that is, customers for whom Defendants had addresses but for whom there was no record of any purchases of Eligible Products during the Class Period. Rust sent personalized claim forms to the zero data customers

6

so that if they had, in fact, purchased Eligible Products, they could correct the "zero data" on the claim form. Similarly, Rust sent zero data claim forms to any Bayer Settlement Claimant who was not also identified by InfoTech using the Defendants' sales data for the BASF and Huntsman Settlements. Finally, Rust sent blank claim forms to anyone who requested one. Hyduk Dec. ¶ 15.

21. The proof of claim form instructed all claimants to return their claim forms by May 28, 2012.[1] Hyduk Decl. ¶ 16; *see* Order Approving Plan of Allocation at ¶ 3 (Dkt. No. 2209) and Plan of Allocation at § 2 (Dkt. No. 2139-1).

22. The Hyduk Declaration, to which Plaintiffs respectfully refer the Court, provides a detailed description of the claims administration process. Specifically, Ms. Hyduk describes the procedures and criteria by which Rust reviewed and evaluated claim forms; Rust's communications with claimants and Class Counsel to evaluate and audit claims; Rust's procedures for, and efforts in, identifying deficiencies in submitted claim forms, notifying claimants of the deficiencies, and allowing claimants to correct and cure the identified deficiencies; the process by which Rust and Class Counsel determined whether to recommend accepting, rejecting, or modifying each claim; Rust's written notifications to claimants whose claims are being recommended for rejection or reduction and the process and deadline for objecting to that recommendation; and how Rust calculated the Recognized Loss Amount (defined below in ¶ 30) for each claim and the resulting Preliminary Schedule of Distribution. *See* Hyduk Decl. ¶¶ 17 – 44.

---

[1] In accordance with section 2 of the Plan Of Allocation (Dkt. No. 2139-1), Class Counsel instructed Rust to accept late claims if doing so would not delay the claims administration process. Class Counsel is not recommending that any claims be denied on the basis that they were not submitted by May 28, 2012.

7

23. Of the 1246 claim forms submitted, 938 accepted the Defendants' positive sales data as listed on the preprinted claim forms, and over 70 others returned claim forms showing zero eligible purchases . Hyduk Decl. ¶¶ 17, 19, 21 and Exh. 9C.

24. For the remaining claims, Rust and Class Counsel used InfoTech's Ineligible Products database and information gathered during the Bayer Settlement administration to streamline the audit and review process.

    a. To reduce claims administration expenses and maximize the funds available for distribution to claimants, Class Counsel established a discrepancy threshold to prevent the audit costs from outweighing the benefit to Class Members. If the variance between Defendants' sales data and the submitted claim was below a certain threshold, and it was determined that the claimant did not purchase prepolymers or other ineligible products, Class Counsel instructed Rust not to perform an extensive audit of the backup documentation submitted with the claim.

    b. If a Class Member submitted a claim that exceeded Defendants' sales data for that Class Member but did not provide adequate supporting documentation, InfoTech's Ineligible Product database often accounted for the discrepancy between the claim and Defendants' Data. In such cases, Class Counsel and/or Rust corresponded with the claimant to explain again that not all of the products that were eligible for compensation in the Bayer Settlement are eligible for compensation in the current settlements, identified the dollar volume of Eligible and Ineligible Purchases as calculated by InfoTech, and reiterated that claimants had to submit adequate supporting documentation to claim more purchases than the amount identified in Defendants' sales

data. The correspondence also suggested contacting Class Counsel to discuss the claim in greater detail.

   c.  If, on the other hand, the Class Member had adequately documented more purchases in the Bayer Settlement than Defendants' sales data for that claimant and the InfoTech database did not indicate that the claimant purchased Ineligible Products, Rust could approve the claim if it did not substantially vary from the claimant's Allowed Purchases in the Bayer Settlement.

25. If the variance between Defendants' sales data and the claim was above the threshold established by Class Counsel, or if it was determined that the claimant did purchase ineligible products, then Rust or Class Counsel audited the claim in greater detail. Class Counsel and Rust tried to resolve as many of those audited claims as possible through phone calls and e-mails with claimants.

26. Rust sent deficiency letters to the claimants whose discrepancies were not resolved through this informal process and also notified claimants in writing as to other claim deficiencies, such as failing to sign the claim form, submission of duplicate claims, and, in the case of third party representatives, failing to have the Class Member itself sign the claim form. Redacted copies of representative samples of these letters are attached at Exhibits 3 and 4 to the Hyduk Declaration.

27. During the claims administration process, InfoTech consulted with Class Counsel as to the eligibility of products listed in Class Members' claims that were not previously identified as either Eligible or Ineligible.

28. Rust and Class Counsel undertook written and telephonic contact with claimants to audit and verify the accuracy, integrity and bona fides of the claims that were submitted;

ensure that claimants receive the benefit of all legitimate purchases; give claimants every reasonable opportunity to support their claims and to cure, explain and be heard with respect to any deficiencies that were identified in their claims; and eliminate or reduce the number of contested recommendations requiring Court resolution. Hyduk Decl. ¶¶ 30, 31.

