IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE URETHANE ANTITRUST LITIGATION ) | |
| ) | Case No. 04-1616-JWL-JPO |
| THIS DOCUMENT RELATES TO THE ) POLYETHER POLYOL CASES ) | |

**CLASS PLAINTIFFS' OPPOSITION TO DOW CHEMICAL COMPANY'S MOTION IN LIMINE TO EXCLUDE REFERENCE TO OR ALLEGATIONS OF ANY PURPORTED CONSPIRACY TO FIX THE PRICES OF POLYETHER POLYOL SYSTEMS**

The Dow Chemical Company ("Dow") moves *in limine* to preclude "any reference at trial to or allegations of a conspiracy to fix the prices of polyether polyols systems ("Systems")." This is yet another attempt by Dow to recast Class Plaintiffs' case from one of a single, overarching conspiracy to separate and individual conspiracies. But Plaintiffs, consistently from the commencement of this action, have alleged a single conspiracy that included systems. The First Amended Consolidated Complaint (Doc. 307) ("Complaint"), at ¶ 1, states: "Plaintiffs allege a conspiracy among Defendants … to fix, raise, maintain or stabilize prices and to allocate customers and markets for Polyether Polyol Products …." At ¶ 6, the Complaint defines "Polyether Polyol Products" to include: "polyether polyols, monomeric or polymeric diphenylmethane diisocyanate ("MDI"), toluene diisocyanate ("TDI"), *and polyether polyol systems* except any such systems that also contain polyester polyols." (Emphasis added.)

The Pretrial Order ("PTO") (Doc. 2374), which is "the controlling document for trial," (*Minter* v. *Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006)(citation omitted)), confirms that Plaintiffs' allege a single-conspiracy. Paragraph 2 of the PTO identifies plaintiffs' claim as "a price-fixing conspiracy in connection with the sale of certain urethane chemicals" and

identifying those chemicals, in the same paragraph as polyols, MDI, TDI and "propylene oxide-based polyether polyols systems (except those that also contain polyester polyols)."[1]

While the Court has held that Class Plaintiffs could prove "common impact" as to systems – that is, that class members purchasing systems generally were harmed by this single conspiracy – on the logical basis that if the conspiracy elevated the prices of the basic chemicals, which are the major inputs to systems, it also raised the prices of Systems, (Court's Memorandum and Order [on Class Certification] (Doc. 708), pp. 21-22),[2] Class Plaintiffs have never abandoned their claim that (1) there is a single, overarching conspiracy (2) that includes systems as well as the basic chemicals. Dow points to no such abandonment in its Motion *in Limine*; it simply asserts, without benefit of citation, that "Class Plaintiffs do not claim that Dow conspired to fix the prices of systems." Dow's Motion, p.1. But, this explicit predicate of Dow's motion is false.[3]

As Class Plaintiffs have demonstrated in their Opposition to The Dow Chemical Company's Motion for Summary Judgment With Respect to All Claims (Doc. 2436) (at pp. 145 - 150), Dow's strategy is to entice the Court to evaluate Plaintiffs' evidence on a piecemeal basis.

---

[1] In ¶ 5 of the PTO, Plaintiffs describe their claim as a single "conspiracy . . . to raise, stabilize or maintain at artificially high levels the prices they charged for Polyether Polyols Products (aka "urethane products") within the United States." The capitalized "Polyether Polyols Products" employed in that description of the single conspiracy are the same products defined in ¶ 2 of the PTO as including "systems", as quoted in the text. *See also* PTO ¶ 6.b.(1) (defining the elements of plaintiffs' claim as "Dow entered into a contract, combination or conspiracy with its competitors to fix, raise, maintain or stabilize the price of Polyether Polyol Products.").

[2] In its class certification opinion, this Court also stated that "[t]he polyether polyol products that are the subject of the alleged conspiracy fall into essentially four categories – monomeric and polymeric diphenylmethane diisocyanate (MDI), toluene diisocyanate (TDI), polyether polyols *and polyether polyol systems*." Memorandum and Order on Class Certification], p. 2 (emphasis added).

