IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE:                                          )
URETHANE ANTITRUST LITIGATION       )          MDL No. 1616
                                                )          Case No. 04-1616-JWL
This document relates to:                       )
The Polyether Polyol Cases                      )
_____)

## MEMORANDUM AND ORDER

In this multi-district class action, plaintiffs allege that remaining defendant Dow

Chemical Company ("Dow") conspired with other manufacturers to fix prices for certain

urethane chemical products in violation of the Sherman Act, 15 U.S.C. § 1. This matter

presently comes before the Court on Dow's motion for summary judgment (Doc. #

2402). For the reasons set forth below, the Court **denies** the motion for summary

judgment in its entirety.[1]

I.      **Background**

In this litigation, the Court has consolidated two sets of cases relating to different

types of urethane products: the Polyester Polyol cases, which have settled; and the

Polyether Polyol cases, to which this order relates.

In the Polyether Polyol class actions, plaintiffs originally brought suit against

_____

[1]Dow's motion (Doc. # 2402) remains pending as it relates to the claims asserted
by direct action plaintiffs that have opted out of the class. The Court will address Dow's
motion for summary judgment against the direct action plaintiffs by separate order.

Dow and various entities affiliated with Dow's competitors, namely Bayer, BASF, Huntsman, and Lyondell.  The Court subsequently certified a class of plaintiffs who purchased certain urethane products (generally known as MDI, TDI, other polyether polyols, and systems based on those products) in the United States from those defendants at any time from January 1, 1999, to December 31, 2004.  The class plaintiffs have settled their claims against Bayer, BASF, Huntsman, and Lyondell, leaving Dow as the only remaining defendant.  In addition, in two separate actions that were consolidated with this class action for pretrial purposes, various direct action plaintiffs that have opted out of the class assert similar price-fixing claims against Dow (having also settled with the other original defendants).

Class plaintiffs now allege a price-fixing conspiracy involving Dow and the other original defendants (referred to collectively as "defendants" or the alleged conspirators) encompassing the years from 1999 to 2003 (a shorter period than the period used to define the class).  Dow seeks summary judgment on all claims asserted against it by class plaintiffs.

## II.   Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the

2

nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id.*

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon the pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the Court notes that summary judgment is not a "disfavored procedural

shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.   <u>Existence of a Price-Fixing Conspiracy</u>

#### A.   <u>*Governing Standards*</u>

Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1.  In this case, class plaintiffs allege a horizontal price-fixing conspiracy involving Dow and the other defendants in violation of Section 1.  *See Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1360 n.3 (10th Cir. 1989) (horizontal price-fixing as constituting a per se violation of the Sherman Act) (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 223-24 (1940)).  To prove such a claim, a plaintiff must show (1) the existence of an agreement, combination, or conspiracy, (2) among actual competitors (3) with the purpose or effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity (4) in interstate or foreign commerce. *Id.* at 1361. In seeking summary judgment, Dow challenges the sufficiency of class plaintiffs' evidence of the existence of a conspiracy or agreement involving Dow to fix prices for these urethane products.

The parties dispute somewhat the proper standard to be applied by the Court in evaluating whether plaintiffs have submitted sevidence of the existence of a conspiracy

4

sufficient to survive summary judgment.  In general, the traditional summary judgment standards apply in antitrust cases.  *See Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1257 (10th Cir. 2006).  To survive summary judgment, plaintiffs must show the existence of an agreement by direct or circumstantial evidence.  *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006).

> Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.  With direct evidence the fact finder is not required to make any inferences to establish facts.

*Id.* at 1083 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)). Not all direct evidence of an agreement, however, establishes the existence of a disputed fact: "Where . . . a plaintiff adduces only weak direct evidence, which by itself is insufficient to defeat summary judgment, additional circumstantial evidence is required to overcome a motion for summary judgment."  *See id.* at 1084 (direct evidence of agreement in that case was weak because particular parties to the agreement were not identified).  The ultimate test is whether the plaintiff presented facts such that a reasonable jury could find in its favor.  *See id.*

> A conspiracy may also be proved by circumstantial evidence.

> While consciously parallel behavior may contribute to a finding of antitrust conspiracy, it is insufficient, standing alone, to prove conspiracy. Such parallel behavior may, however, support the existence of an illegal agreement when augmented by additional evidence from which an understanding among the parties may be inferred.  Such evidence may include a showing that the parties are acting against their own individual business interests, or that there is motivation to enter into an agreement requiring parallel behavior.  Mere exchanges of information, even

regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange.

*Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 858-59 (10th Cir. 1999) (citations and internal quotations omitted).

Dow cites standards applied by the Supreme Court in reviewing a summary judgment granted in a price-fixing case in *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The Court stated:

> Respondents correctly note that on summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.* at 764. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. 465 U.S. at 764. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents.

*Id.* at 587-88 (additional citations omitted). The Court found in that case that the theory of the alleged conspiracy was not economically plausible, and thus that the alleged conspirators had no motive to enter into the alleged conspiracy. *See id.* at 595. The Court concluded:

> That being the case, the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on

6

> the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

*Id.* at 596-97 (citation omitted).  The Court further cautioned in a footnote:

> We do not imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy. . . . [C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy.

*Id.* at 597 n.21 (citation omitted).

