IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE:                                    )
URETHANE ANTITRUST LITIGATION             )        MDL No. 1616
                                          )        Case No. 04-1616-JWL
This document relates to:                 )
The Polyether Polyol Cases                )
_____ )

## MEMORANDUM AND ORDER

In this multi-district class action, plaintiffs allege that remaining defendant Dow

Chemical Company ("Dow") conspired with other manufacturers to fix prices for certain

urethane chemical products in violation of the Sherman Act, 15 U.S.C. § 1.  This matter

presently comes before the Court on Dow's motions to exclude testimony by plaintiffs'

liability expert, Dr. John Solow (Doc. # 2392), and to exclude testimony by plaintiffs'

damages expert, Dr. James McClave (Doc. # 2390).  The Court has considered the

parties' briefs, and it also heard oral argument on these motions on November 19, 2012.

For the reasons set forth below, the motions are **denied**.


### I.    Governing Standards

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the

Supreme Court instructed that district courts are to perform a "gatekeeping" role

concerning the admission of expert scientific testimony.  *See id.* at 589-93; *see also*

*Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999).  The admissibility of

expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In order to determine that an expert's opinions are admissible, this Court must undertake a two-part analysis: first, the Court must determine that the witness is qualified by "knowledge, skill, experience, training, or education" to render the opinions; and second, the Court must determine "whether the witness' opinions are 'reliable' under the principles set forth" in *Daubert* and *Kumho Tire*. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). The rejection of expert testimony is the exception rather than the rule. *See* Fed. R. Evid. 702 advisory committee notes.

To qualify as an expert, the witness must possess such "knowledge, skill, experience, training, or education" in the particular field as to make it appear that his or her opinion would rest on a substantial foundation and would tend to aid the trier of fact in its search for the truth. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004). In determining whether the proffered testimony is reliable, the Court assesses whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be properly applied to the facts in

2

issue. *See Daubert*, 509 U.S. at 592-93.  The *Daubert* Court listed four factors relevant to assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error associated with the theory; and (4) whether the theory has attained widespread or general acceptance. *Id.* at 592-94.  In *Kumho Tire*, however, the Supreme Court emphasized that these four factors are not a "definitive checklist or test" and that a court's inquiry into reliability must be "tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150. In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundations. *Id.* (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)).  The district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Id.* at 152.

## II.    Motion to Exclude Testimony of Dr. Solow (Doc. # 2392)

Dow seeks to exclude certain opinions offered by plaintiffs' liability expert, Dr. Solow.  Dow does not contest Dr. Solow's qualifications as an economist.  Dr. Solow undertook a "structure-conduct-performance" analysis of the alleged conspiracy.  Dow concedes that such a method of analysis is well accepted in this field, but it takes issue with particular aspects of each part of Dr. Solow's analysis.

### A.    *Structure Opinion*

Dow seeks to exclude Dr. Solow's opinion that this market involving these

products and these alleged conspirators is particularly conducive to price-fixing. First, Dow argues that that opinion is not helpful to the jury—and thus, is not a proper subject of expert testimony—because the particular factors cited by Dr. Solow (oligopolistic market, trade association and industry meetings providing opportunities to conspire, fungible commodity goods without product differentiation and without close substitutes, high barriers to entry, excess capacity) are undisputed and can be understood by the jury. To that end, Dow points out that this opinion by Dr. Solow does not depend on any sort of complex economic analysis or even an established method for weighing the factors.[1]

The Court rejects this argument. Dow does not dispute that the market's conduciveness to price-fixing is relevant. *See, e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (fact that industry is conducive to oligopolistic price-fixing provides evidence of motive to enter into a price-fixing conspiracy). The Court is easily persuaded that expert testimony would aid a jury to understand why these factors make a conspiracy easier or give a motive for conspiring. Dow has not cited any authority for excluding such testimony on this basis.

As a second basis for exclusion of this opinion, Dow argues that it is well-

---

[1]Dow does not appear separately to challenge the methodology or reliability of this opinion to the extent that it relies on a qualitative analysis instead of a quantitative one. At any rate, such a challenge would not succeed; Dow has not provided any authority that qualitative analyses are not reliable, and this Court has previous rejected challenges based on a lack of empirical studies as relating to the weight of the evidence and not the admissibility. *See, e.g.*, *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 2008 WL 4382141, at *3, 5 (D. Kan. Sept. 26, 2008).

4

accepted that these same factors can point to legal parallel conduct, such as with tacit collusion (instead of illegal express collusion). Again, however, Dow does not cite authority to support exclusion of this opinion on this basis. Dr. Solow's opinion is merely that these factors make a conspiracy more likely and give a motive; it is not that the presence of these factors conclusively establishes an illegal conspiracy in this case. Accordingly, there is no basis to exclude this opinion.

Dow also stresses that these same factors existed in 2004, after the conspiracy period alleged by plaintiffs. The fact that plaintiffs have chosen not to pursue 2004 as part of the conspiracy, however, does not undermine Dr. Solow's opinion that the 1999-2003 period is conducive. After all, as Dow stresses, the fact that a market is conducive does not necessarily mean that a conspiracy existed, and plaintiffs are free to explain to the jury why they have decided not to include 2004 in the conspiracy period. This point regarding 2004 is solely a matter for cross-examination and does not affect the admissibility of Dr. Solow's opinion. Accordingly, the Court denies the motion to exclude Dr. Solow's structure opinion.

### B.    *Conduct Opinion*

Dow next seeks to exclude Dr. Solow's opinion that certain conduct by the alleged conspirators is consistent with the existence of an agreement to fix prices. Dow first argues that Dr. Solow only considered evidence "cherry-picked" by counsel without considering contrary evidence in forming that opinion. Dow complains that Dr. Solow effectively weighed the evidence, thereby invading the jury's province.

The Court concludes that there is no basis to exclude Dr. Solow's testimony on this issue at this time. Dr. Solow stated that he did consider the defendants' witnesses denials. Moreover, Dr. Solow's opinion is essentially that particular events, assuming they occurred, are consistent with a conspiracy. Certainly, he may not give any opinion concerning the credibility of witnesses or whether a particular event actually occurred, and Dow will be free to object to any such testimony at trial. Nor may Dr. Solow opine on the ultimate issue of whether a conspiracy existed here, as plaintiffs acknowledge. The extent to which Dr. Solow considered the entirety of the evidence in the case is a matter for cross-examination. The Court cannot say that Dr. Solow's failure to examine the entire record renders fatally unreliable his opinion that certain events are consistent with collusion, and Dow has not provided authority that would require exclusion here.

Second, Dow argues that this conduct opinion is not helpful to a jury because it is not based on an economic analysis and thus is not sufficiently scientific or technical as required under Fed. R. Evid. 702. Dow argues that any weighing of non-economic factors to decide if there was a conspiracy should be left to the jury. The Court rejects this basis for exclusion as well. Dow has conceded that the structure-conduct-performance analysis by an economist is well-accepted in this field, and the Court concludes that it would be helpful to a jury for an expert to put events into an economic context. Again, Dow is free to monitor Dr. Solow's testimony at trial to ensure that he does not simply and impermissibly lend an expert imprimatur to plaintiffs' position on disputed facts, but that he instead testifies about how particular conduct relates to price-

fixing.

### C.        *Performance Opinion*

Finally, Dow argues that, in his performance opinion, Dr. Solow has improperly relied on models and opinions by plaintiffs' damages expert, Dr. James McClave, without independently determining that such opinions are sound or reliable.  The Tenth Circuit addressed a similar argument in *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993), in which the court held that an expert witness had improperly adopted the conclusions of a non-testifying expert.  *See id.* at 732-33.  In so holding, the court relied on the facts that the expert witness had no expertise with respect to the projections he had adopted, he had no familiarity with the other expert's methods or reasoning, and there was no evidence of any attempt to corroborate the other expert's findings.  *See id.* at 732.

In the performance section of his expert report, Dr. Solow opined that the effect of the conspirators' conduct was to maintain prices at a supra-competitive level, as shown by Dr. McClave's analysis and as supported by his own analysis of documents and testimony.  Dr. Solow stated that Dr. McClave's analysis is consistent with own structural analysis and with established economic theory.  Dow points to Dr. Solow's testimony that his assessment of performance was based to a large extent on Dr. McClave's analysis, that his performance opinion would be incomplete without the type of analysis done by Dr. McClave, and that he did not have the staff needed to replicate Dr. McClave's work.  These concessions do not provide a basis for exclusion, however.

Unlike the situation in *TK-7*, Dr. Solow did not merely adopt opinions formed by an expert outside his field of expertise.  Although Dr. Solow may not have had the resources to replicate Dr. McClave's work, there is no indication that the work was outside his expertise as an economist (in which field Dr. Solow is clearly qualified) such that he could not understand it.  Indeed, part of Dr. Solow's opinion is that Dr. McClave's analysis is consistent with economic theory.  Moreover, Dr. Solow also reviewed Dr. McClave's models and report and even discussed those with Dr. McClave.  Thus, Dr. Solow has not improperly relied on opinions of another expert.

Moreover, in *TK-7*, part of the court's concern was that the non-testifying expert's opinion was neither confirmed as reliable by the testifying expert nor able to be tested by cross-examination at trial.  *See id.* at 732-33.  In this case, Dr. McClave's own opinions may be challenged in cross-examination at trial.

Dow also challenges the opinion contained in footnote 71 of Dr. Solow's report, in which Dr. Solow stated that Dr. McClave's conclusion that domestic demand for TDI was a less significant factor in market pricing than cost, capacity, and export demand was consistent with the structure of the TDI market; and that the marginal demand driver for TDI was not domestic demand but rather export demand.  In the remainder of the footnote, Dr. Solow gave four examples of documents (with explanations) that supported his statements.  Dow argues that Dr. Solow has improperly attempted to "bless" Dr. McClave's treatment of TDI without a sufficient analysis.  Again, however, Dr. Solow has not merely adopted Dr. McClave's opinion, but has instead formed his own opinion,

8

based on other materials, consistent with Dr. McClave's opinion. Dow's complaints about Dr. Solow's analysis go to weight, not admissibility, and are more appropriately explored in cross-examination at trial. The Court denies Dow's motion to exclude Dr. Solow's performance opinions.

### III.   Motion to Exclude Testimony of Dr. McClave (Doc. # 2390)

Dr. McClave, a statistician and econometrician, is plaintiffs' expert on damages and causation. Dr. McClave created multiple-regression models for prices of the products at issue, using a forecasting method that employed 1999-2003 as the damages period and 2004-2008 as the benchmark period. He tested various models to achieve "fit", that is, a use of particular variables that would return very accurate predictions for actual prices in the benchmark period that could then be applied to the damages period. Plaintiffs rely on Dr. McClave's analysis to show that prices during the damages period were supracompetitive, or above those levels that could be expected if based purely on competition (impact), and to show the amount of that variance (damages).

In its motion, Dow does not challenge Dr. McClave's qualifications as a statistician or econometrician for purposes of his regression analysis. Instead, Dow takes issue with various aspects of the analysis.

#### A.    _Decision Not to Include 2004 in the Damages Period_

Dow first challenges as unreliable Dr. McClave's decision to use 2004 as a benchmark year instead of a damages year. Even though plaintiffs originally alleged a

conspiracy existing from 1999 to 2004, Dr. McClave testified that he made the decision on his own to remove 2004 from the damages period.  As set forth in the pretrial order, plaintiffs now allege a conspiracy lasting only through 2003.  Based on plaintiffs' changing theory and Dow's own expert's conclusions that damages would be severely reduced using Dr.  McClave's models if 2004 were converted to a damages year, Dow argues that Dr. McClave's models are improperly results-driven.

Dow's arguments about plaintiffs' decision to change the alleged conspiracy period do not provide a basis to exclude Dr. McClave's testimony.  Plaintiffs could have decided to narrow their conspiracy allegation after discovery for perfectly legitimate reasons, and plaintiffs have offered some of their rationale in their response (lack of witness testimony supporting a conspiracy in 2004, the departure of key players in the conspiracy from their companies, public knowledge in 2004 of a government investigation).  Dow's attacks on plaintiffs' motives, based on allegedly suspect circumstances, are more appropriately made at trial; thus, much of Dow's argument is irrelevant to the admissibility of Dr. McClave's opinions.  If plaintiffs are able to produce evidence at trial of a conspiracy lasting from 1999 to 2003, Dr. McClave would be free to assume those conspiracy years for his modeling.

Dow also argues that Dr. McClave's decision (on his own) to make 2004 a benchmark year is based on circular reasoning.  Dr. McClave stated that he made that decision because his modeling showed that 2004 behaved more like a benchmark year (with the model accurately predicting the prices) than a conspiracy year.  Dow argues

that such reasoning is circular, and thus unsound scientifically, because the analysis by which Dr. McClave determined that 2004 was more competitive than collusive—his modeling using 2004 as a benchmark year—was itself based on an assumption that 2004 was more competitive than collusive.

The Court rejects this argument for exclusion of the models. Dr. McClave's final models use 2004 as a benchmark year because of his decision regarding that year. Dr. McClave testified that in making that decision, he ran the models both ways, using 2004 as a benchmark year and using 2004 as a damages year, noting along the way that 2004 was better-suited as a benchmark year. He further testified that that determination was verified by the final results using 2004 as a benchmark year. Thus, contrary to Dow's argument, Dr. McClave did not base his decision solely on tests run under an already-made assumption that 2004 should be a benchmark year. Dow has not responded to this testimony that Dr. McClave ran the models both ways, except to argue that its own expert, Dr. Keith Ugone, got different results in running the models with 2004 as a damages year. The fact of different results does not render Dr. McClave's decision unsupported or unsound, however. Indeed, Dr. Ugone testified that he did not offer any opinion concerning whether 2004 should be a damages year in the modeling. Dow has not offered any expert evidence suggesting that Dr. McClave made this decision in an improper way. He has provided a non-circular basis for his decision; accordingly, Dr. McClave's models are not inadmissible for the reason argued by Dow.

Dow also challenges Dr. McClave's reasoning in refusing to use 1994 to 1998 as

11

part of the benchmark period, based the direct-action plaintiffs' allegations of a conspiracy during that period, while using 2004 as a benchmark year despite class plaintiffs' original allegation of a conspiracy that included that year. That decision by Dr. McClave is not without support, however, as he stated that he also felt that the data from the earlier period was insufficient. Moreover, criticisms of Dr. McClave's consideration of possible taint from a conspiracy of potential benchmark years go to the weight of his opinions and not their admissibility.

Finally, Dow argues that Dr. McClave failed to disclose in his report the particular modeling and related data on which he based the decision to make 2004 a benchmark year. That complaint comes too late, however. Dr. McClave stated his reason for making 2004 a benchmark year in his initial report, and any objection that his disclosure regarding that opinion was incomplete should have been raised at that time. *See, e.g.*, D. Kan. Rule 37.1(b) (motion to compel must be filed within 30 days, otherwise objection is waived). Moreover, Dr. McClave was asked questions about that decision in his deposition, and Dow had every opportunity at that deposition to explore fully the bases for that decision by Dr. McClave; thus, Dow cannot show prejudice from any failure to disclose bases for Dr. McClave's opinions. *See, e.g.*, *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (prejudice and ability to cure are factors bearing on the district court's decision whether to exclude expert evidence violating Rule 26(a)). The Court denies Dow's motion to exclude Dr. McClave's testimony on this basis.

B.     *Failure to Conduct Out-of-Sample Tests*

Dow's next challenge to Dr. McClave's models is based on Dr. Ugone's own out-of-sample tests to check the robustness or sensitivity of Dr. McClave's models.  Dr. Ugone would testify that when he ran tests using Dr. McClave's models but taking out either 2004 or 2008 from the benchmark period, the models do not accurately predict prices in the removed year.  Dow argues that, based on the fact that the remainder of the benchmark period cannot accurately predict a sample year in the benchmark period, the 2004 to 2008 benchmark period should not be considered an accurate predictor of prices in the damages period under Dr. McClave's models.

Dr. McClave takes issue with this type of out-of-sample testing by Dr. Ugone.  Dr. McClave states that any such robustness or sensitivity testing should involve the removal only of very small periods of time, randomly selected throughout the benchmark period, and not a wholesale 20-percent reduction of the benchmark period at either end.  Dr. McClave further states that his models easily pass the proper "bootstrapping" tests for robustness that he ran.

The Court rejects this basis for exclusion argued by Dow.  Dr. McClave did do testing for robustness of the models, and both Dow in its brief and Dr. Ugone in his testimony conceded that such bootstrapping tests are commonly accepted tests for multi-regression models.  Dow has not offered any expert opinion that a regression model must pass robustness tests, let alone that it must pass the particular out-of-sample tests performed by Dr. Ugone.  The fact that another test might yield different results does not

13

provide a basis for exclusion of testimony supported by a test that is admittedly well-accepted in this field. *See* Fed. R. Evid. 702 adv. cmtee note (Rule 702 "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise") (citing *Heller v. Shaw Indus.*, 167 F.3d 146, 160 (3d Cir. 1999)).

Nor is the Court persuaded by Dow's argument that Dr. McClave, in effect, performed out-of-sample testing in making his determination that 2004 should be a benchmark year (as discussed above). Dow's argument that that fact undermines Dr. McClave's criticism of Dr. Ugone's out-of-sample testing bears only on the weight of Dr. McClave's testimony. The Court denies this basis for exclusion.

### C.   *Failure to Use a Dummy-Variable Model*

Dow also argues that, instead of using a forecasting model involving discrete damages and benchmark periods, Dr. McClave should have used a dummy-variable model, in which the benchmark period would also include the damages period. Dow notes that Dr. McClave has used the dummy-variable method in other cases, and it attacks Dr. McClave's stated reason for not using the method (the problem of a potential taint of a conspiracy in the damages period) and his attempts to distinguish his other cases involving the dummy-variable method from this one.

Again, the Court rejects this challenge based on Dr. McClave's decision to use one accepted method over another. Neither Dow nor its expert disputes that the forecasting method employed by Dr. McClave is a well-accepted method of multiple-regression modeling. Dr. McClave has stated reasons for his decision not to use the

14

alternative method.  The fact that use of another method would have yielded different results does not provide a basis for exclusion.  (Otherwise, if Dr. McClave had used the dummy-variable method, Dow could argue that he should have used the alternative forecasting method.)  Dow's arguments about which method is superior for use in this case or whether this case is similar to Dr. McClave's other cases go only to the weight of Dr. McClave's opinions, and not to their admissibility.  Accordingly, the Court denies the motion to the extent based on this argument.

D.    *Use of Particular Variables*

1.    TDI EXPORTS

Dow challenges various ways in which Dr. McClave chose variables for his regression analysis.  First, Dow takes issue with Dr. McClave's use of TDI exports as a proxy for demand.  Dr. McClave stated in his report that the data showed that raw material cost, capacity, and export demand were significant drivers of price.  With respect to TDI exports, Dr. McClave stated:

> The amount of TDI exported annually, as a proxy for demand, was positively correlated with changes in price. During the benchmark period, domestic demand was flat or falling and failed to demonstrate a sensible statistical relationship to price.  In conjunction with the costs and capacity factors described above, TDI exports proved to have a positive and statistically significant relationship with price, hence are included in the model as a demand variable.

Dr. McClave further noted that defendants had recognized exports as an important demand driver for TDI, and he cited two documents to support that statement.  He further stated that data showed that TDI exports represented a large percentage, even exceeding

15

40 percent, of overall domestic production.   Finally, Dr. McClave referenced Dr. Solow's expert report's opinions concerning TDI market structure and the significance of export demand.

Dow argues that Dr. McClave does not properly justify using TDI exports as a proxy for demand other than because it provides the best fit statistically; thus, Dow argues that Dr. McClave improperly chose this variable by fit alone.   In its reply brief, Dow cites the Federal Judicial Center's reference manual on scientific evidence for its statements that a correlation between two variables does not imply causation, and that spurious correlations should be avoided.   Dow also cites the extreme example of models that had been created to predict the stock market using Bangladeshi butter production, domestic cheese production, and the population of sheep in the United States and Bangladesh.   Dr. McClave did not use any variable akin to Bangladeshi sheep in this case, however.   Instead he used exports as a proxy for domestic demand, an economic variable with an obvious relation to the product.   Dow has not submitted any expert evidence indicating that an econometrician, in performing a multiple regression analysis, may not use exports as a demand proxy in forecasting domestic prices, or that exports cannot have a sufficient relationship to demand.

Dow does suggest that Dr. McClave, as a non-economist, would not be qualified to determine (absent a statistical study) that exports could be a sensible or expected demand driver.   The Court rejects this argument.   It is a matter of basic economics, easily within the expertise of an econometrician (if not lay persons generally), that demand

generally has a positive correlation with price for a product.  Moreover, Dr. McClave also referenced the opinion of Dr. Solow, an economist, that TDI exports were a demand driver.  Finally, Dr. McClave relied on documents to support the conclusion that TDI exports were a demand driver.  Dow's issues with Dr. McClave's reading of those documents would go to the weight of Dr. McClave's opinions, not their admissibility. The point is that Dr. McClave did have a basis, beyond statistical fit, rooted in general economic theory and particular documents—a basis confirmed by an economist, moreover—for using TDI exports as a demand proxy.

Dow further argues that using TDI exports as a demand proxy was not appropriate in this case.  Dow cites certain evidence in attempting to distinguish between domestic demand and foreign demand, and it argues that exports would not necessarily have correlated well with domestic price.  Again, however, such complaints are better made in cross-examination of Dr. McClave, and do not show that Dr. McClave's method was unreliable in this case.  Dow also cites a graph created by Dr. Ugone that appears to show little correlation between TDI exports and domestic prices.  As plaintiffs point out, however, Dr. Ugone has not done the regression analysis required to determine whether such a correlation actually exists.  Moreover, this graph relates to whether the variable provides a statistical fit; it is therefore not helpful to Dow's argument that Dr. McClave did not justify use of that variable beyond mere statistical fit.  Accordingly, the Court denies Dow's motion to exclude based on Dr. McClave's choice of TDI exports as a variable.

2.      ANNUAL DATA

Dow also complains about Dr. McClave's use of annual data instead of available monthly data for certain variables, even though Dr. McClave's models were broken down by month. Dow argues that Dr. McClave did not articulate any basis to do so other than statistical fit. The Court rejects this argument largely for the same reasons discussed above with respect to TDI exports. Dow has not provided any evidence or other basis for concluding that sound econometrics would require the use of monthly data only in these models.

Dow suggests that using annual data leads to the nonsensical result of predicting prices in January based on data from the rest of the year. Plaintiffs respond that that result is not nonsensical because purchases of materials always precedes the sale of the product. Plaintiffs also note that Dr. McClave's report refers to the volatility of monthly data. At any rate, Dow's conclusion that it is nonsensical to use annual data is not an obvious one scientifically, and Dow has not provided any support to suggest that annual data could not be a reliable factor for predicting monthly prices. Dow's expert, Dr. Ugone, notes in his report that Dr. McClave failed to justify using annual data instead of available monthly data, but he does not opine that using annual data cannot be justified.[2] Dow also points to Dr. Ugone's analysis showing that the substitution of

_____

[2]Again, to the extent that Dow is arguing that Dr. McClave should have disclosed the basis for his decision to use annual data, the Court is not persuaded, as Dr. McClave addressed the issue in his rebuttal report, and Dow had the opportunity to question him
(continued...)

monthly data for annual data in Dr. McClave's models changes the results and in at least one case yields a nonsensical negative sign. Of course, the mere fact that the results would change does not mean that the use of one set of data was improper. Moreover, as Dr. McClave suggested in his rebuttal report, the use of annual data provided a better fit statistically, and the fact that a negative sign resulted for one variable would mean that the monthly data should not be used.[2] Dr. McClave also indicated in that report that he used annual data in at least one case because monthly data was available for only part of the relevant period, and he did not want to mix annual data with monthly data. Dow has not provided any expert evidence or other authority to suggest that Dr. McClave did not employ a proper method in choosing his data. Once again, Dow's arguments go merely to the weight of Dr. McClave's opinions.

### 3.    MOVING AVERAGES

For the same reasons, the Court rejects Dow's challenge to Dr. McClave's use of six- or twelve-month moving averages for some variables. Dow seeks exclusion of Dr. McClave's models based on his use of these moving averages solely to increase statistical fit (while also questioning Dr. McClave's qualifications, as a non-economist, to decide whether the use of certain averages makes economic sense). These arguments

---

[2](...continued)
in his deposition.

[2]In his rebuttal report, Dr. McClave also stated that his tests showed his own models to be superior statistically to these substitution models created by Dr. Ugone.

are for cross-examination only, however.  Dow does not cite any authority supporting this argument.  Nor does Dow argue that the use of moving averages in general is improper; for instance, Dow does not take issue with Dr. McClave's statement that the use of moving averages dampens the volatility of monthly fluctuations.  Dow has conceded in its brief that "[i]t is commonly accepted within the field of econometrics that statistical evidence ought to guide specification decisions, so long as it does not amount to 'cherry-picking'."  In this case, Dr. McClave has not cherry-picked a particular variable; rather, he has made a decision about which set of data to use for a particular variable.  Thus, it makes sense that an econometrician would choose between those data sets based on which one proves a better factor for predicting actual prices, and Dow has not provided any authority to the contrary.

### E.   *Scope of Opinions*

Finally, Dow argues that, even if Dr. McClave's models are not excluded in their entirety, he should not be permitted to testify that prices for any particular year are "more consistent with" either competition or collusion.  Dow argues that Dr. McClave is not qualified to offer such an opinion on liability, and that such an opinion goes to the ultimate question of the existence of a conspiracy, which must be reserved for the jury. Plaintiffs respond that Dr. McClave may properly offer opinions concerning not only the amount of damages, but also the question of impact (that prices charged in the damages period were supracompetitive, as demonstrated by his models).  Plaintiffs insist that Dr. McClave will not offer testimony about whether meetings or documents show a

conspiracy, and that his opinions instead assume the existence of a conspiracy for purposes of his analysis.

The Court denies this portion of the motion at this time.  Testimony as outlined by plaintiffs would be permissible, and Dow has not argued otherwise.  Dr. McClave may properly testify that in particular years actual prices exceeded prices that would be expected from pure competition, as demonstrated by his regression analysis.  The Court will not ban his use of the word "consistent"—that word could be appropriate if used in the context that the Court has just described.  If Dr. McClave testifies to the effect that a conspiracy existed at particular times, Dow will be free to interpose an objection at that time.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant Dow Chemical Company's motion to exclude expert testimony by Dr. John Solow (Doc. # 2392) is **denied**.

IT IS FURTHER ORDERED BY THE COURT THAT defendant Dow Chemical Company's motion to exclude expert testimony by Dr. James McClave (Doc. # 2390) is **denied**.

IT IS SO ORDERED.

Dated this 21st day of December, 2012, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge