IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: URETHANE ANTITRUST LITIGATION | ) ) ) | MDL No. 1616 |
| | ) | Case No. 04-MD-1616-JWL |
| | ) | |
| This Order Relates to the following Polyether Polyol Cases: | ) ) ) | |
| | ) | |
| *Carpenter Co., et al. v. BASF SE, et al.,* | ) ) | Case No. 08-2617-JWL |
| and | ) ) | |
| *Woodbridge Foam Corp., et al. v. BASF SE, et al.,* | ) ) ) | Case No. 09-2026-JWL |
| and | ) ) | |
| *Dash Multi-Corp, Inc., et al. v. BASF SE, et al.* | ) ) | Case No. 10-2077-JWL |

## ORDER

The plaintiffs in this multidistrict litigation ("MDL") allege that the defendant, The

Dow Chemical Company, conspired with other chemical manufacturers to fix prices for

certain polyurethane chemical products in violation of the Sherman Act, 15 U.S.C. § 1.[1] The

litigation includes both a class action and the three direct actions captioned above, which

were brought by plaintiffs who opted out of the class action. The class action was tried to

a jury earlier this year, with judgment awarded in favor of the class-action plaintiffs.[2] The

---

[1]Plaintiffs also sued a number of other chemical companies, but have reached
settlements with those defendants.

[2]Doc. 2880.

direct actions were essentially stayed during the class-action trial and events immediately preceding trial.[3] Now that the class action has concluded, the direct actions are again active before the court. The presiding U.S. District Judge, John W. Lungstrum, and the undersigned U.S. Magistrate Judge, James P. O'Hara, conducted a hearing in the direct actions on May 21, 2013. At the hearing, the parties agreed that certain issues should be resolved by this court before the cases are remanded to the MDL transferor court, the District of New Jersey.[4]

One of those issues is whether additional discovery should be permitted on two discrete topics: (a) a binder created for attorneys in preparation for deposing former Dow employee Stephanie Barbour, and (b) Dow's 2004 investigation into allegations made by Barbour about possible retaliation and code-of-conduct violations by Dow employees.[5] In accordance with guidelines set by the court at the hearing,[6] Dow has filed a motion to modify Scheduling Order No. 8—which set the merits discovery deadline as December 20, 2010[7]—to permit discovery on these topics **(doc. 2894)**. The direct-action plaintiffs

---

[3]*See* doc. 2373 (order granting the request of the direct-action plaintiffs ("DAPs") to be excused from attending the final pretrial conference scheduled for July 2, 2012, because DAPs planned to seek remand of the direct actions to the District of New Jersey following this court's ruling on dispositive motions).

[4]*See* doc. 2884 (order memorializing rulings made at the May 21, 2013 status hearing).

[5]*Id.* at 2.

[6]*Id.*

[7]Doc. 1989. Scheduling Order No. 8 maintained the December 20, 2010 discovery deadline set in Scheduling Order No. 7 (doc. 1952), except for "downstream" discovery ordered by Judge Lungstrum on April 5, 2011.

("DAPs") oppose the motion, arguing that Dow has not demonstrated why it could not have sought the discovery prior to the scheduling-order deadline, nor why the court should permit Dow to retract its previous assertions of privilege over such discovery.[8] Because the undersigned finds the requested discovery relevant to theories newly asserted (i.e., post-discovery-deadline and post-privilege-assertion) by DAPs, the motion is granted and limited discovery is permitted.

## I. Background

Barbour was an executive for Dow from 1998 until her termination in February 2004. In her position as a global business director, she had responsibility for a large portion of Dow's polyurethane business. She reported to David Fischer, a Dow vice president, and worked with Marco Levi, another global business director who reported to Fischer.

Barbour was deposed in this litigation in September 2010. She testified that, beginning in 2000, she became aware that Levi was having discussions with a Dow competitor regarding future pricing in the urethane industry.[9] She stated that she reported

_____

[8]DAPs have filed a motion for leave to file a surreply **(doc. 2947)** on the ground that Dow's reply contained new arguments and attached new documents. Surreplies are typically not allowed, but may be permitted in rare circumstances, such as when new arguments or evidence are raised in a reply. *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005); *King v. Knoll*, 399 F. Supp. 2d. 1169, 1174 (D. Kan. 2005). As discussed below in Section III.B.1, the court finds that Dow's reply does include argument and requests for discovery beyond that requested in its opening brief. Dow also has submitted new evidence in exhibit 5 to its reply (though Dow states that it does not rely on it). Thus, DAPs' motion is granted. The court has considered DAPs' surreply (doc. 2947-1) in deciding the instant dispute.

[9]Doc. 1822-1, Tr. of Barbour depo at 20:21–23:25.

these discussions to Lynn Schefsky, Dow's in-house counsel.[10] Barbour further testified that in 2004, shortly after she learned that Dow was terminating her employment, she informed Phil Cook, a Dow executive vice president, that she believed her termination was the result of retaliation by Fischer for her "fairly public" reports to Schefsky about things that violated Dow's code of conduct, including Levi's conversations with competitors about future pricing.[11] Cook directed Tom McCormick, Dow's compliance and ethics officer, and an attorney, to lead an internal investigation into Barbour's allegations.[12] Finally, Barbour testified that she had prepared notes memorializing debriefing sessions in which Levi reported his pricing conversations to Fischer.[13] She stated that she told McCormick about the notes, but that the notes were not included in the deposition binder prepared by Dow's counsel.[14] Barbour speculated that the notes may have been destroyed when she left Dow.

During Barbour's deposition and thereafter, Dow asserted attorney-client privilege and work-product protection over the contents of the deposition binder and all documents related to McCormick's 2004 internal investigation.[15] This led the class-action plaintiffs and

---

[10]*Id.* at 24:23–25:4, 28:17–22.

[11]*Id.* at 48:10–51:18.

[12]*See id.* at 75:7–13.

[13]*Id.* at 46:14–47:20.

[14]*Id.* at 74:9–23.

[15]*See id.* at 130:14–132:1, 286:2–13.

DAPs to file a joint motion to compel discovery concerning Barbour's reports, notes, and the subsequent investigation.[16]  Plaintiffs argued that Dow waived the privileges under Fed. R. Evid. 502(a) by allowing Barbour, during her deposition, to partially disclose legal advice given by Dow attorneys.[17]  On January 31, 2011, the undersigned issued an order largely sustaining Dow's privilege.[18]  The undersigned found, "nothing indicates that Dow is attempting to gain a tactical advantage by putting at issue the broader subject of the investigation."[19]  Specifically, the undersigned noted that Dow had represented in its response brief that it "does not seek to use the McCormick investigation in any fashion in this litigation."[20]  Thus, the undersigned denied plaintiffs' motion to compel discovery about the investigation.

Less than a week before the class-action trial was scheduled to begin, Dow changed course and voluntarily produced its documents arising from the 2004 investigation.  Class-

_____

[16]Doc. 1807.

[17]Rule 502(a) provides for subject-matter waiver of the attorney-client privilege and work-product protection in limited situations where intentionally disclosed communication and undisclosed communication concerning the same subject matter "ought in fairness . . . be considered together."  The goal of Rule 502(a) is "to prevent a selective and misleading presentation of evidence." Explanatory Note to Rule 502.

[18]Doc. 1947.  The undersigned did hold, however, that Dow waived the attorney-client privilege as to the subject of what McCormick instructed Barbour to do with the notes she kept regarding alleged anti-competitive conduct by her colleagues.  *Id.* at 12.

[19]*Id.* at 14.

[20]*Id.* (quoting Doc. 1870 at 16).

action plaintiffs filed an emergency motion to preclude Dow from using the documents and from referencing the 2004 internal investigation at trial.[21] Judge Lungstrum considered the motion the day before trial and ruled that the parties could not introduce or refer to the documents or the 2004 investigation until the court directed otherwise.[22] Judge Lungstrum reasoned that if Dow was going to waive the privilege, it should have done so earlier "because it may have opened the door to additional discovery" by plaintiffs.[23]

## II.    Legal Standards

Motions to modify a scheduling order are governed by Fed. R. Civ. P. 16(b)(4), which provides that "[a] schedule may be modified only for good cause and with the judge's consent." The party seeking to extend a scheduling-order deadline must establish good cause

---

[21]Doc. 2703.

[22]Doc. 2708.

[23]Doc. 2894-3, Tr. of 1/22/13 hearing at 44:3–4. On the fifteenth day of trial, outside the presence of the jury, Judge Lungstrum and the parties again discussed whether evidence of the 2004 investigation could be introduced. Dow raised the concern that class plaintiffs would "use the assertion of the privilege as a sword." Doc. 2869, Trial Tr. Vol. 15 at 4067:10–24. Judge Lungstrum rejected this argument, ruling that Dow "was well aware of this issue certainly far enough in advance that they could have done something that would have allowed the plaintiffs" to take discovery, but instead "chose to rely on the privilege to the magistrate judge." *Id.* at 4069:16–24. Judge Lungstrum indicated that if class plaintiffs attempted to unfairly use the privilege against Dow, he would give a limiting instruction to the jury, but sustained his past decision that Dow could not "use the McCormick investigation in any fashion in this litigation." *Id.* at 4070:1–3.

by proving the deadline could not have been met with diligence.[24] This normally requires the moving party to show good faith on its part and some reasonable basis for not meeting the deadline.[25] Neither the bad faith of the moving party, nor the lack of prejudice to the non-moving party is a focus of the inquiry.[26] Whether to modify the scheduling order lies within the court's sound discretion.[27]

As noted by DAPs, the undersigned stated in Scheduling Order No. 8—the last scheduling order entered in this action—that the deadlines set therein were "firm" for the reasons discussed at a June 6, 2011 status conference, i.e., Judge Lungstrum's desire to move this case to resolution and avoid moving the class-action trial setting.[28] The undersigned warned the parties that deadlines set in the order would not be modified "unless there are truly extraordinary circumstances," rather than mere "good cause."[29] Given the present posture of the case—which is very different from what it was when Scheduling Order No.

---

[24]*Manuel v. Wichita Hotel Partners, LLC*, No. 09-1244, 2010 WL 3861278, at *1–2 (D. Kan. Sept. 20, 2010) (quoting *Grieg v. Botros,* No. 08-1181, 2010 WL 3270102, at *3 (D. Kan. Aug. 12, 2010)); *Miller v. Union Pacific R.R.*, No. 06-2399, 2008 WL 4271906, at *2 (D. Kan. Sept. 12, 2008); *Denmon v. Runyon*, 151 F.R.D. 404, 407 (D. Kan. 1993).

[25]*Womble v. Salt Lake City Corp.,* 84 F. App'x 18, 20 (10th Cir. 2003) (citing *Putnam v. Morris*, 833 F.2d 903, 905 (10th Cir.1987)).

[26]*Manuel*, 2010 WL 3861278, at *2; *Greig*, 2010 WL 3270102, at *3.

[27]*Paris v. Sw. Bell Tel. Co.*, 94 F. App'x 810, 816 (10th Cir. 2004).

[28]Doc. 1989 at 2.

[29]*Id.*

7

8 was entered two years ago (e.g., there is no imminently pending trial)—the undersigned finds it appropriate to consider Dow's request for additional discovery under the usual good-cause standard.[30]

## III.     Discussion

### A.        Good Cause Exists to Extend the Discovery Deadline

The resolution of this dispute largely turns on the unexpected direction that this litigation has taken since the end of both the scheduling-order discovery period and Dow's assertion of privilege over the 2004-internal-investigation records.  Specifically, DAPs have indicated an intent to pursue two theories that were not active in the case during the discovery period.  First, DAPs have "reserved the right" to pursue a theory that Dow improperly destroyed Barbour's notes after the conspiracy ended in an effort to cover it up.  Second, DAPs have indicated that they may argue at trial that Barbour made antitrust allegations and complaints in 2004, but that Dow did not investigate them.  Because these allegations were not recognized theories in this case during the discovery period, including during the time period that Dow was asserting privilege over documents related to its 2004 internal investigation, the court finds good cause to modify the scheduling order to permit limited additional discovery.

The contention that Dow destroyed Barbour's records and notes after the conspiracy

---

[30]The result reached in this order would not change even if the "extraordinary circumstances" standard were applied.

ended was first raised before the court at a hearing held by Judge Lungstrum on January 22, 2013, the day before the class-action trial began. Dow's counsel objected to slides that plaintiffs' counsel proposed to use during his opening statement which referenced Barbour's missing notes and represented that Dow destroyed documents.[31] Plaintiffs' counsel responded that it was plaintiffs' contention that Dow destroyed Barbour's notes after the conspiracy ended (i.e., December 31, 2003) but before the class-action lawsuit was filed (i.e., November 23, 2004), and that evidence of said destruction "is part of our evidence of coverup in the conspiracy, or pursuant to the conspiracy."[32] Judge Lungstrum overruled Dow's objection and ruled that plaintiffs could pursue that theory at trial. During the class-action trial, plaintiffs introduced Barbour's deposition testimony that she kept electronic notes of the debriefing sessions with Fisher and Levi, and that the notes were not part of the binder prepared for her deposition.

DAPs seized upon this post-conspiracy-cover-up theory. In their papers identifying the issues that the parties wished the court to address at the May 21, 2013 hearing on the future of the direct actions, DAPs asserted for the first time that, "[l]ike Class Plaintiffs, DAPs intend to reserve the right to introduce evidence already in the record regarding the binder, including Ms. Barbour's testimony that the notes were not in the binder, as well as any other issues related to Ms. Barbour's notes and documents and what happened to

---

[31]Doc. 2942-2 at 13–14.

[32]*Id.* at 33.

them."[33]  When questioned during the hearing about this position, counsel for DAPs stated that DAPs "reserve the right to present the evidence from Ms. Barbour that material that she thought should have been in there wasn't and that, that is, in fact, a coverup of the conspiracy and a continuation of the conspiracy."[34]  In DAPs' response to the instant motion, they again "reserve the right to introduce evidence about Stephanie Barbour's notes and to argue that Dow destroyed the notes prior to the litigation as part of a cover-up."[35]  According to Dow, and acknowledged by DAPs in their surreply,[36] Dow then discussed with DAPs a potential stipulation to resolve Dow's discovery request regarding the Barbour deposition binder. Dow asked DAPs to limit their post-conspiracy-cover-up theory to the time period between the end of the conspiracy and the date that the first lawsuit in this MDL was filed (i.e., pre-litigation).[37]  But DAPs refused, thereby implicitly expanding their cover-up theory to include

---

[33]Doc. 2840 at 4.

[34]Tr. of 5/21/13 status conference at 39:6–11.

[35]Doc. 2919 at 5 n.7.

[36]Doc. 2947-1 at 4.

[37]Doc. 2942 at 6.  The undersigned notes that an email from DAPs' counsel to Dow's counsel allegedly summarizing the discussion between the parties states that Dow asked DAPs to stipulate that "DAPs will not argue that the *conspiracy* continued to exist after the class litigation was filed on November 23, 2004."  Doc. 2942-4 (emphasis added).  Such a stipulation would, of course, be different from a stipulation that the DAPs would not argue that the *cover-up* continued post-litigation.  But there appears to be a typographical error in the email summary, as DAPs' surreply confirms Dow's version of the conversation.  Doc. 2947-1 at 4.

post-litigation (in contrast to only post-conspiracy but pre-litigation) document destruction by Dow.[38]

DAPs' theory that Dow destroyed Barbour's notes following the end of the conspiracy (whether post- or pre-litigation) to conceal the conspiracy was not raised in the direct-action complaints,[39] nor in the pretrial order applicable to the class action.[40]  Moreover, there is no indication—and DAPs do not assert—that this was a theory ever raised during discovery or in dispositive motions.[41]

Likewise, the indication given by DAPs that they may make the argument at trial that Dow failed to investigate antitrust complaints made by Barbour prior to her termination (in

---

[38]*See* doc. 2942 at 6; doc. 2947-1 at 4.

[39]Docs. 1123 (Carpenter), 1124 (Woodbridge), & 1332 (Dash).  Although each of the direct-action complaints included a statement that "Defendants and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal" the conspiracy, these allegations were vague and made in the context of DAPs' tolling arguments.  They do not name Dow.  They do not reference the post-conspiracy destruction of documents.  And they are not offered to support the existence of a conspiracy itself.  Contrary to what DAPs suggest in their surreply, these statements did not raise the document-destruction issue that is now being asserted by DAPs.

[40]Doc. 2374.  Although plaintiffs' contentions in the class-action pretrial order included allegations that Dow took affirmative steps to conceal a price-fixing conspiracy, the affirmative steps were alleged to have occurred during the conspiracy period and did not include document destruction.

[41]*See, e.g.,* doc. 2637, summary judgment order at 25–34 (discussing class plaintiffs' argument that Dow fraudulently concealed the conspiracy by issuing false and pretextual price-increase announcements, and committing affirmative acts of concealment *during* the conspiracy period), adopted in doc. 2678 as it applies to the direct actions.

other words, that Dow turned a blind eye to notice of violations) raises concern. This is

another issue that only arose during the class-action trial or shortly before. Dow states that

it first anticipated that class-action plaintiffs *might* make this argument when, two weeks

before trial, class-action plaintiffs notified it of their intent to call Schefsky as a live

witness.[42] At that point, Dow produced documents relevant to the 2004 investigation, thereby

waiving its previous assertion of privilege.[43] During the class-action trial, class-action

plaintiffs introduced testimony from Barbour that she reported her concerns of Levi's pricing

conversations to Schefsky and McCormick during her employment with Dow. Class-action

plaintiffs argued, for the first time in opening statements, that although Barbour reported her

concerns about Levi's anti-competitive actions to Schefsky, "[t]he evidence shows that Dow

didn't do anything about that until 2004 when they fired Miss Barbour."[44] Dow expresses

concern that DAPs will follow the lead of the class-action plaintiffs and argue at trial that

Barbour made price-fixing complaints during her employment which Dow covered up and

---

[42]Dow states that it feared class-action plaintiffs "might try to take advantage" of Dow's privilege assertion "by suggesting that (a) Ms. Barbour's 2010 deposition testimony was consistent with what she told Dow's investigators in 2004, (b) Dow failed to investigate in 2004 the complaints that Ms. Barbour in fact first made in 2010, and/or (c) Dow was 'covering up' the 2004 investigation." Doc. 2894 at 9.

[43]Although the issues of Barbour's reports and the resulting 2004 investigation were certainly raised before discovery ended (and were the subject of plaintiffs' motion to compel and Dow's assertions of privilege), the assertion that Dow failed to take action on Barbour's complaints was newly raised at the trial.

[44]Doc. 2844, Trial Tr. V. 1 at 204:24–205:1.

did not investigate. DAPs do nothing to dispel this concern in their response.

Although the document-destruction-cover-up theory and the failure-to-investigate-price-fixing-reports theory were not actively raised before the discovery deadline, DAPs argue that both stem from Barbour's September 14, 2010 deposition, which occurred during the discovery period and before Dow made privilege assertions to this court. DAPs argue—implicitly if not explicitly—that Barbour's testimony should have put Dow on notice that DAPs would take these positions at trial. With such notice, the argument goes, Dow should have pursued discovery relevant to the theories prior to the close of discovery and not asserted privilege over documents in the deposition binder and arising from the 2004 internal investigation.

This argument, at first blush, has appeal. Certainly, a party should be held to tactical decisions it makes in the course of litigation. But when, as here, a new allegation or theory of the case becomes clear *after* the tactical decision is made, the court must take pause. In so doing, the undersigned finds significant the context of the instant dispute: it arises in a motion to modify the scheduling order in a case where no pending trial is imminent and where additional discovery will not delay the case resolution.

As discussed above, the court may find "good cause" to modify the scheduling order if the moving party demonstrates its good faith and a reasonable basis for not meeting the deadline. Although a close call, the undersigned finds that Dow has satisfied this legal standard. Even if the undersigned were to agree with DAPs that Barbour's deposition *should*

have led Dow to consider the potential that DAPs would assert a post-litigation-cover-up theory and a turning-a-blind-eye-to-Barbour's-complaints theory, nothing in the record indicates that Dow *did* consider such potential arguments prior to the discovery deadline. To the contrary, the record indicates that Dow first considered the possibilities of these new theories as it prepared for the class-action trial, and the theories were actually raised for the first time during the class-action trial. There is no indication that Dow acted in bad faith or intentionally delayed seeking a discovery extension. And Dow's failure to anticipate DAPs' theories does not demonstrate that it acted unreasonably or without diligence.

The context of the instant dispute—and the legal standard applicable to it—also distinguish it from rulings made by Judge Lungstrum in considering the admissibility of certain evidence during the class-action trial. On the literal eve of trial and during trial, Judge Lungstrum ruled that Dow would be held to both its privilege assertion and representation to the undersigned that it would not use evidence of the 2004 investigation in any matter. Judge Lungstrum specifically reasoned that there was no time at that point for class-action plaintiffs to conduct discovery into Dow's 2004 investigation.[45] Judge Lungstrum's statements made clear that he was concerned with conducting a fair trial—Dow would not be permitted to use evidence that it had withheld from class-action plaintiffs as privileged, and class-action plaintiffs would not be permitted to use Dow's assertion of

---

[45]Doc. 2894-3 at 44.

privilege "against [Dow] unfairly."[46]

In contrast, these specific timing and fairness concerns are not present in the instant dispute. With respect to the present posture of the direct actions, the court has determined that they will not be ready to remand until October 2013 at the earliest.[47] Before remand, this court must decide DAPs' motion to substitute expert witness,[48] which is not yet ripe; and the parties' motions addressing (a) the invocation of the Fifth Amendment by certain witnesses for DAPs, (b) the application of the statute of limitations to DAPs' claims of a conspiracy existing prior to 1999, and (c) the application of collateral estoppel involving the jury's verdict in the class action, all of which are not anticipated to be ripe until September 10, 2013.[49] Accordingly, the discovery permitted by this order will not delay remand or the direct-action trials. Finally, with respect to the considerations Judge Lungstrum took into account in ruling on the admissibility of evidence at trial, Rule 16(b)(4) clearly requires a different analysis.

In the end, the undersigned finds that DAPs' new allegations provide good cause to modify the discovery deadline set in the scheduling order. Dow demonstrated a reasonable basis for not seeking discovery on these topics prior to the previously set deadline.

---

[46]Doc. 2869 at 4069:10–4070:14.

[47]Tr. of 5/21/13 status conference at 76.

[48]Doc. 2930.

[49]*See* doc. 2896.

## B.     Limited Discovery Permitted

The undersigned's finding that there is good cause to permit new discovery begs the question of *what* discovery will be allowed.   As discussed below, only limited discovery—and no discovery untimely requested for the first time in Dow's reply—is permitted by this order.

### 1.  Discovery About Barbour's Notes—Deposition of Hamilton Loeb

Dow seeks discovery to refute DAPs' assertion that Dow destroyed Barbour's notes. Dow takes the position that "(a) the notes never existed, (b) they were lost when Ms. Barbour's computer crashed during her employment, or (c) Ms. Barbour destroyed them."[50] Looking to Dow's motion and opening brief, Dow's first discovery request is that it be permitted to depose Hamilton Loeb, Dow's outside counsel.  Loeb is the attorney who prepared the binder used by Barbour's attorney at her deposition.  It is this binder that was shown to Barbour prior to her deposition and about which she testified as not including her notes of debriefing discussions with Fischer and Levi.  Dow seeks to depose Loeb "about the facts and circumstances surrounding the assembly of the binder and its contents."[51]  Dow asserts that this discovery is necessary so that Dow will be in a position to respond to DAPs'

---

[50]Doc. 2942 at 5.

[51]Doc. 2894 at 6.

argument that the contents of the binder are evidence of a post-litigation cover-up.[52]

Dow does a poor job explaining how Loeb's testimony about the assembly of the binder and its contents would address DAPs' allegation that Dow destroyed Barbour's notes. DAPs have agreed not to introduce Barbour's deposition testimony about her notes not being included in the binder, so Dow cannot be seeking from Loeb any specific response to Barbour's testimony in that regard.[53] Dow does direct the court, however, to the proffer of Loeb's proposed testimony previously filed by Dow in the class action.[54] There, Loeb states that he "prepared a binder that contained a subset of materials that had been produced in litigation from Dow . . . includ[ing] documents that Ms. Barbour had provided to the Dow legal officer (Tom McCormick) in the internal review that was undertaken at Phil Cook's request after her February 2004 complaint to Mr. Cook."[55] Giving Dow the benefit of the doubt, it appears that Dow will question Loeb about whether any notes prepared by Barbour were included in the documents that, according to Dow, Barbour provided Dow during its 2004 internal investigation. Loeb's testimony on this point would be relevant to Dow's

---

[52]Dow also expressed a concern that DAPs might argue at trial that Loeb acted improperly in preparing the binder, but DAPs have represented to the court that they will not make that argument. Doc. 2919 at 5. Thus, there is no need for Loeb's deposition to delve into this sub-issue.

[53]*Id.* at 6.

[54]Doc. 2760-4.

[55]*Id.* at ¶6.

theory that no such notes existed in 2004.[56]  Thus, the undersigned will permit Loeb to be

deposed on this very limited topic.[57]

With respect to any other testimony Loeb might provide about the "assembly of the

binder and its contents," Dow has failed to suggest how such testimony would be relevant

to dispute DAPs' post-conspiracy-cover-up theory.  Likely recognizing this, Dow expands

its discovery request in its reply brief.   Dow now also seeks to depose Loeb about "the

disposition of electronic files after they were received from Dow" and "the exhaustive review

and production of Ms. Barbour's ESI."[58]  These broad topics clearly transcend "the assembly

of the binder and its contents"; Dow's reply does not even attempt to explain how they might

fit under the umbrella of Dow's original document request.

In its response to DAPs' motion to file a surreply, Dow makes the rather disingenuous

argument that because the class-action proffer of Loeb's proposed testimony discussed topics

about Barbour's electronic files, DAPs were aware that Dow was seeking to include such

topics in Loeb's deposition.  An examination of the proffer and motion to which it was

attached make clear, however, that Loeb's proposed testimony regarding the review and

---

[56]It would also be relevant to DAPs' theory that Barbour reported her concerns of price-fixing to Dow during her employment but Dow did not investigate.

[57]As Dow recognizes, Dow will waive any privilege or work-product protection applicable to documents that relate to the assembly and contents of the binder.  *See* doc. 2942 at 7.

[58]*Id.* at 5.  *See also*, doc. 2948 at 2–3.

production of Barbour's electronic notes was a topic separate and apart from Loeb's proposed testimony about the binder. The motion stated, "The testimony will cover two primary topics: (1) the search for and production of records before and after Ms. Barbour's deposition and (2) the preparation of a binder that Dow provided to Ms. Barbour's personal counsel prior to her deposition."[59] Similarly, Loeb's proffer discussed the review of Barbour's electronic records as a topic separate from Loeb's preparation of the binder.[60]

Thus, while these new deposition topics appear potentially relevant to DAPs' post-conspiracy-cover-up theory (specifically to whether Barbour's notes could have existed and then been destroyed during this litigation), Dow simply brings them too late, without explanation.[61] As stated by Judge Lungstrum at the May 21, 2013 status hearing, the time for the parties to raise new issues in the direct actions has ended; the time has arrived for "the moving target to stop moving."[62] Thus, the undersigned prohibits Dow from questioning Loeb about the newly raised topics of "the disposition of electronic files after they were received from Dow" and "the exhaustive review and production of Ms. Barbour's ESI."

---

[59]Doc. 2760 at 8.

[60]Doc. 2760-4.

[61]To the extent that Dow's reply could be read to assert that such topics only became relevant when DAPs' post-conspiracy cover-up theory expanded to a post-litigation cover-up theory, *see* doc. 2942 at 6, such argument falls flat. As mentioned, such topics were raised by Dow after the post-conspiracy theory arose in the class action, and were thereby available for Dow to request at the time it filed its motion to modify the scheduling order.

[62]Doc. 2947-1 at 13.

To the extent that DAPs assert that Loeb should be disqualified by professional ethics rules from offering *any* testimony in this litigation, the undersigned disagrees. DAPs argue that N.J. Rule of Professional Conduct 3.7 prohibits Loeb from serving as a witness in this action. Rule 3.7 states that a "lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless" certain exceptions are met. Dow argues that one or more of the exceptions are present in the direct actions. Whether Loeb will be permitted to represent Dow at the direct-action trials is a decision to be made by the trial judge.[63] DAPs have submitted no persuasive authority suggesting that Rule 3.7 limits discovery (as opposed to trial representation) to be taken from counsel.[64]

In summary, Dow's original, limited, discovery request to depose Loeb "about the facts and circumstances surrounding the assembly of the binder and its contents" is granted, but any additional discovery from Loeb (absent agreement by the parties) is denied. Dow

---

[63]The undersigned makes no ruling on this issue, but notes that Dow is knowingly taking the risk, by advocating for Loeb's deposition, that the trial judge may preclude Loeb as trial counsel.

[64]DAPs cite *United States v. Pelullo*, No. 11-740-2, 2012 WL 993422 (D. N.J. March 23, 2012), which disqualified a criminal attorney prior to trial because the attorney "faced a conflict of interest concerning other defendants." *Id.* at 2. Such a situation is not present in the instant case. Rather, the undersigned finds a case distinguished in *Pelullo*, *Main Events Prods., LLC v. Lacy*, 220 F. Supp. 2d 353, 356 (D. N.J. 2002) more on point. *Main Events* concluded that Rule 3.7 "does not apply to pre-trial proceedings." 220 F. Supp. 2d at 356–57.

shall bear the cost of transcribing and videotaping this deposition.[65]

### 2. Discovery About Dow's 2004 Investigation

The second topic on which Dow requests discovery is Dow's 2004 internal investigation into Barbour's allegations of retaliation and misconduct by her co-workers. As was discussed above, Barbour testified during her 2010 deposition about several purported price-related meetings between Dow and its major competitors. She stated that she had prepared notes of debriefing sessions with Fischer and Levi memorializing her antitrust concerns, and that she had verbally reviewed the notes with McCormick during Dow's 2004 internal investigation. Dow contends that, to the contrary, Barbour raised price-fixing allegations for the first time at her deposition, but that it undertook an internal investigation in 2004 based on other allegations she raised. Dow asks the court "to permit the parties to conduct discovery into the allegations that Ms. Barbour made about competition matters in 2004 (as compared to her statements in her 2010 deposition), as well as the conclusion of the 2004 investigation into her allegations."[66]

Such discovery is clearly relevant to the issues of whether Barbour made antitrust allegations and complaints in 2004 (and earlier), and whether Dow acted on them. But Dow's motion does not specifically state the type or extent of discovery it seeks on this topic.

---

[65] *See* doc. 2894 at 11 (stating that "Dow is prepared to bear the cost of transcribing and videotaping these depositions" to alleviate expense that would otherwise be incurred by DAPs).

[66] *Id.* at 10.

It appears that Dow envisions depositions will be taken, as it submits that "Dow is prepared to bear the cost of transcribing and videotaping these depositions."[67] It is not disputed that DAPs already have a copy of Dow's documents related to the 2004 investigation, but they have not indicated what additional discovery they might pursue upon the granting of Dow's motion.[68] Presumably, they will depose Barbour, as their response states, "Had Dow produced the documents and information at issue in a timely manner, DAPs could have questioned Ms. Barbour about it."[69] Although DAPs make the broad assertion that Barbour is now "beyond subpoena power," they provide no reasoning nor cite any authority to support this comment.[70]

Left without any clear guidance on the particular discovery the parties wish to seek on this topic,[71] the court will not set stringent limits on the means and manner—as opposed to the content—of discovery. That being said, this is a fairly well defined and limited topic, and the court does not expect discovery on it to be extensive. Should either side feel that the

---

[67]*Id.* at 11. As with Loeb's deposition, the court orders Dow to stand by this offer.

[68]*See id.* at 9. Dow concedes that it has waived any privilege it had over the 2004 investigation documents. *Id.*

[69]Doc. 2919 at 10.

[70]Dow represents that "there is no reason to believe that Ms. Barbour could not be served with a subpoena to appear at a deposition focused on the 2004 investigation." Doc. 2942 at 8 n.22.

[71]It should be noted that discovery about whether Barbour provided her notes to Dow during the investigation is relevant to the first topic (post-conspiracy cover-up) as well.

other is abusing the limited extension of the discovery deadline granted in this order, it may bring the alleged abuse to the court's attention by filing a motion (after, of course, following the court's meet-and-confer requirements). Any such motion is limited to five pages; any response will be due two business days later and is limited to five pages; any reply will be due the following business day and is limited to two pages.

IT IS THEREFORE ORDERED:

1.     Dow's motion to modify the scheduling order to permit focused discovery (doc. 2894) is granted, subject to the limitations discussed above.

2.     The deadline for the parties to complete such discovery is **September 30, 2013**. Scheduling Order No. 8 is modified accordingly.

3.     DAPs' motion for leave to file a surreply (doc. 2947) is granted.

IT IS SO ORDERED.

Dated July 25, 2013, at Kansas City, Kansas.

  s/James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge