```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
2

3    IN RE:

4

5    URETHANE ANTITRUST LITIGATION        CASE NO. 04-1616

6

7

8            TRANSCRIPT OF PROCEEDINGS (PART 2)
                         before
9             HONORABLE JOHN W. LUNGSTRUM
                          on
10                  NOVEMBER 19, 2012

11
                       APPEARANCES
12
     For the Class
13   Plaintiffs:              Joseph Goldberg
                              Freedman, Boyd, Hollander, Goldberg
14                            & Ives PA
                              20 First Plaza, Suite 700
15                            Albuquerque, NM 87102

16                            Gerard A. Dever
                              Donald L. Perelman
17                            Fine, Kaplan and Black, RPC
                              One South Broad Street, Suite 2300
18                            Philadelphia, PA 19107

19                            Richard A. Koffman
                              Cohen, Milstein, Sellers & Toll
20                            PLLC
                              West Tower, Suite 500
21                            1100 New York Ave., NW
                              Washington, DC 20005-3934
22
                              Robert W. Coykendall
23                            Morris, Laing, Evans, Brock &
                              Kennedy, Chtd.
24                            300 N. Mead St., Suite #200
                              Wichita, KS 67202-2745
25
```

```
 1                              Michael J. Guzman
                                Kellogg, Huber, Hansen, Todd, Evans
 2                              & Figel, PLLC
                                Sumner Square
 3                              1615 M Street, NW, Suite 400
                                Washington, DC 20036-3209
 4
                                Sharon K. Robertson
 5                              Cohen, Milstein, Sellers & Toll,
                                PLLC
 6                              88 Pine St., 14th Floor
                                New York, NY 10005
 7
     For the Direct
 8   Action Plaintiffs:        Richard J. Leveridge
                                James Martin
 9                              Elaine Metlin
                                Jodi Trulove
10                              Dickstein Shapiro, LLP
                                1825 Eye Street, NW
11                              Washington, DC 20006

12                              Jason S. Hartley
                                Stueve Siegel Hanson LLP
13                              550 West C Street, Suite 1750
                                San Diego, CA 92101
14
     For Defendant             G. Hamilton Loeb
15   Dow Chemical:             Stephen B. Kinnaird
                                Jeremy P. Evans
16                              Paul Hastings LLP
                                875 15th St. NW
17                              Washington, DC 20005

18                              David M. Bernick
                                Boies, Schiller & Flexner, LLP
19                              575 Lexington Avenue, 7th Floor
                                New York, NY 10022
20
                                Donald L. Morrow
21                              Paul, Hastings, Janofsky & Walker
                                LLP
22                              695 Town Center Drive
                                Seventeenth Floor
23                              Costa Mesa, CA 92626

24                              Brian R. Markley
                                Stinson Morrison Hecker LLP
25                              1201 Walnut St., Suite 2900
                                Kansas City, MO 64106-2150
```

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-735-2334

1

                  Floyd R. Finch, Jr.
                  Floyd Finch Law Offices

2

                  6811 Shawnee Mission Pkwy, Suite 310
                  Overland Park, KS 66202

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  We are ready to move to the

2      Daubert motions.  Those are Documents 2392, 2390, and

3      2398.

4              Dow, you may proceed.

5              MR. KINNAIRD:  May it please the court,

6      your Honor, we have selected the topics from the

7      motions for which we think oral argument would be

8      most beneficial for the court.  Those issues are as

9      follows:

10             The first is the suspect inclusion of 2004 as a

11     benchmark year by both experts.  The second is the

12     critical incapacity of either expert's models to

13     predict known competitive prices.  If you can't do

14     that, you can't have a claim to predict unknown

15     competitive but-for prices in the damages period.

16     And then for Dr. McClave we will talk about the

17     arbitrariness of his variable selection and for

18     Dr. Raiff the statistical insignificance of two of

19     his models.

20             I think we have to start with the fundamental

21     requirement of Daubert gatekeeping by courts, and

22     that's to make certain that the expert employs in the

23     courtroom the same intellectual rigor that he would

24     use in practice.  And Dr. McClave, it's worth noting

25     that three different courts have excluded opinions

```
 1        he's rendered in whole or in part under Daubert
 2        grounds, which should raise a red flag.  If you're
 3        thinking about what does a practicing expert do if,
 4        for example, she were retained by a company to
 5        develop a pricing model to predict prices in a given
 6        period, that expert would study the industry, would
 7        determine on economic analysis the economic drivers
 8        of prices, and test econometrically in a neutral
 9        manner.
10             The contrary approach -- and it's problematic in
11        litigation econometrics -- is data mining.  And
12        that's where you have -- a data miner loads a model
13        with all the pricing data, puts in a huge number of
14        potential explanatory variables, and runs hundreds,
15        perhaps thousands with automated software, iterations
16        of models to get statistical fit and good damages,
17        because the damages output is there with the data on
18        fit.  And so this is the real risk of unreliable
19        practice here.  And I think the Wall Street Journal
20        article with which we opened our reply brief is
21        important because it points out that correlation is
22        not the same as causation.  You could have a glorious
23        statistical fit between explanatory sheep population
24        and Bangladeshi cheese to explain U.S. stock market
25        returns, but that does not mean it has predictive
```

1    power.

2          Two fundamental errors with Dr. McClave, and the

3    first is his inclusion of 2004 as a benchmark year,

4    and the reason is he could not get the results he

5    wanted when he was testing the conspiracy period

6    actually alleged in the plaintiffs' complaint and in

7    their interrogatory responses at the time in which

8    2004 was a part of the conspiracy period.  So what

9    did he do?  He made a unilateral decision to move

10   2004 into the benchmark period even though when you

11   have an allegation of conspiracy that means that

12   there could be taint.  How could this be necessarily

13   a competitive price if you don't test for taint?  And

14   it's unscientific, your Honor, to change the rules of

15   the experiment based on results.  That's just not

16   done.

17         Now, he puts a window dressing on his analysis

18   by saying that, well, I determined that the prices

19   were more consistent with competition than with

20   collusion, but we need to unpack when he meant by

21   that.  He did not mean that -- he disavowed applying

22   any kind of economic theory of competition; he did

23   not base that at the time that he made that

24   assumption on any underlying evidence; and he

25   disclaimed that he was relying on any kind of testing

1          of 2004 separately in the control period.  Even

2          though he conducted tests, he didn't rely on them in

3          his report, and he didn't produce them, so

4          plaintiffs' claims of extensive econometric analysis

5          are just a mirage.  What he said, these are

6          competitive solely based on his ability to generate a

7          statistical fit with his 2004 to 2008 model that he

8          specified, and you can see this in his deposition.

9          He says, I am, for the purposes of my analysis,

10         assuming that the prices resulting from that 2004 to

11         '08 model are competitive.  He's assuming

12         competitiveness if he gets fit, and therefore he says

13         if there's excellent fit for the model as a whole

14         over the entire benchmark period, then he's declaring

15         2004 prices, because they are in his benchmark, as

16         competitive.  That's just not the way it's done.

17              And you have to ask yourself, your Honor, why

18         would he do that?  Critically, he does not testify

19         that it's impossible to actually create a good model

20         with good statistical fit just using 2005 to 2008.

21         And so why wouldn't he have done that?  Why would he

22         have brought in a potentially tainted year?  The only

23         inference is that he did it to optimize damages for

24         the plaintiff.  And if you look at the bottom

25         right-hand corner, if you put 2004 in, you get

1    damages before trebling of over a billion dollars for

2    the class.  But if you put 2004 in, you get

3    negative -- you get undercharges, and therefore zero

4    damages of 800 million.  And that's just not reliable

5    under Daubert.  And so I think that's one ground.

6         The second is, he never establishes that he has

7    a true forecast model, and this is an excerpt from

8    the ABA antitrust section, its treatise on

9    econometrics.  And this is where you have to see the

10    reason that all the class says about it is, hey, he

11    created a model with wonderful statistical fit, had

12    statistical significance, therefore, it's reliable.

13    No.  The ABA treatise says in the first sentence.

14    "Models that fit data well may not predict well."  So

15    then going to the fourth sentence, if you're looking

16    at whether a model is reliable -- and that's this

17    court's inquiry -- it has to satisfy two conditions.

18    That's to produce two results.  And the one that we

19    are particularly focused on is the second necessary

20    condition, and I'll read it.  It's the one at the

21    end.  "The model, if estimated during a subperiod of

22    the noninclusive period, a subperiod of the benchmark

23    period, should be able to accurately predict prices

24    in the rest of the noninclusive period."  What did

25    the ABA do?  They looked at a model from one of

1    these -- Industrial Silicone was the case, one that

2    looked on top a lot like Dr. McClave's.  Very fine

3    statistical fit in the benchmark period, which goes

4    up to the dash line, and then in what was the alleged

5    collusion period, it showed that the actual prices

6    were above predicted prices, and that's what the

7    expert said were damages.  And what the ABA antitrust

8    section said, if you actually take just the benchmark

9    period there and you split it -- and so in the first

10   four -- you estimate your model just on the first 4½

11   years and test it against the next 3½ years because

12   you know those 3½ years are competitive prices.  So

13   if you've got a competitive pricing model, you ought

14   to have a tight fit if they are actual competitive

15   prices.  And the ABA said this model was bogus

16   because if you look at the bottom, Figure 5, you see

17   that it couldn't actually predict the known

18   competitive prices in the last three years.  This is

19   called out-of-sample forecasting, which one of the

20   major textbooks calls the ultimate test of a

21   forecasting model.

22       Let's see what Dr. Ugone did when he applied

23   this critical test of reliability.  And we're looking

24   at polyols.  So what he did, he said, we can look at

25   it over 2005 to 2008.  If you've picked the right

1    variables and you estimated over this benchmark

2    period and then you made your 2004 known competitive

3    prices, you should see the same type fit that you see

4    on the right side and the left side.  But he doesn't.

5    It's wildly off.  In fact, it's an overprediction of

6    7 to 34 percent, and that's significant when your

7    damages estimate was 13 percent in Dr. McClave's

8    models.  And you have the same lack of tight fit in

9    the test period for TDI and the same for MDI.  And so

10   this isn't just a dispute among experts about, well,

11   which is the best verification test?  This is the

12   core test of the unreliability, and it's grounds for

13   this court to strike it because you can't predict

14   competitive prices.

15        What we see here -- and this is sort of a

16   summary chart.  If you took the original benchmark of

17   2005 and 2008 and you can't predict the green, 2004,

18   when neither one of those are known competitive

19   prices, how can you combine those two and say, my

20   model, you should trust it to predict competitive,

21   i.e., but-for, prices in the conspiracy period as a

22   basis for damages.  He just never goes that step of

23   proving it's a reliable price predictor.  It's not a

24   true forecast model.

25        Another example of Dr. McClave's data mining

1     approach is the arbitrariness with which he

2     approached his variable selection.  So he came up

3     with a counterintuitive -- this is for TDI as an

4     example.  The lone demand variable that he uses to

5     predict U.S. TDI prices are annual future TDI

6     exports.  No rationale for that.  He got that because

7     this provided him the best fit.  But we know

8     correlation is not causation.  That's not enough.

9     What happened?  He would gin up with Dr. Solow in

10    tandem a way to suggest we have some record support

11    that, in fact, TDI exports are a demand variable.

12    I'm only going to go through one of the exhibits that

13    we looked at in the brief, but this is a key one.  He

14    says, oh, well, it's identified as a price driver for

15    TDI.  If you look at this actual exhibit, no, this

16    exhibit says in the first bullet point that global

17    capacity utilization is a key driver.  The second

18    bullet point, raw materials account for less than

19    50 percent of TDI cost of goods sold.  So it's a less

20    important one.  And in the yellow highlight, which is

21    all Dr. McClave relies on, he says, well, they talk

22    here about TDI exports, but that's only explaining

23    what the nature of NAFTA utilization is.  They have

24    had such depressed prices that they only have any

25    kind of utilization because of TDI exports.  Never

1    say it's a driver of prices.  In fact, if you look at

2    the exhibits, they are all about TDI exports and the

3    context of capacity utilization and the need for

4    consolidation.  And, in fact, if anything, they are

5    associated with depressed domestic TDI volumes, which

6    would suggest they be associated with declining TDI

7    prices.  And I would urge your Honor to look at that

8    aspect of our brief.

9        Furthermore, these annual TDI exports, it's

10    current year, so the variable they actually use is

11    January 2007 through December 2007.  To predict what?

12    Monthly prices, including January of 2007.  Well, the

13    future doesn't predict the past.  Now, perhaps he

14    could have chosen to model information that was

15    available to the price setter in 2007 that was a

16    forecast of TDI exports or foreign demand in some

17    other way.  He didn't do that.  You can't have this

18    clearly nonsensical relationship and say it's in my

19    model without any economic rhyme or reason.

20        We see that same lack of rhyme or reason in his

21    various choice of variables.  The problem isn't so

22    much that you can never use moving averages, but he

23    doesn't justify the ones he used.  He used different

24    moving averages for the different costs, sometimes

25    six months, sometimes 12 months.  For natural gas in

1    one of his three models he used a six-month average,

2    another a 12-month average.  No explanation.  Why did

3    he choose them?  They improved statistical fit.

4    There's no economic theory; there's no data.  This is

5    post hoc rationalization.  It fails miserably any

6    test of reliability.

7         I turn now to Dr. Raiff, and I think Dr. Raiff

8    has many of the same problems, but let me start with

9    his MDI and polyols model.  He is putting forth

10   estimates that lack statistical significance by any

11   measure.  And the class, by the way, agrees with us.

12   It's page 12, I believe, of their brief.  They say

13   that statistical significance matters because

14   otherwise you don't know whether you just have a

15   random estimate as opposed to one based on

16   relationships.  And that's critical because in every

17   estimation you have random error.  You have to be

18   able to account for it.  And the gold standard for

19   doing that are confidence intervals, and those

20   confidence intervals are represented here by the

21   bands of the pink shaded area.  And what this is

22   saying is basically that there's no statistical

23   difference between any point within that shaded area.

24   For example, if you were to look at January 2001, he

25   may be predicting an estimate about -- of, say, 55

1     cents, but he can't really say whether it's 30 cents

2     or whether it's a dollar.  And the other critical

3     thing is that for almost every month in his

4     conspiracy period, which is a long conspiracy period,

5     actual prices, the actual prices, the data for actual

6     prices, are within that same confidence interval.

7     What does that mean?  That he can't show a

8     statistical difference between the actual prices and

9     his predicted competitive prices.  He can't say they

10    are statistically different.  That means he can't say

11    there are any damages, much less the ones that he

12    used.  This is the same result for his polyols model.

13    We don't challenge the TDI.

14        Dr. Raiff comes back, and he says, well, I

15    calculated -- I did hypothesis testing, which is a

16    related test.  But, first of all, he did it wrong,

17    and then had to correct it and boost up his values

18    that showed statistical insignificance.  And if you

19    look at those, they estimated a value of 38 percent,

20    and he says, well, under standard tests of

21    statistical significance that might not be important,

22    but I don't believe the statistical significance.  I

23    believe in practical significance.

24        Your Honor, the debate over statistic

25    significance -- there are debates about -- when you

```
 1        have large sample sizes that will yield statistical
 2        significance, almost always, there are debates about
 3        whether it's 1 percent, 5 percent, or 10 percent.
 4        When you're talking for MDI on a two-tailed basis an
 5        estimate of 38 percent, that's just junk
 6        econometrics.  That just means that there's a 38 --
 7        that if the true damages were zero, if there were no
 8        damages, you would still have a 38 percent chance of
 9        coming up with estimates of this magnitude.  That's
10        completely unreliable.  I don't think anybody would
11        say -- error is so pervasive in his models -- that
12        that is acceptable econometrics.
13            And we also had similar problems with Dr. Raiff
14        in the way that he kind of did data mining.  He did
15        his in a little different way.  He did something that
16        was completely novel.  He took one approach, a
17        standard approach, where he subjectively determined
18        the variables and determined fit, and he combined it
19        with a completely mutually exclusive method of doing
20        an automated test of variables called the AIC method.
21        And the problem with that is you can't combine them
22        because the AIC is something that says you have to
23        put in all of your variables, and I'm going to run a
24        criterion and pick out which combination of those
25        variables on an objective basis is the best fit, and
```

1          I penalize you if I end up putting in -- the more

2     variables that end up in the line.  So you can't have

3     this approach where he sort of does -- includes other

4     variables with no basis for statistical significance

5     and combines it with the other one because they are

6     mutually exclusive, and there's no support in the

7     literature.  They point to an article where you have

8     to have some economic judgment in deciding what your

9     variables are for the testing, but not this kind of

10     hybrid method, and you're not allowed to give birth

11     to a brand new method in the courtroom just to

12     optimize damages.

13          And it turns out he has also the same problem

14     Dr. McClave did.  He can't forecast out of sample.

15     His response is, well, my model is nonstationary.  If

16     that's true, any time you estimate damages, you're

17     estimating damages that are outside of your benchmark

18     sample.  So he does that -- if you believe what the

19     opt-out plaintiffs say in their brief, then all his

20     predictions violate a fundamental tenant of

21     regression and they have to be disregarded.  But if

22     you were to accept that he did have stationarity, any

23     way that you slice it and do this test by pulling out

24     periods of his benchmark period, whether you use '92

25     to '98, 2005 to 2008 to test 2004 and then you just

1    test '92, '93, 2004 to 2008, 2008 alone, everything

2    iteration, every combination, there are no damages.

3    And so it's not a proper predictive fit.

4         And we see this -- and this is an example in

5    the -- what you see, what you should see if you

6    tested this -- this is the testing of 2004.  You

7    should see a similar tight fit around the line as you

8    have in the far right benchmark period.  But if you

9    cut out 2004, that should continue if he has a robust

10   prediction model.  He doesn't.  It just looks like

11   the conspiracy period.  So 2004 should not be there.

12   For all these reasons I think this court should

13   exclude both experts.  Thank you.

14             THE COURT:  Thank you very much.

15        Counsel for the class?

16             MR. GOLDBERG:  Good afternoon, your Honor.

17   I'm compelled to take a minute of my time to address

18   something from this morning because it was raised in

19   rebuttal and had not been raised earlier, and that is

20   Mr. Dineen's testimony.

21             THE COURT:  I will permit you to do so

22   because it's coming out of your time here.

23             MR. GOLDBERG:  Yes.  I'm taking it out of

24   my time.

25             THE COURT:  I know.

1              MR. GOLDBERG:  And we're going to file a

2       motion because we're going to need to file a motion.

3       We took the affidavit from Mr. Dineen on his and his

4       lawyer's express promise in writing that Mr. Dineen

5       would appear at trial.  That was three or four years

6       ago.  I have the writing here.  We were shocked and

7       surprised by his counter affidavit, so we contacted

8       his lawyers last week.  I have another writing from

9       his lawyer saying that Mr. Dineen will show up at

10      trial, or if he cannot show up at trial because it is

11      problematic for him from a business point of view, he

12      will sit for a deposition.  We notified Dow of that

13      last week and told them that we were going to raise

14      it today.  I didn't raise it with you because they

15      didn't raise it in their argument.  They didn't raise

16      it in their argument until the rebuttal argument.  I

17      relied on what -- the rebuttal was going to be

18      rebutting what we said.  So we're going to file a

19      motion next week for relief from the scheduling order

20      so we can schedule Mr. Dineen's deposition,

21      memorialize that for evidentiary purposes, his two

22      affidavits, and solve that problem.  But I wanted to

23      raise that with your Honor.

24              THE COURT:  All right.  Thank you.

25              MR. GOLDBERG:  I'm going to address

```
1     Dr. McClave.  I'm going to assume that I'm not going
2     to hear about Dr. Solow in rebuttal.  I'm going to
3     assume that we're not going to hear about Dr. Solow
4     in rebuttal.  I'm going to address Dr. McClave
5     because that's what I understood rebuttal to mean.
6              THE COURT:  If you hear about Dr. Solow,
7     you can object, and I will sustain your objection.
8              MR. GOLDBERG:  Dr. McClave is an
9     extraordinarily well qualified statistician and
10    econometrician.  Quite frankly, in all my experience,
11    I have never met anybody as well qualified as he is,
12    and I've met a lot of them, your Honor.  He was an
13    academic for 20 years.  He's got a Ph.D. in
14    statistics.  He has an undergrad in physics, Ph.D. in
15    statistics.  He was an academic in statistics for 20
16    years.  He's been out of the academy for more than 20
17    years.  He published six separate textbooks for use
18    in universities and colleges for statistics, graduate
19    level and undergraduate, one of which is still being
20    used more than 20 years later and is adopted in more
21    than a hundred universities and colleges in this
22    country, including the University of Kansas,
23    interestingly.  And all that will come out to the
24    jury, as you can expect.  So he is qualified in
25    theoretical statistics and is well qualified in
```

1    econometrics, has testified in more than 50

2    price-fixing cases, or antitrust cases, estimating

3    damages in those cases.  He has been -- in three

4    cases -- he's also testified in more than 50 cases in

5    other cases on other subjects.  In all those cases

6    only in one case involving an antitrust matter were

7    his opinions questioned.  And that was in the

8    District Court in Florida, an appeal to the Eleventh

9    Circuit, and the Eleventh Circuit reversed on all

10   matters but one matter.  Essentially, his opinions

11   were confirmed.  So that's one thing.  There's no red

12   flag here with respect to Dr. McClave.

13        Let's turn to 2004.  The very first thing your

14   Honor ought to pay attention to is that, setting

15   aside the extravagant rhetoric about data mining and

16   cherry picking and backing in and whatever -- all of

17   that comes from the lawyers.  They hired their own

18   expert, Dr. Ugone.  Dr. Ugone in his deposition

19   explicitly refused to accuse Dr. McClave of what they

20   are accusing -- these lawyers are accusing him of.

21   He explicitly stated that he did not accuse

22   Dr. McClave of manipulating his models to get

23   damages.  He does criticize Dr. McClave with respect

24   to 2004, and I'm sure your Honor is familiar with the

25   reports and the depositions, but as Dr. McClave

```
1    showed the tests that Dr. Ugone applies, which is, in
2    fact, predicated on the ABA publication that
3    Mr. Kinnaird talked about but only proven -- with no
4    disrespect to the ABA, but the ABA is the American
5    Bar Association; it's not the American statistics
6    association.  It's not the American econometrics
7    association.  And as Dr. McClave showed, Dr. Ugone's
8    analysis, which was to take 12 months in a block out
9    of the model, is the wrong analysis.  There is an
10   analysis to test this type of -- there's an analysis
11   recognized in the statistics and econometrics
12   discipline to test for this type of robustness, and
13   it's called -- why they use these terms, dummy
14   variable models, it's called, interestingly,
15   bootstrapping.  And what bootstrapping does is, first
16   of all, Dr. McClave says in bootstrapping you
17   wouldn't take out 12 months, not even doing it the
18   right way, but since Dr. Ugone did this, we will take
19   out 12 months, but what you do is, you take them out
20   at random.  You don't take out 12 consecutive months.
21   And there's a reason for that, as he explained, and
22   we're going to show you -- do you still have the very
23   first PowerPoint?
24             THE COURT:  I believe I probably do.
25             MR. GOLDBERG:  Page 13.  It's Dr. McClave
```

1          McClave's MDI model.

2                    THE COURT:  I don't know which you're

3          talking about.

4                    MR. GOLDBERG:  May I hand it up to you?

5                    THE COURT:  Just put it on the --

6                    MR. GOLDBERG:  Oh, this will take a lot of

7          my time, your Honor, if you're asking me to do this.

8                    THE COURT:  Do whatever is easier.

9                    MR. GOLDBERG:  Instead of taking the 12

10         months, look what happened in 2004.  Do you have that

11         in front of your Honor?

12                   THE COURT:  I see it.

13                   MR. GOLDBERG:  What any multiple regression

14         model, any statistical model, like this does is, it

15         relates particular factors not to a price static but

16         to changes in price.  Look what happened in 2004.

17         There's an enormous amount of change going on here.

18         There's an enormous amount of change here.  You can't

19         take that enormous amount of change out and expect

20         the model to behave or predict appropriately.  That's

21         exactly what Dr. McClave stated.  And that's why you

22         don't do that to test robustness.  What you do is,

23         you take the observations out -- in this case the

24         months -- randomly.  And so Dr. McClave did exactly

25         what the boot strapping test says.  You get a random

1      number generator, and you take out those, and he did

2      hundreds of them, literally hundreds of them.  And,

3      of course, it showed that his model was perfectly

4      robust, perfectly robust.  But keep this in front of

5      you.  Mr. Kinnaird says that his model doesn't

6      predict.  What a forecasting model does, as opposed

7      to a joint fit dummy variable model, the forecasting

8      model looks on them at the competitive period first

9      and seeks to relate the variables that you determine

10     from your investigation, your economic and

11     statistical investigation, the important variables to

12     changes in price to see if you can relate those

13     changes in variables to the changes in price.  And

14     you come up literally with an equation -- I call it a

15     recipe like in a recipe book, but it's an equation.

16     And then you use that, you use that equation to

17     predict first the prices in the competitive period to

18     see how good does it do.

19          And, of course, Dr. McClave came up with a

20     fabulous fit.  In each of his three models, the

21     models were in the nineties or higher percent fit

22     range.  It's called the R-squared.  Those are very,

23     very high R-squares.  Statisticians pop the champagne

24     corks with R-squares in the fifties and sixties,

25     literally, and in the health care industry,

1     marketplace, they do it in the twenties and the

2     thirties if they are positive.  These are over

3     90 percent.  But you can see it visually on this

4     chart.  The blue line is literally lying right on top

5     of the red line, but that doesn't predict well.  It's

6     predicting fabulously well.  So that's the very first

7     thing.  That's why it has that high R-squared, your

8     Honor.

9          The second thing to notice about this -- and

10    this only has one of the variables, but Dr. McClave,

11    this is Dr. McClave's chart, and it's in our briefs

12    and in his report.  Look how closely related input

13    costs are to the actual prices and the predicted

14    prices.  Do you see that, your Honor?

15              THE COURT:  I do.

16              MR. GOLDBERG:  Now look over to the damages

17    period, the conspiracy period, and forget the blue

18    predicted price.  Just compare the costs to the

19    actual price.  Are they related?  No, they are not

20    related.  Notice that costs go up and down and up and

21    down, but prices stay basically flat, trending

22    slightly downward.  Well, I'm not a statistician.

23    You've heard me say that over and over again, but

24    what that tells me, your Honor, is something is going

25    on there, and that's what multiple regression is all

1    about.  That's what statistical modeling is all

2    about, and to find out what that something is and to

3    see if it's competitive or not.  And so the answer to

4    2004 is simple.  Dr. McClave testifies, states in his

5    report, testified in deposition, states that he has

6    three basic principles he uses in all his statistical

7    modeling.  The models must make statistical sense;

8    they must be statistically sound.  And these models

9    are enormously statistically sound, very, very high

10    R-squared, very good t-statistics.  The t-statistics

11    tell you in statistical form what the relationship is

12    to the independent variables, the variables like

13    cost, demand, capacity.  Very strong t-statistics in

14    relationship to price.  Are they statistically

15    significant?  And every single one of those

16    t-statistics was supremely statistically significant.

17    And did all of the variables -- that is on the

18    right-hand side, the independent variables -- did

19    they show the right sign?  In other words, economics

20    tells you that you expect costs to be positively

21    correlated with price.  You expect demand to be

22    positively correlated with price, etc.  And every

23    single one of his statistics showed the right sign.

24    That's the very first.

25         The second thing is his models must be

 1          economically sound.  They must be founded in the

 2          industry, and they must make economic sense.  This

 3          goes back to the last statistical issue.  If all of

 4          your variables show the right economic sign, that's

 5          the first indication that it's economically sound.

 6          This, by the way, goes to -- you'll pardon me, your

 7          Honor, the bull that you got in their reply brief.

 8          They saved this for the reply brief, the bull of, we

 9          can show you that stock prices are related to the

10          moon being in the seventh house.  All right?  In

11          statistics that's called spurious correlation.  And

12          this happens all the time.  That's why your model

13          must be economically sound.  Dr. McClave doesn't have

14          the moon in the seventh house as one of his

15          variables.  He's got -- economics tells you that

16          competitive prices should be driven by source of

17          supply and demand, sometimes capacity, and certain

18          things of customer characteristics.  That's what he

19          has in his models.  So it avoids -- that tells you

20          that you don't have spurious correlation.

21              And then finally you look at the model results

22          to see, are they consistent? do they fit? do they

23          accurately predict? do they come up with consistent

24          explainable results?  And these models, all three of

25          these models, do that.  All three of these satisfy

1    those tests.  Going to 2004, he did what

2    statisticians, econometricians are supposed to do.

3    We started out -- we filed a complaint that said '99

4    to 2004.  What did we know?  Seriously.  There's no

5    discovery.  Even under Twombly nobody expects the

6    plaintiffs to know everything about a covert thing

7    like a price-fixing conspiracy.  We did what

8    post-Twombly people are expected to do.  We hired an

9    economist at that time.  Actually, Dr. Beyer was our

10   class certification expert.  We hired an economist

11   who looked at things, and we put it in the complaint

12   about economic indicators that suggested that a

13   conspiracy might be plausible here.

14        Then we started discovery, and then we hired

15   Dr. McClave to do his damage analysis, and

16   Dr. McClave was doing a statistical -- what you do --

17   this is not data mining, and Dr. Ugone recognizes

18   it's not data mining.  You try out your variables and

19   look and see what is happening, and consistently,

20   consistently it showed that the 2004 prices weren't

21   elevated.  They looked more like competitive prices

22   than they looked like collusive prices.  And you can

23   see this -- look at this.  2004, they land right on

24   top; but when you look to 1999 to 2003, the predicted

25   prices, there are times when they come close to the

 1          competitive prices, but they are very different.  And

 2          that's for each one of the models.  And so the very

 3          first thing statistically the statistics were telling

 4          him, not data mining, the statistics were telling

 5          him, there's a question here with 2004.  And so then

 6          he looks in the record, and by this time we're

 7          developing a record.  What does the record show?

 8          First, there is not one -- we spent all morning

 9          talking about the direct and circumstantial evidence

10          of conspiracy here.  There is not one piece of

11          testimony that talks about pricing discussions or

12          collusive meetings in 2004.  By 2004 every single one

13          of the Dow employees that we identified as key to

14          this conspiracy have left Dow or were transferred out

15          of the urethanes business.  Mr. Stern, who was a key

16          actor here, was gone.

17               Capacity, excess capacity.

18               Jerry, can we have the TDI model?

19               Excess capacity was a problem in all of the

20          basic chemicals, but TDI is the paradigm.  All you

21          have to do, your Honor, is look at 2005 on that TDI

22          model.  Something is happening here.  What's

23          happening there is the excess capacity for TDI is

24          being solved; plants are being removed.

25               So the third basic difference between 1999 and

 1          2003 and afterwards is excess capacity is being

 2          resolved for all three of the basic chemicals.  And

 3          that is noted by the internal documents of the firms

 4          themselves, and that is that they showed that margins

 5          are decreasing from -- the profit margins are

 6          decreasing from the conspiracy periods to the period

 7          2004 and afterwards.  So this is not data mining.

 8          This is Dr. McClave paying attention to what the

 9          preliminary results show.

10              My time is up, your Honor.

11              The preliminary results show and what the record

12          evidence in this case shows.  Thank you, your Honor.

13                  THE COURT:  All right.  For the direct

14          action plaintiffs?

15                  MR. MARTIN:  James Martin from Dickstein

16          Shapiro, your Honor.  One of words that stuck out to

17          me when I was listening to counsel's argument was

18          junk econometrics.  Counsel accused Dr. Raiff's

19          model of being junk econometrics.  The words I didn't

20          hear though were methodology, because Dow doesn't

21          dispute that Dr. Raiff used a proper and accepted

22          methodology.  It's the same methodology that was used

23          in Linerboard, in Vitamins, in Sun v. Hynix.  This is

24          set out in our opposition.  There's no dispute that

25          he used a scientifically valid approach to estimate

 1          damages.  It is a slightly different approach from

 2          what Dr. McClave did, but it doesn't mean it's wrong.

 3          It's just a different approach.  What Dr. Raiff did

 4          is, this is the way that these models are developed,

 5          these dynamic forecasting models.  He looked at not

 6          just a post-conspiracy benchmark period or a presumed

 7          competitive activity, but also a preconspiracy

 8          benchmark period, '92 and '93, 2004 through 2008, and

 9          he blended those to come up with an estimate of the

10          relationship between prices and variables throughout

11          that time period.

12               And our opposition explained why Dr. Raiff did

13          that.  First, it allows him to use all of the

14          available data.  There's a limited amount of data.

15          And, second, it allows him to account for the

16          overtime changes in the way that prices and the

17          variables interact.  And this is exactly the way that

18          these models are created.  It's the same thing that

19          was done in Linerboard, the same thing that was done

20          in Vitamins, and the same thing that was done in Sun

21          v. Hynix.  Dow does not dispute that that blended

22          benchmark period was the right way to go about

23          things.

24               Dr. Raiff did a two-step model.  In the first

25          step he estimated that market-wide overcharge based

 1          on a handful of three major products, and then

 2          accounted for each damage on a

 3          transaction-by-transaction basis in a second step for

 4          all of the direct action plaintiffs.  Again, Dow does

 5          not dispute that that was correct.  Dow does not

 6          contest that methodology.  That's, undisputedly, the

 7          way that these models are created, the type of model

 8          Dr. Raiff created.

 9               So what does Dow really complain about?  They

10          have two structural issues.  These are the ones that

11          are raised in their motion.  I see one new issue that

12          they didn't talk about in their PowerPoint.  They

13          seem to have raised another one in their reply.  But

14          there's two issues.  One is 2004, and Mr. Goldberg

15          has told you in detail -- and it's in our papers --

16          why 2004 was not only the right choice.  If he had

17          put it into the conspiracy period, it would have been

18          the wrong choice.  And the second is, how did

19          Dr. Raiff choose his variables?  In one sense they

20          complain that Dr. McClave didn't use economic

21          sense -- I'm using their words; I'm not agreeing --

22          in picking his variables, but now they complain that

23          Dr. Raiff did.  What Dr. Raiff did is, he looked at

24          the market, he studied the market, and he decided

25          what the primary variables were for TDI.  For

1          example, he knew toluene was a raw material that had

2          to be accounted for in his model, so he said, I'm

3          going to include that.  Then he identified a set of

4          additional candidate variables, and he had the

5          question, if I add these, will it make my model

6          better?  And he used an objective criterion, an AIC,

7          and this is discussed in the papers, and that

8          objective criterion identified additional variables

9          to allow him to create a model that fit the data

10         well, and then he applies accepted tests for his

11         methodology.  He inspected the fit, both pre and

12         post-conspiracy.  He looked for prediction errors and

13         confirmed they were statistically equivalent to zero.

14         He looks for auto correlation.  This is in the

15         papers.  He went through all these things and

16         confirmed for himself that the variables he selected

17         and the methodology he used accurately account for

18         the pricing dynamics and that it actually predicted

19         what prices would have been.  This isn't a

20         forecasting or backcasting model.  He has this time

21         period and this time period, and he's asking, what is

22         the best estimate of prices during this time in

23         between?

24              One of the things that is interesting -- again,

25         I didn't hear it from counsel -- is that

 1          Dr. McClave's model is very different.  He used

 2     statistical significance to choose individual

 3     variables.  That's not the way Dr. Raiff does it, and

 4     there's no dispute that Dr. Raiff did it correctly.

 5     But the two models actually come out at the same

 6     place.  They do cross corroborate each other.  The

 7     fact that they are very different actually is

 8     powerful evidence that they are both right, and

 9     there's no doubt that they can be both right.

10          If I can just go back quickly to the variable

11     selection, the objective measure that he used --

12     counsel says there's no economic authority, there's

13     no academic authority for that.  It's in our

14     opposition.  It's at pages 14 and 15.  It's a typical

15     top down approach where we identify the most

16     important variables and winnow it down.  And what is

17     interesting is Dow doesn't dispute that the variables

18     he chose are the correct ones.  Dow doesn't say he

19     should have included an additional variable.  Dow

20     doesn't say he should have excluded a variable.  All

21     they do is they complain about his decision to use

22     these two methodologist together.  If you look at

23     what Dow would do, they say you should only use AIC,

24     this objective test.  That would not include toluene;

25     it wouldn't include any demand factors.  It would

1    just be wrong.  It wouldn't be economically sensible.

2    And while we're talking about economics and all the

3    big words, economic sensibility is commence sense

4    frankly.  It's one of the touchtones of what we

5    discuss.

6         So in terms of methodology, it's just those two

7    things.  Then Dow has a couple of issues about

8    testing, and the purpose of tests is really to

9    identify whether the model is right.  Do the tests

10   tell you that you've included the wrong variables,

11   the wrong benchmark period?  And we have shown in our

12   opposition the tests are inapplicable.  The

13   out-of-sample test doesn't apply to Dr. Raiff's model

14   because Dr. Raiff's is a before-and-after model.

15   They are looking at this ABA treatise with six years

16   of preconspiracy data, and looks forward, but that

17   doesn't work for Dr. Raiff's model because he has the

18   two periods.  And in the second period he also

19   accounts for a structural change, a major reduction

20   in capacity.  He accounts for that with an indicator

21   variable.  And, again, Dow doesn't contest the way he

22   did that.  In its reply Dow says that Dr. Raiff's

23   models must be excluded.  Otherwise, they involve

24   nonstationary.  That's multisyllabic.  What that

25   really means, it's not stable.  The pricing dynamics

1    in '92 and '93 are different than 2004 and 2008.  But

2    as counsel would say, there's no fundamental tenet of

3    economics that says you can't create an econometric

4    model where the relationships are not perfectly

5    stable.  In fact, as we showed, Dr. Raiff's use of a

6    blended time period is undisputed, and it's the best

7    way to make sure you're capturing the pricing

8    dynamics in the early time period and in the later

9    time period.  And his use of an indicator variable

10   was the best way to capture and account for the fact

11   that there was this change in the relationships

12   between price and variables in 2005.  So that test

13   does not apply.  The statistical significance test,

14   we have discussed this in our opposition.  It doesn't

15   also apply to Dr. Raiff's type of models.  There is

16   an issue with the amount of data.  He only has 82

17   months of data.  And there's also a discussion about

18   how Dr. Raiff looks at statistical hypothesis

19   testing.  This is complicated.  It's in the papers.

20   But the upshot is there is an accepted group of

21   academics, econometricians, who look at practical

22   significance.  Statistical significance is an

23   arbitrary threshold, 5 percent, 10 percent, 1

24   percent.  If you come back with 10.01 percent, it's

25   not significant; if you come back with 9.99 percent,

1          it is significant.  And there's a more modern view

2          that one looks at the number.  Is it 5 percent chance

3          that your results are random error?  Is it 7 percent

4          chance random error?  And you look at that in the

5          context of all the other evidence, and you look at

6          that, and you say, well, is this an appropriate

7          model?  Is this methodologically correct, or is there

8          some problem with it?  Dr. Raiff's testing showed, I

9          believe, 2 percent for one model, 7 percent for one

10         model, and 19 percent, not 38 percent, for another

11         model, which means there's a one in five chance that

12         random error was accounting for his damages.  That's

13         pretty good.  It's a four in five chance that it is

14         the right model.  And, again, with his type of model,

15         we're just talking about testing.  That's the stuff

16         of cross examination.  That's the stuff of trial.

17         The fact that we didn't hear the word methodology

18         tells me this isn't a Daubert motion; this is a trial

19         motion.  All of the questions about the testing and

20         whether or not it's statistically significant or the

21         confidence intervals are right, those things you tell

22         the jury and the jury decides whether it's right or

23         wrong.  I would just direct you to the opposition

24         where I think we have covered this as much as we can.

25                    THE COURT:  Thank you, counsel.  Dow, for

1          your rebuttal?

2                    MR. LOEB:  Your Honor, Hamilton Loeb.  I'm

3          going to take about 20 seconds of Mr. Kinnaird's time

4          to put a reply in the record to what Mr. Goldberg

5          told you about Ed Dineen.  My notes show that the

6          issue of Ed Dineen, the former Lyondell guy, and the

7          supposed 1998 dinner that he attended with Bob Wood

8          and Mr. Dhanis came up in the direct presentation

9          that you heard from Mr. Bernick.  In any event, we

10         will welcome this motion.  This was dealt with and

11         considered fully during the pretrial conference.

12         Pretrial order says there's one witness that, if Dow

13         wants to depose them, they can depose them at its

14         election.  Otherwise, discovery is closed.  That's

15         the position we will take, but we will await their

16         motion.

17                    THE COURT:  Very well.  Mr. Kinnaird?

18                    MR. KINNAIRD:  Thank you, your Honor.  I'll

19         begin with the reply to the class.  Dr. McClave may

20         have credentials, but he still has to justify his

21         models, and he's been found wanting three times.  To

22         me that's an extremely high rate.  He mentioned the

23         fact that Dr. Ugone -- if you look at the

24         depositions, out of professional courtesy, he's not

25         going to make an accusation of a fellow expert, but

1          the clear and necessary inference from his entire

2          testimony, the key point is, if you can get

3          statistical fit 2005, 2009, your original

4          benchmark -- and he never says that's impossible --

5          why would you change that to go to 2004?  Only reason

6          is to optimize the damages.

7               They have no answer to the ABA antitrust

8          section.  By the way, that's both plaintiffs and

9          defendants, and that is just pure econometrics, and

10         is not just lawyers.  The Stock & Watson textbook

11         said that's the ultimate test.  Dr. McClave says, oh,

12         well, they are talking about time series; here we

13         have panel data here.  Your Honor, panel data is a

14         subset of time series data.  It's time series data

15         over multiple variables.  This is the key test, and

16         it's just common sense.  If you're saying, I have a

17         model that captures all the drivers of price and I

18         can predict it to a different set of years, well,

19         then, let's test it.  Estimate it over a different

20         benchmark period and test known competitive prices.

21         It's a basic core test of reliability.

22               And I would like to point the court to their

23         very remarkable statement from class plaintiffs.

24         They say, well, you can't use 2004 because look at

25         all the change between 2004 and 2005.  The prices

```
 1    went way down.  Well, there's a lot of change between
 2    '02 and '03, April '02 and '03.  Prices plummet.
 3    Between January of 2000 and October of 2000 --
 4    actually, January of '99 to October 2000.  Is he
 5    saying that's too much change?  I can't predict that?
 6    That's what he's saying.  The key is you have to show
 7    more than statistical fit.
 8         My colleague's argument was all the about
 9    R-squared and statistical significance.  Yes, but you
10    had perfect statistical significance in our
11    Bangladeshi sheep example.  It's true enough that Dr.
12    McClave didn't use outlandish variables, but you can
13    have spurious correlation between various variables
14    that you choose.  You have to be able to show the
15    ability to predict, make sure it's a causal model, a
16    reliable model.  That's what this court is here to
17    do.
18         And then as far as economic sense, that's our
19    whole point.  They never justify all their selection
20    of variables, and the contradictory selection of time
21    periods for moving averages, the counterintuitive
22    selection of TDI exports is their demand variable.
23    He says, look at all the problems with excess
24    capacity.  They had a variable, a separate variable,
25    for U.S. excess capacity.  And to the extent that
```

1          they are going to try TDI exports for global

2          capacity, they would have to put something in to

3          control for other factors affecting global capacity.

4          It didn't.  It's not a sound variable.  He has no

5          theory behind it.  He has no empirical data from the

6          record.  It's not reliable.

7               I'll move on to Dr. Raiff at this point, and

8          that is what I heard principally from the opt-out

9          counsel, is that we didn't attack methodology.  Well,

10         Point 1, methodology, having a methodology is only

11         one part of Daubert.  You also have to show reliable

12         application of methodology.  And just because you're

13         using regressions that other people use, you have to

14         show reliable application.

15              And, secondly, we did attack his variable

16         selection methodology, and that is something they

17         just haven't justified.  They cite to one source that

18         says that you have to exercise economic judgment in

19         selecting variables, no matter what you use.  But no

20         source says you can mash together two mutually

21         incompatible -- a purely objective variable selection

22         method, the AIC, with one that has subjective

23         judgment in the selection of variables.  It violates

24         the principles of AIC to use subjective judgment and

25         to only have a couple of the variables in the AIC

1     because then you're not penalizing -- one of the key

2     principles of statistics is if you put a lot of

3     variables in you're always going to get statistical

4     fit.  That's why the AIC has a penalty for putting in

5     too many variables.  If you have a lot of variables

6     off on the side that you're going to force fit in

7     manually, you violate that principle.  He hasn't

8     justified it.  It's completely novel, and it can't be

9     used.

10          And then on the out-of-sample testing he says,

11     well, there's structural change in 2005, but, your

12     Honor, a damages prediction is predicting out of

13     sample.  He has to have controlled for that

14     structural change in 2005, which is in his benchmark.

15     If he didn't, nonstationarity is fatal to regression.

16     I don't understand counsel's representation that you

17     could have a model with nonstationarity.  If you look

18     at any basic regression textbook, that's No. 1 as

19     your requirement.  And the reason is, if you don't

20     have a stable relationship between the explanatory

21     variables and the dependent variables in your

22     benchmark period, how can you say that those

23     explanatory variables will have the same stable

24     relationship in your model period, in your tested

25     period?  It's a fundamental precept.  So that's the

1          problem, and they are the ones who admitted

2          nonstationarity, so they really can't justify it now.

3              Statistical significance.  I heard again a

4          number of -- he says basically you can't test a model

5          with any two observations for statistical

6          significance.  First of all, that's not true.  But

7          that means that you can't test for random error.

8          They can't say this is anything different -- my

9          estimate is anything different from random error.

10         That's incredibly problematic.  If he has only 82

11         months of observations, rather than the 25,000 that

12         Dr. McClave used, that's self-inflicted.  That's

13         because he chose this particular modeling technique,

14         and he didn't specify it properly, and that's their

15         problem if he can't show any statistical

16         significance.

17             He says that practical significance, that

18         there's a modern view that practical significance is

19         all you need.  All practical significance says is,

20         how big is your estimate? is it something that we're

21         going to want to look at?  It doesn't look at whether

22         it's the product of chance or not, and that's what

23         our confidence intervals show, that this estimate --

24         which you don't know what the true value is; you're

25         estimating the true value of a competitive price.

1    You don't know it, but you do your best to estimate

2    it, but you have to be able to eliminate random

3    error.  And then he says, well, it's okay if there's

4    a one in five chance of random error.  That makes no

5    sense to me.  And then he also said that there was 5

6    to 7 percent that people could worry about that.

7    Your Honor, we're talking here 14 percent on a

8    two-tailed basis and 38 percent for the MDI model,

9    38 percent.  And you have to look at a two-tailed

10   basis because you're looking at how precise this

11   model is.  So is if you're looking at how accurate a

12   quarterback is, you have to look when he throws the

13   ball, sails it over the receiver's head, when he

14   throws it at the dirt.  You can't just look up; you

15   have to look up and down.  Thirty-eight percent, you

16   have statistical insignificance.  I can't imagine

17   there's any econometrician who would neutrally say

18   that's proper, and that's the best he could do after

19   presumably running hundreds of thousands of models.

20   It's just bad science, your Honor, and I hope you

21   will exclude the testimony.

22            THE COURT:  Thank you very much.  That does

23   complete our argument for today.  I want to thank you

24   all for your appearances.  My law clerk asked me if I

25   would set aside a few minutes to announce my ruling

1    from the bench on your motions, but it will not

2    please him to know that I will take this under

3    advisement and we will issue a written memorandum and

4    order or two that deals with these matters.

5        It is certainly my anticipation that I will meet

6    the usual practice of having at least the dispositive

7    matters resolved no less than four weeks before the

8    trial is scheduled to begin on the class case.  If I

9    can do better than that, I will.  I want to give you

10   the most time possible to prepare and to rely on

11   whatever the results are to either prepare or not

12   prepare as you go forward, depending upon what may

13   happen.  Thank you again for your appearances today,

14   and we are in recess.

15               (Court was adjourned.)

16                    * * * * *

17

18

19

20

21

22

23

24

25

```
 1
 2                          CERTIFICATE
 3   STATE OF KANSAS        |
 4                          |   ss
 5   COUNTY OF JOHNSON      |
 6
 7          I, Rebecca Ryder, CSR, RMR, CRR, a Certified
 8   Shorthand Reporter and official reporter for the United
 9   States District Court, District of Kansas, do hereby
10   certify that as such official reporter I was present at
11   and reported in machine shorthand the above and foregoing
12   proceedings.
13          I further certify that a transcript of my
14   shorthand notes was prepared and that the foregoing
15   transcript is a true and correct transcript of my notes in
16   said case to the best of my knowledge and ability.
17
18                          S/REBECCA S. RYDER
                            REBECCA S. RYDER, CSR, RMR, CRR
19
20
21
22
23
24
25
```