# EXHIBIT M

```
                                                                         1
 1    page 1
 2     1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3     2
       3                              - - -
 4     4
       5   IN RE:  LINERBOARD            :  NO. MDL 1261
 5     6                                 :
       7                                 :  Philadelphia, Pennsylvania
 6     8                                 :  July 2, 2007
       9                                 :  10:40 o'clock a.m.
 7    10   . . . . . . . . . . . . . . .
      11
 8    12                        DAUBERT HEARING
      13              BEFORE THE HONORABLE JAN E. DUBOIS
 9    14              UNITED STATES DISTRICT COURT JUDGE
      15
10    16                              - - -
      17
11    18   APPEARANCES:
      19
12    20   For the Direct Action Plaintiffs:
      21
13    22   For Procter & Gamble: RICHARD LEVERIDGE, ESQUIRE
      23                         CHARLES MILLER, ESQUIRE
14    24                         Dickstein Shapiro Morin & Oshinsky
      25                         2101 L Street, N.W.
15    26                         Washington, DC  20037-1526
      27
16    28   For Temple Inland     STEVE BROWN, ESQUIRE
      29   and Gaylord:          Dechert Price & Rhoads
17    30                         CIRA Centre
      31                         2929 Arch Street
18    32                         Philadelphia, PA  19104-2808
19    33
20    34   Audio Operators:      Michael DelRossi, Andrea Mack
21    35
22    36   Transcribed by:       Grace Williams, CET
23    37                         Tracey Williams, CET
24    38                         Paula Curran, CET
25    39
26    40   (Proceedings recorded by electronic sound recording;
27    41   transcript provided by AAERT-certified transcribers.)
```

```
                                                              20
 page 20


 1    publishing my work has focused on the use and misuse of
 2    statistical methods and, in particular, a considerable focus
 3    on multiple regression methods as well as a study of the
 4    extent to which such methods can be used for purposes of
 5    prediction or for purposes of learning about cause-and-effect
 6    relationships.
 7  Q    In formulating or specifying a multiple regression model
 8    must certain choices be made?
 9  A    Yes.
10  Q    Is it possible that reasonable economists can disagree in
11    good faith over the choices that are made in a particular
12    application?
13  A    Certainly.
14  Q    Can you describe for the Court the significant choices,
15    the most significant choices that you made in formulating a
16    multiple regression model to analyze the market price?
17  A    Yes.
18           MR. BROWN:  In this case?
19           MR. MILLER:  In this case.
20           MR. BROWN:  Okay.
21           THE WITNESS:  Yes, sir.  And for this I'd like to
22    turn to Page 4 of the handout that I provided.  So let me
23    begin by reiterating the goal and that is to arrive at a
24    prediction of prices that would occur in the absence of the
25    alleged conspiracy and under market conditions identical to
```

page 21

1  those during the period of the alleged conspiracy.
2         To ensure the first goal it's important to identify
3  a benchmark period that's not affected by the conspiracy, a
4  period of presumably lawful, more competitive behavior that
5  will not be tainted by the alleged conspiracy.  For shorthand
6  I'll call that a benchmark period, and I've done that.
7         Second --
8  BY MR. MILLER:
9  Q   What's the next choice?
10 A   One has to consider the variables which are the drivers
11 of price, that is those variables that determine price in
12 this market.
13 Q   And what's the next choice?
14 A   In identifying those variables one has to consider
15 whether or not those variables are under the control or
16 influence of the alleged conspiracy because if they are then
17 they are tainted by the alleged conspiracy.  And their naive
18 inclusion in the analysis will violate the goal which is to
19 achieve a but-for price which is not tainted by the alleged
20 conduct.
21 Q   We'll come back to this in some more detail but would you
22 please continue with your overview?
23 A   Yes.  Once one has arrived at a benchmark period
24 untainted by the alleged conspiracy, has set up predictor
25 variables untainted by the alleged conspiracy then one can

```
                                                                    22
page 22


 1   fit a multiple regression model using techniques appropriate
 2   to the data at hand.
 3   Q   And what was the next step?
 4   A   From that one gets a set of regression coefficients or
 5   simply weights, those weights then multiply the predictor
 6   variables and can be used to create the but-for prediction
 7   using the actual market conditions but embodying the
 8   relationship between the cost-and-demand predictors and
 9   prices, that is in the benchmark period.
10   Q   I'd like to go back through these in some more detail.
11   Your considerations regarding the benchmark period are set
12   out at some length in your report and your papers.  Without
13   going into great detail can you describe why you chose --
14   what the benchmark period is that you chose and why you chose
15   it?
16   A   Yes.  And now I'm going to be referring back to the chart
17   that's on the easel and to Page 2 of my handout.  There the
18   benchmark period is indicated in blue.  It consists of what
19   I'll call a before period, which is before the alleged
20   conspiracy, and an after period, which is after the alleged
21   conspiracy.
22          So let me now briefly describe how the before and
23   after periods have been chosen.
24   Q   Do you want to start with the before period?
25   A   Yes, sir.  The before period is terminated at a date that
```

2007.07.02 Linerboard - Daubert hearing

```
                                                                23
 1    page 23
 2
 3     1   I chose based upon the instructions from the attorneys and
 4     2   that was to assume the existence of an alleged conspiracy
 5     3   that began no earlier than January of 1993 and no later than
 6     4   I believe it was October of 1993.
 7     5            So in order to ensure that my analysis was not
 8     6   tainted by the alleged conduct I took the earlier of the
 9     7   dates given in the range and therefore stopped my benchmark
10     8   period in December of 1992.  The -- and that was the before
11     9   period.
12    10            The beginning of that before period is determined by
13    11   the broad availability of the data that I determined was
14    12   appropriate for my analysis so that data became available in
15    13   the beginning of 1981 and I have therefore started my before
16    14   period when the data became available for the first time.
17    15   Q   What about the after period, what considerations went
18    16   into your selection of the after period?
19    17   A   The after period was determined as a result of my review
20    18   of the structure of the industry and, in particular, the
21    19   discovery that there was a wave of mergers and acquisitions
22    20   beginning in 1998, I believe in November of 1998,
23    21   unprecedented in the industry.  Whereas before there were
24    22   nine or ten participants, there began a series of three or
25    23   four different mergers reducing total number.
26    24            Economics tells me that the way the prices respond
27    25   to the underlying cost and demand factors will be different.

                     2007.07.02 Linerboard - Daubert hearing
```

```
                                                              24
1    page 24
2
3     1   So not wanting to mix in some different kind of price
4     2   behavior than what I would expect during the period of
5     3   alleged conspiracy in the but-for world I stopped the after
6     4   period in October of 1998 so that it reflects a stable market
7     5   structure.
8     6           This leaves the beginning of the after period for my
9     7   choice and based upon opinions given by Dr. Marshall to my
10    8   team and then later reflected in his report --
11    9   Q   Who is Dr. Marshall?
12   10   A   Dr. Marshall is the plaintiffs' liability expert in this
13   11   case.
14   12   Q   Thank you, please continue.
15   13   A   I undertook a series of experiments to find which
16   14   particular choice of beginning month for the benchmark would
17   15   give the best fit to the price predictions over the periods
18   16   included in the benchmark period and I determined that that
19   17   was best chosen as March of 1997.
20   18   Q   What assumption, if any, did you make regarding
21   19   defendants' conduct during the benchmark period?
22   20   A   The conduct during the benchmark period represents a
23   21   period of presumably legal more competitive conduct that is
24   22   the basis for calculating what prices would otherwise be.
25   23   Q   Let me ask you a hypothetical. Suppose that during the
26   24   benchmark period defendants have unlawfully managed to
27   25   elevate the price above competitive levels for some portion
```

2007.07.02 Linerboard - Daubert hearing

```
                                                                25
 1   page 25
 2
 3    1   of the benchmark period.  What effect, if any, would that
 4    2   have on your predicted prices during the conspiracy period?
 5    3            MR. BROWN:  Your Honor, I object.  He didn't write
 6    4   an opinion on this, this is brand new.  We've never heard
 7    5   this, your Honor.  In fact, I think in Mr. Miller's Footnote
 8    6   17 of his earlier brief he said that Professor White assumed
 9    7   the conduct during the benchmark period was what it was, made
10    8   no assumption of whether it was lawful or not.  This is all
11    9   beyond the scope of his report, your Honor, and beyond what
12   10   Mr. Miller has represented in the brief what his position was
13   11   on the conduct during the benchmark period.
14   12            THE COURT:  You've now asked him the effect of
15   13   unlawful conduct of the defendants during the benchmark
16   14   period.
17   15            MR. MILLER:  Yes, your Honor.  The defendants have
18   16   raised an issue that because Professor White made an
19   17   assumption that the defendants' conduct was presumably lawful
20   18   during the benchmark period that the results of his analysis
21   19   are less reliable or indeed unreliable.
22   20            THE COURT:  Well, I'm going to overrule the
23   21   objection but that doesn't mean that I'm going to rely on the
24   22   answer.  I want to hear the answer and we'll address the
25   23   question whether it's proper under all the circumstances at
26   24   the end of the hearing.
27   25            MR. MILLER:  Okay.

                       2007.07.02 Linerboard - Daubert hearing
```

```
                                                                    26
   page 26


    1            THE COURT:  But I want to hear the answer.
    2            You're not precluded, Mr. Brown, from arguing as
    3   you've just argued that the answer is inadmissible.
    4            THE WITNESS:  May I --
    5   BY MR. MILLER:
    6   Q    You may answer that, please.  I'm asking a hypothetical.
    7   Suppose defendants had acted unlawfully during the benchmark
    8   period in a way that resulted in elevation of the market
    9   price above competitive levels, what effect if any would that
   10   have on your predictions of the competitive price during the
   11   conspiracy period?
   12   A    The likely effect is that the but-for price I calculate
   13   would be higher than otherwise, resulting in a conservative
   14   value for the damages that I estimate.
   15   Q    What do you mean by conservative value?
   16   A    The damages are lower than they otherwise would be.
   17   Q    I next want to turn to your considerations regarding the
   18   identification of cost and demand variables.  And, again, all
   19   those considerations you described at great length in your
   20   report and we've copied in our papers, so again without going
   21   into great detail about all the considerations can you
   22   explain how you arrived at a list of candidate variables?
   23            THE COURT:  Of candidate?
   24            MR. MILLER:  Variables for inclusion in the
   25   regression equation.
```

2007.07.02 Linerboard - Daubert hearing