# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| _____ | ) | |
| IN RE: URETHANE ANTITRUST | ) | MDL No. 1616 |
| LITIGATION | ) | No. 04-MD-1616-JWL |
| _____ | ) | |
| | ) | |
| This Document Relates To: | ) | |
| Polyether Polyol Cases | ) | |
| _____ | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S PETITION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND AWARD OF INCENTIVE PAYMENTS TO CLASS REPRESENTATIVES

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ..................................................................................1

II.    A ONE-THIRD FEE AWARD IS FAIR AND REASONABLE ..................................3

    A.    The Amount Involved and Result Obtained .......................................5

    B.    The Time and Labor Involved ...........................................................7

        1.    The Complaint and Motions to Dismiss ................................8

        2.    Class Certification................................................................9

        3.    Merits and Expert Discovery ...............................................10

        4.    Trial Preparation .................................................................13

        5.    The Trial................................................................................15

        6.    Appeal ....................................................................................16

    C.    The Difficulty of the Litigation.........................................................19

    D.    The Skill and Experience of Class Counsel.......................................24

    E.    Preclusion of Other Employment......................................................26

    F.    The Customary Contingent Fee .........................................................26

    G.    Awards in Similar Cases....................................................................29

    H.    Lodestar Cross-Check.......................................................................32

III.    THE COURT SHOULD AWARD REIMBURSEMENT OF
CLASS COUNSEL'S LITIGATION EXPENSES ....................................................35

IV.    INCENTIVE PAYMENTS....................................................................36

V.    CONCLUSION ....................................................................................40

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                            <u>Page</u>

*Allapattah Services, Inc. v. Exxon Corp.*,
    454 F. Supp. 2d 1185 (S.D. Fla. 2006) ...................................................................... passim

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany and Albany Cty.*
   *Bd. of Elections,* 522 F.3d 182 (2d Cir. 2007) ....................................................................26

*Behrens v. Wometco Enters., Inc.*,
    118 F.R.D. 534 (S.D. Fla. 1988) ........................................................................................28

*Blum v. Stenson*,
    465 U.S. 886 (1984)..............................................................................................................4

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)..............................................................................................................3

*Brown v. Phillips Petroleum Co.*,
    838 F.2d 451 (10th Cir. 1988) .................................................................................5, 24, 26

*Brown v. Pro Football, Inc.*,
    839 F. Supp. 905 (D.D.C. 1993) ........................................................................................36

*Bussie v. Allmerica Financial Corp.*,
    No. 97-40204-NMG, 1999 WL 342042 (D. Mass. May 19, 1999) .......................................4

*Cimarron Pipeline Const., Inc. v. Nat'l Council on Comp. Ins.*,
    No. 89-822, 1993 WL 355466 (W.D. Okla. June 8, 1993)....................................................30

*Comcast Corp. v. Behrend*,
    133 S.Ct. 1426 (2013)...........................................................................................16, 17, 22

*Dahl v. Bain Capital Partners, LLC*,
    No. 1:07-cv-12388-WGY, Dkt. Nos. 1051, 1095 (D. Mass. Feb. 2, 2015).........................31

*Flournoy v. Honeywell Int'l, Inc.*,
    No. Civ. A. 205-184, 2007 WL 1087279 (S.D. Ga. Apr. 6, 2007)................................27, 36

*Gottlieb v. Barry*,
    43 F.3d 474 (10th Cir. 1994) ...............................................................................................3

*Gudenkauf v. Stauffer Commc'ns, Inc.*,
    158 F.3d 1074 (10th Cir. 1998) ...........................................................................................5

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ..................................................................................................6

*In re AmerisSoft Corp. Sec. Litig.*,
210 F.R.D. 109 (D.N.J. 2002) ...............................................................................30

*In re Automotive Refinishing Paint Antitrust Litig.*,
MDL No. 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) ................................. 20, 35, 38-40

*In re Checking Account Overdraft Litig.*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011) .................................................................31

*In re Copley Pharm., Inc., "Albuterol" Prod. Liability Litig.*,
1 F. Supp. 2d 1407 (D. Wyo. 1998) ......................................................................25

*In re Credit Default Swaps Antitrust Litig.*.
No. 1:13-md-02476-DLC, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) .........................34

*In re Enron Corp.*,
586 F. Supp. 2d 732 (S.D. Tex. 2008) ............................................................ 32-34

*In re Flonase Antitrust Litig.*,
951 F. Supp. 2d 739 (E.D. Pa. 2013) .....................................................................29

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995).....................................................................................35

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
142 F.R.D. 588 (S.D.N.Y. 1992) ..........................................................................20

*In re High-Tech Employee Antitrust Litig.*,
No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015).............................39

*In re Ikon Office Solutions, Inc. Securities Litigation*,
194 F.R.D. 166 (E.D. Pa. 2000)............................................................................33

*In re Initial Pub. Off. Sec. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009).....................................................................31

*In re Linerboard Antitrust Litig.*,
No. CIV. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004)....................................6, 38

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010) ..........................................................................19

*In re Neurontin Antitrust Litig.*,
 Civ. A. No. 02-1830, Dkt. No. 114 (D.N.J. Aug. 6, 2014) ....................................................39

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
991 F. Supp. 2d 431 (E.D.N.Y. 2014) ...........................................................................25, 34

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
 09-cv-07666, Dkt. Nos. 693, 697, 697-1, 701 (N.D. Ill. 2014) .........................................31

*In re Puerto Rican Cabotage Antitrust Litig.*,
 815 F. Supp. 2d 448 (D.P.R. 2011)....................................................................................19

*In re Ready-Mixed Concrete Antitrust Litig.*,
 1:05-CV-00979, 2010 WL 3282591 (S.D. Ind. Aug. 17, 2010) ........................................27

*In  re Remeron Direct Purchaser Antitrust Litig.*,
 No. Civ. 03-0085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ......................................27, 30

*In re Ravisent Tech., Inc. Sec. Litig.*, No. Civ.
 A. 00-cv-1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005)..............................................30

*In re Rent–Way Securities Litig.*,
 305 F. Supp. 2d 491, 517 (N.D. Pa. 2003).........................................................................33

*In re Rite Aid Corp. Securities Litig.*,
 396 F.3d 294 (3d Cir. 2005).........................................................................................31, 32

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
 CIV.A. 08-397 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013),
 appeal dismissed (Apr. 17, 2014) ......................................................................................33

*In re Southeastern Milk Antitrust Litig.*,
 No. 07-cv-1000, 2013 WL 2155387 (E.D. Tenn. May 17, 2013) .............................4, 29, 31

*In re Sprint Corp. ERISA Litig.*,
 443 F. Supp. 2d 1249 (D. Kan. 2006)...................................................................................3

*In re Synthroid Marketing Litig.*,
 264 F.3d 712 (7th Cir. 2001) ....................................................................................... 26-27

*In re TFT-LCD Antitrust Litig.*,
 No. M-07-1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ...........................................31

*In re TFT-LCD Antitrust Litig.*,
 No. 07-md-01827, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) .....................................31

*In re Titanium Dioxide Antitrust Litig.*,
  10–CV–00318(RDB),  2013 WL 6577029 (D. Md. Dec. 13, 2013) .............................31, 39

*In re Tricor Direct Purchaser Antitrust Litig.*,
  No. 05-cv-00340, Dkt. No. 543 (D. Del. Apr. 23, 2009)................................31, 34

*In re United Telecommc'ns Sec. Litig.*,
  No. 90-2251-0, 1994 WL 326007 (D. Kan. June 1, 1994) ..................................30

*In re Universal Service Fund Tel. Billing Practices Litig.*,
  No. 02-MD-1468-JWL, 2011 WL 1808038 (D. Kan. May 12, 2011)................. 3, 27-30, 35

*In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014) ...........................................11

*In re Urethane [Polyester Polyol] Antitrust Litig.*,
  No. 04-md-1616-JWL, 2008 WL 696244 (D. Kan. Mar. 13, 2008)....................................39

*In re U.S. Foodservice, Inc. Pricing Litig.*,
  No. 3:07-md-1894 (AWT), Dkt. No. 521 (D. Conn. 2014)..................................31

*In re Vitamins Antitrust Litig.*, No. Misc. 99-197(TFH),
  2001 WL 34312839 (D.D.C. July 16, 2001) ......................................................31

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005)........................................................................4

*Ivax Corp. v. Aztec Peroxides, LLC*,
  No. 1:02CV00593, Dkt. No. 78 (D.D.C. Aug. 24, 2005) ....................................39

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ..............................................................................5, 35

*Klein v. PDG Remediation, Inc.*,
  No. 95 Civ. 4954, 1999 WL 38179 (S.D.N.Y. Jan. 28, 1999)............................30

*Knight v. Red Door Salons, Inc.*,
  No. 08-01520, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ................................28

*Lazy Oil Co. v. Witco Corp.*,
  95 F. Supp. 2d 290 (W.D. Pa. 1997)....................................................................36

*Lewis v. Wal-Mart Stores, Inc.*,
  No. 02-CV-0944, 2006 WL 3505851 (N.D. Okla. Dec. 4, 2006)........................30

*Lucas v. Kmart Corp.*,
  No. 99-cv-01923, 2006 WL 2729260 (D. Colo. July 27, 2006) ..........................28

*Marchbanks Truck Serv. v. Comdata Network, Inc.*,
　Case No. 07–CV–1078, Dkt. No. 713 (E.D. Pa. July 14, 2014)...........................................39

*McNeely v. Nat'l Mobile Health Care, LLC*,
　No. 07-933, 2008 WL 4816510 (W.D. Okla. Oct. 27, 2008) .................................................6

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
　473 U.S. 614, 635 (1985)................................................................................................. 28-29

*Montague v. Dixie Nat. Life Ins. Co.*,
　CIV.A. 3:09-00687, 2011 WL 3626541 (D.S.C. Aug. 17, 2011).........................................27

*Moore v. United States*,
　63 Fed. Cl. 781 (2005) .........................................................................................................30

*New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*,
　234 F.R.D. 627 (W.D. Ky. 2006).........................................................................................30

*Perez v. Asurion Corp.*,
　No. 06-20734-Civ, 2007 WL 2591180 (S.D. Fla. Aug. 8, 2007) ........................................28

*Pillsbury Co. v. Conboy*,
　459 U.S. 248 (1983).............................................................................................................29

*Rosenbaum v. MacAllister*,
　64 F.3d 1439 (10th Cir. 1995) ...............................................................................................3

*Schwartz v. TXU Corp.*,
　No. 3:02-cv-2243-K, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ...................................24

*Shaw v. Interthinx, Inc.*,
　No. 13-CV-01229-REB-NYW, 2015 WL 1867861 (D. Colo. Apr. 22, 2015)....... 3-4, 30, 37

*Smith v. Krispy Kreme Doughnut Corp.*,
　No. 1:05cv00187, 2007 WL 119157 (M.D.N.C. Jan. 10, 2007) .........................................24

*Smith v. Vill. of Maywood*,
　17 F.3d 219 (7th Cir. 1994) .................................................................................................33

*Standard Iron Works v. ArcelorMittal*,
　No. 08-C-5214, Dkt. No. 539 (N.D. Ill. Oct. 22, 2014).......................................................31

*Stanley v. U.S. Steel Co.*,
　04-74654, 2009 WL 4646647 (E.D. Mich. Dec. 8, 2009) ...................................................28

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
  No. Civ. A. 03-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) ....................................20

*Tyson Foods, Inc. v. Bouaphakeo*,
  No. 14-1146, 135 S. Ct. 2806 (2015).....................................................................17, 18, 22

*Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp.*,
  352 F. App'x 232 (10th Cir. 2009) ......................................................................................37

*Uselton v. Commercial Lovelace Motor Freight*,
  9 F.3d 849 (10th Cir. 1993) ..................................................................................................5

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ..................................................................................6, 32, 33

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011)...............................................................................................16, 17, 22

*Williams v. Sprint/United Mgmt. Co.*,
  No. 03-2200-JWL, 2007 WL 2694029 (D. Kan. Sept. 11, 2007)........................................30

## Rules and Statutes

Rule 23(b)(3)...............................................................................................................17, 22

## Other Authorities

MANUAL FOR COMPLEX LITIGATION, Fourth §21:66 (2004)........................................................7

MANUAL FOR COMPLEX LITIGATION, Fourth §14.121 (2004)..............................................4, 6

MANUAL FOR COMPLEX LITIGATION, Fourth §21.724 (2004)...................................................32

4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 14:6 (4th ed. 2002)..32

5 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 15:85 (5th ed. 2015) ...................32

5 William B. Rubenstein, Newberg NEWBERG ON CLASS ACTIONS § 15:87 (5th ed. 2015).....34

5 William B. Rubenstein, Newberg NEWBERG ON CLASS ACTIONS § 17:1 (5th ed. 2015).......36

*Report of Third Circuit Task Force:  Court Awarded Attorney Fees*, 108 F.R.D. 237 (1985) .4

*Report of Third Circuit Task Force:  Selection of Class Counsel*, 208 F.R.D. 340 (2002).......4

Eisenberg, Theodore & Miller, Geoffrey P., *Attorney Fees in Class Action Settlements:  An Empirical Study*, 1 J. Empirical Legal Stud. 27 (2004) ............................*27*

Eisenberg, Theodore & Miller, Geoffrey P., *Incentive Awards to Class Action Plaintiffs:  An Empirical Study*, 53 UCLA Law Rev. 1303 (2006) .........................................*40*

Allyson N. Ho, *Getting Down to Business:  Early Observations on the Roberts Court's Business Cases*, 9 ENGAGE: JOURNAL OF THE FEDERALIST SOCIETY PRACTICE GROUPS (2008) ...........................................................................................23

Brendan S. Maher, *The Affordable Care Act, Remedy, and Litigation Reform*, 63 American Univ. L. Rev. 649 (2014) .................................................................23

Mark S. Popofsky and Douglas H. Hallward-Driemeier, *Antitrust and the Roberts Court*, 28-SUM ANTITRUST 26 (2014) ....................................................23

# I.        INTRODUCTION

After more than a decade of litigation, the *Urethane* Plaintiffs have recovered almost a billion dollars in total settlements.  Class Counsel deserve substantial credit for this result, having represented the Class skillfully from start to finish.  The risks were enormous, yet were surmounted at every stage, culminating in the $835 million settlement with The Dow Chemical Company ("Dow")—one of the largest recoveries in Sherman Act history.  Given the exceptional results, and the risks, costs, and quality of Class Counsel's work, a one-third fee is fair and reasonable.

A brief recap of the case highlights what Class Counsel accomplished in this unusually complex litigation:

- ***Development of the Claims.***  The original complaint was filed in November 2004, and stemmed not from a prior government investigation but rather from Lead Counsel's independent work to uncover and develop the claims.

- ***Motions to Dismiss.***  Plaintiffs defeated two rounds of motions to dismiss challenging, *inter alia*, the conspiracy and fraudulent concealment allegations, and the inclusion of certain products in the case.

- ***Contested Class Certification Proceedings.***  The Court's July 2008 class certification order followed extensive discovery and hundreds of pages of briefing and expert reports. Class Counsel also successfully opposed Defendants' petition for Rule 23(f) review.

- ***Costly and Protracted Merits Discovery.***  Merits discovery involved years of work, more than 14 million pages of document review, more than 100 domestic and international depositions, liability and damage reports from multiple experts, and thousands of docket entries as the parties prepared the case for trial.

- ***Summary Judgment and Daubert Motions.***  Using the fruits of discovery, Class Counsel successfully defeated Dow's Rule 56 and *Daubert* motions.

- ***Trial.***  The case went to trial in early 2013—one of the few large price-fixing class actions ever to do so.  It would be difficult to overstate the costs, complexity, risks, and work at this stage, or the success achieved for the Class.  Class Counsel ultimately secured the largest jury verdict in the United States in 2013, and what is reported to be the largest price-fixing jury verdict ever.

- ***Post-Trial Motions***.  Dow moved on numerous grounds for judgment notwithstanding the verdict and/or class decertification.  Class Counsel successfully opposed these motions, resulting in a $1.06 billion final judgment.

- ***Tenth Circuit Appeal.***  Class Counsel prevailed in the Court of Appeals and defeated Dow's petition for rehearing *en banc*.  The quality of Class Counsel's representation, and willingness to bear risk, increased the settlement value of the case substantially when the Tenth Circuit upheld the judgment in all respects.

- ***Supreme Court***.  Class Counsel navigated a series of complex risks in the United States Supreme Court, the details of which are described at pages 17-18 and 21-24, *infra*. Ultimately, despite considerable uncertainty, Class Counsel secured a settlement for nearly 80% of the final judgment—more than twice the damages awarded at trial.

In short, this case has involved more than a decade of litigation, a successful four-week jury trial, proceedings in the Tenth Circuit and the U.S. Supreme Court, and nearly a billion dollars in settlements.  The extraordinary time, skill and resources devoted to the case, the extraordinary risk borne by Class Counsel, and the extraordinary result all support the requested fee award of one-third of the Dow settlement fund.

A one-third fee falls within the range of percentage fee awards approved by this Court, others in this Circuit, and courts across the country, including in large cases with unusual risks and exceptional class-wide recoveries.  This Court awarded one-third fees from the prior *Urethane* settlements (Dkt. Nos. 995, 2210), and case law has long recognized that class/lawyer interests should be aligned in this type of matter, such that counsel are both compensated for risk and rewarded for success.  *See* Part II, *infra*.

In addition, Class Counsel move for reimbursement of $1,545,872.58 in costs and expenses incurred from July 1, 2011 through the present, including costs for experts, document management, deposition services, transcripts, trial expenses, and electronic research.  All of these costs were necessary to the prosecution of the case, were reasonable in amount, and accordingly are reimbursable under the common fund doctrine.

Plaintiffs further request that the Court approve total incentive awards of $500,000 for the three Class Representatives to be apportioned as follows: $200,000 for Seegott Holdings, Inc. ("Seegott"), $150,000 for Quabaug Corporation ("Quabaug"), and $150,000 for Industrial Polymers, Inc. ("Industrial Polymers"). These awards are justified in light of the services performed for the Class, the business risks incurred, and the fact that, had the Class Representatives not stepped forward, the case would not exist at all.

For all of these reasons, and those that follow, Class Counsel respectfully request that the Court grant their petition and award the requested attorneys' fees, reimbursement of litigation expenses, and incentive payments.

## II.     A ONE-THIRD FEE AWARD IS FAIR AND REASONABLE

It is well-settled that a fee award is appropriate when a common fund is created for class members through the efforts of counsel. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("this Court has recognized consistently that a [lawyer] who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994) (same).

In this Circuit, a percentage-of-the-fund is the preferred method for awarding fees in a common fund case. *See* Dkt. Nos. 995, 2210 (prior *Urethane* fee awards); *In re Universal Serv. Fund Telephone Billing Practices Litig.*, No. 02-MD-1468-JWL, 2011 WL 1808038, *2 (D. Kan. May 12, 2011); *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1269 (D. Kan. 2006) ("preferred method"); *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995); *Gottlieb*, 43 F.3d at 482-83. "The Tenth Circuit favors the common fund approach, as opposed to the lodestar method, because a percentage of the common fund is less subjective than the lodestar plus multiplier approach, matches the marketplace most closely, and is the better suited approach

when class counsel were retained on a contingent fee basis, as in this case." *Shaw v. Interthinx, Inc.*, No. 13-CV-01229-REB-NYW, 2015 WL 1867861, at *5 (D. Colo. Apr. 22, 2015) (internal quotations, citation omitted).

The percentage methodology comports with class action practice nationwide, where the "vast majority" of courts of appeal now direct or permit district courts to award a percentage fee from a common fund. MANUAL FOR COMPLEX LITIGATION, Fourth § 14.121 (2004); *see also Blum v. Stenson*, 465 U.S. 886, 899 n.16 (1984) ("under the common fund doctrine . . . a reasonable fee is based on a percentage of the fund bestowed on the class"). The percentage method provides "appropriate financial incentives" necessary to "attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005). "From a public policy standpoint," moreover, "the [percentage] method of calculating fees more appropriately aligns the interests of the class with the interests of class counsel—the larger the value of the settlement, the larger the value of the fee award." *Bussie v. Allmerica Financial Corp.,* No. 97-40204-NMG, 1999 WL 342042, at *2 (D. Mass. May 19, 1999) (internal quotation, citation omitted); *accord In re Southeastern Milk Antitrust Litig.*, No. 07-cv-1000, 2013 WL 2155387, at *2 (E.D. Tenn. May 17, 2013) ("percentage-of-the-fund method . . . clearly appears to have become the preferred method in common fund cases" and properly "reflects the results achieved by class counsel"). The percentage method also has the endorsement of commentators, including the Third Circuit task forces on class action attorney fees. *See Report of Third Circuit Task Force:  Court Awarded Attorney Fees*, 108 F.R.D. 237, 255-56 (1985); *Report of Third Circuit Task Force:  Selection of Class Counsel*, 208 F.R.D. 340, 355 (2002) ("A percentage fee, tailored to the realities of the particular case, remains superior to

any other means of determining a reasonable fee for class counsel."). *Accord* Report of Professor Charles Silver on the Reasonableness of Class Counsel's Requested Award of Attorneys' Fees, Ex. A hereto, ("Silver Rept."), at ¶ 14.

In determining an appropriate percentage fee, courts in the Tenth Circuit focus on the twelve factors originally articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974):

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee – this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-55 (10th Cir. 1988). Because of differences among cases, the weight given to each factor varies, and "rarely are all of the *Johnson* factors applicable" to the analysis. *Uselton v. Commercial Lovelace Motor Freight*, 9 F.3d 849, 854 (10th Cir. 1993); *see also Gudenkauf v. Stauffer Commc'ns, Inc.*, 158 F.3d 1074, 1083 (10th Cir. 1998) ("We have never held that a district court abuses its discretion by failing to specifically address each *Johnson* factor."); *Brown*, 838 F.2d at 456 (citation omitted).

Examination of the relevant *Johnson* factors demonstrates that an award of one-third of the Dow Settlement Fund is appropriate here.

## A.  The Amount Involved and Result Obtained

The most important factor in determining an appropriate fee in this case is the result achieved for the Class. *See Brown*, 838 F.2d at 456 ("the amount involved and the results obtained may be given greater weight when, as in this case, the trial judge determines that the

- 5 -

recovery was highly contingent and that the efforts of counsel were instrumental in realizing recovery on behalf of the class").[1]  As the *Manual for Complex Litigation* explains, the factor generally "given the greatest emphasis is the size of the fund created, because a common fund is itself the measure of success and represents the benchmark from which a reasonable fee will be awarded."  MANUAL FOR COMPLEX LITIGATION, Fourth § 14:121 (2004) (citation and internal quotation marks omitted).  *See also Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1204-05 (S.D. Fla. 2006) ("Factors indicating 'exceptional success' include success achieved under unusually difficult or risky circumstances and the size of plaintiffs' recovery.").

The result obtained strongly supports the requested fee.  The $835 million paid by Dow is one of the largest settlements ever recovered from a single defendant in an antitrust class action. It is more than twice the jury's approximately $400 million damage award, and far exceeds the normal range of recovery in similar cases, which typically settle before trial for a fraction of single damages.  *See, e.g., In re Linerboard Antitrust Litig.*, No. CIV. 98-5055, 2004 WL 1221350, at *4 (E.D. Pa. June 2, 2004), *amended*, 2004 WL 1240775 (E.D. Pa. June 4, 2004) (collecting cases approving settlements of 5.35% to 28% of potential damages).

Indeed, the jury's damage award appears to be the largest price-fixing verdict in history. *See* Margaret Cronin Fisk, *Bloomberg*, "Dow Loses $1.2 Billion Verdict as Top 2013 Award" (Jan. 14, 2014) (reporting that *Urethane* was the largest jury award of any kind in 2013 and "the largest ever in a price-fixing case"), *available at* http://www.bloomberg.com/news/articles/2014-01-14/dow-loses-1-2-billion-verdict-as-top-2013-award.  Based on that historic context—or

---

[1] *See also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) ("Exceptional results are a relevant circumstance."); *McNeely v. Nat'l Mobile Health Care, LLC*, No. 07-933, 2008 WL 4816510, at *18 n.9 (W.D. Okla. Oct. 27, 2008) (counsel's "willingness to prosecute this matter on a contingent basis . . . ordinarily shifts the analytical focus away from hours spent on the case to the ultimate result class counsel has obtained").  *See generally Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (the "critical factor is the degree of success obtained").

indeed by any other measure—the $835 million settlement represents an extraordinary result for the Class given the uncertainties of continued litigation and the specific risks described below.

In addition, the Dow settlement provides for a guaranteed cash recovery payable upon final approval, with no funds reverting to Dow at any time or for any reason. That is, all settlement money will go directly to the Class in cash after deducting court-approved attorneys' fees and expenses. As with other *Urethane* settlements, moreover, Class members will be able to recover from the Dow Settlement Fund without having to locate their own urethane purchase records. Instead, Class members will be permitted to rely on the work done by Class Counsel and their experts to process and summarize the purchase data produced by Defendants in discovery, which will allow Class members to receive and accept a claim form with pre-tabulated figures showing their qualifying purchase amounts. *Compare* MANUAL FOR COMPLEX LITIGATION, Fourth §21.66 (settlements often require submission of detailed backup and records). This is an important benefit and will allow nearly every Class member to receive a settlement distribution simply by returning the claim form and cashing a check. *Cf. Allapattah*, 454 F. Supp. 2d at 1208 (counsel's work to facilitate claims process supports requested fee award).

For all of these reasons, the extraordinary results achieved and benefits conferred on the Class strongly support Class Counsel's fee application.

### B.       The Time and Labor Involved

Class Counsel's fee request is reasonable in light of the time and effort devoted to the case over the past eleven years, which involved not only the typical challenges associated with direct purchaser antitrust litigation—including motions to dismiss, class certification, merits and expert discovery, summary judgment, *Daubert*, and other pretrial motions—but also the work

associated with a complex trial and years of post-trial proceedings and appeals.

### 1. The Complaint and Motions to Dismiss

The initial *Seegott* complaint was filed in the District of New Jersey on November 23, 2004.  Unlike many antitrust cases in which a criminal investigation laid the foundation for subsequent civil actions, Class Counsel built this case from the ground up.

In June 2005, the JPML panel transferred the *Polyether Polyols* cases to this Court for consolidation or coordination with the then-pending *Polyester Polyols* cases.  After briefing and argument, this Court determined that the *Polyether* cases should be coordinated, not consolidated, with the *Polyester Polyols* cases, because the cases involved distinct products and conspiracies.  Dkt. Nos. 128, 132, 133 136, 157.

On November 10, 2005, the Defendants moved to dismiss for failure to state a claim, after which Plaintiffs filed a comprehensive response brief (Dkt. No. 180) and argued the motion.  The Court subsequently denied Defendants' motion as to the antitrust claims, but granted it with respect to fraudulent concealment, with leave to amend.  Dkt. No. 198.

In January 2006, after months of negotiations, Plaintiffs reached a significant icebreaker settlement with Bayer for $55.3 million, which the Court approved on August 30, 2006.  *See* Joint Declaration of Donald L. Perelman and Richard A. Koffman in Support of Class Counsel's Petition for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Joint Decl."), Ex. B hereto at  ¶ 12; *see also* Dkt. No. 425.  Not a single Class member objected.

Plaintiffs then moved to amend their complaint, supplementing their allegations of fraudulent concealment and alleging that the conspiracy impacted not just basic chemicals (MDI, TDI and polyether polyols), but also systems containing the basic chemicals.  Dkt. Nos. 206, 207.  Defendants in turn moved to dismiss on statute of limitations grounds and vigorously

opposed the amended systems allegations.  Dkt. Nos. 238 to 240.  Plaintiffs filed two separate

response briefs (Dkt. No. 270 & 271) and argued the issues before the Court.  Dkt. No. 288.  On

April 14, 2006, the Court granted Plaintiffs' motion to amend and denied Defendants' motion to

dismiss.  *See* Joint Decl. ¶ 15; Dkt. No. 295.

### 2.  Class Certification

With discovery bifurcated, Plaintiffs pursued extensive discovery on class certification

issues—including document and data requests, interrogatories, depositions, and expert

discovery—and reviewed approximately 750,000 pages of Defendants' documents at the pre-

certification stage.  Defendants served their own discovery requests, and Class Counsel worked

with their clients to produce documents, respond to Defendants' interrogatories, and defend class

representative depositions.  *See* Joint Decl. ¶ 16.  Class Counsel also negotiated with Defendants

to obtain extensive transaction data and worked with their expert consultants to understand the

data and process it for empirical analysis.  *See* Joint Decl. ¶ 17.

Class Counsel retained and worked closely with their expert economist for class

certification, Dr. John Beyer (who filed extensive expert reports), and defended him at his three-

day deposition.   Class Counsel and their experts also reviewed Defendants' expert reports and

deposed Defendants' economist for two days.  *See* Joint Decl. ¶ 18.

Class certification was hotly contested and briefing was voluminous.  In addition to

Plaintiffs' moving brief and supporting exhibits, Class Counsel filed three separate response

briefs, thousands of pages of exhibits, an expert reply report, and prepared for oral argument.

These efforts laid the groundwork for the Court's detailed opinion and Order granting Plaintiffs'

motion for class certification (Dkt. No. 708, July 29, 2008), including class certification for

"systems" products, which Defendants fiercely opposed.[2]  Class Counsel then successfully

opposed Defendants' petition for Rule 23(f) review, and oversaw notice to the class.  *See* Joint

Decl. ¶ 20.

### 3.   Merits and Expert Discovery

Merits discovery commenced in the fall of 2008.  After serving document requests and

interrogatories, Class Counsel held dozens of meet-and-confer calls with defense counsel on

various objections and issues.  The parties resolved most disputes without Court intervention, but

many others required legal research and drafting of discovery motions and responses.  *See* Joint

Decl. ¶¶ 22-24.

Defendants began producing merits documents in February 2009.  Rolling productions

continued through 2009 and 2010, yielding almost 14 million pages of discovery in total.  Class

Counsel developed a protocol to efficiently review and synthesize these documents, focusing, for

example, on the records of executives with top-level responsibilities and/or suspected

involvement in the cartel.  Class Counsel also (1) assigned experienced attorneys to conduct

targeted searches for information about key witnesses, facilities, trade association meetings, price

increase announcements, and other important events; (2) supplemented these efforts by searching

for conspiracy "keyword" terms likely to appear in relevant documents, a technique that is

common today but was cutting edge at the time; and (3) retained an American lawyer fluent in

German to assist in reviewing documents produced from European custodians.

To organize the fruits of discovery, the Plaintiffs' team created chronologies and

summary memos to map out the conspiracy.  The case chronologies, for example, revealed the

---

[2] By fighting to include systems in the amended complaint and the class certification
Order, Class Counsel added considerable value to the case—including for many class members
that purchased systems products exclusively or primarily.  These class members would have
recovered little or nothing absent Class Counsel's work to advance the systems claims.

extent to which Defendants' phone records, expense reports, and competitor meetings were connected systematically to the industry's price increase decisions, announcements, and other relevant acts.  This type of detective work allowed Class Counsel to identify and connect the key evidence introduced in depositions and at trial.[3]  Joint Decl. ¶¶ 27-28.

From September 2009 through January 2011, Plaintiffs noticed and took 57 depositions, mostly of Defendants' current and former employees.  Direct Action Plaintiffs ("DAPs") noticed 3 depositions, and Defendants noticed another 39, for a total of 99 merits depositions (in 17 different states and 3 foreign countries), all of which Class Counsel prepared for and attended.  Joint Decl. ¶ 29.[4]

It goes without saying that these depositions required exhaustive preparation and planning, including the creation of detailed outlines and exhibit lists.  Moreover, many key witnesses were beyond this Court's subpoena power, meaning their video depositions were the only chance to secure admissible testimony for trial.  Accordingly, merits depositions often required the type of advance preparation (and assignment of experienced counsel) typically reserved for a trial witness.  Examples included the "trial-style" depositions of several key Bayer witnesses, including Larry Stern, as well as Dow's Stephanie Barbour, who testified directly about Dow's involvement in the cartel.  The testimony of these individuals featured prominently at trial.

---

[3] One example was cited by the Tenth Circuit in rejecting Dow's challenge to the sufficiency of the evidence as to Lyondell's involvement in the conspiracy:  "First, the plaintiffs presented evidence that Mr. Mario Portela (Lyondell) had communicated with Mr. Marco Levi (Dow) immediately before at least three lockstep price-increase announcements."  *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1266 (10th Cir. 2014).

[4] Class Counsel attended an additional 49 depositions of DAP former and current employees relating to "downstream discovery" and other issues relating to a possible price-fixing conspiracy between certain of the DAP entities.

For many other witnesses, in contrast, Class Counsel anticipated denials of any involvement in price-fixing, which created its own challenges in terms of preparing cross-examination to undercut their testimony.  One example occurred in the deposition of William Bernstein, the head of urethanes for BASF.  Plaintiffs had uncovered in discovery an internal email from Mr. Bernstein stating, "I have tried to determine what Huntsman's response [to a price increase] will be but have not connected."  By itself, the email was suspicious, but Class Counsel expected that Mr. Bernstein would deny any wrongdoing.  On the day of Mr. Bernstein's deposition, however, BASF produced Mr. Bernstein's cell phone records which showed eight phone calls to his Huntsman counterpart, Tony Hankins, shortly before and after this email and a price increase letter issued by BASF the day after Mr. Bernstein and Mr. Hankins "connected" by phone.  When confronted with these documents and phone records at his deposition, Mr. Bernstein had no explanation—a powerful image for the jury at trial.  *See* Bernstein Dep. at pp. 205-226, copy attached as Ex. C hereto.

Class Counsel managed the expert work in parallel.  Throughout merits discovery, the lawyers worked closely with Plaintiffs' expert econometrician, Dr. James McClave, and expert economist, Dr. John Solow, to assist in providing relevant data and documents.  This process culminated in several merits reports from Drs. McClave and Solow as well as fourteen total days of expert depositions—Dow's two experts for five days, Class Plaintiffs' two experts for six days, and DAP's expert for three days.

After merits discovery closed in December 2010, Class Counsel negotiated the Huntsman and BASF settlements for $33 million and $51 million, respectively.  As with the Bayer settlement, no class member objected to either settlement.  The Court approved these settlements in 2011, leaving Dow as the last remaining defendant.

Plaintiffs opposed Dow's motion for summary judgment in the fall of 2012, filing 181 pages of briefing supported by 295 exhibits (Dkt. No. 2436), as well as a 47-page response to Dow's Rule 56.1 Statement (Dkt. No. 2470). Plaintiffs also opposed Dow's *Daubert* motions, which sought to exclude Drs. Solow and McClave (Dkt. Nos. 2428, 2430). The Court denied Dow's motions in all respects after oral argument (Dkt. Nos. 2637, 2649).

### 4.    Trial Preparation

Trial preparation was a massive undertaking, which began years before the trial date. Plaintiffs' deposition strategy, for example, focused heavily on developing credible sponsoring witnesses for key facts and documents. Class Counsel also engaged in protracted negotiations with defense counsel (beginning in 2010) for a stipulation that certain documents would qualify as business records—an evidentiary agreement that later paid dividends at trial. Dkt. No. 2486.

Trial preparations began in earnest in the summer of 2012 with the negotiation of the pretrial order with Dow. The parties attended the final pretrial conference before Magistrate Judge O'Hara and the Court entered the Pretrial Order in July 2012. Dkt. No. 2374. Pursuant to the Court's deadlines, the trial team worked to distill the discovery record to identify trial exhibits, witnesses, and initial designations—a process informed by many rounds of internal discussion and analysis (and a comprehensive multi-day mock trial) to identify the most compelling evidence and arguments for the jury.

Plaintiffs eventually designated 2,137 trial exhibits and disclosed the list to Dow. Dkt. Nos. 2555, 2598. Class Counsel then reviewed the 1,737 exhibits on Dow's initial exhibit list (Dkt. No. 2556), plus 1,537 additional exhibits on its supplemental exhibits list (Dkt. No. 2599), and presented objections thereto (Dkt. Nos. 2660, 2679). Class Counsel next reviewed Dow's objections to Plaintiffs' exhibit list (Dkt. No. 2671), and engaged in lengthy negotiations to

resolve as many issues as possible without Court involvement.  The parties eventually reached a stipulation for the pre-admissibility of more than 1,200 trial exhibits (Dkt. No. 2714).

A similar process was followed for deposition designations.  The team performed a high-level review of the deposition testimony, designating testimony from 41 witnesses and all five defendant companies.[5]  After the parties exchanged initial designations, Class Counsel submitted counter-designations for Dow's 34 witnesses (Dkt. No. 2550); reviewed Dow's counter-designations and objections to Plaintiffs' initial designations (Dkt. No. 2551); and prepared responsive objections and completeness designations (Dkt. No. 2621).

As the docket reflects, the parties engaged in a flurry of pre-trial motion practice.  Plaintiffs, for their part, filed nine motions *in limine* and opposed Dow's eight motions *in limine*, addressing important issues such as ensuring that Dow's live witnesses would be made available for live testimony in plaintiffs' case-in-chief (Dkt. Nos. 2568, 2581, 2597), along with several motions to compel Dow's compliance with the pretrial order (Dkt. Nos. 2582, 2620).

At the same time, Class Counsel researched and drafted a proposed verdict form and jury instructions, exchanged proposals with Dow, and met and conferred with opposing counsel to identify areas of agreement and dispute.  For contested instructions, Plaintiffs filed a 59-page brief in support of their proposals (Dkt. No. 2689), plus similar briefing on the verdict form (Dkt. No. 2695).  The Court's ultimate instructions and verdict form adopted many of Plaintiffs' proposals, including on the key issues of conspiratorial agreement, antitrust impact, and joint and several liability.  Dkt. Nos. 2797, 2799.  The verdict form and the text of the jury instructions featured prominently in the closing arguments of both sides at trial.  Dkt. No. 2876, 2/19/2013 Trial Tr. 5198:15 to 5300:18.

---

[5] The mechanical process of cutting deposition videos to match the designations was an enormous undertaking, as a choppy presentation or a missed sentence could be damaging at trial.

In December 2012, the parties held a last-ditch settlement mediation before Magistrate Judge O'Hara.  Plaintiffs prepared a mediation statement and key decision-makers on both sides convened in the Kansas courthouse.  Dkt. Nos. 2684, 2692.  Despite best efforts, the mediation was unsuccessful and the parties left to prepare for trial.

>    **5.    The Trial**

Dow moved to decertify the class literally on the eve of trial, and attempted to support that motion with detailed and previously undisclosed expert analysis.  Dow's motion challenged, among other things, Dr. McClave's use of extrapolation to estimate damages for Class members for which data was unavailable, an issue not raised by Dow in its earlier *Daubert* motion.  The timing of the motion forced Plaintiffs to respond in the midst of trial (Dkt. No. 2752), including the submission of a responsive report from Dr. McClave.

After several weeks of round-the-clock preparation, trial began on January 23, 2013, and lasted four weeks.  Closing arguments were held on February 19, 2013, and the jury rendered its verdict on February 20, 2013.  All told, the parties introduced 450 exhibits (242 by Plaintiffs and 208 by Dow) and testimony from 39 witnesses (20 by Plaintiffs and 19 by Dow).  But the numbers only begin to tell the story of the time and effort involved.

Other tasks at this stage included, *inter alia*, jury pool research and selection; preparing opening statements, demonstratives, and Plaintiffs' order of proof; briefing and arguing outstanding evidentiary issues; daily negotiations and correspondence with Dow; finalizing and organizing trial exhibits; preparing experts and fact witnesses; finalizing cross-examination outlines; continuously reviewing, cutting, and re-cutting video deposition designations; managing trial vendors (trial technology, consultants, logistics, etc.); daily trial team strategy meetings; and of course appearing in court throughout the trial day.

The scope of the back-office operation bears emphasis.  In the weeks before trial, the trial team shifted operations from home offices into a large commercial space a few blocks from the Kansas City courthouse.  Staffed with an army of experienced lawyers, paralegals and support staff—many of whom worked seven days a week for grueling hours before and throughout the four-week trial—the trial office was the hub for all the work that enabled a polished presentation in court.  This type of 24/7 effort allowed Plaintiffs' trial counsel to present the evidence in an efficient, coherent, and compelling way and to anticipate Dow's arguments and defenses, an effort that paid off with a $400 million verdict for the Class.

Post-trial challenges followed.  Dow renewed its motion to decertify the class, challenging Dr. McClave's methodology under *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011) and *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013), and asserting the existence of "zero injury" class members that, according to Dow, defeated class certification.  Dow also moved for judgment as a matter of law and/or for a new trial, challenging the sufficiency of the evidence, jury instructions, the verdict form, and more.  On May 15, 2013, after extensive briefing, the Court denied these post-trial motions.  After further briefing on motions to amend the judgment, the Court offset prior settlement amounts and entered final judgment in the amount of $1.06 billion, which is reported to be the largest post-trial price-fixing judgment in the history of the Sherman Act.

### 6.    Appeal

After the trial, Class Counsel made the strategic decision to retain former Solicitor General Paul Clement to handle the matter on appeal.  Mr. Clement is one of the most experienced and respected appellate and Supreme Court lawyers in the country, and his work and guidance proved invaluable to the Class going forward.

Dow retained its own experienced high-stakes appellate counsel, Carter Phillips of the Sidley Austin firm, to advance an array of arguments on appeal.  After a lengthy Tenth Circuit briefing process—handled principally by Mr. Clement and his team at the Bancroft firm, with assistance from other Class Counsel—and exhaustive preparation for oral argument, the Class prevailed across-the-board.  In a thorough Court of Appeals opinion that rejected each and every one of Dow's challenges to class certification, evidentiary and *Daubert* rulings, damages calculations, sufficiency of the evidence, the jury verdict, and allocation of damages under the Seventh Amendment, the panel affirmed the judgment unanimously in all respects.

Dow moved for rehearing or rehearing *en banc*, and the Tenth Circuit requested a response.  After Class Counsel and Bancroft filed a comprehensive opposition brief addressing Dow's challenges to the panel's decision, the Court of Appeals denied Dow's motion for rehearing or rehearing *en banc*, with no Judge dissenting.

The case then took a series of unexpected twists and turns in the Supreme Court.  Dow petitioned for *certiorari* on March 9, 2015, arguing principally that urethane prices and products were too diverse to support Rule 23(b)(3) class certification; that Dr. McClave's damage model used "average" statistical estimates in a manner foreclosed by the Supreme Court's *Wal-Mart* decision; and that Dr. McClave's statistical analysis was inconsistent with *Comcast*, a case in which the Supreme Court rejected a different antitrust damage model of Dr. McClave's.  Dow's petition for *certiorari* was supported by numerous business group *amici*, including the U.S. Chamber of Commerce, which has a successful record in terms of convincing the Court to grant review in this type of high-stakes business matter.  Class Counsel, with Mr. Clement taking the lead, filed a brief in opposition to Dow's petition on May 11, 2015.

On June 8, 2015, before the Supreme Court could consider Dow's petition, the Court granted *certiorari* in a different class action, *Tyson Foods, Inc. v. Bouaphakeo*, No. 14-1146, 135 S.Ct. 2806 (2015) (granted June 8, 2015).  At the time, many Supreme Court experts and commentators believed the Court was likely to issue a ruling in *Tyson* that would move Rule 23 in a pro-defendant direction and potentially jeopardize other pending class actions, including the *Urethane* judgment.[6]  Those concerns were further heightened when the Court removed the *Urethane* case from its scheduled conference list, which was a clear sign that the case was being held in abeyance for *Tyson*.  That, of course, created additional risk and uncertainty for the Class, because if the Supreme Court had changed the law in a pro-defendant direction in *Tyson*, there was significant risk that the Tenth Circuit's *Urethane* decision would have been vacated and remanded, or even reversed outright on the merits.

Dow in turn filed an *amicus* brief in *Tyson* in the summer of 2015, characterizing the issues in *Tyson* as similar to those in *Urethane*.  Class Counsel worked throughout this period to understand the *Tyson* issues and prepare a responsive *amicus* brief, which was filed in September 2015.  More generally, the *Urethane* team worked closely with their appellate counsel throughout the post-trial years to understand and manage appellate risks.  With a billion dollars at stake, it was critical to grasp the nuances of what was happening in the Supreme Court—in *Tyson* and other pending matters—to make the best decisions possible for the Class.

After the *Tyson* oral argument, held on November 10, 2015, settlement discussions intensified with Dow.  After serious negotiations over several months—a continuation of many

---

[6] The *Wall Street Journal* weighed in with an editorial urging the Court to issue a pro-defendant ruling in *Tyson* and to grant *certiorari* and reverse in *Urethane*.  *See* "Class Action Spring Cleaning" (June 12, 2015), *available at* http://www.wsj.com/articles/class-action-spring-cleaning-1434150614.

years of settlement negotiations between Plaintiffs and Dow—the parties agreed to resolve the case for $835 million, at a time when *Tyson* could have been decided in a matter of days.

### C.    The Difficulty of the Litigation

When Class Counsel undertook to represent the Class in November 2004, the case posed considerable risk.  *See* Joint Decl. ¶ 5.  As the litigation draws to a close in 2016, it is safe to say the risks were even more serious than originally anticipated.  Most significantly, Class Counsel overcame not only the usual pre-trial obstacles but also the unique challenges of a four-week jury trial, post-trial attacks on the verdict and class certification, a Tenth Circuit appeal, and extensive briefing and proceedings in the Supreme Court.  Given the complexities, and the skill, time, and experience required to navigate the issues, this factor strongly supports the requested fee. *Allapattah*, 454 F. Supp. 2d at 1193 ("The most apparent feature distinguishing this class action from virtually every other class action in the reported federal decisions is obviously that it did not settle before trial.").

The pre-trial challenges were significant by themselves.  In particular, this was not a case that stemmed from or was assisted by criminal charges, findings, or guilty pleas, which often serve as the catalyst for a related civil class action and/or assist in its prosecution by allowing civil plaintiffs to follow in government footsteps.[7]  In fact, Plaintiffs were forced to rebut Dow's repeated assertions that the absence of criminal prosecution was tantamount to a government finding of innocence.

---

[7] *Compare In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 460-61 (D.P.R. 2011) (noting that counsel's risk was mitigated by preceding DOJ investigation and FBI raids); *In re Marsh ERISA Litig.,* 265 F.R.D. 128, 147 (S.D.N.Y. 2010) ("Risk is not uniform in all class actions" and for "certain antitrust class actions filed in the wake of a Department Justice consent decree… the risk is limited.").

- 19 -

Here, Class Counsel developed this case entirely on their own, a fact that supports a substantial fee award to account for the heightened risk of the case. *See, e.g.*, *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *5 (E.D. Pa. Jan. 3, 2008) ("The risk of nonpayment is even higher when a defendant's *prima facie* liability has not been established by the government in a criminal action" and thus "warrants approval" of class counsel's one-third fee request.); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ. A. 03-4578, 2005 WL 1213926, at *12 (E.D. Pa. May 19, 2005) ("[T]his action was riskier than many other antitrust class actions because there was no prior government investigation, or prior finding of civil or criminal liability based on antitrust violations, in this case."); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992) ("[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill.  They did all the work on their own.").

The risks continued after the litigation was underway.  For example, Defendants filed multiple motions to dismiss, insisted on a protracted class certification discovery schedule, and vigorously opposed class certification on numerous grounds.  Class Counsel nevertheless secured class certification for three different basic chemical groups and, significantly, for systems, but only after years of document discovery, expert reports and depositions, hundreds of pages of briefing, and a petition for Rule 23(f) appeal.  At the merits stage, Class Counsel overcame the challenges of international discovery, Fifth Amendment invocations by certain Bayer witnesses, aggressive motion practice by the remaining defendants, dangerous collateral issues raised by the DAPs' alleged price-fixing in downstream markets, and much more, all to develop a factual record showing that the five major manufacturers of urethane chemicals conspired to fix prices,

and that the conspiracy caused class-wide injury and damages.  Class Counsel navigated each and every one of these pre-trial challenges and eventually defeated Dow's summary judgment and *Daubert* motions on the eve of trial.

The trial, post-trial, and appellate risks, however, are what truly distinguish this case.  At the trial stage, Plaintiffs' task was to convince a lay jury that professional executives of the largest chemical companies in the world were willing to put their careers and liberty at risk to engage in *per se* unlawful price-fixing.  While a few witnesses provided direct evidence of the conspiracy, many others denied wrongdoing, forcing Class Counsel to rebut their testimony in a convincing yet understandable way with circumstantial, documentary, economic, and other types of proof—often introduced through video deposition testimony rather than live witnesses.  The elements of classwide impact and damages presented their own challenges in terms of communicating technical and econometric concepts in a jury-friendly manner.  But Class Counsel overcame these obstacles and prevailed, as the verdict confirms.

Moreover, the courtroom presentation was the product of a much larger effort.  The record in this case was massive, and the trial team understood the importance of having it organized for instant access throughout the trial day, both for affirmative presentation and to rebut Dow's positions.  Doing so required careful planning and advance work, organizational skill, mastery of technology, and close coordination between the courtroom and back-office trial teams.  The conduct of the trial and the verdict demonstrate that Class Counsel were successful in this endeavor.

Post-trial, Dow reacted as one would expect from a large, sophisticated defendant seasoned in litigation and facing a billion-dollar judgment.  It raised numerous legal and evidentiary challenges, but the attacks on class certification posed the most serious risk.  Relying

heavily on *Wal-Mart* and *Comcast*—two major class action precedents decided *after* this Court's original class certification decision—Dow argued vigorously in post-trial motions and on appeal that (1) the class action prevented them from raising individual defenses against class members (*e.g.*, each class member's individual negotiations), thereby submerging important differences and violating due process; (2) the use of averages and extrapolation of damages by Dr. McClave constituted a "trial by formula" forbidden by *Wal-Mart*; and (3) Dr. McClave's methodology could not be squared with *Comcast*. The Tenth Circuit unanimously rejected these arguments, but the outcome was far from certain in either the Tenth Circuit or the Supreme Court. Class actions are both controversial and a topic of substantial interest for the Justices, making a billion-dollar judgment the type of result likely to receive close scrutiny at the *certiorari* stage.

These risks were further heightened when the Supreme Court granted *certiorari* in the *Tyson* case, and held the *Urethane* case in abeyance pending the Court's decision in *Tyson*. Indeed, the questions presented in *Tyson* involved a strikingly familiar framing of the issues, namely, a class that (according to Tyson) was too diverse to support Rule 23(b)(3) certification and that (according to Tyson) ran afoul of *Wal-Mart* by relying on "average" statistical proof and "trial by formula." The defendant in *Tyson* was represented by the same Supreme Court counsel as Dow; was supported (as Dow was supported) by the U.S. Chamber of Commerce and other business group *amici*; and the *Tyson* defendant even cited *Urethane* directly in its *certiorari* petition as a similar case in which the lower courts supposedly "refus[ed] to follow *Wal-Mart*." No. 14-1146, Pet. at 4, copy attached as Ex. D hereto.

While Class Counsel believed the Class would prevail in the Supreme Court, the risks were serious at the time of settlement. In particular, many Supreme Court experts and observers believed that the Court was likely to issue a decision in *Tyson* that moved the law in a pro-

defendant direction.  For example, the widely read SCOTUSBlog noted in an argument preview

in the *Tyson* case that "lawyers who have groups of clients pursuing common grievances—often

against big corporations—have known for years that their cases are an endangered species in the

Supreme Court."[8]  And the *Wall Street Journal* made the point even more directly, encouraging

the Court to "clean up the mess of class-action law" by reversing in *Tyson* and "pairing it with

*Dow* [to] send an even stronger message" to class action plaintiffs.  *See* note 6, *supra*.  The risks

of this actually happening were significant.  As Professor Silver explains, "the Roberts Court has

been almost three times as active in the antitrust area as the Rehnquist Court," and has shown a

notable "hostil[ity] to broad antitrust liability."  Silver Rept. at ¶¶ 47-48 (quoting academic

reviews).[9]

Class Counsel (advised by Mr. Clement) thus reasonably believed at the time of

settlement that the outcome in *Tyson* was uncertain at best, and could have yielded a devastating

merits decision that would have effectively foreclosed class certification in *Urethane*.  Moreover,

no matter the outcome in *Tyson*, several major litigation risks remained, including the risk of:

(1) a post-*Tyson* grant-vacate-remand ("GVR") order from the Supreme Court that would have

---

[8] Lyle Denniston, "Argument Preview: New woe for class-action lawsuits?"
SCOTUSBlog (Nov. 7, 2015), *available at* http://www.scotusblog.com/2015/11/argument-preview-new-woe-for-class-action-lawsuits/.

[9] *See, e.g.*, Allyson N. Ho, *Getting Down to Business:  Early Observations on the Roberts Court's Business Cases*, 9 ENGAGE: JOURNAL OF THE FEDERALIST SOCIETY PRACTICE GROUPS 92, 94 (2008) ("[t]he Roberts Court has decided a remarkable number of antitrust cases" and has "rejected the claims of antitrust plaintiffs by a combined 46-5 vote."  There exists "a broad consensus in the middle of the Court [that is] generally hostile to broad antitrust liability"); Mark S. Popofsky and Douglas H. Hallward-Driemeier, *Antitrust and the Roberts Court*, 28-SUM ANTITRUST 26 (2014) (noting Court's appetite for antitrust cases and that "the Roberts Court has consistently raised the threshold for plaintiffs seeking to pursue class actions"); Brendan S. Maher, *The Affordable Care Act, Remedy, and Litigation Reform*, 63 American Univ. L. Rev. 649, 651 (2014) ("Since John G. Roberts, Jr. became Chief Justice in 2005, the Court has issued landmark decisions regarding pleading, arbitration, and class actions that have significantly curtailed plaintiffs' abilities to bring and win lawsuits.").

required additional Tenth Circuit proceedings in *Urethane*; (2) a continued *Urethane* hold pending other class action cases in the Supreme Court pipeline; or (3) a *certiorari* grant in *Urethane* that could have led to outright reversal of the judgment in this case.

These substantial trial and post-trial risks—at a time of great uncertainty about the direction of Supreme Court precedent in Rule 23 class actions—support the requested fee award. The ultimate recovery for the Class is all the more extraordinary in light of the countless risks and pitfalls that Class Counsel had to manage and overcome in order to achieve that result.

**D.     The Skill and Experience of Class Counsel**

This case required lawyering at the highest level.  The Defendants were large, sophisticated corporations represented by skilled, nationally-respected trial and appellate attorneys with extraordinary resources at their disposal.  Joint Decl. ¶ 54.  Indeed, Dow was the largest and most aggressive of all.[10]  After the other defendants settled, Dow fought every issue tooth and nail throughout the pre- and post-trial stages described above.  Overcoming these challenges required skill and diligence by Class Counsel at every step.[11]

---

[10] As Anthony Carbone, Dow's former Vice Chairman of the Board, testified at trial: "When I joined Dow in 1962 our sales were less than a billion dollars, we were the 14th or 15th largest chemical company in the U.S., and maybe the 25th in the world.  *And when I retired in 2005, we were the largest chemical and plastics company in the world*." Carbone Trial Testimony at pp. 1463-64, copy attached as Ex. E hereto (emphasis added).

[11] *See Brown*, 838 F.2d at 455 ("quality of opposing counsel" supports fee application); *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05cv00187, 2007 WL 119157, at *2 (M.D.N.C. Jan. 10, 2007) ("Additional skill is required when the opponent is a sophisticated corporation with sophisticated counsel."); *Schwartz v. TXU Corp.*, No. 3:02-cv-2243-K, 2005 WL 3148350, at *29-30 (N.D. Tex. Nov. 8, 2005) ("The standing of opposing counsel should be weighed in determining the fee, because such standing reflects the challenge faced by plaintiffs' attorneys. The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation.") (internal citation omitted).

By qualifications and experience, the *Urethane* team was impressive.  Co-Lead Counsel Fine Kaplan and Cohen Milstein are among the most experienced class-action litigators in the country.[12]  These two firms built the case from the ground up; managed all discovery and class certification efforts; directed every aspect of day-to-day and strategic case management; and took primary drafting responsibility for all major briefs before this Court, including briefing on motions to dismiss, class certification, summary judgment, *Daubert* and the post-trial motions.

Co-Lead Counsel also assembled an exceptional trial team of respected antitrust trial counsel from the Freedman Boyd and Kellogg Huber law firms, both of which are nationally recognized for their high-stakes trial practices.[13]  The appellate work was led by former Solicitor General Paul Clement and his colleagues at the Bancroft firm, whose peerless skill and advocacy preserved the judgment on appeal.  *See* Ex. I (Bancroft PLLC firm resume).  In short, Class Counsel's qualifications, experience, and quality of work throughout the case support the requested fee award.

Most fundamentally, however, the bottom line result—an $835 million recovery from Dow and $975 million in total settlements—speaks for itself and provides the best metric for evaluating Class Counsel's skill and advocacy on behalf of the Class.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,* 991 F. Supp. 2d 431, 441 (E.D.N.Y. 2014) ("[T]he quality of representation . . . may be measured in large part by the results that counsel achieved for the classes."); *In re Copley Pharm., Inc., "Albuterol" Prod. Liability Litig.*, 1 F. Supp. 2d 1407, 1414 (D. Wyo. 1998) ("While it is beyond dispute that class counsel are among

---

[12] *See* Ex. F (Fine Kaplan and Black, R.P.C. firm resume) and Ex. G (Cohen Milstein Sellers & Toll, PLLC firm resume).

[13] *See* Ex. H (firm resumes of Freedman Boyd Hollander Goldberg Urias & Ward, P.A., and Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC).

the nation's most experienced, reputable, and skilled plaintiff's attorneys, class counsel's skill is further demonstrated by the result achieved.").

### E.     Preclusion of Other Employment

Class Counsel handled this matter for more than eleven years, far longer than the vast majority of class actions.  *See* Joint Decl. ¶¶ 4-51; Silver Rept. ¶¶ 62-63.  Owing to the substantial demands and long duration of the case, they also have forgone other litigation opportunities.  *See* Joint Decl. ¶ 56.  Co-Lead Counsel Fine, Kaplan and Black, for example, is a small firm with ten attorneys and three paralegals.  For substantial periods during the past decade, more than half the firm's attorneys and all of the firm's paralegals spent the majority of their time on the *Urethane* matter, leaving little room for other opportunities (and further highlighting the risks borne by the firm).  This factor likewise supports the requested fee award.  *See Brown*, 838 F.2d at 455 (granting fee application and emphasizing that substantial work on the litigation "precluded or reduced their opportunity for other employment"); *Allapattah*, 454 F. Supp. 2d at 1209 ("Taking on this resource-sapping, risk-based venture also precluded Class Counsel from accepting other contingent matters during the period of representation."); Silver Rept. ¶¶ 58-63.

### F.     The Customary Contingent Fee

To compensate counsel for the risks and delay inherent in contingent antitrust class actions, and to ensure vigorous enforcement of the antitrust laws, attorney's fees should reflect, at a minimum, what is typically agreed to by clients and attorneys.  "[A] district court should consider the rate [a] reasonable, paying client would pay, and use that rate to calculate the presumptively reasonable fee."  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany and Albany Cty. Bd. of Elections,* 522 F.3d 182, 193 (2d Cir. 2007).  *See also In re*

*Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."); Silver Rept. ¶¶ 20-36.

A one-third fee from the Dow settlement fund is consistent with what is typically agreed to by clients and attorneys. As one study concluded: "Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases." Eisenberg & Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,* 1 J. Empirical Legal Stud. 27 (2004), at 35. "In non-class contingency fee litigation, a 30% to 40% contingency fee is typical." *Montague v. Dixie Nat. Life Ins. Co.*, CIV.A. 3:09-00687, 2011 WL 3626541, at *2 & *3 (D.S.C. Aug. 17, 2011). "Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation." *In re Remeron Direct Purchaser Antitrust Litig*., No. Civ. 03-0085, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005). *See also In re Ready-Mixed Concrete Antitrust Litig.,* 1:05-CV-00979, 2010 WL 3282591, at *3 (S.D. Ind. Aug. 17, 2010) ("[T]he market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time is a contingent fee in the amount of one-third (1/3) of the common fund recovered.") (internal quotations, citation omitted); *Flournoy v. Honeywell Int'l, Inc.*, No. Civ. A. 205-184, 2007 WL 1087279, at *2 (S.D. Ga. Apr. 6, 2007) ("The most common contingent fee is one third of the recovery. Forty percent fee contracts are common for complex and difficult litigation. . . ."); Silver Rept. ¶ 2 and *passim.*

The reason one-third fees are relatively standard, of course, is risk. Contingent fee litigation is risky in general and particularly so in matters like this one, which is why courts in the Tenth Circuit and elsewhere view the uncertainty of contingent litigation—and the risk of non-payment—as supporting the requested fee award. *See In re Universal Service Fund Tel.*

*Billing Practices Litig.*, No. 02-MD-1468-JWL, 2011 WL 1808038, at *2 (D. Kan. May 12, 2011) (awarding one third of the judgment fund where "any fee recovery by counsel was contingent on success in the litigation"); *Stanley v. U.S. Steel Co.,* 04-74654, 2009 WL 4646647, at *3 (E.D. Mich. Dec. 8, 2009) ("A contingency fee arrangement often justifies an increase in the award of attorneys' fees[.]") (internal quotations, citation omitted); *Lucas v. Kmart Corp*., No. 99-cv-01923, 2006 WL 2729260, at *6 (D. Colo. July 27, 2006) ("Given the risk of non-recovery, this factor weighs heavily in favor of the requested fee.") (citation omitted).[14]

Class Counsel accepted this case on a completely contingent basis. If the case had failed, they would have gotten nothing. At each stage, moreover, Class Counsel's investment of time and expense has been at risk, with recovery dependent on success. Since July 1, 2011, for example, Class Counsel have invested substantial time and money on behalf of the Class—including the extraordinary efforts devoted to trial and appeal—an investment that would have been lost had Dow prevailed. *See* Joint Decl. ¶¶ 36-51. Given the considerable risk, with no guarantee of recovery, the legal team should be compensated for their efforts in securing excellent results for the Class.

Antitrust policy favors this result. The Supreme Court has emphasized repeatedly that "the private cause of action plays a central role in enforcing this [antitrust] regime." *Mitsubishi*

---

[14] *See also Knight v. Red Door Salons, Inc.,* No. 08-01520, 2009 WL 248367, at *6 (N.D. Cal. Feb. 2, 2009) ("This substantial outlay [of time and expenses], when there was a risk that none of it would be recovered, further supports the award of the requested fees."); *Perez v. Asurion Corp*., No. 06-20734-Civ, 2007 WL 2591180, at *4 (S.D. Fla. Aug. 8, 2007) ("Class Counsel prosecuted this class action on a purely contingent basis, thereby assuming the risk of non-payment for a considerable amount of work over an extended period of time. Thus, the contingency risk in this case was substantial."); *Allapattah,* 454 F. Supp. 2d at 1215 (finding this factor weighs "heavily in favor of" granting the requested fee); *Behrens v. Wometco Enters., Inc*., 118 F.R.D. 534, 548 (S.D. Fla. 1988) (recognizing that if a "'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing").

*Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 635 (1985); *Pillsbury Co. v. Conboy,* 459 U.S. 248, 262-63 (1983) (same).  It is thus important to incentivize skilled class counsel by rewarding them for success, and for upholding the core goals of the Sherman Act, in this type of complex contingent case—particularly where, as here, the conduct at issue went uncharged by the government.  *See generally Southeastern Milk Antitrust Litig.,* 2013 WL 2155387, at *5 ("[F]ailing to fully compensate class counsel for the excellent work done and the various substantial risks taken would undermine society's interest in the private litigation of antitrust cases.  Society's interests are clearly furthered by the private prosecution of civil cases which further important public policy goals, such as vigorous competition by marketplace competitors.  Simply put, anti-competitive conduct such as that alleged in this case would likely go unchallenged absent the willingness of attorneys to undertake the risks associated with such expensive and complex litigation.") (internal citations omitted).

### G.    Awards in Similar Cases

As the preceding history of the case makes clear, this was one-of-a-kind litigation in light of the work done, risks surmounted, duration, and results for the Class—making any comparison to fee awards in "similar" matters a difficult challenge.  Nevertheless, one-third of the Settlement Fund is typical, reasonable, and justified by extensive Rule 23 authority.  This Court awarded one-third attorneys' fees from the prior *Urethane* settlements based on risks, obstacles, and results achieved, and a one-third fee is equally appropriate at this final stage of the case, particularly given the enormous costs and risks at trial and throughout the appellate process, and the outstanding results secured for the Class.

The law is well-established that a one-third fee is reasonable in this type of litigation. *See, e.g., In re Flonase Antitrust Litig.,* 951 F. Supp. 2d 739, 748-52 (E.D. Pa. 2013) ("in the last

two-and-a-half years, courts in eight direct purchaser antitrust actions approved one-third fees").

Moreover, this Court and many others have approved one-third fee awards in a wide range of

class action matters.  *See, e.g.*, *Universal Service Fund*, 2011 WL 1808038, at *2 ("an award of

one-third of the fund falls within the range of awards deemed reasonable by courts") (citation

omitted);  *Shaw*, 2015 WL 1867861, at *6 ("The customary fee awarded to class counsel in a

common fund settlement is approximately one third of the total economic benefit bestowed on

the class.") (citation omitted).[15]

A one-third fee is reasonable in certain so-called "megafund" cases as well, which are

well-known to be among the most complex and risky matters to handle on contingency.  Where,

as here, class counsel achieved superior results in the face of exceptional risks, courts have not

hesitated to award fees of 30% or more from nine-figure recoveries and, indeed, many courts

---

[15] *See also Williams v. Sprint/United Mgmt. Co.*, No. 03-2200-JWL, 2007 WL 2694029, at *6 (D. Kan. Sept. 11, 2007) (awarding 35% of $57 million common fund) (Lungstrum, J.); *Lewis v. Wal-Mart Stores, Inc.*, No. 02-CV-0944, 2006 WL 3505851, at *1 (N.D. Okla. Dec. 4, 2006) (awarding one-third of the settlement fund and noting that a "one-third [fee] is relatively standard in lawsuits that settle before trial"); *In re United Telecommc'ns Sec. Litig.*, No. 90-2251-0, 1994 WL 326007, at *3 (D. Kan. June 1, 1994) (awarding 33.3% of settlement fund); *Cimarron Pipeline Const., Inc. v. Nat'l Council on Comp. Ins.*, No. 89-822, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993) ("Fees in the range of 30-40% of any amount recovered are common in complex and other cases taken on a contingent fee basis."); *New England Health Care Employees Pension Fund v. Fruit of the Loom, Inc.*, 234 F.R.D. 627, 635 (W.D. Ky. 2006) ("[A] one-third fee from a common fund case has been found to be typical by several courts.") (citations omitted); *Remeron*, 2005 WL 3008808, at *15 ("A one third fee from a common fund has been found to be typical by several courts within this Circuit which have undertaken surveys of awards within the Third Circuit and others.") (citation omitted); *In re Ravisent Tech., Inc. Sec. Litig.*, No. Civ. A. 00-cv-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005) ("[C]ourts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses."); *In re AmerisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 134 (D.N.J. 2002) ("Scores of cases exist where fees were awarded in the one-third to one-half of the settlement fund.") (citations omitted); *Klein v. PDG Remediation, Inc.*, No. 95 Civ. 4954, 1999 WL 38179, at *4 (S.D.N.Y. Jan. 28, 1999) ("33% of the settlement fund . . . is within the range of reasonable attorney fees awarded in the Second Circuit"); *Moore v. United States*, 63 Fed. Cl. 781, 787 (2005) ("one-third is a typical recovery").

have rejected arguments that percentage fees should be reduced in a large-recovery case because doing so would be "antithetical to the percentage of the recovery method . . . the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained."   *Allapattah*, 454 F. Supp. 2d at 1213 (awarding 31.33% fee from $1.06 billion settlement); Silver Rept. ¶¶ 66-74 (collecting cases).[16]

This authority strongly supports the requested fee.  In fact, few if any of these cases involved the unique combination of risks, obstacles, and ultimate result presented here.  Few of these cases lasted more than eleven years.  Few involved a lengthy trial or three years of appeals

---

[16] *See also In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 302-03 (3d Cir. 2005) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund"); *In re TFT-LCD [Direct Purchaser] Antitrust Litig.*, No. 07-md-01827, 2011 WL 7575003, at *1 (N.D. Cal. Dec. 27, 2011) (30% fee from $405 million fund in case that settled before trial and was assisted by numerous guilty pleas); *In re TFT-LCD [Indirect Purchaser] Antitrust Litig.*, 2013 WL 1365900, at *8 & n.11 (N.D. Cal. Apr. 3, 2013) (30% fee to all counsel including state attorneys from $1.08 billion fund in case that settled before trial and was assisted by numerous guilty pleas); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (30% fee from $410 million fund in case that settled before class certification, with court explaining that "courts nationwide have repeatedly awarded fees of 30 percent or higher in so-called 'megafund' settlements"); *Dahl v. Bain Capital Partners, LLC*, No. 1:07-cv-12388-WGY, Dkt. Nos. 1051 and 1095 (D. Mass. Feb. 2, 2015) (33% fee from $590.5 million fund in antitrust case that settled before class certification) (unreported decisions are collected at Ex. J hereto); *In re Vitamins Antitrust Litig.*, No. Misc. 99-197(TFH), 2001 WL 34312839, at *10, *14 (D.D.C. July 16, 2001) (34% fee from $359 million fund in cartel case that settled before trial and was assisted by criminal prosecutions and guilty pleas); *In re Initial Pub. Off. Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (one-third fee from $510 million fund in case that settled before trial); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, Dkt. No. 543 at p. 10 (D. Del. 2009) (one-third fee from $250 million fund in case that settled before verdict), Ex. J hereto; *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-1894 (AWT), Dkt. No. 521 (D. Conn. 2014) (one-third fee from $297 million fund in case that settled before summary judgment), Ex. J hereto;  *Standard Iron Works v. ArcelorMittal,et al.*, No. 08-C-5214, Dkt. No. 539 at p. 2 (N.D. Ill. 2014) (33% fee from $163.9 million fund in case that settled before class certification), Ex. J hereto; *In re Titanium Dioxide Antitrust Litig.,* 10–CV–00318(RDB), 2013 WL 6577029, *1 (D. Md. Dec. 13, 2013) (one-third fee from $163.5 million fund in case that settled before trial); *Southeastern Milk,* 2013 WL 2155387, *8 (one-third fee from $158.6 million fund in case that settled before trial); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 1:09-cv-07666, Dkt. Nos. 693, 697, 697-1 and 701 (N.D. Ill. 2014) (one-third fee from $128 million fund in case that settled before class certification), Ex. J hereto.

reaching the Supreme Court.  Few were pursued without the benefit of government prosecutions or guilty pleas.  And only a small handful produced a comparable recovery for the Class.

### H.    Lodestar Cross-Check

Courts sometimes use a lodestar "cross-check" analysis to confirm the reasonableness of a requested common fund fee award.  MANUAL FOR COMPLEX LITIGATION, Fourth §21.724; *Newberg on Class Actions* § 15:85 (5th ed. 2015).  The cross-check involves calculating class counsel's total lodestar and applying a case-specific "multiplier" to account for risk, outcome, quality of work, and other case-specific factors.  *Id.   See also Rite Aid*, 396 F.3d at 305-06 (explaining cross-check method and emphasizing that it requires "neither mathematical precision nor bean-counting").

Typical multipliers range from 1-4 depending on the facts, with many courts awarding multipliers larger than four on case-specific grounds.  *See, e.g., Vizcaino*, 290 F.3d at 1050-51 & n.6 (awarding 3.65 multiplier from $96.9 million settlement fund, and noting standard 1-4 multiplier range); *Newberg on Class Actions* § 14.6 (4th ed. 2009) ("multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied"); *In re Enron Corp.*, 586 F. Supp. 2d 732, 799-803 (S.D. Tex. 2008) (approving 5.2 multiplier and $688 million fee award, and collecting similar cases); Silver Rept. ¶¶ 75-76.

At this stage of the *Urethane* case, the Court is in a position to evaluate the full body of Class Counsel's work by comparing the lodestar for the entire litigation to the total fees requested for all settlements combined.[17]  To perform the lodestar cross-check on this basis, the

---

[17] The Court previously suggested this methodology.  In particular, the Court and Class Counsel discussed how future fee petitions would be considered in connection with the initial Bayer settlement.  After counsel explained that we would present "cumulative time" and "cumulative fee" information for the Court's consideration in connection with any future (post-Bayer settlement) fee awards, the Court emphasized that future multipliers would be tied to the

following pieces of information are necessary: (1) the total lodestar from the beginning of the case to the end; and (2) the total requested fee (*i.e.*, the requested fee from the Dow settlement plus the fees awarded previously from prior settlements).

1.      Since the case began in 2004, Class Counsel have devoted more than 193,000 hours to representing the Class.  *See* Joint Decl. ¶ 53.[18]  Based on current hourly rates—which is the appropriate metric in a protracted case such as this one[19]—the total lodestar from inception to March 31, 2016 is $100.8 million.[20]

2.      The requested fee from the Dow settlement fund is $278.33 million, plus $47.46 million in fees awarded from prior settlements, for an overall total of $325.79 million.

---

overall success of the case.  *See* Ex. K, 7/20/2009 Hearing Tr. at pp. 31-32 (The Court:  "the proof in a way will be in the pudding with regard to the ultimate result in the other cases.  That's another way to check.  If the ultimate settlements, assuming there were settlements with the other defendants, were disappointing, that perhaps is an appropriate place to say, multiplier, what's that? in looking at what the fee is at that end.").

[18] Class Counsel are prepared to submit more detailed records accounting for the time and efforts devoted to this litigation.  Given that the litigation is not over until the settlement is finally approved by the Court, Class Plaintiffs request that any such submission be made *in camera*, subject to an appropriate confidentiality order, to avoid providing Dow insight into Plaintiffs' litigation strategy.  Accordingly, today Class Plaintiffs also filed their Motion To Permit *In Camera* Submission Of Fee And Expense Declarations.  *See* Joint Decl. ¶ 60.

[19] Use of current billing rates is appropriate to account for the delay of payment when a case is protracted (as distinct from the risk of loss, quality of work, and results obtained, which are compensated by the "multiplier").  *See Smith v. Vill. of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994).  "To compensate for delay in receiving fees, counsel have properly used their current billing rates."  *Enron*, 586 F. Supp. 2d at 779.  *See also Vizcaino*, 290 F.3d at 1050-51 (awarding 3.65 multiplier based on current rates); *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. 08-397 DMC, 2013 WL 5505744, at *33 n.28 (D.N.J. Oct. 1, 2013), *appeal dismissed* (Apr. 17, 2014); *In re Rent–Way Sec. Litig.*, 305 F. Supp. 2d 491, 517, n. 10 (W.D. Pa. 2003); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 195 (E.D. Pa. 2000).

[20] The $100.8 million lodestar figure consists of $59.63 million for the period from the start of the case through the BASF and Huntsman settlements (July 1, 2011) and $41.17 million for the period from July 1, 2011 to March 31, 2016.

Using the total case lodestar as a cross-check, the fee requested from the Dow settlement yields an aggregate multiplier of 3.2 at current hourly rates (calculated by dividing $325.79 million in total requested fees by the $100.8 million lodestar figure). This method provides an accurate picture of the fee request in the context of the work performed and success achieved over the life of the case.[21]

The requested multiplier is fair and reasonable under the circumstances. A multiplier of 3.2 at current rates and 4.2 at historical rates is appropriate for all the case-specific reasons explained at length above, including the work done, risks surmounted, quality of Class Counsel's representation, and results secured over more than a decade of exceptionally complex litigation. *See Newberg on Class Actions* §15:87 (5th ed. 2015) (substantial multiplier is appropriate where case was risky, time-consuming, involved wrongdoing uncovered by counsel in first instance, and delivered exceptional results). Class Counsel respectfully submit that if any case belongs at the high end of the typical multiplier range, it is this one. And ample authority supports that result.[22]

\* \* \* \*

---

[21] The total lodestar based on hourly rates in place at the time the work was performed—known as "historical" hourly rates—is $77.53 million (Joint Decl. ¶ 53), yielding a 4.2 multiplier when calculated from that baseline.

[22] *See Newberg, supra*; *Enron,* 586 F. Supp. 2d at 799-803 (5.2 multiplier and $688 million fee award justified by "the unmatched size of the recovery, the obstacles and risks . . . and the skill and commitment exhibited by counsel") (collecting similar cases); *Payment Card Interchange Fee*, 991 F. Supp. 2d at 448 ($544.8 million fee and 3.41 multiplier, which is "comparable to multipliers in other large, complex cases"); *In re Credit Default Swaps Antitrust Litig.*. No. 1:13-md-02476-DLC, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) ($253.8 million fee and multiplier "just over 6" in case that settled *before* class certification); *Tricor*, Dkt. No. 543 (one-third fee and 3.93 multiplier from $250 million fund), Ex. J hereto; *Flonase*, 951 F. Supp. 2d at 750-51 (one-third fee and 2.99 multiplier from $150 million fund, explaining that 1-4 is the standard multiplier range).

For all of the reasons explained above, the requested fee—one-third of the recovery from Dow—is well within the range of awards in similar cases, is the same percentage fee previously awarded in this case, is supported by the *Johnson* factors, and is fair and reasonable compensation for Class Counsel's outstanding work on behalf of the Class.[23]

## III.   THE COURT SHOULD AWARD REIMBURSEMENT OF CLASS COUNSEL'S LITIGATION EXPENSES

Class Counsel respectfully request that the Court also award reimbursement of reasonable costs and expenses incurred since July 1, 2011.  It is well settled under the common fund doctrine that a lawyer "whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation…."  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 820 n.39 (3d Cir. 1995) (citation omitted).   The Settlement Agreement with Dow likewise expressly authorizes payment to counsel of "all expenses" from the Settlement Fund.[24]

Since July 1, 2011, Class Counsel have incurred reasonable costs and expenses totaling $1,545,872.58.  *See* Joint Decl. ¶ 57.  These unreimbursed expenses include items typically billed to fee-paying clients, such as expert costs, jury consultant and mock trial costs, document

---

[23] As was done in connection with prior settlements in this case, Co-Lead Counsel request that the Court authorize them to distribute the fees in a manner that, in the opinion of Co-Lead Counsel, fairly compensates each firm in view of its contribution to the prosecution of Plaintiffs' claims.  *See* Dkt. Nos. 995 ¶ 4 and 2210 ¶ 5.  *See also Universal Service Fund*, 2011 WL 1808038, at *3 ("Co-Lead Counsel for plaintiffs shall determine the uses and distribution of the fee award in their good faith best judgment.").  Here, Co-Lead Counsel have directed this case from its inception and are best able to assess the weight and merit of each Plaintiffs' counsel's contribution.  *See* Joint Decl. ¶ 55.  "Courts generally approve joint fee applications which request a single aggregate fee award with allocations to specific firms to be determined by Co-Lead Counsel, who are most familiar with the work done by each firm and each firm's overall contribution to the litigation."  *Auto. Refinishing Paint,* 2008 WL 63269, at *7.

[24] *See* Dow Settlement Agreement ¶ 33 (Ex. L hereto); Notice of Dow Settlement at Question 12 (Ex. M hereto).

repository rent, document management, travel, photocopying, overnight mail, deposition services and transcripts, long-distance telephone, and electronic research, among others. *Id.* ¶ 59. All of these reasonable costs and expenses were directly related and necessary to Class Counsel's efforts to litigate this matter and to achieve the best possible result for the Class.[25]

Class Counsel have advanced the funds necessary to pay these costs and maintained careful records to document them. A summary is set forth in the Joint Declaration.[26] *See* Joint Decl. ¶¶ 57-59. Other courts have found such evidence provides an adequate basis to award reimbursement of costs, *see Flournoy*, 2007 WL 1087279, at *3, as did this Court when it awarded reimbursement of expenses in response to earlier requests in this litigation. *See* Dkt. Nos. 995 ¶ 3; 2210 ¶ 4.

Accordingly, the Court should award reimbursement of Class Counsel's reasonable expenses of $1,545,872.58 incurred since July 1, 2011.

## IV. INCENTIVE PAYMENTS

"At the conclusion of a class action, the class representatives are eligible for a special payment in recognition of their service to the class." *Newberg on Class Actions* § 17:1 (5th ed. 2015). In the Tenth Circuit, "[i]ncentive awards to class representatives are justified when necessary to induce individuals to become named representatives, but there is no need for such

---

[25] *See Brown v. Pro Football, Inc.*, 839 F. Supp. 905, 916 (D.D.C. 1993) ("Plaintiffs' out-of-pocket costs for telephone, telecopier, air and local couriers, postage, photocopying, Westlaw research, secretarial overtime, and counsels' travel expenses are routinely billed to fee-paying clients, and thus are all compensable as part of a reasonable attorney's fee") (citations omitted); *see also Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 344 (W.D. Pa. 1997) (awarding costs for "copying expenses, travel and lodging expenses, telephone and telecopy expenses and other litigation expenses").

[26] Subject to an appropriate Order, and if requested by the Court, Class Counsel will submit for *in camera* inspection more detailed records accounting for the requested expenses. *See* Joint Decl. ¶ 60; Motion To Permit *In Camera* Submission Of Fee And Expense Declarations (filed concurrently with this Memorandum).

an award if at least one class member would have stepped forward without the lure of an incentive award.  Moreover, a class representative may be entitled to an award for personal risk incurred or additional effort and expertise provided for the benefit of the class."  *UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Min. Corp.*, 352 F. App'x 232, 235 (10th Cir. 2009) (internal quotation, citation omitted).  In applying this standard, district courts in this Circuit have considered the following factors: "1) the actions that the class representative took to protect the interests of the class; (2) the degree to which the class has benefitted from those actions; and (3) the amount of time and effort the class representative expended in pursuing the litigation."  *Shaw*, 2015 WL 1867861, at *8.

The *Urethane* Class Representatives should be compensated appropriately for their work on behalf of the Class, which was instrumental in achieving this historic recovery.  The three named plaintiffs—Seegott, Quabaug, and Industrial Polymers—stepped forward in the first instance to bring large, fiercely-disputed claims against the most powerful urethane manufacturers in the world, after which they devoted more than a decade of attention to the case. Seegott, for example, shouldered significant discovery obligations, and served as an active and engaged class representative throughout the case, including full-day court appearances for much of the trial.  The discovery burdens were serious, requiring Seegott to preserve and collect a mountain of documents and data from archives and warehouse locations, and to disclose highly sensitive financial information to a group of hostile defendants.  Seegott eventually produced over three hundred thousand pages of documents, and further assisted the Class by (1) consulting on factual and strategy issues throughout the litigation, including at the pre-complaint investigation stage, (2) providing declarations in support of motions and briefs, (3) working with Plaintiffs' experts on technical and industry issues, (4) submitting to multiple depositions, (5)

attending pre-trial witness preparation and trial team strategy sessions, (6) testifying at trial, and (7) representing the class throughout the settlement process.  *See* Declaration of Paul Seegott on Behalf of Seegott Holdings, Inc. ("Seegott Decl."), attached as Ex. N hereto.  In total, Seegott devoted approximately 570 hours to the case.  *Id.* ¶ 9.

Quabaug and Industrial Polymers also devoted substantial time to the case, including the work involved with preserving and producing tens of thousands of pages of documents and data; providing information to Plaintiffs' experts; submitting to depositions; and reviewing settlement materials.  *See* Declaration of Eric Rosen on Behalf of Quabaug Vibram Innovation LLC ("Rosen Decl."), attached as Ex. O hereto; Declaration of Carl Boddie on Behalf of Industrial Polymers, Inc., attached as Ex. P hereto.  Importantly, moreover, Quabaug and Industrial Polymers were operational businesses throughout the case, putting them at significant risk of retaliation from their suppliers.  Rosen Decl. ¶ 5; Boddie Decl. ¶ 4.  Incentive awards "are particularly appropriate" in this situation, where "there was no preceding governmental action alleging a conspiracy and taking a high-profile role threatened to jeopardize class representatives' relationships with their suppliers."  *Linerboard*, 2004 WL 1221350, at *18.  *See also Auto. Refinishing Paint*, 2008 WL 63269, at *7 (finding that incentive awards were appropriate where "[t]he Class Representatives not only conferred benefits on all of the Class members, but also risked jeopardizing their existing relationships with their suppliers of automotive refinishing paint products").[27]

Most importantly, the Class Representatives' decade-long commitment to the case resulted in extraordinary benefits for the Class.  Without named plaintiffs willing to step forward

---

[27] Indeed, another proposed class representative, the Elliott Company, withdrew as a class representative out of concern that its business relationship with defendants would be adversely affected.  Dkt. No. 665.

and undertake the responsibilities summarized above, the $975 million class-wide recovery would not exist, and these results fully support the requested incentive awards.  *See, e.g., In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *17-18 (N.D. Cal. Sept. 2, 2015) (awarding $100,000 to $140,000 to each of five class representatives following final approval of settlements amounting to $415 million); *Marchbanks Truck Serv. v. Comdata Network, Inc.*, Case No. 07–CV–1078, Dkt. No. 713 at 2, 8 (E.D. Pa. July 14, 2014) (approving $130 million settlement of antitrust class action, including service award of $150,000 to one class representative and service awards of $75,000 to each of two other class representatives), Ex. J hereto; *In re Neurontin Antitrust Litig.*, Civ. A. No. 02-1830, Dkt. No. 114 at ¶ 31 (D.N.J. Aug. 6, 2014) (approving $190 million settlement and granting incentive awards of $100,000 to each class representative), Ex. J. hereto; *Titanium Dioxide*, 2013 WL 6577029, at *1 (awarding $125,000 to lead class representative out of $163.5 million settlement); *Ivax Corp. v. Aztec Peroxides, LLC*, Case No. 1:02CV00593, Dkt. No. 78 at 2 (D.D.C. Aug. 24, 2005) (awarding service awards of $100,000 to each class representative in an antitrust price-fixing class action, to be paid out of the $21 million in settlement funds), Ex. J. hereto.

Indeed, the total requested incentive award of $500,000 represents just 0.05% of all settlement funds, a small percentage when compared to similar matters.  *See, e.g., In re Urethane [Polyester Polyol] Antitrust Litig.*, No. 04-md-1616-JWL, 2008 WL 696244, at *1 (D. Kan. Mar. 13, 2008) (approving $30,000 in incentive awards, which represented 0.091% of the $33 million in settlement funds); *Titanium Dioxide*, 2013 WL 6577029, at *1 (awarding $175,000 to class representatives, which represented 0.11% of the $163.5 million in settlement funds); *In re High-Tech Employee*, 2015 WL 5158730, at *17-18 (awarding $540,000 to class representatives, which represented 0.13% of the $415 million in settlement funds); *Auto. Refinishing Paint*, 2008

WL 63269, at *7 (awarding $120,000 to class representatives, which represented 0.11% of the $105.75 million total settlement fund).  *See also* Eisenberg, Theodore and Miller, Geoffrey P., "Incentive Awards to Class Action Plaintiffs: An Empirical Study," 53 UCLA Law Review 1303, at 1338-39 (2006) (analyzing incentive awards in cases from 1993-2002 and concluding that "[w]hen given, incentive awards constituted, on average, 0.16 percent of the class recovery").

In sum, the incentive awards are fair and reasonable in light of what the Class Representatives did and achieved on the Class's behalf.

## V.    CONCLUSION

For the foregoing reasons, Class Counsel respectfully request that the Court grant their petition, award the requested attorneys' fees and expenses, award the requested incentive payments to the named plaintiffs, and authorize Co-Lead Counsel to distribute the attorneys' fees in a manner that, in their opinion, fairly compensates each firm in view of its contribution to the prosecution of Class Plaintiffs' claims.

Dated:  June 1, 2016                    Respectfully submitted,


   _/s/  Robert W. Coykendall_
Robert W. Coykendall, #10137
Roger N. Walter, #08620
Morris, Laing, Evans, Brock & Kennedy, Chartered
Old Town Square
300 North Mead - Suite 200
Wichita, KS  67202
Tel:  (316) 262-2671
Fax: (316) 262-5991

**Class Plaintiffs' Liaison Counsel**

Donald L. Perelman
Roberta D. Liebenberg
Gerard A. Dever
Paul Costa
Matthew Duncan
**Fine, Kaplan and Black, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
Tel:  (215) 567-6565

**Class Plaintiffs' Co-Lead Counsel**

Richard A. Koffman
Kit A. Pierson
Christopher J. Cormier
Sharon K. Robertson
Laura M. Alexander
**Cohen, Milstein, Sellers & Toll PLLC**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Tel:  (202) 408-4600

**Class Plaintiffs' Co-Lead Counsel**

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June, 2016, I caused the foregoing **Class Counsel's Memorandum of Law in Support of Class Counsel's Petition For Award Of Attorneys' Fees, Reimbursement Of Litigation Expenses, And Award Of Incentive Payments To Class Representatives** to be filed electronically with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all counsel who have registered for receipt of documents filed in this matter.


     /s/  *Robert W. Coykendall*
Robert W. Coykendall