# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: URETHANE ANTITRUST LITIGATION )<br><br>This Document Relates To:<br>Polyether Polyol Cases | MDL No. 1616<br>No. 04-MD-1616-JWL |

**REPORT OF PROFESSOR CHARLES SILVER ON THE REASONABLENESS OF CLASS COUNSEL'S REQUESTED AWARD OF ATTORNEYS' FEES**

## I.  SUMMARY OF OPINIONS

1.      This is a remarkable piece of litigation.  One need not be an expert on class actions to see that Class Counsel have done a spectacular job.  Settlements exceeding $800 million are rare.  So are antitrust classes that are certified for litigation, class actions that are tried to verdicts, and settlements that recover more than 80% of plaintiffs' trebled damages.  Put all of these features together and you have a once-in-a-lifetime accomplishment.

2.      In terms of risks incurred and results obtained, few cases rival this one, and in those that do, judges have often awarded fees similar to those that real clients pay.  Had the businesses that purchased polyether polyol products from The Dow Chemical Company ("Dow") hired Class Counsel directly to investigate and pursue class action claims without the benefit of any government prosecution or findings, they would have likely agreed to pay contingent fees equal to 33.33%-40% of their gross recoveries.  Taking guidance from market rates would be advisable here, because the amounts clients actually pay incentivize lawyers to maximize their gains. Mimicking the market is also proper as a matter of jurisprudence.  Even in mega-fund cases with recoveries of $100 million or more, judges have often awarded fee percentages like those Class

1

Counsel request, particularly in cases in which the risks, duration, and results support the requested fee—as they certainly do here.

## II.    CREDENTIALS

3.      In this report, I offer my perspective as an expert on class actions, attorneys' fees, and legal ethics, subjects I have studied and written about for years.  My resume appears below in Exhibit A.

4.      I have testified as an expert on attorneys' fees many times and in many large cases, including  *Allapattah Services, Inc. v. Exxon Corp*., 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (31.33 percent fee award on recovery exceeding $1 billion); *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) (fee award of 30 percent on recovery of $410 million); and *Kirk Dahl et al. v. Bain Capital Partners LLC et al*., No. 1:07-cv-12388 (D. Mass. 2015) (33% fee award on $590 million recovery).

5.      Professionally, I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media.  I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.  I received tenure in 1991.  Since then I have been a Visiting Professor at the University of Michigan School of Law, the Vanderbilt University Law School, and the Harvard Law School.

6.      From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010).  Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

7.      I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for 30 years.  I have published over 80 major writings, many of which appeared in peer-reviewed

2

publications and many of which focus on subjects relevant to this Report.  In 2015, two coauthors and I published a major study of fee awards in securities class actions in the COLUMBIA LAW REVIEW.  Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371 (2015).  My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996) and the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004). In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

8.     Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field. See Appendix A.  I have also taught the subject of legal ethics for years, including a specialized course titled "Professional Responsibility for Civil Litigators" that includes a good deal of material on aggregate lawsuits and lawyers' fees.

## III.    DOCUMENTS REVIEWED

9.     When preparing this Report, I reviewed the items listed below which, unless noted otherwise, were generated in connection with this case.  I may also have reviewed other items including, without limitation, cases, treatises, news reports, correspondence, and published scholarly works.

- Class Plaintiffs' Memorandum of Law in Support of Their Motion for Preliminary Approval of Settlement with the Dow Chemical Company

- Memorandum of Law in Support of Class Plaintiffs' Petition for Award of Attorneys' Fees and Reimbursement of Litigation Expenses (Bayer Settlement Fund)

3

- Memorandum of Law in Support of Class Plaintiffs' Petition for Award of Attorneys' Fees and Reimbursement of Litigation Expenses (Huntsman and BASF Settlement Funds)

- Memorandum of Law in Support of Class Counsel's Petition for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Award of Incentive Payments to Class Representatives

- *In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014) (affirming judgment)

- *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145 (D. Kan. 2012) (denying Dow's motion for summary judgment

- *In re Urethane Antitrust Litigation* closing arguments (2/19/2013 Tr. Trans., pp. 5198-5300)

- *In re Urethane Antitrust Litig.*, 2013 WL 2097346 (D. Kan May 15, 2013) (denying motion to decertify the class and motion for judgment as a matter of law or for a new trial)

- Dow's Petition for a Writ of Certiorari, S. Ct. No. 14-1091 (3/9/2015)

- Respondents' Brief in Opposition to Dow's Certiorari Petition, S. Ct. 14-1091 (5/11/2015)

- Dow's Reply Brief, S. Ct. No. 14-1091 (5/22/2015)

- Tyson Foods, Inc. v. Bouaphakeo, Petition for a Writ of Certiorari, S. Ct. No. 14-1116 (3/19/2015)

- Tyson Foods, Inc. v. Bouaphakeo, Brief of Petitioner, S. Ct. 14-1116 (8/7/2015)

- Tyson Foods, Inc. v. Bouaphakeo, Brief for Respondents, S. Ct. 14-1116 (9/22/2015)

- Tyson Foods, Inc. v. Bouaphakeo, Reply Brief of Petitioner, S. Ct. 14-1116 (10/21/2015)

## IV.   FACTUAL BACKGROUND

10.     The history of this litigation, including the remarkable accomplishments that led to the proposed settlement, are known to the Court and are fully set out in the *Memorandum of Law in Support of Class Counsel's Petition for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Award of Incentive Payments to Class Representatives*.  I will therefore highlight certain relevant aspects of the litigation in this section, while omitting most details.

11.     Following a pre-filing investigation, Class Counsel commenced litigation in 2004. *Seegott Holdings, Inc. v. Bayer AG, et al*., C.A. No. 2:04-5850 (D.N.J.).   The case was later transferred to this Court for consolidated proceedings by the Judicial Panel on Multidistrict Litigation.   Transfer Order, *In re Urethane Antitrust Litigation*, Docket No. 1616, Judicial Panel on Multidistrict Litigation (June 16, 2005).

12.     In the more than 11 years that have elapsed since the lawsuit was filed, Class Counsel have carried out their responsibilities admirably, to the considerable benefit of the class. After surviving two rounds of dismissal motions, Class Counsel convinced the Court to certify a plaintiff class containing all purchasers of a range of urethane chemical products, partly by working with expert economists who provided models used to demonstrate the manner of proving class-wide damages.   They then defeated the Defendants' efforts to have certification reversed on interlocutory appeal.   Class Counsel then dealt with a staggering volume of discovery, which included depositions taken in foreign countries, and prepared the case for trial, a process that required additional expert work.   In 2013, the case was tried, making it one of the few large class actions of any type to reach this stage.   After receiving evidence and hearing arguments for four weeks, the jury found for the class and granted a verdict that, after trebling and deducting prior settlements, produced a $1.06 billion final judgment for the class.   Class Counsel then successfully defeated Dow's attempts to have the verdict thrown out or reversed on appeal.   But in an important respect, the fate of the Class was not in Class Counsel's hands, for the Supreme Court had taken Dow's motion to reverse the class certification order under advisement while it was considering *Tyson Foods, Inc. v. Bouaphakeo*, No. 14-1146 (certiorari granted June 8, 2015).   Because *Tyson Foods* saddled the class with a significant risk that certification would be overturned or remanded to the Tenth Circuit for reconsideration, Class Counsel negotiated an $835 million settlement with

Dow while the case was pending.  Three more years have now elapsed since the trial, bringing the total lifespan of this case to almost 12 years.

13.     While continuing to litigate against Dow, Class Counsel negotiated partial settlements with other defendants.  Bayer AG paid $55.3 million in 2006, and BASF and Huntsman paid $51 million and $33 million, respectively, in 2011.  Adding these to the recovery from Dow brings the total amount of relief won for class members to almost $1 billion.

## V.     ANALYSIS

14.     Since the first article I published after becoming a law professor, I have argued that judges should mimic the market when awarding fees from common funds.  They should base fees on a percentage of the recovery because real plaintiffs use this method almost exclusively.  They should also award percentages like the ones that real plaintiffs actually pay because market rates incentivize lawyers to maximize claimants' recoveries.  I have continued to endorse these views throughout my career.  See Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1991); Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371 (2015).

15.     As I explain more fully below, these views are now shared by many federal judges and have been formally adopted in some federal circuits.  The Tenth Circuit appears to be one of them.  Like most others, it has expressed "a preference for the percentage of the fund method." *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995). See also *Gottlieb v. Barry*, 43 F.3d 474, 483 (10th Cir. 1994) (stating that "*Uselton [v. Commercial Lovelace Motor Freight, Inc.,* 9 F.3d 849 (10th Cir.1993)] implies a preference for the percentage of the fund method").  The percentage need only be reasonable in light of the factors enunciated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).  See *Millsap v. McDonnell Douglas Corp.,*

6

2003 WL 21277124, at *6 (N.D. Okla. May 28, 2003).  Because the *Johnson* factors identify features of representations that are likely to affect market rates, judges can mimic the market when awarding fees from common funds without fear of violating the Tenth Circuit's doctrinal constraints.

> The *Johnson* factors are as follows:
>
> the time and labor required, the novelty and difficulty of the question presented by the case, the skill requisite to perform the legal service properly, the preclusion of other employment by the attorneys due to acceptance of the case, the customary fee, whether the fee is fixed or contingent, any time limitations imposed by the client or the circumstances, the amount involved and the results obtained, the experience, reputation and ability of the attorneys, the 'undesirability' of the case, the nature and length of the professional relationship with the client, and awards in similar cases.

See *Johnson,* 488 F.2d at 717–19.  Not all of the *Johnson* factors necessarily apply to every case.  In this report, I will focus mainly on the results obtained, the customary fee, the contingent nature of the fee, and awards in similar cases.  I conclude that Class Counsel's request for one-third of the recovery as fees is justified in light of these considerations.

### A.    The Results Obtained

16.    When awarding fees, judges regularly consider the results obtained.  Many judges regard this as the single most important consideration, pointing out that superior results warrant superior fees.  See MANUAL FOR COMPLEX LITIGATION, FOURTH § 14:121 (2004) (observing that "the size of the fund created" usually receives the greatest weight).  Of course, when judges mimic the market and use the contingent percentage approach, larger recoveries generate larger fee awards automatically.  This preserves the salutary incentives that contingent fee clients seek to create.  Such clients are happy when lawyers recover the maximum number of dollars on their claims and reward them for doing so.

17.     By any measure, an $835 million recovery is a spectacular accomplishment. Bloomberg reported that the case produced the largest jury verdict in a price-fixing case ever. Margaret Cronin Fisk, *Dow Loses $1.2 Billion Verdict as Top 2013 Award*, Bloomberg.com (Jan. 14, 2014), http://www.bloomberg.com/news/articles/2014-01-14/dow-loses-1-2-billion-verdict-as-top-2013-award.  Recent empirical research also puts the total recovery of $975 million among the largest antitrust class action recoveries in history.  See Joshua P. Davis & Robert H. Lande, *Toward an Empirical and Theoretical Assessment of Private Antitrust Enforcement*, 36 SEATTLE UNIVERSITY LAW REVIEW 1269 (2013).

18.     Size matters, but it is only one measure of Class Counsel's accomplishment. Percentage of antitrust damages recovered is another and is no less important.  In a subsequent article, Professor Lande and another coauthor calculated "recovery ratios" that showed recoveries as a percentage of damages for the 71 antitrust cases they studied, all of which involved cartels. They found that in only 14 cases (20%) did the victims recover their damages (or more) in settlement, and in only 7 (10%) were double damages or more recouped.  "The rest—the victims in 57 cases—received less than their initial damages. Four received less than 1% of their damages and 12 received less than 10%.  Overall, the median average settlement was 37% of single damages."  John M. Connor & Robert H. Lande, *Not Treble Damages: Cartel Recoveries Are Mostly Less Than Single Damages*, 100 IOWA L. REV. 1997, 1998 (2015).  Interestingly, plaintiffs fared worse in larger cases, meaning that smaller fractions of damages were recovered as victims' losses grew.  By recovering more than double damages in this enormous case, Class Counsel performed exceptionally well.

19.     The proposed settlement also bears several hallmarks of good class action settlements.  It is a cash fund, and all of the money in it will be paid to class members.  No dollars

will revert to Dow.  The claims process is also easy, as class members can rely on work by Class Counsel to validate their claims.  They need not hunt down purchase records themselves. Altogether, a terrific result.

### B.      The Customary Fee

20.      Lawyers' fees are normally set by agreement with clients.  When clients are sophisticated, experienced, and can freely choose the lawyers they want, these agreements provide the best evidence of the amounts that clients willing pay for lawyers' services and of the amounts that lawyers willingly accept.  This is why the law of restitution—the body of law that entitles lawyers to collect fees from common funds—uses prevailing prices as guides.   The intuition is that, had class members been able to bargain with their lawyers directly, a deal would have been struck at the market rate.

21.      As mentioned, I first encouraged judges to use real fee agreements as guides in my 1991 article, *A Restitutionary Theory of Attorneys' Fees in Class Actions*.  The idea caught on quickly.   In 1992, Judge Richard A. Posner wrote that "[t]he object in awarding a reasonable attorney's fee [from a class action settlement] . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 572 (7th Cir. 1992).  S*ee also Id.* at 568 ("[I]t is not the function of judges . . . to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order.").[1]  Since then, the practice of mimicking the market has been the rule in the Seventh Circuit,

---

[1] Many Seventh Circuit cases support this rule.  *See, e.g.*, *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011) ("When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys."); *In re Synthroid Mktg. Litig.,* 264 F.3d 712, 718–19 (7th Cir. 2001) ("We have held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must

and has led to large percentage-based fee awards in cases with large settlements.  For example, in *Standard Iron Works v. Arcelormittal et al.*, which settled for $164 million in 2014, the district court found "that a 33% fee comport[ed] with the prevailing market rate for legal services of similar quality in similar cases." No. 08-C-5214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014).

22.     The Second Circuit also has endorsed the use of market rates.  In *Goldberger v. Integrated Resources, Inc*., 209 F.3d 43, 52 (2d Cir. 2000), it agreed that "lawyers who successfully prosecute [class actions] deserve reasonable compensation, and that market rates, where available, are the ideal proxy for their compensation."

23.     In other circuits, district court judges often take guidance from market rates too.  In *Allapattah Services, Inc. v. Exxon Corp.,* 454 F. Supp. 2d 1185, 1211 (S.D. Fla. 2006), a case discussed in more detail below, Judge Alan Gold agreed that "the more appropriate measure of a reasonable percentage is the market rate for a contingent fee in commercial cases" and awarded a fee of 31.33 percent from a billion dollar recovery.  In the First Circuit, District Court Judge D. Brock Hornby has applied the mimic-the-market approach repeatedly, and has gained adherents among his brethren.  *See, e.g.*, *Nilsen v. York County*, 400 F. Supp. 2d 266, 277-278 (D. Maine 2005) (endorsing market-based approach).[2]  See also *In re Cabletron Systems, Inc. Securities Litigation*, 239 F.R.D. 30 (D. N.H. 2006) (following *Nilsen*).

_____

do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.").  District Court decisions in the Seventh Circuit applying the mimic-the-market approach include, *see e.g.*, *Beesley v. Intl. Paper Co*., 2014 WL 375432, at *2 (S.D. Ill. 2014) ("In common fund cases, 'the measure of what is reasonable [as an attorney fee] is what an attorney would receive from a paying client in a similar case.'"); and *Stumpf v. Pyod, LLC*, 12 C 4688, 2013 WL 6123156, at *1 (N.D. Ill. 2013) (In a certified class action, "counsel is entitled to the fee that counsel would have received 'from a paying client in a similar case.'").

[2] In addition to *Nilsen v. York County*, 400 F. Supp. 2d 266, 277-278 (D. Maine 2005), discussed in the text, Judge Hornby applied the mimic-the-market approach in *Scovil v. FedEx Ground Package System, Inc*., 2014 WL 1057079 (D. Maine 2014); *In re New Motor Vehicles Canadian*

24.     District court judges in the Tenth Circuit also appreciate the importance of market rates.  When approving a 40% fee in *Chieftain Royalty Co. v. Laredo Petroleum, Inc.,* 2015 WL 2254606, at *4 (W.D. Okla. May 13, 2015), Judge Timothy D. DeGiusti observed that "[t]he market rate for Class Counsel's legal services also informs the determination of a reasonable percentage to be awarded from the common fund as attorneys' fees."  As support, he cited *Millsap v. McDonnell Douglas Corp.,* 2003 WL 21277124, at *6 (N.D. Okla. May 28, 2003), where Judge Sven Holmes said plainly that "[i]n setting a reasonable amount of attorney fees to be awarded to Class Counsel in this case, the Court will consider . . . percentages awarded in other common fund cases in the Tenth Circuit, in conjunction with the market rate for Class Counsel's services."  In turn, Judge Holmes relied on *In re Synthroid Mktg. Litig.,* 264 F.3d 712, 718 (7th Cir. 2001), a Seventh Circuit case cited above, showing that the idea of using market rates as guides has spread. See *Millsap*, 2003 WL 21277124, at *7 (citing *Synthroid*).

25.     It remains to consider how much sophisticated clients usually pay.  In the following subsections, I discuss some of the evidence bearing on this point.  It shows that when sophisticated clients serve as plaintiffs in high-stakes commercial lawsuits—including but not limited to class actions—they typically pay their lawyers 25%-40% of their gross recoveries.  This is not a new discovery.  In 1993, Chief Judge Ralph G. Thompson made the following observation when awarding class counsel one-third of a $35 million common fund recovery: "Fees in the range of 30–40% of any amount recovered are common in complex and other cases taken on a contingent fee basis."  *Cimarron Pipeline Constr., Inc. v. Nat'l Council on Compensation Ins.,* 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993).

---

*Export Antitrust Litigation*, 842 F. Supp. 2d 346 (D. Maine 2012); and *Prescott v. Prudential Ins. Co. of America*, 2011 WL 6662288 (D. Maine 2011).

11

1.    Fees Promised by Named Plaintiffs and Other Class Members

26.    I recently learned about the fees that a number of sophisticated business clients agreed to pay in two different class actions, one of which, *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa.), was a mammoth antitrust case. *King Drug* was one of a series of lawsuits in which drug wholesalers accused manufacturers of inflating prices by engaging in anticompetitive practices. Collectively, the 17 class actions that preceded *King Drug* generated more than $1 billion in recoveries. A list of the cases showing the recoveries and fee awards appears in Exhibit B. In 16 of the cases, the wholesalers endorsed fee awards equal to one-third of the recovery and the presiding judges awarded that amount. In one case, class counsel requested only 30%, which the wholesalers supported and the judge awarded. Finally, in *King Drug*, which settled for more than $500 million, class counsel sought an award of 27.5%, which the wholesalers again supported and the court again awarded.

27.    The second case was a RICO class action, *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct.), which produced a $297 million settlement. One of the named plaintiffs, Thomas & King Inc., was formerly one of the largest operators of Applebee's franchises in the United States and the nation's eighth-largest restaurant franchise company overall, with approximately 7,500 employees. The other named plaintiff, Catholic Healthcare West/Dignity Health, was the fifth largest health system in the nation and the largest provider of non-profit hospital services in California. Both clients were represented by counsel in their fee negotiations with class counsel, and both agreed that the fee award might be as high as 40 percent. The court awarded one-third of the recovery as fees.

28.    The examples just described are not part of a new trend. To the contrary, sophisticated clients have been paying fees of 33% or more in antitrust cases for years. A famous case from the 1980s involved the Texas law firm of Vinson & Elkins (V&E). ETSI Pipeline

Project (EPP) hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline.  In a sworn affidavit, Harry Reasoner, then V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as they were incurred, but all legal fees were contingent upon a successful outcome. We were paid 1/3 of all amounts received by way of settlement or judgment.  We litigated the matter for 5 years.  At the conclusion, we had settled with all defendants for a total of $634,900,000.00.  As a result, a total of $211,633,333.00 was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities Litigation,* MDL No. 551 (D. Arizona, Nov. 30, 1990).

29.     In all the cases just discussed, the named plaintiffs were sophisticated businesses with significant resources and ready access to the market for legal services.  Their willingness to promise fees ranging from one-third to 40 percent in large commercial class actions shows clearly that, in their judgment, fees in this range were reasonable.[3]

2.     Contingent Fees in Patent Cases

30.     There are many reports of percentage fees of one-third or higher being paid in patent cases, which, like antitrust cases, often involve difficult technical and empirical issues.  Indeed,

_____

[3] Examples of sizeable contingent fees can also be found in cases involving business clients who intervened in class actions.  In *In re Synthroid Marketing Litig.*, 264 F.3d 712, 719 (7th Cir. 2001), Judge Frank Easterbrook reported that, *after a settlement was already on the table*, "a group of more than 100 [third party payers] . . . contracted with two law firms to represent them. . . . [T]he contracts provided for a 25% contingent fee at maximum."  In an expert witness report submitted in the *High Fructose Corn Syrup Antitrust Litigation*, Professor John C. Coffee, Jr. reported that Gray & Co., an opt-out claimant, promised its lawyers 33-40 percent of the recovery in parallel litigation, depending on the time of settlement.  *Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087, Dkt. No. 1421 (C.D. Ill. Oct. 7, 2004), pp. 1-2.  Notably, neither of these situations (*Synthroid* or *High Fructose*) presented anywhere near the risk for the lawyers associated with building a complex class action case from scratch.

the usual patent case is often less risky and protracted than the typical antitrust litigation because patent plaintiffs rarely face the risks and delay of class certification, making the fees paid in patent litigation a conservative point of comparison.

31.     The most famous example of the prevalence of fees of 33% or more in high-stakes patent litigation related to the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry.  NTP, the plaintiff, promised its law firm, Wiley Rein & Fielding (WRF), a one-third contingent fee.  When the case settled for $612.5 million, WRF received more than $200 million in fees.  Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, at D03.

32.     The terms in WRF's fee agreement were typical, as Professor David L. Schwartz learned by interviewing 44 experienced patent lawyers and reviewing 42 contingent fee agreements that were used in patent cases.  Professor Schwartz reported that, across the board, fee percentages were comparable to the fee requested here.

> On the whole, the contingent rates are similar to the "one-third" that a stereotypical contingent personal injury lawyer charges.  There are two main ways of setting the fees for the contingent fee lawyer: a graduated rate and a flat rate.  Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery.  The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates.  As the case continued, the lawyer's percentage increased.  Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALABAMA LAW REVIEW 335, 360 (2012).  In a case like this one that lasted over a decade and was settled after trial and appeals, the highest graduated rate would apply.

33.     Professor Schwartz did not have a random sample of engagement contracts used in patent cases to consider.  But his conclusions are consistent with both the examples discussed

above and with reports found in patent blogs, case reports, and other publications.  For example,

the following passage appeared in Matt Cutler, *Contingent Fee Patent Litigation, and Other*

*Options*.

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not
> pay any legal fees for the representation. Instead, the law firm only gets paid from
> damages obtained in a verdict or settlement. Typically, the law firm will receive
> between 33-50% of the recovered damages, depending on several factors—a
> strictly results-based system.

Matt Cutler, *Contingent Fee Patent Litigation, and Other Options*, PATENT LITIGATION,

http://ipr-pgr.com/patent-litigationlaw-updates/cost-contained-u-s-patent-litigation.

3.     <u>Contingent Fees In Other Commercial Litigations</u>

34.     Turning from patent lawsuits to matters of other types, many examples show that

compensation as a significant percentage of recovery is common.  In 2012, the U.S. Court of

Appeals for the Tenth Circuit decided a case involving a dispute over the fee that a business client

owed the law firm of Susman & Godfrey (S&G).  S&G had handled an oil and gas matter for the

client on the following terms.  "Under the Fee Agreement, [the client] agreed to pay [S&G] 30%

'of the sum recovered by settlement or judgment,'" subject to caps based on when the lawsuit was

resolved. *Grynberg Production Corp. v. Susman Godfrey, L.L.P.*, No. 10-1248, 2012 U.S. App.

LEXIS 3316, at *2 (10th Cir. Colo., February 16, 2012).  "[T]he Fee Agreement capped fees at

$50 million if the case settled within one year after the action was filed."  *Id.* The fee agreement

thus entitled S&G to be paid $50 million for a year's worth of work—and that is what an arbitrator

decided S&G should receive, subject to an offset of less than $2 million that, for present purposes,

is irrelevant.  The Tenth Circuit affirmed the fee award.

35.     Based on what lawyers who write about fee arrangements in business cases have

said, contingent percentages of one-third or more remain common today.  In 2011, THE

ADVOCATE, a journal produced by the Litigation Section of the State Bar of Texas, published a

15

symposium entitled "Commercial Law Developments and Doctrine."  It included an article on alternative fee arrangements, according to which:

> A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOCATE (TEXAS) 20 (2011).

36.     I could add examples to those already discussed, but the point has been made. When seeking to recover money in lengthy and risky commercial lawsuits involving large stakes, sophisticated business clients often pay contingent fees equal to or greater than one-third of the recovery plus expenses.  They pay such percentage fees when the risks and costs of litigation warrant the expenditure, because they are better off hiring lawyers at market rates than giving up on their claims.  To be clear, I am not saying that sophisticated business clients always pay fees in this range; they will pay less when they can hire competent lawyers on more attractive terms.  The point is just that they know how the market for legal services works: risks require offsetting rewards.

## C.     The Contingent Nature of the Fee

37.     After reading the previous section, one might want to know why sophisticated business clients caught up in high-dollar commercial lawsuits agree to pay contingent fees that are so high.  The most important reason is risk.  Throughout the economy, large rewards are paid to encourage people to bear large risks.  Commercial lawsuits are no exception.  Clients who want

16

lawyers to bear substantial litigation risks must offer hefty premiums over lawyers' guaranteed hourly rates. Otherwise, lawyers will find it more attractive to represent only clients who can pay by the hour, meaning that clients with big commercial cases will either have to bear litigation risks themselves or do without representation.

38.     The need to offer substantial risk premiums in class actions and other lawsuits that saddle lawyers with large risks was explained years ago in James Stock and David Wise *Market Compensation in Class Action Suits: A Summary of Basic Ideas and Results*, 16 CLASS ACTION REPORTS 584 (1993). The authors showed that some contingent fee lawyers assume low risks and earn small premiums over prevailing hourly rates, while others assume large risks that only large premiums can offset. A low-risk practitioner might handle, for example, a large number of car crash cases involving victims who sustained minor injuries. Although each car crash case is risky when considered individually, the portfolio as a whole is not. The large number of cases makes both the average cost and the average recovery per case predictable. The risk is diversified away by being spread across a series of cases.

39.     The low-risk portfolio resembles a series of small wagers, each placed on the toss of a fair coin. Each separate coin toss is a risky, win/lose proposition, but the outcome of the series of gambles is not. It can be predicted with reasonable confidence. Because the portfolio as a whole is not risky, a small premium over a lawyer's guaranteed hourly rate provides a sufficient incentive for a lawyer working on contingency to manage a practice of this type. Stock and Wise make this point empirically by using several data sets to show that lawyers with diversified practices earn risk multipliers ranging from 1.23 to 1.35.

40.     It is obvious, however, that the model just described does not fit the practice of lawyers who handle class actions or large commercial cases like the *Urethane* case. These lawyers

bear large risks that cannot be diversified. They pour substantial fractions of their firms' available resources into small numbers of lawsuits, each of which is inherently risky. In effect, they make a few enormous bets instead of placing a large number of small ones. This makes their income streams unpredictable and necessitates larger risk premia. And because people are risk averse, substantial risk multipliers are often required. As Professors Stock and Wise explained,

> Risk aversion is what the term implies: people are hesitant to take chances and more hesitant still to take large chances. While many people of limited means might risk a dollar on a 50-50 chance of winning two dollars, few would risk their annual income on a 50-50 chance to triple it. The consequences of failure inhibit accepting such risk. *A market would necessarily reflect this risk aversion by offering greater compensation to those taking substantial, non-diversifiable risk.*

Summarizing the literature on risk aversion, Stock and Wise conclude: "The evidence suggests a high degree of risk aversion and thus that the multipliers necessary to induce representation increase very rapidly as risk increases." *Id.* Depending on the resource commitment undertaken and the likelihood of winning, double-digit risk multipliers may be required.

41.     When Fine, Kaplan and Black, RPC ("FKB") and Cohen Milstein Sellers & Toll PLLC ("CMST") and other Class Counsel agreed to represent the plaintiffs in this case, the firms took on a large, non-diversifiable risk. The risk related partly to the case itself which, being a massive antitrust class action, was inherently difficult to win, and partly to the resource commitment the litigation would require. I discuss both aspects of the risk in the subsections that follow.

42.     Here, I note briefly that Dow is an incredibly wealthy defendant with extensive experience in mass litigation. The company's current market capitalization is $58 billion, its revenues over the year preceding the current date were $47 billion, and its gross profit over the same period was just shy of $11 billion. The Dow Chemical Company, https://finance.yahoo.com/q/ks?s=DOW (visited May 17, 2016). Dow currently ranks 48th on the

Fortune 500.  The company's past involvements in mass lawsuits include controversies relating to Bendectin, the toxic release at Bhopal, India, and silicone breast implants, in all of which it enjoyed considerable success.  Lawsuits which involve wealthy defendants with considerable litigation experience are always risky propositions, and the risks are especially great when plaintiffs seek enormous recoveries.

### 1.   The Difficulty of Winning Antitrust Class Actions

43.   Class actions are risky lawsuits.  The belief that plaintiffs' attorneys can collect buckets of dollars just by filing class actions isn't true.  Defendants resist these lawsuits tooth and nail, and often defeat them.  Partly for this reason, successful antitrust class actions are actually rare.  Professor Brian Fitzpatrick, who gathered all federal class action settlements that occurred in 2006 and 2007, found 30 antitrust cases, an average of 15 per year.  Settlements of cases of other types were far more numerous.  Professor Fitzpatrick identified 257 settled securities class actions, 94 settled labor and employment class actions, and 87 settled consumer protection class actions.  Only settlements of commercial class actions were fewer in number than antitrust settlements.  Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811, 818 Table 1 (2010) (hereinafter "*Fitzpatrick Study*").

#### a)   *Class Certification Is A Difficult Hurdle*

44.   It has been hard for plaintiffs to convince federal judges to certify litigation classes for years, and since its hey-day in the 1990s, class action practice has greatly declined.  For a discussion, see Robert H. Klonoff, *The Decline of Class Actions*, 90 WASHINGTON UNIVERSITY LAW REVIEW 729 (2013).

45.     Class certification is especially hard to obtain in private antitrust cases.   The difficulty of proving antitrust damages has a lot to do with this.   Even in non-class cases, antitrust damages are hard to prove because they often require a comparison between actual prices and hypothetical prices that would have prevailed in a free market.   Estimating the latter requires expert testimony based upon sophisticated economic models that are always open to challenge and that always *are* challenged.   The battle of the experts and the accompanying *Daubert* objections to the admissibility of testimony offered by plaintiffs' experts are fixtures of antitrust litigation.   See Rebecca Haw, *Adversarial Economics in Antitrust Litigation: Losing Academic Consensus in the Battle of the Experts*, 106 NORTHWESTERN UNIVERSITY LAW REVIEW 1261, 1270-71 (2012) ("Since the rise of microeconomics as the dominant tool for analyzing competition, antitrust has become one of the most expert-driven areas of law.").

46.     When Class Counsel filed this lawsuit in 2004, they knew that they would have to win a battle of the experts to obtain class certification as well.   Writing in 2005, The Sedona Conference Working Group on the Role of Economics in Antitrust observed that "it has become standard practice to use economic testimony in support of, or in opposition to, class certification motions."   The Sedona Conference Working Group on the Role of Economics in Antitrust, *Best Practices in Using Economics for Class Certification Motions Under Rule 23 of the Federal Rules of Civil Procedure*, 6 SEDONA CONFERENCE JOURNAL 46 (2005).   This battle engages dueling experts over the possibility of proving class-wide injury for all or most class members using a single methodology.

> In antitrust class actions, expert economic evidence is offered in certification proceedings most often on issues of whether impact and damages are susceptible of class-wide proof. To show that impact is susceptible to class-wide proof, class action plaintiffs are required to proffer a plausible method of proving that the vast majority of the class has been injured. On a class motion, an expert report must

> support plaintiffs' "minimum burden of showing there is a reasonable probability
> of establishing . . . common impact."

*Id.*, p. 47 (quoting *In re Playmobil Antitrust Litig.,* 35 F. Supp. 2d 231, 247 (E.D.N.Y. 1998)).

"Where individual damage 'does not lend itself to . . . mechanical calculation, but requires

"separate mini-trial[s]" of an overwhelming[ly] large number of individual claims,' class

certification will be denied." *Id.* (quoting *Windham v. American Brands, Inc.,* 565 F.2d 59, 68 (4th

Cir. 1977)).  *See also Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 342 (4th

Cir. 1998) (decertifying class because, among other things, "each putative class member's claim

for lost profits damages was inherently individualized and thus not easily amenable to class

treatment").

47.     To determine whether any informed commentator thought that the odds of

certifying an antitrust class became easier during the past decade, I conducted a Westlaw search

in the "law reviews and journals" database.  The search identified 64 articles, all of which I

reviewed.[4]  Most authors who took a position on the issue were decidedly negative.[5]  A few articles

offered impressive statistics.  Writing in 2008, Allyson Ho observed that "[t]he Roberts Court

ha[d] decided a remarkable number of antitrust cases" and had "rejected the claims of antitrust

plaintiffs by a combined 46-5 vote."  She concluded that there is "a broad consensus in the middle

of the Court [that is] generally hostile to broad antitrust liability."  Allyson N. Ho, *Getting Down*

---

[4]  The search phrase was "("roberts court" /p ("class action" or "class certif!")) and
DATE(aft2004)".

[5]  The following comment by Professor Brendan S. Maher was typical: "Since John G. Roberts, Jr.
became Chief Justice in 2005, the Court has issued landmark decisions regarding pleading,
arbitration, and class actions that have significantly curtailed plaintiffs' abilities to bring and win
lawsuits."  Brendan S. Maher, *The Affordable Care Act, Remedy, and Litigation Reform*, 63
AMERICAN UNIVERSITY LAW REVIEW 649, 651 (2014).

*to Business: Early Observations on the Roberts Court's Business Cases*, 9 ENGAGE: JOURNAL OF

THE FEDERALIST SOCIETY PRACTICE GROUPS 92, 94 (2008).

48.     In 2014, Mark Popofsky and Douglas Hallward-Driemeier noted that the Roberts

Court had been almost three times as active in the antitrust area as the Rehnquist Court.   In a

section entitled "Raising the Class Action Bar," they wrote:

> In its first decade, the Roberts Court has consistently raised the threshold for
> plaintiffs seeking to pursue class actions. Although non-antitrust cases illustrate the
> trend as well, it is not mere coincidence, given the prevalence and nature of
> contemporary antitrust class action litigation, that a trilogy of antitrust cases
> provided vehicles for the Court's key decisions in this area: (1) *Bell Atlantic Corp.
> v. Twombly*, [550 U.S. 544 (2007)], which cracked down on notice pleading (a
> watershed decision that, of course, transcends both class actions and antitrust); (2)
> *Comcast Corp. v. Behrend*, [133 S. Ct. 1426 (2013)], which requires putative
> plaintiff classes to offer, at the class-certification stage, a competent damages model
> tied to their theory of liability; and (3) *American Express Co. v. Italian Colors
> Restaurant*, [133 S. Ct. 2304 (2013)], which upheld class action waivers in
> arbitration agreements. Collectively, these decisions impose significant new
> obstacles to sustaining class actions under Rule 23.

Mark S. Popofsky and Douglas H. Hallward-Driemeier, *Antitrust and the Roberts Court*, 28-SUM

ANTITRUST 26, 26 (2014).

49.     Any list of important cases would be incomplete without mentioning *Wal-Mart

Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), the case in which Justice Scalia curtly dismissed the

trial court's finding that *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993), did not apply

to expert testimony at the certification stage of class-action proceedings, remarking "We doubt

that is so."   The reaction was immediate.   In class actions of all types, defense lawyers began

subjecting plaintiffs' economic experts to *Daubert* challenges at the certification stage, with

devastating effect.   As the author of *Death by Daubert* observed:

> Private antitrust class actions are under attack. . . .   Antitrust cases were already on
> life support thanks to heightened pleading and evidentiary hurdles. The final nail in
> the coffin may be a new judicial barrier: pre-class certification review of expert
> testimony under Federal Rule of Evidence 702, commonly called *Daubert*."

Christine P. Bartholomew, *Death by Daubert: The Continued Attack on Private Antitrust*, 35 CARDOZO LAW REVIEW 2147, 2148-2150 (2014).

50.     Because of these developments, "[t]he number of antitrust class action cases filed in federal courts is now in steep decline after rising substantially during the past decade: 208 antitrust class actions were filed in 1999, and the number grew to 766 by 2008, but 2009 witnessed a precipitous decline to 375, and filings for 2010 will return to the level of a decade earlier at the current rate." Donald W. Hawthorne, *Recent Trends in Federal Antitrust Class Action Cases*, 24-SUM ANTITRUST 58, 58 (2010).   Private attorneys not only file fewer cases; they are also increasingly reluctant to initiate litigation without accompanying government investigations. "Nearly 60 percent of antitrust class actions [filed between 2007 and 2009] arose from a prior government enforcement action, domestic or foreign." *Id*., p. 58.   Here, however, no governmental antitrust investigation preceded the filing of this class action.   Class Counsel displayed uncommon bravery by commencing this lawsuit.

        *b)*      *The* Wal-Mart/Comcast/Tyson Foods *One-Two-Three Punch*

51.     After losing at trial in 2013 and failing to convince the Tenth Circuit to reverse, Dow asked the Supreme Court to review the case.   It made several potent arguments, including two that focused on the damages model on which the decision to certify a class rested.   The first argument claimed that the model used "average" statistical estimates in a manner that ran afoul of *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).   The second argued that Dr. James McClave's statistical analysis had been found deficient in *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013), a case in which he had previously served as an expert witness.   Both arguments posed serious challenges to certification.   Given the result in *Comcast*, the attack on Dr. McClave must have seemed especially threatening.

52.     At the same time, the Supreme Court seemed to be continuing its attack on the class action by granting *certiorari* in other cases, some of which involved issues relevant to the *Urethane* litigation.  One of these was *Tyson Foods, Inc. v. Bouaphakeo*, No. 14-1146 (certiorari granted June 8, 2015), which the Supreme Court thought was sufficiently related as to provide a basis for holding Dow's petition in abeyance.

53.     *Tyson Foods* thus saddled the class with a risk its lawyers could do little to control. The facts and the certification strategy in *Tyson Foods* were developed by other lawyers who had no reason to care how their actions might affect the *Urethane* claimants.  With the grant of *certiorari* in *Tyson Foods*, the best result reasonably to be expected was that the Supreme Court would remand *Urethane* to the Tenth Circuit for reconsideration in light of its decision.  This action would mean uncertainty and force a delay lasting months or years.

54.     Winning a large class action lawsuit takes more than being right.  It takes enormous resources and exceptional lawyering, and even then the lawyers face serious risk.  I once served as co-counsel in a class action that involved over $1 billion in overcharges for workers' compensation insurance.  The defendants, all of which were large insurance carriers, put us to the test and forced the district court judge to hold a week-long certification hearing, which produced a lengthy and truly excellent opinion in the class' favor.  Then, the Fifth Circuit—one of the most anti-class action venues in the country—reversed, partly because the judges who were on the panel misunderstood the requirements for proving causation in RICO cases predicted on mail fraud. Compare *Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Co*., 319 F.3d 205 (5th Cir. 2003) (holding that proof of reliance is required in RICO cases predicated on mail fraud); with *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) (holding that a plaintiff asserting a RICO claim for mail fraud did not need to show reliance, either as an element of the

claim or as a prerequisite to establishing proximate causation).  We were right but we still failed to hold onto class certification.  The difficulty of winning an enormous class action is hard to overstate.

      2.      The Lack Of A Parallel Government Action Or Public Signal of Wrongdoing

55.     As just mentioned, lawsuits brought to vindicate civil claims often "piggy-back" on or otherwise benefit from prior or contemporaneous investigations by public regulators.  In these situations, the burden on class action lawyers may be reduced somewhat because the governmental proceeding may lend credence to the private allegations and may be a source of valuable information or other assistance.  Indeed, many antitrust cases that have produced comparable recoveries were assisted substantially by criminal prosecutions and guilty pleas, including civil cases involving the notorious *Vitamins* and *Flat Panel* cartels.  See, e.g., *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) ($365 million class recovery and 34.6% fee award in case supported by criminal prosecutions and guilty pleas); *In re TFT-LCD (Flat Panel) [Indirect Purchaser] Antitrust Litig.*, MDL No. 1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ($1.08 billion class recovery and approximately 30% fee to class counsel and state attorneys general in case supported by sweeping criminal prosecutions and guilty pleas).

56.     Many private class actions are also triggered by public actions that alert plaintiffs' attorneys to the possibility of wrongdoing.  For example, a sudden, marked drop in the price of a stock, a company's announcement that it will restate its earnings, or a publicized withdrawal by an accounting firm may be a signal of wrongdoing that leads to the filing of a securities fraud class action.  "In 2013, . . . 21 percent [of settled securities fraud class actions] were associated with restatements."  Cornerstone Research, SECURITIES CLASS ACTION SETTLEMENTS: 2013 REVIEW

AND ANALYSIS 13 (2014).  Reflecting their greater strength on the merits, these cases settled for a higher percentage of estimated damages than others.

57.     If parallel government proceedings and public signals of wrongdoing make class actions less risky, then (other things being equal) fee awards should be higher in cases like this one, where Class Counsel undertook the litigation without help from a regulator and without the benefit of any public acknowledgement of wrongdoing.

### 3.     The Resource Commitment

58.     The premium that is needed to offset a risk depends on both the likelihood of winning and the resources that must be devoted to a case.  The prior section discussed the difficulty of certifying an antitrust class, without which a class-wide recovery cannot be obtained.  This section focuses on Fine, Kaplan & Black, R.P.C. (FKB) and Cohen Milstein Sellers & Toll, PLLC (CMST), the law firms that serve as Co-Lead Counsel, the resources they committed, and the time it took to obtain a recovery.

59.     FKB is a small firm with 10 full-time lawyers, 3 other attorneys of counsel, and 3 paralegals.  CMST is larger, with 90 attorneys and offices in several cities, but even so it is a small to mid-sized firm by current standards.  In Law360's 2016 rankings of the 400 largest law firms by size, CMST fell just below the smallest firm on the list, which had 94 attorneys.  Cristina Violante, *Law360 Reveals 400 Largest US Firms*, Law360.com (March 24, 2016).

60.     Before the Co-Lead firms commenced litigation in 2004, they knew that they would have to bear an enormous burden.  The reasons were many and obvious.  Discovery would require them to depose witnesses at home and abroad; millions of documents would have to be reviewed; litigation would be protracted, because the Defendants were enormous corporations that would rationally spend tens of millions of dollars to keep the hundreds of millions of dollars the plaintiffs wanted in damages; assistance from expert witnesses and consulting firms on causation and

damages would be required at the pleading stage, in connection with class certification, and at trial; legal issues would be disputed; and so forth.

61.     In fact, and as Co-Lead Counsel explain in their filings, throughout much of this litigation, more than half of FKB's attorneys and all of its paralegals spent the majority of their time on this case.  This prevented FKB from diversifying the risk it faced by working on other matters and prevented the firm from receiving guaranteed income from other sources.  The time FKB expended and the expenses it incurred document the enormity of FKB's resource commitment.

62.     Being a larger firm, CMST was better able to bear the burden this litigation would predictably entail.  But even for it the resource commitment was remarkable.  Who can afford to lend litigation services on credit and bear millions of dollars in costs for so many years?  Even for firms like CMST that have more diverse dockets this is hardly the norm.  To see that, one need only compare this case to successful securities class actions, which tend to last around 3.5 years. Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371, 1389 (2015) (reporting a median length of 3.5 years for securities fraud class actions that settled with payments).[6]  A 12-year lawsuit is plainly an outlier.

63.     That this litigation was exceedingly risky also seems clear when one compares this case to securities actions in terms of the procedural stage that was reached when litigation against Dow ended.  Studying the progress of 900 securities cases that took longer than 60 days to resolve

_____

[6] A study of class actions in four federal district courts found median time periods from filing the complaint to closing for settled non-securities class actions ranging from "eleven and thirteen months" on the low end to "thirty-six and fifty months" on the high end.  Thomas E. Willging et al., AN EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 16 (Federal Judicial Center 1996).

(so-called "slower filings"), Cornerstone Research found that only 9 percent of them made it to the point where a summary judgment motion was decided. See Cornerstone Research, SECURITIES CLASS ACTION FILINGS: 2012 YEAR IN REVIEW 9, Figure 7 (2013), available at https://www.cornerstone.com/GetAttachment/81e1daa9-7a2e-4589-9dd6-a443950b0837/Securities-Class-Action-Filings%E2%80%942012-Year-in-Revie.pdf.    Here, by contrast, the case was tried and both the certification decision and the trial victory were defended on appeal.    Along with its intensity, the duration of litigation shows this case to have been exceptionally risky.

### D.    Awards in Similar Cases

64.    In Section V.A, I argued that judges should mimic the market when awarding fees in class actions.    Many Tenth Circuit judges already do this.    In *Chieftain Royalty Co. v. Laredo Petroleum, Inc*., 2015 WL 2254606, at *3 (W.D. Okla. May 13, 2015), Judge DeGiusti observed that a 40% contingent fee fell within the acceptable range in the Tenth Circuit, which extends from 20% to 50%.    This range overlaps fairly closely the range of percentages that sophisticated clients commonly pay in large commercial litigations.    When Professor Brian Fitzpatrick studied all federal class actions that settled in 2006 or 2007, he found that fee awards tended to fall in a narrower range extending from 25% to 40% (exclusive of costs), and that more awards fell into the 30%-35% range than any other.    Fitzpatrick Study, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811, 834 Fig. 4 (2010).    His results indicate that the overlap between fee awards and market rates is even closer.

65.    One of the cases that Judge DeGiusti cited in support of his observation was Judge David R. Russell's 30% award in *Chieftain Royalty Co. v. QEP Energy Company,* No. 5:11-cv-00212-R, Dkt. No. 182 at *6 (W.D. Okla. May 31, 2013), which yielded a total recovery of $155

million.  The fee award could also be described as a 39% fee on the cash portion of the settlement, which was $115 million.  Either way, Judge Russell's award is significant because it shows that judges will award large percentages in mega-fund cases when the circumstances call for it.  When the costs and risks warrant high percentages in mega-fund cases, judges are happy to award them.

66.     Although it sometimes is suggested that fee percentages should decline as recoveries increase, that isn't so.  Judges actually use the so-called "decrease/increase" rule selectively.  They invoke it when needed to prevent lawyers from collecting windfalls.  Table 1 documents the point empirically.  It lists 34 cases with settlements of $100 million or more (the traditional mega-fund threshold) in which fee awards equaled or exceeded 30%.

| | Table 1. Mega-Fund Class Actions Settlements with Fee Awards of 30% or More | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 1 | *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000)[1] | $185 | 40.00% |
| 2 | *In re Combustion, Inc.*, 968 F.Supp. 1116 (W.D.La.1997) | $127 | 36.00% |
| 3 | *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 | 34.60% |
| 4 | *In re Tricor Indirect Purchaser Antitrust Litigation*, C.A. No. 05-360, Order and Final Judgment Approving Settlement (Oct. 28, 2009); *In re Tricor Direct Purchaser Antitrust Litigation*, C.A. No. 05-340, Order and Final Judgment (4/23/2009) | $316 | 33.33% |
| 5 | *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-1894 (AWT) (D. Ct. Dec. 9, 2014) | $297 | 33.33% |
| 6 | *In re Tricor Direct Purchaser Litig.*, D. Del. 05-340-SLR, Doc. No. 543 (4/23/2009) | $250 | 33.33% |
| 7 | *In re Neurontin Antitrust Litigation*, D.N.J. 2:02-cv-01830, Doc. No. 114 (8/6/2014) | $190 | 33.33% |
| 8 | *In re Titanium Dioxide Antitrust Litig.*, 10-CV-00318 (D. Maryland, Dec. 13, 2013) | $164 | 33.33% |
| 9 | *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739 (E.D. Pa. 2013) | $150 | 33.33% |
| 10 | *City of Greenville v. Syngenta Crop Protection*, No. 3:10-cv-00188 (S.D. Ill. Oct. 23, 2012) | $105 | 33.33% |
| 11 | *In re Initial Pub. Offering Sec. Litig.*, 671 F.Supp.2d 467 (S.D.N.Y. 2009) | $510 | 33.30% |
| 12 | *In re Buspirone Antitrust Litig.*, No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003)[2] | $220 | 33.30% |
| 13 | *In re Relafen Antitrust Litig., No. 01-12239*, 2004 U.S. Dist. LEXIS 28801 (D. Mass. Apr. 9, 2004) | $175 | 33.30% |
| 14 | *In re OSB Antitrust Litig.*, Master File No. 06-826 (March 4, 2009) | $111 | 33.30% |
| 15 | *Kirk Dahl et al. v. Bain Capital Partners LLC et al.*, No. 1:07-cv-12388-WGY, Dkt. Nos. 1051 (motion requesting 33% fee award from $590.5 million common fund) and 1095 (order granting motion) (D. Mass. 2015) | $590 | 33.00% |
| 16 | *Standard Iron Works v. ArcelorMittal et al.*, No. 08-C-5214 (N.D. Ill., Oct. 22, 2014) | $164 | 33.00% |
| 17 | *In re Apollo Group Inc. Securities Litigation*, 2012 WL 1378677, at *9 (D.Ariz., April 20, 2012) | $145 | 33.00% |
| 18 | *San Allen, Inc. v. Buehrer, Admin., Ohio Bureau of Workers' Compensation*, CV-07-644950 (Common Pleas, Cuyahoga Cty, OH Nov. 25, 2014) | $420.0 | 32.70% |
| 19 | *In re Automotive Refinishing Paint Antitrust Litigation*, MDL No. 1426 (E.D. Pa. Jan. 3, 2008) | $106 | 32.70% |
| 20 | *Weatherford Roofing Co., et al. v. Employers National Ins. Co.*, No. 91-05637 (116th Dist. Ct, Dallas, TX) (Dec. 1, 1995) | $190 | 31.60% |
| 21 | *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1,060 | 31.33% |
| 22 | *In Re (Bank of America) Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330 (S.D. Fla. 2011) | $410 | 30.00% |
| 23 | *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) | $220 | 30.00% |
| 24 | *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. 2004) | $203 | 30.00% |
| 25 | *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D.Okla. Jan. 2, 1990) | $185 | 30.00% |
| 26 | *In re: (Chase Bank) Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. Dec. 19, 2012) | $162 | 30.00% |
| 27 | *Chieftain Royalty Co. v. QEP Energy Co.*, Case No. CIV-11-212-R (W.D. Okla. May 31, 2013) | $155 | 30.00% |
| 28 | *In re: (Citizens Bank) Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. Mar. 12, 2013) | $137.5 | 30.00% |
| 29 | *In re Informix Corp. Sec. Litig.*, Master File No. C-97-1289-CRB (N.D.Cal. Nov. 2, 1999) | $132 | 30.00% |
| 30 | *Kurzweil v. Philip Morris Cos., Inc.*, Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 | 30.00% |
| 31 | *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D.Pa.2000) | $111 | 30.00% |
| 32 | *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632 (N.D.Tex. Apr. 9, 2010) | $110 | 30.00% |
| 33 | *In re Cardizem CD Antitrust Litig.*, No. 99-MD-1278 (E.D.Mich. Nov. 26, 2002) | $110 | 30.00% |
| 34 | *In re Prison Realty Sec. Litig.*, Civil Action No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D.Tenn. Feb. 9, 2001) | $104 | 30.00% |

[1]. Although technically not a class action, this case is equivalent to a class-action in which the fee was negotiated ex ante.
[2]. The global settlement exceeded $500 million, of which $220 million was reserved for the Direct Purchaser Class. The trial court approved a fee equal to 33 1/3% of the Direct Purchaser fund.

67.     Several things must be kept in mind when considering Table 1.  First, the list is *not*
complete.  Because no comprehensive dataset of mega-fund class actions exists, I cannot say with
certainty how many cases should be on the list.  I found several new cases when preparing this
report, and there may be others that should be in the table which I have not identified.

68.     Second, mega-fund settlements are rare.  Focusing on securities class actions,
which account for about 70% of the dollars recovered in class actions each year, Cornerstone
Research observed that "[d]espite the publicity that often accompanies mega-settlements, . . . only
7 percent of cases have settled for $100 million or higher."  Ellen M. Ryan and Laura E. Simmons,
SECURITIES CLASS ACTION SETTLEMENTS—2011 REVIEW AND ANALYSIS 4    (Cornerstone
Research   2012),   https://www.cornerstone.com/GetAttachment/22345269-75a0-4fc2-a459-
62345cf23488/Securities-Settlements-2011-Review-and-Analysis.pdf.  Small settlements are the
norm.  More than half the securities class actions in Cornerstone Research's dataset settled for less
than $10 million.

69.     Third, because mega-fund settlements are rare, the 34 cases listed in Table 1
actually document a significant tendency on the part of judges to award fees of 30% or more in
large cases.  As explained above, they show that the prevailing judicial practice is *not* to reduce
fee percentages automatically as recoveries grow; it is to award fees that are warranted in light of
the circumstances, which can justify high percentages even in large cases.  When class actions last
for years, are tried and appealed, or require lawyers to absorb large risks and costs for other
reasons, judges recognize the fact and regulate lawyers' compensation accordingly.  In this case,
Class Counsel incurred enormous risks, as explained in Section V.B.  They pursued an antitrust
case against well-heeled defendants without the benefit of a prior governmental investigation,
persevered for over a decade, prevailed on a contested motion for class certification, won at trial,

31

and held onto both the class and the verdict on appeal.  They have earned the fee award they request.

70.     In terms of risk, few cases compare to this one.  Indeed, many cases in Table 1 were of considerably shorter duration and involved far less risk.  The *Vitamins* and *Flat Panel* cases, mentioned in Paragraph 55 above, are two examples of cartel cases that settled *before* trial and *after* substantial assistance from criminal prosecutions, yet the courts awarded 34.6% and 30% in fees, respectively.  The trial judge in *Flat Panel* believed that "the not-insignificant risk involved in litigating the claims at issue" warranted the fee even though "some risk was lessened on account of parallel criminal price-fixing charges and guilty pleas." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *7.  The *Flat Panel* case also resolved in 6 years (versus 12 here) and involved neither a trial on the merits nor a post-verdict appeal.  The risks in *Flat Panel* and *Vitamins* were lower in all of these respects, but they were still great enough to warrant a substantial fee percentage in two mega-fund cases.

71.     *Dahl v. Bain Capital Partners* (listed at No. 15 on Table 1), a case in which I submitted an expert report on attorneys' fees, was another recent antitrust matter that settled before trial and resulted in a 33% fee from a $590 million class action recovery.  The *In re Tricor* direct and indirect purchaser settlements (Nos. 4 and 6 in Table 1) likewise settled before trial, with one-third fees being awarded by the court from mega-fund recoveries.

72.     *Allapattah Services* is one of the few comparable cases in terms of risk.  There, the lawyers who represented the plaintiff class also pulled off a miracle.  After 14 years of litigation against Exxon Corp., the case settled for $1.06 billion, after being tried twice and creating new authority on diversity jurisdiction in the Supreme Court.[7]  Recognizing that the lawyers bore

---

[7] See *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005).

enormous risks, the trial judge awarded a 31.33% fee. *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006).  In some respects, however, *Allapattah Services* was less risky than this case.  It was a breach of contract action in which thousands of dealers with similar contracts sued Exxon for discounts they claimed to be owed.  Insofar as the merits were concerned, the case was simpler, both legally and factually, than this one.  Class certification was also easier because the common issue was more obvious.

73.     *San Allen, Inc. v. Buehrer* is another comparable litigation.  There, class counsel sued an arm of the State of Ohio and challenged the legality of an insurance program that enjoyed enormous political support.  The complaint sought almost a billion dollars in premium refunds, an unheard of sum for a governmental entity to pay.  During 7 years of hard-fought litigation against an opponent with an essentially unlimited defense budget, class counsel prevailed on class certification after a contested trial court hearing, fended off challenges to the class on appeal twice, won on the merits at a bench trial that lasted 7 days, obtained a judgment in excess of $859 million, preserved $651 million of the judgment after an appeal and subsequent proceedings, and convinced the State to make $420 million in relief available in settlement.  Recognizing the risks class counsel bore, the trial judge awarded 32.5% of the enormous recovery as fees.  *San Allen, Inc. v. Buehrer, Admin., Ohio Bureau of Workers' Compensation*, CV-07-644950 (Common Pleas, Cuyahoga Cty, OH Nov. 25, 2014).  The fee was in the same range as that requested here, even though the case resolved in half the time.

74.     Ultimately, when awarding fees in this type of case, judges should strive to connect risks to rewards in the same manner that the market does.  Otherwise, lawyers will be discouraged from handling cases that impose enormous risks and absent class members will be denied representation, even when their claims have merit.  The record of fee awards described in Table 1

shows that judges understand the relationship that should exist between risks and rewards.  Even in cases that generate enormous recoveries, they award high percentage fees when lawyers incur risks that warrant them.

### E.     Class Counsel's Requested Multiplier Is Reasonable

75.     Given the size of the recovery in this case, the Court has discretion to approve the fee request knowing that the multiplier is approximately 3.2 based on current hourly rates.  The history of fee awards in class actions provides one basis for this.  Judges tend to award higher lodestar multipliers in cases with larger recoveries.  See Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248, 274 (2010) (finding that multipliers correlate strongly with settlement size).  Judges have also granted large multipliers in cases where the circumstances warrant.  As Judge Melinda Harmon noted when approving a $688 million fee award and 5.2 multiplier from the massive *Enron* settlement, many courts have approved multipliers of 4 or greater to account for risk, results, the market rate for legal services, and other relevant factors.  *In re Enron Corp. Sec., Derivative & ERISA Litig*., 586 F. Supp. 2d 732, 752 (S.D. Tex. 2008).  A survey of settlements and fee awards published by CLASS ACTION REPORTS bears out these observations.  It reports an average multiplier of 4.5 for the largest cases—those with settlements exceeding $100 million—and multipliers in individual mega-fund cases reaching as high as 21.8.  *Attorney Fee Awards in Common Fund Class Actions*, 24 CLASS ACTION REPORTS 4 (April 2003).

76.     Plainly, a district court judge has discretion to approve a lodestar multiplier in the 3-4 range, or even greater when the circumstances warrant.  This case presents the best reason for doing so.  The main purpose of lodestar multipliers is to compensate lawyers for bearing risks, and the risks Class Counsel bore in this litigation were enormous.  High risks and high rewards go

hand-in-hand in the private market for legal services, as previously explained.  To incentivize lawyers to handle risky antitrust class actions, judges should preserve the connection when awarding fees from common funds.

## VI.    CONCLUSION

77.    Class Counsel have secured the largest price-fixing verdict in history and one of the largest class action antitrust settlements ever.  This remarkable achievement, obtained after almost 12 years of litigation, was possible only because Class Counsel persevered in the face of extraordinary costs and risks.  Had paying clients hired these lawyers on contingency to handle this litigation, the best available evidence shows that they would have had to pay 33%-40% of their gross recoveries as fees.  Because the market for legal services provides the best guidance as to the value of lawyers' services, judges should apply similar percentages when awarding fees from common funds.  In fact, this is what many federal judges already do, including those who are bound to apply the factors set out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).  Federal judges also apply market-based fee percentages in cases that generate mega-fund recoveries, when the litigation risks warrant.  Because this antitrust class action was exceptionally risky, I conclude that Class Counsel's request for one-third of the recovery as fees is reasonable.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

June 1, 2016

_____
CHARLES SILVER

EXHIBIT A

RESUME OF PROFESSOR CHARLES SILVER

# CHARLES SILVER

School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705
(512) 232-1337 (voice)
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

## ACADEMIC EMPLOYMENTS

UNIVERSITY OF TEXAS SCHOOL OF LAW

| | |
|---|---|
| Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure | 2004-present |
| Co-Director, Center on Lawyers, Civil Justice, and the Media | 2001-present |
| Robert W. Calvert Faculty Fellow | 2000-2004 |
| Cecil D. Redford Professor | 1994-2004 |
| W. James Kronzer Chair in Trial & Appellate Advocacy | Summer 1994 |
| Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow | 1991-1992 |
| Assistant Professor | 1987-1991 |

HARVARD LAW SCHOOL

| | |
|---|---|
| Visiting Professor | Fall 2011 |

VANDERBILT UNIVERSITY LAW SCHOOL

| | |
|---|---|
| Visiting Professor | 2003 |

UNIVERSITY OF MICHIGAN LAW SCHOOL

| | |
|---|---|
| Visiting Professor | 1994 |

UNIVERSITY OF CHICAGO

| | |
|---|---|
| Managing Editor, Ethics: A Journal of Social, Political and Legal Philosophy | 1983-1984 |

## EDUCATION

JD 1987, Yale Law School
MA 1981, University of Chicago (Political Science)
BA 1979, University of Florida (Political Science)

38

## SPECIAL PROJECTS

Associate Reporter, Principles of the Law of Aggregate Litigation, American Law Institute (2010) (with Samuel Issacharoff (Reporter), Robert Klonoff and Richard Nagareda (Associate Reporters)).

Co-Reporter, Practical Guide for Insurance Defense Lawyers, International Association of Defense Counsel (2002) (with Ellen S. Pryor and Kent D. Syverud) (published on the IADC website in 2003 and revised and distributed to all IADC members as a supplement to the Defense Counsel J. in January 2004).

## BOOKS IN PROGRESS

Expensive By Design: Why American Health Care Costs Too Much And Delivers Too Little (coauthored with David A. Hyman)

To Sue is Human: Medical Malpractice Litigation in Texas 1988-2005 (coauthored with Bernard Black, David Hyman, and William Sage).

## BOOKS

Health Law and Economics, Edward Elgar (2016) (coedited with Ronen Avraham and David Hyman).

Law of Class Actions and Other Aggregate Litigation, 2nd Edition, Foundation Press (2013) (with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley).

Professional Responsibilities of Insurance Defense Counsel, LexisNexis Mathew Bender (2012) (with William T. Barker) (Annual Updates 2013-2105).

## PUBLICATIONS AND WORKS IN PROGRESS

1.   "A Private Law Defense of the Fiduciary Duty" (in progress) (presented at several law schools and conferences), available at http://ssrn.com/abstract=2728326.

2.   "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

3.   "It Was on Fire When I Lay Down on It: Defensive Medicine, Tort Reform, and Healthcare Spending," in I. Glenn Cohen, Allison Hoffman, and William M. Sage, eds., Oxford Handbook of American Health Law (forthcoming 2016) (with David A. Hyman).*

4.   "Compensating Persons Injured by Medical Malpractice and Other tortious behavior for Future Medical Expenses Under the Affordable Care Act," 25 Annals of Health Law 35 (2016) (with Maxwell J. Mehlman, Jay Angoff, Patrick A. Malone, and Peter H. Weinberger)

5.  "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010**,**" J. Empirical Legal Stud. (forthcoming 2016) (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati).

6.  "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

7.  "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," Rutgers U. L. Rev. (forthcoming 2015) (with William T. Barker) (symposium issue).

8.  "The Economics of Plaintiff-Side Personal Injury Practice," U. Ill. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

9.  "Fix Problems Where They Arise: The Liability System Is Not To Blame For The Problems of Healthcare," Oxford Handbook of American Health Law (Glenn I. Cohen, Allison Hoffman, and William Sage, eds.) (forthcoming 2015) (with David A. Hyman) (invited chapter).

10. "Policy Limits, Payouts, and Blood Money: Another Look at Med Mal Settlements in the Shadow of Insurance," U.C. Irvine L. Rev. (forthcoming 2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

11. "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., Research Handbook in the Law & Economics of Insurance (forthcoming 2015) (peer-reviewed).

12. "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with David A. Hyman, Bernard S. Black and Myungho Paik) (peer-reviewed), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.

13. "Insurer Rights to Limit Costs of Independent Counsel," ABA/TIPS Insurance Coverage Litigation Section Newsletter 1 (Aug. 2014) (with William T. Barker).

14. "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

15. "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation?  A Comment on Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation," 5 J. of Tort L. 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

16. **"Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," 63 DePaul L. Rev. 574 (2014) (with David A. Hyman) (invited symposium).

17. "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 DePaul L. Rev. 617 (2014) (invited symposium).

18.   "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

19.   "Five Myths of Medical Malpractice," 143:1 Chest 222-227 (January 2013) (with David A. Hyman) (peer-reviewed).

20.   "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard Black, David A. Hyman, Myungho Paik, and William Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017 (peer-reviewed).

21.   "Ethical Obligations of Independent Defense Counsel," 22:4 Insurance Coverage (July-August 2012) (with William T. Barker), available at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

22.   "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (coauthored with David A. Hyman), 46 New England L. Rev. 101 (2012) (invited symposium).

23.   "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?", in Ken Oliphant & Richard W. Wright (eds.) Medical Malpractice and Compensation in Global Perspective (2013), originally published in 87 Chicago-Kent L. Rev. 163 (2012) (coauthored with David A. Hyman).

24.   "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman) (peer reviewed).

25.   "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012) (peer-reviewed).

26.   "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. 1985 (2011) (invited symposium).

27.   "Fiduciaries and Fees," 79 Fordham L. Rev. 1833 (2011) (with Lynn A. Baker) (invited symposium).

28.   "The Impact of the Duty to Settle on Settlement: Evidence From Texas," 8 J. Empirical Leg. Stud. 48-84 (2011) (with Bernard Black and David A. Hyman) (peer reviewed).

29.   "Ethics and Innovation," 79 George Washington L. Rev. 754 (2011) (invited symposium).

30.   "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard Black and David A. Hyman) (peer reviewed).

31.    "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 <u>Fordham Urb. L. J.</u> 357 (2010) (with David A. Hyman) (invited symposium).

32.    "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 <u>Vanderbilt L. Rev</u>. 107 (2010) (with Geoffrey P. Miller).

33.    "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 <u>J. Empirical Legal Stud</u>. 723 (2009) (with David A. Hyman and Bernard S. Black) (peer-reviewed).

34.    **"**Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 <u>J. Legal Analysis</u> 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue) (peer-reviewed).

35.    "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 <u>The Advocate</u> 25 (2008) (with David A. Hyman and Bernard Black) (invited symposium).

36.    "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 <u>Amer. Law & Econ. Rev.</u> 185 (2008) (with Bernard Black, David A. Hyman, and William M. Sage) (peer-reviewed).

37.    "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 <u>DePaul L. Rev.</u> 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

38.    "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 33 <u>Geneva Papers on Risk and Insurance: Issues and Practice</u> 177-192 (2008) (with David A. Hyman, Bernard S. Black, William M. Sage and Kathryn Zeiler) (peer-reviewed).

39.    "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 <u>J. Legal Stud.</u> S9 (2007) (with Bernard Black, David A. Hyman, William Sage, and Kathryn Zeiler) (peer-reviewed).

40.    "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," <u>J. Empirical Legal Stud.</u> 3-68 (2007) (with Bernard Black, David A. Hyman, William M. Sage, and Kathryn Zeiler) (peer-reviewed).

41.    Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider, 20 <u>The NAPPA Report</u> 7 (Aug. 2006).

42.    "The Allocation Problem in Multiple-Claimant Representations," 14 <u>S. Ct. Econ. Rev.</u> 95 (2006) (with Paul Edelman and Richard Nagareda) (peer-reviewed).

43.    "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006) (accompanied Task Force on Contingent Fees, Tort Trial and Insurance Practice Section

of the American Bar Association, "Report on Contingent Fees in Class Action Litigation," 25 Rev. of Litig. 459 (2006)).

44.   "In Texas, Life is Cheap," 59 <u>Vanderbilt L. Rev.</u> 1875 (2006) (with Frank Cross) (invited symposium).

45.   "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 <u>Vanderbilt L. Rev</u>. 1085 (2006) (with David A. Hyman) (invited symposium).

46.   "A Rejoinder to Lester Brickman: *On the Theory Class's Theories of Asbestos Litigation,"* 32 <u>Pepperdine L. Rev.</u> 765 (2005).

47.   "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII <u>Widener L. J.</u> 121 (2005) (with David A. Hyman) (invited symposium).

48.   "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 <u>J. Empirical Legal Stud.</u> 207–259 (July 2005) (with Bernard Black, David A. Hyman, and William S. Sage) (peer-reviewed).

49.   "Speak Not of Error, <u>Regulation</u> (Spring 2005) (with David A. Hyman).

50.   "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?," 90 <u>Cornell L. Rev.</u> 893 (2005) (with David A. Hyman).

51.   "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 <u>Pepp. L. Rev.</u> 301 (2004) (invited symposium).

52.   "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 <u>Harv. J. L. and Pub. Pol</u>. 107 (2004) (with David A. Hyman) (invited symposium).

53.   "We're Scared To Death: Class Certification and Blackmail," 78 <u>N.Y.U. L. Rev.</u> 1357 (2003).

54.   "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 <u>Ariz. L. Rev.</u> 787 (2002) (invited symposium).

55.   "Introduction: Civil Justice Fact and Fiction," 80 <u>Tex. L. Rev.</u> 1537 (2002) (with Lynn A. Baker).

56.   "Does Civil Justice Cost Too Much?" 80 <u>Tex. L. Rev.</u> 2073 (2002).

57.   "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 <u>G'town J. Legal Ethics</u> 29 (2001) (with Ellen S. Pryor).

58.   "A Critique of *Burrow v. Arce*," 26 <u>Wm. & Mary Envir. L. & Policy Rev.</u> 323 (2001) (invited symposium).

43

59. "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

60. "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).

61. "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 Tex. L. Rev. 599 (2000) (with Ellen S. Pryor).

62. "What's Not To Like About Being A Lawyer?," 109 Yale L. J. 1443 (2000) (with Frank B. Cross) (review essay).

63. "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

64. "The Aggregate Settlement Rule and Ideals of Client Service," 41 S. Tex. L. Rev. 227 (1999) (with Lynn A. Baker) (invited symposium).

65. "Representative Lawsuits & Class Actions," in Int'l Ency. Of L. & Econ., B. Bouckaert & G. De Geest, eds., (1999) (peer-reviewed).

66. "Preliminary Thoughts on the Economics of Witness Preparation," 30 Tex. Tech L. Rev. 1383 (1999) (invited symposium).

67. "The Lost World: Of Politics and Getting the Law Right," 26 Hofstra L. Rev. 773 (1998) (invited symposium).

68. "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 Conn. Ins. L. J. 205 (1998) (invited symposium).

69. "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 Va. L. Rev. 1465 (1998) (with Lynn A. Baker) (invited symposium).

70. "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 G'town J. Legal Ethics 959 (1998) (with David A. Hyman) (invited symposium).

71. "Mass Lawsuits and the Aggregate Settlement Rule," 32 Wake Forest L. Rev. 733 (1997) (with Lynn A. Baker) (invited symposium).

72. "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 Fordham L. Rev. 233 (1996) (invited symposium).

73. "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6-3 Coverage 47 (May/June 1996) (with Michael Sean Quinn).

74. "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6-2 <u>Coverage</u> 21 (Jan./Feb. 1996) (with Michael Sean Quinn).

75. "Bargaining Impediments and Settlement Behavior," in <u>Dispute Resolution: Bridging the Settlement Gap</u>, D.A. Anderson, ed. (1996) (with Samuel Issacharoff and Kent D. Syverud).

76. "The Legal Establishment Meets the Republican Revolution," 37 <u>S. Tex. L. Rev.</u> 1247 (1996) (invited symposium).

77. "Do We Know Enough About Legal Norms?" in <u>Social Rules: Origin; Character; Logic; Change</u>, D. Braybrooke, ed. (1996).

78. "The Professional Responsibilities of Insurance Defense Lawyers," 45 <u>Duke L. J.</u> 255 (1995) (with Kent D. Syverud), reprinted in <u>Ins. L. Anthol.</u> (1996) and 64 <u>Def. L. J.</u> 1 (Spring 1997).

79. "Wrong Turns on the Three Way Street: Dispelling Nonsense About Insurance Defense Lawyers," 5-6 <u>Coverage</u> 1 (Nov./Dec.1995) (with Michael Sean Quinn).

80. "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 <u>Tex. L. Rev.</u> 1203 (1994) (with Ellen Smith Pryor).

81. "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 <u>Tex. L. Rev.</u> 1583 (1994), reprinted in Practising Law Institute, <u>Insurance Law: What Every Lawyer and Businessperson Needs To Know</u>, Litigation and Administrative Practice Course Handbook Series, PLI Order No. H0-000S (1998).

82. "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice (3d)</u> (Texas Center for Legal Ethics and Professionalism 1996).

83. "Getting and Keeping Clients," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice (3d)</u> (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

84. "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 <u>Law and Contemporary Problems</u> 213 (1995) (with John S. Dzienkowski, Sanford Levinson, and Amon Burton).

85. "Advertising and Marketing Legal Services," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice</u> (Texas Center for Legal Ethics and Professionalism 1994).

86. "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice</u> (Texas Center for Legal Ethics and Professionalism 1994).

87. "Thoughts on Procedural Issues in Insurance Litigation," VII <u>Ins. L. Anthol.</u> (1994).

88.    "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 <u>Clearinghouse Rev</u>. 114 (June 1994) (with Stephen Yelenosky).

89.    "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 <u>Tex. Rev. of Litig.</u> 301 (1993).

90.    "A Missed Misalignment of Interests: A Comment on Syverud, The Duty to Settle," 77 <u>Va. L. Rev.</u> 1585 (1991), reprinted in VI <u>Ins. L. Anthol.</u> 857-870 (1992).

91.    "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 <u>Tex. L. Rev.</u> 865 (1992).

92.    "Comparing Class Actions and Consolidations," 10 <u>Tex. Rev. of Litig.</u> 496 (1991).

93.    "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 <u>Cornell L. Rev.</u> 656 (1991).

94.    "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 <u>L. & Phil.</u> 381 (1987) (peer-reviewed).

95.    "Justice In Settlements," 4 <u>Soc. Phil. & Pol.</u> 102 (1986) (with Jules L. Coleman) (peer-reviewed).

96.    "Negative Positivism and the Hard Facts of Life," 68 <u>The Monist</u> 347 (1985) (peer-reviewed).

97.    "Utilitarian Participation," 23 <u>Soc. Sci. Info.</u> 701 (1984) (peer-reviewed).

98.    "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 <u>Pop. Res. & Pol. Rev.</u> 255 (1984) (with Robert Y. Shapiro) (peer-reviewed).

## NOTABLE SERVICE ACTIVITIES

Associate Reporter, American Law Institute Project on the Principles of Aggregate Litigation

Interested Party, Statistical Information Task Force, National Association of Insurance Commissioners, Model Medical Malpractice Closed Claim Reporting Law

Invited Academic Member, American Bar Association/Tort & Insurance Practice Section Task Force on the Contingent Fee

Chair, Dean Search Committee, School of Law, University of Texas at Austin

Chair, Budget Committee, School of Law, University of Texas at Austin

Coordinator, General Faculty Colloquium Series, School of Law, University of Texas at Austin

Sole Drafter, Assessment Report for the Juris Doctor Program at the School of Law, University of Texas at Austin, for the Commission on Colleges of the Southern Association of Colleges and Schools

## RECENT AWARDS

Distinguished Fellow, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (2014)

Robert B. McKay Law Professor Award, Tort Trial & Insurance Practice Section, American Bar Association (2009)

Faculty Research Grants, University of Texas at Austin (various years)

## MEMBERSHIPS

American Bar Foundation

Texas Bar Foundation (Life Fellow)

State Bar of Texas (admitted 1988)

Tort Trial and Insurance Practice Section, American Bar Association

Society for Empirical Legal Studies

American Law and Economics Association

American Association for Justice

Association of American Law Schools

EXHIBIT B

TABLE OF PHARMACEUTICAL ANTITRUST CASES

| RECOVERIES AND FEE AWARDS IN PHARMACEUTICAL ANTITRUST CASES, SORTED BY DATE | | |
|---|---|---|
| **Case** | **Recovery (millions)** | **Fee Award** |
| *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015) | $512 | 27.5% plus expenses |
| *In re Doryx Antitrust Litig.*, No. 12-3824 (E.D. Pa. Sept. 15, 2014) | $15 | 33⅓% plus expenses |
| *In re Neurontin Antitrust Litig.*, No. 02-1830 (D.N.J. Aug. 6, 2014) | $191 | 33⅓% plus expenses |
| *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-cv-83 (E.D. Tenn. June 30, 2014) | $73 | 33⅓% plus expenses |
| *In re Flonase Antitrust Litig.*, No. 08-cv-3149 (E.D. Pa. June 14, 2013) | $150 | 33⅓% plus expenses |
| *In re Wellbutrin XL Antitrust Litig.*, No. 08-cv-2431 (E.D. Pa. Nov. 7, 2012) | $37.50 | 33⅓% plus expenses |
| *Rochester Drug Co-Operative, Inc. v. Braintree Labs., Inc.*, No. 07-142 (D. Del. May 31, 2012) | $17.25 | 33⅓% plus expenses |
| *In re DDAVP Antitrust Litig.*, No. 05-2237 (S.D.N.Y. Nov. 28, 2011) | $20.25 | 33⅓% plus expenses |
| *In re Wellbutrin SR Antitrust Litig.*, No. 04-5525 (E.D. Pa. Nov. 21, 2011) | $49 | 33⅓% plus expenses |
| *Meijer, Inc. v. Abbott Labs.*, No. C07-5985 CW (N.D. Cal. Aug. 11, 2011) | $52 | 33⅓% plus expenses |
| *In re Nifedipine Antitrust Litig.*, No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011) | $35 | 33⅓% plus expenses |
| *In re Oxycontin Antitrust Litig.*, No. 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011) | $16 | 33⅓% plus expenses |
| *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-340 (D. Del. April 23, 2009) | $250 | 33⅓% plus expenses |
| *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) | $75 | 33⅓% plus expenses |
| *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, 2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) | $74 | 33⅓% plus expenses |
| *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) | $175 | 33⅓% plus expenses |
| *In re Buspirone Antitrust Litig.*, No. 01-CV-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) | $220 | 33⅓% plus expenses |
| *In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D. Mich. Nov. 26, 2002) | $110 | 30% plus expenses |