# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| IN RE: URETHANE ANTITRUST LITIGATION ) ) ) ) ) This Document Relates To: ) Polyether Polyols Cases ) ) | MDL No. 1616 No. 04-MD-1616-JWL |

**JOINT DECLARATION OF DONALD L. PERELMAN AND RICHARD A. KOFFMAN IN SUPPORT OF CLASS COUNSEL'S PETITION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

Donald L. Perelman and Richard A. Koffman declare as follows:

1. Donald L. Perelman states that he is a member of the law firm of Fine Kaplan and Black, R.P.C. ("Fine Kaplan") and is one of the Court-appointed Co-Lead Counsel for the Plaintiff Class in this litigation.

2. Richard A. Koffman states that he is a partner in the law firm of Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") and is one of the Court-appointed Co-Lead Counsel for the Plaintiff Class in this litigation.

3. Class Counsel submit this Declaration in support of Class Plaintiffs' Petition For Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses. We have personal knowledge of the matters set forth in this affidavit and, if called as witnesses, we could and would testify competently thereto.

4. Fine Kaplan and Cohen Milstein worked together on the pre-complaint investigation, devoting substantial time and effort. We interviewed witnesses relating to the nature and structure of the industry and pricing in the industry. We interviewed purchasers of

Polyether Polyol Products and examined their documents to determine transactional prices. We engaged and worked with an expert economist who analyzed both publicly available information and transactional price information and documents we obtained from purchasers.

5. Based on the foregoing investigation, we determined that there was a strong basis to allege that the major manufacturers of Polyether Polyol Products – BASF, Bayer, Dow, Huntsman and Lyondell – had engaged in collusive pricing with respect to the products. At the same time, we recognized that the case presented significant risk in the form of legal and factual difficulties and procedural and substantive obstacles.

6. On November 23, 2004, Plaintiffs' Counsel filed the initial complaint in this matter, captioned *Seegott Holdings, Inc. v. Bayer AG et al.*, No. 04-5850 (JAP), in the United States District Court for the District of New Jersey.

7. Plaintiffs' Counsel accepted this case on a completely contingent basis and advanced all costs.

8. On June 16, 2005, the Judicial Panel on Multidistrict Litigation ("JPML") transferred the *Polyether Polyol* cases to this Court for consolidation or coordination with the pending *Polyester Polyol* cases. *See* Dkt. No. 83.

9. Following the JPML's transfer order, Plaintiffs' Counsel prepared briefs and participated in argument before the Court and persuaded the Court that this case should be coordinated, not consolidated, with the *Polyester Polyols* cases, because the cases involved two distinct sets of products and two distinct conspiracies. *See* Dkt. Nos. 128, 132, 133, 136 and 157.

10. On November 10, 2005, the Defendants moved to dismiss the Polyether plaintiffs' consolidated amended complaint (Dkt. No. 158), arguing the allegations failed to state a claim.

Plaintiffs' Counsel prepared and filed a comprehensive response brief (Dkt. No. 180) and defended the complaint at oral argument on January 9, 2006.

11. The Court denied Defendants' motion as to Plaintiffs' antitrust claims, but granted the motion with respect to the fraudulent concealment allegations, with leave to amend. *See* Dkt. No. 198.

12. Over a period of several months in 2005 and 2006, Plaintiffs' Counsel and Counsel for Bayer engaged in settlement negotiations, both in person and via telephone. Those negotiations culminated in a $55.3 million settlement agreement, dated January 31, 2006.

13. The Bayer settlement agreement included a cooperation provision. Pursuant to that provision, Plaintiffs obtained valuable cooperation from Bayer, including information that the conspiracy impacted not only the basic chemicals at issue in our initial complaints (MDI, TDI and polyether polyols), but also systems containing the basic chemicals.

14. Pursuant to the cooperation provision, Plaintiffs were able to obtain information and documents from Bayer to support Plaintiffs' claims without the burdens of protracted and expensive discovery. Documents and information obtained from Bayer were featured in Plaintiffs' successful class certification motion, and information from Bayer provided details about conspiratorial meetings and communications that assisted Plaintiffs in pursuing merits discovery and framing their litigation strategy.

15. On February 3, 2006, Plaintiffs moved to amend their complaint to include purchases of Polyether Polyol systems. *See* Dkt. Nos. 206 & 207. Defendants opposed including systems in the complaint and moved to dismiss on statute of limitations grounds. *See* Dkt. Nos. 238 to 240. We prepared and filed two separate response briefs (Dkt. Nos. 270 & 271) and argued Plaintiffs' position during a March 27, 2006 hearing before the Court. *See* Dkt. No.

288. On April 14, 2006, the Court granted Plaintiffs' motion to amend and denied Defendants' motion to dismiss.  *See* Dkt. No. 295.

16. During the class certification phase of discovery, Plaintiffs' Counsel served document requests and interrogatories on the non-settling Defendants and participated in six depositions of witnesses for Plaintiffs and Defendants.  Pursuant to its cooperation agreement, Bayer produced approximately 444,000 pages of documents, all of which were reviewed by Plaintiffs' Counsel.  The non-settling Defendants produced approximately 300,000 additional pages of documents, which likewise were reviewed and analyzed by Plaintiffs' Counsel.  We also worked with our clients, the representative plaintiffs, to produce documents in response to the non-settling Defendants' document requests and to respond to Defendants' interrogatories.

17. Obtaining usable transaction data from all Defendants was an important aspect of class certification discovery.  This process was a complicated undertaking, and involved receiving from Defendants millions of records of transactions of the relevant products in electronic media and extensive negotiations between Plaintiffs' Counsel and Defendants' Counsel as to the extent, scope and format of that production.  Plaintiffs' Counsel had extensive discussions with Plaintiffs' expert consultants and Defendants' Counsel and Defendants' "IT" personnel resolving issues related to understanding the voluminous data produced and making it usable for the benefit of the Class.

18. Plaintiffs' Counsel worked extensively with Plaintiffs' expert consultants with respect to the facts of the case, organizing and "cleaning up" the voluminous transaction data collected from the defendants, and the experts' findings and statistical analyses.  We worked closely with Plaintiffs' expert economist for class certification, Dr. John Beyer, during preparation of his reports and defended him during three days of deposition.  Plaintiffs' Counsel

and their experts reviewed Defendants' expert's submissions with respect to class certification and deposed Defendants' expert economist, Dr. Rapp, for two days.

19. In support of Plaintiffs' motion for class certification, Plaintiffs' Counsel researched and drafted 161 pages of briefs supported by 120 exhibits. Responding to Defendants' opposition papers required a considerable investment of time, including extensive legal research, multiple drafts of responsive arguments, lengthy discussions with Plaintiffs' economic experts, and preparation for oral argument. The Court granted Plaintiffs' motion for class certification on July 29, 2008. *See* Dkt. No. 708.

20. Defendants filed a Rule 23(f) Petition for review of the Court's class certification order, and Plaintiffs' Counsel prepared a successful opposition brief submitted to the Tenth Circuit.

21. Plaintiffs' Counsel worked to provide notice to the litigation class, establish a website (www.PolyetherPolyolLitigation.com) regarding the certification decision, and manage requests for exclusion, among other administrative matters.

22. Merits discovery commenced in the fall of 2008. Plaintiffs' Counsel negotiated a discovery schedule, researched and retained a sophisticated e-discovery vendor, and prepared and served on Defendants merits interrogatories and requests for production of documents.

23. Beginning in October 2008, Plaintiffs' Counsel participated in dozens of meet-and-confer conference calls with defense counsel, both on a group and bilateral basis, addressing numerous issues relating to merits discovery, including the temporal scope of Plaintiffs' discovery requests, an e-discovery protocol, the relevance of certain requests of both Plaintiffs and Defendants, the identity of custodians whose files should be searched, the timing for service

of Defendants' interrogatory responses, and the provision of test productions to ensure technical sufficiency, among many other issues.

24. The meet-and-confer negotiations between Plaintiffs and Defendants led to many agreements reached without Court intervention; at the same time, disputes arose, requiring Plaintiffs' Counsel to conduct legal research, draft discovery motions, and respond to Defendants' motions to compel. More than twenty discovery-related motions were filed by the Class Plaintiffs and Defendants requiring sometimes extensive briefing by Plaintiffs' Counsel and, on one occasion, retention of an expert on foreign law. *See* Dkt. No. 782 (Class Plaintiffs' opposition to BASF SE's motion for a protective order, which sought an order requiring that discovery of BASF SE proceed under the Hague Evidence Convention); *see also* Dkt. Nos. 746, 752, 763, 765, 849, 855, 1044, 1045, 1083, 1255, 1678, 1725, 1807, 1809, 1850, 1965.

25. In February 2009, Defendants began producing voluminous amounts of documents to Class Plaintiffs in electronic form. Rolling productions continued throughout 2009 and well into 2010. In all, Defendants produced almost 14 million pages of documents to Plaintiffs. Plaintiffs' Counsel loaded these documents onto an electronic database.

26. Plaintiffs' Counsel developed a document review protocol to efficiently review and synthesize these documents, paying particular attention to "key" executives with top-level responsibilities for pricing and production of Polyether Polyol Products and other participants in the conspiracy. Plaintiffs' Counsel took advantage of the electronic capabilities of their document platform to supplement the review efforts by searching for key terms likely to appear in relevant documents. Plaintiffs' Counsel also hired an American lawyer fluent in German to review documents produced from European custodians. Finally, Plaintiffs' Counsel assigned a few experienced attorneys to conduct targeted searches designed to gather information about

certain important people, facilities, trade association meetings, price increase announcements, and other specific issues.

27. Plaintiffs' Counsel synthesized the information learned from the document review into the context of other information that Plaintiffs had uncovered through their investigation and during the class certification discovery in this matter.

28. Plaintiffs' Counsel drafted chronologies and summary memos organizing the documents so that they could see how various pieces of the conspiracy fit together. By way of example, Plaintiffs' Counsel closely studied phone records, expense reports and other documents showing meetings with competitors and thereby developed significant evidence tying Defendants' pricing activities to their communications with competitors. Plaintiffs' Counsel also searched for and collected documents corroborating and expanding on the information provided by the Bayer witnesses, who provided substantial information about the conspiracy. This extensive document work uncovered significant circumstantial evidence of the conspiracy and laid the groundwork for the deposition program.

29. From September 2009 through January 2011, Plaintiffs noticed and took 57 depositions, largely of Defendants' current and former employees. The depositions required the preparation of detailed outlines and extensive work to locate, organize and analyze potential exhibits. Direct Action Plaintiffs noticed 3 depositions, and Defendants noticed another 39 depositions. Thus, there were a total of 99 merits depositions in this case that Plaintiffs' Counsel prepared for and attended. The depositions took place in 17 different states and in 3 foreign countries. Plaintiffs' Counsel attended an additional 49 depositions of DAPs' former and current employees relating to "downstream discovery" and other issues relating to a possible price-fixing conspiracy among certain of the DAP entities.

30. Plaintiffs' Counsel worked extensively with Plaintiffs' expert consultants, InfoTech, Inc., with respect to the facts of the case; organizing and "cleaning up" the voluminous transaction data; organizing and collecting documents relevant to their analysis; and the experts' findings, analyses and reports. Plaintiffs' Counsel worked closely with Plaintiffs' expert econometrician, Dr. James McClave, and expert economist, Prof. John Solow, during the preparation of their reports.

31. Expert discovery was extensive and included fourteen total days of expert depositions – Dow's two experts for five days, class plaintiffs' two experts for six days and DAPs' expert for three days.

32. At the same time that Plaintiffs' Counsel were pursuing the merits of this case, counsel worked to distribute the settlement proceeds from the Bayer settlement to the Settlement Class. This work included overseeing the claims process administered by the Claims Administrator, Rust Consulting (f/k/a Complete Claim Solutions, LLC); communicating with Settlement Class members about their claims; and making oral and written presentations to the Court seeking approval to distribute the Bayer settlement funds to the Settlement Class. This work culminated with the issuance of payments to Class members in January 2011.

33. Over a period of several months in 2010 and 2011, Plaintiffs' Counsel and counsel for Huntsman engaged in settlement negotiations, both in person and via telephone. These negotiations culminated in the $33 million settlement agreement, dated May 27, 2011. Thereafter, Plaintiffs' Counsel committed significant time and effort to establishing an escrow account for the settlement funds, updating the settlement website (www.PolyetherPolyolSettlement.com), and obtaining Court approval of the settlement, including briefing and developing a notice program for the class.

34. Similarly, over a period of several months in 2010 and 2011, Plaintiffs' Counsel and counsel for BASF engaged in settlement negotiations, both in person and via telephone. These negotiations culminated in the $51 million settlement agreement, dated September 21, 2011.

35. Lyondell filed for bankruptcy in late 2008 and thus, under the protections afforded by the automatic stay of the Bankruptcy Code, did not participate in the case after that time. Plaintiffs' Counsel engaged bankruptcy counsel, preserved the Class's antitrust claims by filing proofs of claim against Lyondell in the Bankruptcy Court, and monitored those proceedings. The Bankruptcy Court confirmed Lyondell's plan of reorganization in April 2010. Plaintiffs' Counsel studied the plan and conferred with Plaintiffs' bankruptcy counsel. Thereafter, Plaintiffs' Counsel had numerous settlement meetings and calls with counsel for Lyondell over a period spanning multiple months, and ultimately executed a nonmonetary settlement with Lyondell, which this Court approved on September 27, 2011. *See* Dkt. No. 2079.

36. In the Fall of 2012, after merits discovery closed, summary judgment and *Daubert* motions were briefed. Plaintiffs' Counsel opposed Dow's motion for summary judgment, filing 181 pages of briefing supported by 295 exhibits (Dkt. No. 2436), as well as a 47-page response to Dow's Rule 56.1 Statement (Dkt. No. 2470). Plaintiffs' Counsel also opposed Dow's *Daubert* motions, which sought to exclude Dr. John Solow and Dr. James McClave. (Dkt. Nos. 2428 & 2430). Plaintiffs' Counsel prepared for a day's worth of oral argument on these motions. After the argument, the Court denied Dow's motions in all respects. (Dkt. Nos. 2637 and 2649).

37. Plaintiffs' Counsel began preparing for trial of this matter years before the trial date. For example, Plaintiffs' Counsel's deposition strategy focused on developing credible

sponsoring witnesses for key documents and facts at trial, which was important given that the vast majority of witnesses at trial came in through videotape deposition.  Also, in March 2010, Plaintiffs' Counsel commenced lengthy negotiations with the non-settling defendants seeking to obtain a stipulation that certain documents were authentic and qualified as business records under the Federal Rules of Evidence.  That process involved negotiations over the language in the proposed stipulation; several exchanges among the parties of proposed lists of documents to be governed by the stipulation; review and analysis of the hundreds of listed documents; and subsequent conference calls and written communications among the parties concerning areas of agreement and disagreement.

38.     Plaintiffs' Counsel ramped up its trial preparation in the summer of 2012 with the preparation of the pretrial order.  Plaintiffs' Counsel prepared a draft of the order, negotiated key provisions with Dow and prepared for and attended the final pretrial conference before Magistrate Judge O'Hara.  The Court entered the Pretrial Order in July 2012.  (Dkt. No. 2374).

39.     Next, Plaintiffs' Counsel worked to distill the vast discovery record into a smaller universe of trial-worthy exhibits, witnesses and deposition designations – a process informed by much internal discussion and analysis.  This comprehensive process included a multi-day mock trial to help identify the most compelling evidence and arguments for the jury.

40.     Plaintiffs' Counsel eventually designated 2,137 trial exhibits, which were exchanged with Dow.  (Dkt Nos. 2555 and 2598).  Plaintiffs' Counsel then reviewed 1,737 exhibits on Dow's exhibit list (Dkt. No. 2556), as well as 1,537 additional exhibits on its supplemental exhibit list (Doc. 2559), and presented objections thereto (Dkt. Nos. 2660, 2679).  Plaintiffs' Counsel reviewed Dow's objections and engaged in lengthy negotiations to resolve

many objections without Court involvement, culminating in a pre-admissibility stipulation for more than 1,200 trial exhibits.  (Dkt. No. 2714).

41. Plaintiffs' Counsel designated deposition testimony from 41 witnesses from the five defendant companies; reviewed and prepared objections and counter-designations to Dow's designations for 34 witnesses, and prepared responsive objections and completeness designations to Dow's counters to Plaintiffs' initial designations.  (Dkt. Nos. 2550, 2621).

42. At the same time as they were preparing for trial, Plaintiffs' Counsel engaged in extensive pre-trial motion practice.  Plaintiffs filed nine motions *in limine*, including some relating to how witness testimony would be heard, *i.e.*, the order and timing of playing of videotaped deposition designations and whether Dow's live witnesses would be made available for live testimony in plaintiffs' case in chief.  (Dkt. Nos. 2568, 2581, 2597).  Plaintiffs also responded to Dow's motions *in limine* and filed several motions to compel Dow's compliance with the pretrial order.  (Dkt. Nos. 2582, 2620).

43. Also during the run up to trial, Plaintiffs' Counsel researched and drafted a proposed verdict form and jury instructions, exchanged proposals with Dow, and met and conferred.  Plaintiffs' Counsel filed a 59 page brief in support of their position on contested instructions (Dkt. No. 2689), plus a brief relating to the appropriate verdict form.  (Dkt. No. 2695).

44. On the eve of trial, Dow moved to decertify the class relying on previously undisclosed expert analysis.  The motion challenged, among other things, Plaintiffs' expert's use of extrapolation to estimate damages for class members for whom data were unavailable, an issue not raised by Dow in its earlier *Daubert* motion.  During trial, Plaintiffs' Counsel prepared and filed a response to this motion.  (Dkt. No. 2752).

45. Prior to trial, the Plaintiffs' trial team shifted their operations from their offices into a large commercial space a few blocks from the Kansas City courthouse. This office was staffed with many experienced lawyers, paralegals and support staff – most of whom worked very long hours seven days a week for the duration of the four-week trial.

46. Among other things, the trial team worked on jury pool research and selection; preparation of opening statement demonstratives, and Plaintiffs' order of proof; research, briefing and argument for outstanding evidentiary issues; daily negotiations and correspondence with Dow; finalizing and organizing trial exhibits to be presented; preparing expert and fact witnesses; finalizing cross-examination outlines; reviewing, cutting and re-cutting video deposition designations; managing trial vendors (trial technology, consultants, logistics, etc.); and daily trial team strategy meetings.

47. Several attorneys appeared every day in Court for the four-week trial and many other attorneys and paralegals attended portions of the trial in a supporting role.

48. After the jury rendered its verdict in favor of the Class, Plaintiffs' Counsel remained busy with post-trial motion practice. In particular, Plaintiffs' Counsel prepared comprehensive responses to supplemental briefing by Dow on its motion to decertify (Dkt. No. 2817) and Dow's motion for judgment as a matter of law or for a new trial (Dkt. Nos. 2816, 2836). Thereafter, Plaintiffs' Counsel prepared a response to Dow's motion to amend the judgment (Dkt. No. 2925).

49. Plaintiffs' Counsel retained former Solicitor General Paul Clement to handle the appeal of this matter.

50. After lengthy briefing and oral argument – handled principally by Mr. Clement and his team at the Bancroft firm, with assistance from other Plaintiffs' Counsel – the Tenth

Circuit Court of Appeals affirmed the judgment on September 29, 2014. The Court of Appeals later denied Dow's motion for rehearing or rehearing *en banc,* with no Judge dissenting.

51. Dow next Petitioned for a Writ of *Certiorari* to the United States Supreme Court. Plaintiffs' Counsel monitored developments at the Supreme Court over the next year and a half. In particular, in June 2015, the *Urethane* case was held in abeyance pending the outcome in *Tyson Foods, Inc. v. Bouaphakeo*, S. Ct. No. 14-1146 (*cert. granted* June 8, 2015). Plaintiffs' Counsel worked throughout the summer of 2015 to understand the *Tyson* issues and prepare an *amicus* brief, which Plaintiffs' Counsel filed in September 2015.

52. For nearly two years, Plaintiffs' Counsel engaged in serious and continuing settlement discussions with Dow. In February 2016, the parties executed the $835 million settlement that is now before the Court for consideration.

53. Since the inception of this litigation, counsel for Defendants mounted a vigorous and aggressive defense of their clients. They have contested nearly every step of this litigation, including multiple motions to dismiss; more than twenty discovery motions; and extensive class certification proceedings, including an appeal to the Tenth Circuit and a Petition for *Certiorari* to the Supreme Court. Because of defense counsel's efforts, Plaintiffs' Counsel have had to expend significant additional time and expense to effectively prosecute the Class's claims. Since the case began in 2004, Plaintiffs' Counsel have devoted more than 193,000 hours to representing the Class. The lodestar at current rates is $100,796,604.70. (At historical rates, the lodestar is $77,531,954.45.) The portion of the total lodestar attributable to the period since the settlements with BASF and Huntsman (July 1, 2011 to March 31, 2016) is approximately $41,166,129.45 at current rates (and approximately $35,347,813.00 at historical rates). These lodestar figures

exclude Plaintiffs' Counsels' lodestar incurred preparing Class Plaintiffs' Petition for Award of Attorneys' Fees and Reimbursement of Litigation Expenses and related materials.

54. At all times throughout the case, Class Counsel have worked efficiently and made every effort to avoid wasting time or duplicating effort. In Co-Lead Counsel's experience, the total lodestar reported above is reasonable for a case of this nature (involving large claims and more than a decade of litigation against sophisticated Defendants), and indeed is lower than in many comparable cases of shorter duration.

55. Plaintiffs' Co-Lead Counsel have directed this case from its inception and are able to assess the weight and merit of each Plaintiffs' Counsel's contribution.

56. Due to the substantial demands of this case, both in terms of time and expense, Plaintiffs' Counsel have forgone other substantial litigation opportunities.

57. Plaintiffs' Counsel seek reimbursement for a total of $1,545,872.58 in costs and expenses incurred from July 1, 2011 to March 31, 2016 in the prosecution of this litigation. Plaintiffs' Counsel have advanced all of these costs and expenses and have not been reimbursed.

58. Each Plaintiff's law firm has submitted to Plaintiffs' Counsel a signed declaration setting forth that specific law firm's costs and expenses incurred in connection with the prosecution of this litigation from July 1, 2011 to March 31, 2016. The declaration submitted by each firm attests to the accuracy of, and provides the basis for, its expenses. Each firm requesting reimbursement of expenses has averred that the expenses are reflected in books and records maintained by the firm. The total of the amounts set forth in the individual law firm declarations is $1,151,563.39.

59. In addition, from time to time, law firms were directed to pay assessments to a common expense litigation fund ("Litigation Fund"), which was established by Plaintiffs'

Counsel to pay for common expenses of the litigation. The Litigation Fund has incurred $394,309.19 in expenses since July 1, 2011. Such common expenses included e-discovery and trial software ($16,036.68), outside photocopying ($92,628.01), document repository and storage expenses ($84,574.81), expert fees ($126,917.80), transcripts and research materials ($591.80), trial and appeal expenses ($54,216.35), cloud share services, federal express and postage ($2,904.03) and tax preparation and banking fees ($16,439.71). The expenses incurred by the Litigation Fund in this action are reflected in the books and records of the Litigation Fund. These books and records are prepared by a professional bookkeeper from expense vouchers, check records and other source materials and represent an accurate recordation of the expenses incurred.

60.     The foregoing aggregate lodestar and expense figures were compiled from detailed records accounting for Plaintiffs' Counsel's time, costs and expenses in this litigation. Plaintiffs' Counsel are prepared to submit these detailed records for the Court's review. However, because the firm declarations and common litigation fund materials reflect confidential information concerning the strategy, efforts, work product and resources of Plaintiffs' Counsel, Plaintiffs' Counsel would prefer that any such submission be made *in camera*, subject to an appropriate confidentiality order. Accordingly, today Class Plaintiffs also filed their Motion To Permit *In Camera* Submission Of Fee And Expense Declarations.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  June 1, 2016

 */s/  Donald L. Perelman*                                              */s/  Richard A. Koffman*
Donald L. Perelman                                                    Richard A. Koffman

Plaintiffs' Co-Lead Counsel