IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE:                                              )
URETHANE ANTITRUST LITIGATION    )    MDL No. 1616
                                                       )    Case No. 04-1616-JWL
This document relates to:                 )
The Polyether Polyol Cases               )
_____)

## MEMORANDUM AND ORDER

This matter came before the Court for hearing on July 27, 2016, on class plaintiffs' motion for final approval of a settlement with defendant Dow Chemical Company ("Dow") (Doc. # 3246), plaintiffs' motion for approval of a plan of allocation and distribution of the settlement fund (Doc. # 3248), and class counsel's petition for awards of attorney fees, expenses, and incentive payments (Doc. # 3250). The Court will enter separate orders granting those motions. By this Memorandum and Order, upon consideration of the written submissions and the arguments at the hearing, the Court **overrules** the objection by PMC Global, Inc. ("PMC Global") (Doc. # 3263) to plaintiffs' plan of allocation; and it **overrules** the objections by Johns Manville Corporation ("Johns Manville") and Whirlpool Corporation ("Whirlpool") (Doc. #3261) and by FXI, Inc. ("FXI") (Doc. # 3262) to the attorney fee petition .[1]

---

[1] FXI's objection is also asserted on behalf of class members Future Foam, Johnson Controls, Inc., and Lear Corporation. INOAC USA, Inc. also purports to join in the objection, but plaintiffs' counsel states that the class member purchased by that company previously opted out of this class action, which means that the company has no standing to assert this objection.

### I.     <u>**Background**</u>

In this multi-district class action, initiated in 2004, the plaintiff class alleged that Dow and other manufacturers conspired to fix prices for certain urethane chemical products, in violation of the Sherman Act, 15 U.S.C. § 1. The Court certified a class consisting of purchasers of the products from any defendant from January 1, 1999, through December 31, 2004. During the course of the litigation, plaintiffs reached settlements with the other defendants for amounts totaling $139,300,000. The claim against Dow, the remaining defendant, was tried to a jury over a period of four weeks, and on February 20, 2013, the jury awarded plaintiffs damages in the amount of $400,049,039.00, while finding that such amount did not include any damages for the period prior to November 24, 2000. The Court then modified the class to exclude purchases in 2004, and it eventually entered judgment against Dow in the amount of $1,060,847,117, an amount that accounted for statutory trebling and a setoff for the prior settlements. Dow appealed, but the Tenth Circuit affirmed the judgment. *See In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014). Dow then filed a petition for certiorari in the Supreme Court.

While the petition for certiorari was pending, plaintiffs and Dow reached a settlement in the amount of $835,000,000, which agreement included a release of all claims by class members based on purchases within the entire class period. On April 27, 2016, the Court issued orders by which it preliminarily approved the settlement and authorized notice to the class. Plaintiffs then filed their motions regarding approval of

the settlement, a plan of distribution, and attorney fees.  The only objections received by the Court with respect to those motions are those objections addressed herein.

## II.    **Objection to the Plan of Allocation and Distribution**

PMC Global objects to plaintiffs' proposed plan of allocation of the proceeds of the settlement with Dow.[2]  Specifically, PMC Global objects to the fact that the plan would not provide for any recovery with respect to purchases from January 1, 1999, to November 23, 2000 (also referred to herein as the "1999-2000 period")—a period within the class period—even though claims based on such purchases were included within the release of claims granted to Dow in the settlement agreement.  PMC Global is a holding company for several class members.  Although it states that it does not know the exact amount and breakdown of its companies' purchases during the class period, PMC Global states that those companies' claims based on a total of $117 million in purchases were approved with respect to the settlements with other defendants, and it believes that the majority of those purchases within the class period occurred before November 24, 2000.  PMC Global requests either a revised plan of allocation or, preferably, a procedure whereby plaintiffs would appoint independent counsel to represent the interests of purchasers from the 1999-2000 period and a mediator would hear arguments and recommend a revised plan of allocation.  In response, plaintiffs argue that the proposed

---

[2]PMC Global states explicitly that it favors approval of the settlement.

3

allocation is reasonable in light of the jury's finding of no damages during the 1999-2000 period.

The Court has previously stated the standard for approval of a plan of allocation of class action settlement proceeds as follows:

> In evaluating a plan of allocation, the court must ensure that the distribution of funds is fair and reasonable. When formulated by competent and experienced class counsel, . . . an allocation plan need only have a reasonable, rational basis. A reasonable plan may consider the relative strength and values of different categories of claims.

*See In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1262 (D. Kan. 2006) (Lungstrum, J.) (citations omitted); *see also Law v. NCAA*, 108 F. Supp. 2d 1193, 1196 (D. Kan. 2000) ("Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.") (citations and internal quotations omitted).

PMC Global argues that the allocation cannot be presumed fair because no class representative had a majority of its purchases during the 1999-2000 period. PMC Global further argues that the 1999-2000 period claims could have value, based on the facts that Dow evidently sought a release for those claims and that Dow sought judgment post-trial on those claims based on the verdict. PMC Global further argues that if the claims did have value, an allocation that includes no recovery for such claims is not reasonable. PMC Global contends that the jury's finding should not be dispositive on the issue but should merely be one factor, and that there is at least an argument that should be had

4

concerning the value of those claims. PMC Global cites various cases for the proposition that a reasonable allocation may include a recovery for claims that seem to have no value on the merits.

The Court rejects these arguments, and it remains unpersuaded that these claims may have value for purposes of an allocation of the settlement funds. The present case is distinguishable from the cases cited by PMC Global (as that party concedes), as in this case the jury's finding and the lack of a subsequent appeal of that finding foreclose any possible future recovery on such claims.[3] These claims are simply dead, with no further

---

[3]Addressing the cases on which PMC Global most heavily relies: In *In re BankAmerica Corp. Securities Litigation*, 210 F.R.D. 694 (E.D. Mo. 2002), the proposed allocation was not fair because the plaintiffs receiving no portion of the settlement did have valuable claims remaining under state law. *See id.* at 712. In the present case, the claims have no value. In *Law v. NCAA*, 108 F. Supp. 2d 1193 (D. Kan. 2000), which involved a settlement after a jury verdict for the plaintiff class, the plaintiffs had seemingly abandoned claims of some members at trial; nevertheless, the court approved an allocation under which those members would receive a small recovery. *See id.* at 1197. In that case, however, there does not appear to have been any objection to recovery by those members, and the court did not consider whether a no-recovery allocation would have been reasonable. *See id.* The fact that that court approved as reasonable an unopposed allocation that included a recovery for abandoned claims certainly does not mean that a court should reject a proposed allocation that does not include an award for worthless claims. In *Better v. YRC Worldwide, Inc.*, 2013 WL 6060952 (D. Kan. Nov. 18, 2013), the court refused to approve a plan of allocation with no recovery for a subset of plaintiffs where no class representatives were only members of that subset; thus, the Court could not determine whether plaintiffs were correct in arguing that the subset's claims had no merit. *See id.* at \*4-5. In that case, there had been no ruling on the merits of the claims, *see id.*, as there has been in this case. Moreover, as discussed below, the class representatives in this case could ably represent the interests of PMC Global. In *Freebird, Inc. v. Merit Energy Co.*, 2013 WL 1151264 (D. Kan. Mar. 19, 2013), the court approved an allocation under which a discounted recovery was allowed for certain claims that had been ruled time-barred. *See id.* at \*3.
(continued...)

recourse available. A reasonable defendant in Dow's position would naturally desire to obtain a release from all class members, whether or not some of those members still have viable claims; thus, the fact that the 1999-2000 period claims were included in the release does *not* provide evidence that those claims have value. *See In re CRT Antitrust Litig.*, 2016 WL 3648478, at *14 (N.D. Cal. July 7, 2016) ("That Defendants insisted on a global release does not change this analysis, since defendants typically insist on a global release in *every* case."). Nor does the fact that Dow sought judgment on these claims post-trial provide evidence that the claims have value, as Dow most likely sought such a judgment for its possible preclusive effect with non-parties, i.e., opt-outs from the class.[4] There is no basis to assign any value to the claims; thus, the proposed allocation

---

[3](...continued)
Again, the fact that one court approved a proposed allocation allowing for some recovery for seemingly worthless claims does not mean that such an allocation is required. Moreover, in *Freebird*, the case was still pending before the district court at the time of settlement, and thus the possibility existed that the limitations ruling could have been reversed on appeal—which means that those claims may have retained some value. In the present case, no possibility of appeal remained on the relevant claims. Finally, in *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242 (2d Cir. 2011), the court reversed the certification of a settlement class for lack of adequacy of representation under Rule 23; the court ruled that a subclass was required because no named plaintiff had claims only within the subset of the worst claims (which subset included 99 percent of the claims overall), and thus the court could not determine the amount by which those claims were inferior to the other claims. *See id.* at 254-55. Again, the case (which did not involve approval of a plan of allocation) does not stand for the proposition that worthless claims must be allocated a portion of a settlement fund. Moreover, as discussed below, the named plaintiffs in this case could adequately represent PMC Global's interest.

[4]In denying the motion, the Court noted that the requested amendment would essentially have affected only non-parties, and thus it independently considered the issue
(continued...)

precluding recovery for such claims is reasonable.

Nor is there any basis to delay the approval of plaintiffs' plan of allocation by requiring additional procedures to allow for further argument. The Court rejects PMC Global's argument that none of the named plaintiffs could represent its interests with respect to this issue. One named plaintiff made 41 percent of its class-period purchases during the 1999-2000 period, and that fraction for another named plaintiff was 32 percent. Those plaintiffs would have had an incentive to make any reasonable argument to compensate 1999-2000 period claims in the plan of allocation, and thus appointment of separate counsel to make that argument is unwarranted. Moreover, the arguments that PMC Global seeks to make before a mediator about the value of the 1999-2000 claims can just as easily be made—and have been made—before this Court in considering this motion, and the Court nevertheless remains unconvinced that these claims have value.

PMC Global concedes that a plan of allocation may reflect the relative strengths of the class members' various claims. *See In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d at 1262. PMC Global also concedes that a plan may reasonably allocate no recovery for certain claims. The court's reasoning in the *CRT* case in recently approving a plan of allocation applies here as well:

> As the Court noted earlier, no Ninth Circuit case holds that the release of a class action claim must be compensated in all instances, and

---

[4](...continued)
despite the lack of opposition from plaintiffs. *See* Memorandum and Order of July 26, 2013, at 4 n.2.

>this Court will not break new ground by announcing one. Class counsel here were within their rights to allocate the settlement proceeds according to the degree of injury suffered by the class. Certain class members were not injured in any manner recognized by law, and accordingly did not receive compensation. That Defendants insisted on a global release does not change this analysis, since defendants typically insist on a global release in *every* case. Were the Court to place any weight on this latter fact, it would essentially be adopting a *per se* compensation rule—which, as just explained, the Court is unwilling to do. Nor is the Court persuaded by the argument that plaintiffs with meritless claims should always be able to extract nuisance value for them whenever those claims are part of a global settlement. If such claims actually have value, the affected plaintiffs can demonstrate that fact during the objection process (or timely opt out). If they fail in that effort, the Court will not have worked any injustice in allowing claims with no value to go uncompensated.

*See In re CRT Antitrust Litig.*, 2016 WL 3648478, at *14 (citations and footnote omitted). In the present case—unlike in any case cited by PMC Global—the uncompensated claims were rejected by the jury, and no appeal was taken. Thus, more so than in any other case, the Court can conclude with certainty that these particular claims have no value. Therefore, the proposed plan of allocation reasonably apportions no recovery for those claims, and the Court overrules PMC's objection.

No other class member asserted an objection to the proposed plan of allocation, which plan experience class counsel recommends. The Court thus finds in its discretion that the proposed plan of allocation, which is based on calculations of actual damages as found by the jury, is fair and reasonable. The Court further finds that the other terms in the proposed plan relating to administration and distribution of the settlement fund are reasonable. Accordingly, the Court will approve the proposed plan of allocation by separate order.

### III.  <u>Objections to the Attorney Fee Petition</u>

Plaintiffs' counsel have moved for an award of attorney fees in the amount of one-third of the Dow settlement fund. Objections were filed by only two sets of objectors out of some 2,200 class members, although their purchases comprise a significant percentage of the class purchases to be compensated from the fund. Objectors argue that a one-third fee would be excessive.

Attorney fees are appropriately awarded from a class action settlement fund, "on the theory 'that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.'" *See Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). The Tenth Circuit has expressed a preference for the percentage-of-the-fund method of awarding attorney fees in common fund cases. *See Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995) (citing *Gottlieb*, 43 F.3d at 483). Objectors do not take issue with the use of the percentage-of-the-fund method in this case, and the Court finds it appropriate to use that method here.

The Tenth Circuit has endorsed the use of the following factors—the so-called *Johnson* factors—in setting percentage fee awards in common fund cases:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee—this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability

9

>of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*See Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-55 (10th Cir. 1988) (citing *Johnson v. Georgia Hwy. Expr., Inc.*, 488 F.2d 714 (5th Cir. 1974)).  "[R]arely are all of the *Johnson* factors applicable; this is particularly so in a common fund situation." *See id.*  In this case, the sixth, seventh, and eleventh factors are not applicable; the other factors, however, all weigh in favor of plaintiffs' counsel's request for a substantial award of attorney fees in the amount of one-third of the settlement fund.

The most important factor in this case is undoubtedly the amount involved and the results obtained.  "In a common fund case, . . . although time and labor required are appropriate considerations, the [eighth] *Johnson* factor—the amount involved and the results obtained—may be given greater weight when, as in this case, the trial judge determines that the recovery was highly contingent and that the efforts of counsel were instrumental in realizing recovery on behalf of the class."  *See Brown*, 838 F.2d at 456.  Hundreds of millions were at stake here, and counsel achieved incredible success on the merits of the claims, earning a verdict of over $400 million that would be trebled and eventually obtaining settlements totaling over $974 million (much more than double the amount of damages).  Liability on these claims was far from certain, and thus the case presented a great deal of risk, as counsel was required to advance all expenses and attorney time to litigate a hard-fought case against highly experienced opposing counsel hired by a defendant with ample resources.  The case was not settled pretrial for a

10

percentage of the damages, nor was it settled on appeal for a steep discount from the judgment amount; instead counsel litigated the case to a verdict and an appellate affirmance. Counsel achieved this verdict and judgment without the benefit of a government investigation or prosecution of members of the alleged antitrust conspiracy. The subject matter was complex and not easily digestible by a lay jury, and there were no personal injuries to heighten sympathy. In almost 25 years of service on the bench, this Court has not experienced a more remarkable result. This enormous success in a highly contingent case favors an award of a substantial percentage of the Dow settlement fund to the counsel who achieved that success for the class members.

The other applicable *Johnson* factors favor a significant fee award as well. Counsel and staff were required to expend an enormous amount of time and labor, totaling over 193,000 hours, over a period of more than 11 years (first factor). This was an extremely difficult and complex case (second factor). The case was contested quite vigorously on both sides, with significant disputed issues arising at the pleading and summary judgment stages, in class certification proceedings, in conducting fact and expert discovery, in pretrial motion practice, during a long jury trial, and on appeal. Litigation of this case required great skill in a highly specialized field (third factor), against highly skilled opposing counsel, and plaintiffs' attorneys, who had great experience and superior national reputations, demonstrated great skill throughout (ninth factor). The amount of time expended over a protracted period leaves little doubt that these attorneys were forced to forego other work during this case (as confirmed by the

11

attorneys' declarations) (fourth factor). The Court agrees with counsel that a one-third fee is customary in contingent-fee cases, and indeed that figure is often higher for complex cases or cases that proceed to trial (fifth factor).[5] The undesirability of this case (tenth factor) is shown by the fact that plaintiffs' counsel in the companion polyester cases, which were aided by a government investigation, declined to litigate these polyether cases as well.

The Court then turns to the only factor truly disputed by objectors—awards in similar cases (twelfth factor). Objectors argue that fees are typically awarded at a much lower percentage in so-called "megafund" cases that involve extremely large settlements (for instance, over $100 million), and they cite a number of cases and two surveys of cases with class-action settlements. They further argue that lower-percentage awards are especially common in the largest megafund cases, and FXI repeatedly cites the

---

[5]That figure is supported by counsel's expert and a 2004 survey. *See* Theodore Eisenberg and Geoffrey Miller, "Attorney Fees in Class Action Settlements: An Empirical Study," 1 J. Empirical L. Stud. 27, 35 (2004); *see also, e.g.*, *Flournoy v. Honeywell Int'l, Inc.*, 2007 WL 1087279, at *2 (S.D. Ga. Apr. 6, 2007) ("The most common contingent fee is one third of the recovery. Forty percent fee contracts are common for complex and difficult litigation . . . ."). Johns Manville and Whirlpool argue in a footnote that the Court should not find one-third to be a customary fee in considering this factor, but they cite no authority for that argument. These objectors concede that a one-third fee is common in "ordinary contingent-fee cases," but they argue that the present case is not ordinary by virtue of the large settlement amount. This argument, however, is better made in the context of the factor considering awards in similar cases (the twelfth factor), which the Court addresses below. Moreover, the Court is persuaded that any experienced counsel would have insisted on a contingent fee of at least one third for this case, given the great amount of risk involved, as discussed above. Thus, the Court finds that a one-third fee would be customary in a case of this type.

"principle" in the Tenth Circuit that fee award percentages decrease as settlement funds increase.

Objectors do not dispute, however, that the fee percentage must be determined on a case-by-case basis, based on a weighing of the applicable *Johnson* factors. Moreover, there is no Tenth Circuit principle as argued by FXI. The Tenth Circuit itself has not suggested such a principle; rather, FXI cites only two cases from district courts within the circuit. In *Ramah Navajo Chapter v. Jewell*, __ F. Supp. 3d __, 2016 WL 825710 (D.N.M. Mar. 2, 2016), the court stated that "[t]o avoid windfalls, Courts generally modify their analysis by awarding a lower percentage in mega fund cases," and that "courts in other districts have awarded between 10% and 15% of a mega fund." *See id.* at \*19 (citing cases). The court also noted contrary authority, however. *See id.* (citing *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006)). Moreover, in *Ramah*, the court was not asked to award a higher percentage fee; rather, it made these statements about other megafund cases in concluding that the 8.5 percent fee requested in that case was conservative. *See id.* In *In re Copley Pharmaceutical, Inc.*, 1 F. Supp. 2d 1407 (D. Wyo. 1998), the court noted that, according to studies, courts had reduced percentage fee awards as the size of recovery increases, in sensitivity to the concern that if a common fund is extraordinarily large, the application of a benchmark or standard percentage could result in a fee that is unreasonably large for the benefit conferred. *See id.* at 1413. The court then proceeded to consider the *Johnson* factors in determining an appropriate percentage-fee in that case. *See id.*

13

This Court appreciates that some courts have awarded lower percentages to avoid granting an excessive windfall to counsel under the unique circumstances of those cases. On the other hand, the court agrees with those courts who have noted that such a diminishing scale can fail to provide the proper incentive for counsel. For example, the court in *Allapattah* (cited in *Ramah*) reasoned as follows:

> While such an approach may have validity when there is a large settlement short of a full trial, I conclude that the rationale has no reasonable application in this unique case for the reasons I have already discussed. Likewise, the court in *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 197 (E.D. Pa. 2000) rejected this "declining percentage method:
>
>> Such an approach also fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is great risk of no recovery. Nor does it give significant weight to the fact that large attorneys' fees serve to motivate capable counsel to undertake these actions.
>
> While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method adopted by the Eleventh Circuit . . ., the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained. By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for the Class Counsel to settle too early for too little.

*See Allpattah*, 454 F. Supp. 2d at 1212-13 (citations and internal quotation omitted). Similarly, in the present case, as discussed above, class counsel achieved extraordinary success in a very long litigation. Thus, use of a declining-scale approach is not appropriate here, and the Court will award fees based on the unique circumstances of the

14

case.

Moreover, although objectors have cited a number of lower-percentage awards in megafund settlement cases, plaintiffs' counsel have cited many such cases in which courts did award higher percentages, up to and exceeding one-third of the fund. Counsel's expert has identified 34 megafund cases with settlements of at least $100 million in which the court awarded fees of 30 percent or higher. Thus, although a one-third fee would be at the top of the range of awards in megafund cases, that figure does still fall within that range, especially in more recent cases. Moreover, the consideration of awards in similar cases is but one factor among the many applicable *Johnson* factors to be considered here.

The Court concludes, based on a consideration of those applicable factors, that a percentage award at the top end of the range is warranted and reasonable here. All cases present unique circumstances, but it is difficult to imagine a case in which an award at the highest percentage would be more appropriate than in this case. As already discussed, counsel achieved an incredible result for the class, in a case with an extreme amount of risk at all stages of the litigation, and they obtained that result because they won what is reported to be one of the largest verdicts of its kind in United States history. Counsel had to build this case on their own, without the help of a governmental investigation or prosecution, after other counsel had declined to pursue it, and they toiled for many years, at great expense to themselves, with a very real risk that they would not recover anything from this defendant.

15

Thus, this case is easily distinguished from cases in which a lower-percentage fee was awarded.[6] The case most resembles *Allapattah*, in which the court awarded fees of 31-and-one-third percent of a $1 billion settlement after a jury verdict. Indeed, counsel's expert, Brian Fitzpatrick, who authored one of the empirical studies on which objectors rely, opines that of the 688 settlements in his study, *Allapattah* is the case most similar to the present case and supports the fee percentage requested here. Thus, the Court considers the facts that courts have awarded fees as high as one-third in megafund cases and that the most similar case included an award in excess of 31 percent.

In percentage-of-the-fund cases, courts often engage in a "cross-check" of the fee award against the lodestar figure accounting for counsel's hours and hourly rates. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305-06 (3d Cir. 2005). According to billing records provided *in camera* to the Court, counsel expended over 193,000 hours in this litigation, which, at current rates, yields a total lodestar amount of approximately $100 million.[7] Thus, an award of one-third of the Dow settlement fund would yield a total multiplier (including settlements with all defendants) of approximately 3.2.

---

[6]For instance, although the litigation in *Ramah* lasted 18 years, counsel worked on the case only for a total 19,213.48 hours, which yielded a multiplier of over 7. *See Ramah*, 2016 WL 825710. The present case involved ten times more hours, and even a one-third percentage award would yield a significantly lower multiplier here.

[7]Because of the long delay in receiving payment for past work, the Court concludes that use of current billing rates is appropriate in conducting this lodestar cross-check. *See Smith v. Village of Maywood*, 17 F.3d 219, 221 (7th Cir. 1994) (courts should use either current rates or past rates with interest).

16

Objectors note that they have not been allowed to examine the billing records, but because the records are used only for a cross-check and not to determine the actual amount of the award, it is less important for objectors to be able to dispute particular hours. Moreover, the Court has had the opportunity to review the records. If it were awarding damages based on the lodestar, the Court might very well reduce some of the hourly rates slightly and might very well be able to find some places in which the hours expended were excessive. This was an exceedingly complex case, however, and the Court cannot say that the hours needed to litigate the case reasonably would not be in the range of the hours actually expended. Moreover, the amounts at issue justified use of the best counsel charging the highest rates (just as Dow used similarly high-priced counsel in the litigation). Thus, even if the Court were to reduce the lodestar a small amount, such that the multiplier here increased to 4 or 5, that multiplier would fall within the range of multipliers accepted by a number courts in megafund cases, as demonstrated in plaintiffs' counsel's reply brief. Moreover, as the Court has discussed, the circumstances of this case justify the highest award, and in light of the great risk assumed by counsel, the requested one-third award would not provide an excessive or improper windfall to counsel in this case.[8] That is especially true given the fact that,

---

[8]Although objectors expressed concern about double-counting in this calculation of the lodestar and the multiplier, the Court is persuaded that no such double-counting has taken place here, as plaintiffs' counsel has calculated the multiplier based on the total amount of the settlements with all defendants and their total hours worked on the entire litigation.

17

even after a one-third award of fees, class members would still receive approximately 1.4 times the amount of their actual damages as determined at trial.

Accordingly, the Court concludes, based on a consideration of the *Johnson* factors as applied to the unique circumstances of this case, that the requested fee award of one-third of the Dow settlement fund is reasonable and appropriate in this case, and it will award such fees by separate order.[9]

No class member has objected to counsel's request for reimbursement of expenses from the settlement fund. The Court finds such an award to be reasonable and appropriate, and it will therefore award expenses in the requested amount of $1,545,872.58. Nor has any class member objected to the requested incentive awards for the named plaintiffs, and the Court will also grant such awards as reasonable in this case. Finally, the Court approves the proposed language giving co-lead-counsel the authority to distribute the awarded attorney fees in a fair manner. The Court will enter a separate written order granting the motion for fees, expenses, and incentive payments.

IT IS THEREFORE ORDERED BY THE COURT THAT the objection by class member PMC Global (Doc. # 3263) to class plaintiffs' plan of allocation and distribution

---

[9] It appears from the proposed order submitted by plaintiffs' counsel that they assumed that the one-third award would be calculated before awarded expenses were deducted. The Court concludes, however, that the one-third share is more appropriately calculated *after* the deduction of expenses awarded to counsel (but before deductions for incentive payments for the named plaintiffs).

18

of the Dow settlement fund is hereby **overruled**.

IT IS FURTHER ORDERED BY THE COURT THAT the objections by class members Johns Manville and Whirlpool (Doc. # 3261) and by class member FXI (Doc. # 3262) to plaintiffs' counsel's attorney fee petition are hereby **overruled**.

IT IS SO ORDERED.

Dated this 29th day of July, 2016, in Kansas City, Kansas.

*s/ John W. Lungstrum*
John W. Lungstrum
United States District Judge