**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: URETHANE ANTITRUST LITIGATION | ) | MDL 1616 |
| This Document Relates To: The Polyether Polyol Cases | ) | Civil No. 04-md-1616-JWL-JPO |

**CLASS PLAINTIFFS' MOTION TO APPROVE DISTRIBUTIONS FROM THE DOW SETTLEMENT FUND**

## I. INTRODUCTION

1. The claims process is now complete. By any measure, the process has been a success. Claims were submitted by every one of the top 75 class members and 149 out of the top 150 class members. Indeed, claims were submitted by class members reflecting more than 95% of the Recognized Losses estimated by Plaintiffs' damages expert, a remarkably high percentage. The high claims participation makes all the more impressive that participating Class Members will recover more than 100% of their Recognized Loss, as described more fully below.

2. Now that the claims process is complete, Class Plaintiffs ("Plaintiffs"), by their undersigned counsel, hereby respectfully move this Court to approve: (a) the procedures used, the actions taken, and the determinations made by the Settlement Administrator, Garden City Group, LLC ("GCG"), and by the undersigned Class Counsel relating to the administration of, and proposed distributions from, the settlement fund established in accordance with the Settlement Agreement with The Dow Chemical Company as approved by this Court (the "Dow Settlement Fund"), including the administrative determinations of the Settlement Administrator and Class Counsel in accepting, revising, and rejecting claims in connection therewith; (b) the

payments of certain invoices associated with claims administration; and (c) distribution of settlement funds to approved claimants.

## II. BACKGROUND

3. On July 29, 2016, the District Court granted final approval to the Dow Settlement (Dkt. No. 3274), and also approved Plaintiffs' proposed Plan of Allocation for the Dow Settlement Fund (Dkt. No. 3275).

4. The Notice and Claims process, described in detail below, is now complete, and the Settlement Administrator is prepared to distribute the net Dow Settlement Fund to the Class, on approval by the Court.

5. The current total available balance of the Dow Settlement Fund is $556,980,141 as of the September 30, 2017 Summary of Accounts. Declaration of Angela Ferrante, attached hereto as Exhibit 1 ("Ferrante Decl."), ¶ 46.

6. For the reasons set forth below, Class Counsel recommend distributing the Settlement Fund in two installments: (i) 85% to be distributed as soon as practicable after court approval and the running of the applicable appeal period; and (ii) the remaining approximately 15% at an appropriate and prudent future date. Based thereon, Class Counsel recommend transferring $473,433,120.57 into a new Distribution Account for purposes of making the first installment of payments. The monies in the Distribution Account will be distributed to claimants *pro rata* based on their Recognized Loss Amounts as described below and in accordance with the Estimated Recommended Schedule of Distribution, attached as Exhibit D-1 to the Ferrante Declaration.

7. The Estimated Recommended Schedule of Distribution is "estimated" because percentages and distribution amounts could change before the actual distributions. For example,

Court-ordered changes to the treatment of specific claims or the acceptance of any additional claims could affect percentages and distribution amounts. Should percentages or distribution amounts change, Plaintiffs will submit a revised recommended schedule of distribution to the Court, as they did in the Bayer and the BASF and Huntsman Settlement distribution processes (Dkt. Nos. 1853-1; 2546-1).

## III. CLAIMS ADMINISTRATION PROCESS

8. With the Court's approval, Class Counsel engaged Garden City Group ("GCG") to act as the Settlement Administrator, under the supervision of Class Counsel. GCG is experienced in handling class action settlement notice programs and claims administration.

9. In its capacity as Settlement Administrator, GCG was authorized to: prepare and mail proof of claim forms to Class Members; receive, review and enter data regarding the claim forms that were filed; audit claims when appropriate and necessary; recommend the dollar volume of eligible (and, where appropriate, ineligible) purchases as to each claim filed; and otherwise assist Class Counsel in the claims administration process. GCG's efforts are summarized in the Ferrante Declaration.

10. The Plan of Allocation (the "Plan") called for sending Class Members individualized Proof of Claim Forms that showed the following:

- Direct Purchase Amounts: The Class Member's total net purchases of Polyether Polyol Products between November 24, 2000 and December 31, 2003 (the "Damages Period") in dollars, directly from all of the Defendants. Direct Purchase Amounts were reported by product category (*i.e.*, MDI, TDI, polyols, and systems), as derived from sales data provided by the Defendants.

- Overcharge Percentage: The Class Member's overcharge percentage for each product category, as determined by Plaintiffs' expert on damages.[1] *See* Plan § 1 & Claim Form Part 1.

Each Class Member's Recognized Loss Amount is calculated by multiplying its Direct Purchase Amounts by its Overcharge Percentage in each product category and then adding together the resulting amounts, the total being that Class Member's Recognized Loss Amount.[2] As explained in the Plan, claimants' awards are to be based on their Recognized Loss Amounts. *See* Plan § 3.

11. The Defendants' sales data identified nearly 2,000 Class Members with positive purchase data during the Damages Period. For each such Class Member, InfoTech obtained by product category (i) the Class Member's Direct Purchase Amounts from the database of class member purchases constructed from Defendants' sales records and (ii) the Overcharge Percentage from the damages model constructed by Dr. McClave for presentation at trial.

12. InfoTech then prepared a database consisting of (i) Class Member names; (ii) most current or best street addresses as derived from Defendants' sales data, the work performed during the Bayer and BASF/Huntsman settlement distributions, and the settlement notice programs; (iii) Direct Purchase Amounts for each Class Member for each product category during the Damages Period; and (iv) Overcharge Percentages for each Class Member for each product category.

---

[1] The overcharge percentage is bounded by the Interquartile Range ("IQR") for each modeled product overcharge applicable to that customer so as to compensate claimants based on their estimated damages while eliminating outlier estimates and excessive variability among claimants. *See* Memorandum in Support of Class Plaintiffs' Motion for Approval of Their Plan of Allocation and Distribution of the Dow Settlement Fund at 5-6 (Dkt. No. 3249).

[2] Plaintiffs' expert estimated each Class Member's overcharge percentage to between 14 and 16 decimal points, but the claim forms were simplified to identify overcharge percentages to two decimal points. Total Recognized Loss herein is being calculated based on Plaintiffs' expert's more precise estimates. Therefore, the Recognized Loss amounts listed on the Schedule differ slightly from the calculations based on the figures in the claim forms.

13. GCG, in consultation with Class Counsel and InfoTech, created and sent personalized, pre-printed proof of claim forms to the members of the Class identified in Defendants' purchase data. Ferrante Decl. ¶ 6. The personalized proof of claim forms specified the Direct Purchase Amounts and Overcharge Percentages for each product category.

14. The proof of claim forms instructed claimants that they had two options: (a) they could accept the pre-printed Direct Purchase Amounts appearing on the claim form, in which case claimants did not have to provide any additional proof of their purchases, or (b) they could claim different purchase amounts, in which case claimants were instructed to submit adequate proof that they had purchased the claimed amount of Eligible Products directly from the Defendants in the United States or its territories during the Damages Period. Ferrante Decl. ¶ 6. The Claim Form explained that although a claimant's Direct Purchase Amounts may be contested and adjusted if supported by adequate documentation, the customer-specific Overcharge Percentage could not be challenged. *See* Plan § 1 & Claim Form Part 5, Instructions 4, 6 & 7. A sample proof of claim form is attached as Exhibit A to the Ferrante Declaration.

15. GCG sent personalized claim forms showing no eligible purchases to entities that had Recognized Loss Amounts in connection with the Bayer and/or BASF/Huntsman settlement distributions but did not have Eligible Purchases for purposes of the Dow settlement distribution, either because of changes in the list of Eligible Products or the duration of the period of eligibility. GCG also sent blank claim forms to anyone who requested one during the course of the litigation. This ensured that such Class Members had notice of the claims process and could submit a claim with corrected amounts if they had, in fact, purchased Eligible Products during the Damages Period. Ferrante Decl. ¶ 7.

16. The proof of claim form instructed all claimants to return their claim forms by February 27, 2017.[3] Ferrante Decl. ¶ 6; *see* Claim Form, Part 1 and Part 5, Instruction 1.

17. The Ferrante Declaration, to which Plaintiffs respectfully refer the Court, provides a detailed description of the claims administration process. Specifically, Ms. Ferrante describes the procedures and criteria by which GCG reviewed and evaluated claim forms; GCG's communications with claimants and Class Counsel to evaluate and audit claims; GCG's procedures for, and efforts in, identifying deficiencies in submitted claim forms, notifying claimants of the deficiencies, and allowing claimants to correct and cure the identified deficiencies; the process by which GCG and Class Counsel determined whether to recommend accepting, rejecting, or modifying each claim; GCG's written notifications to claimants whose claims are being recommended for rejection or reduction and the process and deadline for objecting to that recommendation; and how GCG calculated the Recognized Loss Amount for each claim and the resulting Estimated Recommended Schedule of Distribution.

18. More than 1,500 claim forms were submitted. After eliminating duplicative, ineligible, and deficient claims, GCG and Class Counsel recommend that 865 claims be approved for payment. Ferrante Decl. ¶¶ 20, 43.

19. The Defendants' Purchase Data as listed on the preprinted claim forms (the "Undisputed Claims") was accepted by 783 Claimants. Class Counsel and GCG treated the Undisputed Claims as presumptively approved for payment. Ferrante Decl. ¶ 22.

20. A number of Claimants returned claim forms that did not specify the amount of claimed purchases. Many of these were "placeholder" claims, which are claims filed before the claimant or someone acting on behalf of the claimant has determined the extent – or perhaps

[3] In accordance with the Plan of Allocation (Dkt. No. 3248-1), Class Counsel instructed GCG to accept late claims if doing so would not delay the claims administration process. Class Counsel is not recommending that any claims be denied on the basis that they were not submitted by February 27, 2017.

even the existence – of Eligible Purchases. GCG sent a Notice of Claim Deficiency ("Deficiency Notice") to all claimants who did not specify purchase amounts, informing them that if they failed to submit purchase numbers and supporting documentation, their claims would be rejected. The majority of the placeholder claims were withdrawn or abandoned. The claims that responded with purchase numbers were reviewed as disputed claims as set forth below. Ferrante Decl. ¶ 23.

21. GCG received more than one hundred claim forms disputing the purchase information reflected in the Defendants' sales records, claiming either that (i) the claimant had made more purchases than the positive purchase numbers on the claim form they received or the products on their claim form were misclassified (*e.g.*, listed as systems instead of MDI); or (ii) they had made eligible purchases though the Defendants' data showed no Eligible Purchases during the Damages Period ("Disputed Claims"). Ferrante Decl. ¶ 24.

22. The Disputed Claims were first reviewed for completeness. Disputed Claims that did not provide documents to support claimed purchase amounts were sent a Deficiency Notice requiring that documentation be submitted to justify the additional claimed amounts. Many of these Disputed Claims failed to supplement their claim with supporting documents or were affirmatively withdrawn by the Claimants after they received Deficiency Notices, and as a result, are recommended for rejection. Claims that provided supporting documentation were considered for further review to determine eligibility. Ferrante Decl. ¶ 25.

23. All remaining Disputed Claims were then reviewed and evaluated individually to determine whether the Claimant had sufficiently proven qualifying purchases in the amounts claimed. In making this determination, GCG and Class Counsel considered, *inter alia*, the following factors: (i) whether the Claimant had demonstrated that it purchased products within

the Damages Period; (ii) whether the purchases were foreign or U.S. purchases; (iii) whether the Claimant had demonstrated that the products were purchased directly from the Defendants; (iv) whether the Claimant had demonstrated that the products purchased were Eligible Products within the Class definition; and (v) the extent to which the Claimant had documented the amounts of purchases. In many instances, GCG and Class Counsel searched Defendants' Purchase Data, often asked InfoTech to perform additional research, and often conducted independent research into the reasons for discrepancies between the amounts in Defendants' Purchase Data and the amounts claimed by Claimants. Ferrante Decl. ¶ 26.

24. Class Counsel and GCG tried to resolve as many of the issues relating to Disputed Claims as possible through phone calls and e-mails with Claimants. This approach was extremely effective in streamlining the claims review process, and numerous Disputed Claims were resolved in this manner. Ferrante Decl. ¶ 27.

25. Where the informal process was not successful or was deemed unlikely to be successful, GCG sent a personalized letter to the Disputed Claimant whose claimed purchase amounts were to be reduced or rejected, explaining the basis for reduction or rejection and providing the Claimant with another opportunity to submit supplemental proof or argument. *Id.* Some of the Claimants did not respond with any supplemental proof or argument, or affirmatively withdrew their claims and, as a result, are recommended for rejection.

26. Many Disputed Claimants responded to the Deficiency Letters with more information. All responding Claimants' files, including the new information, were re-reviewed. Where Claimants were able to produce sufficient proof of the amounts claimed, their Claims are being recommended for approval. *Id.*

27. A further aspect of the claims review process involved the submission of duplicative claim forms filed by the same Claimant. GCG notified these Claimants of the duplication and informed them that only one Claim Form could be approved for payment. GCG and Class Counsel designated one of the submitted Claim Forms as the primary claim and provided the Claimant with an opportunity to respond with additional information, including with respect to the preferred address for communications and receipt of the settlement proceeds. Ferrante Decl. ¶ 31.

28. In some instances, GCG received competing claim forms from two or more different Claimants with respect to a particular claim, causing a potential duplication of recoveries. In each such instance, GCG and Class Counsel communicated with the competing claimants and suggested that the claimants agree between themselves as to which claimant is the rightful owner of the claim or as to an appropriate allocation of the claim. Class Counsel and GCG tried to resolve as many of these conflicts as possible through phone calls and e-mails with the competing claimants. In some instances, they provided the claimants with additional information as to the purchases at issue in order to clarify who made the purchases. In other instances, they requested from the claimants the legal and factual bases for their claims. This approach was extremely effective in resolving conflicts, and in almost all of these instances, the competing claimants have successfully resolved ownership and/or allocation of the claim. Ferrante Decl. ¶ 35.

29. In only one instance (Reference # 50), the claimants have not resolved fully the ownership and/or allocation issues. With respect to this claim, the competing claimants have agreed that a part of the claim properly is attributed to one of the claimants and so only the remaining portion of the claim is in dispute. GCG and Class Counsel will continue to work

towards resolving this conflict through the date of the Distribution Hearing. To the extent that this claim remains unresolved at the time of the Hearing, Class Counsel will recommend to the Court that the claim be approved based on the full amount in Defendants' Data; that the amounts that are not in dispute be paid as agreed; and that the amounts that continue to be in dispute be retained in the Distribution Fund until such time as the dispute is resolved, either by negotiation, mediation or court process. Class Counsel has informed the affected claimants of this proposal, and they are both agreeable to this recommended approach. Ferrante Decl. ¶ 36.

30. Among the claims received by GCG were five claims submitted by companies that were not related to any defendant during the Damages Period when their purchases of eligible products were made but that are currently subsidiaries of defendants.[4] For the reasons stated below, Class Counsel and GCG recommend that these claims be accepted. Ferrante Decl. ¶ 37. The class herein is defined to include all persons and entities who purchased Polyether Polyol Products directly from a defendant at any time from November 24, 2000 through December 31, 2003 in the United States and its territories, "excluding all governmental entities, any defendants, their employees, and their respective parents, subsidiaries and affiliates." While the class definition excludes defendants and their subsidiaries, it is not clear whether the exclusion applies to a claimant's current corporate status or to its status at the time the purchases in question were made. In resolving this ambiguity, Class Counsel placed considerable weight on the fact that (i) the purchases were impacted by the conspiracy and thus the companies were overcharged; and (ii) the purchases made by these companies were included in plaintiffs' damages model and therefore were reflected in the jury's verdict and the settlement with Dow. Class Counsel recognize, however, that others may weigh factors differently and at least

[4] These claims are identified on the Accepted Claims spreadsheet as Reference #11/Claim #692; Reference #16/Claim # 1002764; Reference #17/Claim # 1001266; Reference #35/Claim #1010006; and Reference #67/Claim #1008190.

one class member has expressed to Class Counsel that any such purchases should be considered ineligible. Given these circumstances, GCG and Class Counsel concluded that the best course was to lay out the relevant facts in this motion, allowing any interested parties to submit argument and enabling the Court to make a final determination as to the eligibility of these purchases.

31. GCG and Class Counsel recommend that a total of 71 of the Disputed Claims be approved as follows: 26 for the full amount requested by the Claimant, 8 for an amount greater than that contained in Defendants' Purchase Data but less than the full amount requested by the Claimant, and 37 for the amount contained in Defendants' Purchase Data (*i.e.*, rejecting just the additional claimed amount). Ferrante Decl. ¶ 29.

32. In addition, GCG and Class Counsel recommend that 56 Disputed Claims be rejected in full. Ferrante Decl. ¶ 30.

## IV. DISTRIBUTION PROCESS

33. Attached as Exhibit D to the Ferrante Declaration is a list of all the Claims filed.

34. Exhibit D-1 lists the 865 Claims that GCG and Class Counsel recommend be approved, in whole or in part. Exhibit D-1 lists, for each claim, the Claim Number; the Reference Number; the Total Recognized Loss Amounts; the Total Estimated Payment Amount (100%); the Estimated Initial Payment Amount (85%); and a short description of the circumstances relating to the claim.

35. As stated above, the results of the claims process were extraordinary. Every one of the Top 75 Class Members (by Recognized Loss Amount) submitted a claim, and 149 of the Top 150 Class Members submitted claims. Indeed, claims were submitted by Class Members reflecting 95% of the Recognized Losses estimated by plaintiffs' damages expert.

36. Class Counsel is not aware of any claims process that comes anywhere close to matching the results achieved here.

37. Exhibit D-2 lists 677 claims that GCG and Class Counsel recommend be rejected in full. Exhibit D-2 lists, for each such claim, the Claim Number; the Reference Number; and a short description of the circumstances relating to the claim.

38. For privacy reasons, these lists identify Claimants only by Claim Number and Reference Number. No names, addresses or Taxpayer I.D. numbers are disclosed.

39. All told, GCG and Class Counsel recommend approval of 865 claims representing a Total Recognized Loss Amount of $519,257,220.68. The September 2017 statement for the Dow Settlement escrow account shows a total available balance of $556,980,141. According to the Plan of Allocation, each Approved Claimant shall be allocated a pro rata share of the Settlement Fund based on its percentage of the Total Recognized Loss Amount, after deduction of reasonable, anticipated further expenses.

40. GCG and Class Counsel recommend that the Settlement Fund be distributed in two installments: (i) 85% of the Settlement Fund to be distributed as soon as practicable after the Court enters a distribution order and the applicable appeal period has run; and (ii) the remaining approximately 15% of the Settlement Fund to be distributed at an appropriate and prudent future date.[5] The purpose of this approach is to retain flexibility in the event that legitimate corrections or adjustments need to be made after the initial settlements payments are distributed or any presently unforeseen claims issues arise. GCG and Class Counsel believe that this approach

[5] To the extent that any Claimants appeal the treatment of their claims, GCG and Class Counsel propose that instead of delaying the distribution to other Class members pending resolution of such appeals, GCG would hold back from the distribution an amount sufficient to pay all such claims in the amounts claimed, in the event that that becomes necessary or appropriate. GCG and Class Counsel will submit an amended Recommended Schedule of Distribution to the Court in that event. If the appealing claimants ultimately do not prevail in full, the extra monies held back would revert to the general Distribution Fund to be allocated to all approved claimants on a *pro rata* basis.

provides sufficient back-up to ensure the integrity of the distribution process. Class Counsel request that the Court authorize a hold back here with the understanding that at an appropriate and prudent future date, Class Counsel will petition the Court for leave to distribute the remaining settlement proceeds to valid claimants on the same pro rata basis used for the initial distribution requested in this Motion.

41. GCG calculated the Estimated Initial Payment Amount for each Approved Claimant listed on Exhibit D-1 in accordance with the Court-approved Plan of Allocation, and using an initial Distribution amount of $473,433,120.57. That amount is 85% of the available balance of the Dow Settlement Fund.[6] Ferrante Decl. ¶¶ 45-46.

42. GCG calculated the Total Estimated Payout Amount using a total distribution amount of $556,980,141, which is the balance in the Dow Settlement Fund as of September 30, 2017. This amount will change as of the time of the final distribution. For example, the amount will increase based on additional interest earned in the fund, as well as any uncashed Class Member checks. In addition, GCG has incurred fees and expenses of $76,224.71 between August 1 and October 15, 2017 that have not yet been billed, and estimates that approximately $164,000 will be expended in reasonable, anticipated further expenses. These include further work on the claims and distribution process, including conducting the initial and supplemental distributions, re-issuing checks as necessary, and other administrative tasks. These expenses also include expenditures associated with preparing tax forms, paying any taxes due on interest earned by the Dow Settlement Fund, and funding any unanticipated costs. Ferrante Decl. ¶ 46. Rather than requesting that the Court set aside a reserve to cover these expenses, Class Counsel

[6] The recommended Approved Payment Amounts for Claimants for whom GCG's initial calculations returned a *pro rata* share of less than $500 have been adjusted upward to $500. Class Counsel and GCG recommend that the Court approve $500 as the minimum payment for each Approved Claim.

recommends that they be paid out of the funds remaining in the Escrow Account and they be accounted for at the time Class Counsel seeks the Court's leave for the final distribution.

43. GCG and Class Counsel recommend that the Court approve GCG's determinations as set forth above and in Exhibit D. After approval by the Court and expiration of the appeal period,[7] GCG will prepare and mail checks to all Approved Claimants for their pro rata shares of the Settlement Fund as set forth in Exhibit D-1 to the Ferrante Declaration. For details of the mechanics of the Distribution, see Ferrante Decl. ¶¶ 50-56.

44. A significant number of claims were filed on behalf of Class Members by Third Party Filers. Now that we are approaching the distribution stage of the settlement process, an issue has arisen as to how the settlement checks should be made out and where they should be sent: whether GCG should (i) make the settlement checks payable to the Class Member and mail the check directly to the Class Member; or (ii) make the settlement checks payable to the Third Party Filer "For the Benefit of" ("FBO") the Class Member and mail the check directly to the Third Party Filer. GCG and Class Counsel recommend that all settlement checks be made payable to and mailed to the Class Member, rather than the Third Party Filer. Ferrante Decl. ¶ 53. The magnitude of the payments in this case are enormous, more than ten times as much as they were in the earlier settlements in this case. Indeed, some of the Dow Settlement claims submitted through Third Party Filers involve recoveries in the many millions of dollars. Under these circumstances, sending negotiable checks to third-party entities rather than the Class Members to whom we have our direct obligation is not the prudent course. The protections

[7] As described above, if any claimants appeal the treatment of their specific claims, Class Counsel propose withholding sufficient funds from the initial distribution to pay such claims in full, proceeding with the distribution to all other claimants, and making any necessary payment adjustments in the supplemental distribution.

available for the Class Members are not sufficient to justify any risk that the settlement monies never make it to their intended beneficiary, the Class Member.[8]

45. In order to encourage Claimants to promptly negotiate their distributions, and to avoid or reduce future expenses relating to unpaid distributions, GCG and Class Counsel recommend that the distribution checks bear the notation, "CASH PROMPTLY. VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT NEGOTIATED WITHIN 90 DAYS AFTER ISSUE DATE." Ferrante Decl. ¶ 56.

46. GCG agreed to be the Settlement Administrator in exchange for payment of its fees and expenses. Class Counsel have been billed and received reports of all of the work GCG performed with respect to the administration of the Settlement, and authorized all of the claims administration work GCG performed. Since settlement approval, GCG has been paid a total of $320,658.64 out of the Dow Settlement Fund for the work it reasonably performed through July 31, 2017. Ferrante Decl. ¶ 57. For a summary of that work, see Ferrante Decl., *passim* & Exh. E. Plaintiffs request that the Court find that those expenses were reasonable.

47. During the claims administration process, InfoTech consulted with Class Counsel as to the eligibility of products listed in Class Members' claims. InfoTech also provided information on the billing and shipping locations of class member purchases which were used in resolving disputes between competing claimants. Since settlement approval, InfoTech has been paid a total $32,675.00 out of the Settlement Fund for the work it reasonably performed through August 31, 2017. Plaintiffs request that the Court find that those expenses were reasonable.

48. As contemplated by § 4 of the Plan of Allocation, at least 21 days before the date of the hearing on this Motion ("Distribution Hearing"), GCG will mail letters to claimants whose

[8] Mailing checks to Class Members is not and should not be interpreted as a resolution by GCG or Class Counsel, in form or substance, of any claims between the Class Member and Third Party Filer. It is simply a protocol to complete the claims distribution process in a timely and efficient manner.

claims were rejected *in toto* and to those whose claims were reduced in the review and audit process. The letters will inform the claimants of the rejection or modification of their claims, the procedures for disputing those determinations, the deadline for doing so, and the time and date of the Distribution Hearing. *See* Ferrante Decl. ¶ 48.

49. Class Counsel and GCG will continue to work closely with claimants until the Distribution Hearing to eliminate or reduce the number of potential disputes relating to claimants' recommended Recognized Loss Amount. *See* Ferrante Decl. ¶ 49.

## V. CONCLUSION

50. For the foregoing reasons, Plaintiffs respectfully request that the Court enter the proposed Order authorizing the distributions from the Dow Settlement Fund as requested in this Motion.

DATED: November 6, 2017

Respectfully submitted,

/s/ Robert W. Coykendall

Robert W. Coykendall, No.10137
Robert N. Walter, No.08620
Morris, Laing, Evans, Brock &
Kennedy, Chartered
Old Town Square
300 North Mead – Suite 200
Wichita, KS 67202
Tel: (316) 262-2671
Fax: (316) 262-5991

**Plaintiffs' Liaison Counsel**

Donald L. Perelman
Roberta D. Liebenberg
Gerard A. Dever
Paul Costa
Matthew Duncan
Mary Russell
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19103
Tel: (215) 567-6565
Fax: (215) 568-5872

Richard A. Koffman
Kit A. Pierson
Christopher J. Cormier
Sharon K. Robertson
Laura Alexander
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, N. W.,
Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

**Plaintiffs' Co-Lead Counsel**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of November, 2017, I caused the foregoing Class Plaintiffs' Motion to Approve Distributions from the Dow Settlement Fund to be electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel who have registered for receipt of documents filed in this matter.

*/s/ Robert W. Coykendall*
Robert W. Coykendall