29.    Class Counsel worked extensively with Rust at all stages of the claims administration process, and consulted with Rust on a regular basis.

30.    This Motion and the Hyduk Declaration refer to the dollar value of a claimant's eligible purchases as the "Recognized Loss Amount." "Disallowed Purchases" refers to the dollar value of claimed purchases that Rust and Class Counsel have determined are ineligible for compensation under the Settlement Agreements (including indirect purchases and purchases of ineligible products) and purchases as to which the claimant did not provide adequate proof. Hyduk Decl. ¶ 29.

31.    As set forth in the Preliminary Schedule of Distribution attached as Exhibit 9 to the Hyduk Declaration, the total Recognized Loss Amount on all Eligible Claims is $8,879,403,933.05.

32.    As contemplated by § 4 of the Plan of Allocation, at least twenty-one days before the date of the hearing on this Motion ("Distribution Hearing"), Rust will mail letters to claimants whose claims were rejected *in toto* and to those whose claims were reduced in the review and audit process. The letters will inform the claimants of the rejection or modification of their claims, the procedures for disputing those determinations, the deadline for doing so, and the time and date of the Distribution Hearing. *See* Hyduk Decl. ¶ 32.

33.    Class Counsel and Rust will continue to work closely with claimants until the Distribution Hearing to eliminate or reduce the number of potential disputes relating to

claimants' recommended Recognized Loss Amount, so as to avoid the need for the Court to resolve such matters. *See* Hyduk Decl. ¶ 33.

## IV.  REQUEST FOR APPROVAL OF PAYMENTS TO INFOTECH AND RUST

34.  In addition to seeking approval for the initial distribution from the Huntsman and BASF Settlement Funds, Class Counsel seek approval for certain payments to InfoTech and to Rust in its capacity as Administrator of the Bayer Settlement, as described more fully below.

35.  The Balance Statement that is attached as Exhibit 6 to the Hyduk Declaration shows a balance in the BASF Settlement Fund of $27,187,643.53. This balance reflects the deduction of $6,662,523.68 in legal fees and expenses awarded by the Court and payments to Rust totaling $149,834.41 for settlement and claims administration fees and expenses through September 30, 2012. *See* Hyduk Declaration at ¶ 34 and Exh. 6 thereto.[2]

36.  The Balance Statement attached as Exhibit 6 to the Hyduk Declaration shows a Huntsman Settlement Fund balance of $17,593,205.74. This balance reflects the deduction of legal fees and expenses awarded by the Court ($4,318,529.44) and payments to Rust totaling $95,795.72 for settlement and claims administration fees and expenses through September 30, 2012. *See* Hyduk Declaration at ¶ 34 and Exh. 6 thereto.

37.  The accounting of the Huntsman Settlement Fund also reflects a transfer into the account of $7,533.67 pursuant to the Court's Order Approving Final Distribution of the Bayer Settlement Fund dated August 25, 2011 (Dkt. No. 2020). That Order provided that if any funds

---

[2] The Plan of Allocation Order (Dkt. 2209) authorized Class Counsel to direct the Huntsman Escrow Agent and the BASF Escrow Agent to pay invoices submitted by Rust for reasonably necessary fees and expenses incurred in administering the Huntsman and BASF Settlements. *Id.* ¶ 4. Pursuant to the Court's Order, therefore, Class Counsel reviewed the invoices that Rust submitted and approved them for payment from the BASF and Huntsman Settlement Funds or, in the case of invoices associated with preparing and disseminating notice of the Lyondell settlement, sent them to former defendant Lyondell for direct payment.

were left in the Bayer Distribution Account because of settlement checks that were not negotiated within a reasonable time,[3] those funds should be transferred to the Huntsman Settlement Fund for distribution to the Litigation Class. *Id.* at ¶ 11. As described below, Plaintiffs request that some of those transferred monies be paid to Rust for additional work it has performed in connection with the final Bayer Distribution.

38. The Order Approving Class Plaintiffs' Plan of Allocation of the Huntsman and BASF Settlement Funds (Dkt. No. 2209) authorized Class Counsel "to carry out all steps necessary to effectuate the Plan" of Allocation. *Id.* ¶ 5. One of the necessary steps taken by Class Counsel was engaging InfoTech to calculate individual Class Members' Eligible Purchase amounts and prepare a database of Ineligible Purchases, as described above. InfoTech prepared regular invoices for that work and has provided those invoices to Class Counsel. InfoTech has not received payment on any of those invoices, which total $112,474. Class Counsel respectfully submit that the fees invoiced by InfoTech for its work in creating the databases of Eligible and Ineligible Purchases were reasonable and necessary for the effective administration of the BASF and Huntsman Settlements and for disbursement of settlement funds to Class Members. Thus, Class Counsel request authorization to direct the Escrow Agent to pay InfoTech's invoices in the amount of $112,474.

39. The Class Plaintiffs' motion for leave to make the final Bayer Settlement Distribution included a firm estimate from Rust of $23,707 to complete the second distribution,

---

[3] All settlement checks included a notice that they would expire in ninety days. Rust wrote to all claimants that had not negotiated their settlement checks by a certain date, reminding them to negotiate the check immediately or request a reissued check. Rust reissued settlement checks upon request. It also communicated at least once with claimants who did not negotiate reissued checks of $50 or more by the expiration date on those checks. Hyduk Decl. at ¶ 38. Despite these efforts, as of October 18, 2012, $7,533.67 remained in the Bayer Distribution Account due to checks that were never negotiated, and so that sum was transferred to the Huntsman Settlement Fund as required by the Plan of Allocation. *Id.*

and the Court authorized Class Counsel to pay Rust up to that amount for future invoices. Rust has been paid $23,341.98 -- $365.02 less than amount allowed by the Court -- for work between August 26, 2011 and February 29, 2012.

40. Rust continued to work on the final Bayer Distribution after February 29, 2012 but did not submit invoices for its work because such invoices would have exceeded the maximum amount authorized by the Court to be paid for that distribution. At the request of Class Counsel, Rust recently prepared an invoice for its work on the Bayer Distribution from March 1, 2012 through August 31, 2012. The invoice, which is attached as Exhibit 8 to the Hyduk Declaration, totals $6,497.13. Class Counsel believe the additional work performed by Rust was reasonable and necessary. The additional amounts were caused by, among other things, the need for Rust to follow up multiple times with claimants who did not negotiate their settlement checks in a timely fashion and Class Counsel's request that Rust perform certain additional tasks after Rust prepared its "Final Estimate" for completion of the distribution. Therefore, Plaintiffs seek leave to pay Rust $6,497.13 from the Bayer Distribution Account residuum that was transferred to the Huntsman Escrow Account.

## V.  CONCLUSION

41. For the foregoing reasons, Plaintiffs respectfully request that the Court enter the proposed Order authorizing the distributions from the BASF and Huntsman Settlement Funds as requested in this Motion and payment of the InfoTech and Rust invoices.

DATED: October 24, 2012                             Respectfully submitted,

         /s/ Robert W. Coykendall
Robert W. Coykendall, No.10137
Robert N. Walter, No.08620
Morris, Laing, Evans, Brock &
    Kennedy, Chartered

                                        Old Town Square
                                        300 North Mead   Suite 200
                                        Wichita, KS  67202
                                        Tel:  (316) 262-2671
                                        Fax: (316) 262-5991

                                  **Plaintiffs' Liaison Counsel**

| | |
|---|---|
| Allen D. Black | Richard A. Koffman |
| Roberta D. Liebenberg | Christopher J. Cormier |
| Donald L. Perelman | Sharon K. Robertson |
| Gerard A. Dever | Laura Alexander |
| Paul Costa | **COHEN MILSTEIN SELLERS &** |
| Matthew Duncan | **TOLL PLLC** |
| **FINE, KAPLAN AND BLACK, R.P.C.** | 1100 New York Avenue, N. W., Suite 500 |
| 1835 Market Street, 28th Floor | Washington, DC  20005 |
| Philadelphia, PA  19103 | Tel:  (202) 408-4600 |
| Tel:  (215) 567-6565 | Fax:  (202) 408-4699 |
| Fax:  (215) 568-5872 | |

                              **Plaintiffs' Co-Lead Counsel**

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on this 24th day of October, 2012, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel who have registered for receipt of documents filed in this matter. I also certify that I mailed a true copy of the foregoing document by first class mail to the following non-CM/ECF participants:

Mark V. Chester
Johnson & Colmar
2201 Waukegan Rd., Suite 260
Bannockburn, IL 60015

William J. Pinilis
Pinilis Halpern, LLP
160 Morris Street
Morristown, NJ 07960

Daniel R. Karon
Goldman Scarlato & Karon, P.C.
700 W. St. Clair Ave., Suite 204
Cleveland OH 44113

Simon Bahne Paris
David J. Cohen
Patrick Howard
Saltz Mongeluzzi Barrett & Bendesky, P.C.
1650 Market Street
One Liberty Place, 52nd Floor
Philadelphia, PA 19103

Joseph H. Meltzer
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087

Stacey Vu
Vinson & Elkins LLP
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760

Michael F. Tubach
O'Melveny & Myers, LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901

Peter D. St. Phillip, Jr.
Lowey, Dannenberg, Cohen & Hart, PC
White Plains Plaza
One North Broadway
White Plains, NY 10601-2310

Timothy P. Irving
Troutman Sanders LLP
11682 El Camino Real, Suite 400
San Diego, CA 92130

William J. Linklater
Baker & McKenzie
One Prudential Plaza
300 East Randolph Street, Suite 5000
Chicago, IL 60601


s/Robert W. Coykendall
Robert W. Coykendall, #10137