[3] From this predicate, Dow posits that therefore any reference to any such conspiracy "or allegations of [such] a conspiracy . . . would be irrelevant to the claims in this case." Dow's Motion at p. 1; *see also id.* at p. 2. ("[A]ny reference to or allegations of a conspiracy to fix the prices of Systems would be irrelevant to the claim actually asserted . . . .").

But this strategy is contrary to the well-settled law that "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), quoting United States v. Patten, 226 U.S. 525, 544, 33 S.Ct. 141, 57 L.Ed. 333 (1913).

Notably, Dow does not argue a lack of evidence linking systems to the conspiracy that Class Plaintiffs allege.[4] And it could not; there is ample such evidence. For example, Stephanie Barbour, who was an executive in Dow's MDI and polyols business and one of the key witnesses in this case, testified that in 2003, Peter Davies, who headed Dow's Systems business told her that his contact at BASF wanted to know why Barbour was not passing along to G.E. the entire agreed-to price increase. The inference flowing from BASF's complaint was that Dow was not adhering to the price-fixing conspiracy that included Systems in its dealings with G.E., and that competitors making systems products were unable, effectively, to compete, inferring that the link between Systems and their underlying constituent products was understood as inherent in the conspiracy. Barbour explained that Dow's contract with G.E. contained price caps. *See* CSJR Ex. 2 to the Plaintiffs' Opposition to Dow's Motion for Summary Judgment (Barbour Dep. at 30:1 – 31:14. *See also*, Barbour Dep. Tr. at 432:15-434:23, attached hereto as Exhibit A.

In addition, many of the pricing announcements that Class Plaintiffs will show as coordinated through the conspiracy expressly included systems. On four occasions between May, 2000 and March, 2003, Dow notified customers of price increases on its Systems products.

---

[4] And, of course, any such argument would be improper as untimely, in violation of this Court's PTO ¶ 15.b, as well as Scheduling Order No 8 (Doc. 1989). Dow did not seek limited summary judgment on an argument that there was no evidence linking systems to the conspiracy plaintiffs alleged. It cannot do so belatedly through this *limine* Motion.

3

These system price increases all occurred about the time Dow and its co-conspirators were raising the prices of MDI and Polyols.[5] By way of example, the July 1, 2002 price increase that plaintiffs will prove was the subject of discussion among the co-conspirators before, during and immediately after the May 2002 trade association meeting in Singapore included a systems price increase. *See Class Plaintiffs' Opposition to Dow's Motion for Summary Judgment* (Doc. 2436) at ¶¶ 156-178. That the conspirators understood and intended this price increase to include systems is evidenced by Bernstein's (of BASF) note: "All other markets must go up on 7/1 as well. I've told Joe Steiner to issue a system price increase effect July 1 ...." *Id.* at ¶ 168. Dow and BASF similarly raised system prices in connection with this round of price increases. *Id.* at ¶ 175.

The evidence of coordination and meetings between executives and managers of Dow and the other urethane manufacturers leading to the announcements of price increases in April, 2001, August, 2001, March, 2002, July, 2002 and November, 2002, is substantial, as detailed in Class Plaintiffs' Opposition to Dow's Motion for Summary Judgment (Doc. 2436) at ¶¶ 205 through 223 and pp. 151-154.

Moreover, as Class Plaintiffs showed in their Opposition to Dow's Summary Judgment

---

[5] Dow, Huntsman and BASF all announced price increases for systems on May 15, 2000 and June 15, 2000 (*see* Dow announcement at Bates No. TDCC_PU0048238). The four conspirators (Dow, Huntsman, BASF and Bayer) had all announced price increases for polyols and MDI between May 15, 2000 and June 1, 2000. Similarly, Dow announced system price increases on January 26, 2001 (Bates Nos. TDCC_PU0022643 and 1105993-994). BASF and Huntsman followed suit with systems price increases on February 7, 2001 and March 3, 2001, respectively. These systems price increases tracked price increases for polyols and MDI by Dow, BASF, Bayer and Huntsman that were announced between February 19 and March 5, 2001. Dow, BASF and Bayer announced system price increases between June 1 and June 18, 2002 (Dow announcement at Bates No. TDCC_PU1207972 and 1123448) in conjunction with polyol price increases announced by Dow, Bayer and BASF between May 30, 2002 and June 6, 2002 and MDI increases announced by Dow, Bayer, BASF and Huntsman between May 30 and June 6, 2002. Finally, Dow, Bayer, Huntsman and BASF all announced systems price increases between February 27 and March 6, 2003 (Dow Announcement at Bates No. TDCC_PU0131059), and the same four announced polyol and MDI price increases between February 24 and March 5, 2003. Price increase announcements attached hereto as Exhibit B.

Motion at pp. 145 - 163, the very nature of this conspiracy – a "top down" conspiracy reached and enforced at the highest levels of Dow and the other urethane firms[6] – as well as the organizational structures of these business provide ample basis for a jury to find that the conspiracy at issue in this case was linked to Systems.

Dow cites no authority for its proposition that mentioning at trial Systems, which are part of the class, is improper. But there is ample case authority that supports permitting Plaintiffs to mention Systems and to proffer evidence at trial that the cost to Plaintiffs and the Class of Systems was impacted by the conspiracy. *See e.g.*, *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002) (certifying the proposed class of purchasers of vitamins and products fabricated therefrom, the court noted that "[c]ourts have often rejected claims by defendants that the industry, pricing structure, products, and transactions with each other and with their customers are so complex, varied, fragmented, and diverse that common issues cannot predominate."). This Court cites further authority for the proposition that a conspiracy involving the price of raw material necessarily affects the price of products fabricated therefrom in its Class Certification Order (at p. 21). *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153 (3d Cir. 2002) (reasoning that a conspiracy to control the output of linerboard, and therefore to raise its price, necessarily encompassed a conspiracy to raise the price of corrugated boxes, which are made from linerboard); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 475 n. 1 (W.D. Pa. 1999) (certifying a class including purchasers of flat glass "and all products subsequently fabricated therefrom").

---

[6] For example, in Dow, the systems business was part of its organization that Dow called its "urethanes business"; and systems (headed at relevant times by Mr. Davies) reported up the chain to individuals who are key participants in the conspiracy, such as Fischer, Wood and Parker.

Plaintiffs' pleadings and the Pretrial Order define the issues at trial; Defendant's retroactive attempt to rewrite Class Plaintiffs' theory of recovery does not. *Vitamins*, 209 F.R.D. at 265 ("The defendants improperly re-characterize the plaintiffs' allegations. The plaintiffs have not alleged multiple conspiracies—they have alleged a single price fixing conspiracy as to vitamins and as to choline chloride, and improper market allocation."); *see also Thomas & Thomas Rodmakers, Inc.* v. *Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002) (holding that because the plaintiffs' complaint alleged a conspiracy involving both carbon fiber and prepeg, a product fabricated from carbon fiber, proof at trial of those claims would necessarily prove the claims of purchasers of both carbon fiber and of fabricated prepeg). Here Dow attempts to redefine Class Plaintiffs' claims and limit the Court's Class Certification Order so as to exclude probative evidence.

Dow argues that permitting "such allegations" that Systems are part of the conspiracy at issue and presumably admitting evidence supporting those allegations would create confusion for the jury. Dow Motion, pp. 2-3. This argument is based on Dow's erroneous assertion that the conspiracy to fix the prices of Systems is somehow a different conspiracy than the conspiracy to fix the prices of polyols, MDI and TDI. It is not.

Finally, Dow makes an *ipse dixit* claim of prejudice, but it does not state how it actually might be prejudiced. And the decisional law that Dow cites adds no insight. Dow cites *Stump* v. *Gates*, 211 F.3d 527 (10th Cir. 2000) and *United States* v. *Martinez*, 938 F.2d 1078 (10th Cir. 1991) for the unremarkable proposition that unduly prejudicial evidence should not be admitted under Fed. R. Evid. 403. Dow suggests that "[e]vidence is unfairly prejudicial when it will have an 'undue tendency to suggest decision on an improper basis'" (Dow Motion, p. 3.)

6

These cases, neither of which involve allegations of price fixing, are factually distinguishable and provide no guidance on the question of prejudice here. In *Stump*, plaintiffs were the children of a man whose death was ruled a suicide, although there was indication suggesting murder by his second wife, the plaintiffs' stepmother. Plaintiffs sued the former chief of police and the detective in charge of the initial investigation asserting that they had covered up and destroyed evidence that could have established their stepmother as the murderer. The trial court admitted a grand jury report on the mishandled investigation. The hearsay grand jury report detailed the grand jury's findings of missteps in the initial investigation, and ended with a note by the special prosecutor to the effect that if the statute of limitations had not run, the grand jury would have indicted the former police chief and lead detective. The Tenth Circuit held that the admission of the grand jury report was an abuse of discretion under Rule 403 – that the prejudicial effects far outweighed its probative value. Even assuming *arguendo*, that the conspiracy to raise prices of polyols, MDI and TDI was a separate and independent conspiracy having no bearing on the price of Systems (which as demonstrated, above, it is not), *Stump* offers this Court no insight into whether evidence of that conspiracy would cause the jury, by prejudice rather than by logic, to find that the effect was to raise prices for Systems.

*Martinez,* similarly, is unhelpful. There, the defendant, Martinez, was convicted of drug distribution charges when he and an associate sold two kilograms of cocaine to a D.E.A. undercover agent. After the arrest, agents searched the stash house and seized a large quantity of cocaine, a large amount of money, weapons and scales. At the trial, information as to the items seized were admitted as "standard tools of drug trafficking." Martinez objected on Rule 403 grounds. The Tenth Circuit held that there was no abuse of discretion in admitting these items,

which were directly related to the crime involved. Similarly, Dow's participation in the conspiracy to achieve supra-competitive prices for polyols, TDI and MDI is directly related to the artificially high cost of Systems products. Contrary to Dow's assertion, evidence of the conspiracy will not lead the jury to decide if the increased price of Systems was due to the conspiracy to raise the prices of Systems' principal constituent elements "on an improper basis."

## CONCLUSION

For the reasons stated herein, Dow's motion *in limine* should be denied.

This 14th day of December, 2012.

Respectfully submitted,

/s/ Robert W. Coykendall
Robert W. Coykendall, #10137
Roger N. Walter, #08620
Morris, Lang, Evans, Brock & Kennedy, Chartered
Old Town Square
300 North Mead – Suite 200
Wichita, KS  67202
Tel:  (316) 262-2671
Fax:  (316) 262-5991

**Class Plaintiffs' Liaison Counsel**

Allen D. Black
Roberta D. Liebenberg
Donald L. Perelman
Gerard A. Dever
Paul Costa
Fine, Kaplan and Black, R.P.C.
One South Broad Street
23rd Floor
Philadelphia, PA  19107
Tel:  (215) 567-6565
Fax:  (215) 568-5872

Richard A. Koffman
Christopher J. Cormier
Sharon K. Robertson
Laura A. Alexander
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4600

**Class Plaintiffs' Co-Lead Counsel**

## **CERTIFICATE OF SERVICE**

      I, the undersigned, do hereby certify that on this 14th day of December, 2012, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel who have registered for receipt of documents filed in this matter.

      s/Robert W. Coykendall
      Robert W. Coykendall, #10137