Dow urges the Court to apply this standard from *Matsushita* by examining every piece of evidence to determine whether it "tends to exclude the possibility" that the alleged conspirators acted independently.  The Supreme Court was making clear, however, that the evidence, as a whole, must tip the scales, such that a reasonable jury could find in favor of the plaintiff, before a triable issue is created.  That is because, as the Supreme Court made clear in its footnote, conduct that is equally consistent with collusion and competition—ambiguous evidence—does not, *by itself*, support an inference of conspiracy sufficient to defeat summary judgment.  *See also Gibson v. Greater Park City Co.*, 818 F.2d 722, 724 (10th Cir. 1987) (noting, in applying *Matsushita*, that evidence is "ambiguous" if it is "as consistent with the defendants' permissible independent interests as with an illegal conspiracy").  Thus, the Court, in examining class plaintiffs' evidence of a conspiracy, must determine whether that evidence is ambiguous, in the sense that it is equally consistent with collusion and

competition, or whether a reasonable jury could find that a conspiracy existed, either from direct evidence or from circumstantial evidence that creates a reasonable inference of a conspiracy (or from a combination of the two).

Dow also suggests that the alleged conspiracy was not economically plausible, such that the inferences that may be drawn from plaintiffs' circumstantial evidence should be limited. Specifically, Dow argues that the alleged conspiracy to fix prices was not economically plausible because prices actually fell or were flat during the alleged conspiracy period, while costs for the key constituent elements of the products in fact rose at the same time. Thus, Dow argues that defendants could not plausibly have decided to stabilize prices with costs going up.

The Court rejects this argument. First, this argument would not affect the weight to be given to direct evidence of a conspiracy. In *Champagne Metals*, the court noted that this maxim—that the range of permissible inferences from evidence varies with the strength of the proffered economic theory—is undoubtedly true in a case based solely on circumstantial evidence, but it further noted that concerns over the reasonableness of inferences do not apply to direct evidence of an agreement. *See Champagne Metals*, 458 F.3d at 1084-85. The court then declined to consider whether this maxim should affect inferences from circumstantial evidence in a case also involving direct evidence, in light of its conclusion that the alleged conspiracy was economically rational in that case. Similarly here, the Court need not decide the issue because it concludes that the conspiracy alleged by class plaintiffs here was economically plausible.

In this case, the parties do not dispute that the structure of the industry—a highly concentrated oligopoly with high barriers to entry and homogeneous commodity products without close substitutes—was conducive to a price-fixing conspiracy. Thus, defendants here had a motive to enter into a price-fixing conspiracy. *See, e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (fact that industry is conducive to oligopolistic price-fixing provides evidence of motive to enter into a price-fixing conspiracy). Whether or not costs were increasing—that is, whether or not it would be difficult to stabilize prices—defendants would still have had a motive to fix prices. In *Matsushita*, the Supreme Court was concerned with the lack of a motive to engage in an illegal conspiracy[2]; Dow has not explained how rising costs would affect defendants' *motive* to conspire to fix prices.[3] Thus, there is no basis to find economic implausibility

---

[2]In *Matsushita*, the Supreme Court concluded that the alleged conspirators would have had little motive to enter into the alleged conspiracy, which was economically implausible because it involved an inherently speculative and rarely successful predatory pricing scheme, intended to charged lower-than-competitive prices to drive out competitors; it involved not merely a single company, but 21 companies; each conspirator would have had a strong incentive to cheat during the conspiracy, and cheating would have been fatal to the conspiracy; and even after 20 years, the conspiracy had not yet succeeded, as the conspirators had not yet gained significant market share, even though such a conspiracy requires a long period of success to recoup losses sustained during the period of predatory pricing. *See Matsushita*, 475 U.S. at 589-93. The present case certainly does not involve such an unlikely conspiracy.

[3]Moreover, even if the merits of Dow's argument were considered, the Court notes that Dow has not addressed any other factors that could contribute to pricing for the product; in the absence of such analysis, Dow has not shown that a conspiracy in which prices stabilized while one constituent cost rose (if those facts are true, which is a question for the jury) is somehow nonsensical.

9

here such that the range of inferences to be drawn from circumstantial evidence should be limited.

### B.   *Evidence of a Conspiracy*

The Court concludes that class plaintiffs have provided evidence of a price-fixing conspiracy involving Dow sufficient to allow a reasonable jury to find that a conspiracy existed in this case.  In reaching that conclusion, the Court first considers the direct evidence in this case.

Plaintiffs' most substantial direct evidence of an agreement to fix prices is provided by Stephanie Barbour, Dow's Global Business Director for MDI and related polyols from 2000 until early 2004.  First, Ms. Barbour testified about meetings she attended with Marco Levi, Dow's global TDI manager, and their boss, David Fischer.  Ms. Barbour testified that on more than ten occasions, Mr. Levi stated that he had met with competitors Bayer and BASF and reached agreements to set prices and make price increases stick.  Second, Ms. Barbour testified about an instance when Peter Davies, Dow's worldwide head of polyurethane systems, told her that he had had a conversation with BASF and that BASF was unhappy because Dow was not charging the full amount of a recent price increase with a particular customer.  After Ms. Barbour explained that Dow's contract with that customer contained price caps that precluded charging the full amount of the increase, Mr. Davies responded that he would so advise BASF, and he further stated that if Ms. Barbour told anyone about their conversation, he would deny

10

it and call her a liar.  Third, Ms. Barbour testified that in 2003, her new counterpart at Bayer called and, with respect to an MDI price increase, stated, "I know that I'm not supposed to have these conversations with you, I've been told that you don't have these conversations, but I just want to let you know we're being good."  Finally, Ms. Barbour testified that she informed Dow's in-house counsel about these incidents and about pricing conversations that Mr. Fischer had with competitors.

Two Bayer employees have also provided direct evidence of a price-fixing agreement.  Michele Blumberg testified that in 2002 at a meeting in Germany, Wolfgang Friedrich, Bayer's global head of MDI business, told her that she needn't worry about low pricing from competitors because he had already talked to the competition.  When she asked him whether that was illegal, Mr. Friedrich responded that it was not illegal in that country.  Ms. Blumberg then testified that Bayer was indeed able to achieve the price increase that had been discussed with Mr. Friedrich.  Ms. Blumberg also testified that on another occasion, she heard Mr. Friedrich tell her colleague not to adjust pricing for a certain bid and that competitors would not change their pricing either.  Gerard Phelan, a Bayer business manager responsible for MDI, testified that Mr. Friedrich had told him of an understanding Bayer had with competitors regarding MDI prices.

In response to this evidence, Dow notes that these witnesses denied ever having entered into illegal agreements themselves, that their knowledge was therefore secondhand, and that documentation did not corroborate that testimony.  Such arguments concerning the weight to be given this testimony, however, are not appropriate at the

summary judgment stage, at which the evidence must be viewed in the light most favorable to plaintiffs.  Although some of this testimony might be characterized as circumstantial instead of direct evidence—the second and third incidents related by Ms. Barbour, perhaps, and the second incident related by Ms. Blumberg—the remainder of this testimony does constitute direct evidence of an agreement, in the form of admissions by persons with knowledge of the agreement.  No additional inference is necessary to get to the existence of an agreement.  Moreover, while the evidence about Mr. Friedrich's statements might be considered "weak" direct evidence that does not identify the particular parties to the agreement, which thus cannot defeat summary judgment by itself, Ms. Barbour's testimony about the agreement described by Mr. Levi is particularly compelling and identified Bayer and BASF as conspirators with Dow.  That latter direct evidence is sufficient by itself to create a question of fact for trial concerning the existence of an agreement.  Finally, even if none of this evidence constituted strong direct evidence that could defeat summary judgment by itself, each piece of evidence supports the other, such that a reasonable jury could find that an agreement existed from this testimony taken together.

This direct evidence is also supported by circumstantial evidence of a conspiracy here, of various types, as set forth below.

*First*, although their testimony may not constitute direct evidence as plaintiffs have contended, additional witnesses have provided testimony that at least supports the inference of a price-fixing agreement.  Foremost among those witnesses is Larry Stern,

12

Bayer's head of polyurethanes from April 2000 through December 2002.  Although Mr. Stern did not testify that he had entered into any price-fixing agreement, he did testify about various conversations with his competitors in which the participants discussed future pricing, their companies' intent to raise prices, and the need for competitors to support their price increases—conversations that he testified should not have occurred. Primarily, Mr. Stern had these conversations with his counterparts at Dow (David Fischer), BASF (Bill Bernstein), and Huntsman (Tony Hankins).  Another witness, Robert Kirk, a Bayer vice president, testified that he had felt uncomfortable in a conversation with Mr. Fischer; when Mr. Fischer stated that Dow planned to increase prices, Mr. Kirk responded that Bayer had supported such increases in the past.  Edward Dineen, an executive at Lyondell, stated in an affidavit that he and Bob Wood, Mr. Fischer's predecessor at Dow, attended a dinner at a restaurant in Belgium with Jean-Pierre Dhanis, BASF's global head of urethanes, who commented to the others on the need for prices to increase.  These comments made Mr. Dineen uncomfortable, and he believed that Mr. Dhanis might have been attempting to coordinate pricing.[4]

*Second*, plaintiffs have provided evidence that throughout the alleged conspiracy period, the alleged conspirators announced identical price increases simultaneously or within a very short time period.

---

[4]Dow has submitted a second affidavit by Mr. Dineen in which he denies any link between that conversation and later pricing discussions within Lyondell.  Nevertheless, Mr. Dineen's affidavits provide evidence at least that Mr. Dhanis of BASF was attempting to coordinate pricing with executives at Lyondell and Dow.

13

*Third*, class plaintiffs have submitted evidence of a great number of communications and meetings and even vacations involving executives for these competitors, including communications involving pricing, and including communications at or near the time of price increase announcements by the companies. A few representative examples follow:

- A few days after a golf outing together in August 1999, Bayer's Hans Kogelnik (Mr. Stern's predecessor) left a telephone message for Mr. Bernstein stating "Sept. increase—where, who why."

- On June 22, 2000, Bob Wood of Dow met with Mr. Bernstein of BASF; on June 26, 2000, Rick Beitel of Dow played golf with Mr. Kirk of Bayer; and on June 26, 2000, Mr. Beitel prepared an internal memo that mentioned support from BASF and Bayer for price increases.

- In August 2000, Mr. Bernstein made notes about aggressive pricing by Bayer, including the following: "Call Dow / prices not up in August."  A Dow e-mail dated three days later stated that Dow was leaving BASF alone because BASF was supporting increases.

- In March 2001, in an internal e-mail, Mr. Bernstein wrote that he was trying to determine Huntsman's response to a price increase, but that they had not yet "connected".  That same day and the following day, before and after the e-mail, while he was on vacation, Mr. Bernstein placed eight calls to Mr. Hankins of Huntsman.  The following day, BASF and Hunstman

14

announced price increases identical to Dow's increase.

*Fourth*, the suspect communications and meetings involved high-ranking executives at these companies who could and did influence pricing for these products.

*Fifth*, plaintiffs have submitted evidence that the alleged conspirators undertook to maintain the secrecy of their communications, particularly those involving pricing. That evidence is set forth more fully below in the discussion of plaintiffs' claim of fraudulent concealment. *See infra* Part IV.C.1.  In summary, there is evidence of the following:  Mr. Stern made calls to Mr. Fischer from a pay phone at a gas station using a prepaid credit card; at a particular meeting with competitors, Mr. Stern and the others went outside to discuss pricing, in order to avoid listening devices in the facility; Mr. Stern gave Mr. Hankins a document containing pricing information after Mr. Hankins gave assurances that the document would be destroyed, and the men's reports of the meeting excluded their pricing discussion; Mr. Stern and Mr. Bernstein would leave trade association meetings and conduct future pricing discussions at an off-site coffee shop so that the men could talk in confidence; Mr. Davies told Ms. Barbour that he would deny a conversation with her about BASF's complaint to Dow regarding the failure to adhere to a particular price increase with a particular customer; Mr. Dhanis failed to list Messrs. Wood and Dineen on the expense report for a meal at which he made comments indicating that he may have been attempting to coordinate pricing; Messrs. Fischer and Bernstein conducted numerous meetings outside of their offices around the time of price increase announcements; and many of the communications were

15

by telephone calls placed after normal business hours and on weekends, including near the times of price increase announcements.

*Sixth*, as noted above, the structure of this particular market was conducive to price-fixing and provided a motive to enter into an illegal agreement.

*Seventh*, plaintiffs have provided evidence that on particular occasions, the alleged conspirators acted in a manner that would have been contrary to their own interests absent a conspiracy. Specifically, plaintiffs have provided evidence that these companies on various occasions evinced by statements or actions a greater interest in sticking to a price than in gaining volume or market share. As one example, on one occasion Mr. Friedrich of Bayer berated subordinates about their attempt to take some business away from their competitor BASF.

*Eighth*, plaintiffs have submitted expert opinion evidence that prices were supra-competitive—that is, higher than they would have been absent agreement—during the alleged conspiracy period.[5]

Dow disputes much of the this evidence, and it stresses that all of these alleged participants have denied entering into any price-fixing agreements. Again, however, those arguments are unavailing, as the evidence must be viewed in plaintiffs' favor at

---

[5]Dow has moved to exclude opinions offered by plaintiffs' expert econometrician, and the Court will address that motion by separate order. Even if this particular evidence were excluded, the Court would nevertheless conclude that the evidence of a conspiracy is sufficient to withstand summary judgment. In opposing summary judgment, plaintiffs do not appear to rely on their liability expert's opinion that defendant's conduct is more consistent with collusion that with competition.

summary judgment.  Dow also argues that the fact that prices actually were flat or decreased during the conspiracy period provides strong evidence that defendants did not conspire by way of coordinated price increase announcements.  As Dow concedes, however, an illegal antitrust conspiracy may be based on an agreement to keep prices from falling or from falling too much.  Dow also questions class plaintiffs' motives for changing its theory to have the conspiracy period end in 2003 instead of 2004, as originally alleged—Dow argues that the same kind of trade association meetings and golf outings on which plaintiffs' claims are based occurred also in 2004.  The Court cannot attempt to divine plaintiffs' intent in this way, however, and must simply consider whether there is sufficient evidence of a conspiracy during the alleged period.  All of these arguments are more appropriately made to the jury and do not affect whether plaintiffs' evidence is sufficient to withstand summary judgment.

Dow's primary argument in support of summary judgment is that the meetings and communications between the competitors were justified by legitimate business reasons, and it has provided evidence that Dow and the other alleged conspirators did actually engage in competitive conduct on various occasions.  Thus, Dow argues that plaintiffs have not excluded the possibility that the conspirators acted competitively instead of collusively in communicating with each other.  This argument would merit serious consideration if plaintiffs' evidence were limited to circumstantial evidence of parallel conduct coupled with communications among competitors; in that case, the Court would have to determine whether the evidence was truly ambiguous, in the sense

17

that a jury could not reasonably tip that balance in favor of collusion.  Plaintiffs'
evidence is not so limited, however, as detailed above, and includes direct evidence of
a conspiracy as well.  In light of that additional evidence, the Court concludes that
plaintiffs' evidence is not ambiguous in that way, and that a reasonable jury could find
the existence of a price-fixing agreement involving Dow.  Accordingly, the Court denies
Dow's request for summary judgment on this basis.

### C. *Duration and Scope of Conspiracy*

Dow also makes the narrower argument that it is entitled to summary judgment
for claims arising from the period of the alleged conspiracy prior to the July 2000 price
increase, which was the first increase to take place after Mr. Stern took over at Bayer.
Dow also argues that Ms. Barbour's evidence of a conspiracy cannot support a claim
during that period because she only joined Dow in 2000.

The Court rejects this argument.  First, plaintiffs' evidence goes beyond the
testimony of Mr. Stern and Ms. Barbour, as set forth above.  Moreover, the evidence of
a conspiracy existing in 2000 at least allows for the reasonable inference that the
conspiracy was ongoing at that point.  For example, Mr. Stern followed the practice of
his predecessor, Mr. Kogelnik, in having sensitive conversations with competitors
outside the office, after Mr. Kogelnik informed him that, in light of previous antitrust
issues, the office could be bugged.

Plaintiffs also point to two specific series of events in 1999 to support a

conspiracy period extending back to that year. The first involves the meeting in February 1999 at which Mr. Dhanis of BASF made comments to his competitors that made Mr. Dineen uncomfortable and that suggested an attempt to coordinate pricing. Plaintiffs note that Dow announced a price increase later that month, and that Lyondell, Bayer, and BASF subsequently announced identical increases. Plaintiffs also cite their evidence, described above, concerning the golf outing in August 1999 and the subsequent telephone message involving Mr. Kogelnik and Mr. Bernstein. Again, this message was followed a month later by identical price increases by Bayer, Lyondell, and BASF.

The Court agrees that this evidence of these 1999 events, by itself, would likely not be sufficient to support the existence of a conspiracy. The Court has already concluded, however, that the entirety of the evidence is sufficient to create a question of fact concerning the existence of a price-fixing conspiracy. There is also at least some specific evidence that this conspiracy existed as early as 1999, as cited by plaintiffs. Assuming the existence of a conspiracy, its duration is a question of fact for the jury.

Dow also seeks summary judgment specifically on any claim that the conspiracy extended to specific products, namely MDI, related polyols, and systems. Again, the Court concludes that this issue of the scope of the conspiracy is one for the jury. There is at least some evidence that these companies addressed pricing of these products together, and that the conspiracy encompassed all of these urethane products. For instance, on a number of occasions, the conspirators' parallel conduct included price

19

increases for both MDI and TDI.  Moreover, there is specific evidence of a conspiracy involving MDI.  For instance, although Mr. Levi's statements involved TDI, the other incidents to which Ms. Barbour testified involved MDI.  Mr. Friedrich, the subject of testimony by Ms. Blumberg and Mr. Phelan, was on the MDI-side of the business for Bayer.  Assuming the existence of a conspiracy, a reasonable jury could find that that conspiracy also involved MDI and related polyols.

With respect to systems, Dow argues that the alleged conspirators handled that business differently, and that there were more competitors in the marketplace for systems.  Plaintiffs' theory, however, is that prices for systems would have been improperly affected by the alleged conspiracy to fix prices for the constituent elements of MDI and TDI, and the Court has already rejected a challenge by Dow and the other defendants to that approach in this case.  *See In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 638-39 (D. Kan. 2008).  Plaintiffs have submitted evidence that systems prices were affected by the prices for MDI and TDI, and as Dow concedes, there were parallel price increases by the conspirators that included prices for systems.  The Court rejects this basis for summary judgment.

IV.     **Statute of Limitations – Fraudulent Concealment**

A.     *Governing Standards*

Dow also seeks summary judgment on any claims by the class plaintiffs for the period prior to November 24, 2000, on the basis that any such claims are time-barred.

20

A four-year statute of limitations applies to plaintiffs' antitrust claims, *see* 15 U.S.C. § 15b, and plaintiffs filed this action on November 24, 2004.

Plaintiffs allege that the statute of limitations was tolled by the conspirators' fraudulent concealment of the alleged price-fixing conspiracy. This "equitable doctrine is read into every federal statute of limitation." *See Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946). To avail themselves of the doctrine of fraudulent concealment, class plaintiffs must show (1) the use of fraudulent means by the conspirators; (2) successful concealment from plaintiffs; and (3) that plaintiffs did not know or by the exercise of due diligence could not have known that they might have had a cause of action. *See Ballen v. Prudential Bache Securities, Inc.*, 23 F.3d 335, 336-37 (10th Cir. 1994).

In its previous order in this case by which it ruled on a motion to dismiss this fraudulent concealment claim, the Court noted the three standards that have been used for determining whether an antitrust plaintiff has satisfied the first element of this test, as set forth by the Fourth Circuit:

> These are denominated the "self-concealing" standard, the "separate and apart" standard, and the intermediate, "affirmative acts" standard. Pursuant to the self-concealing standard, a plaintiff satisfies the first element merely by proving that a self-concealing antitrust violation has occurred. At the opposite end of the spectrum is the separate and apart standard in which a plaintiff is required to provide evidence, separate and apart from the acts of concealment involved in the defendants' antitrust violation, that the defendants affirmatively acted to conceal the plaintiff's claim. Finally, under the intermediate standard, a plaintiff must prove that the defendants affirmatively acted to conceal their antitrust violations, but the plaintiff's proof may include acts of concealment involved in the antitrust violation itself.

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995) (citations omitted), *quoted in In re Urethane Antitrust Litigation*, 235 F.R.D. 507, 518 (D. Kan. 2006).  In its prior order, the Court rejected the stricter separate-and-apart standard urged by defendants, but concluded that it did not need to decide between the two lesser standards because plaintiffs' allegations were sufficient under either standard. *See Urethane*, 235 F.R.D. at 518-19.

At summary judgment, Dow again urges the adoption of the separate-and-apart standard, but the Court finds no reason to reconsider its earlier rejection of that standard. Dow has not advanced any new arguments in favor of the separate-and-apart standard, and its only authority on this point, *Colorado v. Western Paving Construction Co.*, 630 F. Supp. 206 (D. Colo. 1986)[6], was previously cited to and considered by the Court in connection with the motion to dismiss.  As the Court explained in its prior order, the Tenth Circuit has not required that the affirmative acts of concealment have been separate from the conspiracy.  Most notably, in *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147 (10th Cir. 1981), the Tenth Circuit effectively applied the intermediate standard, first by requiring proof of an affirmative act of concealment, and then by concluding that certain acts within the perpetration of the antitrust violation

---

[6]The district court's opinion in *Western Paving* was reversed by a panel of the Tenth Circuit, *see* 833 F.2d 867 (10th Cir. 1987), but the panel's opinion was subsequently vacated, and the district court judgment was affirmed and reinstated without explanation by an equally divided Tenth Circuit, *see* 841 F.2d 1025 (10th Cir. 1988).  Such an affirmance by the Tenth Circuit is not entitled to any precedential value. *See Rutledge v. United States*, 517 U.S. 292, 304 (1996).

established fraudulent concealment as a matter of law.  *See id.* at 1154-56.  In other fraudulent concealment cases outside the antitrust context, the Tenth Circuit has similarly stated the requirement of affirmative acts of concealment without requiring that those acts be separate from the underlying wrongful act.  *See, e.g.*, *Industrial Constructors Corp. v. United States Bur. of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994); *Baker v. Board of Regents of Kan.*, 991 F.2d 628, 633 n.4 (10th Cir. 1993).

The Court is not persuaded by the district court's opinion in *Western Paving*.  In that case, the court did not undertake any analysis of the differing standards, but merely cited two cases in support of its application of a separate-and-apart standard.  *See Western Paving*, 630 F. Supp. at 210.  In those cases, however, the courts distinguished between acts within and outside of the conspiracy in the context not of this first requirement to show acts of concealment, but rather in the context of discussing the due diligence requirement for fraudulent concealment.  *See McConnell v. Frank Howard Allen & Co.*, 574 F. Supp. 781, 787 (N.D. Cal. 1983); *Board of Educ. of Evanston Twp. High Sch. Dist. No. 202 v. Admiral Heating & Ventilation, Inc.*, 94 F.R.D. 300, 302 (N.D. Ill. 1982).  Thus, those two cases did not provide any basis for the *Western Paving* court's application of a separate-and-apart standard.  *See Supermarket of Marlinton*, 71 F.3d at 126 (Fourth Circuit noting *Western Paving* court's misreading of the cases on which it relied).

Finally, as the Fourth Circuit concluded when rejecting the separate-and-apart standard, the adoption of the intermediate standard instead avoids "the difficult, if not

impossible, task of deciding which acts are in furtherance of conspiracies and which acts are separate and apart from conspiracies." *See id.* at 125; *see also Texas v. Allan Constr. Co., Inc.*, 851 F.2d 1526, 1532 (5th Cir. 1988) (citing this problem as a basis for rejecting the separate-and-apart standard).

On the other hand, class plaintiffs urge the adoption of the less strict self-concealing standard, which, according to plaintiffs, is not inconsistent with the Tenth Circuit precedent. In *King & King*, the Tenth Circuit noted that in *Ashland Oil Co. of Calif. v. Union Oil Co. of Calif.*, 567 F.2d 984 (Temp. Emerg. Ct. App. 1977), the Temporary Emergency Court of Appeals had stated that to toll the statute of limitations the plaintiff there had to show fraudulent concealment or that the defendant's conduct was inherently self-concealing. *See King & King*, 657 F.2d at 1154 (quoting *Ashland Oil*, 567 F.2d at 988). In *Ashland*—a non-antitrust case before an appellate court whose precedent is not binding here—the court supported its self-concealing standard by citation to two Supreme Court cases in which fraud had formed the basis for the underlying claim. *See Ashland*, 567 F.2d at 988 (citing *Holmberg v. Armbrecht*, 327 U.S. 392 (1945), and *Bailey v. Glover*, 88 U.S. (21 Wall.) 342 (1875)). Thus, *Ashland* does not provide support for application of a self-concealing standard in an antitrust context.

More significantly, in *King & King* the Tenth Circuit did not apply the self-concealing standard, but required proof of an affirmative act of concealment. *See id.* (noting that the parties had agreed that the district court had correctly stated the

24

applicable law).  The Tenth Circuit has never applied the self-concealing standard, and as stated above, the Tenth Circuit has consistently required proof of an affirmative act to support a claim of fraudulent concealment to toll the statute of limitations.  Moreover, the Court agrees with Dow that application of the self-concealing standard in all price-fixing antitrust conspiracy cases would effectively swallow the rule and eviscerate the statute of limitations in such cases.  The Court is persuaded by the Fourth Circuit's thorough analysis of these standards in *Supermarket of Marlinton*, by which the Fourth Circuit determined that the intermediate standard, which is in accord with the weight of authority, best balances the equities involved in furthering the policies underlying both the statute of limitations and the fraudulent concealment doctrine.  *See Supermarket of Marlinton*, 71 F.3d at 124-26.  For these reasons, the Court applies the intermediate standard, as the Tenth Circuit did in *King & King*.

### B.  *Scope of Evidence*

In support of their claim for fraudulent concealment, class plaintiffs argue that the alleged conspirators affirmatively concealed the price-fixing conspiracy by issuing false and pretextual price increase announcements and by taking measures to make sure that the conspiracy remained secret.  Dow argues that plaintiffs may rely only on the announcements in attempting to support this claim of fraudulent concealment.  Dow relies on the Court's previous statement at the motion-to-dismiss stage that "[b]ecause [the issuing of announcements] is the only aspect of plaintiffs' fraudulent concealment

theory which is pled with particularity [as required by Fed. R. Civ. P. 9(b)], . . . plaintiff's tolling theory rests entirely on the allegations that defendants gave false and pretextual reasons for their price increases." *See Urethane*, 235 F.R.D. at 518.

The Court rejects Dow's attempt to limit plaintiffs' evidence in this way.  As plaintiffs point out, in the pretrial order, which now controls the scope of the parties' claims and defenses, *see Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1304 (10th Cir. 2003), plaintiffs' contentions include an allegation of fraudulent concealment based not only on price announcements, but also on acts promoting secrecy.  Dow did not object to that latter basis for plaintiffs' fraudulent concealment claim.  Accordingly, plaintiffs may pursue that claim as stated in the pretrial order.

Dow argues that the pretrial order should not be deemed to override the Court's previous order.  In that previous order, however, the Court did not conclude that plaintiffs' claim based on acts of secrecy was not legally cognizable; rather, the Court merely concluded that plaintiffs' had not pleaded such a claim with sufficient particularity.  Plaintiffs' subsequent inclusion of the claim in the pretrial order, coupled with Dow's failure to object, effects a proper amendment of plaintiffs' claims, at a time when pleading requirements do not apply.  Dow also complains that these allegations appear in the portion of the pretrial order setting forth the parties' contentions, which each side supplied unilaterally.  That would be the case for any newly-asserted claim, however, and Dow was required to object to any new claim that it believed plaintiffs should not be permitted to pursue.

26

Finally, and most significantly, Dow has not responded to plaintiffs' argument that Dow has not suffered any prejudice from the inclusion of the allegations of fraudulent concealment based on acts of secrecy. As plaintiffs point out, such acts also bear on the issue of the existence of a conspiracy, and Dow therefore had every reason to conduct discovery concerning those acts. Moreover, the direct action plaintiffs' claim of fraudulent concealment was based on both price announcements and acts of secrecy. Accordingly, because Dow has not shown any prejudice, plaintiffs' allegations in the pretrial order would stand even if Dow were permitted to object to the pretrial order at this time. Thus, the Court will consider both types of fraudulent concealment evidence submitted by plaintiffs.[7]

### C.   *Affirmative Acts of Concealment*

Dow seeks summary judgment on the basis of the statute of limitations for the reason that plaintiffs have not submitted sufficient evidence of affirmative acts of concealment in support of their fraudulent concealment theory. The Court disagrees and concludes that this issue of fraudulent concealment remains for the jury.

---

[7]In its initial brief, Dow also assumed that plaintiffs would be limited to relying only on the three specific pricing announcements identified by plaintiffs in their amended complaint. In its prior order, however, the Court did not limit plaintiffs' theory only to those three announcements. *See Urethane*, 235 F.R.D. at 518. In their summary judgment response, plaintiffs relied on all of the announcements issued during the alleged conspiracy period, and Dow did not object to that approach in its reply brief. Accordingly, the Court will not limit plaintiffs only to reliance on the three particular announcements.

1.    ACTS TO MAINTAIN SECRECY

In *King & King*, the Tenth Circuit, in affirming the district court's decision not submit a limitations defense to the jury in a price-fixing case, held that the plaintiff had established the defendant's fraudulent concealment of the conspiracy as a matter of law. *See King & King*, 657 F.2d at 1154-56.  The court noted that "where there is a dispute as to the existence of fraudulent concealment, the question is one for the jury."  *See id.* at 1156.  In that case, however, the court concluded that the evidence did not merely create a question of fact on the issue, but established fraudulent concealment as a matter of law, as there was no evidence from which the jury could have believed that the price-fixing conspiracy, if it existed, had not been fraudulently concealed.  *See id.* at 1155-56. The Court supported its conclusion "that the evidence overwhelmingly supports the proposition that all price-fixing activity was concealed by [the defendant]" by citing evidence that the defendant's employees had used a "talk/no talk" document distinguishing reliable contacts who would keep a confidence from unreliable contacts who would not; that price-fixing calls were often made after normal working hours; that price-fixing agreements had been made "under cover"; that any conspiracy had been concealed; and that the plaintiff had not known of the price-fixing activities.  *See id.* at 1155.

Class plaintiffs' evidence of acts of secrecy by the alleged conspirators is at least comparable to the "overwhelming" evidence cited in *King & King*.  Plaintiffs have submitted evidence that, when viewed in the light most favorable to plaintiffs, shows that

the conspirators met and communicated privately and in secret in discussing pricing and otherwise attempted to conceal activities relating to price-fixing.  That evidence includes evidence of the following affirmative acts of concealment:

- At least twice, Mr. Stern of Bayer left his office to make telephone calls to Mr. Fischer of Dow from a pay phone at a gas station using a prepaid credit card, in order to maintain the confidentiality of the conversations involving future pricing; Mr. Stern's predecessor, Mr. Kogelnik, had told Mr. Stern that as a result of previous antitrust issues at Bayer, sensitive conversations with competitors should be held outside the office because the office could be bugged.

- At a meeting at a Bayer facility in Pennsylvania in October 2000 involving Messrs. Kogelnik, Stern, and Fischer, after discussing some issues the men went for a walk outside to avoid any listening devices that may be present in the facility, and they proceeded to discuss future pricing and their companies' intent to increase prices.

- At a meeting in August 2002 at an airport hotel, at which Mr. Stern and Mr. Hankins of Huntsman exchanged pricing information and discussed the resolve to have a price increase stick, Mr. Stern gave Mr. Hankins a document containing Bayer pricing information relating to a particular customer, after receiving assurances that Mr. Hankins would destroy the document; reports prepared by Messrs. Stern and Hankins concerning the

29

topics discussed at the meeting omitted the pricing discussion.

- On at least two occasions, Mr. Stern and Mr. Bernstein of BASF left trade association meetings and conducted future pricing discussions at an off-site coffee shop so that the men could talk in confidence.

- After Mr. Davies and Ms. Barbour of Dow discussed Dow's failure to adhere to a particular price increase with a particular customer and BASF's complaint to Mr. Davies about that conduct, Mr. Davies told Ms. Barbour that if she told anyone about the conversation, he would deny the conversation and call her a liar.

- After a February 1999 dinner in a private room at a restaurant in Belgium involving Mr. Dhanis of BASF, Mr. Wood of Dow, and Mr. Dineen of Lyondell, at which Mr. Dhanis had made comments regarding the need to get prices up (which comments Mr. Dineen felt could be an attempt to coordinate pricing), Mr. Dhanis failed to list Messrs. Wood and Dineen on the expense report for the meal, instead listing two BASF employees.

- Mr. Fischer of Dow and Mr. Bernstein of BASF conducted numerous meetings outside of their offices around the time of price increase announcements.

- The executives of the alleged conspirators communicated numerous times by telephone calls placed after normal business hours and on weekends, including at times near the times of price increase announcements.

In response to this evidence, Dow refers to its own evidence that the competitors had legitimate business reasons to be in contact, and it argues that they would have had legitimate reasons to keep business conversations private. Dow is free to make such arguments at trial; at this stage, however, the evidence must be construed in plaintiffs' favor, and any dispute of fact must be decided by the jury, as *King & King* instructs. Dow also attempts to characterize any secrecy by the conspirators as mere failures to disclose the existence of the conspiracy, which cannot constitute fraudulent concealment. *See King & King*, 657 F.2d at 1155 ("in the absence of a fiduciary duty between the parties, mere failure to disclose the existence of a cause of action does not constitute fraudulent concealment"). In the cited examples, however, the alleged conspirators did not simply remain silent, but engaged in affirmative acts of concealment (for example, leaving the office to have conversations, submitting false reports, demanding secrecy, assuring the destruction of a document).

In light of *King & King*, this evidence is sufficient at least to create a fact question on the issue of fraudulent concealment, and Dow has provided no authority to the contrary. Accordingly, the Court concludes that Dow is not entitled to summary judgment on its statute-of-limitations defense on this basis.

2.     PRICE ANNOUNCEMENTS

In light of the Court's conclusion that the evidence of acts of secrecy is sufficient to create a question of fact for trial concerning whether the alleged conspirators engaged in affirmative acts of concealment, the Court need not necessarily address plaintiffs'

additional basis, namely the allegedly false and pretextual price increase announcements issued by the alleged conspirators.  The Court nevertheless addresses that basis to confirm that plaintiffs may rely on such evidence at trial in support of their fraudulent concealment claim.

Dow argues that class plaintiffs cannot rely on the announcements as evidence of fraudulent acts of concealment because they cannot show that the statements in those announcements relating to market conditions affecting price (the cost of constituent materials, for example) were in fact false (and thus fraudulent).  In response to that argument, plaintiffs have not attempted to show that any such factual statements about market conditions contained in those announcements were false.  Rather, plaintiffs' theory, as set forth in the pretrial order, is that such announcements were false and pretextual because they attributed the price increases to other reasons (the market conditions) without mentioning the price-fixing conspiracy as a cause of the increases.

Dow argues that plaintiffs are improperly attempting to rely on mere failures to disclose the existence of the conspiracy.  As the Court has stated twice previously, however, *see Urethane*, 235 F.R.D. at 519-20; *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1235-36 (D. Kan. 2010), the price announcements do not constitute mere silence as to the existence of a conspiracy, but represent affirmative acts of concealment. Contrary to Dow's position, there is a misrepresentation alleged here—plaintiffs do not argue that the conspirators falsely stated that costs were rising or that other market conditions existed, but rather they allege that the conspirators falsely stated that prices

32

were being raised because of those conditions, when in fact they were raising prices in furtherance of a price-fixing conspiracy. Such conduct goes beyond mere silence or nondisclosure. *See In re Magnesium Oxide Antitrust Litig.*, 2012 WL 1150123, at *6 (D.N.J. Apr. 5, 2012) (whether statements about market conditions in justification for price increases were false was irrelevant, as those justifications could nonetheless mislead the plaintiffs as to the existence of a price-fixing conspiracy; such justifications constituted affirmative acts of concealment).

Moreover, Dow has not provided any authority to support its position that such announcements do not constitute affirmative acts of concealment, and it has not addressed the cases cited by plaintiffs in support of their theory. *See, e.g.*, *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 855 (N.D. Ill. 2010) (despite the defendants' contention that price announcements were honest disclosures supported by market data, question of fact remained concerning whether the defendants affirmatively concealed illegal agreements through misleading public statements); *In re Catfish Antitrust Litig.*, 908 F. Supp. 400, 408 (N.D. Miss. 1995) (evidence of affirmative acts of concealment, creating an issue of fact for trial, included incomplete explanations concerning prices that omitted the fact of an illegal agreement); *United Nat'l Records, Inc. v. MCA, Inc.*, 609 F. Supp. 33, 36 (N.D. Ill. 1984) (statements offering alternative reasons for pricing went beyond mere denial of wrongdoing and created triable issues of fact concerning whether the defendants affirmatively concealed their alleged price-fixing agreement).

Accordingly, plaintiffs are free to pursue this basis for fraudulent concealment,

and the price announcements provide additional evidence creating an issue of fact concerning whether the alleged conspirators engaged in affirmative acts of concealment.

### D.    *Reliance and Due Diligence*

Finally, Dow argues that it is entitled to summary judgment on plaintiffs' fraudulent concealment claim—and thus on its statute-of-limitations defense—based on plaintiffs' failure to show reliance and due diligence. Dow argues that plaintiffs cannot show that they read and relied on the price announcements and that any such reliance would not be justified because the purchasers of these products were sophisticated companies that monitored the market factors that affected pricing.

The Court rejects this argument. First, in its initial brief, Dow directed this argument only to the price announcements. As noted above, however, plaintiffs' claim of fraudulent concealment also rests on affirmative acts of secrecy. After plaintiffs filed their summary judgment response, in which they also relied on such acts of secrecy, Dow did not address this issue of reliance or due diligence in its reply brief. Accordingly, there is no basis for judgment in Dow's favor on plaintiffs' tolling theory in the scope permitted by the Court.

Second, as set forth above, the elements of this doctrine do not include reliance; rather, plaintiffs must show that they did not know or by the exercise of due diligence could not have known that they might have had a cause of action. Dow has not met its initial burden on summary judgment to show the absence of any material issue of fact concerning whether plaintiffs knew of the conspiracy or should have known of it in the

34

exercise of due diligence. As mentioned, Dow has not addressed the acts of secrecy at all. With respect to the announcements, the purchasers' sophistication may well have allowed them to consider whether market conditions were accurately stated in the announcements; that sophistication, however, would not necessarily have given them any insight into whether the price increases did or did not result from a price-fixing conspiracy (the falsehood alleged by plaintiffs).

Dow has not cited any authority supporting judgment it its favor on this basis, and the Tenth Circuit has stated that this element of fraudulent concealment generally presents a question of fact for the jury. *See, e.g.*, *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir. 1985) ("It is settled law in the majority of circuits that the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury."). The Court concludes that a question of fact remains for the jury in this case concerning the second and third prongs of the test for fraudulent concealment, and Dow's motion for summary judgment on this limitations issue is therefore denied.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant Dow Chemical Company's motion for summary judgment (Doc. # 2402), to the extent that it relates to the claims asserted against it by the class plaintiffs, is **denied**.

IT IS SO ORDERED.

Dated this 18th day of December, 2012, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge